**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLICATION OF BENJAMIN STEINMETZ FOR AN ORDER TO TAKE DISCOVERY FROM VALE S.A., VALE AMERICAS INC., RIO TINTO PLC, AND RIO TINTO LIMITED PURSUANT TO 28 U.S.C. § 1782 | Case No.  _____ |

<u>**DECLARATION OF DR. AVI YANUS IN SUPPORT OF APPLICATION FOR AN ORDER TO TAKE DISCOVERY FROM VALE S.A., VALE AMERICAS INC., RIO TINTO PLC, AND RIO TINTO LIMITED PURSUANT TO 28 U.S.C. § 1782**</u>

Pursuant to 28 U.S.C. § 1746, I, **Dr. Avi Yanus**, hereby declare and state as follows:

1.      I am a citizen of the United Kingdom and a citizen of the State of Israel.

2.      I am the sole director of B.C. Strategy UK Ltd. ("**Black Cube**," the "**Company**," or "**BC**") and have been so since the founding of the company in 2012.  I hold a bachelor's degree (with honors) in economics and management from the Technion – Israel Institute of Technology, a master's degree (with honors) in business administration from Tel Aviv University, and a Ph.D. in business administration from Tel Aviv University.

3.      I submit this Declaration in support of the Application of Benjamin Steinmetz ("**Steinmetz**")  under 28 U.S.C. § 1782 to take discovery from Vale S.A., Vale Americas Inc., Rio Tinto plc, and Rio Tinto Limited for use in legal proceedings in the U.K. originated from a joint venture entered into between Vale S.A. ("**Vale**") and BSG Resources Limited ("**BSGR**"), in April 2010, to develop an iron ore mining concession in Eastern Guinea, believed to be one of the largest untapped deposit of iron ore in the world ("**Simandou**").

4.     The information contained in this statement is based upon my own knowledge and/or belief, except where stated otherwise. When information is not based upon my own knowledge, I will explain the source of the information and/or belief.

## I.     **Background**

5.     Black Cube is a business intelligence firm.  The Company owns, through B.C. Strategy Ltd. (Israel), the Black Cube brand in Israel, the United Kingdom, the European Union, the United States, and 25 other jurisdictions.

6.     Black Cube is comprised of a select group of veterans of special units in the Israeli intelligence community and skilled intelligence officers with a background in law and finance.  The Company has over 120 employees, including attorneys, economists, and financial professionals, who use a combination of their legal, business, and intelligence experience.  Black Cube's offices are located in London, Tel Aviv, and Madrid, and its client base includes international corporations and international law firms.

7.     The Company is engaged for its expertise in intelligence collection and analysis, specifically in support of legal proceedings and arbitrations of extraordinary complexity and international scope, such as disputes that are litigated in several jurisdictions simultaneously, complex white-collar disputes, international investment disputes, and asset tracing and enforcement.

8.     Black Cube's general operating procedures and methodologies are tailor-made in accordance with legal advice and guidance obtained from top-tier law firms in the U.S., England, and Israel.  In addition, Black Cube obtains legal advice from external counsel regarding the jurisdictions in which it operates in a specific case in order to verify and affirm that the methodologies used are in compliance with relevant criminal law.

## II.     The Investigation's Background

9.     We have been informed of certain facts regarding the dispute originated from a joint venture agreement entered into between BSGR and Vale in April 2010 to develop the Simandou iron ore deposit.

10.     BSGR was granted prospecting permits for areas referred to as Simandou North and South by the Guinean government in February 2006.  Following successful exploration operations and the submission of a feasibility study, BSGR signed a base convention with the Government of Guinea in December 2009 and was subsequently awarded a mining concession for Zogota, a mining region located in Simandou South, in March 2010.  In addition, BSGR was granted prospecting permits for areas referred to as Simandou Blocks 1 and 2 in December 2008.  The Zogota concession and the Simandou Blocks 1 and 2 concessions (the "**Mining Rights**") were the assets chosen for development by BSGR and Vale's joint venture.

11.     In 2009, Vale approached BSGR to buy an interest in these mining rights.

12.     In March 2010, BSGR and Vale began negotiating a joint venture. During these negotiations, Vale contracted several law and accountancy firms, as well as a risk assessment company, in order to conduct its due diligence prior to entering the joint venture.

13.     On April 30, 2010, upon the completion of the due diligence process and approval of the transaction by Vale's board, Vale entered into a joint venture with BSGR to develop the Mining Rights.

14.     In October 2012, a technical committee organized by the newly-appointed Government of Guinea notified Vale and BSGR's joint venture, Vale BSGR (Guinea) Limited (the "**Joint Venture**" or "**VBG**"),  that it was evaluating the manner in which BSGR had obtained the Mining Rights.  The technical committee explained that it was investigating allegations that BSGR

had acquired the Mining Rights through bribery of Guinean government officials, including Mamadie Touré, the fourth wife of the late President Lansana Conté.

15.     On April 17, 2014, the Government of Guinea revoked the Mining Rights, alleging that BSGR had engaged in bribery and corruption.

16.     On April 28, 2014, Vale filed its request for arbitration with the LCIA, seeking the return of the US $500 million it paid to BSGR, along with approximately $700 million it claimed to have spent on the development of the Mining Rights.  Vale also sought the rescission of the Joint Venture agreements.

17.     Vale's main claims in the arbitration were as follows: (i) Vale had no knowledge of any wrongdoings which led to BSGR obtaining the Mining Rights; and (ii) Vale relied on BSGR's representations as well as its belief that the Mining Rights were acquired lawfully while entering the Joint Venture.  Vale claimed that had it not relied on the representations made by BSGR, it would not have entered into the Joint Venture.

18.     The arbitration tribunal issued its final award on April 4, 2019, holding BSGR liable on each of Vale's claims, and awarding Vale US $1,246,580,846 in damages, as well as pre and post award interest, costs, and legal fees.

III.   **Black Cube's Investigation**

19.    On December 29, 2019, Black Cube began investigating the events leading up to the dispute, focusing on Vale's knowledge of BSGR's alleged misconduct in obtaining the Mining Rights.  Mr. Steinmetz commissioned Black Cube with regards to this investigation.

20.    Black Cube's research team performed comprehensive research across multiple sources: public registries in numerous jurisdictions, various documents pertaining to the matter, social media profiles, open-source information obtained by deep web analysis, web mapping services and multiple databases and database aggregators such as Lexis Diligence, Pipl, Checkr, D&B and more.

