# EXHIBIT 7

Claim No. CL-2019-000723

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**
**BETWEEN:**

**(1) VALE S.A.**
**(2) VALE HOLDINGS B.V.**
**(3) VALE INTERNATIONAL S.A.**

**Claimants**

**-and-**
**(1) BENJAMIN (BENY) STEINMETZ**
**(2) DAG LARS CRAMER**
**(3) MARCUS STRUIK**
**(4) ASHER AVIDAN**
**(5) JOSEPH TCHELET**
**(6) DAVID CLARK**
**(7) BALDA FOUNDATION**
**(8) NYSCO MANAGEMENT CORPORATION**

**Defendants**

---

**DEFENCE OF THE FIRST DEFENDANT**

---

1.      In this Defence, save where otherwise indicated:

1.1.    Reference to paragraph numbers are to paragraphs of the Particulars
        of Claim.

1.2.    Headings and abbreviations used in the Particulars of Claim are
        (unless tendentious) adopted herein, without admitting their
        accuracy or relevance.

1.3.    Unless otherwise admitted or not admitted herein, each and every
        allegation in the Particulars of Claim is denied as if it were set out
        and traversed individually.

1

1.4.    Where Steinmetz does not admit allegations, he does so because he has no or insufficient knowledge or recollection of the facts concerned so as to admit or deny them, and by pleading a non-admission Steinmetz requires the Claimants (where the context admits, referred to together herein as **"Vale"**) to prove the same.

1.5.    Whilst Steinmetz does not plead to allegations relating to all or some of the other Defendants, he avers that:

(i)   the Second, Seventh and Eighth Defendants had no involvement at all in matters taking place in Guinea;

(ii)  from his personal experience of working with each of the Second to Sixth Defendants he knows them to be honest and upstanding individuals who abide by moral and legal obligations upon them in their respective professional roles; and

(iii) during the material times, none of the Second to Sixth Defendants said anything that indicated the existence of corruption on the part of BSGR or that there was any attempt during the transaction with Vale to misrepresent the true position.


**OVERVIEW**

2.   Steinmetz denies that he was involved in or had knowledge of any corruption or bribery, or made any fraudulent misrepresentations in relation to the same. Further, to the best of his knowledge, none of the other Defendants engaged in any such conduct. Vale wanted to do the deal with BSGR at all costs, and conducted a sham due diligence exercise designed to create a false impression that Vale had met its regulatory and legal obligations but without Vale at any point caring whether the representations made were true.  Alternatively, if the Court finds that any representations

made were false, which is strenuously denied, Vale knew that was the case, or alternatively was wilfully blind as to the suspicions which it had, and proceeded with the transaction regardless, thereby exposing itself to potential criminal liability in the USA. Vale conducted a deliberately cursory and superficial due diligence process which did not probe the central matters about which it now complains. Vale has destroyed certain internal email correspondence which, it should be inferred, provided further evidence of the superficiality of the due diligence process and Vale's nonchalance regarding the truth of the representations made during that process. Vale itself recognised at the time of the transaction with BSGR that its due diligence was unsatisfactory and that its lawyers had warned that Vale may itself be in violation of its obligations under the US Foreign Corrupt Practices Act (the "**FCPA**") and risked its own liability for breach of the FCPA. Nevertheless, Vale chose to proceed.

3. Irrespective of the other failings in the Claimants' claims set out herein, those claims fail because (i) Vale placed no reliance on any of the representations; and/or (ii) the claim is based on a sham due diligence exercise which it was warned risked non-compliance with its own FCPA obligations, and its claim falls to be dismissed by reason of the maxim *ex turpi causa non oritur actio*. Furthermore, and in any event, the entirety of its claim is statute barred as a matter of New York Law, and/or English law under the Limitation Act 1980.

4. Steinmetz did not sit on the board of BSGR, and he was not a shareholder of it. He was paid a flat rate fee for his role as an adviser. Steinmetz did not involve himself in the day to day running of BSGR or its subsidiaries' operations, nor did he make any decisions on its behalf.

5. Steinmetz is a discretionary beneficiary of Balda, a Liechtenstein Foundation. Balda indirectly owns a group of companies whose businesses focus on resources, diamonds and real estate. BSGR was a part of that group

of companies and owned the resources projects. Steinmetz has no role on the board or as an employee of Balda.

6.  Roy Oron, CEO of BSGR, was introduced to Guinea in 2005 / 2006 by Noy and Lev Ran (who later became shareholders of Pentler), after Lev Ran contacted Oron. Steinmetz was not involved in that introduction. Steinmetz would have occasionally spoken to Oron, but Steinmetz had no involvement in BSGR's activities in Guinea until 2008. Steinmetz did not meet any of the shareholders in Pentler until 2008.

7.  Avidan and Struik were recruited by Oron without Steinmetz's knowledge and involvement. BSGR applied for and received exploration licences for Simandou North and South without Steinmetz's involvement.

8.  At the beginning of 2008, Steinmetz became involved in the Guinea project because it had become clear that Zogota (part of Simandou South) now looked as if it would be a potential real project. At this time, Steinmetz learned that:

    8.1.  Pentler had introduced BSGR to Guinea and helped set up the operations (offices etc.) on the ground in 2006.

    8.2.  In return, Pentler had a 17.65% shareholding in BSGR BVI (the remainder was held by BSGR Steel, a company 100% owned by BSGR).

    8.3.  Pentler had had no other material involvement from the time that Mr Avidan was appointed as Country Manager and had been a "silent" partner. Steinmetz never understood Pentler to be a consultant for BSGR in Guinea.

9.  The first time Steinmetz visited Guinea was in February 2008.

10.  Any suggestion that Steinmetz was involved in meetings with President Conté in 2005 to 2007 in which he (or others) made promises of payments

4

to Mme Touré or President Conté is entirely false. Steinmetz has passport and flight documents confirming categorically that he was in locations outside of Guinea when the alleged meetings are said to have taken place.

11.   Steinmetz recalls having one, maybe two meetings with President Conté, after February 2008:

11.1.   One was at the Presidential Palace, where the meeting was outside, under a tree. Avidan was also present. Steinmetz cannot recall the date. There were around 10 other people there. It is typical of meetings with high ranking officials in Guinea that there a large number of other people present. Mme Touré may have been one of them. President Conté said that the GoG were keen to replicate the work that BSGR had done on Zogota in SB1 and SB2. The President said that he wanted BSGR to invest in the country and not behave like the other big companies which talked big but did nothing.

11.2.   Steinmetz understands from Avidan's statement in the LCIA Arbitration that another meeting took place in September or October 2008 attended by President Conté and Steinmetz, at the President's home in the village of Buramaya outside of Conakry. Steinmetz does not recall this meeting, but it is possible that it happened.

12.   The Claimants plead that Steinmetz attended other meetings with President Conté and/or Mme Touré. That is untrue:

12.1.   Vale says that representatives of BSGR "possibly" attended a meeting in November / early December 2005 at the President's home, at which the President told the then Minister of Mines, Souaré, to facilitate BSGR's investment in Guinea (paragraph 40). In the LCIA Arbitration, it was alleged that Steinmetz was one of those who "possibly" attended, but it is noted that this is not pleaded in the Particulars of Claim. If Vale maintain that Steinmetz attended, or possibly attended, this meeting, then it is denied. It is not known

if Cilins attended this meeting, but if he did, he did not do so on behalf of, or authorised by, BSGR or Steinmetz.

12.2.   Vale alleged in the LCIA Arbitration that a meeting took place on 6 February 2006 attended by President Conté and Steinmetz, and arranged by Mme Touré. Vale alleged that at this meeting Steinmetz offered Mme Touré a 5% interest in BSGR ProjectCo (LCIA Award, para. 194). It is noted that, faced with evidence to the contrary, Vale's Particulars of Claim make no reference to this meeting. If Vale maintain that Steinmetz attended this meeting and/or offered a 5% interest to Mme Touré, that is categorically denied.

12.3.   It was alleged in the LCIA Arbitration that Mme Touré signed a Memorandum of Understanding between BSGR and Matinda in a meeting with Steinmetz and others on 20 June 2007 (in reliance on para. 17 of the statement of Mme Touré). That is not true. There was no such meeting, nor was any document signed by Steinmetz or any BSGR company with Mme Touré. It appears, again, that this allegation is no longer pursued by Vale.

12.4.   Steinmetz did not join a meeting by telephone in early 2008 with Mme Touré at which Mme Touré was asked for her assistance to secure rights over SB1 and SB2 (paragraph 48.7). This is based on the statement of Mme Touré, at para. 18 of her statement. It is untrue.

12.5.   Vale alleges that in "c. February 2008", Steinmetz flew to Guinea to discuss with President Conté the possibility of the "BSGR Group" being granting mining licences over SB1 and SB2 (paragraph 48.6). If this meeting is different to the one held in the grounds of the Presidential palace, referred to at paragraph 11.1 above, it is denied.

12.6.   Vale alleged in the LCIA Arbitration that a meeting took place between February and July 2008 in Dubreka with President Conté and Mme Touré, attended by Steinmetz, Avidan and others, at which

Steinmetz gave the President a diamond encrusted car and offered the President money (Vale's Statement of Case in the LCIA Arbitration para. 161). It is not true that this meeting took place either and these allegations are entirely false. Vale appear to have also abandoned this allegation.

13. To the extent that Avidan or Struik had meetings with Guinean officials, those were, to the best of Steinmetz' knowledge, entirely proper and legitimate attempts by BSGR to (i) ensure that people knew about BSGR, its track record and experience (including in Simandou North and South); (ii) position itself so that when Rio Tinto's rights were revoked (as appeared highly likely given their failure to do anything of substance with them for many years), that an application from BSGR would be seen in a favourable light; and (iii) ensure that it kept abreast of when SB1 and SB2 would become available. It was not a secret nor was it an illegitimate aim that BSGR was interested in the potentially very large iron ore deposits at SB1 and SB2. So were Vale and others. No promises of payment in return for influence were made, and nor did Steinmetz authorise or ask that any such promises be made.

14. In March 2008, at the request of BSGR, Steinmetz led the negotiations, together with others, which led to the buy-out of Pentler's shares in BSGR BVI. Pentler could not afford to contribute to the capital requirements of the Guinea project. In the circumstances, BSGR did not consider it to be commercially sensible or fair for Pentler to keep its full carry. Pentler was reluctant to sell its shares, whilst unable to contribute capital to the project. This resulted in heated discussions between the parties. The negotiation was largely between Steinmetz and Noy. Ultimately the terms were approved by BSGR's board. The following then occurred:

14.1. The Pentler SPA was entered into, whereby it was agreed that BSGR Steel would buy out Pentler's interest for US$22 million in

instalments, with an additional US$8 million if BSGR realised a profit of US$1 billion. Equally, if the project ceased operation, no payment, or further payment would be due to Pentler.

14.2. The financial crisis in 2008/2009 led to BSGR failing to make the third payment under the Pentler SPA. This led to a substantial dispute which escalated to threats of litigation. Pentler and BSGR instructed lawyers and this resulted in a Settlement Agreement dated 25 July 2009, with the involvement of Mr Kavanagh of Skadden Arps. This set out new dates for repayment of the balance of the instalments.

14.3. The first payment was made under the Settlement Agreement, but not the balance. By this time, it looked like a deal could be done with a third party to take a substantial stake in the project, and BSGR therefore served a notice under clause 4 of the Settlement Agreement effectively to put back the date for payment.

14.4. Further discussions were held between Steinmetz and Noy, which led to agreement on 10 May 2010 that BSGR would pay the balance due under the Pentler SPA, i.e. an aggregate sum of US$30 million, in full and final settlement.

14.5. Afterwards, and in light of the deal signed by BSGR with Vale, Noy and Pentler claimed additional money, claiming that they were deprived of participation in a deal in which their 17.65% stake would have earned them hundreds of millions of dollars. They therefore made a further attempt to renegotiate in light of the deal done with Vale, since Pentler felt they should have got more. In the end, the parties agreed on a further payment of US$4.5 million in order to avoid any escalation of the dispute. That sum was paid in instalments on 5 August 2010 and 22 March 2011, and was a fraction of what had been demanded by Pentler.

15.     Those agreements were all entered into openly and with the involvement of independent lawyers on both sides.

16.     In early 2009, as part of the overall relationship with the GoG, BSGR ProjectCo worked alongside the relevant government officials responsible for mining projects, including the Minister of Mines, Thiam. Steinmetz advised when requested or necessary. This was to ensure contact between BSGR, as investor, and the GoG and was part of Steinmetz's ambassadorial role for the group and consistent with Steinmetz's role in all of the BSGR's and its related companies' activity worldwide. The allegations that Thiam was given gifts or other financial benefit in exchange for promoting BSGR's interests are nonsense:

   16.1.   BSGR paid for certain flights for Thiam, where he was travelling at BSGR's invitation. Steinmetz understands that payment of travel expenses in this way was both standard in the industry and compliant with local law. It is noted that in or around 2006 and 2010 Vale did precisely the same thing in respect of the travel arrangements of a Guinean governmental delegation.

   16.2.   Thiam attended Steinmetz's daughter's wedding in Israel. He was one of at least 500 guests. The invitation, out of courtesy, had been made to the President who could not attend, but sent Thiam in his place.

   16.3.   Thiam did not receive money from BSGR to pay for properties in New York. He did not receive that money or any money at all from BSGR, or Steinmetz or from any entity associated with either Steinmetz or BSGR.

17.     In March 2012, there was a failed attempt to blackmail BSGR by producing forged contracts between BSGR and Mme Touré / Matinda (referred to further below). Following that, Noy told Steinmetz that Pentler would make efforts to seek to persuade Mme Touré to tell the truth and withdraw the

untrue allegations she was making. This is apparently what led to Cilins' trip to the USA to see Mme Touré. To be clear:

17.1.   Steinmetz did not offer money, through Cilins, or in any other way, for Mme Touré to sign a further statement or to destroy documents.

17.2.   Cilins did not travel to the USA on Steinmetz's or BSGR's instructions, or with their authority.

17.3.   Cilins was not authorised by Steinmetz or BSGR in any capacity whatsoever.

17.4.   Cilins' reference to Steinmetz in his meetings with Mme Touré was apparently an attempt to persuade Mme Touré that Cilins' approach was sought or authorised by Steinmetz. That was untrue. Cilins himself confirmed that in witness evidence given in the LCIA Arbitration.

18.   As for the joint venture negotiations with Vale, Steinmetz played a major role in the headline commercial negotiations, though that always remained subject to the board's approval, as he made clear to Vale several times.

19.   Whilst Steinmetz was aware of the FCPA due diligence process, he was not involved in the preparation of the detail of that process. As far as he was aware the due diligence documentation was a matter being handled by personnel within BSGR with the relevant first-hand knowledge under the supervision of BSGR's lawyers at Skadden. From time to time, Steinmetz attended meetings/calls with Skadden which dealt solely with commercial matters. The only document relating to the due diligence which Steinmetz recalls is the Steinmetz ABL Certificate which he personally signed, after having taken advice on its contents from Skadden.