21.    In addition to conducting open source research, during the investigation Black Cube also contacted a number of individuals who are familiar with the case and the relevant parties.  The objective of these in-person meetings was to obtain information relevant to the case through conversation with the individuals.  The conversations took place in person during meetings in public places or through video conference calls or telephone calls.

22.    The conversations were recorded during these meetings.  Needless to say, recordings are only made in jurisdictions where it is lawful to record a conversation with consent from only one of the parties to the conversation ("**one-party consent states**").  It should further be noted that when required by the laws of the relevant jurisdiction, Black Cube also utilizes licensed local investigation firms to assist with its investigations.

23.    Each conversation is recorded from start to finish, without breaks, and multiple recording devices are used to ensure that all statements are captured during the meeting.  Black Cube preserves each of the audio recordings in its entirety and does not alter the original recordings in any way.

24. The individuals with whom Black Cube made contact and provided relevant evidence are listed below, along with the date and location(s) of Black Cube's meetings with those individuals:

**A. Mr. Jose Carlos Martins ("Martins")**

25. Jose Carlos Martins is a Brazilian citizen. Martins was an Executive Director at Vale between 2004 and 2014. Martins is the most senior person in Vale that was involved in the deal that is still alive today.

26. Martins was the head of the Iron Ore division at Vale and one of the key figures in facilitating the Joint Venture between Vale and BSGR at the time of the aforementioned events. Martins was highly involved in negotiations with BSGR, the due diligence process, and the approval of the Joint Venture by Vale's board of directors.

27. Black Cube's agent met Martins three times, on February 12, 2020 and February 13, 2020 in New York State, U.S. and on March 30, 2020 on a Skype video call, while Black Cube's agent was in Israel. Black Cube's agent presented himself as a partner in an investment consultancy firm.

28. All three conversations with Martins were conducted in English, recorded using a recording device and transcribed. The meetings were held in a friendly and relaxed environment. The information provided by Martins was given in a completely voluntary manner.

**B. Mr. Alex Monteiro ("Monteiro")**

29. Alex Monteiro is a Brazilian citizen. Monteiro was employed by Vale between 2006 and 2014 and served as General Manager of Corporate Mergers & Acquisitions between 2010 and 2011 and as Director of Mergers & Acquisitions between 2011 and 2014.

30. Monteiro was heavily involved in the due diligence process Vale conducted prior to entering the Joint Venture with BSGR during the time of the aforementioned events.

6

31.     Black Cube's agent met Monteiro once, on March 30, 2020 on a Skype video call, while Black Cube's agent was situated in Israel. Black Cube's agent presented himself as an independent financial advisor.

32.     The conversation with Monteiro was conducted in English, recorded using a recording device, and transcribed.  The meeting was held in a friendly and relaxed environment. The information provided by Monteiro was given in a completely voluntary manner.

**C.     Mr. Denis Thirouin ("Thirouin")**

33.     Thirouin is a French citizen who is based in Paris, France.  Thirouin was a mining consultant for Vale in Guinea.

34.     Thirouin played a crucial role in assisting Vale's team in Guinea during the due diligence process.  Therefore, Thirouin was exposed to the parties' understandings of each other's representations and their real time perceptions of what had occurred prior to the negotiations stage.

35.     Black Cube's agent held a WhatsApp call and a phone call with Thirouin, on May 3, 2020 and May 14, 2020 while the agent was situated in Israel.  Black Cube's agent presented himself as a partner in an advisory firm.

36.     The conversation with Thirouin was conducted in French, recorded using a recording device and transcribed.  The phone conversations were held in a friendly and relaxed environment. The information provided by Thirouin was given in a completely voluntary manner.

IV.     **Black Cube's Findings**

37.     As described below, Black Cube's operations provided trustworthy evidence which indicates the following:[1]

**A.     Vale was desperate to obtain the Mining Rights at Simandou.**

38.     During the first meeting with Martins, he mentioned that Vale was highly motivated to enter the Joint Venture, as Simandou was the "only open door in Africa" to maintain Vale's iron ore market share:

| | |
|---|---|
| **Martins** | ***It was very important, it was the only door open****. |
| **BC Agent** | *In Africa?* |
| **Martins** | *In Africa.* |
| **BC Agent** | *So, you wanted to be in Africa?* |
| **Martins** | ***Yeah****. **We want to go in this tenement***. Unfortunately, you don't have this in Fifth Avenue.* |

39.     In addition, Martins described how several members of Vale's board applied pressure in favor of entering the Joint Venture due to their affiliations with Brazil's then-president, Luiz Inácio Lula da Silva ("**Lula**"), who sought to increase Brazil's influence in Africa at the time:

| | |
|---|---|
| **Martins** | *I believe it's because the very nature of the company. Vale is not state-owned, but **the government has a lot of participation in it**. At the time, the Brazilian president, Lula--.* |
| **BC Agent** | *Lula. He was in prison?* |

---

[1] All the citations referred to below are based on all of the raw recordings produced in the meetings.  Bracketed phrases "[]", were added by BC when needed.

| | |
|---|---|
| **Martins** | *Yeah. **He was willing to go to Africa. Brazil has to be close to Africa. So,*** |
| | ***he supported it. So, all the guys in the board that were from the*** |
| | ***government, supported him.*** |

**B.    Vale believed there was something wrong with the way the concessions were obtained by BSGR prior to entering into the Joint Venture agreement.**

40.    When Martins began describing the events which led to Vale entering the Joint Venture with BSGR, he immediately concluded the sequence of events by mentioning that despite being a good deal that was well-structured, there was a fault in its origin.

| | |
|---|---|
| **Martins** | *So, it took six months negotiating the value and also making the due diligence,* |
| | *okay? And, as I told you, we make a business plan for the mine, 50% each,* |
| | *and the business value was 5 billion. That NPV, the NPV of the investment* |
| | *and—was 5 billion, so we bought 50%. And there we have to carry the* |
| | *partner, we'll gonna make a whole investment and he'll pay his part using the* |
| | *future profit. There is a very good interest rates—The deal was very well* |
| | *structured, okay? **But there was a fault in the origin.*** |

41.    Martins also mentioned that Vale's "first hint" was that BSGR could not have obtained the concessions because of Steinmetz's blue eyes, as the granting of the license made no sense to anyone in the mining industry:

| | |
|---|---|
| **Martins** | *This guy, this Jewish guy, because of his close relationship, big and* |
| | *beautiful blue eyes.* |
| **BC Agent** | *He is?* |
| **Martins** | *Yeah, actually, he has blue eyes.* |
| **BC Agent** | *Okay. Because you called him 'blue eyes', so I was wondering if he really* |
| | *has blue eyes.* |