20.   During one of the discussions with Skadden on commercial matters, Steinmetz recalls a short deliberation about whether the Pentler relationship required disclosure within the due diligence process that had been agreed

between the parties. Skadden knew the relationship BSGR had with Pentler because they had advised on the dispute over the Pentler SPA. Skadden's advice was that BSGR did not have to disclose the relationship and this advice was followed.

21. Pentler was a former shareholder in the business. This fact was not responsive to the due diligence questionnaires which Vale sent to BSGR. In any event, the existence of a minority shareholder in the business was a matter of record from the accounts, which was in the due diligence dataroom. Steinmetz understands from information acquired during the course of the LCIA Arbitration that Monteiro of Vale, and Tchelet of BSGR discussed the 17.65% minority shareholding, but Monteiro never asked him to identify the shareholder. Vale never asked for any document relating to the US$22 million purchase of the minority shareholding, even though they were aware of it.

22. Steinmetz had no involvement with Bah or Mme Touré.

    22.1. Steinmetz does not specifically recall being told about attempts made by Bah and Mme Touré to blackmail BSGR, which he now understands were dealt with by BSGR's lawyers. As Steinmetz now knows, Mme Touré had withdrawn her claims and agreed to destroy invented documents attached to her blackmail attempt, only later to withdraw her withdrawal.

    22.2. Steinmetz does not recall having heard of Mme Touré until March 2012, when forged contracts between her / her company, Matinda, and BSGR were produced as part of another blackmail attempt. Once again, Mme Touré withdrew her allegations. BSGR took advice from Ken Macdonald QC, the former Director of Public Prosecutions in the UK, on whether the blackmail attempts should be reported to the criminal authorities.

23.     Neither Steinmetz nor anyone associated with BSGR is, was or has been involved in any corruption, bribery or unlawful activity.

24.     It is noted that in an order dated 30 March 2020 the Conakry Court of Appeal in Guinea recorded the fact that the public prosecutor in Guinea had decided to withdraw criminal proceedings which it had started against Mme Touré, I.S. Touré, Mahmoud Thiam and others in respect of allegations of bribery, stating that: *"this withdrawal implies that following the investigations into the case brought before the court, the Public Prosecutor's Office has no evidence that could lead the court to convict the defendants"*. In the premises, the Court of Appeal inferred from the withdrawal of the prosecution that there was insufficient evidence to show corruption on the part of those individuals with respect to BSGR and its associated entities.

25.     The Steinmetz ABL Certificate was true when Steinmetz signed it and remains true today.


## APPLICABLE LAW

26.     All of Vale's claims against Steinmetz are governed by New York law, not English law:

26.1.   The law applicable to each of Vale's claim is governed by Art. 4(1) of Rome II (Regulation (EC) No 864/2007 on the law applicable to non-contractual obligations, "**Rome II**").

26.2.   Pursuant to Art. 4(1) of Rome II, the law applicable to a non-contractual obligation arising out of a tort or delict is the law of the country in which the damage occurs. This is irrespective of the country in which the event giving rise to the damage occurred or the country in which the indirect consequences of that damage occurred.

26.3.   Art. 2(1) defines "damage" as any consequence arising out of the tort or delict.

26.4.   In respect of (i) a claim for funds paid in reliance on fraudulent misrepresentation, and/or by reason of an unlawful means conspiracy, and/or (ii) a proprietary claim for return of funds paid by reason of such fraudulent misrepresentation and/or an unlawful means conspiracy, damage for the purposes of Art. 4(1) will be suffered by a claimant in the country where the account from which payment of those funds was made is located.

26.5.   The initial payment of US$500 million and all, or substantial portions of, the alleged subsequent payments made between 2010 and 2015 by Vale to BSGR were paid from an account in New York. Vale alleges that it made those payments in reliance on the Defendants' purported misrepresentations, alternatively by reason of an unlawful means conspiracy, and in respect of which it claims that the Initial Consideration is held on constructive trust for which claims a proprietary remedy.

26.6.   In the premises, the law of the country in which the damage occurred is the law of the USA, and more specifically New York law.

27.   Since Vale has pleaded no reliance on New York law, and save in respect of limitation addressed at paragraphs 38 to 42 below to which New York law is pleaded, Steinmetz responds to the Particulars of Claim by reference to the law relied on by Vale, i.e. English law. He does so without prejudice to the matters set out in the previous paragraph. Further, to the extent that Vale subsequently seeks to rely on New York law, Steinmetz reserves his right to plead to the same.

**CLAIMANT'S OVERVIEW**

13

28.   Steinmetz pleads as follows to the "Overview" section of the Particulars of Claim (paragraphs 1 to 11).

29.   Paragraphs 1 to 3 are admitted.

30.   Save that no admissions are made as to the subsequent payments exceeding US$746 million alleged at paragraph 4, paragraph 4 is admitted.

31.   As to paragraph 5:

    31.1.   It is denied that Steinmetz made any fraudulent misrepresentations.

    31.2.   At no material time did Steinmetz understand that Cilins, Boutros, Pentler or Thiam served relevantly as agents, intermediaries or consultants, whether in obtaining the Mining Licences or otherwise.

32.   As to the example set out at paragraph 6, if the Claimants rely upon the matters set out in that paragraph to allege wrongdoing against Steinmetz, such wrongdoing is denied.

33.   As to paragraph 7:

    33.1.   The first sentence is denied. Steinmetz is not the principal ultimate beneficiary of the "BSGR Group" (as defined by the Claimants at paragraph 28). Furthermore, Steinmetz is a discretionary beneficiary of Balda, a Liechtenstein Foundation, but does not have any entitlement as such until the Foundation Council elects to make a distribution.

    33.2.   Steinmetz does not plead to whether the Second to Sixth Defendants were "senior executives", since those Defendants are serving their own Defences.

    33.3.   It is denied that the Second to Sixth Defendants were rewarded, handsomely or otherwise, by way of recognition for playing a part in inducing Vale to enter into the JVA and the SHA.

34. In so far as it concerns Steinmetz, paragraph 8 is denied for the reasons set out more fully below. Otherwise, no admissions are made as to paragraph 8.

35. As to paragraph 9:

    35.1. it is not admitted that the GoG's real reason for revoking the Mining Licences was because they had been procured by bribery;

    35.2. it is denied that the Mining Licences had in fact been procured by bribery by BSGR or its related companies;

    35.3. otherwise it is admitted.

36. As to paragraph 10:

    36.1. It is denied that Steinmetz made any fraudulent misrepresentations, that he held the requisite intention to deceive, or that the Claimants relied on, or induced to act by, any representations made by him.

    36.2. Vale's due diligence process, in the context of which Steinmetz made the representations in question, was a sham, in that Vale did not care whether the representations made in the context of that due diligence process were true or not. Alternatively, if the Court finds that the representations were false, which is denied, Vale knew that was the case. Accordingly, Vale was not induced by those representations to enter into the JVA or the SHA or to make and/or procure payments pursuant to the JVA and SHA. Ultimately Vale sought to rescind the JVA and SHA for commercial reasons rather than by reason of any alleged misrepresentations.

    36.3. It is denied that Steinmetz was party to any conspiracy.

    36.4. Otherwise, no admissions are made as to paragraph 10.

37.    Paragraph 11 is denied. Steinmetz repeats his denial that he made any fraudulent misrepresentation and for that reason (without limitation) denies that the Claimants enjoy any proprietary claim as against him, which claim is (as with all claims) in any event statute-barred.


## LIMITATION

38.    The entirety of the claims against Steinmetz are statute-barred:

   38.1.    as a matter of New York law, pursuant to New York Civil Practice Law and Rules ("**N.Y. C.P.L.R.**") section 213(8) (McKinney 2004); and

   38.2.    as a matter of English law, under the Limitation Act 1980 ("**the 1980 Act**").

**Statute of Limitations as a matter of New York Law**

39.    A civil claim for fraudulent misrepresentation or fraudulent inducement under New York law must be commenced within the greater of six years from the date the cause of action accrued or two years from the time the claimant, or the person under whom the claimant claims, discovered the fraud, or could with reasonable diligence have discovered it: N.Y. C.P.L.R. section 213(8) (McKinney 2004).

40.    Vale's claim for fraudulent misrepresentation is time barred as a matter of New York law, in that:

   40.1.    Vale's Claim Form was issued on 3 December 2019.

   40.2.    Vale discovered the alleged fraud, or could with reasonable diligence have discovered it, more than 2 years prior to 3 December 2019. In that regard, Steinmetz relies on the facts and matters pleaded at paragraph 44.5 below.

40.3.   For those reasons, Steinmetz's primary position is that the cause of action accrued on 30 April 2010. To the extent that Steinmetz's primary position is not accepted, it is averred that the letters and matters referred to at paragraph 44.5(v) below put Vale on notice of the alleged fraud, or enabled them with reasonable diligence to discover the same on or before 2 December 2017.

41.   As for Vale's claim in conspiracy:

41.1.   New York law does not recognise an independent cause of action based upon a civil conspiracy to commit a tort. Instead, under New York law, a claimant must first establish a primary tort.

41.2.   A claim for civil conspiracy will be time-barred if the primary tort on which it is based is time-barred.

41.3.   The relevant statute of limitations in respect of Vale's claim in conspiracy is the statute of limitations for fraudulent misrepresentation or fraudulent inducement (which is the same).

41.4.   In the premises, Vale's conspiracy claim is time-barred under New York law for the same reasons as those set out at paragraph 40 above.

42.   As for Vale's proprietary claim:

42.1.   New York law does not recognise a separate cause of action akin to a proprietary claim. Rather, contractual rescission and the return of the consideration paid for the contract is a remedy available to a claimant.

42.2.   The relevant statute of limitations is therefore that which relates to the underlying tort. In respect of Vale's proprietary claim, that is the statute of limitations for fraudulent misrepresentation or fraudulent inducement (which, as noted above, is the same).

42.3.   In the premises, Vale's proprietary claim is time-barred under New York law for the same reasons as those set out at paragraph 40 above.

**Limitation as a matter of English Law**

43.   As a matter of English law, Steinmetz pleads as follows.

44.   As to the Claimants' claims against Steinmetz in fraudulent misrepresentation and conspiracy (which latter claim is contingent on the claim in fraudulent misrepresentation):

44.1.   As noted above, the Claimants' Claim Form was issued on 3 December 2019.

44.2.   The primary limitation period is six years under section 2 of the 1980 Act.

44.3.   That limitation period can be extended under section 32 of the 1980 Act until such time as the Claimants discovered the fraud, concealment or mistake (as the case may be), or could with reasonable diligence have discovered such matters.

44.4.   Steinmetz avers that the Claimants either did discover the essential facts underlying their claims against him more than six years prior to 3 December 2019, or could with reasonable diligence have done so.

44.5.   In particular:

(i)   Steinmetz relies on the matters set out at paragraph 194 below, as evidencing the matters set out at paragraph 44.4 above.

(ii)   Vale and/or their representatives commissioned a report by Nardello & Co LLP as part of Vale's due diligence, headed *"Report to Clifford Chance LLP Re: Beny Steinmetz and BSG Resources Ltd"* (the "**Nardello Report**"). The Nardello Report,

18

which is undated but is believed to have been provided to Vale in around February / March 2010 before the JVA was signed, and which Vale shared with the GoG on 12 April 2013, stated, *inter alia*, that based on an investigation report: (a) BSGR was close to the "Conté clan"; (b) I.S. Touré was in charge of external relations for BSGR in Guinea and is a brother of Mme Touré, the fourth wife of President Conté; and (c) Mr Avidan was working with IS Touré to manage "the transition" of BSGR's development at Simandou.

(iii) Further, the Claimants were possessed of all of the Initial DD Questionnaire, the Supplemental DD Questionnaire and the Steinmetz ABL Certificate (containing the core representations relied upon as against Steinmetz) as of end of April 2010 at the latest.

(iv) Accordingly, Steinmetz's primary position is that the Claimants knew the essential facts underlying their claims as at 30 April 2010.

(v) In any event, the Claimants were put on notice of the alleged factual basis for their claim that the relevant representations were false by as early as (i) receipt of a letter dated 30 October 2012 (which letter Steinmetz infers came to the Claimants' notice on or about the same date) from the Technical Committee; (ii) a meeting on 12 April 2013 in Paris between Vale and its lawyers and the lawyers to the GoG, DLA Piper, at which Vale was shown evidence of BSGR's alleged corruption in relation to the acquisition of the Mining Rights, and several further meetings in and around April 2013 between Vale and the GoG and/or their representatives at which information was shared on a common interest basis in order to assist Vale in

19

making claims arising out of the alleged corruption; (iii) the arrest of Cilins in the US on 14 April 2013, and the issuing the following day of a press release referring to Mme Touré and President Conté; and/or (iv) receipt of a letter dated 7 May 2013 (which Steinmetz infers came to the Claimants' notice on or about the same date) from the Technical Committee.

(vi) The letter dated 30 October 2012 in particular contained details of the bribery and alleged corruption on the parts of Mme Touré, I.S. Touré and Mr Thiam now relied upon by the Claimants as ultimately founding their claims in fraudulent misrepresentation. At the meeting on 12 April 2013, Steven Fox, the investigator acting for the GoG, gave a presentation to Vale on the evidence allegedly substantiating the matters set out in the 30 October 2012 letter.

(vii) To the extent that Steinmetz's primary position is not accepted, it is averred that both of the said letters and the above matters either put the Claimants on notice of the essential facts underlying their claims against Steinmetz, or enabled them with reasonable diligence to discover the same on or before 2 December 2013.

45. As to the Claimants' proprietary claim against Steinmetz:

45.1. The primary limitation period is six years under section 21(3) of the 1980 Act.

45.2. The Claimants found their proprietary claim against Steinmetz on the alleged receipt of traceable proceeds of the US$500 million by him made by BSGR, Nysco and/or Balda "in and after 2010".

45.3. The Claimants' cause of action in relation to their proprietary claim against Steinmetz was complete as of the date on which sums were

allegedly received by Steinmetz, which derived from monies paid by the Claimants pursuant to the JVA (and not, as the Claimants appear to contend, on the date on which the JVA was first rescinded).

45.4.   In the premises, the Claimants' proprietary claim against Steinmetz has been statute-barred since in or about 2016.

45.5.   Alternatively, the claim is time-barred by the doctrine of laches, so that it would be unconscionable now for the Claimants to be permitted to enforce their alleged rights.

## SECTION A: PARTIES

<u>The Claimants</u>

46.   As to paragraph 12, the first and second sentences are admitted. Otherwise it is not admitted.

47.   As to paragraphs 13 and 14, no admissions are made.

<u>The Defendants</u>

48.   As to paragraph 15 (concerning Steinmetz):

48.1.   The first and second sentences are admitted save that Steinmetz's indirect interest in BSGR is as set out above at paragraphs 4 and 5 above.