9

| | |
|---|---|
| **Martins** | *No, no, blue eyes. The name is Benjamin Steinmetz.* |
| **BC Agent** | *Okay.* |
| **Martins** | *He's Jewish, lives in Israel--.* |
| **BC Agent** | *Never heard of him.* |
| **Martins** | *So, **he won the tenement. And nobody in the mining industry got it.*** |
| | ***Why?** So, **that was the first hint**, okay? but was **not only because of his** |
| | ***blue eyes, but he got it**.* |

42.    Martins continued to describe how despite Vale's understanding that the Mining Rights must have been obtained by alleged misconduct, it decided to turn a blind eye and enter the deal, due to its lucrativeness:

| | |
|---|---|
| **Martins** | *I always said, 'Why this guy got this beautiful tenement? Because of his blue eyes, beautiful blue eyes? **It's impossible. Something wrong is here**.'* |
| **BC Agent** | *So, you felt it?* |
| **Martins** | *I felt. **And I talk in the board, I told this, 'Look, we are entering this business, but we are closing our eyes**.' So--.* |
| **BC Agent** | *Closing eyes, like the monkeys, huh?* |
| **Martins** | *Yeah, yeah.* |
| **BC Agent** | *Because you probably wanted a deal.* |
| **Martins** | ***Yeah, yeah, because it's the only way to get into**.* |

43.    At a different stage in the conversation, Martins described how these sentiments were not hidden from Vale's board of directors, who did not like the idea of engaging in a transaction under such circumstances, but decided to proceed anyways, as this opportunity was considered important for the company:

10

**BC Agent**     *What was the reaction in the Vale board of directors when you say,*

                    *'Something doesn't smell right.'?*

**Martins**     ***They didn't like it. They didn't like but they accept****.*

**BC Agent**     *Because the deal was good?*

**Martins**     ***Was important for the company****.*

**BC Agent**     *Was what?*

**Martins**     ***It was very important****.*

44.    When Monteiro was asked about Vale's state of mind prior to the signing of the Joint Venture agreements, he echoed Martins' statement that there was a "bad smell" to the deal and added that several directors at Vale attempted to persuade Vale's CEO Roger Agnelli ("**Agnelli**") to refrain from entering the Joint Venture at that stage:  Monteiro even stressed that due to these failed attempts, his superior, Vale's CFO at the time Fabio Barbosa, stepped down from his position:

**Monteiro**     *That **I believe that he** [the CEO] **was kind of more, aggressive than I***

                ***believe that he should be. A lot of people tried to convince him***, *my*

                *boss left the company because of that and so on.*

**BC Agent**     *Oh, okay.*

**Monteiro**     *Because-- yeah, because we were not-- by the end of the day, **we were***

                ***not able to convince him***. *And of course the reason why we were not*

                *able to convince him was that because we didn't have any credible*

                *allegation. All the diligence we did was fine, **but still, there was that***

                ***smell of something that could have been done wrongly****.*

45. At a certain point during the conversation with Martins, Martins mentioned that there was "no doubt" that there was something wrong with the way the concessions were obtained by BSGR:

| Martins | *The guy was very good relationship all over the world. And well-looking and good speech, and so and so.* ***But we know that something was wrong, we have no doubt about it.*** |
|---|---|
| BC Agent | *No doubt?* |
| Martins | ***No doubt.*** |

C. **Vale's beliefs about the way the concessions were obtained by BSGR were supported by BHP and Rio Tinto prior to signing the agreement.**

46. During the second meeting with Martins, he mentioned that at a certain point during the negotiations with BSGR, Vale was told by BHP Group Limited ("**BHP**") and Rio Tinto Limited ("**Rio Tinto**"), who hired a private intelligence company, that BSGR's Mining Rights had been obtained through alleged misconduct:

| Martins | *First, the competitors, always talking to us that: 'Oh, don't do it because there is something wrong there'.* |
|---|---|
| BC Agent | *Okay.* |
| Martins | *Okay? '**We made investigation--.**'* |
| BC Agent | *Ah, they said they made investigation?* |
| Martins | *Yeah.* |
| BC Agent | *Who is the competitors?* |
| Martins | ***BHP and Rio***. |

47. Martins further disclosed that this information was presented to Vale's board of directors:

| | |
|---|---|
| **Martins** | *The competitors also told us, okay?* **Rio Tinto and BHP, because they were involved also**-- *this, I better not to get involved with this guy--.* |
| **BC Agent** | *Ah, so they told you.* |
| **Martins** | **They told me**. |
| **BC Agent** | *And* **the board knew about that**. |
| **Martins** | **Everybody knows about it, there was no secret, okay?** |

48.    Subsequently, Martins elaborated as to how BHP and Rio Tinto's investigators obtained this information from BSGR's inner circle:

| | |
|---|---|
| **Martins** | *They hired some intelligence company--.* |
| **BC Agent** | *Umm-hmm.* |
| **Martins** | *-normally it's from Israel.* |
| **BC Agent** | *Okay.* |
| **Martins** | *And the company was also from Israel,* **so they got someone almost insider**, *okay?* |
| **BC Agent** | *Ah, really?* |
| **Martins** | *Yeah. Because this guy--.* |
| **BC Agent** | *So,* **how come there was no proof if they hired an intelligence**--. |
| **Martins** | *Oh,* **it's because people talk, but they don't put on paper**. |
| **BC Agent** | *Okay. So, just talking?* |
| **Martins** | *Yeah,* **it was talk** *because, you know, this guy, Steinmetz, all the-- all his officers came from Israeli spy agents, what's the name, it's--.* |
| **BC Agent** | *Okay. It's not CIA, CIA is America--.* |
| **Martins** | *It's a kind of--.* |

**BC Agent**   *Yeah, okay.*

**Martins**   *-more efficient, more efficient than CIA. So, they, oh my God, the name comes and goes. So, in this area, Israel is the most developed country in surveillance, they go to the cloud, they get everything is in cloud.*

**BC Agent**   *So, we have to be careful*

**Martins**   *Yes. No, no, it's true. Later I'll tell you why. And—So, they're having a relationship with them--.*

**BC Agent**   *So, the competition hired, hired some--.*

**Martins**   ***Another agents, another company--.***

**BC Agent**   *-to find some proof--.*

**Martins**   *-yeah, yes.*

**BC Agent**   *-some, some.*

**Martins**   *There was no proof, **but the guys talked to each other**.*

**BC Agent**   *Okay.*

**Martins**   *So, **they get the information that something's wrong**.*

**BC Agent**   *And they gave it to you.*

**Martins**   ***And they told us--.***

49.    Martins concluded the story by using the Portuguese proverb, "we witnessed the miracle, yet not the saint", which means Vale was told what others believed had occurred, but was not told the exact circumstances of how this supposedly happened:

**Martins**   ***They told us the, the miracle but they don't told us the Saint**, okay?*

14

> *But they told, 'Okay, **we know that there was some monkey business***
>
> ***here, you are putting your hands in something that is dirty**, blah, blah,*
>
> *blah, blah'.*

**BC Agent**    *And that's—the board knew?*

**Martins**    ***Knew**.*

50.    Martins also stressed that Vale's board knew about this information, yet decided to take the risk of proceeding with the deal:

**BC Agent**    *And the board was aware of everything?*

**Martins**    ***And board was aware of everything**. But, you know, it is the only door*

> *open. We enter this door--.*

**BC Agent**    *Because it was open.*

**Martins**    ***That's only the door open, so-- And then we run the risk.***

**D.    Vale realized the validity of the permit had been flawed due to lack of parliamentary confirmation.**

51.    Another cause for Vale's doubtfulness regarding the legal validity of BSGR's Mining Rights was that Guinean law mandates that any granting of mining licenses in the country must be confirmed by the Guinean parliament.  Since the Guinean parliament was dissolved at the time, Vale suspected that BSGR's concessions might not be valid.

52.    Monteiro explained Vale's doubts during his meeting in detail:

**Monteiro**    *It was mainly because there was a rule in Guinea that the Parliament*

> *has to confirm a permit that is given, a permit that's given to a mining*
>
> *company. **And in that case, because there was no parliament at that***
>
> ***time, because the government had to dissolve the Parliament, then that***
>
> ***guy did not went through that process**.*

15

| | |
|---|---|
| **BC Agent** | *Umm-hmm.* |
| **Monteiro** | *So, he said, 'Well, **the validity of the permit is not 100% because he has not been through a parliament confirmation**.'* |

53.     Monteiro continued to describe how, as a result of these doubts, some of Vale's directors urged Vale's CEO at the time, Agnelli, not to pay BSGR "a penny" but rather to put the money in escrow, and let the new Guinean government to run its own investigation and due diligence process in order to secure Vale:

| | |
|---|---|
| **Monteiro** | *Actually, at that time, **the CEO of Vale was quite keen on acquiring those assets.*** |
| **BC Agent** | *Umm-hmm.* |
| **Monteiro** | ***Our recommendation was to put everything on escrow**.* |
| **BC Agent** | *Umm-hmm.* |
| **Monteiro** | ***Do not pay one penny to the guy**--.* |
| **BC Agent** | *Yeah.* |
| **Monteiro** | *-until we could-- because there was to happen a changing government in Guinea. So, **what we recommended was that, 'Let's put everything in escrow until the new government takes place, runs its diligence, its investigation, and then we are secure**.' But the president-- the CEO at that time was so-- he was very afraid that the Chinese could put their hands on those reserves--.* |
| **BC Agent** | *Umm-hmm.* |
| **Monteiro** | *And China is the largest customer of Vale.* |

54.     When Martins was asked about Vale's risk assessment regarding the transaction, he emphasized Vale's inability to anticipate the new Guinean government's change of approach rather

than Vale's awareness of the alleged wrongdoings which led to BSGR obtaining the Simandou concessions:

| | |
|---|---|
| **Martins** | *So, that was the situation. **It was a big mistake from our side because we never thought about that the new government will change everything**. And it was very interesting.* |
| **BC Agent** | *So, **actually you went to the deal--**.* |
| **Martins** | ***Knowing**.* |
| **BC Agent** | *-knowing that there is a problem with the—it was obtained by--.* |
| **Martins** | ***Yes. We know but there is no proof**.* |

**E.    Vale signed and approved the deal despite its belief that the Mining Rights were improperly obtained by BSGR.**

55.    During the course of multiple meetings with Vale's executives, Black Cube's agents encountered numerous statements that Vale "knew" that alleged wrongdoings led BSGR to obtaining the Mining Rights, despite not finding any concrete evidence to support these allegations during the due diligence process.

56.    However, since the Joint Venture was a crucial and unique business opportunity, Vale decided to enter the agreement and to approve it at the board level.

57.    When Martins was asked about the way Vale viewed the deal, he compared the situation to intimate relations with a beautiful girl that has HIV:

| | |
|---|---|
| **Martins** | ***Everybody knows that there was something wrong**.* |
| **BC Agent** | *Everybody?* |
| **Martins** | ***Everybody**.* |
| **BC Agent** | *All the, all the board. Not only you? They understood that something was wrong?* |

| Martins | *Myself, the CEO. But **it was so important not to let this buying to get the competition hands**, you know--.* |
| BC Agent | *So, you decided to go ahead with the deal--.* |
| Martins | *Not to use—like you get a beautiful girl--.* |
| BC Agent | *I like it.* |
| Martins | *-**you bring her to your room, she's naked, marvelous, and then she says: 'A little problem, maybe I am with AIDS'**, okay? It's a problem.* |
| BC Agent | *So, everybody knew there's something wrong in there?* |
| Martins | *Yeah.* |

58.   When Thirouin was asked about Vale's understanding of the manner in which the concessions were obtained, he stressed that Vale was fully aware of these concerns (translated from French):

| BC Agent | *Did they, did they-- when Vale started the partnership, **did they know-- were they aware of the way the license had been obtained by the partner?*** |
| Thirouin | ***Oh well, obviously, yes. They were aware, right.** Even if-- well, you know, really, people talk. If you will, all of this goes through ministries, so, people talk about it, really.* |

59.   Thirouin stated that there was a difference between the level of knowledge Vale's geologists had in comparison to its higher management, yet emphasized that the latter group was fully aware:

| Thirouin | *Sometimes, the people who investigated in the field are not exactly aware of what happened. And in the case of Vale, that is what* |

18

*happened. The geologists with whom I worked, they are the-- so,*

*we made sure that all the documents were in order, and then after*

*that, general management in Brazil took over. **So, it is someone***

***from general management who fiddled with another partner.***

**BC Agent**   ***Yes. And so, Vale knew perfectly well about the way the license***

***had been obtained by the partner?***

**Thirouin**   ***Well yes, of course.***

60.   In addition, Thirouin confirmed that it was within Vale's interests that nothing be found in the due diligence process, enabling the deal to move forward:

**BC Agent**   *Yes, but that's what I'd like to understand, it is that Vale, from the*

*beginning, was aware of the way the **license** had been obtained by*

*the partner. And so, so, **was it in its interest that nothing would be***

***found in the due diligence?***

**Thirouin**   ***Obviously.***

61.   Martins further described how Vale's board shared the officers' awareness of the problematic nature of the Mining Rights:

**BC Agent**   *In the board there was a discussion if to go to the deal or not. So, the CFO*

*was against?*

**Martins**   *Yeah, but this is—was in the officer's level, okay?*

**BC Agent**   *After?*

**Martins**   *In the officer's level. **When you go to the board--**.*

**BC Agent**   *Yes.*

| | |
|---|---|
| **Martins** | *-only one position, our CEO was very strong.* |
| **BC Agent** | *And he was for, for the deal?* |
| **Martins** | *Yeah, in favour of the deal.* ***I was in favour of the deal; I was in charge of the business.*** |
| **BC Agent** | *All the board knew about the question marks—about the problematics--* |
| **Martins** | *Yeah, yeah.* |
| **BC Agent** | *Yes.* |
| **Martins** | ***We never, we never hide, okay? Never hide.*** |
| **BC Agent** | *Okay, so it was open on the board that--.* |
| **Martins** | ***It was open, okay?*** |
| **BC Agent** | ***That it's Africa, and the way it was obtained--.*** |
| **Martins** | ***Yeah.*** |

62.    Martins disclosed that the board was fully aware that it is impossible to invest in Africa without "getting your hands dirty."  Therefore, despite knowing how the concessions were obtained, Vale's board voted in favor of the deal unanimously:

| | |
|---|---|
| **Martins** | *So, such countries like Africa,* ***it's very difficult to go to Africa without get your hands dirty some way.*** |
| **BC Agent** | *And you said that the board knew about that?* |
| **Martins** | ***Yeah. They know completely,*** *cause they know, in the past in Brazil was the same.* |
| **BC Agent** | *And there was no part of the board that was against the deal completely?* |
| **Martins** | *No, no, no.* |
| **BC Agent** | *So, everybody was for the board.* |

| | |
|---|---|
| **Martins** | *Everybody is in favour, there is no vote against--.* |
| **BC Agent** | *Without all the red flags and the nose closed and--.* |
| **Martins** | *No vote against it. 100% in favor of doing the deal.* |
| **BC Agent** | *And they knew it's Africa, they knew the deal was very fishy?* |
| **Martins** | *Yeah, there was some issues involved.* |

63.     Martins' reference to similar practices in Brazil in the past serves as an additional indication of the content of Vale's "knowledge."  This is a clear reference to a culture of corruption which was widespread in Brazilian politics.

64.     During the third meeting with Martins, he mentioned that the discussion regarding the alleged wrongdoings that led to obtaining the Mining Rights was never recorded in Vale's board meeting minutes:

| | |
|---|---|
| **BC Agent** | *I want to ask you, one other thing is, when you put everything to the board, you said everything was on the table for the board, everything in the board also was written on a protocol for the board?* |
| **Martins** | *Yes.* |
| **BC Agent** | *Or something you say, 'No, we don't write it because it doesn't smell good.', or something like that?* |
| **Martins** | *No, no. We only wrote-- what is our intuition was not written, okay, was told.* |
| **BC Agent** | *So, it wasn't written in the papers?* |
| **Martins** | *Was not written.* |
| **BC Agent** | *So--.* |
| **Martins** | *We told everything we did in the due diligence process. Everything we did, we looked this, we looked that, blah, blah, blah.* |

| | |
|---|---|
| **BC Agent** | *No, no, but all your-- before the due diligence,* **all your thoughts and suspicions about--.** |
| **Martins** | **No, no.** |
| **BC Agent** | *No, it wasn't written?* |
| **Martins** | **Only told***.* |
| **BC Agent** | *Ah, okay.* |
| **Martins** | *Because if it was written--.* |
| **BC Agent** | *Then it's a problem?* |
| **Martins** | **Even when we told one of the board members said, 'Don't tell me, I don't want to know at all.'** *We don't want [...] at all--.* |
| **BC Agent** | *'I want to go ahead with a deal, don't tell me.'* |
| **Martins** | *Yeah, yeah.* |
| **BC Agent** | *Okay.* |
| **Martins** | **You prove it's good strategically so, we're gonna give you***, I would say,* **go ahead, but don't tell me anything else***. But I have to tell because was important to tell, okay.* |

65.     Martins later stressed that despite the results of the completed due diligence process, which did not find any evidence of misconduct, he notified the board of his belief that there was "something wrong" with the deal and that moving forward with the Joint Venture would necessitate doing so with Vale's "nose closed."  Martins further mentioned that the board was reluctant to hear anything further regarding the matter and the board ultimately approved the deal:

| | |
|---|---|
| **Martins** | *So, my suspicion was giving-- when I told them,* **'Look, although we didn't find anything wrong, although it's very good for the company, I needed to** |

**say that I'm going for it, I'm proposing it with my nose closed because I smell something wrong**.' *Because the guy didn't get this, it was one of the best resource in the world. So, the guy wouldn't get it only because he has blue eyes and beautiful eyes, okay.*

**BC Agent**   *Yes.*

**Martins**   *Nothing wrong happened, but we didn't found anything at all. So, that's-- it's only the additional information we gave, and we told the board, look, the CEO was with me because-- the CEO, he's the one that present the proposal, okay. We were together only to confirm the numbers, confirm the premises and--.*

**BC Agent**   *Yes.*

**Martins**   *-the assumptions, and everything.* **But he proposed the deal, and we told them, 'Look, something wrong',** *and the CEO told the same things. And at the end, the board said, '***Okay, let's go. Don't tell anything more. Let's go for it.***'*

66.    Furthermore, despite warnings from Vale's officers, Vale's board remained keen on approving the Joint Venture, as long as the due diligence process showed no evidence of wrongdoings:

**Martins**   *I already talked the board, okay?*

**BC Agent**   *No, but, sometimes in the board, you know, some people really think 'okay, no problem, we don't know anything, we continue'.*

**Martins**   **No question was raised as long as the due diligence showed nothing.**

67.     Following the completion of the due diligence process and the presentation of red flags that raised by the due diligence team and the c-level officers, Vale's board still decided to approve the deal with full knowledge:

**BC Agent**    *There was a big argument in the board for the, for this-- when you said you*

*don't-- you have to close the nose in order not to smell.*

**Martins**    ***Not too much.***

**BC Agent**    *Because-- why? Because it's very-- it was very important--.*

**Martins**    ***Everybody was willing to do it.***

**BC Agent**    *Because it was very important to--.*

**Martins**    ***It was very important for the company to do it, so, it went through easily***.

**BC Agent**    *Even though **you raised red flags all the way**?*

**Martins**    ***Clearly***.

68.     Martins clarified that the board's approval followed a detailed explanation of the "history" of the Mining Rights following the conclusion of the due diligence process:

**BC Agent**    *So, you were in the board, you were against the deal?*

**Martins**    *No, I was in favour.*

**BC Agent**    *In favour?*

**Martins**    *I proposed the deal.*

**BC Agent**    *Ah, you proposed the deal?*

**Martins**    ***I told-- All the history, okay? The board decided knowing everything.***

**BC Agent**    *Even the question marks?*

**Martins**    *And I told them**, I was in the board meeting and I said, 'I'm proposing*

*this deal, but I am--.'***

**BC Agent**     *Closing your nose.*

**Martins**     ***Because I don't smell-- that not smell good. We made all due diligence***

　　　　　　　　***three months ago, we didn't found anything wrong.***

　　　69.　　A similar statement was made by Martins while quoting Vale's CFO at the time, who reported to the board that despite not finding any evidence during the course of the due diligence process, this did not necessarily mean that wrongdoings did not take place:

**Martins**     *And __after the due diligence__, we present the due diligence--.*

**BC Agent**     *There is no proof.*

**Martins**     *-even the CEO, the CFO which was not very in favour went to the board, 'We*

　　　　　　　　*look this, we look that, blah, blah, blah', 'We hire this, we hire that', all very*

　　　　　　　　*good companies and [...],* '__Look, we did—we didn't find but that does not__

　　　　　　　　__mean there was not a problem there__'

**BC Agent**     *Who said so?*

**Martins**     *We, the [...] --.*

**BC Agent**     *Ah, the board.*

**Martins**     ***In the board meeting, I told you: 'I'm going to this deal with our nose***

　　　　　　　　***closed'.***

　　　70.　　Martins stressed that during these discussions with the board, Vale knew that something was wrong with the way the Simandou license was obtained by BSGR, despite having conducted due diligence which found nothing:

**Martins**     *At the time,* ***we decide to go because it was very important for Vale to go****. It*

　　　　　　　　*was one of the biggest challenges for the company. And as I told you,* ***you***

　　　　　　　　***have to discuss it with the board and we open everything for the board****, we*

*made a due diligence, we never found anything wrong.* **We did due diligence, but we know that there was something wrong**, *okay?*

[...]

**Martins**   *But on the other hand,* **we know that Africa is all about it**, *okay?*

**BC Agent**   *Yes.*

**Martins**   ***It's impossible to go to Africa--.***

**BC Agent**   *To get anything-- to get--.*

**Martins**   ***Yeah, without getting your hands dirty,*** *okay?* **We <u>know</u> that he got it in a way** *that we-- but* **we, Vale's company, would never do it** *because we are* **<u>listed in New York</u>** *so, we did all the due diligence, okay, if they did something, we needed to found. And then we didn't found anything wrong so-- but I told you, when I was in the board, I told the board in a very, very open speech,* '**Look, I'm going to this with my nose blocked.**'

**BC Agent**   *Closed.*

**Martins**   **Because there is some bad smell here**.

71.    It is clear from the above that Vale's "bad smell" at the time relates to FCPA violations, due to the clear reference to Vale being listed in NYSE, unlike its partner, which "got its hands dirty."

### F.   Vale did not rely on BSGR's statements.

72.    Although Vale was aware of the alleged wrongdoings which led to BSGR obtaining the Simandou concessions, it knowingly opted to move forward with the deal and protected itself with a series of declarations made by BSGR regarding the manner in which the concessions were obtained.

26

73.   This was done merely as a mechanism to optimize Vale's chances of avoiding any corruption allegations and not as a foundation to rely upon in the decision-making process behind whether Vale would proceed with the agreement or not.

74.   During the meeting with Monteiro, he explained that BSGR's declarations were an attempt to protect Vale:

**Monteiro**   *We structured a quite strong contract where we were forcing the company--*
*well, not forcing, but anyway, enforcing, that's a better word, **the company to***
***declare, to make a lot of declarations of the reps and warranties of how they***
***were-- how they did (or didn't) manage to get those permits, and […] were***
***legal, or that they used legal means, that they did not bribe officials** and so on.*
*And by the end of the day actually, it was what we found out, we went through--*
*the government in Guinea changed and they started to challenge the validity of*
*the means that the guy did manage to get the permit. But the **way our contract***
***was done was quite strong, I mean, what the-- all the measures we took and***
***reflected in the SPA to get Vale protected**.*

75.   However, Monteiro then admitted that the declarations were not made so Vale could be reassured that wrongdoings did not actually take place, since Vale realized that no business entity would ever admit bribery in such circumstances:

**BC Agent**   *But you mention that you investigated and there were a number of companies*
*that did the due diligence--.*

**Monteiro**   *Yes.*

**BC Agent**   *-and they had to declare that everything was done properly, and they didn't*
*commit any corruption, but it's obvious that--.*

27

| | |
|---|---|
| **Monteiro** | *They would never do that. Yeah*, no, they--. |
| **BC Agent** | *It's obvious that nobody will tell you, 'Listen, I had to pay, I don't know, this guy to get a permission. This is something obvious.* ***Nobody will tell you upfront that they did that.*** |
| **Monteiro** | ***Yeah, I-- of course not****. But-- and the companies would not work in a way that they would tell you that everything was properly done, I mean, that's not the way they work.* |

76.     It is also noteworthy that in this context, where Vale's main concern was that BSGR "used legal means, that they did not bribe officials," Monteiro's earlier statement that "all the diligence we did was fine, but still, there was that smell of something that could have been done wrongly" relates to that exact concern which guided the due diligence process.