48.2.   The third sentence is denied.

(i)   An accurate summary of Steinmetz's relationship with BSGR is set out at paragraphs 4 and 5 above.

(ii)   It is not accurate to characterise the companies referred to as a group of companies, or that Steinmetz founded the "BSGR Group". Paragraph 53.2 below is repeated.

21

49.    As to paragraph 16 (concerning Balda):

    49.1.    Paragraph 16.1 is admitted.

    49.2.    As to paragraph 16.2:

        (i)    Steinmetz was at all material times an adviser to Balda. If the word "presented" is intended to imply that Steinmetz was anything other than an adviser, that is denied.

        (ii)    The second sentence is denied. Steinmetz did not control all material decisions relating to BSGR or to any other entity identified in Appendix 1 to the Particulars of Claim. An accurate summary of Steinmetz's relationship with Balda and BSGR is set out at paragraphs 4 and 5 above.

50.    As to paragraph 17:

    50.1.    The first sentence is denied. Steinmetz is a discretionary beneficiary of Balda but it is denied that this made him the principal beneficiary of the US$500 million paid to BSGR under the JVA, which was a sum paid to BSGR.

    50.2.    The second sentence is embarrassing for want of particularly as to what payments are being referred to. Steinmetz is unable to plead to it because of that want of particularity, and because the ultimate destination of the said $500 million is the subject of a tracing exercise which is being carried out by other Defendants, but which Steinmetz himself is unable to carry out because he is not in possession of all of the documents necessary to carry out that exercise.

51.    As to paragraph 18:

    51.1.    It is admitted that Steinmetz signed the Steinmetz ABL Certificate, but it is denied that the LCIA Tribunal considered or determined

whether Steinmetz had made any fraudulent misrepresentations in the Steinmetz ABL Certificate.

51.2.   In any event, the Tribunal made the Award following an evidential hearing in which BSGR did not participate at all. Moreover, the claim (and the Award) was made against BSGR only and not against any of the Defendants (including Steinmetz), who were not party to the LCIA Arbitration and had no right to be (and were not) represented in those proceedings. In these circumstances, the Award is not probative of any claim made by Vale in these proceedings and the findings made by the Tribunal in the Award are irrelevant to these proceedings.

51.3.   It is admitted that Steinmetz is currently facing criminal charges in Switzerland. Steinmetz denies those charges. Those charges resulted from an investigation instigated at the request of the GoG, and that related charges in Guinea have been withdrawn, as set out at paragraph 24 above.

52.   As to the vague allegation in paragraph 19 that Cramer is a close associate of Steinmetz, this is not admitted. Regarding Cramer's role in the Vale deal, as pleaded in paragraph 20 of the Particulars of Claim, Steinmetz's recollection is that Cramer's role was limited to negotiating a couple of financial issues in respect of the joint venture, and approving the final transaction as part of the full board on 28 April 2010. Otherwise, paragraphs 19 to 27 relate to the Second to Eighth Defendants respectively and, as such, are not pleaded to by Steinmetz.

<u>Other Key Companies and Individuals</u>

53.   As to paragraph 28:

53.1.   It is not clear what is meant by "complex" and so the first sentence is not admitted.

53.2.   The second sentence is denied. It is not correct to refer to the "BSGR Group" in respect of the entities identified in the schedules at Appendix 1 to the Particulars of Claim. Appendix 1 identifies a number of entities including Balda, Nysco and Pentler which were not related to BSGR in any group sense. Further, it is not appropriate for the Particulars of Claim to use the term "BSGR Group" when what is and should be identified is the specific company to which reference is being made.

54.   As to paragraph 29, it is denied that Mme Touré was the fourth wife of President Conté. Neither Vale nor the GoG in the LCIA or ICSID proceedings adduced sufficient evidence to demonstrate that Mme Touré was married to President Conté.

55.   As to paragraph 30 (concerning Pentler):

55.1.   It is admitted that Pentler is a BVI company.

55.2.   It is denied that Pentler was a vehicle through which Mme Touré held a 5% interest in BSGR BVI, or that she did hold such an interest in BSGR BVI. Steinmetz notes that the Claimants' pleaded position is that Mme Touré never held any shares, through Pentler or otherwise, in BSGR BVI (see paragraph 52.2). Steinmetz only learned at the beginning of 2008 that Pentler had been given a shareholding in BSGR BVI, and has no recollection of hearing Mme Touré's name prior to 2012.

55.3.   It is admitted that Pentler's shareholders were Noy, Cilins and Lev Ran. Steinmetz cannot recall when he first heard about Noy, Cilins or Lev Ran, but he never met any of them until 2008.

55.4.   It is admitted that Cilins and Noy are French, and that Lev Ran is South African. It is not admitted that Lev Ran was, at "the relevant time" (whenever that is said to be) based in South Africa.

56.   Paragraph 31 is not admitted. The first time Steinmetz heard of Boutros was in the context of legal proceedings in Switzerland in 2014.

57.   As to paragraph 32:

57.1.   The first and second sentences are admitted. Thiam was the Guinean Minister of Mines between January 2009 and 22 December 2010, and he was appointed shortly after the death of President Conté.

57.2.   The third sentence is denied:

(i)   Thiam was not an adviser or a consultant for BSGR.

(ii)   Thiam did not receive bribes from BSGR or the 'BSGR Group'.

(iii) Thiam did not 'help' obtain confirmation from the new regime that the Mining Licences were valid. He did not lobby or otherwise seek on behalf of BSGR to influence government decision-making.

57.3.   As to the fourth sentence:

(i)    the implication in the words "not the only bribes received" that Thiam received bribes from BSGR or the 'BSGR Group', is denied;

(ii)   otherwise it is admitted, but irrelevant.


**SECTION B: THE MINING LICENCES**

58.   Prior to 2008, Steinmetz was not involved in BSGR's activities in Guinea and had no knowledge of the same. However, in the course of the LCIA Arbitration and other legal proceedings, Steinmetz has learned of various matters and where Steinmetz is able to admit or deny matters as a result of knowledge gained during those proceedings, then he does so in this

Defence. In respect of matters prior to 2008 in particular, such admission or denial is not by reason of any personal knowledge of those matters.

<u>Introduction: Guinea and Simandou</u>

59.     Paragraphs 33 to 35 are admitted.

<u>The grant of the Mining Licences to the BSGR Group</u>

60.     Paragraphs 36 is admitted, save that no licences were granted to or held by the "BSGR Group". The Mining Licences were held by BSGR BVI and BSGR ProjectCo.

61.     To the best of Steinmetz' knowledge, paragraph 37 is admitted, save that:

61.1.   In respect of matters prior to 2008, Steinmetz has no personal knowledge of those matters. Paragraph 6 above is repeated.

61.2.   The reference at paragraph 37.5 to 17 July 2007 is believed to be 12 July. The letter from BSGR ProjectCo asking for research permits over SB1 and SB2 is dated 12 July.

61.3.   As regards paragraph 37.6, Rio Tinto's mining concession was revoked by the GoG on 28 July 2008. The GoG said that the concession was revoked because of Rio Tinto's prolonged failure to conduct exploration activities. While Rio Tinto was allowed to retain some exploration licences in the area, it was required to retrocede half of its permit area back to the GoG. As noted below, ultimately Rio Tinto was required to give up SB1 and SB2, but allowed to retain exploration permits over SB3 and SB4. After the July 2008 Decree, the GoG publicly announced that SB1 and SB2 were available for exploration and asked for applications from interested parties.

61.4.   As to paragraph 37.7, the application by BSGR ProjectCo was not a "renewal" of an application, but an application for SB1, SB2 and

SB3 following the public invitation by the GoG for interested parties to do so. Other parties also applied.

61.5.   As to paragraph 37.8, further to the July 2008 Decree, on 4 December 2008, the Council of Ministers ordered the Ministry of Mines to withdraw half of Rio Tinto's concession, corresponding to SB1 and SB2. Rio Tinto retained exploration permits over SB3 and SB4.

## SECTION C: HOW THE MINING LICENCES WERE OBTAINED BY THE BSGR GROUP BETWEEN 2005-2008

62.   As to paragraph 38, the opening words are admitted, although this was not known to Steinmetz until the beginning of 2008 as he became involved. In 2008, Steinmetz learned that Pentler had introduced BSGR to Guinea and helped set up the operations on the ground in 2006. Otherwise, so far as Steinmetz understood, Pentler had no other involvement.

63.   Paragraphs 38.1 to 38.4 are not admitted.

64.   Paragraph 38.5 is denied. To the best of Steinmetz's knowledge, Pentler introduced BSGR to Guinea and helped set up the operations on the ground in 2006, but conducted no further work for BSGR or the "BSGR Group".

*The alleged involvement of Pentler, Cilins, Mme Touré et al*

65.   Paragraphs 39 to 42 are not admitted. Paragraphs 40 and 42 refer to "BSGR Group representatives" attending a meeting and being transported by a presidential helicopter in 2005, without naming the representatives. If it is intended to be implied that Steinmetz was one of those representatives, that is denied.

66.   Paragraph 43 is admitted.

67. Paragraph 44 is admitted, save that it is not admitted that Struik ran the "BSGR Group's" business in Guinea "with the help of Cilins". So far as Steinmetz understood it, Pentler's involvement was limited to the matters set out in paragraph 8 above.

68. Save that Steinmetz understands from Mr Struik's evidence in the LCIA Arbitration that the BSGR office in Conakry was officially opened in September 2006, paragraph 45 is not admitted.

69. Paragraphs 46 and 47 are not admitted, as this was before Steinmetz became involved in BSGR's activities in Guinea.

70. As to paragraph 48:

   70.1. Paragraph 48 (opening words) and subparagraphs 48.1 to 48.5 are not admitted.

   70.2. Paragraph 48.6 is admitted. Sometime after February 2008, Steinmetz flew to Guinea to discuss with President Conté the progress of Zogota and within this context the President raised the possibility of the BSGR Group being granted mining licences over SB1 and SB2. President Conté said that the government of Guinea was keen to replicate the work that BSGR had done on Zogota in SB1 and SB2. This is the meeting described at paragraph 11.1 above and 71.2(ii) below.

   70.3. Paragraph 48.7 is denied. Steinmetz did not join any such meeting by telephone.

71. As to paragraph 49:

   71.1. The opening to paragraph 49 is denied in light of information acquired by Steinmetz during the LCIA Arbitration. Steinmetz understands that BSGR and the individuals alleged to have signed

the 2008 Matinda Contracts stated in the LCIA Arbitration that those contracts were forgeries.

71.2.  As to paragraph 49.1:

(i)  Save that in 2008, and as described below, Steinmetz attended one or two meetings with President Conté, the opening words of paragraph 49.1 are not admitted.

(ii)  As to subparagraph (a), it is admitted that a meeting took place at the Presidential Palace. It took place outside. Avidan was present and possibly also Mme Touré. There were approximately 10 other people there, but Steinmetz did not know any of them. President Conté said that he wanted BSGR to invest in Guinea and not behave like the other big companies which spoke highly about their intentions but did nothing to implement them. It is not admitted that the said meeting was in about April 2008, or that during that meeting the President instructed Soumah to conduct a review into the Rio Tinto concessions because Steinmetz has no recollection of the same.

(iii)  Although Steinmetz has no personal knowledge in respect of subparagraph (b), on the basis of information acquired during the ICSID Arbitration, it is denied.

(iv)  Subparagraph (c) is admitted. Steinmetz arrived in Guinea on 20 May 2008 and departed from Guinea on 22 May 2008. The implication that Steinmetz's visit was linked with the removal from office of Prime Minister Kouyaté or Soumah's writing to Rio Tinto regarding the withdrawal of the Rio Tinto Concessions is denied.

71.3.  Paragraph 49.2 is admitted.

71.4.  No admissions are made as to paragraph 49.3.

71.5.   As to paragraph 49.4, Steinmetz does not recall the meeting in September or October 2008. In any event, the inference that the meeting was arranged by Mme Touré is denied since there is no basis for such inference. The third sentence is not admitted.

71.6.   Paragraphs 49.5 to 49.7 are admitted.

*How the Pentler Principals, I.S. Touré and Mme Touré were allegedly paid*

72.   Paragraph 50 is denied. To the best of Steinmetz's understanding, there was to be no remuneration of Pentler Principals, just payment to Pentler itself. Steinmetz has no knowledge of any plan or arrangements to remunerate others who allegedly provided assistance on the ground in Guinea, or to make any payments to Mme Touré.

73.   As to paragraph 51, it is denied that anything was done to "achieve these ends". Although Steinmetz had no contemporaneous knowledge of the purchase of Pentler from Onyx, based on documents disclosed in the LCIA Arbitration it is admitted that the Pentler Principals purchased Pentler from Onyx on around 14 February 2006.

74.   Paragraph 51.1 is admitted on the basis that although Steinmetz was not involved in the agreement when it was executed, he understands from the underlying letter dated 14 February 2006 and from Mr Struik's evidence in the LCIA Proceedings that the agreement between BSGR BVI and Pentler was entered into.

75.   Paragraph 51.2 is not admitted. Save that Steinmetz has seen documents in the course of the LCIA Arbitration which correspond with the descriptions pleaded of the Pentler-Bah Agreement, the Pentler-Daou Agreement or the Touré MoU, Steinmetz has no knowledge of whether those agreements were entered into by Pentler or of the circumstances in which they might have been entered into.

76.   As to paragraph 51.3:

76.1.   The first sentence is admitted.

76.2.   Subparagraphs (a), (b) and (c) are not admitted. Paragraph 75 above is repeated.

76.3.   Subparagraph (d) is not admitted. Steinmetz has no knowledge of whether payment of US$500,000 was made by BSGR BVI to Pentler, or to Bah, I.S. Touré and Daou.

77.   Paragraph 51.4 is not admitted as the alleged agreement is not within Steinmetz's knowledge, but it is admitted that a document recording such an agreement was disclosed in the LCIA Proceedings.

78.   As to paragraph 51.5, it is admitted that invoices were sent to BSGR in the amount stated, but no admissions are made as to whether they were paid.

79.   As to paragraph 51.6:

79.1.   The first sentence is admitted. Paragraph 74 above is repeated.

79.2.   The second sentence is not admitted. Steinmetz has no knowledge of whether Pentler or the Pentler Principals treated Mme Touré as holding shares in Pentler. Further, the pleading that Mme Touré was "treated" as holding such shares is embarrassing for lack of particularity.

79.3.   The third sentence is admitted, although Steinmetz only learned this later, during 2008 and save that he makes no admissions regarding the date on which Pentler acquired the shares.

80.   Paragraph 51.7 is not admitted.

81.   As to paragraph 52:

81.1.   Paragraph 52.1 is admitted, albeit that Steinmetz did not understand the 17.65% interest to have arisen out of the BSGR-Pentler Milestone Agreement.