77.     When Martins was questioned regarding whether Vale relied on BSGR during the negotiations prior to entering the Joint Venture, he replied that BSGR was not considered reliable by Vale from the beginning:

| | |
|---|---|
| **BC Agent** | *Did Vale understood that they cannot rely on the statements of the company from before the project did-- it was understood that it's not reliable?* |
| **Martins** | ***No. The partner was considered not reliable from the beginning,*** *okay?* ***That's the fact****, okay? Because* ***we understood that he got the permits not in a straight way, not according to legislation****.* |

78.     In the same context, Monteiro reflected on Vale's doubtful state of mind when he explained an attempt by some of Vale's directors to halt the payment to BSGR, in accordance with the Joint Venture agreement, until the new Guinean parliament was assembled, as Vale realized that moving forward with the deal was a risky decision:

**Monteiro**   *The president at that time was an interim president in Guinea, and he had to call for election, he was under pressure to call for elections, for parliament elections,* **then we recommend let's wait a year or whatever** *it takes to-- until we have a Parliament and the Parliament can confirm it. And then* **put everything on escrow***, and then-- but* **he insisted on buying the whole stuff and getting-- some protections in the contract***, we did have, I mean, the contract was [...] that* **we won the arbitration and Vale won the arbitration. But yeah, it was a risky decision at that time.**

### G.   Vale treated the due diligence as an insurance policy.

79.   As mentioned, despite conducting a due diligence process prior to entering the Joint Venture with BSGR, Vale had knowledge of alleged wrongdoings prior to BSGR obtaining the Simandou concessions.

80.   Therefore, Vale did not treat the due diligence process as a means to seek the truth, but rather as a means for protection and insurance that if the alleged wrongdoings were ever exposed, Vale could argue its innocence.

81.   This was confirmed by Martins during his third meeting:

**Martins**   *We made the whole investigation. We hired I think Clifford, Clifford Chance I think, the big lawyer office.*

**BC Agent**   *Yes.*

**Martins**   *We had people from Israel, these guys that investigate this kind of wrongdoing. And* **we found nothing***,* <u>**although we knew that there was something wrong**</u>*. And that time is, it's a good experience, okay?*

**BC Agent**   *Yeah.* **So, actually, the due diligence was like an insurance policy** *for you--.*

**Martins**      _**Yeah**_.

**BC Agent**      _-that, 'Okay, we check' and everything is okay._

**Martins**      _And that what we brought to the board and I said, '**Look, we found nothing**.'_

82.      Monteiro echoed these sentiments during his meeting:

**BC Agent**      _Isn't this kind of due diligence some kind of insurance policy saying, 'Listen, we did the due diligence, and everything is okay.'?_

**Monteiro**      _**That's, well, that's how, that's a thing to do as well**, I mean, that you-- it's also a way that if you have troubles with the authorities, **you can prove that you have done a serious due diligence** and that was one of your concerns. So, **there is also a sense that not necessarily if the guy has done it well done, _not necessarily the company will find out anything in their investigation_, but it's also a way for you to get kind of protected and armoured**--._

**BC Agent**      _Yeah._

**Monteiro**      _-that-- before the authorities, **because if anything is find out later down the road, then you can prove that you were diligent** and that you did all you could to figure out or try to find out if there was any illegal activities in the process to get a permit._

**H.**      **Martins signed a witness statement for Vale and granted access to his e-mails.**

83.      During Martins' third meeting, he disclosed that following the collapse of the parties' Joint Venture and the triggering of the arbitration proceedings by Vale, he was asked to sign a witness statement for Vale, as well as provide access to all of his emails:

**BC Agent**      _You yourself, you had to be involved in the process, in this legal process?_

**Martins**      _No. **I only gave some testimony in written**._

| | |
|---|---|
| **BC Agent** | *Oh, okay.* |
| **Martins** | *When Vale was involved on it,* **I had to open all my emails***, okay? all my information, I have to sign a letter, giving the rights to go to all my even personal email and everything. So,* **I gave all the information***, and I was completely clean, okay? I enter--.* |
| **BC Agent** | **So, you had to sign a statement for Vale?** |
| **Martins** | **Yeah, yeah***.* |

### I.   The new Guinean government asked Vale for bribes to keep Simandou.

84.     Following the signing of the Joint Venture agreements, a series of events, unrelated to the question of whether or not the Mining Rights were obtained by alleged misconduct, began deterring Vale from remaining in Guinea.

85.     The first of these events took place due to the appointment of the new administration in Guinea which took place following Guinea's December 2010 elections.

86.     As reflected on by Martins, as soon as the regime in Guinea was replaced, the newly-appointed government began demanding that Vale provide government officials with bribes in order to retain the Mining Rights:

| | |
|---|---|
| **Martins** | *We paid half billion dollars and we start investing very fast, Brazilian president was with us, Lula [...], met with us to dinner to talk with the new president, but* **that was the problem in Africa. You make a deal with one guy, the next guy also want money***. So, what they do? they--.* |
| **BC Agent** | *They have to pay everybody?* |
| **Martins** | **They destroy the deal in order for them to them to get their money** *[...].* |
| **BC Agent** | *I didn't understand the last question-- the last sentence.* |

| | |
|---|---|
| **Martins** | *They didn't get-- because they had a new government, okay?* ***And they know probably that the former government take some money from it****.* |
| **BC Agent** | *Yes.* |
| **Martins** | ***They want their part****. So, the way that--.* |
| **BC Agent** | *The new government?* |
| **Martins** | *Huh?* |
| **BC Agent** | *The new-- sorry, the new government.* |
| **Martins** | *The new government, yeah, the new government. So,* ***the way to get this is to create problems.*** *All the agreement that was done with the last government, was not subscribed by the new government. So, then he start having a lot of discussions and that you never entered an agreement because you're not willing to pay again, okay?* |
| **BC Agent** | *But this time, not you, you pay-- he paid.* |
| **Martins** | *The guy paid.* |
| **BC Agent** | *Yes. So, he was not ready to pay--?* |
| **Martins** | *But now,* ***this new government*** <u>***not asking money from the old***</u>***,*** *from the Jewish,* <u>***asking money from us***</u>*.* |
| **BC Agent** | *Ah, they are asking money from--?* |
| **Martins** | ***Yes****.* |

87.     The above serves as further insight as to what Vale's knowledge was during the signing of the Joint Venture agreements.  Martins clearly indicated that Vale understood that the previous government "asked [for] money... from the Jewish."

88.     Martins explained that the demands for bribes from the new Guinean government came indirectly from a middleman:

**BC Agent**    *So, the new government came to you to ask for more money?*

**Martins**    *Right. But not the real government, some-- **you know, they don't do it direct.***

               ***They send someone--.***

**BC Agent**    *Some middleman--.*

**Martins**    ***Yeah.***

89.    In addition, George Soros, who was affiliated with the new Guinean government, began demanding that Vale "pay some money" for the development of Guinea on behalf of the new government:

**Martins**    *Soros came to ask, ask me for more money for the country. Okay, you pay the*

               *2.5 billion to the Jewish and ask [...] for Guinea. You have to pay some money*

               *for Guinea to develop*

**J.    Vale withdrew from Simandou due to financial reasons before the investigation was launched.**

90.    Another significant incentive for Vale to withdraw from the Simandou project, following their agreement to the Joint Venture, was its failed negotiations with the Liberian government for the instalment of a railway to connect Simandou to Buchanan port on the Liberian seashore.