81.2.   Paragraph 52.2 is not admitted. Paragraph 75 above is repeated. Further, the pleading that Mme Touré's "entitlement" to shares in Pentler was "recognised" by Pentler and the Pentler Principals is embarrassing for want of particularity.

81.3.   As to paragraph 52.3, the first sentence is not admitted. The second sentence is admitted, based on the evidence of Mr Tchelet in the LCIA Arbitration. Mr Tchelet's evidence was that Cilins was paid a monthly service fee until Avidan was appointed as Country Manager, from (he believes) January 2006 until July 2006, in the sum of $10,000.

81.4.   Paragraph 52.4 is not admitted. Steinmetz has no knowledge of monies received by Bah, I.S. Touré or Daou from Pentler.

82.   Paragraph 53 is denied, based on information acquired by Steinmetz in the LCIA Arbitration. It is noted that BSGR alleged in the LCIA Arbitration that the 2008 Matinda Contracts were forgeries.

83.   Paragraph 54 is admitted:

83.1.   BSGR had asked Pentler to contribute to the funding of the project. This was in accordance with Clause 6.2 of the Pentler Shareholders agreement entered into between BSGSR Steel, Pentler and BSGR BVI dated 19 July 2007. Pentler did not have the resources required to meet their contractual obligations to contribute.

83.2.   Steinmetz led the negotiation of the buy-out of Pentler's shares in BSGR BVI in March 2008. The negotiation was with Noy, and this was the first occasion that Steinmetz had met Noy. Lev Ran was involved in the negotiations to a limited extent. The agreement was to buy out Pentler's interest for US$22 million in four instalments: US$3 million on 15 April 2008, US$1 million on 15 June 2008, US$9 million on 15 April 2009; and US$9 million on 15 April 2010.

The reason for this structure was that BSGR wanted to load the deal for the latter part of the payment schedule when the project may have been revenue-generating or at least closer to revenue generating, or BSGR may have secured third party investment. Furthermore, if the project ceased operation for any reason, no payment, or further payment if any had been made already, would be due to Pentler.

83.3.    Steinmetz's recollection is that clause 6 of the Pentler SPA was designed to keep Pentler "onside" in the event that relevant business opportunities arose in the future and to prevent Pentler from assisting a competing business. Steinmetz did not regard Pentler as anything other than shareholders in BSGR BVI.

84.    Paragraph 55 is admitted. The third payment, of US$9 million, due on 15 April 2009 was not paid. BSGR was facing liquidity issues due to the financial crisis and worldwide recession. Pentler instructed lawyers and there was a heated exchange of correspondence and meetings between Pentler's lawyers and BSGR's lawyers, Skadden. This was resolved in the 2009 BSGR/Pentler Settlement.

85.    The 2009 BSGR/Pentler Settlement recited the fact that the parties had agreed the price of US$22 million for Pentler's shares and that the first US$4 million had been paid, and set out new dates for payment of the balancing instalments of US$18 million:

85.1.    US$4 million was due to be paid within 3 business days. That was paid.

85.2.    The balancing payments of US$14 million were not paid in accordance with the agreement. By the time of the next payment (31 December 2009) it looked possible that a deal could be done with a third party to take a stake in the project. BSGR therefore served notice on Pentler that it was relying on the grace period set out in Clause 4 of the settlement agreement, under which Pentler would not

enforce non-payment of the 31 December 2009 tranche until 15 April 2010.

86.   Following further discussion between Steinmetz and Noy, it was agreed that Pentler would receive a further US$22 million, representing the balance of $14 million plus the US$8 million bonus envisaged by clause 5 of the Pentler SPA. This took the entire amount Pentler received to US$30 million.

87.   Shortly afterwards, Noy asked for a further payment of US$20 million, as Pentler felt that that project as a whole was worth US$5 billion, so Pentler's 17.65% was worth in excess of US$700 million. He asked for an additional payment of US$19.5 million. BSGR and Pentler eventually agreed on a further payment of US$4.5 million. On the basis of that agreement, two further payments were made to Pentler: US$3 million on 5 August 2010 and US$1.5 million on 22 March 2011.

88.   Paragraph 56 is denied based on information acquired by Steinmetz during the LCIA Arbitration. It is noted that BSGR alleged in the LCIA Arbitration that this document was a forgery.

89.   Paragraph 57 is not admitted because Steinmetz has no knowledge of whether or how US$1 million was paid to Mme Touré in late 2009. It is noted, however, that BSGR engaged Crowe Howarth to carry out an audit of BSGR in 2013. Crowe Howarth concluded that:

> *"[N]othing has come to our attention that has caused us to believe, in all material respects, that the costs comprising the investment in the Project as at December 31, 2012 are not legitimate and justified Project's costs which have been reasonably evidenced by duly authorized transaction documents; nor has BSGR, directly or indirectly nor have its officers, advisors or employees, been involved in corruption or wrongdoing in respect of the Project."*

90.   As to paragraph 58:

90.1.   As to paragraph 58.1, it is admitted that Pentler had entered into an agreement to sell its interest in BSGR BVI for US$22 million. It is not admitted to whose benefit that sum would enure. It is noted that on the Claimants' pleaded case, Mme Touré was not a shareholder in Pentler and would not, on that basis, have been entitled to any part of the US$22 million.

90.2.   Paragraph 58.2 is denied based on information acquired by Steinmetz during the LCIA Arbitration. Steinmetz had no involvement with Mme Touré or the alleged payments to her or her company, nor does he have any reason to believe that BSGR ProjectCo entered into any such agreement or made any payments to her. It is noted that in the LCIA Arbitration BSGR and those alleged to have signed the 2008 Matinda Contracts maintained that they were forgeries.

## SECTION D: 2009/10: HOW THE MINING LICENCES WERE CONFIRMED FOLLOWING PRESIDENT CONTÉ'S DEATH

*The Mining Licences are confirmed and extended*

91.   Paragraph 59 is admitted, save that Steinmetz understands the Base Convention was signed on 16 December 2009, not 21 December 2009. It is noted that the Base Convention was only signed after review of the detailed Feasibility Study submitted by BSGR.

92.   Paragraph 60 is noted.

*Thiam allegedly acted for and was paid by the BSGR Group*

93.   Paragraph 61 denied:

93.1.   Thiam was not acting as a consultant, adviser, intermediary and/or representative to the "BSGR Group" at any time.

93.2.   Thiam did not receive nor was he promised substantial payments from the "BSGR Group" at any time or for any purpose.

94.   Further, it is noted that in the LCIA Arbitration:

94.1.   the Tribunal did not conclude that Thiam was acting as a consultant, adviser, intermediary and/or representative to BSGR or any related company; and

94.2.   the Tribunal dismissed Vale's allegations that BSGR bribed Thiam.

95.   As to paragraph 62:

95.1.   As to paragraph 62.1:

(i)   The first and second sentences are not admitted and Vale is put to proof, including as to who within the "BSGR Group" sought to hold a meeting with Thiam. Steinmetz did not do so.

(ii)   On the basis of knowledge gained by Steinmetz during the LCIA Arbitration, it is admitted that on 15 January 2009 BSGR reimbursed Mr Thiam $8,017 for a flight from Washington to London via Paris and that this was in respect of Fofana's travel in December 2008.

95.2.   Paragraph 62.2 is admitted.

95.3.   As to paragraph 62.3, it is admitted that a BSGR Group company purchased a ticket to France in or around April 2009, although Steinmetz has no knowledge as to whether Thiam flew to France between 10 and 20 April 2009. This payment was made to BSGR's travel agent, Diesenhaus Unitours, rather than Thiam.

95.4.   Paragraph 62.4 is admitted.

95.5.   As to paragraph 62.5:

(i)   The first sentence is admitted. BSGR was also engaged in talks with Chinalco at around the same time, and afterwards Baosteel.

(ii)  The second sentence is not admitted.

(iii) Otherwise it is denied. To the best of Steinmetz's knowledge, Thiam did not seek to assist the "BSGR Group's" discussions, nor was he acting as a consultant, adviser, intermediary and/or representative of the BSGR Group.

95.6.   Paragraph 62.6 is denied. On 10 June 2009, Thiam granted BSGR's request to renew the exploration permits for Simandou North and South.

95.7.   Paragraph 62.7 is not admitted. Insofar as Thiam sought to cultivate business in relation to Guinea's natural resources he did so on behalf of the GoG and not on behalf of BSGR. It is noted that this type of activity, to encourage foreign investment in local industry, is typical of minsters of mines or energy in countries around the world.

95.8.   Based on documents in the LCIA Arbitration seen by Steinmetz, paragraph 62.8 is admitted. But it is denied that Thiam's involvement in negotiations with CIC and/or Baosteel rendered him an agent or consultant of, or otherwise acting on behalf of, BSGR. Paragraph 93 above is repeated. On 25 November 2009, BSGR paid $10,744.66 for Thiam's flights to Israel and Hong Kong in September 2009. The payment in respect of the flight to Israel was to attend the wedding of Steinmetz's daughter, referred to at paragraph 16.2 above. This payment was made to BSGR's travel agent, Diesenhaus Unitours, rather than Thiam. Steinmetz understands that payment of travel expenses in this way was both standard in the industry and compliant with local law. It is noted that Vale also paid for travel expenses of Guinean government officials in or around 2006 and 2010.

95.9.   Paragraph 62.9 is admitted.

95.10.  As to paragraph 62.10:

    (i)   It is denied that Thiam assisted the "BSGR Group" in the negotiations for the Base Convention with the GoG.

    (ii)  It is denied that the emails referred to, to which Steinmetz was not a party, demonstrate that Thiam assisted the "BSGR Group" in its negotiations for the Base Convention with the GoG. They disclose nothing more than legitimate queries by a member of the Commission to the Minister of Mines.

    (iii) Otherwise, it is not admitted because Steinmetz had no involvement in the negotiation of the Base Convention, and has no knowledge about how it was negotiated.

95.11.  Paragraph 62.11 is admitted. Steinmetz believed that the reappointment of Thiam as Minister of Mines was positive news because Thiam was well placed to deal with international companies like BSGR given his Western education and excellent English, his background in investment banking having worked at Merrill Lynch and UBS, and what appeared to be a genuine sense of patriotism to act in the interests of the Guinean people. It is noted that representatives of Vale had mentioned to Steinmetz that they believed that Thiam was an excellent minister.

95.12.  As to paragraph 62.12:

    (i)   It is denied that Thiam assisted the "BSGR Group's" negotiations with Vale in connection with the JVA. The matters relied on are no more than Thiam doing his job as Minister of Mines and providing the information that would be expected of a Minister of Mines.

(ii)  Otherwise it is not admitted.

95.13.  No admissions are made as to paragraph 62.13.

95.14.  As to paragraph 62.14, it is admitted that Steinmetz received a letter from Thiam in June 2010. The subject line of the covering email was "confidential" but it is denied that the letter was marked "confidential". It is understood from Thiam's evidence in the LCIA Arbitration that this letter was sent to dispel rumours that SB1 and SB2 were about to be returned to Rio Tinto. Otherwise it is not admitted.

95.15.  Paragraph 62.15 is denied:

(i)  The money was paid to CCS was in respect of a Mozambique coal project and BSGR committed money to the deal in good faith. The money was paid by BSGR for an exclusive right to view the due diligence on the project.

(ii)  The money was paid to CCS as owner of the asset. It was not paid to Rajahussen.

(iii) BSGR was introduced to the project by Thiam, but Steinmetz has no knowledge of any arrangements between Thiam and Rajahussen. Steinmetz has never met or spoken to Rajahussen.

(iv) Steinmetz did not know that any of the money BSGR paid to access the due diligence would be used for the benefit of Thiam (if this is indeed what happened).

(v)  BSGR was trying to do five deals in the coal sector at the time. Metallurgical coal was the most attractive commodity and Mozambique was the best location. Struik managed a team dealing specifically with coal deals at the time and it was

believed that the Mozambique coal project was a great opportunity.

(vi) At around the same time Rio Tinto paid c. US$3.7 billion for a similar opportunity adjoining this Mozambique coal project. Vale also invested in a coal project in Mozambique in a similar area, which they considered was worth billions of dollars of investment.

95.16.  As to paragraph 62.16:

(i)  The first sentence is not admitted because Steinmetz has no knowledge of an attempt by Rajahussen to blackmail Thiam.

(ii)  Save that it is admitted that the words cited are from document C-636 in the LCIA Arbitration, the second sentence is not admitted.

(iii) It is not admitted that the reference to "B" in the emails is a reference to Steinmetz. If the reference to "B" is to Steinmetz, it is denied that the matters quoted from those emails are true.

95.17.  As to paragraph 62.17:

(i)  It is admitted that Thiam was tried and convicted in the United States in respect of unrelated matters. That conviction is of no relevance to the present case, nor is it "similar fact evidence" (to the extent such a concept is applicable to the present proceedings).

(ii)  No admissions are made as to rest of the paragraph. Steinmetz does not have knowledge of the details of the allegations or findings against Thiam.

## SECTION E: THE JVA AND THE SHA

Introduction

96.    Paragraph 63 is admitted.

97.    Paragraph 64 is admitted based on Struik's evidence in the LCIA Arbitration, albeit that Steinmetz understands that Vale had made earlier approaches to BSGR prior to this approach.

98.    Paragraph 65 is admitted, save that it is not admitted that the due diligence was conducted principally in Johannesburg or that that is where the relevant information was kept.

99.    Paragraph 66 is admitted.

100.   As to paragraph 67:

100.1.  The first two sentences of paragraph 67 are admitted.

100.2.  Steinmetz admits that terms for the proposed joint venture were reached during the negotiations, but denies that Clifford Chance conducted in-depth due diligence relating to (inter alia) corruption and bribery issues. For reasons set out below, it is averred that Vale's due diligence process was a sham in that Vale did not care whether the representations being made in the process were true. Steinmetz relies on the following particulars:

(i)   The Heads of Terms signed on 19 March 2010 included a deadline of 29 April 2010 to complete the deal.

(ii)  The SHA was in fact completed on 30 April 2010, within an unusually short period.

(iii) The due diligence process was concluded in under six weeks, which is an extremely short period within which to conduct due diligence for a transaction of this nature and size.

41

(iv) Vale completed the transaction before Ernst & Young, Vale's accountants, had finalised their audit of the target companies.

(v) Vale pressured Ernst & Young into altering their initial conclusion that BSGR posed a high risk of bribery and corruption.

(vi) In the interests of completing the transaction by the end of April 2010, the parties agreed to limit the scope of the due diligence to include only those companies in which Vale was purchasing an interest, namely BSGR Guernsey and its subsidiaries.

100.3. The Claimants' position in the final sentence is noted and pleaded to more fully below.

<u>Steinmetz's Involvement in the Due Diligence Process</u>

101.    Whilst Steinmetz was aware of the FCPA due diligence process, he was not involved in the preparation of the data room documents or the due diligence questionnaires. He was not shown a draft of the proposed responses to the Initial or Supplemental DD Questionnaire; nor did he provide any instructions or advice regarding the content of the responses; nor were enquiries made of him by Clark or anyone else regarding the content of the responses.