91.    Simandou is located deep in south-eastern Guinea and is much closer to Liberia's seashore than Guinea's gateway to the Atlantic Ocean.  As a result, the blueprint for the Simandou project included a relatively short railway route for the sake of the shipping of Simandou's iron ore.

92.    However, due to failed negotiations with the Liberian government, which were followed by demands by the Guinean government that Vale ship the iron ore through Guinea using

a significantly longer route, Vale decided to withdraw from the deal.   Martins explained this situation during his meeting:

| | |
|---|---|
| **Martins** | *Because, you know, this tenement is the middle of Guinea, and Guinea is a country like that.* |
| **BC Agent** | *Like what?* |
| **Martins** | *Between Guinea and the sea, you have a lot of other countries. And this tenement is almost 1,000 miles, 1,**000 kilometers from the coast, Guinea coast. Not feasible, if you have to build a railway from that point to their seaside***. |
| **BC Agent** | *Yes.* |
| **Martins** | ***The only way to make it feasible is to go to Liberia**. Because instead of 1,000 kilometers, you're gonna have only 300 kilometers.* |
| **BC Agent** | *Big difference.* |
| **Martins** | ***And also, in Liberia, you have a deep-water sea, which you don't have in Guinea**. So, the cost of the project of going through Guinea, all the way through Guinea, it would be something like $25 billion. But through Liberia it will be less than 10. So that specifically was the concession this guy brought. Not only the tenement, but also the rights--.* |
| **BC Agent** | *Rights for the--.* |
| **Martins** | *-to go to Liberia.* |
| **BC Agent** | *It made the cost much lower.* |
| **Martins** | *And make the project feasible.* |
| **BC Agent** | *That's why it was interesting, the project?* |
| **Martins** | *Yeah. But the new board, the first thing he did is '**No, no, now you have to go through Guinea.' Then we said, 'Well, Guinea is not, is not feasible.'** |
| **BC Agent** | *Not feasible.* |

**Martins**     *And __then__ they took the tenement.*

93.     Martins expressed that Vale decided to stop investing in Africa before the investigation regarding the Simandou license began:

**Martins**     *So, __I didn't reach an agreement with Soros__, __I didn't reach agreement with the middleman__. We changed the CEO of-- because of political issues. And __the new CEO was not willing to invest in Guinea anymore__. __So, and we start exit process from there__, and that was gone, okay? And __then__, there was big problem because DJO [DoJ] went against Benny Steinmetz, against the former wife of the former president, so, __there was a big investigation__.*

94.     During his third meeting, Martins disclosed that in order to rectify the situation, Vale facilitated its connections with Brazil's then-president Lula to negotiate with the newly-elected Guinean government.  However, at that stage, Vale realized that the new administration had already cemented its position against the company:

**Martins**     *We took Mr. Lula and we went to Guinea because Mr. Lula was a leader in Africa, okay?*

**BC Agent**    *Okay.*

**Martins**     *All the Africa love him. And __we bring him to Guinea to talk with the new president of Guinea__. And when we come back, Mr. Lula told us, '__Look, this guy is crazy__.' Because okay, maybe you have something wrong there, but it would be a $10 billion-- $12 billion project in Guinea. A country that has $2-3 billion GDP. So, it's something that could change the country completely.*

**BC Agent**    *Yes.*

**Martins**     *And __he is not willing to let this go forward__. So, then __we understood that this new president will be against us__ because we send him Lula there, okay? It was the best ambassador that we could send to there.*

## V.  Summary of evidence collected by Black Cube

95.     Vale was desperate to get a foothold in the Simandou iron ore mine prior to entering the Joint Venture agreement and could not afford losing it to its competitors.  Vale realized that it was the only "open door" in Africa and therefore decided to proceed with the deal at any cost. Additionally, Vale's strong political affiliations with Brazil's former president, Lula, served as an additional incentive to approve the deal, as Brazil sought to expand its influence in Africa.

96.     Vale realized from the very beginning that BSGR obtained the Mining Rights through alleged misconduct and doubted the legal validity of the Mining Rights due to a lack of parliamentary confirmation in granting the license.

97.     In addition, Vale received information from BHP and Rio Tinto, who conducted a private investigation in connection to the matter, which reinforced Vale's existing suspicions, since the investigation obtained its information from a BSGR "insider."

98.     However, since Vale was highly motivated to get a foothold in Simandou, it decided to proceed by conducting due diligence as well as getting written declarations from BSGR regarding the manner in which the license was obtained.

99.     Vale did not treat the due diligence process as a means to seek the truth, but rather as "an insurance policy" and did not rely on BSGR's declarations in its decision-making process, as it deemed its partner "unreliable from the beginning."

100.     Following the completion of the due diligence process, in which no evidence of wrongdoings was discovered, Vale still "knew something was wrong" and some directors advised the CEO of Vale not to pay BSGR "a penny," but rather to put the money in escrow and let the Guinean government perform its own investigation and due diligence in order to secure Vale, who

saw the deal as "a risk."  However, Vale's CEO was very keen on the deal and opted to proceed as agreed.

101.     Vale's board was completely aware of its officers' understanding of the manner in which the Simandou concessions were allegedly obtained.  This was discussed at length and in detail during board meetings.  However, Vale did not document such discussions in the board meeting minutes, while some board members "did not want to hear" about it.

102.     Finally, the board approved the deal unanimously and Vale entered the Joint Venture.  However, once Vale began making investments in Guinea, it began receiving requests for bribes from the newly-elected government via a middleman.  In addition, George Soros, who was close to the new Guinean regime, requested that Vale "pay some money" towards the development of the country.

103.     Simultaneously, Vale's business plan of shipping Simandou's iron ore via Liberia collapsed due to the Liberian government's unacceptable demands and due to the new Guinean regime's demand that Vale lay the proposed railway solely through Guinean soil.  This demand made the Simandou project no longer financially beneficial for Vale and practically forced the company to withdraw from the project, regardless of the investigation regarding the manner in which the Mining Rights were obtained.

104.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

the United States of America that the foregoing is true and correct.


Executed on the 21st day of May, 2020 in London, United Kingdom.


_____

**DR. AVI YANUS**