102.    As far as he was aware the due diligence documentation was a matter being handled by personnel within BSGR with the relevant first-hand knowledge, and under the close supervision of BSGR's lawyers, Skadden. Skadden ran the due diligence exercise and spent a significant amount of time on the detail of the due diligence process.

103.    Between 19 March and completion of the transaction, Skadden held meetings and phone calls with BSGR management on a regular basis. In respect of Steinmetz's involvement, paragraphs 19 and 20 above are repeated.

104.    The only document which Steinmetz recalls is the Steinmetz ABL Certificate which he signed.

<u>The Alleged Representations</u>

*The Initial DD Questionnaire*

105.    Paragraph 68 is admitted.

106.    As to paragraph 69 and 70:

106.1.  Paragraphs 69 and 70 paraphrase certain definitions, questions and answers in the Initial DD Questionnaire. Steinmetz will refer to the words used in the questionnaire. Further, for the avoidance of doubt, it is noted that the definition of "BSG Group" in the Initial DD Questionnaire was not the same as the use of the term "the BSGR Group" which is otherwise used in the Particulars of Claim (as defined at paragraph 28);

106.2.  Further, and without prejudice to the pleading in the preceding paragraph:

(i)     As to paragraph 69.5, in respect of Steinmetz it is denied. The response to question B regarding UBOs was that BSGR was fully owned by Balda and that the class of beneficiaries of Balda is Steinmetz and members of his family. It is denied that Steinmetz "ultimately owned and/or controlled the BSG Group". Steinmetz does not plead in respect of Cramer, Nysco and Balda because they are separately represented in these proceedings.

(ii)    As to paragraph 69.6, it is denied that inquiry was made of Steinmetz and otherwise it is not admitted as Steinmetz has no knowledge of the inquiries made by Clark.

(iii) Paragraph 70.1 contains an inaccurate summary of the representation which appears at paragraph A of Section III of the Initial DD Questionnaire and is therefore denied.

107.    Paragraph 71 (opening paragraph) is denied to the extent it refers to Steinmetz:

107.1.  Steinmetz did not approve or adopt the alleged representations as set out in the Initial DD Questionnaire. Paragraphs 101 to 104 above are repeated.

107.2.  Steinmetz did not provide assistance with completing the Initial DD Questionnaire.

107.3.  Steinmetz did not induce, incite, procure, review or approve the alleged representations contained in the Initial DD Questionnaire.

108.    Steinmetz makes no admissions as to paragraph 71 in respect of the other Defendants.

109.    Save that Steinmetz was a discretionary beneficiary of Balda which owned Nysco, the owner of BSGR, and was referred to in two of the responses to the Initial DD Questionnaire, paragraph 71.1 is denied. In particular:

109.1.  Steinmetz was an adviser to Balda; he did not control all material decisions relating to the "BSGR Group", BSGR or its sale of the Shares.

109.2.  Save that he played a major role in the commercial negotiations in respect of the joint venture with Vale, he was not the key decision maker on the part of BSGR. The decision to approve the terms of the transaction was taken by the board of BSGR.

109.3.  Clark did not make any enquiries of Steinmetz when completing the Initial DD Questionnaire.

109.4.  The fact that the Initial DD Questionnaire refers to Steinmetz as a beneficiary and adviser of the Balda Foundation does not support the assertions set out in paragraph 71.1.

110.   Save for paragraph 71.8, paragraphs 71.2 to 71.9 concern other Defendants and Steinmetz does not plead to them. As to paragraph 71.8, whilst Steinmetz was involved in the negotiations of various commercial aspects of the JVA and SHA, he was not involved in the drafting or approval of the representations set out in the Initial DD Questionnaire.

111.   As to paragraph 71.10:

111.1.  (i) is not admitted. Steinmetz will rely on the full meaning and effect of the JVA, including section 1.8.

111.2.  (ii) to (iv) concern other Defendants and Steinmetz does not plead to them.

112.   Paragraph 71.11 is denied. It is not to be inferred that Steinmetz discussed and agreed with any of the other Defendants the answers to be given in the Initial DD Questionnaire in advance, and Steinmetz did not do so. Nor did Steinmetz approve or adopt those answers.

*The Supplemental DD Questionnaire*

113.   Paragraph 72 is admitted.

114.   Paragraph 73 is admitted.

115.   As to paragraph 74:

115.1.  Based on documents from the LCIA Arbitration, it is admitted that on 31 March 2010, the BSGR Group effected an internal restructuring. Steinmetz has no recollection of the restructuring or of having been consulted in respect of the same. In any event,

Steinmetz would not normally be involved in corporate structuring issues of this type.

115.2. Otherwise it is denied. Steinmetz did not instigate nor was he involved in the restructuring. As far as Steinmetz is aware, there was no intention by or among any of the other Defendants to use the restructuring as a means to avoid disclosing matters which allegedly ought to have been disclosed. It is also noted that Skadden specifically advised that Pentler was not required to be disclosed.

116. As to paragraph 75:

116.1. It is denied that the 31 March 2010 Restructuring was carried out on the instructions of Steinmetz (whether with the assistance of the Second to Eighth Defendants or otherwise), or that that is to be inferred. Steinmetz does not plead to the knowledge of the Second to Eighth Defendants.

116.2. Paragraph 75.2 is denied.

117. As to paragraph 76:

117.1. It is denied that Clark made inquiry of Steinmetz, if the same be alleged.

117.2. Otherwise, it is not admitted because Steinmetz was not involved in the completion of the Supplemental DD Questionnaire.

118. As to paragraph 77:

118.1. It is denied that Steinmetz "concealed" anything by means of the Supplemental DD Questionnaire.

118.2. Paragraphs 77.1 and 77.2 paraphrase two of the questions and answers given in the Supplemental DD Questionnaire. Steinmetz will rely on the words used in the document.

118.3. As to paragraph 77.1, it is denied that a "legal counsel" called Mohammed L Boumbia was mentioned, though reference to a Mohammed L. Doumbia, "Local counsel" was made.

118.4. As to paragraph 77.2, the relevant question refers to "the Liberian Project or Project Hills", not "the Simandou Project or Project Hill". Further, for the avoidance of doubt, it is noted that the definition of "BSG Group" in the Supplemental DD Questionnaire was not the same as the use of the term "the BSGR Group" which is otherwise used in the Particulars of Claim (as defined at paragraph 28).

119. As to paragraph 78:

119.1. It is denied that Steinmetz is responsible for the alleged representations. Paragraphs 107 to 112 above are repeated.

119.2. It is denied that (i) Steinmetz was involved in the March 2010 Restructuring; or (ii) that it was carried out for the purposes pleaded by the Claimants.

119.3. Subparagraphs 78.2 to 78.4 relate to other Defendants and Steinmetz does not plead to them.

*The Alleged 8 April Representations*

120. Paragraphs 79 and 80 are not admitted because Steinmetz was not present at the FCPA Interview.

121. As to paragraph 81:

121.1. It is denied that Steinmetz is responsible for the alleged representations. Paragraph 119 above is repeated.

121.2. Paragraph 81.1 is not admitted. Steinmetz was not party to the alleged email.

121.3. Paragraph 81.2 is not admitted. Steinmetz was not involved in the FCPA Interview, or in the Initial and Supplemental DD Questionnaires. Neither Vale nor its lawyers, Clifford Chance, required that Steinmetz give an FCPA interview. It is inferred that this was because neither Vale nor Clifford Chance considered that Steinmetz had relevant knowledge.

*The Steinmetz ABL Certificate*

122. Paragraph 82 is admitted, save that Steinmetz had no knowledge at the time that the Steinmetz ABL Certificate used the same definition of 'Government Official' as contained in the DD Questionnaires.

123. Paragraph 83 paraphrases certain matters stated in the Steinmetz ABL Certificate. Steinmetz will rely on the words of the certificate.

124. Paragraph 84 concerns the other Defendants and Steinmetz does not plead to it.

*The Clark ABL Certificate*

125. Paragraphs 85 and 86 are not admitted because Steinmetz has no knowledge of the circumstances in which the Clark ABL Certificate came to be executed or its contents.

126. As to paragraph 87:

126.1. It is denied that Steinmetz is responsible for the alleged representations. Paragraph 119 above is repeated.

126.2. As to paragraph 87.1, is denied that the Clark ABL Certificate was reviewed by Steinmetz prior to its execution.

126.3. As to paragraph 87.2, it is denied that the Clark ABL Certificate refers to the knowledge of Steinmetz. Steinmetz is neither a director, employee nor a person acting on BSGR's behalf.

126.4.  As to paragraph 87.3:

(i)  It is admitted that Clark executed the JVA and SHA on 30 April 2010.

(ii)  It is admitted that the JVA contained warranties in Schedule 4. Steinmetz will rely on the full terms and effect of those warranties.

(iii) It is admitted that the JVA stated that the knowledge and awareness of BSGR for the purposes of the JVA included the knowledge of Steinmetz, Struik, Avidan and Tchelet, but it is denied that this results in Steinmetz being responsible for the representations made in the Clark ABL Certificate.

(iv) Otherwise, it is not admitted as Steinmetz was not involved in the Clark ABL Certificate.

126.5.  As to paragraph 87.4, (i) and (ii) are not admitted because Steinmetz was not involved in the said approvals. As to (iii), it is denied that the 'transactional documents' were executed on instructions from Steinmetz albeit his advice was sought by BSGR before execution.

*Further London Meetings*

127.   As to paragraph 88:

127.1.  It is admitted that Steinmetz attended certain of the meetings in London regarding negotiations for the JVA and SHA. Otherwise the opening to paragraph 88 is not admitted as Steinmetz cannot speak to the meetings that he did not attend. As to the final sentence, Steinmetz pleads as set out below.

127.2.  Paragraphs 88.1 concerns an alleged representation made by Tchelet, Avidan and Cramer, and is not pleaded to by Steinmetz.

127.3. As to paragraph 88.2, Steinmetz has no recollection of making the said representation and Vale is put to proof that the representation was made, the words used, and exactly when and where it was allegedly said. If Steinmetz did say those words, they are consistent with what he believed to be true then and now.

127.4. Paragraphs 88.3 concerns an alleged representation made by Avidan, and is not pleaded to by Steinmetz.

128. Paragraph 89 concerns alleged representations made by Tchelet and Cramer, and is not pleaded to by Steinmetz.

129. As to paragraph 90:

129.1. The first sentence is denied. Steinmetz is not responsible for the alleged representations. Paragraph 119 above is repeated.

129.2. The second sentence is not admitted. Steinmetz has no knowledge of and was not involved in the making of the alleged representations in the Initial and Supplemental DD Questionnaires, at the FCPA Interview or in the Clark ABL Certificate.

*Other matters*

130. As to paragraph 91, it is admitted that the representations made in the Steinmetz ABL Certificate (namely the Sixth Corruption Representation) was made with the intention that Vale should rely upon it so as to enter into the JVA and SHA, though, as is now known, Vale did not in fact rely on the same (see paragraphs 193 to 199 below). No admissions are made as to the balance of paragraph 91.

131. Paragraph 92 is denied. Steinmetz made no implied representations.

The terms of the JVA and SHA

132.   Steinmetz will also rely upon the JVA and SHA at trial for their full terms and true effect. In so far as it accurately summarises parts of the JVA and SHA, paragraph 93 is admitted.

Completion of the JVA and SHA

133.   Paragraph 94 is admitted.

Further payments made by Vale pursuant to the JVA and SHA

134.   Paragraph 95 is not admitted. It is noted that Vale avers that it continued to advance monies to the joint venture after it was aware of the circumstances giving rise to the present claims. Vale were apparently content to make further investments in respect of an asset which they assert was obtained illegally. Steinmetz will also rely on this as appropriate in respect of failure by Vale to mitigate its losses.


**SECTION F: ALLEGED PAYMENTS TO THE DEFENDANTS AND FACILITATORS AFTER THE JVA AND SHA**

Alleged bonus payments made to the Second to Sixth Defendants

135.   As to paragraphs 96 to 98.1:

135.1.  Steinmetz admits that BSGR made bonus payments to various individuals.

135.2.  Steinmetz has no recollection of the amounts of the bonus payments to each individual, but he recalls that he was consulted and gave recommendations regarding the proposed level of bonus for some of the senior individuals and in respect of the Second Defendant he recalls having consulted with Mr Bonnnant.

135.3.  It is denied that Steinmetz offered bonuses to the Second to the Sixth Defendants before the JVA and SHA were entered into. It is also

51

denied that Steinmetz had the authority to make such an offer on BSGR.

135.4. Otherwise, paragraphs 96 to 98 are not admitted.

136. Paragraph 99 is embarrassing for want of particularity. Steinmetz is unable to plead to paragraph 99 because of that want of particularity, and because the ultimate destination of the said $500 million is the subject of a tracing exercise which is being carried out by others of the Defendants, but which Steinmetz himself is unable to carry out because he is not in possession of all of the documents necessary to carry out that exercise.

<u>Alleged payments made to Pentler and Mme Touré</u>

137. Steinmetz has no personal knowledge of the payments made to Pentler or any payments alleged to have been made to Mme Touré, but is able to admit certain payments to Pentler having negotiated the Pentler SPA and based on knowledge acquired by him during the LCIA Arbitration. That is the basis for the admissions in respect of payments to Pentler set out in herein.

138. As to paragraph 100:

138.1. The first sentence is admitted. Paragraph 83 above is repeated.

138.2. It is admitted on the basis of knowledge obtained in the LCIA proceedings that the balance of US$22 million was paid by BSGR to Nysco on 10 May 2010, and by Nysco to Windpoint on 17 May 2010.

138.3. The third sentence is embarrassing for lack of particularity. Steinmetz is unable to plead to the third sentence because of that lack of particularity, and because the ultimate destination of the said $500 million is the subject of a tracing exercise which is being carried out by others of the Defendants, but which Steinmetz himself is unable

to carry out because he is not in possession of all of the documents necessary to carry out that exercise.

138.4.   As to the fourth sentence and subparagraphs 100.1 and 100.2:

(i)   The further US\$4.5 million was paid by Windpoint to Pentler by way of US\$3 million on 5 August 2010 and US\$1.5 million on 22 March 2011.

(ii)  Otherwise it is not admitted.

139.   Paragraph 101 is not admitted as Steinmetz has no knowledge of contracts made by Pentler with Mme Touré or payments made to her.

## SECTION G: ALLEGED ATTEMPTS TO DESTROY INCRIMINATING MATERIAL

140.   Paragraphs 102 and 103 do not allege any material facts relevant to the causes of action on which the Claimants rely, but set out purported evidence which ought not to have been pleaded. Steinmetz's response to those paragraphs herein is without prejudice to that position.

141.   Paragraph 102 is denied.

142.   Paragraph 103 is denied. Steinmetz did not give any such instructions to Cilins.

143.   As to paragraph 103.1:

143.1.  It is denied that Cilins was acting on Steinmetz's instructions.

143.2.  Otherwise it is not admitted. Steinmetz has no knowledge of Cilins' communications or meetings with Mme Touré.

144.   As to paragraphs 103.2 to 103.7:

144.1.  It is denied that Cilins was acting on Steinmetz's instructions:

(i)  Steinmetz hardly knew Cilins and had no real relationship with him. All Steinmetz's dealings with Pentler were with Noy. Steinmetz had met Cilins on approximately four or five occasions. He never met Cilins alone.

(ii)  Steinmetz was aware that Pentler was going to try to ask Mme Touré to restate the falsity of allegations she had made (and which the Technical Committee had purported to rely on). This was because Noy had told Steinmetz that Pentler would make efforts to seek to persuade Mme Touré to tell the truth and withdraw, as she had done before, the untrue allegations she was making.

(iii)  Steinmetz did not offer money, through Cilins or in any other way, for Mme Touré to sign a further statement or destroy documents. Cilins did not travel to the USA on Steinmetz's instructions, or with his authority, or on behalf of BSGR or anyone associated with BSGR. Cilins confirmed this in evidence in the LCIA Arbitration.

(iv)  It is very common for other people to speak as if they have Steinmetz's authority when they do not. Steinmetz has influence and people seek to improve their position by claiming an association they do not have. Cilins had no authority or instruction from Steinmetz.

144.2.  It is admitted that on 10 March 2014, Cilins pleaded guilty to the offence of obstructing a criminal investigation and, on 25 July 2014, was sentenced to 24 months' imprisonment.

144.3.  Otherwise paragraphs 103.2 to 103.7 are not admitted. Steinmetz has no knowledge of Cilins' communications or meetings with Mme Touré.

## SECTION H: REVOCATION OF THE MINING LICENCES

145.    Save that no admissions are made as to the final sentence, paragraph 104 is admitted.

146.    It is noted that the manner in which the Technical Committee engaged in the review process was devoid of procedural fairness and featured fundamental flaws in basic due process:

146.1.  The burden of proof was reversed, with the GoG insisting that BSGR demonstrate why no corruption had taken place.

146.2.  The allegations made by the Committee were unsupported by evidence, and/or the Committee failed to provide BSGR with the purported evidence on which they were based or, where evidence was provided, that evidence was patently incomplete.

146.3.  The GoG had predetermined the outcome of the Technical Committee review. Even before the Technical Committee had completed its review and without providing BSGR, BSGR Guernsey or BSGR ProjectCo with all the evidence on which that committee relied, President Condé had declared his intention to expropriate BSGR ProjectCo's rights and assets.

146.4.  Further, as noted above, on 30 March 2020 the Conakry Court of Appeal in Guinea recorded the fact that the public prosecutor in Guinea had decided to withdraw the criminal proceedings which it had started against Mme Touré, I.S. Touré, Mahmoud Thiam and others in respect of allegations of bribery.

## SECTION I: CLAIMS IN DECEIT

Alleged falsity of the First to Eighth Corruption Representations

147.   So far as it relates to Steinmetz, the introduction to paragraph 105 is denied. Paragraph 24 above is repeated.

*Particulars in relation to Mme Touré*

148.   No admissions are made as to paragraphs 105.1 to 105.6. At the material times Steinmetz had no knowledge of (a) Mme Touré's existence or role at any material time, (b) any material links she may have had to Pentler or to BSGR, or (c) any payments made to her. Steinmetz met Mme Touré only once, if at all, as described at paragraph 71.2(ii) above, and did not converse with her in any way.

149.   As to paragraph 105.1:

149.1.   It is denied that Mme Touré fulfilled the definition of Government Official contained in the Initial and Supplemental DD Questionnaires and the Steinmetz and Clark ABL Certificates. Furthermore:

(i)   It is denied that she was the fourth wife of President Conté; paragraph 54 above is repeated.

(ii)   It is not admitted that she held regular meetings with GoG ministers in her capacity as the President's wife, and, if she did so, it is denied that such meetings brought her within the definition of Government Official for the purposes of the documents referred to above.

(iii) It is denied that she attended public events and ceremonies as the spouse of the Head of State, since it is denied that she was the wife of President Conté.

(iv) It is not admitted that she held a diplomatic passport identifying her as the wife of the President of Guinea, and, if she did hold such a passport, it is denied that doing so brought her within the definition of Government Official for the purposes of the documents referred to above.

149.2. Since it is denied that Mme Touré was the wife of President Conté, it is denied that she was the spouse of a Government Official for the purposes of the Second Corruption Representation.

150. As to paragraph 105.2:

150.1. It is denied that Mme Touré was the wife of President Conté, for the reasons set out in paragraph 54 above.

150.2. It is not admitted that the participants in the FCPA Interview and the London Meetings understood that the meaning of the phrase "government official" at those meetings was the same as the definition used in the Initial and Supplemental DD Questionnaires.

150.3. It is denied that as a matter of ordinary language and in the context of the broad questions asked at those meetings (as to which no admissions are made) the term "government official" included the wife of the President.

151. As to paragraph 105.3:

151.1. It is not admitted that Mme Touré was offered an interest in Pentler. Paragraph 75 above is repeated.

151.2.  It is not admitted that Mme Touré was paid $5 million in relation to that alleged interest. Steinmetz has no knowledge of contracts made by Pentler with Mme Touré or payments made to her

151.3.  It is denied that BSGR ProjectCo agreed anything with Mme Touré by the 2008 Matinda Contracts, or made any payments to her pursuant to the 2008 Matinda Contracts, as those purported contracts did not exist. Paragraph 82 above is repeated.

152.  As to paragraph 105.4, since it is denied that the alleged 2008 Matinda Contracts existed, it is also denied that BSGR ProjectCo made or authorised promises or payments in respect of the 2008 Matinda Contracts.

153.  As to paragraph 105.5:

153.1.  It is denied that BSGR approved any offer by Pentler to Mme Touré of any interest in Pentler, if such an offer was made, regarding which Steinmetz makes no admissions.

153.2.  It is denied that any such approval can be inferred from the alleged actions of Ms Merloni-Horemans set out in this paragraph, regarding which Steinmetz makes no admissions.

153.3.  It is denied that BSGR wished to confer financial benefits on Mme Touré, and so it is denied that BSGR procured the sale of Pentler for that purpose and it is denied that BSGR executed the BSGR-Pentler Milestone Agreement for that purpose.

153.4.  It is denied that the 2008 Matinda Contracts existed, so it is denied that BSGR authorised BSGR ProjectCo to enter into them or to make payments pursuant to them.

153.5.  It is not admitted that BSGR authorised the Pentler SPA or the 2009 BSGR/Pentler Settlement or the subsequent amendments thereto No

admissions are made regarding any alleged payments by the Pentler Principals to Mme Touré from the proceeds of those agreements.

*Particulars in relation to Thiam*

154. Paragraph 105.7 is admitted.

155. As to paragraph 105.8:

155.1. It is denied, if it is alleged, that Steinmetz promised payments or benefits to Thiam in connection with steps he took to confirm the Mining Licences, or that Steinmetz had any knowledge of any such payments or benefits to Thiam.

155.2. On the basis of documents seen by Steinmetz in the LCIA Arbitration, it is admitted that (i) Thiam was reimbursed US$8,017 for Fofana's travel to London in early January 2009; and (ii) Thiam's air tickets to France, Israel and Hong Kong in May and September 2009 were paid for by BSGR Treasury Service Limited. Steinmetz was not involved in the payment of those sums, other than having knowledge as to payment of Thiam's travel expenses to attend his daughter's wedding. To the best of Steinmetz's knowledge, the other sums were also for legitimate travel costs. It is noted, on the basis of documents seen by Steinmetz in the LCIA Arbitration, that Vale itself paid for Thiam's hotel on a trip to Carajas and placed its private jet at Thiam's disposal.

155.3. It is denied, if it is alleged, that Steinmetz promised Thiam US$5 million in November 2010 in the manner described in the Particulars of Claim, or that Steinmetz had any knowledge that such sum was promised to Thiam in that manner.

*Particulars: General*

156.    Paragraph 105.9 is denied. As pleaded above: (i) Mme Touré was not a Government Official or the spouse of one; (ii) BSGR ProjectCo did not enter into the 2008 Matinda Contracts with Mme Touré or promise her any payment or benefit; (iii) no "part payments" were made under the 2008 Matinda Contracts, whether authorised by and made on behalf of BSGR ProjectCo or otherwise, because the 2008 Matinda Contracts did not exist.

157.    As to paragraph 105.10:

157.1.  it is admitted that Thiam was a Government Official;

157.2.  it is denied, if it is alleged, that Steinmetz promised or made payments or other benefits to Thiam in connection with the steps Thiam took in respect of the Mining Licences, or had any knowledge of any such promises or payments;

157.3.  otherwise it is not admitted.

158.    No admissions are made as to paragraph 105.11. To the extent it is alleged, Steinmetz did not procure or authorise, directly or indirectly (i) Pentler's entry into the Touré MoU or (ii) any payments or promises of payments or other benefits to Thiam, nor did he have any knowledge of the same.

159.    As to paragraph 105.12:

159.1.  Steinmetz did not hold meetings with the President of Guinea, the Prime Minister of Guinea, the Minister of Mines or others with a view to seeking to have the Rio Tinto Concessions revoked.

159.2.  Steinmetz does not plead to the allegation as to meetings attended by Avidan and Struik, save that Steinmetz has no knowledge that either Avidan or Struik held any such meetings with a view to seeking to have the Rio Tinto Concessions revoked.

159.3.  As far as Steinmetz is aware the Rio Tinto Concessions were revoked because of Rio Tinto's prolonged failure to conduct exploration activities.

159.4.  Otherwise it is not admitted. As to whether Mme Touré attended a number of those/similar meetings for the same alleged purpose, (i) Steinmetz can only recall one occasion when he may have met Mme Touré, which was at a meeting with President Conté sometime after February 2008; and (ii) Steinmetz does not know Mme Touré's purpose for attending that meeting (if indeed she did).

160.   No admissions are made as to paragraph 105.13. Steinmetz did not, directly or indirectly, make or offer any corrupt payments or provide anything of value to any officials in connection with the "BSGR Group's" business in Guinea, nor does he have any knowledge of the same.

161.   As to paragraph 105.14:

161.1.  It is denied that the Sixth Corruption Representation was false.

161.2.  It is denied that Steinmetz authorised the making of the promises and payments identified at paragraphs 105.3 and 105.8 of the Particulars of Claim.

161.3.  It is not admitted that BSGR Guernsey authorised the payment of US$1 million or any other sum to Mme Touré on behalf of BSGR ProjectCo. Steinmetz had no involvement in or knowledge of any such payments to Mme Touré.

161.4.  It is denied that BSGR Guernsey authorised payment of US$5 million to Thiam in November 2010. Paragraph 95.15 above is repeated.

161.5.  On the basis of documents disclosed in the LCIA Arbitration, it is admitted that certain of Thiam's travel costs were reimbursed, but

Steinmetz was not personally involved in the same. Paragraph 95 above is repeated.

162. No admissions are made as to paragraph 105.15. Steinmetz has no knowledge of, and had no involvement with, any payments of money or anything of value to Mme Touré or Thiam.

163. As to paragraph 105.16:

163.1. No admissions are made as to whether BSGR, its subsidiaries or affiliates had made, promised and/or authorised the payment of money or something of value to Mme Touré. Steinmetz has no knowledge of, and had no involvement with, any promises to or payments of money or anything of value to Mme Touré.

163.2. It is denied that BSGR, its subsidiaries or affiliates had made, promised and/or authorised the payment of money or something of value to Thiam. Paragraphs 93 to 95 above are repeated.

163.3. To the best of Steinmetz's knowledge, the Mining Licences were obtained and confirmed through a clean process and BSGR did do the "right things" (though no admissions are made as to what the "right things" entailed). It is denied, if it is alleged, that Steinmetz bribed or procured improper payments to Mme Touré or Thiam, or had any knowledge or involvement in any such bribery or procuring of improper payments.

163.4. Otherwise, it is not admitted.

Alleged falsity of the First to Third Consultancy Representations

*Particulars in Relation to Cilins*

164. Save as otherwise admitted above on the basis of knowledge gained by Steinmetz from his involvement in the LCIA Arbitration, no admissions are made as to 106.1(a) to (j).

165.   As to paragraph 106.1(k):

165.1.  the first sentence is admitted;

165.2.  it is admitted that Pentler's shareholders included Cilins, but it is denied that it is to be inferred that Cilins continued to act on behalf of BSGR or BSGR ProjectCo on a regular basis. So far as Steinmetz is aware, Cilins did not. Steinmetz's recollection about the reason why clause 6 was included in the Pentler SPA is set out in paragraph 83.3 above.

166.   Paragraph 106.1(l) is not admitted.

167.   As to paragraph 106.1(m):

167.1.  It is not admitted that Cilins travelled to Florida in 2013 to meet Mme Touré and to offer her money to destroy the alleged Incriminating Documents or sign the alleged False Testimony.

167.2.  If Cilins did so, it is denied that he did so on Steinmetz's instructions.

*Particulars in Relation to Pentler*

168.   Paragraph 106.2 is not admitted. So far as Steinmetz understood, Pentler did not act as an intermediary, consultant, representative and/or agent to BSGR or BSGR ProjectCo, nor was it a member of a "local advisory team" retained by BSGR or BSGR ProjectCo, whether directly or indirectly.

168.1.  As to subparagraph (a):

(i)   The first sentence is admitted.

(ii)  The second sentence is not admitted. So far as Steinmetz understood, Pentler was not representing or acting for BSGR or BSGR ProjectCo in Guinea.

168.2.  Subparagraph (b) is not admitted as Steinmetz does not know when the Pentler Principles became shareholders of Pentler. Further, it is not admitted that "their acts" are necessarily to be attributed to Pentler and the Claimants are put to proof of the same in respect of the particular acts alleged to be attributed.

168.3.  As to subparagraph (c), on the basis of Steinmetz's knowledge gained from the LCIA Arbitration, it is admitted that BSG MM and Pentler entered into a Services Agreement, although no admissions are made as to the date of such agreement.

168.4.  As to subparagraph (d), it is admitted that the BSGR-Pentler Milestone Agreement states as is quoted. So far as Steinmetz is aware, Pentler was not thereafter acting as a consultant for or on behalf of BSGR Project Co.

168.5.  As to subparagraph (e):

(i)   The first sentence is not admitted as Steinmetz has no knowledge of the agreements between Pentler and Bah, Daou and/or Touré (other than the documents that he has seen in the course of the LCIA Arbitration) or of Pentler's intention in entering into any such agreements.

(ii)  The second sentence is not admitted. Steinmetz has no knowledge that BSGR BVI paid or procured payment of US$500,000 or any other amount to Bah, I.S. Touré or Daou.

168.6.  As to subparagraph (f):

(i)   It is admitted that entities within the BSGR group of companies paid various sums to Pentler in respect of its introduction of BSGR to Guinea. To the best of Steinmetz's knowledge, these were not consultancy fees nor was Pentler retained as a consultant. Paragraph 8 above is repeated.

(ii) On the basis of knowledge gained by Steinmetz in the LCIA Arbitration, it is admitted that on 21 May 2007 Pentler invoiced BSGR BVI in the amount of US$62,000, and that the invoice described this as "consultant fees" in relation to "Your mining activity in Guinea". It is admitted that this sum was paid by BSGR BVI shortly thereafter. "Consultant" was the default term used by BSGR to signify third party service providers, i.e. to distinguish external service providers from employees. It did not connote that Pentler was a consultant.

168.7. As to subparagraph (g):

(i) The first sentence is admitted.

(ii) The second sentence is denied. The US$8 million payment was to recognise that if BSGR Steel realised a profit exceeding US$1 billion, then Pentler were entitled to an additional payment to recognise the value of Pentler's shareholding which had been sold.

*Particulars in relation to Boutros*

169. As to paragraph 106.3:

169.1. It is not admitted that Boutros and/or LMS acted as a consultant or intermediary for BSGR or BSGR ProjectCo. Paragraph 106.3 also refers to BSGR Guinea, but that is not defined in the Particulars of Claim and it is not clear which company is being referred to. Steinmetz has no knowledge of Boutros or LMS, nor was he involved in the negotiation of the Boutros Contract or in authorising the Boutros Payments. As noted above, the word "consultant" was broadly used within BSGR. Payments received by third parties were often described by BSGR as "consulting fees", but this was not an indication that the person acted as a consultant or an intermediary. It

was used by BSGR as a way to differentiate between employees and non-employees.

169.2.  No admissions are made to paragraphs 106.3(a) to (e).

*Particulars in relation to I.S. Touré*

170.  As to paragraph 106.4:

170.1.  It is not admitted that I.S. Touré was the half-brother of Mme Touré.

170.2.  It is denied that Mme Touré was married to President Conté. Paragraph 54 above is repeated.

*Particulars: General*

171.  As to paragraphs 106.5 to 106.10:

171.1.  at no point did Steinmetz possess any knowledge, whether actual or constructive, as to the matters alleged to have rendered the First to Third Consultancy Representations false;

171.2.  otherwise no admissions are made to paragraphs 106.5 to 106.10.

Alleged Falsity of the Fourth Consultancy Representation

172.  Save that Steinmetz makes no admissions as to who owned Pentler, paragraph 107.1 is admitted. The purchase of Pentler's 17.65% shareholding in BSGR BVI arose because Pentler was not able to contribute to the funds required for BSGR's Guinean operations. So far as Steinmetz is aware, it was not because of tax planning purposes. Paragraph 14 above is repeated.

173.  Paragraph 107.2 is denied:

173.1.  The purpose of the Pentler SPA was to buy out a minority shareholder which was unable to contribute capital to the project. The consideration payable for the shares was achieved through

66

negotiation and was, in retrospect, conservative in light of the consideration which Vale agreed to pay in respect of the project some two years later.

173.2.  So far as Steinmetz is aware, Pentler was not, and never had been, a consultant for BSGR in Guinea. It introduced the company to the country in 2005 and 2006 and then conducted no further work.

173.3.  Clause 6 of the Pentler SPA says that Pentler's shareholders would *"continue to advise and act as consultant for the period of 5 years from signing date hereof"*. Steinmetz recalls that BSGR wanted to keep Pentler with it, as potentially future business opportunities might have come up that BSGR would want to work with them on, and this clause was seen as a way to keep them onside. As far as Steinmetz understood, it was not BSGR's intention that Pentler would do any further work, and Pentler had not done any work for BSGR since the initial introduction to Guinea and assistance in setting up BSGR's office.

173.4.  The US$8 million payment was to recognise that if BSGR Steel realised a profit exceeding US$1 billion, then Pentler were entitled to an additional payment to recognise the value of the deal which they had introduced.

Allegation that Steinmetz knew that the representations were false or acted recklessly

174.  As to paragraph 108 (opening), save that it is admitted that Steinmetz signed the Steinmetz ABL Certificate, in respect of which Steinmetz will rely on the words used, it is denied that Steinmetz made each or any of the Corruption and Consultancy Representations. In the event that it is found that Steinmetz did make each or any of the Corruption and Consultancy Representations, it is denied that Steinmetz did so knowing them to be false, without belief in their truth or recklessly as to whether they were true or not.

175.    Save that it is admitted that Steinmetz was a discretionary beneficiary of Balda, which was the ultimate beneficial owner of BSGR, paragraph 108.1 is denied. The role of Steinmetz in respect of decisions made by the BSGR Group is set out in paragraphs 4 and 5 above and in any event such facts and matters do not give rise to any inference of dishonesty or recklessness.

176.    Save that it is admitted that Steinmetz was involved in high level strategy issues connected to BSGR's business in Guinea, the first sentence of paragraph 108.2 is denied.

177.    As to the second sentence of paragraph 108.2:

177.1.    The meetings attended by Steinmetz in Guinea are set out in paragraph 11 above. Insofar as the Eighth, Ninth and Twelfth Touré Intercessions and the meeting pleaded in paragraph 48.6 of the POC are not the same meetings as those described in paragraph 11 above, paragraph 108.2(i) is denied.

177.2.    As to paragraph 108.2(ii), it is admitted that the September 2007 Email was sent to Steinmetz but it is denied that this gives rise to any inference of dishonesty or recklessness.

177.3.    As to paragraph 108.2(iii) it is admitted that Steinmetz was involved in the negotiations which culminated in the Pentler SPA and then the BSGR/Pentler Settlement but it is denied that this gives rise to any inference of dishonesty or recklessness.

177.4.    As to paragraph 108.2(iv), it is admitted that Steinmetz was in contact with Thiam over the course of 2009 and 2010. It is denied that this gives rise to any inference of dishonesty or recklessness.

178.    Paragraph 108.3 is denied. As set out above, Steinmetz was consulted in respect of some of the bonuses which BSGR paid out after execution of the SHA and JVA. At this distance in time, he cannot recall in respect of which of the bonuses he was consulted. He recalls that BSGR's management

wanted to pay bonuses to personnel to thank each of them for their hard work over the previous few years in respect of the Guinea project, which bore fruit when BSGR entered into the joint venture with Vale. In any event, it is denied that the payment of bonuses gives rise to an inference of dishonesty or recklessness.

179. Paragraph 108.4 is embarrassing for want of particularity. The traceable proceeds of the sums received from Vale under the JVA and SHA is subject to an ongoing tracing exercise. In any event, it is denied that any financial windfall obtained by Steinmetz gives rise to any inference of dishonesty or recklessness.

180.    As to paragraph 108.5:

180.1. It is admitted that the September 2007 Email was sent.

180.2. At this distance in time Mr Steinmetz has no specific recollection of receiving or reading the September 2007 Email and he doubts that he even noticed the reference to "the Lady".

180.3. As for Steinmetz's response to the September 2007 Email, that response indicated that (i) BSGR's presentation should focus on the merits of BSGR's position rather than Rio Tinto's failures, and (ii) the GoG should make their own decision about withdrawal of Rio Tinto's rights without influence from BSGR.

180.4. It is denied that the September 2007 Email or Steinmetz's response gives rise to any inference of dishonesty or recklessness.

181. Paragraph 108.6 is denied. The extent of Steinmetz's knowledge of Mme Touré is set out in paragraph 22 above and nothing in the "terms of the September 2007 Email" gives rise to any inference of dishonesty or recklessness.

182. Paragraph 108.7 is denied. Steinmetz was unaware of the 31 March 2010 Restructuring at the time and was not aware at any stage that it was carried out with any improper intentions.

183. Paragraphs 108.8 and 108.9 are denied. Steinmetz did not approve the agreements referred to in paragraph 108.8, nor did he have knowledge of or give consent to the payment of any bribes.

184. Paragraphs 108.10 and 108.11 are denied.

185. As to paragraph 108.12, the words quoted from the Pentler SPA are admitted. However, Steinmetz understood those words to mean as set out at paragraph 83.3 above. In the premises, it is denied that these words give rise to any inference of dishonesty or recklessness.

186. As to paragraph 108.13:

   186.1. The first sentence is denied. No authority seized Steinmetz's Blackberry.

   186.2. No other admissions are made for the reasons set out in Steinmetz's Second Witness Statement in the LCIA Arbitration.

187. Paragraph 108.14 is not admitted.

188. Paragraph 108.15 is denied.

189. As to paragraph 108.16:

   189.1. It is admitted that Steinmetz knew that the Pentler SPA did not involve a BSGR company or a tax planning transaction, and that he knew it involved the purchase of shares from Pentler, which he understood to be owned by the Pentler Principals.

   189.2. It is denied that Steinmetz knew that Mme Touré was an owner of Pentler, or that she was in fact an owner of Pentler.

189.3.   As to the second sentence:

(i)   it is denied that Steinmetz knew about BSGR's relationship with Pentler save as admitted or averred in this Defence;

(ii)   it is denied that Steinmetz made any false claims regarding the advice given by Skadden;

(iii) it is admitted that Pentler was not disclosed to Vale; this was on the basis of advice given by Skadden.

<u>Allegation that the other Defendants knew that the representations were false or acted recklessly</u>

190.   Paragraphs 109 to 113 relate solely to the other Defendants, and they are therefore not pleaded to by Steinmetz.

191.   As to paragraph 114:

191.1.   Paragraph 114.1 is denied as it relates to Steinmetz. Steinmetz was not a controlling mind of Nysco at the time the representations were made. Steinmetz was not a director of Nysco, was not acting on Nysco's behalf in any material respect, and did not act (and is not alleged to have acted) as an agent for Nysco in making the alleged representations. Otherwise, no admissions are made.

191.2.   No admissions are made in respect of paragraph 114.2.

191.3.   Paragraph 114.3 is denied. Steinmetz is and was at all material times a discretionary beneficiary of Balda. He was not engaged by Balda to provide services to the "BSGR Group". His relationship with those entities was as set out in paragraphs 4 and 5 above.

191.4.   On the basis of the denials set out above in respect of paragraphs 114.1 and 114.3, paragraph 114.4 is denied.

191.5.   No admissions are made in respect of paragraph 114.5.

191.6. As to paragraph 114.6, it is admitted on the basis of knowledge obtained in the LCIA proceedings that the balance of US$22 million was paid by BSGR to Nysco on 10 May 2010, and by Nysco to Windpoint on 17 May 2010. Otherwise, no admissions are made.

192. As to paragraph 115:

192.1. Paragraph 115.1 is admitted.

192.2. Save that it is admitted that under Liechtenstein law a de facto organ of a legal entity is a person who acted as a director or took the decisions a director would take, paragraph 115.2 is not admitted.

192.3. As to paragraph 115.3, it is denied that Steinmetz was a de facto organ of Balda at the time the representations were made and the JVA/SHA entered into:

(i) As to paragraph 115.3.1 was a discretionary beneficiary (as opposed to a first class beneficiary, whatever that phrase is intended to mean), but it is denied that the fact that Steinmetz was a beneficiary of Balda rendered him a de facto organ of Balda.

(ii) Paragraph 115.3.2 is admitted save for the word "purportedly, which is denied. It is also denied that the fact that Steinmetz acted as an adviser to Balda pursuant to the terms of a contract rendered him a de facto organ of Balda.

(iii) Paragraph 115.3.3 is denied. Onyx was appointed as consultant to Balda by Balda's foundation council, not by Steinmetz.

(iv) Paragraph 115.3.4 is denied. Steinmetz's requests for distributions were not always accepted by Balda's foundation council.

(v) As to paragraph 115.3.5, it is denied that any relevant information regarding Steinmetz's assets in 2010 can be inferred from statements made in 2020 in response to the Worldwide Freezing Order. Even if, which is not admitted, in April 2010 Steinmetz's material assets were solely held by Balda and Vessna Foundation, it is denied that this rendered him a de facto organ of Balda.

(vi) As to paragraph 115.3.6, it is denied that Steinmetz attended "meetings" of the Balda foundation council; he attended one meeting. In any event, it is denied that attending meetings of the Balda foundation council would render him a de facto organ of Balda.

(vii) As to paragraph 115.3.7, on the basis of the denials set out above it is denied that Steinmetz controlled all or any material decisions of Balda or BSGR.

192.4. No admissions are made in respect of paragraph 115.4.

192.5. As to paragraph 115.5, on the basis of the denials set out above it is denied that any relevant knowledge of Steinmetz was attributable to Balda. No admissions are made in respect of whether Cramer's knowledge was attributable to Balda.

Inducement and reliance

193. Paragraph 116 is denied.

193.1. It is now clear that the representations made during Vale's due diligence process on which the Claimants rely in these proceedings were provided as part of a sham due diligence process, undertaken solely so that Vale could demonstrate that it had met any regulatory requirements by reference to the undertaking of the said process, but without Vale at any point caring about the truth of the

representations so made, such that it placed no reliance on the same and was not induced by them to enter into the JVA and the SHA.

193.2.   Further or in the alternative, and in the event that the Court finds that the alleged representations made by Steinmetz were false (which is denied), Vale knew them to be false when they were made, such that it placed no reliance on the same and was not induced by them to enter into the JVA and the SHA.

193.3.   Further and in any event and in the premises set out below, Vale placed no reliance on representations made by Steinmetz in particular.

194.   Prior even to commencing its due diligence process, Vale considered that BSGR had a poor reputation (for acting unethically), was reputed to be engaged in bribery and other acts of political corruption and was reputed to have a corrupt relationship with Mme Touré in particular, who was suspected of receiving a US$2 million bribe from BSGR as the first level of a structure of payments used by BSGR to obtain the mining rights at Simandou and who had placed her brother as a director with BSGR. In particular:

194.1.   In a "Kick Off Meeting" document, Vale indicated that it was of the view that *"thanks to their close relationship with influential people of the GoG (the fourth spouse of President Conté), we suppose that BSGR is a strong candidate to be granted with the areas that might be withdrawn from RT [i.e. Rio Tinto]"*.

194.2.   As is evidenced by an internal Vale email dated 25 October 2008, Vale was of the view as of that date that, in relation to the Simandou project in Guinea, BSGR was *"acting in an unethical manner and talking directly to one of the wives of the President in an attempt to get something"*.

74

194.3.   During a meeting on 24 November 2008, Vale was informed by Rio Tinto PLC that Mr Steinmetz's and BSGR's efforts to obtain the Simandou concession from Rio Tinto involved "*bribery and other acts of political corruption*" (as set out at paragraph 82 of an Amended Complaint filed by Rio Tinto PLC in the United States District Court, Southern District of New York, dated 15 August 2014).

194.4.   As is evidenced by an internal Vale email dated 7 January 2009, Vale believed at that date that:

(i)   I.S. Touré worked for BSGR and was responsible for international relations.

(ii)   I.S. Touré was the brother of Mme Touré.

(iii)   Mme Touré was President Conté's fourth wife.

194.5.   In an internal Vale reported dated 14 September 2009, Vale referred to *"[BSGR's] controversial relationship with former president Conté, particularly one of the wives of the defunct president which sponsored BSGR in Guinea"*.

194.6.   A presentation entitled "Projeto Venezia" prepared by Vale towards the end of 2009 recorded as follows of BSGR and some unspecified "*Chinese Companies*":

> *"Please note that both have histories fraught with bribery affairs and high-level corruption scandals in the country that could affect the process for the Simandou project. Particularly in the case of BSGR, which has a very strong relationship with the president's 4th wife…"*

194.7.   The same presentation recorded that (i) Mme Touré was suspected as having received an approximately US$2 million bribe from

BSGR; (ii) payments to Mme Touré could be a first level of a structure of payments used by BSGR to obtain the mining rights at Simandou; and (iii) Mme Touré had placed her brother as a director with BSGR.

194.8. An internal Vale email dated 5 February 2010 made reference to BSGR, in the context of a statement regarding a non-disclosure agreement between BSGR and Vale, in terms as follows:

> *"it's a document Vale will be signing with this group of "ill-reputation". But for me, it has to be that way, otherwise we can't analyze it for buying purposes and get them out of the way."*

195. With knowledge as to all of the aforesaid matters, by as early as February 2010 Vale was desperate to obtain a share of the rights in the Simandou. In particular, in an internal Vale email dated 17 February 2010 Vale's position was expressed as follows:

> *"We cannot run the risk of leaving the deposit in the hands of the Chinese. We can't just watch. We must act. If you think that the JV with RT is not possible, we must be aggressive to buy the rights from BSGR."*

196. Viewed in the light of the matters set out at paragraphs 194 and 195 above, Vale then proceeded to conduct a knowingly and deliberately cursory and superficial due diligence exercise. In particular:

196.1. With the agreement of Vale, the scope of due diligence was narrowed significantly in that the definition of "the Group" excluded the "associated companies" and "investment companies" and in that financial due diligence was limited to BSGR Guernsey, excluding BSGR ProjectCo.

196.2. Vale's due diligence questionnaires posed no specific questions

about BSGR's relationship with Mme Touré, I.S. Touré or any of the matters set out at paragraph 194 above.

196.3.   Ernst & Young carried out no audit procedures in Guinea as part of the due diligence exercise.

196.4.   Furthermore, Vale pressured Ernst & Young into altering their initial conclusion that BSGR posed a high risk of bribery and corruption.

196.5.   By 13 April 2010, the Initial Due Diligence Questionnaire, the Supplemental Due Diligence Questionnaire and the Steinmetz ABL Certificate had been completed, and the alleged 8 April Representations been made. On 13 April 2010, Mr Monteiro (Vale's then Director of Mergers and Acquisitions) wrote as follows:

> *"Our recommendations to the business department have been the following, based on the legal and commercial risks:*
>
> *If the decision is of closing the deal, that it be made in escrow (bank financing doesn't eliminate FCPA risk). The lawyers' standing is clear, once we close it, we run the risk of already being in violation the FCPA on D+1, given that we couldn't do a books and accounts review of the 4 companies that come in the acquisition package (located in Guernsey, Guinea, Liberia and BVI);*
>
> *... 3. Due Diligence - the result of the due diligence is not satisfactory, nor exhaustive; more time and information is needed from the other party ..."*

196.6.   In a separate email on the same date, Mr Monteiro referred to advice Vale had received from Clifford Chance as to the risk of Vale contravening the FCPA by reason of its limited due diligence, as follows:

(i) *"In relation to the FCPA, I ponder that the risk to close the deal without any escrow is not just reputational, but is a "risk of civil administrative liability to the SEC for the Company", according to the Clifford Chance specialists in FCPA."*

196.7. As part of the due diligence, Vale was put on notice, by provision of BSGR's 2008 Consolidated Financial Statements, that US$22m was paid to a "third party" minority shareholder, but it raised no queries as to the same payment.

196.8. On 30 April 2010, Fabio Barbosa, Financial Director of Vale, refused to sign the deal with BSGR because, it is to be inferred, of his concerns over Vale's liability under the FCPA. In his place, the documents were signed by others within Vale.

197. Given Vale's knowledge as to the matters set out at paragraph 194 above and in the circumstances of its desperation to close a deal with BSGR as set out at paragraph 195 above, it is to be inferred from Vale's cursory and superficial due diligence exercise as described at paragraph 196 above that the said exercise was conducted in that manner knowingly and deliberately. In those circumstances, the only proper inferences to be drawn are those set out at paragraphs 193.1 and/or 193.2 above.

198. When Vale was asked to disclose specific classes of internal emails in the LCIA proceedings, Vale responded that it had destroyed the emails of several centrally relevant custodians involved in the due diligence process in potential breach of its FCPA duties. Further, some of them, namely Ledsham, Marco Monteiro and Paul Antaki, had relevant knowledge prior to the deal with BSGR, since they were involved in Guinea from 2005/2006. It is to be inferred from the fact that Vale destroyed what should be assumed to be a significant number of internal emails that had those emails been available for disclosure, they would have shown *inter alia* that the due diligence process was a sham.

199.    It is further to be inferred from Vale's conduct subsequent to the execution of the JVA and the SHA that Vale's attitude towards allegations of corruption and bribery on the part of BSGR was one of nonchalance:

    199.1.   On its own case, Vale continued to invest in the Simandou project even after allegations of corruption and bribery were formally made against BSGR by the Technical Committee in its letters dated 30 October 2012 and 7 May 2013 and even after Mr Cilins was arrested by the FBI on 14 April 2013. In the LCIA proceedings Vale alleged that it invested c. $124 million in the Simandou project after 30 October 2012, with the final payment being made on 2 February 2015, some 27 months after the Technical Committee's letter of 30 October 2012.

    199.2.   Under Schedule 4 to the SHA, Vale was permitted to serve notice on BSGR if it considered that representations made in the due diligence process were false and thereby to be relieved of all obligations under the terms of the relevant joint venture contracts. Notwithstanding the matters set out above, Vale did not serve such a notice, instead waiting until after the GoG revoked the mining licences before taking any steps against BSGR.

## SECTION J: CLAIM IN CONSPIRACY

200.    Insofar as it relates to Steinmetz, paragraph 117 is denied:

    200.1.   Steinmetz was not party to any relevant agreement or combination between himself and the other Defendants.

    200.2.   Steinmetz did not possess any intention to injure the Claimants.

    200.3.   Steinmetz did not carry out any unlawful acts pursuant to a combination or agreement with the other Defendants as a means of

    injuring the Claimants, nor did he make any fraudulent misrepresentations to Vale.

201. Paragraphs 117.1 to 117.6 are denied, in so far as they relate to Steinmetz, for the reasons set out more generally above.


### SECTION K: PROPRIETARY CLAIM

202. As to paragraphs 118 to 120 (and without prejudice to Steinmetz's position on limitation as set out above):

  202.1. Steinmetz was not involved in any deceit or conspiracy and makes no admission of any deceit or conspiracy by any other person.

  202.2. The traceable proceeds of the sums which BSGR received from Vale International under the JVA and SHA is subject to an ongoing tracing exercise, and no admissions are made in respect of that.

  202.3. Steinmetz acted in good faith at all material times.

  202.4. Steinmetz was accordingly a bona fide purchaser for value without notice in respect of any traceable proceeds received by him.

  202.5. It is accordingly denied that the Claimants have a valid proprietary claim in respect of any traceable proceeds received by Steinmetz.

203. Further or alternatively, by its Award, the Tribunal held that Vale was entitled to damages for deceit, and Vale elected to claim and to obtain an award for such damages, which were assessed, as Vale asked them to be, without giving any credit for the value of any proprietary claim. In those circumstances, Vale is not entitled to claim any proprietary remedy in relation to the proceeds from any person.

204. Further or alternatively, the payments in respect of which proprietary claims are now asserted were made by Vale Holdings and Vale International, rather

than Vale, and thus not by the relevant contractual counterparty. In the premises, no proprietary claim can be made in respect of them.

## SECTION L: CAUSATION, LOSS AND DAMAGE

205.   In the circumstances set out above, it is denied that Steinmetz has committed any acts of wrongdoing against the Claimants capable of founding a claim for loss and damage against him. Causation as alleged at paragraphs 121 and 122 and as applicable to Steinmetz is denied.

206.   Further, in relation to paragraph 122:

206.1.   It is denied that the Claimants are entitled to assert any claim in relation to the sums set out in paragraph 122.2 as against Steinmetz. By the Share Purchase Deed dated 13 March 2015 between Vale, BSGR and BSGR Guernsey, Vale sold its 51% interest in BSGR Guernsey back to BSGR, BSGR assumed liability for the debts owed by BSGR Guernsey and others to Vale, and the JVA and SHA were terminated.

206.2.   It was a material term of the Share Purchase Deed (at clause 6.3(ii)) that following completion *"…Vale and its Affiliates shall not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than as part of the LCIA Arbitration, in which case the reservation of rights set forth in Clause 6.2 shall be applicable, or based on the terms of the Vale Debt Amendment Agreement"*.

206.3.   For these purposes the "VBG Debt" comprised the debt owed by BSGR Guernsey under promissory notes advanced between 2010 and 2015 by Vale to finance the Business Plan as defined in the JVA, and now claimed by the Claimants in the sum of US$581,197.104, and Affiliates *"means, in relation to a specified person, any family relation of such person, any person directly or indirectly*

81

> *Controlling, Controlled by or under direct or indirect common Control with the specified person and shall also include any person who is a director or officer of the specified person or beneficial owner of at least 50% (fifty per cent.) of any class of the then issued share capital of the specified person, and in the case of any Party shall include their respective subsidiaries."*

206.4.  On the Claimants' case, Steinmetz was and is an "Affiliate" as defined within the Share Purchase Deed by reason of the Claimants alleging (for example at paragraph 108.1) that Steinmetz controls BSGR.

206.5.  In the premises, it is denied that the Claimants are now permitted to assert any claim in respect of the VBG Debt as against Steinmetz.

207.  The Claimants are put to proof as to the quantum of their losses as set out at paragraphs 122 to 124, but in any event it is denied that they are entitled to recover those losses from Steinmetz.

208.  Even if in all other respects the claim is successful, the Claimants should not be entitled to recover damages related to sums which Vale invested in the Simandou project after 30 October 2012, the date of the Technical Committee's letter formally alleging that the mining licences were obtained through corruption. Vale reasonably ought to have understood on that date that there was a significant risk of the mining licences being revoked, and ought reasonably to have ceased further investment in the project to reduce losses arising from revocation.

## SECTION M: INTEREST

209.  It is denied that the Claimants are entitled to the payment of interest by Steinmetz, whether as set out at paragraph 125 or paragraph 126.

## SECTION N: EX TURPI CAUSA

210.   Further and/or alternatively to the above, and in any event, Steinmetz avers that Vale's claim fails in its entirety by reason of the maxim *ex turpi causa non oritur actio*.

211.   It is Vale's case that BSGR procured the Mining Licences by corruption, and that the corrupt payments were in part funded by the $500 million paid to BSGR under the JVA. This is denied, but if the Court finds this to be true, then Vale's claim is tainted by and/or founded upon and/or relies upon Vale's own wrongdoing. At this stage, Steinmetz pleads as follows:

211.1.   There were grounds upon which Vale suspected, or ought to have suspected, that the money Vale paid to BSGR would or may be used to pay or contribute towards payments prohibited by the FCPA. The facts and matters set out at paragraph 194 are repeated. Nevertheless, Vale conducted a cursory and superficial due diligence process and proceeded with the transaction, giving rise to liability or potential liability under the FCPA; and/or

211.2.   Vale entered into a transaction in respect of an asset which it knew or ought to have known had been acquired through corruption and/or Vale was wilfully blind or indifferent as to whether that asset had been acquired through corruption. Under the FCPA, Vale was bound to proceed in good faith, and it inherited liability for the actions of BSGR Guernsey and/or BSGR ProjectCo. Further, Vale failed to disclose its suspicions in violation of the US Securities and Exchange Act (15 U.S.C. 77a et seq).

212.   Further and/or alternatively, it would be contrary to the public interest and/or unfair and/or harmful to the integrity of the legal system, and/or contrary to public morality, to allow Vale's claim. Pending disclosure and without limitation, Steinmetz relies on the following matters:

212.1. the facts and matters set out at paragraphs 194 to 196 above;

212.2. the representations on which Vale's claim relies were sought by Vale apparently to give the impression that it had complied with FCPA requirements, but that was a sham exercise which was conducted in circumstances where Vale did not care about the truth of the representations;

212.3. Vale conducted a deliberately cursory due diligence exercise, and itself had been advised that it had failed to carry out proper due diligence in relation to FCPA issues;

212.4. the anti-bribery obligations to which Vale was subject are a matter of public policy, and it would be contrary to such policy to permit Vale to recover in circumstances where it proceeded with a due diligence exercise in order to demonstrate compliance with those anti-bribery obligations, but with no belief in the accuracy of that exercise and in circumstances where its own internal advice indicated that it was inadequate;

212.5. Vale's conduct is serious. There was no suggestion by Vale to Steinmetz or BSGR at the time that Vale was conducting a sham due diligence process.

212.6. Vale's conduct is central to the transaction between it and BSGR, and the representations on which it relies, and to the present claim. The matters on which Vale bases its claim are said to have place during the same due diligence exercise which is impugned by its own conduct.

212.7. Vale's conduct was intentional. It was advised about its failings in respect of the due diligence and its FCPA obligations, but was desperate to close the deal with BSGR so proceeded knowingly and deliberately.

## SECTION O: RESERVATION OF RIGHTS

213.    Pending disclosure, Steinmetz reserves the right to bring a counterclaim including in relation to (but not limited to) matters arising out of Vale's conduct since entering into the SHA and JVA, including inter alia Vale's conduct during the course of the LCIA Arbitration.

PHILIP JONES QC

IAIN QUIRK

**STATEMENT OF TRUTH**

I believe that the facts stated in this Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:         _____

Name:          Benjamin Steinmetz

Dated:          1 May 2020

Served this 1st day of May 2020 by the solicitors for the First Defendant, Asserson Law Offices, 38 Wigmore Street, London, W1U 2RU

213.   Pending disclosure, Steinmetz reserves the right to bring a counterclaim including in relation to (but not limited to) matters arising out of Vale's conduct since entering into the SHA and JVA, including inter alia Vale's conduct during the course of the LCIA Arbitration.

PHILIP JONES QC

IAIN QUIRK

## STATEMENT OF TRUTH

I believe that the facts stated in this Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name:      Benjamin Steinmetz

Dated:      1 May 2020

Served this 1st day of May 2020 by the solicitors for the First Defendant, Asserson Law Offices, 38 Wigmore Street, London, W1U 2RU