# Exhibit 3

AWARD 4 APRIL 2019

## LONDON COURT OF INTERNATIONAL ARBITRATION

## IN THE MATTER OF AN ARBITRATION

between

## VALE S.A.

… Claimant

and

## BSG RESOURCES LIMITED

… Respondent

## LCIA ARBITRATION NO. 142683

───────────────────

## AWARD

───────────────────

**Members of the Tribunal:**
Sir David A.R. Williams, QC
Dr Michael Hwang, SC
Professor Filip De Ly, Chairman

**4 April 2019**

# TABLE OF CONTENTS

List of Abbreviations ................................................................................................. 7

DRAMATIS PERSONAE ............................................................................................ 11

I.  INTRODUCTION – NATURE OF THE DISPUTE ................................................. 17

II.  PARTIES, ARBITRATION AGREEMENT AND PROCEDURAL HISTORY ............. 21

  A.  The Parties and their Representatives ....................................................... 21

    1.  The Claimant .......................................................................................... 21

    2.  The Respondent ..................................................................................... 22

  B.  The Arbitration Agreement ........................................................................ 22

  C.  Procedural History of the Arbitration ........................................................ 24

    1.  The initial phase of the arbitral procedure .............................................. 24

    2.  Procedural Order No. 1 and Procedural Order No. 2 ............................. 24

    3.  Respondent's Stay Application and Procedural Order No. 3 .................. 24

    4.  Procedural Order No. 4 .......................................................................... 25

    5.  Procedural Order No. 5 and U.S. Discovery .......................................... 25

    6.  Second Stay Application ........................................................................ 25

    7.  BSGR's Statement of Defence .............................................................. 26

    8.  Procedural Order No. 6 .......................................................................... 26

    9.  Procedural Order No. 7 .......................................................................... 26

    10. Document Production and U.S. Discovery .............................................. 27

    11. Procedural Order No. 8 .......................................................................... 27

    12. Procedural Order No. 9 and Second Decision on Document Production ........... 27

    13. Procedural Order No. 10 ........................................................................ 28

    14. Third Decision on Document Production ................................................. 28

    15. Vale's Statement of Reply and Procedural Order No. 11 ....................... 28

    16. Further Document Production Issues ...................................................... 29

    17. The Respondent's First Challenge against all three Tribunal members in May 2016 ................................................................................................. 30

    18. Procedural Order No. 12 and Procedural Order No. 13 ......................... 30

    19. Fourth Decision on Document Production ............................................... 31

    20. BSGR's Statement of Rejoinder ............................................................ 31

    21. Procedural Order No. 14 ........................................................................ 31

    22. LCIA Decision on the First Challenge .................................................... 33

    23. The Appointment of a New Chair by the Parties .................................... 33

    24. The Appointment of a New Chair of the Tribunal ................................... 33

    25. Vale's Rejoinder on Counterclaims ....................................................... 34

26. The Appointment of a New Chair by the LCIA ................................................... 35

27. Respondent's Second Challenge to co-arbitrators Hwang and Williams and Procedural Order No. 16 ................................................................................... 35

28. Procedural Order No. 15, cancellation of hearing scheduled for 29 August – 16 September, and establishment of educational hearing for 5 – 9 September 2016 36

29. Respondent announces it will not attend the Educatory Hearing until its Second Challenge was decided by the LCIA ............................................................... 36

30. Respondent announces it will not appear at the Educatory Hearing .................. 36

31. The 5–8 September 2016 Educatory Hearing .................................................... 37

32. Respondent announces High Court Proceedings for removal of co-arbitrators Hwang and Williams ....................................................................................... 37

33. Procedural Order No. 17 – Procedural Order following reconstitution of the Tribunal ........................................................................................................... 38

34. Procedural Order No. 18 .................................................................................. 39

35. The Challenge to the ICSID Tribunal is denied................................................. 39

36. The LCIA Division dismisses the Second Challenge ......................................... 39

37. Procedural Order No. 19 .................................................................................. 40

38. Respondent advises that it will not participate in the merits hearing .................. 40

39. Procedural Order No. 20 .................................................................................. 40

40. English High Court dismisses BSGR application to remove arbitrators and for a document disclosure order................................................................................ 41

41. Procedural Order No. 21 .................................................................................. 41

42. Merits Hearing 20 – 22 February 2017 ............................................................ 42

43. Procedural Order No. 23 .................................................................................. 42

44. Respondent's non-payment of deposit ............................................................. 42

45. Corrections to transcript .................................................................................. 43

46. Claimant's application to introduce new exhibits and to amend its costs submissions..................................................................................................... 43

47. Procedural Order No. 24 .................................................................................. 44

48. Procedural Order No. 25 .................................................................................. 44

49. Administration Order and Procedural Order No. 26 ........................................... 44

50. Payment of further deposits............................................................................. 45

51. Procedural Order No. 27 .................................................................................. 45

52. Concluding Comment of the Tribunal ............................................................... 46

III. RELEVANT FACTUAL BACKGROUND .................................................................. 52

A. Introduction............................................................................................................ 52

B. BSGR in Africa ...................................................................................................... 52

C. Background 1997-2005 .......................................................................................... 53

D. BSGR enters Guinea.............................................................................................. 54

3

E. Exploration Permits in Simandou North and South and the contractual relationship with Pentler ................................................................................................. 55

 1. BSGR-Pentler Milestone Agreement ......................................................... 57

 2. Services Agreement ................................................................................... 58

 3. Pentler-Bah Milestone Agreement ............................................................. 58

 4. Pentler-Daou Milestone Agreement ........................................................... 58

 5. Touré MoU ................................................................................................. 59

 6. MoU between BSGR Guinea BVI and the GoG ......................................... 59

 7. First payment under BSGR-Pentler Milestone Agreement ......................... 59

F. Shareholding in BSGR Guinea BVI provided to Pentler and Mme. Touré ............... 61

G. BSGR commences work in Guinea .............................................................. 62

H. Simandou Blocks 1 and 2 ............................................................................ 63

I. Share Buyback – Pentler .............................................................................. 64

J. GoG revokes Rio Tinto's mining concessions and grants exploration permits to BSGR ............................................................................................................ 65

K. The death of President Conté ....................................................................... 66

L. Renewal of Exploration Permits for Simandou North and South ................... 66

M. Restructure by BSGR ................................................................................... 67

N. Dispute between Pentler and BSGR .............................................................. 68

O. Payments to Mme. Touré .............................................................................. 69

P. Base Convention .......................................................................................... 70

Q. The Joint Venture - Due Diligence and Negotiations ..................................... 70

R. BSGR, Pentler and Various Contractors ....................................................... 73

S. President Condé and the Revocation of Mining Rights ................................... 75

T. Frédéric Cilins in the United States ............................................................... 77

IV. **SUMMARY OF THE PARTIES' POSITIONS** ..................................................... **78**

A. Claimant's Position ...................................................................................... 78

 1. Vale's Allegations ...................................................................................... 78

 2. Fraudulent misrepresentation .................................................................... 80

 3. Breach of Warranty .................................................................................... 82

 4. Frustration ................................................................................................. 83

 5. Response to BSGR's Defences .................................................................. 83

 6. Quantum .................................................................................................... 84

B. Respondent's Position ................................................................................. 84

 1. Response to Vale's Allegations .................................................................. 85

 2. Response to allegation of fraudulent misrepresentation ............................ 87

 3. Vale's Requests for Relief .......................................................................... 89

 4. Warranties ................................................................................................. 89

5. Frustration ................................................................................. 90
6. BSGR's Counterclaims ............................................................. 90
**V. PRELIMINARY JURISDICTION ISSUE** .................................................. 93
**VI. FRAUDULENT MISREPRESENTATION** ................................................ 98
A. Standard of proof ............................................................................. 98
1. The appropriate standard of proof is the "balance of probabilities test", albeit there should be a high evidentiary threshold before the Tribunal finds that BSGR had committed fraudulent activities .................................................. 98
2. The burden of proof may be shifted in "special circumstances" where appropriate .................................................................................................. 99
3. The Tribunal is not precluded from drawing adverse inferences ......................... 99
B. Elements of the tort of deceit ................................................................ 102
1. The allegation that BSGR made numerous false representations to Vale ......... 103
2. BSGR made representations that were false .................................................. 106
3. BSGR knew that its representations were false .............................................. 187
4. BSGR intended that Vale should act in reliance on its representation .............. 196
5. Vale acted in reliance on the representations and suffered loss ....................... 197
C. BSGR's contractual estoppel defence .................................................. 202
**VII. BREACH OF WARRANTIES** ............................................................... 207
A. Analysis of applicable legal principles .................................................. 207
1. Liability for breach of warranty ..................................................................... 207
2. BSGR's interpretation of "knowledge" as referring to "actual knowledge (or the equivalent) by a defined group of BSGR people" is wrong .............................. 207
B. Has there been a breach of warranty? .................................................. 208
1. Section 2.1 of Schedule 4 ........................................................................... 208
2. Section 3.1 of Schedule 4 ........................................................................... 209
3. Section 3.2 of Schedule 4 ........................................................................... 210
4. Section 3.5 of Schedule 4 ........................................................................... 211
5. Section 3.6 of Schedule 4 ........................................................................... 211
6. Section 4.2 of Schedule 4 ........................................................................... 212
7. Section 16.1 and Schedule 3 of the SHA ..................................................... 213
**VIII. FRUSTRATION** ............................................................................... 221
A. Introduction ........................................................................................ 221
B. Preliminary Issue: whether frustration is "parasitic" on other heads of claim .......... 222
C. Bar I: *Force majeure* clause ................................................................ 223
D. Bar II: Foreseeability .......................................................................... 229
E. Application of the doctrine of frustration ............................................... 232
**IX. REFLECTIVE LOSS** ........................................................................... 235

| A. | The Parties' Positions | 235 |
|---|---|---|
| B. | The Rule Against Reflective Loss | 238 |
| C. | Was the burden on BSGR to raise the issue of reflective loss? | 240 |
| D. | Application of the Rule Against Reflective Loss to the Facts – the Effect of the Share Purchase Deed of 13 March 2015 on any Application of the Rule Against Reflective Loss | 241 |
| E. | Tribunal's Conclusion | 244 |

| **X.** | **REMEDIES** | **245** |
|---|---|---|
| A. | Cumulative remedies | 245 |
| | 1. Chronological history of pleadings | 245 |
| | 2. Tribunal's decision | 246 |
| B. | Remedies for Fraudulent Misrepresentation | 249 |
| | 1. Rescission | 250 |
| | 2. Damages | 259 |
| | 3. Conclusion | 271 |
| C. | Remedies for Breach of Warranty | 272 |
| D. | Remedies for Frustration | 272 |
| E. | Interest | 272 |

| **XI.** | **COSTS** | **275** |
|---|---|---|
| **XII.** | **SUMMARY OF FINDINGS** | **277** |
| **XIII.** | **DISPOSITIF** | **279** |
| | **APPENDIX – CHART OF KEY INDIVIDUALS** | **281** |

# List of Abbreviations

| | |
|---|---|
| ABL Solution | Anti-Bribery Laws Solution |
| Administration Order | The Administration Order issued by the Royal Court of Guernsey dated 6 March 2018 placing BSGR into voluntary administration |
| Base Convention | Basic Agreement between the Republic of Guinea and BSG Resources for the Exploitation of the Zogota / N'zerekore Iron Ore Deposits, between BSGR Guernsey, BSGR Guinea and the GoG, dated 16 December 2009 |
| Boutros Contract | Subcontracting and Service Provision Agreement between LMS and BSGR Guinea |
| BSG Group | BSGR and related companies (unless otherwise defined) |
| BSG Metals and Mining | BSG Metals and Mining Limited |
| BSGR or Respondent | BSG Resources Limited |
| BSGR Guernsey | BSGR Resources (Guinea) Limited (incorporated in Guernsey) |
| BSGR Guinea | BSG Resources (Guinea) S.à.r.l |
| BSGR Guinea BVI | BSGR Resources (Guinea) Limited (incorporated in the British Virgin Islands) |
| BSGR-Pentler Milestone Agreement | Milestone Agreement between Pentler and BSGR Guinea BVI, dated 14 February 2006 |
| BSGR Steel | BSGR Steel Holdings Limited |
| BVI | British Virgin Islands |
| Claimant | Vale S.A. |
| Commission Contract | Commission Contract allegedly concluded between Matinda and BSGR Guinea BVI dated 27 February 2008 |
| Concession Areas | Simandou Blocks 1 and 2 and Zogota |
| CPDM | Centre de Promotion et de Développement Miniers |
| DDI | Descriptive Declaration of Importation dated 17 August 2009 |
| FBI | United States' Federal Bureau of Investigations |

| FCPA | Foreign Corrupt Practices Act (US) |
|---|---|
| February 2008 MoU | Memorandum of Understanding allegedly concluded between BSGR Guinea BVI and Matinda, dated 28 February 2008 |
| Framework Agreement | Joint Venture Framework Agreement dated 30 April 2010 between the Claimant Vale and the Respondent BSG Resources Limited |
| GoG | Government of Guinea |
| IBA Rules on Evidence | IBA Rules on the Taking of Evidence in International Arbitration (2010, International Bar Association) |
| ICSID Proceedings | ICSID Arbitration Proceedings between BSGR and the Republic of Guinea registered as ICSID case no. ARB/14/22 |
| I.S. Touré | Ibrahima Sory Touré |
| Joint Venture Agreements | The Framework Agreement and the Shareholders Agreement |
| LCIA Rules | 1998 Rules of Arbitration of the London Court of International Arbitration |
| LTS | Liberian Transport Solution |
| LMS | Logistics & Maintenance Services Sàrl |
| Matinda | Matinda and Co. Limited |
| Mme. Touré | Mamadie Touré |
| MoU | Memorandum of Understanding between BSGR Guinea BVI and the GoG, dated 20 February 2006 |
| NMC | National Mining Commission |
| Nysco | Nysco Management Corporation Limited |
| Onyx | Onyx Financial Advisors Limited |
| Parties | Vale and BSGR |
| Pentler | Pentler Holdings Limited |
| Pentler-Bah Milestone Agreement | Milestone Agreement between Pentler, I.S. Touré and Bah, dated 20 February 2006 |
| Pentler-Daou Milestone Agreement | Milestone Agreement between Pentler and Ismaila Daou, dated 20 February 2006 |

| Pentler-Daou Shareholding Agreement | Shareholding Agreement between Pentler and Ismaila Daou, dated 20 February 2006 |
| --- | --- |
| Pentler Shareholders Agreement | Shareholders Agreement between BSGR Steel, Pentler and BSGR Guinea BVI, backdated to 10 March 2006 |
| Project Hills | The Project which was the subject of the Joint Venture Agreements |
| Respondent | BSGR |
| Rio Tinto | Rio Tinto plc |
| Rio Tinto Proceedings | Proceedings brought by Rio Tinto plc against Vale, VBG and BSGR and other defendants on 30 April 2014 in the Southern District of New York, docket no. 14-cv-3042 |
| Services Agreement | Services and Co-operation Agreement between Pentler and BSG Metals and Mining Limited, backdated to 15 October 2005 |
| Settlement Agreement | Settlement Agreement between Pentler and BSGR Steel, dated 25 July 2009 |
| SHA | Shareholders' Agreement between Vale, BSGR and BSGR Guernsey dated 30 April 2010 |
| Share Purchase Agreement | Share Purchase Agreement of Shares in BSG Resources (Guinea) Ltd between BSGR Steel and Pentler, dated 24 March 2008 |
| Simandou Blocks 1 and 2 | Blocks 1 and 2 of the Simandou iron ore deposit |
| Touré MoU | The Memorandum of Understanding signed by Pentler and Mme. Touré, dated 20 February 2006 |
| UBO | Ultimate Beneficial Owner |
| USD | United States dollar |
| U.S. DOJ | United States Department of Justice |
| Vale or Claimant | Vale S.A. |
| Vale GmbH | Vale International Holdings GmbH |
| Vale International | Vale International S.A. |
| VBG | Vale BSGR Guinea Limited (Guernsey incorporated) |

| Zogota Feasibility Study | BSGR's Feasibility Study for Zogota, completed at the end of October 2009 and submitted to the Ministry of Mines on 16 November 2009 |

# DRAMATIS PERSONAE[1]

## I. INDIVIDUALS[2]

| Name | Position |
|------|----------|
| Agnelli, Roger | Chief Executive Officer, Vale, 2001 to 2011 |
| Antaki, Paul | New Business Development Manager, Vale |
| Avidan, Asher | Chief Executive Officer, BSGR Guinea; President, BSGR, May 2010 to present |
| Bah, Aboubacar | Businessman from Mali who resided in Guinea |
| Bangoura, Issiaga | Security Director, BSGR |
| Barnett, David | Internal Counsel, BSGR |
| Boutros, Ghassan | Lebanese businessman; BSGR equipment supplier and alleged consultant operations |
| Camara, M'Bemba | Security Agent for the company "Fist Interim" |
| Camara, Moussa Dadis | President of the Republic of Guinea from 23 December 2008 to 3 December 2009 |
| Cilins, Frédéric | Principal of Pentler |
| Clark, David | Director, BSGR; Director and Group Treasurer, BSGR Guinea |
| Condé, Alpha | President of the Republic of Guinea from 21 December 2010 to present |
| Conté, Lansana | President of the Republic of Guinea from 26 March 1984 to 22 December 2008 |
| Cramer, Dag | Director, BSGR; Chief Executive Officer, Onyx Financial Advisors |

---

[1] Based on the Dramatis Personae provided by the Claimant in its Statement of Reply, Appendix A.
[2] Unless specified otherwise, this appendix – pursuant to footnote 1 above – sets out the role of the individual at the time of the events described in the Statement of Case and Statement of Reply.

| Daou, Ismaila | Malian businessman |
|---|---|
| Doumbia, Mohammed L. | BSGR's local Guinean counsel |
| Etchart, Eduardo | General Manager for Exploration in Africa, Vale; presently Manager for the Evaluation of Mineral Resources, Vale Mozambique |
| Fofana, Ibrahima Kassory | Economy and Finance Minister of the Republic of Guinea from 1997 to 2000; principal of IF Global LLC; consultant to BSGR |
| Freeh, Louis | Attorney commissioned by the Balda Foundation to conduct an internal investigation into BSGR's acquisition of mining rights in Guinea |
| Hennig, Walter | South African businessman<br>Allegedly attempted to "blackmail" BSGR |
| Kanté, Ahmed | Minister of Mines of the Republic of Guinea from March 2007 to August 2008 |
| Kleinfeld, George | Partner, Clifford Chance<br>Advised Vale during the Project Hills negotiations |
| Konaté, Sékouba | President of the Republic of Guinea from 3 December 2009 to 21 December 2010 |
| Kouyaté, Lansana | Prime Minister of the Republic of Guinea from March 2007 to May 2008 |
| Ledsham, Eduardo | Exploration Department Executive Director, Vale from 2010-2011 |
| Lev Ran, Avraham | Principal of Pentler |
| Lieberman, Joseph | Attorney commissioned by the Balda Foundation to conduct an internal investigation into BSGR's acquisition of mining rights in Guinea |
| Mebiame, Samuel | Gabonese businessman; alleged associate of Walter Hennig |
| Merloni-Horemans, Sandra | Director, BSGR and Onyx Financial Advisors |

| Monteiro, Alex | General Manager of Corporate Mergers & Acquisitions Department, Vale from 2010-2011; Director of Mergers & Acquisitions Department, Vale from 2011–2014; presently Director of Production, Planning, Governance and Operational Excellence for Base Metals, Vale Canada |
|---|---|
| Nabé, Dr Louncény | Minister of Mines of the Republic of Guinea between August and December 2008 |
| Noy, Michael | Principal of Pentler |
| Oron, Roy | Chief Executive Officer, BSGR until April 2007 |
| Pollak, Daniel | Business Development Manager and Consultant, BSGR; Country Manager, VBG Logistics |
| Saad, Ricardo | Director and CEO, VBG Guinea from 2010 to 2012 |
| Saada, Patrick | Director, Steinmetz Diamonds Group from 1990 to 2007; Vice Chairman and Chief Marketing Officer of Octea Ltd from 2007 to 2013; Director of Koidu Holdings |
| Sidibe, Adama | Business associate of Ghassan Boutros |
| Souaré, Dr. Ahmed Tidiane | Minister of Mines of the Republic of Guinea from 2005 to 2006 under President Lansana Conté; Prime Minister from May 2008 to December 2008 |
| Soumah, Fodé | Minister of Youth and Sports of the Republic of Guinea under President Lansana Conté |
| Soumah, Mamady Sam | Secretary General to the President of the Republic of Guinea under President Lansana Conté |
| Steinmetz, Benjamin ("Beny") | Beneficial owner of BSGR |
| Struik, Marc | Director, BSGR Guernsey, BSGR Guinea/VBG Guinea and BSGR BVI; CEO of BSG Metals and Mining from May 2007 to present |
| Tchelet, Yossie | Chief Financial Officer, BSGR |

| Teles, Leandro | Simandou Finance Manager and Project Leader for VBG Guinea from August 2010 to June 2015 |
| Thiam, Mahmoud | Minister of Mines of the Republic of Guinea from 2009 to 2010 under President Moussa Dadis Camara |
| Touré, Ibrahima Sory (I.S.) | Half-brother of Mamadie Touré<br><br>Pentler's local partner; Director of External Relations, BSGR Guinea S.à.r.l, from 2007 to 2010; Vice-President, BSGR Guinea S.à.r.l from 2010 to 2011 |
| Touré, Mamadie | Fourth wife of President Conté; owner of Matinda & Co. Ltd; "Confidential Witness" in FBI investigation |
| Touré, Sékou | President of Guinea from 1958 until 1984 |

## II.   ENTITIES

| Name | Position |
|------|----------|
| Balda Foundation | Liechtenstein trust and BSGR's ultimate holding company, of which Steinmetz and his family are the sole beneficiaries |
| BSG Resources Limited | Respondent in this arbitration; wholly owned by Nysco; 100% owner of BSGR Guernsey, BSGR Guinea BVI, BSGR Guinea, BSGR Liberia, and BSGR Liberia BVI |
| BSG Resources (Guinea) Limited | BSGR subsidiary registered in the BVI<br><br>Party to the Shareholders Agreement with Pentler |
| BSG Resources (Guinea) Limited | BSGR subsidiary registered in Guernsey; 100% owner of BSGR Guinea as of 2009 |
| BSG Resources (Guinea) S.à.r.l. | BSGR subsidiary registered in Guinea; wholly owned by BSGR Guernsey as of 2009<br><br>Permit-holder of BSGR's Guinean mining rights |

14

| BSG Resources (Liberia) Limited (Liberia) ("**BSGR Liberia**") | BSGR subsidiary registered in Liberia; wholly owned by BSGR Liberia BVI<br><br>Permit holder of BSGR's Liberian mining rights |
|---|---|
| BSG Resources (Liberia) Limited (BVI) ("**BSGR Liberia BVI**") | BSGR subsidiary registered in Liberia |
| BSGR Treasury Services Limited (BVI) | BSGR subsidiary |
| BSGR Steel Holdings Limited | BSGR subsidiary; co-shareholder and party to Shareholders Agreement in BSGR Guinea BVI alongside Pentler; party to Share Purchase Agreement with Pentler regarding the buyback of its stake in BSGR Guinea BVI; party to Settlement Agreement with Pentler |
| CW France | Pentler affiliate |
| FMA International Trading (Pty) Ltd. | Pentler affiliate |
| Koidu Holdings | BSGR subsidiary; diamond mining operation based in Sierra Leone |
| Logistic and Maintenance Services SARL | Company owned by Boutros; service and equipment provider to BSGR |
| Margali Management Corporation | Onyx subsidiary; sole director of BSGR Steel; sole director of Pentler until 15 February 2006 |
| Matinda & Co. Ltd. | Company owned by Mamadie Touré |
| Matinda & Co. LLC | Limited liability company owned by Mamadie Touré |
| Nysco Management Corp. | Holding company registered in the BVI wholly owned by Balda; wholly owns BSGR |
| Onyx Financial Advisors S.A. | BSGR's English agent and management company; includes companies incorporated in the British Virgin Islands, Switzerland and the U.K. |
| Pentler Holdings | BVI shelf company sold by Onyx to Cilins, Lev Ran, and Noy in February 2006 |
| Resources Advisory Services (BVI) | BSGR subsidiary used to procure advisory and consulting services for BSGR's operations in Guinea |

| Thiam & Co. | Company owned by former Minister of Mines Mahmoud Thiam |
|---|---|
| Vale BSGR Guinea Limited | Joint Venture company and owner of mining rights – formerly BSG Resources (Guinea) S.à.r.l. |
| Vale International Holdings GmbH | Wholly owned subsidiary of Vale, registered in Austria |
| Vale International S.A. | Wholly owned subsidiary of Vale, registered in Switzerland |
| Vale S.A. | A publicly limited company registered in Brazil |
| Windpoint Overseas Limited (“**Windpoint**”) | BSGR affiliate |

## I. INTRODUCTION – NATURE OF THE DISPUTE

1. This arbitration was commenced by the Claimant, Vale S.A., on 28 April 2014 pursuant to the Joint Venture Framework Agreement dated 30 April 2010 between Vale S.A. and the Respondent, BSG Resources Limited (the "**Framework Agreement**").[3] In accordance with the Framework Agreement, the arbitration is conducted under the 1998 version of the LCIA Rules of Arbitration (the "**LCIA Rules**").

2. Vale S.A. ("**Vale**" or the "**Claimant**") is a public limited company registered under the laws of Brazil. Vale's principal lines of business are mining and related logistics. It is the world's largest producer of iron ore, and also produces nickel, manganese ore, ferroalloys, coal, copper, platinum group metals, gold, silver, cobalt and potash, phosphates, and other fertilizer nutrients. Vale's securities are traded on the stock exchanges of Sao Paulo, New York, Hong Kong, Madrid, and Indonesia, as well as on Euronext, and are included in the Indice Bovespa benchmark index of the Sao Paulo Stock Exchange.

3. BSG Resources Limited ("**BSGR**" or the **"Respondent"**) is a company registered under the laws of Guernsey. In this Award, a reference to BSGR refers to BSG Resources Limited but may also (depending on its context) refer to BSGR and its subsidiaries or to any of its affiliates. BSGR is principally engaged in mining operations in Africa and Eastern Europe, and also engages in power generation and oil and gas exploration and production. The company is wholly owned by Nysco Management Corporation Limited ("**Nysco**"), a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Beny Steinmetz ("**Steinmetz**"), an Israeli businessman domiciled in Switzerland, and members of his family. During the arbitration proceedings, BSGR – as further discussed below – was put into administration by an order dated 6 March 2018 of the Royal Court of Guernsey.

4. Vale brings this arbitration against BSGR (collectively, the "**Parties**") in connection with (i) the Framework Agreement (defined above), and (ii) a Shareholders' Agreement between Vale, BSGR and BSGR Resources (Guinea) Limited ("**BSGR Guernsey**") dated 30 April 2010 (the "**SHA**")[4] (collectively, the "**Joint Venture Agreements**").

5. The Agreements followed the Government of Guinea in West Africa (the "**GoG**") granting to BSGR on 19 March 2010 concessions to exploit Blocks 1 and 2 of the Simandou iron ore deposit ("**Simandou Blocks 1 and 2**") and the Zogota iron ore deposit, all of which are located in the far east of Guinea (collectively, the "**Concessions**" or the "**Concession Areas**"). The Simandou deposit was widely acknowledged to be one of the largest, if not the largest, remaining unexploited iron ore deposits in the world. A map outlining the geography of the Concession Areas taken from Appendix D of Vale's Statement of Case is reproduced below:

---

[3] Framework Agreement, 30 April 2010, **C-1**.
[4] SHA, 30 April 2010, **C-2**.



6. BSGR approached Vale with the possibility of selling Vale an interest in the Concessions as BSGR needed a partner that could both invest capital and offer technical expertise for the development of the Concession Areas. BSGR and Vale negotiated and signed the Joint Venture Agreements. The project was known as "Project Hills".

7. Vale now claims that BSGR obtained those Concessions by bribery and corruption of Guinean government officials. It notes that the GoG revoked the Concessions on 17 April 2014 after the GoG's formal investigation into how BSGR obtained the Concessions uncovered what the investigating committee found to be the bribery and corruption committed by BSGR. BSGR has since initiated ICSID proceedings against the Republic of Guinea in which it challenges the bribery and corruption findings and the revocation of its Concessions.[5] In a 25 February 2019 statement reported by the financial press, BSGR indicated that its dispute with the GoG has been settled and that pending suits will be withdrawn.

8. Vale contends in this case that it was induced to enter into the Joint Venture Agreements with BSGR on the basis of extensive representations by BSGR and its representatives first, during an intensive due diligence process undertaken by an international law firm, Clifford Chance LLP ("**Clifford Chance**"), on behalf of Vale, and secondly, as warranties in the Framework Agreement itself. These representations covered a wide range of subjects. Some questions posed by Clifford Chance were addressed directly and specifically to bribery and corruption, whereas others were designed to uncover indicia or red flags of bribery. Vale's position is that, either individually or taken as a collective representation (that BSGR had obtained the mining rights lawfully and without engaging in any bribery or corruption), BSGR had made false representations to Vale and violated the warranties of the Joint Venture Agreements.

---

[5] *BSG Resources Limited, BSG Resources (Guinea) Limited and BSG Resources (Guinea) SÀRL v. Republic of Guinea*, ICSID Case No. ARB/14/22.

9.  In asserting that the representations were false, Vale relies in part on the fact that one of BSGR's alleged agents (or intermediaries), who was involved in BSGR's efforts in Guinea to obtain the Concessions, has pleaded guilty in the United States to criminal acts that he committed in an unsuccessful effort to destroy documentary evidence of the bribery in which BSGR was alleged to have engaged.

10. Vale contends that BSGR's corrupt activities all occurred prior to Vale's investment and were completely contrary to the representations and warranties made by BSGR to Vale that neither BSGR nor its agents had engaged in any such conduct. Vale further contends that the GoG's revocation of the Concessions due to BSGR's corrupt activities resulted in Vale losing its entire USD 750 million investment in the mining operations under the Concessions, as well as the USD 500 million that it initially paid to BSGR when it entered into the Joint Venture Agreements. Vale therefore seeks the return of the money that it contends BSGR fraudulently obtained from Vale, rescission of the Joint Venture Agreements and (if and to the extent necessary) a declaration that the Joint Venture Agreements have been frustrated, relieving Vale of any further obligations it would have under the Joint Venture Agreements.

11. BSGR contests Vale's allegations vigorously. It denies that BSGR deceived Vale when entering into the Joint Venture Agreements or that it misrepresented facts and breached any of its representations and warranties. It disputes that Vale may declare the Agreements frustrated. For BSGR, the crux of the matter is that the new government of the Republic of Guinea resulting from President Condé's election in 2010 chose to cancel the Concessions awarded to BSGR so that it could re-issue the Concessions to other mining companies that had assisted it during the election. BSGR contends that the Republic did so for improper reasons (i.e., to pay for the new President's election campaign and other commitments made to obtain support for that campaign). Hence, the GoG invoked fake pretexts related to alleged corruption by BSGR in obtaining the Simandou mining rights and Concessions.

12. The ICSID arbitration referred to above has in this respect been instituted by BSGR to seek relief against the Republic's alleged expropriation and unfair and inequitable treatment of BSGR's investment in the Republic. In sum, BSGR contends that the Republic is liable under international law for the divesture of BSGR's investment in Simandou as its investment was lawfully obtained. Consequently, BSGR asserts that Vale's claims in this LCIA arbitration should also be dismissed, as they are based on the assumption that the mining rights and the Concessions were procured in an illegal manner. That assumption being false, BSGR alleges that it did not deceive Vale, that it did not breach the Joint Venture Agreements' representations and warranties and that the Agreements have not been frustrated. In addition, BSGR has instituted counterclaims against Vale. However, as will be discussed below, these counterclaims are deemed, in accordance with the LCIA Rules, to have been withdrawn as a result of BSGR's failure to pay requested deposits to fund this arbitration.

13. The Tribunal notes that this arbitration has been procedurally complex, as detailed in the following section. The reasons for this complexity include: (a) managing parallel ICSID proceedings, with three stay applications; (b) multiple document production issues; (c) parallel criminal proceedings with subsequent applications to submit documents to this Tribunal; (d) two arbitral challenge proceedings; (e) the removal and replacement of the Chairman of the Tribunal; (f) ancillary proceedings in the English High Court, as well as

disclosure requests in the LCIA, English and US Courts; (g) BSGR's voluntary administration in Guernsey; and (h) the proceedings by and large being conducted as of September 2016 by default without the benefit of BSGR's oral hearing submissions, the presentation of its witness and expert evidence and its examination of Claimant's witnesses and expert.

14.    Two hearings were held, although the case was not bifurcated. The first hearing was held in September 2016, using some of the time that had initially been allocated for the merits hearing. This was an "educatory hearing" for the new Chairman of the Tribunal. The second hearing was the merits hearing and was held in February 2017. BSGR did not participate in either hearing.

15.    The arbitration took more than four and a half years to complete as a result of the complex nature of the dispute and the various complexities described above.

## II. PARTIES, ARBITRATION AGREEMENT AND PROCEDURAL HISTORY

16. By and large, arbitral awards can be short as to describing the history of the arbitration proceedings. It is usual to summarise the major milestones of the arbitration proceedings, without a lengthy discussion of minor procedural incidents that arose during the proceedings and how these were resolved by the parties or by the tribunal. This Award is an exception and – in the opinion of the Tribunal – requires a much longer section on procedural issues as the arbitration proceedings since September 2016 have largely been conducted *ex parte* due to BSGR's failure to participate in two hearings, as described in more detail below. In addition, there have been other procedural complications such as challenges against the arbitrators before the LCIA Court and the High Court in London, discovery requests in the U.S.A., issues regarding the relationship between the present arbitration and the pending ICSID arbitration between BSGR and the Republic of Guinea and the 6 March 2018 order of the Royal Court of Guernsey putting BSGR in administration. These and other elements will be elaborated upon below. From the outset, the Tribunal emphasises that it considers that – notwithstanding the issues identified above – its duty at all times is to conduct these arbitration proceedings in an independent and impartial way in compliance with the LCIA Rules and the English Arbitration Act as the law of the place of arbitration agreed upon by the Parties. In discharging its duty, the Tribunal has sought to balance at all times both Parties' due process rights, the equality of the Parties and the fairness and efficiency of the proceedings.

### A. The Parties and their Representatives

#### 1. <u>The Claimant</u>

17. Vale is a public limited company (*Pr. Sociedade Anónima*) registered under the laws of Brazil, with its principal office at Av. Graca Aranha, 26, 20.300-900, Rio de Janerio, RJ, Brazil.

18. Vale is represented in this arbitration by Jonathan Blackman, Joaquin Terceño and Esti Tambay of:

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> NY 10006 New York
> U.S.A.

And by Mr. Jonathan Kelly of:

> Cleary Gottlieb Steen & Hamilton LLP
> City Place House
> 55 Basinghall Street
> London EC2V 5EH
> United Kingdom

## 2. The Respondent

19. BSGR is a company registered under the laws of Guernsey with registered number 46565, with its registered office at West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX.

20. BSGR is represented in this arbitration by Karel Daele, James Lisbon and Heidrun Walsh of:

> Mishcon de Reya LLP
> Summit House
> 12 Red Lion Square
> London WC1R 4QD
> United Kingdom

21. BSGR is also represented by David Wolfson QC of One Essex Court.

22. For part of this arbitration, BSGR was also represented by Messrs. Asserson and Baigel of:

> Asserson Law Offices
> 38 Wigmore Street
> London W1U 2RU
> United Kingdom

## B. The Arbitration Agreement

23. The governing law of the Joint Venture Agreements is English law and the place of arbitration is London, England.

24. Section 16.10 of the Framework Agreement provides:

> 16.10 Governing Law; Arbitration
>
> a) This Agreement is governed by English law. The Parties agree that all disputes arising out of or in connection with this Agreement, or with its negotiation, legal validity or enforceability, or with its consequences, whether the alleged liability shall be said to arise under the law of England or under the law of some other country, and whether the same shall be regarded as contractual claims or not, shall be exclusively governed by and determined only in accordance with English law.
>
> b) Any dispute, controversy or claim arising between any of the Parties to this Agreement out of or in connection with this Agreement, including any question regarding the existence, validity, or termination of this Agreement, shall be referred to and finally resolved by arbitration under the Rules of Arbitration of the London Court of International Arbitration (the "LCIA Rules"), which Rules are deemed to be incorporated by reference into this Section 16.10. There shall be three arbitrators, and the Parties agree that one arbitrator shall be nominated by each Party to the arbitration for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairman of the tribunal, shall be nominated by agreement of the two Party nominated arbitrators within 14 days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court. The seat or place of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English. The award shall be final and binding on the parties to the arbitration and may be entered and enforced in any court having jurisdiction. Any request for arbitration shall be

served on the other party pursuant to the notice provision in Section 16.2 of this Agreement.

c) In order to facilitate the comprehensive resolution of related disputes, and upon request of any party to an arbitration pursuant to this Section 16.10, an arbitral tribunal may, within 90 days of its appointment, consolidate the arbitration proceedings before it with any other arbitration proceedings or proposed arbitration proceedings involving the Parties. An arbitral tribunal shall not consolidate such arbitration proceedings unless it determines that (i) there are issues of fact or law common to the arbitrations in question so that a consolidated proceeding would be more efficient than separate proceedings and (ii) no party to the proceedings sought to be consolidated would be materially prejudiced as a result of such consolidation for any reason, including (a) a failure to have an equal say in the formation of the arbitral tribunal which would hear the consolidated proceedings, (b) a failure to be heard on the issue of consolidation or (c) undue delay. Unless the parties to the proceeding sought to be consolidated agree otherwise, the arbitral tribunal first formed shall determine the disputes arising in the consolidated proceedings. In the event of different rulings on the question of consolidation by differently constituted arbitral tribunals formed pursuant to this Section 16.10, there shall be no consolidation of proceedings unless all of the parties to the proceedings sought to be consolidated agree otherwise.

d) By agreeing to arbitration in accordance with this Section 16.10, the Parties do not intend to deprive any competent court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings or the enforcement of any award. The arbitral tribunal shall have full authority to order a Party to seek modification or vacation of any order issued by a national court, and to award damages or give other appropriate relief for the failure of any Party to respect the arbitral tribunal's orders to that effect.

e) The Parties hereby waive their rights to apply or appeal under Sections 45 and 69 of the Arbitration Act 1996.

f) To the extent that any Party hereto (including permitted assignees of any Party's rights or obligations under the Agreement) may be entitled, in any jurisdiction, to claim for itself or its revenues, assets or properties, sovereign immunity from service of process, from suit, from the jurisdiction of any court, from attachment prior to judgment, from attachment in aid of execution of an arbitral award or judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be. attributed such a sovereign immunity (whether claimed or not), each Party hereto hereby irrevocably agrees, to the extent permitted by law, not to claim, and hereby irrevocably waives generally, to the extent permitted by law, such sovereign immunity.

g) Vale hereby confirms that it has irrevocably appointed TMF Corporate Services Limited at its registered office for the time being, being at the date hereof Pellipar House, 1st floor, 9 Cloak Lane, London, EC4R 2RU as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason Vale does not have such an agent in England, it will promptly appoint a substitute process agent and notify BSGR of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

h) BSGR hereby confirms that it has irrevocably appointed BSG Management Services Limited, a company registered in England and Wales with registered no. 05459227 at its registered office for the time being, being at the date hereof Level 3, 7 Old Park Lane, London, W1K 1QR as its authorized agent

for service of process in England of the kind described in Section 16.10(b) above. If for any reason BSGR does not have such an agent in England, it will promptly appoint a substitute process agent and notify Vale of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

25. Section 17.10 of the SHA contains a substantially identical clause to that above, other than in respect of provisions concerning multiparty arbitration and joinder, which are not relevant to this arbitration.

## C. Procedural History of the Arbitration

### 1. The initial phase of the arbitral procedure

26. Vale filed its Request for Arbitration with the LCIA on 28 April 2014, in which it nominated David Williams QC as its arbitrator. On 29 May 2014, BSGR filed its Response, including Counterclaims, with the LCIA and nominated Michael Hwang SC as its arbitrator.

27. Following a list procedure whereby the Parties ranked their preferred candidates for Chairman, the co-arbitrators nominated the Hon. Judge Charles Brower as the Chairman of the Tribunal. The Tribunal was constituted on 1 August 2014.

### 2. Procedural Order No. 1 and Procedural Order No. 2

28. On 22 August 2014, the Tribunal issued Procedural Order No. 1 in which it appointed Michael Daly as Secretary to the Tribunal with the consent of the Parties and scheduled an Initial Session. On 6 October 2014, the Chairman of the Tribunal, with the consent of his co-arbitrators and the Parties, presided alone over the Initial Session, which was held in-person in London. Following the Initial Session and a further discussion with the Parties, the Tribunal issued Procedural Order No. 2 on 5 November 2014, reflecting the procedural aspects of this arbitration that were agreed on by the Parties, recording the expedited schedule agreed on by the Parties in respect of a stay application that BSGR intended to file, and deciding on a procedural schedule to take effect should the proposed stay application be denied. Paragraph 12 of Procedural Order No. 2 records the agreement that the International Bar Association's IBA Rules on the Taking of Evidence in International Arbitration (2010) (the "**IBA Rules on Evidence**") may be referred to by the Tribunal as guidelines.

### 3. Respondent's Stay Application and Procedural Order No. 3

29. On 20 October 2014, BSGR filed its stay application (the "**First Stay Application**") pursuant to Procedural Order No. 1, seeking an order staying this arbitration in favour of a separate arbitration between BSGR and the Republic of Guinea registered with the International Centre for the Settlement of Investment Disputes on 8 September 2014 (the "**ICSID proceedings**"). The parties filed two rounds of written submissions, followed by a hearing on 1 December 2014 in Paris (attended by Michael Hwang SC by telephone). On 10 December 2014, the Tribunal issued Procedural Order No. 3, in which the Tribunal stated that it had concluded its deliberations on the First Stay Application and was actively embarking on drafting the accompanying decision. The Tribunal also fixed the merits hearing on 4–8 April 2016 and 11–15 April 2016, with a further week (18-22 April) held in reserve should the Parties require it to present their cases.

30. On 16 December 2014, the Tribunal issued its Decision on Respondent's Application to Stay the Arbitration, dismissing the First Stay Application on the basis that it was too early to know how the ICSID dispute would develop, and whether there would be unnecessary delay and expense in allowing parallel proceedings to continue. The Tribunal stated that BSGR could renew its First Stay Application in the future based on new developments in the ICSID proceedings or otherwise and ordered BSGR to submit to the Tribunal a short report each month concerning the status of the ICSID proceedings. The full procedural history of that Decision, as set out in section II of the Decision, is incorporated by reference into this Award.

31. On 4 February 2015, Vale submitted its Statement of Case, appendices, consolidated indices of factual exhibits and legal authorities and its factual exhibits and legal authorities. Vale filed four factual witness statements in support of its case from: Eduardo Etchart; George Kleinfeld; Alex Monteiro; and Ricardo Saad.

### 4. Procedural Order No. 4

32. On 12 February 2015, after consulting the Parties, the Tribunal issued Procedural Order No. 4 where it amended the dates of the merits hearing in the light of a potential scheduling conflict faced by the Chairman. The hearing was to take place on 29 August to 2 September 2016, and 5–9 September 2016, with the week of 12–16 September 2016 held in reserve should the Parties require it.

### 5. Procedural Order No. 5 and U.S. Discovery

33. On 20 February 2015, Vale sent the Tribunal a proposed amended procedural schedule which was represented to have been agreed to by both Parties. BSGR did not object to this schedule. On 3 March 2015, the Tribunal issued Procedural Order No. 5 where it adopted the procedural schedule proposed by Vale in its letter dated 20 February 2015.

34. On 2 April 2015, Vale wrote to the Tribunal seeking permission to produce documents from these proceedings to Rio Tinto plc ("**Rio Tinto**") as part of an ongoing litigation taking place in the United States District Court for the Southern District of New York between Rio Tinto and Vale, BSGR and VBG (the "**Rio Tinto proceedings**"). BSGR objected to this request.

35. On 30 April 2015, the Tribunal issued its "Decision on Claimant's Request Concerning U.S. Discovery". The full procedural history of this decision, as set out in section I of the Decision, is incorporated by reference into this Award. The Tribunal ruled that Vale's request should be denied as it could not point to any existing legal requirement to produce the documents in issue. The decision prohibited Vale from disclosing documents in the Rio Tinto proceedings, and held that, in the event that the US court rendered a decision that Vale considered constituted a "legal duty" to compel it to produce documents from this arbitration in the Rio Tinto proceedings, Vale should not disclose such documents before securing an additional written authorisation from the Tribunal.

### 6. Second Stay Application

36. On 20 May 2015, BSGR renewed its application to stay the arbitration (the "**Second Stay Application**"), which was opposed by Vale.

37. On 28 June 2015, the Tribunal issued its "Decision on Claimant's Request to Share LCIA Record with the Republic of Guinea and the ICSID Tribunal". The procedural history of the Decision, set out at paragraphs 1–9 of the Decision, is incorporated by reference into this Award. The Tribunal ruled that BSGR should disclose, on an ongoing basis, all documents from the ICSID proceedings to Vale and the Tribunal, and that the Parties were authorised to provide to the Republic of Guinea and to the ICSID Tribunal all documents produced or rendered in the LCIA arbitration with the exception of witness statements and documents over which BSGR claimed confidentiality, reserving a right for Vale to respond to BSGR's alleged confidentiality grounds.

38. On 24 July 2015, the Tribunal issued its "Decision on Respondent's Renewed Application to Stay the Arbitration", denying BSGR's Second Stay Application. The procedural history of the decision, as set out in section I of the Decision, is incorporated by reference into this Award.

### 7. BSGR's Statement of Defence

39. Shortly before this Decision was issued, on 1 July 2015, BSGR filed its Statement of Defence (corrected on 7 July 2015). The Statement of Defence was filed together with consolidated indices of factual exhibits and legal authorities and its factual exhibits and legal authorities. BSGR filed 14 factual witness statements in support of its case from: Beny Steinmetz; Marc Struik; Asher Avidan; Michael Noy; Frédéric Cilins; Avraham Lev Ran; Mahmoud Thiam; Patrick Saada; David Barnett; Yossie Tchelet; David Clark; Daniel Pollak; Dag Cramer; and Sandra Merloni-Horemans.

### 8. Procedural Order No. 6

40. On 14 August 2015, BSGR sent the Tribunal a proposed amended procedural schedule agreed to by both Parties. On 15 August 2015, the Chairman of the Tribunal made two requests to the Parties arising out of BSGR's letter. The first sought confirmation of Vale's agreement to the proposed amended procedural schedule. The second sought the Parties' confirmation that they no longer wished for the Tribunal to hold a third week, 12–16 September 2016, in reserve for the hearing.

41. On 17 August 2015, Vale confirmed its agreement to the proposed amendments to the procedural timetable, and reaffirmed the view that two weeks for the merits hearing were sufficient. BSGR remained of the view that a third week for the hearing should be held in reserve.

42. On 19 August 2015, the Tribunal issued Procedural Order No. 6, adopting the amended procedural schedule, and ruled that it continued to hold the week of 12–16 September 2016 in reserve for the merits hearing.

### 9. Procedural Order No. 7

43. On 1 September 2015, the United States Department of Justice (the "**U.S. DOJ**") served a subpoena on Vale as part of a Grand Jury proceeding, commanding Vale to produce any and all documents and records related to this arbitration.

44. On 3 September 2015, Vale wrote to the Tribunal requesting authorisation for Vale to make legally required disclosures pursuant to the subpoena. The Tribunal invited BSGR to

respond to the request by 9 September 2015. On 14 September 2015, BSGR informed the Tribunal that it had no objections to Vale's request. The Tribunal issued Procedural Order No. 7 on the same day, granting Vale's application to make document disclosures in accordance with the subpoena.

### 10. Document Production and U.S. Discovery

45.    In accordance with the agreed timetable, the Parties submitted Redfern Schedules (accompanied by exhibits and legal authorities) to the Tribunal on 11 September 2015. On 24 September 2015, BSGR wrote to the Tribunal raising additional comments regarding the Redfern Schedules. Vale requested that the Tribunal disregard BSGR's additional comments, or permit Vale to submit a response by 28 September 2015. On 25 September 2015, the Tribunal authorised Vale to submit a response in accordance with the Tribunal's instructions. In accordance with the Tribunal's instructions, Vale submitted its response requesting that the Tribunal order BSGR to produce certain documents requested by Vale.

46.    On 28 September 2015, Vale informed the Tribunal that the U.S. Court in the Rio Tinto proceedings had ordered that Vale disclose the Parties' documents from this arbitration pursuant to an order from Judge Andrew J. Peck. Based on the attached transcript from the hearing before Judge Peck, Vale renewed its request that the Tribunal grant permission for the production of documents from this arbitration in the Rio Tinto proceedings. BSGR was invited to comment on Vale's request by 30 September 2015. BSGR stated that it had no further comments on Vale's request, noting that the documents were covered by the protective order in force in relation to the U.S. proceedings.

47.    On 1 October 2015, the Tribunal issued its "Second Decision on Claimant's Request Concerning U.S. Discovery", granting Vale's application in relation to Judge Peck's order, permitting Vale to produce Vale's and BSGR's documents in the Rio Tinto proceedings.

48.    On 17 October 2015, the Tribunal issued its "Decision on Document Production", together with the Parties' Redfern Schedules, containing orders granting or denying production for each specific request. The Decision on Document Production included an order directing BSGR to make a good faith effort at obtaining and producing documents held by third parties and directing the Parties to produce privilege logs detailing any documents over which privilege was claimed.

### 11. Procedural Order No. 8

49.    On 2 November 2015, BSGR sent the Tribunal a proposed amended procedural schedule agreed on by both Parties. Vale confirmed its agreement to the proposed schedule. The schedule was adopted by the Tribunal on 4 November 2015 in Procedural Order No. 8. Accordingly, the amended deadline for the Parties to make the required document productions along with any corresponding privilege logs was 18 November 2015 for document production, and 3 December 2015 for privilege logs respectively.

### 12. Procedural Order No. 9 and Second Decision on Document Production

50.    On 23 November 2015, the Tribunal issued Procedural Order No. 9, ordering BSGR to submit a report concerning the status of the ICSID proceedings, and all documents from the ICSID proceedings that had been filed in such proceedings or become available in it. The Tribunal also ordered BSGR to meticulously comply with both of these obligations that

were initially set out in the Tribunal's "Decision on Respondent's Application to Stay the Arbitration" and "Decision on Claimant's Request to Share LCIA Record with the Republic of Guinea and the ICSID Tribunal". For a period, BSGR provided these monthly updates.

51. On 14 December 2015, Vale sent a letter to the Tribunal alleging deficiencies in BSGR's document production that breached the Tribunal's "Decision on Document Production". Following instructions from the Tribunal, both Parties filed further correspondence and submissions on this matter. The Chairman heard oral arguments from the Parties via teleconference on 4 February 2016, with a copy of the transcript provided to the co-arbitrators. The Tribunal issued its "Second Decision on Document Production" on 15 February 2016. A more detailed procedural history for this decision, principally set out at paragraphs 1–3 of the Decision, is incorporated by reference into this Award.

52. On 17 February 2016, Vale advised the Tribunal that Mahmoud Thiam ("**Thiam**") (Minister of Mines of the Republic of Guinea from 2009 to 2010) had filed an objection to the U.S. Court's order granting Vale the right to use 83 documents produced in the Rio Tinto proceedings in the present arbitration.

### 13. Procedural Order No. 10

53. On 24 February 2016, Vale sent the Tribunal a proposed amended procedural schedule represented to have been agreed on by both Parties. BSGR provided confirmation on 26 February 2016, as requested by the Tribunal. On 27 February 2016, the Tribunal issued Procedural Order No. 10, adopting the amended schedule.

### 14. Third Decision on Document Production

54. On 18 March 2016, the Tribunal issued its "Third Decision on Document Production", denying Vale's further request for relief. The procedural history of the Third Decision, set out at paragraphs 1–8 of the Third Decision, is incorporated by reference into this Award. Subject to any substantiated objections from BSGR, the Tribunal directed BSGR to produce all remaining documents pursuant to the Tribunal's "First Decision on Document Production" and "Second Decision on Document Production" and to submit any necessary privilege logs to Vale on or before 24 March 2016.

55. On 24 March 2016, BSGR confirmed to the Tribunal that it had complied with the Tribunal's "Second Decision on Document Production" and "Third Decision on Document Production" subject to four outstanding points, which it stated it would complete as soon as possible.

### 15. Vale's Statement of Reply and Procedural Order No. 11

56. On 24 March 2016, Vale submitted its Statement of Reply and attachments. Vale filed eight factual witness statements in support of its case from: Eduardo Etchart; Roger Agnelli; Alex Monteiro; Ahmed Kanté; Louncény Nabé; Ricardo Saad; Ahmed Tidiane Souaré; and Leandro Teles. Vale also filed an Expert Report from Dr Min Shi.

57. On 28 March 2016, Vale requested the Tribunal's permission to submit a revised Statement of Reply incorporating the 83 documents produced by Thiam (or his banks) in the Rio Tinto proceedings following a ruling from the U.S. Court on 25 March 2016. Vale also sought an extension to the deadline for it to submit USB drives and hyperlinked copies

of its submission from 31 March 2016 to 4 April 2016. The Tribunal invited BSGR to provide its view on the request by 29 March 2016.

58. On 29 March 2016, BSGR conveyed to the Tribunal that it was not in a position to deal with Vale's request regarding the Thiam documents, and proposed an extension to respond by 31 March 2016. On 31 March 2016, BSGR expressed the view that it was unnecessary to respond until Vale substantiated its request in accordance with Article 22.1 of the 1998 LCIA Rules and paragraphs 11 and 12(c) of Procedural Order No. 2. Vale responded that it had fully substantiated its request and submitted its Statement of Reply submission from 24 March 2016 with minor typographical corrections on 31 March 2016. The Parties subsequently provided additional comments on the request.

59. On 29 March 2016, BSGR wrote to the Tribunal requesting clarification and disclosure regarding the Tribunal Secretary's role, following a misdirected email sent by the Chairman of the Tribunal dated 23 March 2016. The Tribunal responded on 8 April 2016. BSGR subsequently wrote to the Tribunal on 12 April 2016 expressing its view that the Tribunal's response was inadequate and incomplete. BSGR repeated its initial requests (subject to an amendment to its fifth request) and conveyed additional requests to the Tribunal.

60. On 31 March 2016, BSGR wrote to Vale enclosing its updated privilege log and requesting confirmation that a specific privileged communication identified in Exhibit C-542 would be redacted or deleted from Vale's storage system. Vale proposed substituting the document with a redacted version along with its submission of a revised Statement of Reply incorporating Thiam's documents, should the Tribunal grant Vale's request of 28 March 2016.

61. On 11 April 2016, the Tribunal issued Procedural Order No. 11, permitting Vale's request to submit an amended Statement of Reply to incorporate references to the 83 Thiam documents from the Rio Tinto proceedings and to substitute a redacted version of Exhibit C-542 within three business days.

## 16. Further Document Production Issues

62. On 19 April 2016, BSGR wrote to the Tribunal, expressing no objection to Vale's request to submit a further revision to the Statement of Reply, but reserving its right to apply for an extension of time to serve its Second Memorial and evidence in support should the need arise. It additionally requested that the Tribunal require Vale to provide a redline version of its amended submission to reflect any changes made to the original version dated 24 March 2016. BSGR informed the Tribunal, in relation to Vale's second request, that it would endeavour to provide the certifications in accordance with the Tribunal's "Second Decision on Document Production" by 27 April 2016. The Tribunal was subsequently notified on 27 April 2016 that BSGR would only be in a position to submit the certifications by 28 April 2016.

63. On 28 April 2016, BSGR provided the three separate certifications regarding the disclosure process in accordance with the Tribunal's "Second Decision on Document Production". BSGR reserved the right to make further submissions on the Tribunal's decision in relation to the provision of certificates. The supporting documents to the certifications were provided on 5 May 2016.

64. On 3 May 2016, BSGR applied to the Tribunal for an order that Vale produce the "Nardello Report" and any other documents responsive to Respondent's Request No. 19(b). By separate letter on the same date, BSGR also informed the Tribunal that BSGR would be represented by an additional firm, Asserson Law Offices, and requested that any future communications reflect this appointment.

**17.   The Respondent's First Challenge against all three Tribunal members in May 2016**

65. On 5 May 2016, BSGR filed a challenge in the LCIA Court against all three members of the Tribunal seeking to revoke their appointment in accordance with Article 10(4) of the LCIA Rules (the "**First Challenge**"). The Court appointed Dr. Inka Hanefield, Professor Luca Radicati di Brozolo and Peter J. Rees QC to be the Division of the LCIA Court to determine the challenge, with Peter J. Rees QC presiding.

66. BSGR's challenge was based on five grounds.

66.1.   Ground 1: The Tribunal improperly delegated its role to the Secretary by systematically entrusting the Secretary with a number of tasks beyond what was permissible under the LCIA Rules and the LCIA Policy on the use of arbitral secretaries;

66.2.   Ground 2: The Chairman breached his mandate as an arbitrator and his duty not to delegate by seeking the views of a person who was neither a party to the arbitration nor a member of the tribunal on substantial procedural issues (i.e. the Secretary);

66.3.   Ground 3: The other members of the Tribunal equally breached their mandate as arbitrators and their duty not to delegate by not sufficiently participating in the arbitration proceedings and the decision-making process;

66.4.   Ground 4: Circumstances existed which gave rise to justifiable doubts as to the Chairman's independence or impartiality; these arose out of comments the Chairman had made at an international conference;

66.5.   Ground 5: The Chairman breached his duty to maintain the confidentiality of the arbitral proceedings.

67. On 10 May 2016, Vale wrote to the Tribunal regarding alleged alterations made to the language of the certifications that BSGR's counsel had provided on 28 April 2016. Vale requested the Tribunal to direct BSGR's counsel to answer certain questions regarding the certifications and further requested that the Tribunal should draw the appropriate adverse inference if BSGR's counsel fail to comply. The Parties provided further comments on Vale's letter of 10 May 2016 on 20 and 23 May 2016, culminating in Vale renewing its request that the Tribunal hold BSGR to its original order and require it to explain any rewording of the certifications.

**18.   Procedural Order No. 12 and Procedural Order No. 13**

68. On 2 June 2016, the Tribunal issued Procedural Order No. 12, directing the Parties to respond to each other's arguments of privilege raised in an exchange of correspondence

beginning 3 May 2016 in respect to the production of the "Nardello Report" and certain other documents. The Tribunal also expressed its willingness to give BSGR additional time to file its Rejoinder Submission and Reply on Counterclaims and proposed a revised procedural schedule. Vale wrote to the Tribunal on the same day, contending that the proposed revised schedule was unnecessary and unfair. Following further correspondence from BSGR, the Tribunal issued Procedural Order No. 13 on 4 June 2016, adopting the procedural schedule annexed to Procedural Order No. 12. The Tribunal directed the Parties to make their further submissions in accordance with the new schedule.

69.     On 7 June 2016, Vale wrote to the Tribunal, requesting its intervention as BSGR had allegedly failed to engage with Vale regarding the organisation of hearing logistics. The request was withdrawn on the same day.

### 19.   Fourth Decision on Document Production

70.     On 13 July 2016, the Tribunal issued its "Fourth Decision on Document Production", addressing all remaining document production issues that had been raised by the Parties in an extensive exchange of correspondence. The procedural history detailed throughout that Decision is incorporated by reference into this Award.

### 20.   BSGR's Statement of Rejoinder

71.     On 15 July 2016, BSGR informed the Tribunal that it did not anticipate being able to finalise and serve its Statement of Rejoinder and supporting evidence by 15 July 2016, and requested an extension of the deadline to 18 July 2016. Vale opposed the extension, but requested that, if the Tribunal accepted the extension, it orders that no further delay would be tolerated, and to expressly reserve the right to refuse to admit into the record any submission by BSGR made after that date. Vale also reserved the right to file its Rejoinder on Counterclaims on 15 August 2016, being four weeks after BSGR contended it would file its Statement of Rejoinder.

72.     The extension was granted, and BSGR filed its Statement of Rejoinder on 18 July 2016 with supporting exhibits and legal authorities. BSGR filed 15 factual witness statements in support of its case. Second witness statements were given by: Beny Steinmetz; Marc Struik; Asher Avidan; Michael Noy; Mahmoud Thiam; Patrick Saada; David Barnett; Yossie Tchelet; David Clark; Daniel Pollak; Dag Cramer; and Sandra Merloni-Horemans. First witness statements were also given by Cesare Morelli, Yuval Sasson and Arieh Ovadia. BSGR filed an Expert Witness Report from Francois Ferreira.

### 21.   Procedural Order No. 14

73.     On 21 July 2016, Vale wrote to the Tribunal expressing its concerns regarding BSGR's allegedly delayed compliance with the Tribunal's "Fourth Decision on Document Production" and requested that the Tribunal mandate BSGR's full compliance with the decision no later than 26 July 2016. Vale further requested that the Tribunal order a specific schedule for compliance with the decision. Following the Tribunal's invitation to respond, BSGR accepted Vale's proposed schedule in relation to documents referred to in paragraphs 154, 166 and 182 of the "Fourth Decision on Document Production", but requested an extension to 28 July 2016 in order to amend the privilege log and consider whether additional production would be required. Vale opposed the extension, and made further requests of BSGR by the same deadline proposed in its 21 July 2016 letter.

74.     On 22 July 2016, the Tribunal issued Procedural Order No. 14, ordering BSGR to produce all documents pursuant to the Tribunal's "Fourth Decision on Document Production" by the close of business on 25 July 2016. To the extent BSGR contended that any document it was directed to either produce or log was not within its possession or control, BSGR was directed to identify those documents and provide an explanation as to why it did not have possession or control over said documents by close of business on 25 July 2016 (subsequently corrected to 27 July 2016 in Revised Procedural Order No. 14 issued on 24 July 2016). BSGR was additionally ordered to provide revised privilege log entries (or else produce the withheld documents) by the close of business on 27 July 2016. The Tribunal additionally invited BSGR to respond to Vale concerning paragraph 121 of the Tribunal's "Fourth Decision on Document Production".

75.     Vale wrote to the Tribunal on 26 July 2016 stating that BSGR had failed to comply with the order in Procedural Order No. 14 to produce all documents it was ordered to produce under the Tribunal's "Fourth Decision on Document Production" by close of business on 25 July 2016. Vale requested that the Tribunal order BSGR to produce the two 19 February 2014 Crowe Horwath reports and the 8 December 2014 Crowe Horwath report immediately.

76.     Additionally, Vale wrote to the Tribunal on 27 July 2016 alleging that BSGR had violated Procedural Order No. 14 by failing to produce its revised privilege log or to identify any documents it claimed were not in its possession or control by the deadline given. Vale contended that BSGR had therefore failed to substantiate its privilege claims, or to establish that it was not in control of any document it had been ordered to produce. Vale requested the Tribunal to direct BSGR to produce all documents covered by Procedural Order No. 14.

77.     BSGR produced its revised privilege log later that day.

78.     On 28 July 2016, Vale wrote again to the Tribunal to request an order enforcing the Tribunal's "Fourth Decision on Document Production" as well as Procedural Order No. 14. Vale requested the Tribunal to direct BSGR to produce all documents covered by Procedural Order No. 14 forthwith, including (without limitation), documents contained in BSGR's privilege log produced on 27 July 2016.

79.     On 28 July 2016, BSGR wrote to the Tribunal regarding Vale's assertion in its letter of the same date that no further production by Vale was required under paragraph 121 of the Tribunal's "Fourth Decision on Document Production". BSGR invited the Tribunal to order Vale to comply with paragraph 121 of that decision by close of business on 1 August 2016. Vale responded on 5 August 2016, contending that it had no further obligation to produce documents or information in response to paragraph 121 of that decision.

80.     On 1 August 2016, BSGR provided a response by letter to Vale's assertion that it should produce all documents, including those on its privilege log. By letter of the same date, Vale responded by requesting that the Tribunal find that BSGR had not substantiated its privilege claims and that it direct that BSGR produce all of those documents within 48 hours of the Tribunal's decision on the issue.

81.     On 4 August 2016, BSGR wrote to the Tribunal requesting partial reconsideration of the Tribunal's "Fourth Decision on Document Production" in relation to the passage regarding production of reports generated by Ernst & Young that post-dated 30 April 2010. BSGR

requested that Vale be required to produce reports and other documents generated by Ernst & Young up to the end of June 2010. Vale opposed the request on 8 August 2016.

### 22. LCIA Decision on the First Challenge

82. On 4 August 2016, the Division of the LCIA Court issued its Decision on the First Challenge (referred to in paragraph 65 above). The "Decision of the Division of the LCIA Court on Respondent's Challenge to the Tribunal" revoked the appointment of Hon. Judge Charles N. Brower as Chairman of the Tribunal in this arbitration on the basis that his remarks concerning this arbitration at an ITA-ASIL conference gave rise to justifiable doubts as to his independence or impartiality, but denied the application to revoke the appointment of the two co-arbitrators, finding that there had been no inappropriate use of an arbitral secretary as regards Ground 1, and that there had been no improper delegation of their duty not to delegate by leaving it to the Chairman and the Tribunal Secretary to make decisions as regards Ground 2. As to costs, the Division said at paragraph 343 that "the issue of costs and expenses generated by this challenge should be treated as costs in the arbitration, and determined as part of the arbitral award". The procedural history set out at Section I(C) of that Decision is incorporated by reference into this Award.

### 23. The Appointment of a New Chair by the Parties

83. On 5 August 2016, Vale wrote to the LCIA, requesting that the LCIA Court decide that the new Chairman of the Tribunal be appointed in accordance with the original nominating process and invite the co-arbitrators to nominate the new Chair by 18 August 2016.

84. On 5 August 2016, BSGR wrote to the co-arbitrators, confirming that both Parties endorsed the use of the original nominating process to select a new Chairman of the Tribunal. BSGR additionally requested to stay proceedings pending appointment of a new Chairman and to release the hearing dates of 29 August to 18 September 2016. BSGR contended that all decisions already made by the Tribunal would need to be re-examined, and that any future involvement of the Tribunal Secretary would be inappropriate.

85. On 5 August 2016, Vale responded that it was premature to release the existing hearing dates and that, if it became necessary to release those dates, the hearing should be rescheduled to the nearest available dates. Vale further contended that there was no basis for altering the other dates in the existing procedural timetable, disagreed that the Tribunal decisions would need to be re-examined, and pointed out that there was no suggestion that the Tribunal Secretary engaged in any impropriety.

86. On 6 August 2016, Vale wrote to the Division of the LCIA Court requesting reconsideration of its "Decision of the Division of the LCIA Court on Respondent's Challenge to the Tribunal" with respect to the decision whether BSGR met its burden of proof that Ground 4 was raised on a timely basis and the decision revoking the appointment of the Chair of the Tribunal. On 8 August 2016, the LCIA replied that the LCIA Court's decisions were not subject to reconsideration.

### 24. The Appointment of a New Chair of the Tribunal

87. On 8 August 2016, BSGR wrote to the co-arbitrators rejecting the co-arbitrators' proposal sent earlier that day to use the original list of candidates as ranked by the parties in July 2014 in the selection process of a new Chair of the Tribunal. BSGR contended that there

should be a new list procedure, conducted *de novo*. Vale disagreed and expressed the view that an extension in respect of the nomination process would not be appropriate. Vale agreed with the co-arbitrators' proposal to approach Professor William Park to check his availability and conflicts on the basis of his ranking in the original list of candidates.

88.     On 9 August 2016, Michael Hwang SC wrote to the LCIA on behalf of the co-arbitrators, formally nominating Professor Park as Chairman of the Tribunal.

89.     On 9 August 2016, BSGR wrote to the LCIA requesting that the co-arbitrators' nomination of Professor Park as Chairman of the Tribunal should be rejected. BSGR requested the LCIA Court to order the co-arbitrators to withdraw their nomination of Professor Park and to nominate a new Chairman in accordance with the original nominating process. Vale, in response, expressed the view that the LCIA Court should appoint the co-arbitrators' choice of a new Chairman and let the reconstituted Tribunal deal with any complaints that BSGR may raise about maintaining the long-agreed schedule.

90.     On 10 August 2016, BSGR wrote to the LCIA repeating its request that the LCIA order the co-arbitrators to withdraw their nomination of Professor Park and nominate a new Chair of the Tribunal in accordance with the original nominating process, including a consultation and ranking process. Vale wrote to the LCIA in response requesting the LCIA Court to reject BSGR's protestations as to the nomination process. The Parties provided further comments to the LCIA on 11 August 2016.

91.     On 12 August 2016, Vale wrote to the LCIA requesting confirmation of the appointment of Professor Park, who had been nominated by the co-arbitrators.

92.     On 15 August 2016, Michael Hwang SC wrote to the Parties, on behalf of the co-arbitrators, advising that the "Fourth Decision on Document Production" had been decided and could not be revisited until the Tribunal had been reconstituted.

93.     On 15 August 2016, BSGR wrote to the co-arbitrators stating that BSGR no longer had confidence in the co-arbitrators' ability properly to conduct the proceedings. It expressed the view that the fairest outcome was for the co-arbitrators to revoke their appointments as arbitrators of this arbitration. BSGR reserved its rights in relation to further challenges.

94.     On 15 August 2016, BSGR repeated its request to the LCIA Court to confirm the LCIA Court's previous decision that the original nominating process must be followed, to confirm that the co-arbitrators' nomination of Professor Park was not made in accordance with the original nominating process, and to reject the nomination of Professor Park on that basis. On the same date, Vale wrote to the LCIA requesting prompt confirmation of the appointment of Professor Park.

## 25.   Vale's Rejoinder on Counterclaims

95.     On 15 August 2016, Vale filed its Statement of Rejoinder on Counterclaims with supporting documents (including witness statements from Elizia Boechat, Ricardo Saad and Leandro Teles). Vale wrote to BSGR identifying the witnesses it wished to cross-examine at the hearing.

### 26. The Appointment of a New Chair by the LCIA

96. On 17 August 2016, the LCIA notified the Parties that, pursuant to Article 10.1 of the LCIA Rules, the LCIA Court formally revoked the appointment of the Hon. Judge Charles N. Brower and, pursuant to Articles 5.5 and 11 of the LCIA Rules, the LCIA Court appointed Professor Dr. Filip De Ly as the replacement Chair of the Tribunal in this arbitration.

97. On 17 August 2016, Vale wrote to the new Chairman of the Tribunal regarding the provision of copies of submissions and other documents. On the same day, BSGR wrote to the Chairman requesting confirmation that the Chairman would not read any material sent by Vale without BSGR's agreement. After receiving Vale's reply, Professor De Ly responded that he would refrain from reading such material until the matter had been discussed with counsel and a determination made. The Parties were also requested to provide an indication of any objection to the Chairman reading documents sent by the LCIA. The Parties confirmed that there were no objections.

98. On 17 August 2016, Vale requested that the Tribunal enforce the procedural timetable, and order that BSGR promptly identify Vale's witnesses it wished to cross-examine at the hearing, no later than close of business on 18 August 2016. Vale also requested confirmation that the telephone conference scheduled for 19 August 2016 would proceed as previously scheduled, or an indication, if that time was no longer available, when the Tribunal wished to conduct it.

99. On 18 August 2016, Vale wrote to the Tribunal to identify and summarise its position as to the issues to be discussed during the 19 August 2016 pre-hearing conference call. The Tribunal confirmed that the pre-hearing conference call would proceed with an open agenda at 9 a.m. EST, subject to the availability of the Parties. Both Parties confirmed their availability.

### 27. Respondent's Second Challenge to co-arbitrators Hwang and Williams and Procedural Order No. 16

100. On 23 August 2016, BSGR submitted a second challenge to the co-arbitrators to the LCIA Court (the "**Second Challenge**") and on the same day filed another application for a stay of the arbitral proceedings pending determination of the Second Challenge. Vale opposed the stay application on 24 August 2016. The Second Challenge asserted that the co-arbitrators had failed, *inter alia*, to act fairly and impartially on several grounds, including nominating Professor Park as the replacement Chair instead of conducting the whole appointment process again. Professor Park had been the equal favourite for appointment with Judge Brower under the list procedure which the Tribunal had utilised in the initial appointment process. BSGR subsequently sought the Tribunal's consent to reply to Vale's letter of opposition. Vale opposed the request. The Tribunal decided to authorise a brief further submission by BSGR and a further reply by Vale. Following an exchange of further submissions by the Parties, the Tribunal dismissed the stay application on 29 August 2016 in Procedural Order No. 16.

28. **Procedural Order No. 15, cancellation of hearing scheduled for 29 August – 16 September, and establishment of educational hearing for 5 – 9 September 2016**

101. Following the conference call with the Parties on 19 August 2016, the Tribunal issued Procedural Order No. 15 on 24 August 2016 in which it cancelled the evidentiary hearing scheduled for the period from 29 August to 16 September 2016 in view of the removal of the previous Chairman and his replacement by a new Chairman. The Tribunal directed instead that a hearing dealing with procedural issues and during which the Parties would make oral submissions for the purpose of educating the Tribunal be held on 5–9 September 2016, with 12 September 2016 as a reserve day (the "**Educatory Hearing**"). The Parties were requested to make appropriate modifications as to the organisation of the Educatory Hearing including the reservations with the International Dispute Resolution Centre as to the hearing room facilities and the bookings with court reporters.

102. On 25 August 2016, BSGR wrote to the Tribunal proposing an alternative procedural timetable. Vale opposed the alternative timetable on 29 August 2016, and requested that the Tribunal direct the Parties and counsel to be prepared at the upcoming Educatory Hearing to provide their availability for the next six months.

29. **Respondent announces it will not attend the Educatory Hearing until its Second Challenge was decided by the LCIA**

103. On 25 August 2016, BSGR wrote to the Tribunal, indicating that it would not participate in the Educatory Hearing, nor would it provide written submissions on various procedural issues set out in Procedural Order No. 15 (including the issue of reviewing the Tribunal's previous decisions in accordance with Section 27(4) of the English Arbitration Act). It expressed the view that the Educatory Hearing must be held after a determination had been made on the Section 27(4) issues, which itself could not be made until its Second Challenge had been decided. BSGR indicated that, in any event, it would only attend under strict conditions including that the co-arbitrators not be present at the hearing and that no documents exhibited in the Parties' second or third round of submissions be shown to, or discussed with, the Chairman.

104. On 28 August 2016, having received BSGR's Second Challenge against the co-arbitrators dated 23 August 2016, the Tribunal wrote to the Parties and to the LCIA declaring that the co-arbitrators had decided not to withdraw from their appointed function as members of the Tribunal.

105. On 30 August 2016, BSGR wrote to the Tribunal stating that it had not submitted a brief on the Section 27(4) issue, nor would it be responding to Vale's brief on the matter. BSGR indicated that it would not be attending the Educatory Hearing before the Tribunal until the Second Challenge had been decided and until the Tribunal was properly reconstituted. BSGR repeated its position that it would attend an educatory hearing, but only on the conditions set out in section 4 of its letter of 25 August 2016.

30. **Respondent announces it will not appear at the Educatory Hearing**

106. On 1 September 2016, BSGR wrote to the Tribunal indicating that it would not be filing written submissions, nor a bundle of documents, for the forthcoming Educatory Hearing. BSGR also indicated that it would not be attending the Educatory Hearing. Vale filed its

Pre-Hearing Written Submissions and wrote to the Tribunal in response to BSGR, expressing the view that the Tribunal should proceed with the Hearing to resolve any outstanding procedural issues, and to schedule a merits hearing.

### 31. The 5–8 September 2016 Educatory Hearing

107. Over the course of 5–8 September 2016, the Educatory Hearing – being a hearing to educate the Chairman as to the issues in the case generally, resolve outstanding procedural issues and schedule a merits hearing – took place in London. Attending the Educatory Hearing on behalf of Vale were Jonathan Blackman, Jeffrey Rosenthal, Jonathan Kelly, Joaquin Terceño, Emily Balter and Rikki Stern, all from Cleary Gottlieb Steen & Hamilton. It is important to record that, while BSGR did not attend the Educatory Hearing, it was sent a copy of the transcript from the hearing at the end of each hearing day.

108. On 6 September 2016, BSGR made three applications to the Tribunal in case it chose to determine the outstanding procedural issues before the pending challenges against the co-arbitrators were determined by the LCIA. First, BSGR applied to fix the hearing on the merits only in a period in which BSGR's counsel, David Wolfson QC, had sufficient availability to prepare and attend such hearing (this would not be before May 2017). Second, BSGR applied for leave to file additional submissions in response to Vale's Rejoinder on Counterclaims and new evidence adduced therein. Third, BSGR applied for leave to file additional submissions in relation to a criminal complaint filed in the U.S. on 12 August 2016 against Samuel Mebiame ("**Mebiame**"), a Gabonese businessman, for bribing Guinean government officials in 2010–2012 in exchange for "an opportunity to be partners with a Guinean state-owned mining company",[6] and its relevance to the issues in this arbitration. BSGR proposed to incorporate the latter submissions in its reply to Vale's Rejoinder on Counterclaims.

109. By email dated 7 September 2016, the Tribunal proposed that BSGR attend the Educatory Hearing the following day (8 September) to discuss the matters referred to by BSGR in its three letters of 6 September 2016. Later that day, BSGR notified the Tribunal that it would not be attending the Hearing scheduled for 8 September to discuss the procedural matters referred to above.

110. On 12 September 2016, David Wolfson QC (lead counsel for BSGR) wrote to the Tribunal commenting on the transcript from the Educatory Hearing on 8 September 2016 and, in particular, his availability for a merits hearing. Vale wrote to the Tribunal in response later that day.

111. On 15 September 2016, BSGR wrote to the Tribunal providing observations in relation to the transcripts from the Educatory Hearing dated 5–8 September 2016. Vale provided a response to the Tribunal (copied to BSGR) later that day.

### 32. Respondent announces High Court Proceedings for removal of co-arbitrators Hwang and Williams

112. On 7 October 2016, BSGR informed the Tribunal and Vale of its intent to issue a claim pursuant to Section 24(1) of the Arbitration Act in the English High Court for the removal of

---

[6] *USA v. Samuel Mebiame*, Complaint, Dkt. No. 1, 12 August 2016, **R-403**.

the co-arbitrators. On 21 October 2016, BSGR commenced removal proceedings in respect of its challenge before the High Court in London seeking removal of Sir David A.R. Williams QC and Dr Michael Hwang SC (the "**High Court Challenge**"). BSGR also made an interim application for disclosure of the Tribunal's internal correspondence.

### 33. Procedural Order No. 17 – Procedural Order following reconstitution of the Tribunal

113. On 17 October 2016, the Tribunal issued Procedural Order No. 17, addressing a number of procedural issues identified following the reconstitution of the Tribunal. It confirmed previous Procedural Orders issued by it and further confirmed its "Decision on Respondent's Application to Stay the Arbitration" dated 16 December 2014 and "Decision on Respondent's Renewed Application to Stay the Arbitration" dated 24 July 2015. In addition, it (1) authorised BSGR to brief the Tribunal on the relevance of the U.S. criminal complaint against Mebiame (as referred to in paragraph 108 above), giving Vale a right of reply; (2) adopted a provisional timetable for the arbitral proceedings, (3) adopted a formula for determining the activities of the Tribunal Secretary and (4) provided further notice that the current Tribunal Secretary would continue to provide services as defined in the formula to the Tribunal for the remainder of the arbitration unless his services were terminated at an earlier date.

114. In relation to the provisional timetable, Procedural Order No.17 records in detail the issues around the availability of BSGR's counsel (including Mr Wolfson QC and Mishcon de Reya) which, in effect, meant that BSGR did not want to proceed with a merits hearing until June 2017. Mr Wolfson had previously indicated that he had a three-week trial commencing on 30 January 2017 and scheduled to last until 23 February 2017.[7] As the provisional dates for the merits hearing commenced on 20 February 2017, Mr Wolfson would be unavailable for the first few days of the hearing (assuming all three weeks were required).

115. However, having concluded in Procedural Order No.17 that the "Arbitral Tribunal is insufficiently convinced that Mr. Wolfson has no capacity in the next nine months to conduct a trial for which he was fully prepared in August 2016," the Tribunal provisionally reserved the relevant dates in February and April 2017 for the hearing. The Tribunal further observed that, should those dates prove impossible for Mr Wolfson QC, "there is a vast pool of excellent professionals with unquestionable reputation in the London market and elsewhere to perform arbitration advocacy, which can take over the tasks of Mr. Wolfson if he were to be unavailable."[8]

116. On 18 October 2016, BSGR wrote to the Tribunal applying for a three-week extension until 21 November 2016 to file the additional memorial addressing the Mebiame investigation. Vale opposed the extension.

117. On 9 November 2016, BSGR wrote to the Tribunal expressing concern that proceeding with the provisional hearing dates would lead to an unfair handling of the case. BSGR proposed that the first week of a split hearing be held in the first week of April 2017, with

---

[7] See Letter from Mr Wolfson to the Tribunal, 12 September 2016. It transpired that Mr Wolfson's trial finished early and he would have been available to appear on 20 February 2017 (see Transcript, Merits Hearing, Day 1: p. 239, lines 6-14).
[8] Procedural Order No.17, paragraph 47.

the second and potential third week to be fixed after the dates fixed for the ICSID hearing. Vale opposed the proposal.

### 34. Procedural Order No. 18

118.   On 7 December 2016, the Tribunal issued Procedural Order No. 18, confirming Procedural Order No. 17 and dismissing BSGR's request to amend the provisional timetable of the arbitration proceedings, subject to three qualifications. The Tribunal repeated its offer in paragraph 46 of Procedural Order No. 17 that BSGR was free to indicate alternative merits hearing dates for consideration, if Mr Wolfson QC remained unable to make the dates provisionally reserved for the hearing. The Tribunal vacated two hearing days and invited the Parties, within a period of five working days, to comment on its suggestion to sit on two additional proposed reserve days. The Tribunal also invited the Parties, within a period of five working days, to comment on the possibility of using the three weeks commencing 10 May 2017, in whole or in part, for the merits hearing if the ICSID hearing dates were to be vacated (due to a challenge against the Tribunal that was in the process of being determined by ICSID).

### 35. The Challenge to the ICSID Tribunal is denied

119.   On 14 December 2016, Vale wrote to the Tribunal reiterating its availability for the hearing dates originally scheduled by the Tribunal. It also informed the Tribunal that, to the extent that additional hearing dates were deemed necessary, it would be available on the proposed reserve dates of 1–2 April 2017. Additionally, it expressed an intention to oppose, even on a conditional basis, abandonment of the current schedule in favour of holding the hearing in this matter in May 2017. BSGR responded on 29 December 2016 noting that, subject to the ICSID hearing dates in May 2017 becoming available, BSGR would be available as well as its counsel of choice, David Wolfson QC. Vale then informed the Tribunal that, on 28 December 2016, ICSID had denied BSGR's challenge to the ICSID Tribunal and the ICSID proceedings had resumed.

### 36. The LCIA Division dismisses the Second Challenge

120.   On 16 December 2016, the Division of the LCIA Court issued its "Decision of the Division of the LCIA Court on Respondent's Challenge to the Tribunal", dismissing BSGR's Second Challenge application dated 23 August 2016 against the co-arbitrators. The procedural history set out at section I(C) of the Decision is incorporated by reference into this Award. The LCIA Division found, in paragraph 203 of its Decision, that there was nothing to support the BSGR claim that the co-arbitrators were acting in any way unfairly between the parties in nominating Professor Park as replacement Chairman, nor were any other of the complaints made against the co-arbitrators valid. As to costs, and as with the first LCIA Decision, costs were to be treated as costs in the arbitration and determined as part of the Final Award.

121.   On 21 December 2016, BSGR filed a petition in the United States District Court for the District of Columbia against the former Chairman of the Tribunal, the Hon. Judge Charles N. Brower, and the Tribunal Secretary, Michael Daly, to produce documents and appear for depositions under 28 U.S.C. § 1782, compelling discovery in aid of the pending judicial proceedings in the English High Court seeking the removal of the co-arbitrators.

122.    On 9 January 2017, Asserson Law Offices informed the Tribunal that it was no longer instructed by BSGR in relation to this arbitration.

123.    On 5 and 20 January 2017, Vale wrote to the Tribunal, seeking to supplement the record with additional exhibits which became available to Vale after it had filed its Statement of Rejoinder on Counterclaims. BSGR responded on 26 January 2017, questioning the relevance of the proposed exhibits.

124.    On 13 January 2017, Vale wrote to the Tribunal proposing a procedural timetable and requesting the Tribunal to direct BSGR to co-operate with Vale in making the necessary logistical arrangements for the hearing. Vale sought identification of BSGR's appropriate contact person for this purpose.

125.    On 13 January 2017, BSGR updated the Tribunal on the status of the ICSID proceedings, and informed the Tribunal that a hearing was scheduled for 22 May to 2 June 2017.

126.    On 17 January 2017, BSGR wrote to the Tribunal urging it to set aside the provisional hearing dates for the merits hearing and put in place a new procedural timetable. Vale wrote to the Tribunal in response on 19 January 2017.

127.    On 24 January 2017, the Tribunal Secretary, Michael Daly, tendered his resignation for personal reasons. No replacement has since been appointed by the Tribunal.

### 37.    Procedural Order No. 19

128.    On 26 January 2017, the Tribunal issued Procedural Order No. 19, dealing with several outstanding issues, including the remaining procedural issues identified by the Parties which were not the subject of Procedural Order No. 17, the detailed hearing timetable, and the Tribunal Secretary.

129.    On 27 January 2017, Vale provided the Chair of the Tribunal with its Statement of Reply, BSGR's Statement of Rejoinder and Vale's pre-hearing written submissions.

### 38.    Respondent advises that it will not participate in the merits hearing

130.    On 31 January 2017, BSGR wrote to Vale indicating that it would not be participating in the forthcoming merits hearing. Vale wrote to the Tribunal on the same day, requesting for an acceleration of the pre-hearing conference call to discuss hearing issues.

131.    On 2 February 2017, BSGR wrote to the Tribunal in relation to Procedural Order No. 19. BSGR disagreed with various determinations of the Tribunal, refused to disclose certain documents and recorded its intention to file a response to Vale's Statement of Rejoinder on Counterclaims on 9 February 2017. Vale wrote to the Tribunal in response on the same day and requested the Tribunal to draw appropriate adverse inferences against BSGR for refusing to comply with its document production obligations. Vale reserved the right to request further relief as appropriate.

### 39.    Procedural Order No. 20

132.    On 3 February 2017, the Tribunal issued Procedural Order No. 20. The Tribunal interpreted BSGR's letter of 31 January 2017 as expressing an intention not to participate in the hearing on the hearing dates indicated. The Tribunal decided to proceed with the hearing

as scheduled, but invited BSGR to correct the Tribunal's interpretation or to cure BSGR's default regarding the preparation and organisation of the hearing before 7 February 2017. The Tribunal again confirmed the hearing dates and directed Vale to proceed with various aspects for the hearing arrangements. BSGR was ordered to produce any witnesses for the purposes of Vale's cross-examination and was further directed, within five working days, to communicate a list of the witnesses to be produced and the dates and times at which they could be examined at the hearing. The Tribunal cancelled the pre-hearing conference call scheduled for 10 February 2017 and dismissed Vale's request for the rescheduling of the call.

### 40. English High Court dismisses BSGR application to remove arbitrators and for a document disclosure order

133. On 3 February 2017, Popplewell J in the English High Court dismissed BSGR's High Court Challenge application to remove the co-arbitrators as well as its application seeking disclosure of documents from the Tribunal, which documents it had proposed to use in its second application for removal of the co-arbitrators. Popplewell J held, at paragraph 22 of his judgment, that it is only in the very rarest cases, if ever, that arbitrators should be required to give disclosure of internal documents of the Tribunal. On 9 February 2017, Popplewell J delivered his reasons for his dismissal of both applications in *P v Q and Ors* [2017] EWHC 148 (Comm) and *P v Q and Ors* [2017] EWHC 194 (Comm). Permission to appeal the application for a disclosure order was refused by the Court of Appeal on 22 February 2017.

134. On 6 February 2017, Vale wrote to the Tribunal, reporting back in relation to the Tribunal's directions in Procedural Order No. 20 at paragraph 20.

135. On 9 February 2017, BSGR filed its Reply to Vale's Statement of Rejoinder on Counterclaims. On 13 February 2017, Vale wrote to the Tribunal expressing concern about BSGR's alleged non-compliance with Procedural Order No. 19 in its latest submissions. BSGR wrote to the Tribunal in response on 16 February 2017 requesting the Tribunal to confirm that its submissions were compliant, that the submissions would be admitted into the record, and that they would be afforded the same weight as Vale's and BSGR's earlier substantive submissions.

136. On 8 February 2017, the LCIA acknowledged receipt of Vale's payment of the further advance on fees that had been requested by the LCIA on 26 January 2017.On 10 February 2017, the LCIA wrote to the Parties, advising that BSGR had not paid its share of the advance and requesting BSGR to confirm whether it had made arrangements for payment.

137. On 13 February 2017, Vale requested that the LCIA treat BSGR's non-payment of the required advance as a withdrawal of its counterclaims in the proceeding and to notify the Tribunal and the Parties of its decision as a matter of urgency and in advance of the upcoming merits hearing scheduled to begin on 20 February 2017.

### 41. Procedural Order No. 21

138. On 14 February 2017, the Tribunal issued Procedural Order No. 21, noting that BSGR failed to cure its default regarding hearing preparation (as indicated in Procedural Order No. 20) or provide any other explanation for the default. The Tribunal thus confirmed that it would proceed to a hearing on the basis that there was actual default of BSGR in preparing

and assisting regarding the organisation of the hearing. The Tribunal noted that BSGR had failed to comply with Procedural Order No. 20 ordering that BSGR communicate a list of witnesses to be produced or otherwise to have the witnesses called by Vale produced for examination. The Tribunal made requests in relation to the hearing bundle availability and adopted a modified version of Vale's draft hearing schedule. The Tribunal gave notice to the Parties that the hearing would take place at the International Dispute Resolution Centre, 70 Fleet Street, London.

## 42.   Merits Hearing 20 – 22 February 2017

139.   Over the course of 20–22 February 2017, the merits hearing took place in London (the "**Merits Hearing**"). Vale was represented by the same counsel as in the Educatory Hearing, with the addition of Jean Yves Garaud, Elizabeth Iung and Matt Karlan, all of Cleary Gottlieb. Ten witnesses gave oral evidence on behalf of Vale at the hearing. They were: Ahmed Tidiane Souaré; Ahmed Kanté; Louncény Nabé; George Kleinfeld; Eduardo Etchart; Alex Monteiro; Ricardo Saad; Elizia Boechat; Leandro Teles; and Dr Min Shi.

140.   BSGR and its witnesses did not attend the hearing, but, at the direction of the Tribunal, a copy of the transcript from each day's proceedings was provided to BSGR by email each evening.

## 43.   Procedural Order No. 23

141.   On 21 February 2017, the Tribunal issued Procedural Order No. 22, noting that BSGR failed to appear at the start of the hearing on 20 February 2017 at 10 a.m. at the notified venue and failed to cure that default during the first hearing day.

142.   On 21 February 2017, BSGR wrote to the Tribunal seeking confirmation of the company providing translation services and the names of the qualified interpreters. Vale confirmed that Elizabeth Zendle and Corrine Kennedy, both of whom are professional interpreters engaged through Geotext Translations, conducted the simultaneous interpretation during the examination of Vale's francophone witnesses during the hearing.

143.   On 3 March 2017, the Tribunal issued Procedural Order No. 23, noting that BSGR also failed to appear at, and did not participate in, Days 2 and 3 of the hearing on 21 and 22 February 2017. The Tribunal vacated all unused hearing days and closed the proceedings. The Parties were directed, within two weeks, to present to the Tribunal, the other party and the court reporter a list of any corrections to the hearing transcript. Vale was also directed to present a separate list of its suggestions for corrections to the transcript related to the simultaneous interpretation where Vale, at the end of the hearing, indicated that there were discrepancies between the testimony in French and its interpretation into English. The Parties were also directed, within three weeks, to simultaneously file short costs submissions with a summary overview of the various heads of costs that were claimed.

## 44.   Respondent's non-payment of deposit

144.   On 8 March 2017, the LCIA wrote to the Parties, noting that BSGR had not paid its outstanding deposit and setting a final deadline for payment of 15 March 2017. The LCIA reminded BSGR of the provisions of Article 24.4 of the LCIA Rules, in that failure by a counterclaiming party to provide promptly and in full the required deposit may be treated by the LCIA Court and the Tribunal as a withdrawal of the counterclaim. On 16 March 2017,

the LCIA further wrote to BSGR, noting its failure to pay the outstanding advance by the final deadline and stating that, accordingly, "the LCIA Court and the Arbitral Tribunal have decided to treat BSGR's counterclaim as withdrawn pursuant to Article 24.4 of the Rules."

### 45. Corrections to transcript

145.  Pursuant to Procedural Order No. 23, Vale submitted corrections to the transcript on 17 March 2017, including some corrections related to the simultaneous interpretation into English of the examinations of the witnesses who testified in French. On the same date, BSGR wrote to the Tribunal regarding the Tribunal's direction to the Parties to present a list of corrections to the transcripts. BSGR agreed that it was unnecessary for it to send separate typographical error corrections to the transcripts. BSGR urged the Tribunal to proceed with caution in respect of Vale's corrections to the translation of witness testimony and to take care to verify the submissions of Vale against the statements on the record. BSGR noted some additional information concerning David Wolfson QC's calendar which it said was in aid of ensuring that the "record in the case be correct". Vale wrote to the Tribunal in response on 21 March 2017 taking issue with the "gratuitous submission" regarding David Wolfson QC.

146.  Both Parties filed Submissions on Costs on 24 March 2017.

### 46. Claimant's application to introduce new exhibits and to amend its costs submissions

147.  On 26 May 2017, Vale wrote to the Tribunal, requesting leave to update the record with respect to two recent developments. The first development concerned three additional exhibits that Vale wished to introduce into the record related to the recent criminal conviction of Thiam (former Minister of Mines for the GoG) in the United States District Court for the Southern District of New York on charges related to his acceptance of bribes. The second concerned a requested amendment to Vale's Submission on Costs.

148.  On 29 May 2017, BSGR wrote to the Tribunal requesting a one-week extension of time to respond to Vale's letter of 26 May 2016. Vale objected to the requested extension. Alternatively, Vale requested the Tribunal to clearly direct BSGR to limit its response to the two subjects of Vale's letter.

149.  On 9 June 2017, BSGR wrote to the Tribunal agreeing to Vale's request to amend its Submission on Costs and to submit three exhibits from Thiam's trial. BSGR requested leave to reopen the record and add the following documents: (i) the transcript of a United States' Federal Bureau of Investigations (the "**FBI**"), Interview with Thiam dated 13 December 2016 (as Exhibit R-524); (ii) the transcripts from the ICSID hearing; and (iii) the forensic expert report to be produced in the ICSID proceedings regarding the authenticity of certain "Mamadie Touré contracts". BSGR also requested that it be allowed to provide an explanation of the relevance of the evidence heard in the ICSID proceedings to the current proceedings and permission for the Parties to comment on the forensic expert report.

150.  On 16 June 2017, Vale objected to the application in relation to the ICSID transcripts and the forensic expert report from the ICSID proceedings, but did not object to the FBI interview being accepted into the record. On 23 June 2017, BSGR repeated its request in relation to the ICSID documents, and conveyed a proposal in order to improve the

efficiency of the process. Vale again objected to the application. On 30 June 2017, BSGR wrote to the Tribunal, proposing that its application in relation to addition of the forensic examination be stayed pending the establishment of a schedule by the ICSID Tribunal in relation to the forensic examination of the "Mamadie Touré contracts", but that, in the interim, the Tribunal should deliver its decision on the addition of the ICSID hearing transcripts. Vale again requested that the Tribunal reject BSGR's application. On 27 July 2017, BSGR updated the Tribunal regarding the ICSID forensic examination process.

151.    On 14 July 2017, BSGR notified the Tribunal that the date for the agreement of the parties to the ICSID proceedings regarding the transcripts from the ICSID hearing had been amended from 12 July 2017 to 26 July 2017.

### 47.    Procedural Order No. 24

152.    On 6 September 2017, the Tribunal issued Procedural Order No. 24 in which it confirmed that it would accept:

(a) Vale's proposed amendment to its Submission on Costs; and

(b) The three Thiam documents it sought to admit into the record, as was the transcript of the FBI interview of Thiam that BSGR requested be admitted.

The Tribunal stayed the application to admit the ICSID transcript pending the Tribunal's deliberations and preparation of the Award. The application to admit the forensic report to be provided in the ICSID case was dismissed as premature, but BSGR was granted leave to apply to admit the report into the record if and when it became available.

### 48.    Procedural Order No. 25

153.    On 26 November 2017, the Tribunal issued Procedural Order No. 25 in response to a letter from BSGR dated 18 October 2017 regarding the alleged unfairness of Procedural Order No. 24. Following a reply from Vale and a further letter from BSGR, the Tribunal confirmed that it was not the appropriate time for a final decision on BSGR's requests to admit the documents detailed in Procedural Order No. 24.

### 49.    Administration Order and Procedural Order No. 26

154.    On 7 March 2018, counsel for BSGR informed the Tribunal that BSGR had been placed into voluntary administration in Guernsey and provided a copy of the Administration Order issued by the Royal Court of Guernsey dated 6 March 2018 ("**Administration Order**"). Counsel for BSGR asserted that the Tribunal, during the administration, could not continue the proceedings against BSGR except with the consent of the administrators or leave of the Court. No such consent had been given.

155.    After receiving submissions from Vale and further submissions from BSGR, the Tribunal sent the Parties an email on 23 March 2018 which:

155.1.    acknowledged receipt of the Administration Order;

155.2.    acknowledged BSGR's counsel's right to continue to represent BSGR based on Mishcon de Reya's representation that it continued to represent BSGR and

without prejudice to the Tribunal's decision as to the effects of the 6 March 2018 Order on the arbitration proceedings; and

155.3.   requested the parties to comment further on the effect of the Administration Order on proceedings in this arbitration.

156.   Following receipt of those additional submissions, the Tribunal issued Procedural Order No. 26 on 17 April 2018. The Tribunal noted that, in their further submissions on the effect of the Administration Order, the Parties came to a common ground that the Order did not automatically suspend the present arbitration, seated in London. However, BSGR in its submission of 30 March 2018, applied for a stay of proceedings for the sake of efficiency. The Tribunal considered this request, but denied the application for a stay because:

156.1.   the Tribunal was not convinced that recognition of the Order in the UK could be obtained in a matter of weeks, as suggested by BSGR; and

156.2.   it was unclear whether recognition would be granted by the English High Court.

157.   Up to and including the date of this Award, the Tribunal has not been informed about recognition proceedings in the United Kingdom regarding the Administration Order.

### 50.   Payment of further deposits

158.   On 22 June 2018, the LCIA requested a further deposit from both Parties of £150,000 each. On 10 July 2018, Vale wrote to the LCIA reciting BSGR's failure to pay certain previous deposits requested and stating that, on the presumption that BSGR would once again default on payment, Vale would make a substitute payment of BSGR's outstanding balance. The payment was made without prejudice to Vale's ability to recover the sum in the final costs award.

159.   On 11 March 2019, the LCIA requested a deposit from Claimant of GBP 131,623.29. On 15 March 2019, Vale wrote to the LCIA reciting BSGR's failure to pay certain previous deposits requested and stating that, on the presumption that the requested deposit includes BSGR's share of remaining costs of the arbitration, Vale would pay the requested deposit without prejudice to Vale's ability to recover the sum from BSGR under Article 24.3 of the LCIA Rules and its position that BSGR is responsible for this sum, and others, in the final cost award. On that same day, the LCIA acknowledged receipt of the deposit of GBP 131,623.29.

### 51.   Procedural Order No. 27

160.   On 25 October 2018, the Tribunal issued Procedural Order No. 27 in which it dismissed BSGR's application to introduce its Post-Hearing Brief from the ICSID proceedings, consistent with its ruling in Procedural Order No. 24.

161.   On 12 March 2019, BSGR wrote to the Tribunal referring to the accommodation that the parties to the ICSID proceedings had reached in those proceedings. BSGR reiterated its request that the materials and evidence in the ICSID proceedings be considered in the present arbitration in view of any such evidence being clearly exculpatory of BSGR and, if it were to be ignored, would give rise to a potential miscarriage of justice. At the request of the Tribunal, Vale replied by letter of 13 March 2019 requesting the Tribunal to reject

BSGR's request and to proceed to an award. Vale considered that the accommodation in the ICSID proceedings was irrelevant to the present arbitration and that the Tribunal in the present proceedings properly rejected BSGR's attempts to re-open the record on a number of occasions. On 20 March 2019, the Arbitral Tribunal acknowledged receipt of Vale's letter and indicated that it would address any issues raised by the Parties' respective letters of 12 and 13 March in further directions or in an award (as to which par. 164-169 below).

### 52. Concluding Comment of the Tribunal

162.  As indicated above, the Tribunal – notwithstanding the procedural complexities above – at all times intended and attempted to conduct the arbitral proceedings in an independent, impartial and fair way respecting the Parties' rights to natural justice and equality of treatment. It did so, notwithstanding the challenges to the co-arbitrators and criticisms as to the way the Tribunal conducted the proceedings, including regarding the role of the Tribunal Secretary, the alleged delegation of powers by the co-arbitrators to the Chairman and the Tribunal Secretary, and the alleged deficiencies regarding the appointment process leading to the nomination of a replacement Chair.

163.  In relation to other matters, the Tribunal had the duty to take the proceedings forward and had to rule on numerous procedural issues, such as the production of documents, the relationship between the current arbitration proceedings and the ICSID proceedings, the effects of the Administration Order on the arbitration and its role in conducting the arbitration proceedings as of the September 2016 Hearing on a – by and large – default basis. Absent agreement between the Parties, the Tribunal in discharging its duties progressed the proceedings and, in that process, may have taken decisions that were unfavourable or unsatisfactory to one of the Parties. The consensual nature of arbitration proceedings in this respect stops where the Parties cannot find common ground and put the Tribunal in the role of a final decision maker regarding procedural issues subject to overriding considerations of natural justice and procedural fairness. The Tribunal has taken care to ensure that, in discharging its duties, it has complied with these basic propositions and refers in this respect to the reasoning of its numerous procedural orders detailed above. In this respect, three issues deserve some further comments: (1) the ICSID proceedings; (2) the default nature of a significant part of the current arbitration proceedings; and (3) the assessment of hearsay evidence.

### ICSID Proceedings

164.  The Tribunal considers that specific mention should be made of the parallel ICSID arbitration (ICSID Case No. Arb/14/22) that is ongoing between BSGR, BSGR Guinea and the Republic of Guinea. In particular, the Tribunal wishes to record (in addition to what is said at paragraph 1001 of this Award) the reasons that it has decided not to admit as evidence in this arbitration the transcripts from the ICSID proceedings, as well as the Post Hearing Briefs from those proceedings. It has also declined to receive further submissions regarding the suggested impact of the ICSID proceedings on the current arbitration.

165.  At the outset, the Tribunal refers to Procedural Orders Nos. 24, 25 and 27 which are summarised at paragraphs 152, 153 and 160 above. In these Procedural Orders, the Tribunal made it clear that, although its proceedings were closed in accordance with Procedural Order No. 23, additional evidence could still be admitted with agreement of the Parties or permission from the Tribunal. Hence, new evidence could be accepted up until the rendering of this Award. However, the Tribunal has also sought to manage the

proceedings efficiently so that its deliberations on and preparation of an award were not disturbed whenever new evidence arose in the ICSID proceedings. A case in point is the forensic report prepared in the ICSID proceedings as to BSGR's allegations that some contracts were forgeries. In Procedural Order No. 24, the Tribunal dismissed the request for submission of this report into these proceedings as being premature as no forensic report was yet available. However, the Tribunal authorised BSGR to seek leave to submit that report when it became available. In the event, BSGR never sought such permission.

166.  As noted above, these proceedings were closed by Procedural Order No. 23, which stated at paragraph 13 that no further submissions, correspondence or evidence were to be filed without the consent of the other side or the prior authorisation of the Tribunal upon a reasoned application of any Party. Paragraph 10 of Procedural Order No. 24 then clarified that any evidence or other documents related to the ICSID proceedings were no longer governed by the Record Sharing Decision or the First or Second Stay Decisions but by paragraph 13 of Procedural Order No. 23. Paragraph 9.3 of Procedural Order No. 24 then indicated that, if and to the extent necessary or proper, the Tribunal would reopen the proceedings, or alternatively deal with the issue of the ICSID hearing transcript in any other appropriate way in its Award. Such language was repeated at paragraph 4.1 of Procedural Order No. 25 and at paragraph 8 of Procedural Order No. 27.

167.  This Award now records that the Tribunal did not consider it necessary or proper to reopen the proceedings in relation to the ICSID transcripts or other documents or to deal with this issue in any other way other than in this Award. The reasons for this decision are as follows.

167.1.  First, the ICSID proceedings are separate proceedings with different substantive principles and procedural rules as compared to this arbitration. Whether a particular conduct involves breach of a treaty (as alleged in the ICSID proceedings) is not determined by asking whether there has been a breach of contract or the commission of a tort, which are the key issues in this arbitration. As a result, it is difficult to know what, if any, weight could be given in this arbitration to evidence received from that proceeding. This is particularly so in relation to the transcripts of witness evidence where neither the Tribunal nor the Claimant in this arbitration had any opportunity to observe and evaluate the relevance of such evidence or assess the credibility of the witnesses or ask questions of them.

167.2.  Secondly, BSGR – in the Tribunal's opinion– failed, save for the forensic report, to specifically indicate what precise evidence from the ICSID proceedings it sought to submit. Instead, BSGR sought to submit the full ICSID hearing transcript without any sufficient precision as to what material was relevant and why. To have accepted this evidence would have risked reopening the full LCIA arbitration or major parts of it. The same holds true for BSGR's request to submit the ICSID hearing transcripts in relation to six Guinean fact witnesses, three of whom were heard by this Tribunal. Although the latter three are easily identifiable by the Tribunal, the identity of the other three Guinean fact witnesses heard by the ICSID Tribunal but not by this Tribunal, was not disclosed nor was the precise scope of their witness evidence in the ICSID proceedings explained to this Tribunal. Indeed, as a matter of principle, the Tribunal would, absent exceptional circumstances, take the view that the findings of another tribunal between different parties on

different issues would not be binding on this Tribunal or even relevant to its inquiry. And if the findings of such other tribunal are not relevant, it follows that, again subject to exceptional circumstances, the evidence in support of such findings would be equally irrelevant.

167.3. Thirdly, leaving aside the issue of specificity just discussed, the Tribunal considers that BSGR did not make a sufficiently compelling case that the evidence from the ICSID proceedings it intended to submit in these proceedings was sufficiently relevant to this case or material to its outcome. For example, with regard to the six Guinean fact witnesses, BSGR failed to indicate to what extent the witness evidence of the three Guinean witnesses heard in these proceedings, Ahmed Kanté ("**Kanté**"), Dr. Louncény Nabé ("**Nabé**") and Dr. Ahmed Tidiane Souaré ("**Souaré**") (all former Minister of Mines), was identical, similar or contradictory to their evidence in the ICSID proceedings and whether that was relevant or material in this case. Similarly, the Tribunal is not convinced that the evidence of the three other Guinean fact witnesses before the ICSID Tribunal would be relevant or material to the issues to be decided by this Tribunal, which differ considerably from those at issue in the ICSID proceedings. Moreover, it was never suggested by BSGR that these witnesses were to be called before this Tribunal for examination and without hearing these witnesses it would of course be difficult, if not impossible, to assess their veracity. This is particularly so in light of the fact that the corruption issues addressed by this Tribunal as part of the misrepresentation and warranty allegations primarily concern the interaction between Mamadie Touré ("**Mme. Touré**") (fourth wife of President Conté) and Pentler Holdings Limited ("**Pentler**") as to which other members of the GoG did not have first-hand knowledge.

167.4. Fourthly, in relation to Kanté, Nabé and Souaré, BSGR chose not to appear at the Merits Hearing and thus not to cross examine these witnesses produced by Claimant.

167.5. Fifthly, regarding the forensic expert report, BSGR did not apply for leave to submit the actual forensic report, if any, produced in the ICSID proceedings. The Tribunal would have considered this request on its merits, had BSGR decided to make such a request when the report became available.

167.6. Finally, regarding the Post-Hearing Briefs, the Tribunal considers that a request for submission of evidence from other proceedings does not extend to pleadings and submissions in these other proceedings. The Post-Hearing Briefs merely contain the submissions of BSGR, which would presumably make reference to the evidence of certain witnesses but would not contain the actual testimony of such witnesses (except possibly on a selective basis) nor the context in which selected extracts of such testimony was given. There can be no evidential value in submissions, as opposed to testimonial evidence, which has already been discussed in paragraphs 167.2 and 167.3 above. Consequently, there is no sound basis upon which the Briefs should have been admitted in these proceedings.

168. Apart from the reasons set out above, the Tribunal has been and remains, reluctant to accept new evidence on the record after the closure of proceedings, given that the Parties in this case have already had the benefit of a full opportunity to be heard. This opportunity has included written submissions, document production and an evidentiary hearing. There

is certainly no obligation or compulsion on a tribunal to receive new evidence from a parallel arbitration after the proceedings have closed, especially where the evidence is not material to the outcome of the case. Indeed, to do so would run the risk of creating unfairness to Vale that was not a party to the parallel arbitration.

169. Furthermore, the Tribunal notes that, in its deliberations and preparation of the Award, the Tribunal has meticulously reviewed the record and has come to the conclusion that the evidence sought to be submitted from the ICSID proceedings regarding forged documents, the cooperation of Mme. Touré with the FBI investigations regarding bribery in relation to the procurement of the mining rights or the examination of six Guinean fact witnesses in the ICSID arbitration regarding the alleged fraudulent procurement of the mining rights is highly unlikely to change the conclusions of the Tribunal set out in this Award. In addition, the Tribunal is convinced that the overall outcome of the arbitration as expressed in the dispositif would not be altered by the ICSID evidence, given that the Tribunal has found multiple misrepresentations by BSGR during the pre-contractual due diligence process, other than the misrepresentation as to the absence of corruption (to which BSGR suggests the ICSID transcripts relate). Consequently, even absent a finding of corruption, the multiple remaining misrepresentations would warrant the Tribunal's conclusions and its decisions as to Vale's primary prayer for relief regarding fraudulent misrepresentation. Therefore, the evidence BSGR seeks to admit would have ultimately no bearing on the relief to be awarded in this arbitration. This is yet another reason why the Tribunal has decided not to accept the ICSID transcripts and post-hearing briefs into the record. Finally, the settlement and any withdrawal of the ICSID proceedings – in the opinion of the Tribunal – does not have a material bearing on the issues discussed above.

### Hearsay Evidence

170. Another general evidentiary matter which has often arisen in this arbitration is the Parties' reliance on hearsay evidence, i.e. oral and written statements made by persons who are not called as witnesses that are tendered as evidence of the matters stated. This includes sworn testimony in other proceedings by persons who are not called as witnesses in the present proceedings. Because of the frequency of the Parties' reliance on such evidence in respect of a variety of factual issues, the Tribunal will now explain its approach to hearsay evidence at the outset. One would then be able to appreciate the consistency of the Tribunal's approach when reading the Tribunal's analysis of the various forms of hearsay evidence in this Award.

170.1. The rule under English common law was that hearsay evidence is generally inadmissible, subject to certain limited exceptions. The orthodox justification for this rule is that hearsay evidence is not the "best evidence". However, while the rule may sometimes serve to promote accurate truth-finding, the rule has been criticised on the basis that hearsay evidence in certain cases may well be highly reliable (and sometimes the only available) evidence. In recognition of these criticisms, the U.K. Parliament passed the Civil Evidence Act 1995 which virtually abolished the rule in civil proceedings.

170.2. Another rule in English common law was that a judgment *in personam* delivered in civil or criminal proceedings is generally inadmissible against a stranger as evidence of the facts found or legal conclusions drawn in that judgment.

170.3. The governing law of the dispute in this arbitration is English law and the arbitration is seated in London. However, the Tribunal is not bound to apply the strict rules of evidence at common law, because it is empowered by section 34(2)(f) of the English Arbitration Act 1996 and Article 22(f) of the LCIA Rules 1998 to decide "whether to apply strict rules of evidence (or any other rules) as to the admissibility, relevance or weight of any material (oral, written or other) sought to be tendered on any matters of fact or opinion" (subject to the Parties' right to agree otherwise). This is consistent with Article 9(1) of the IBA Rules on Evidence[9] , which requires the Tribunal to "determine the admissibility, relevance, materiality and weight of evidence" without specifying the rules to be applied to make that determination. This effectively confers upon the Tribunal a *discretion* to decide these issues.

170.4. In the experience of all members of the Tribunal, the general practice in international arbitration is that arbitral tribunals would (in the absence of special circumstances) refrain from excluding evidence on technical grounds of inadmissibility, and evaluate the relevance, credibility, and weight of the evidence instead. The Tribunal's settled approach to hearsay evidence and earlier judgments tendered in this arbitration is therefore to regard them as admissible, but to assess their weight individually, having regard to the surrounding circumstances that would shed light on their reliability. For example, in respect of witness testimony in other proceedings by persons who are not called as witnesses in this arbitration, such as Mme. Touré's written statement to the U.S. authorities (which the Technical Committee relied on in its Report)[10] and Ghassan Boutros' oral testimony in Guinean and Swiss proceedings, [11] the Tribunal considers that the accuracy of these testimony and the credibility of the persons giving these testimony are particularly vital, because they bear upon critical (and deeply contested) factual issues in this arbitration. These are qualities which can only be tested in cross-examination, and the Tribunal would ascribe little, if any, weight to such testimony if the persons giving such testimony have not been called as witnesses in this arbitration.

***Default Arbitration Proceedings***

171. As a final observation, the Tribunal considers it appropriate to explain its role regarding the conduct of the hearings and the preparation of the Award in view of BSGR's default. As this arbitration (governed by English law and the LCIA Rules) could proceed notwithstanding BSGR's refusal to participate in the hearings and the examination of evidence at those hearings, the question arose as to how the Tribunal was obliged to conduct the hearings and to prepare the Award in view of the proceedings having lost their adversarial character as to oral submissions and evidence at and after the September 2016 hearing. In this respect, the Tribunal – absent much guidance under English law and the LCIA Rules – has taken the approach that the oral submissions and the evidence presented at the hearings by Claimant were not to be taken as granted and that Claimant's claims should not be awarded automatically, but needed to be tested separately by the Tribunal as to the weight

---

[9] As noted in paragraph 28, Procedural Order No.2 stated that the IBA Rules on Evidence could be referenced as guidelines by the Tribunal.
[10] Recommendation and Report of the Technical Committee, 21 March 2014, pp. 36-41, **C-6**.
[11] Report of questioning for Ghassan Boutros, 29 August 2013, **R-132**; Procès verbal de G. Boutros, 7 July 2015, **C-278**.

to be given to the Claimant's evidence and the strength of Claimant's arguments. The Tribunal considered Claimant's evidence against the evidence in writing produced by BSGR in its factual exhibits, its witness statements and its expert report, taking into account that such evidence had not been subject to cross-examination by reason of BSGR's default. Likewise, the Tribunal sought to test the Claimant's arguments against those of BSGR, given that BSGR did not appear and therefore did not directly challenge the Claimant's arguments at the hearings. Although a full adversarial hearing is, of course, preferable, the Tribunal confirms that it has considered BSGR's position, arguments and evidence as much as possible within the confines mentioned above.

## III.  RELEVANT FACTUAL BACKGROUND

### A.  Introduction

172.  In this section of the Award, the Tribunal outlines the evidence and its findings concerning the largely undisputed factual background relating to this dispute which it has drawn from the factual exhibits, the signed witness statements of both sides and the Parties' submissions.[12] Where facts are disputed by a Party, that dispute has been indicated in the text.

173.  This Section includes a number of structural diagrams drawn from the evidence provided by the Parties, demonstrating the ownership of relevant companies at different points in time. A chart in the Appendix to this Award also provides further information regarding a number of key people involved in the factual narrative. This chart was supplied by Vale at the Educatory Hearing. Additionally, a full *dramatis personae* is included at pages 11–16 of this Award.

### B.  BSGR in Africa

174.  BSGR had mining operations in Africa prior to entering Guinea in 2005, including diamond mining in Sierra Leone, copper and cobalt production in Zambia and the Democratic Republic of Congo and an alumina smelting project in South Africa. It also had exploration projects in iron ore, coal and other commodities.[13] BSGR ran these operations through local subsidiaries, supported by various entities within the wider BSG group of companies (the "**BSG Group**").

175.  Onyx Financial Advisors Limited ("**Onyx**") was a company incorporated in the British Virgin Islands (the "**BVI**") to provide management services and other business support functions to the Balda Foundation, a Liechtenstein trust, of which Beny Steinmetz and members of his family were the sole beneficiaries. The Balda Foundation was the 100% beneficial owner of BSGR through Nysco.

176.  The relationship between Onyx and the BSG companies owned by the Balda Foundation is not clear to the Tribunal, although it is evident that the companies were related. Vale submitted that:

> [Onyx is] an ostensibly "independent" company that is the financial arm of the Beny Steinmetz Group. BSGR has admitted that Onyx is related to BSGR. The Onyx name has been used by the Beny Steinmetz Group in several jurisdictions. Indeed, "Onyx's former name was BSG Management Services Limited, which was changed to Onyx on 7 March 2011." There are clear ties between the two companies, including an overlap in directors and officers, such as Dag Cramer and Sandra Merloni-Horemans. Onyx Financial Advisors even shares an address with BSGR.[14]

177.  As a convenient point of reference, the Tribunal has, based on uncontroversial facts in the record, prepared the following diagram showing the management structure of relevant companies within the Steinmetz group.

---

[12] See paragraphs 31, I.A.7, I.A.15, 72 and I.A.25 for the list of witnesses relied upon by the Parties.
[13] BSGR's Statement of Defence, paragraph 22.
[14] Vale's Statement of Case, paragraph 149.



## C.    Background 1997-2005

178.    As described in the introductory paragraphs of this Award (see paragraphs 1 to 15), this dispute arose as a result of the GoG's revocation of BSGR's exploration and mining concessions in the Simandou area, following allegations of bribery by BSGR in obtaining those concessions.

179.    In 1997, a local subsidiary of Rio Tinto, a large multinational mining company, was granted four exploration permits to explore iron ore deposits around Mount Simandou in Guinea. In May 2000, the permits were renewed by the GoG, but the area covered by the renewed permits was half of the original total surface area. The areas covered by the renewed permits became known as Simandou Blocks 1, 2, 3, and 4.

180.    During this period, the president of Guinea was Lansana Conté who came to power in 1984 and remained in power until his death in 2008. The passport of Mme. Touré indicates that she was the spouse of President Conté.[15] Vale alleges that she was his fourth wife.

181.    In 2005, Michael Noy ("**Noy**") and his business partners, Frédéric Cilins ("**Cilins**") and Avraham Lev Ran ("**Lev Ran**") (all serving as principals of Pentler), began working in Guinea to explore business opportunities, including mining opportunities. Lev Ran was from South Africa. Noy and Cilins lived in France. Through their company, FMA Trading International, they had substantial business interests across Africa, particularly in the pharmaceutical industry. However, none of the men lived in Guinea or had any experience in the mining sector.

---

[15] Diplomatic Passport of M. Touré, **C-75**.

182. The local contacts who introduced various business opportunities in Guinea to Noy and his colleagues (including in the mining sector) were Ismaila Daou ("**Daou**") and Aboubacar Bah ("**Bah**") (both Malian businessman) and Ibrahima Sory Touré ("**I.S. Touré**").[16]

183. I.S. Touré was the half-brother of Mme. Touré and was later employed as BSGR's public relations officer in Guinea.

## D. BSGR enters Guinea

184. Noy and his associates did not have the experience to develop the mining opportunities themselves but decided to introduce these opportunities to someone in the mining sector who could develop them. Their intention was to make a return through the introduction.[17]

185. At a chance meeting in an airport in South Africa, Noy told Roy Oron ("**Oron**"), then CEO of BSGR, about various mining opportunities in Africa, including an opportunity in Guinea regarding iron ore.[18] Following this conversation, on 14 July 2005, Oron wrote to Cilins asking him to introduce BSGR to mining opportunities in Guinea.[19] Cilins then arranged for Oron to visit Guinea and meet with Guinea's Minister of Mines.[20] This meeting took place sometime on or about 20 July 2005.[21]

186. In November 2005, Oron and Marc Struik ("**Struik**") (CEO of BSG Metals and Mining Limited) embarked on a five-day trip to Guinea, including meeting Cilins and I.S. Touré. Struik also spent time at the Centre de Promotion et de Développement Miniers ("**CPDM**") – the government agency where information about mining opportunities was stored.

187. According to Struik, during his discussions with the CPDM, it became clear that (a) Simandou North and Simandou South were available for exploration, (b) the Government was eager to grant these licences, but (c) BSGR was not the only interested party.[22] North and South Simandou are separate and distinct areas from Simandou Blocks 1, 2, 3 and 4 over which Rio Tinto held exploration permits.

188. On 24 November 2005, BSGR submitted the first draft of a Memorandum of Understanding (the "**MoU**") to the GoG. The MoU covered a large area of Simandou, including Simandou North and South and Simandou Blocks 1 and 2, which were already subject to licences granted to Rio Tinto at the time.

189. The Minister of Mines at this time was Souaré. Souaré described a short meeting that he had with President Conté and two representatives from BSGR (possibly Cilins and Steinmetz) in late November or early December 2005 at the Palais des Nations.[23] Also present was Mme. Touré and (possibly) I.S. Touré. Souaré was told by the President "to facilitate [BSGR's] investment in the country".[24] It is alleged that at one of BSGR's

---

[16] Noy First WS, paragraph 23.
[17] Noy First WS, paragraphs 6, 25 and 28.
[18] Noy First WS, paragraphs 29-30.
[19] Letter from BSGR to the Ministry of Mines, 25 October 2010, **R-43**.
[20] Noy First WS, paragraph 34.
[21] Letter from BSGR to A. Souaré, 2 August 2005, **R-144;** Email from C. Swart to F. Cilins, 30 August 2005, **R-145** (Noy First WS, paragraph 34). See also Letter from Minister of Mines to BSGR, 1 November 2010, **R-44**.
[22] Struik First WS, paragraph 23.
[23] Souaré WS, paragraph 9.
[24] Souaré WS, paragraph 10; Transcript, Merits Hearing, Day 1, p. 213, lines 12-18.

meetings with the President in 2005, Oron gave President Conté a gold watch inlaid with Steinmetz diamonds, with an approximate value of USD 60,000.[25] BSGR denies ever gifting such a watch to President Conté and denies that a meeting in late 2005 took place or, at least, that any representatives from BSGR attended any such meeting.[26]

190. Souaré said that the following day, the presidential helicopter containing representatives from BSGR and the assistant director of the CPDM landed in the Mount Simandou area. A later report by the CPDM confirmed the visit. This was an area over which Rio Tinto held permits.[27] Struik confirmed that BSGR did borrow a government helicopter but said that was later in 2006 and the helicopter did not land on areas subject to Rio Tinto permits.[28]

## E. Exploration Permits in Simandou North and South and the contractual relationship with Pentler

191. Struik again travelled to Guinea in mid-January 2006 to meet with Government officials and negotiate the MoU for the Simandou area on behalf of BSGR.[29]

192. Around this time, on 16 January 2006, Onyx transferred the shares in BSG Resources (Guinea) Limited ("**BSGR Guinea BVI**"), a subsidiary of BSGR incorporated in the BVI, to BSGR Steel Holdings Limited ("**BSGR Steel**"), also a subsidiary of BSGR incorporated in the BVI.[30] BSGR Guinea BVI was the parent company of BSG Resources (Guinea) S.à.r.l. ("**BSGR Guinea**") – the local Guinean subsidiary that would eventually be granted the mining concessions in Simandou. As a convenient point of reference, the Tribunal has, based on uncontroversial facts in the record, prepared the following diagram setting out the holding structure as at February 2006. The structure is relevant as it was later amended by BSGR, as described in paragraph 256 of this Award.

---

[25] Vale's Statement of Case, paragraph 144.
[26] BSGR's Statement of Rejoinder, paragraphs 99-100 and footnote 145.
[27] Souaré WS, paragraphs 11-19.
[28] Struik Second WS, paragraph 19.
[29] Struik First WS, paragraph 29.
[30] Merloni-Horemans First WS, paragraph 28.



193. On 6 February 2006, GoG granted BSGR Guinea four exploration permits over specified areas in Simandou South, and three exploration permits over specified areas in Simandou North.[31] These permits enabled BSGR to begin exploration for iron ore deposits in the specified area but did not amount to a concession for mining iron ore for which a separate exploitation permit was required.

194. Around this time, BSGR met with President Conté. BSGR was represented by Cilins, Noy, I.S. Touré, Oron and Patrick Saada ("**Saada**") (the Director of Steinmetz Diamond Group). Vale asserts that Steinmetz and Struik also attended the meeting, which was arranged by Mme. Touré.[32] The meeting took place in a courtyard of the presidential palace. According to Vale, Steinmetz offered Mme. Touré a 5% interest in BSGR Guinea in exchange for further assistance to obtain mining concessions over Simandou Blocks 1 and 2.[33] BSGR disputes Vale's account of the meeting, stating that the purpose of the meeting was to introduce BSGR to President Conté, given that it had just been granted exploration permits.[34]

195. As their work in Guinea was increasing, Noy, Cilins and Lev Ran wanted a company through which to conduct their affairs. At BSGR's suggestion, Noy contacted Sandra Merloni-Horemans ("**Merloni-Horemans**") (Director of Onyx and BSGR) and requested

---

[31] Ministerial Order No. A 2006/706/MMG/SGG, 6 February 2006, **C-21**; Ministerial Order No. A 2006/707/MMG/SGG, 6 February 2006, **C-22**.
[32] Vale's Statement of Reply, paragraph 353.
[33] Vale's Statement of Case, paragraph 145.
[34] Noy First WS, paragraphs 44-46; Saada First WS, paragraph 6.

that Onyx sell them one of its BVI shelf companies. Merloni-Horemans agreed to sell Pentler Holdings Limited to Noy, Cilins and Lev Ran for USD 1,500.[35] Pentler was a shelf company that had been incorporated by Onyx in October 2005.

196. Noy asked Merloni-Horemans if Onyx would continue to hold the shares in Pentler as trustee for the three men until further notice.[36] Consequently, Onyx (as trustee) remained the formal shareholder of Pentler until November 2006. A power of attorney was issued to Noy and Lev Ran. From this time onwards, Pentler became the vehicle through which Noy, Cilins and Lev Ran operated in Guinea.

197. Over the course of the next few months, Pentler entered into a number of agreements with BSG companies and with various other contacts in Guinea. These agreements form the basis of Pentler's role in assisting BSGR to exploit mining opportunities in Guinea.

## 1. BSGR-Pentler Milestone Agreement

198. On 14 February 2006, Pentler and BSGR Guinea BVI entered into a Milestone Agreement (the "**BSGR-Pentler Milestone Agreement**").[37] This Agreement took the form of a letter from Struik to Pentler which provided Pentler a shareholding in BSGR Guinea BVI (the parent of the local subsidiary company) and set out various milestones and success fees that related to the Simandou project.

199. The letter stated:

> This letter serves to clarify the relationship between BSGR (Guinea) and Pentler with regards to the Simandou iron ore project, located in the Republic of Guinea.
>
> BSGR (Guinea) affords Pentler an interest of 15% (free carry) in the Simandou iron ore project. In order to effect this interest, the 17.65% shareholding in BSGR Guinea will be made available to Pentler.
>
> Further details of the relationship will be formulated in a Shareholders' Agreement.
>
> With specific regard to the Simandou iron ore project, success fees are based on the mutually agreed milestones as shown in the table overleaf.
>
> Pentler has agreed to continue its efforts to reach an agreement for Blocks 1 and 2, and assist in acquiring these blocks for the Simandou iron ore project and assist in any possible manner with the Simandou iron ore project.

200. As can be seen from the text above, the BSGR-Pentler Milestone Agreement related to the Simandou project generally, but also specifically required Pentler to "continue its efforts to reach an agreement for Blocks 1 and 2". Simandou Blocks 1 and 2 were part of the area over which Rio Tinto held permits. Under this Agreement, if BSGR acquired a mining concession over Simandou Blocks 1 and 2, Pentler would receive a "success fee" of up to USD 4.5 million. In total, up to USD 19.5 million in success fees were potentially payable to Pentler under this Agreement.

---

[35] Emails between S. Merloni-Horemans and M. Noy, 13-14 February 2006, **R-146**.
[36] Merloni-Horemans First WS, paragraph 18; Email from S. Merloni-Horemans to M. Noy, 15 February 2006, **C-333**.
[37] Letter from BSGR Guinea BVI to Pentler, 14 February 2006, **R-117**.

### 2. Services Agreement

201. A Services and Co-operation Agreement was also signed by Pentler and BSG Metals and Mining Limited ("**BSG Metals and Mining**"), a company incorporated in the BVI, (the "**Services Agreement**").[38] The Services Agreement specified that the parties were "independent contractors" and stated that:

201.1. Pentler "agrees to offer its deal flow in the mining sector to BSGR" (clause 3.1); and

201.2. the Parties "hereby agree to provide consideration to the other Party for their respective cooperation as they may agree upon from time to time on a case by case basis" (clause 4.1).

202. Although it was signed in 2006, the Services Agreement was backdated to 15 October 2005.

### 3. Pentler-Bah Milestone Agreement

203. Sometime in January 2006, BSGR prepared a draft of a milestone agreement to be signed with I.S. Touré and Bah – two of the local Guinean contacts (the "**Pentler-Bah Milestone Agreement**"). The counterparty for this agreement was not specified in BSGR's draft. According to Vale, the draft was disclosed by BSGR from the files of Struik and had been prepared within the BSG Group.[39]

204. On 15 February 2006, the day after the BSGR-Pentler Milestone Agreement was signed, Noy sent Merloni-Horemans a draft of the Pentler-Bah Milestone Agreement with Pentler as the counterparty. Merloni-Horemans reviewed and commented on the Agreement.[40]

205. Pentler, I.S. Touré and Bah signed the Pentler-Bah Milestone Agreement on 20 February 2006.[41] The milestones in that Agreement mirrored the milestones contained in the BSGR-Pentler Milestone Agreement. Under the Pentler-Bah Milestone Agreement, I.S. Touré and Bah would be remunerated for their "services, counsel, assistance and development of a project for the exploration and exploitation of the Simandou iron ore deposit."

### 4. Pentler-Daou Milestone Agreement

206. Also on 20 February 2006, Pentler and Daou (another local contact) entered into a separate milestone agreement (the "**Pentler-Daou Milestone Agreement**") and a shareholding agreement (the "**Pentler-Daou Shareholding Agreement**").[42] Like the Bah Milestone Agreement, the Pentler-Daou Milestone Agreement was based on the terms of the original Milestone Agreement between Pentler and BSGR.

---

[38] Services and Co-operation Agreement between BSG Metals and Mining and Pentler, 15 October 2005, **R- 23**.

[39] Letter of Commitment from Pentler to I.S. Touré & A. Bah, 17 January 2006, **C-652**.

[40] Emails between S. Merloni-Horemans & Karine (Noy's assistant), 15 February 2006, **C-341**; Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-343**; and Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-344**.

[41] Memorandum of Understanding between Pentler, A. Bah and I.S. Touré, 20 February 2006, **C-96**.

[42] Memorandum of Understanding between Pentler and I. Daou, 20 February 2006, **C-602**. A copy of the Shareholding Agreement has not been provided in the arbitration but Noy refers to it in his evidence (see Noy First WS, paragraph 60.3.1; Vale's Statement of Reply, paragraph 388).

207. The success fees that Pentler agreed to pay to I.S. Touré, Bah and Daou under the Pentler-Bah and Pentler-Daou Milestone Agreements added up to the same total success fee as BSGR Guinea BVI had agreed to pay to Pentler under the BSGR-Pentler Milestone Agreement. In other words, the money received by Pentler from BSGR Guinea BVI under the BSGR-Pentler Milestone Agreement would be paid to the three local contacts assisting with arrangements in Guinea while Pentler would obtain a shareholding in BSGR Guinea BVI.

### 5.   Touré MoU

208. Again, on that same day (20 February 2006), Pentler entered into a Memorandum of Understanding with Mme. Touré (the "**Touré MoU**").[43] According to this MoU, Mme. Touré (as a "local partner") would acquire a 5% interest in the local Guinean subsidiary (BSGR Guinea) that would ultimately own and operate the mining rights in Simandou. To facilitate this interest, Pentler agreed to transfer to Mme. Touré, free of charge, a 33.3% interest in Pentler. As a result of Pentler's 17.65% interest in BSGR Guinea BVI, Mme. Touré would ultimately own a 5% interest in the local Guinean operator. Noy gave evidence that this interest was granted to Mme. Touré "following our local partners' agreement with her."[44]

209. Both the Pentler-Bah Milestone Agreement and the Touré MoU were reviewed by Merloni-Horemans (Director of BSGR) before they were entered into by Pentler.[45]

### 6.   MoU between BSGR Guinea BVI and the GoG

210. Finally, also on 20 February 2006, BSGR Guinea BVI and the GoG signed the MoU for the Simandou project, which "set the legal, economic, technical and financial conditions governing the relations between the parties for the development of a part of the iron ore deposits in Simandou."[46] The area covered by the MoU included Simandou North and South, as well as Simandou Blocks 1 and 2, as described in Appendix 1 to the MoU. The MoU granted BSGR's local subsidiary, BSGR Guinea, exclusive right to the relevant mining concessions for the agreed areas for the duration of the MoU.

211. A model miniature car plated in gold and diamonds was presented to the GoG by BSGR at the signing ceremony for the MoU as a "symbolic gift".[47]

### 7.   First payment under BSGR-Pentler Milestone Agreement

212. The first payment under the BSGR-Pentler Milestone Agreement (and under the Pentler-Bah and Pentler-Daou Milestone Agreements) was triggered by the signing of the MoU between BSGR Guinea BVI and the GoG. As noted above, the signing of these three agreements all occurred on the same day (20 February 2006), and it was on this day that the first success fee of USD 500,000 became due and payable by BSGR Guinea BVI to Pentler under the BSGR-Pentler Milestone Agreement. The signing of the MoU with the

---

[43] Touré MoU, 20 February 2006, pp. 223-224, **C-6**.

[44] Noy First WS, paragraph 8.

[45] Emails between S. Merloni-Horemans & Karine (Noy's assistant), 15 February 2006, **C-341**; Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-343**; Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-344**.

[46] Memorandum of Understanding between the Republic of Guinea and BSGR Guinea BVI, 20 February 2006, **R-25**.

[47] Souaré First WS, paragraph 28; Transcript, Merits Hearing, Day 1, p. 227, lines 3-21.

GoG also triggered payments of USD 425,000 from Pentler to I.S. Touré and Bah under the Pentler-Bah Milestone Agreement, and of USD 75,000 from Pentler to Daou under the Pentler-Daou Milestone Agreement.

213.   As it happened, Pentler did not receive the money at all. BSGR Guinea BVI paid the money directly (in cash) to Bah, I.S. Touré and Daou.[48]

214.   BSGR compensated the owners of Pentler (i.e. Noy, Lev Ran and Cilins) separately for the provision of services. On 27 February 2006, the owners of Pentler sent invoices to BSGR to pay a total of USD 125,000 for assistance in signing the 2006 MoU with the GoG.[49] The invoices were made payable to CW France and FMA International Trading Pty (companies owned by Noy, Cilins and Lev Ran). BSGR paid these invoices on 6 March 2006.

215.   To summarize, the Tribunal has, based on uncontroversial facts in the record, prepared a diagram showing the agreements in place as of 27 February 2006:



---

[48] Letter from A. Bah to M. Struik, 19 August 2010, **C-337**.
[49] Payments to CW France and FMA International Trading (Pty) Ltd, 27 February 2006, **R-178**.

216. According to BSGR, Bah and I.S. Touré later assigned their rights under the Pentler-Bah Milestone Agreement to Mme. Touré's company, Matinda and Co. Limited ("**Matinda**").[50] Pentler was allegedly a party to this assignment agreement, although Noy stated that he did not know why or when the rights were assigned.[51]

**F.    Shareholding in BSGR Guinea BVI provided to Pentler and Mme. Touré**

217. In accordance with the BSGR-Pentler Milestone Agreement, on 10 March 2006, BSGR Steel transferred 8,825 shares in BSGR Guinea BVI to Pentler – constituting a 17.65% shareholding in BSGR Guinea BVI.[52] The shares were held by Oynx "on trust" for Pentler.[53]

218. Pursuant to the Touré MoU, Pentler was obliged to transfer 5% of this interest to Mme. Touré by granting her a 33.3% shareholding in Pentler. Noy gave evidence that this MoU was signed but that Pentler "never formalised the transfer of shares to Mamadie Touré."[54] Nonetheless, Noy said that Mme. Touré was a considered to be a "stakeholder" in Pentler, "although, we never formally transferred 33% of Pentler to Mamadie Touré".[55]

219. Pentler had also agreed to transfer a small interest to Daou under the Daou Shareholding Agreement, which was conditional on obtaining the mining rights. Pentler apparently repurchased these shares in September 2007.[56]

220. In addition to these contracts, there was also a Shareholders Agreement between BSGR Steel, Pentler and BSGR Guinea BVI (the "**Pentler Shareholders Agreement**").[57] Under section 2.2.2 of that Agreement, Pentler had a 17.65% interest in shares of BSGR Guinea BVI. Of an initial Board of three directors, Pentler was entitled to appoint one director, while BSGR Steel was entitled to appoint the remaining two directors.[58] The Shareholders Agreement was signed on 19 July 2007 but backdated to 10 March 2006 (the date that Pentler received the shares).

221. At this time, the relevant corporate structure was as follows in the diagram below. Again, this diagram was prepared based on uncontroversial facts in the record.

---

[50] Amendment to the Agreement Protocol of 20 February 2006 between Pentler, A. Bah and I.S. Touré, **R-150** (the assignment agreement is signed, but undated).
[51] Noy First WS, paragraph 60.2.3. See also Email from M. Noy to D. Barnett, 7 June 2009, **R-153**.
[52] Emails between M. Struik & S. Merloni-Horemans, 1-2 March 2006, **C-236**; Shareholding Certificate in BSGR Guinea BVI issued to Pentler, 10 March 2006 **R-149**.
[53] Merloni-Horemans First WS, paragraphs 18-19.
[54] Noy First WS, paragraph 60.1.4.
[55] Noy First WS, paragraph 72.
[56] Noy First WS, paragraph 60.3.1.
[57] Shareholders Agreement between BSGR Steel, Pentler and BSGR, 19 July 2007, **R-24**
[58] Shareholders Agreement between BSGR Steel, Pentler and BSGR, 19 July 2007, clause 4.3.2, **R-24**.



### G. BSGR commences work in Guinea

222.  On 30 March 2006, the GoG, by Presidential Decree, granted Rio Tinto's local subsidiary a mining concession for Simandou Blocks 1, 2, 3 and 4 for 25 years.[59]

223.  Around the same time (April 2006), BSGR established an office in Conakry (Guinea's capital city), although it was not officially opened until September 2006.[60] In June, BSGR informed the Minister of Mines of its exploration plan for Simandou North and South. Struik, with the help of Cilins, ran the business during this period.[61] BSGR also employed I.S. Touré from this time (eventually making him its public relations officer).

224.  On 9 May 2006, the GoG also granted BSGR (upon BSGR's application) a number of exploration licences for areas containing bauxite deposits on the Guinean border with Mali in the North. Just after this, Pentler entered into two further "engagement letters" with Mme. Touré which confirmed the terms of the Touré MoU in relation to Mme. Touré's 33.3% interest in Pentler, but also referenced her assistance in obtaining the bauxite permits. They were signed by Lev Ran and are dated 21 July 2006.[62]

225.  Asher Avidan ("**Avidan**") (Chief Executive Officer of BSGR Guinea and now President of BSGR) arrived in Guinea to take up the role of "Country Manager" in June 2006. On the

---

[59] BSGR's Statement of Defence, paragraph 60.
[60] Struik First WS, paragraph 40.
[61] Struik First WS, paragraph 41.
[62] Engagement Letter, 21 July 2006, pp. 226-229, **C-6**; Engagement Letter, 21 July 2006, pp. 231-232, **C-6**.

day of the official office opening in September 2006, Oron, Avidan, Cilins and I.S. Touré held a presentation attended by the press, where they presented BSGR's exploration plan on the Simandou project.[63]

226. Avidan met with Mme. Touré at her house in Dubréka a few months later (around September) to discuss the Simandou mining venture – which she referred to as "her project". She told Avidan that she thought Cilins should be running things for BSGR, rather than Avidan.[64]

227. On 28 February 2007, BSGR obtained uranium permits, allegedly with the assistance of Mme. Touré. On 20 June 2007, BSGR Guinea and Matinda allegedly entered into an agreement whereby Matinda was promised a 5% direct shareholding in BSGR Guinea as a reward for Mme. Touré's assistance in obtaining these permits.[65] The contract was legalized by a Greffier of the Conakry Court of First Instance on 20 July 2007.[66] BSGR has submitted that this agreement is a forgery.[67]

## H. Simandou Blocks 1 and 2

228. In July 2007, BSGR Guinea applied for exploration permits for Simandou Blocks 1 and 2.[68] At the time, Rio Tinto held mining concessions over these areas. Kanté (who was then Minister of Mines) gave evidence that he was not receptive to BSGR's approaches with regard to Blocks 1 and 2.[69]

229. As noted above, BSGR Steel, Pentler and BSGR Guinea BVI entered into the Pentler Shareholders Agreement on 19 July 2007, although it was backdated to 10 March 2006.[70] BSGR Steel and BSGR Guinea BVI also entered into a management agreement granting BSGR Steel the authority to manage the business on behalf of BSGR Guinea BVI.[71]

230. Over the course of 2007, BSGR continued with the exploration of Simandou North and South. BSGR initially concentrated on Simandou North. However, around mid-2007, BSGR discovered deposits of iron ore around the Zogota area in Simandou South and thereafter concentrated its exploration on Zogota.

231. In August 2007, Avidan and I.S. Touré met with Kanté to make known BSGR's interest in Simandou Blocks 1 and 2. This was followed by a further meeting in late September 2007 with President Conté and Kanté, where – once again – BSGR's interest in Blocks 1 and 2 was discussed, but no orders were given to grant concessions over Simandou Blocks 1 and 2.[72] Kanté said he had a further meeting with BSGR at the Ministry of Mines about an hour later where he reiterated he had been given no orders in relation to Blocks 1 and 2

---

[63] Struik First WS, paragraph 51; BSGR's Chronicle of Events and Overview of BSGR's Iron Ore Investment in Guinea in Response to the Technical Committee, 26 December 2012, **C-23**.

[64] Avidan First WS, paragraph 37.

[65] Memorandum of Understanding between BSGR and Matinda, 20 September 2007, **R-234**.

[66] Attestation of Lansana Tinkiano, 9 January 2015, **C-98**.

[67] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.

[68] BSGR Application for Exploration Permits for Simandou Blocks 1 and 2 (ICSID Ex. R-214), 12 July 2007, **C-694**.

[69] Kanté WS, paragraphs 12-19.

[70] Shareholders Agreement between BSGR Steel, Pentler and BSGR, 19 July 2007, **R-24**.

[71] Management Agreement between BSGR Steel and BSGR Guinea BVI, 19 July 2007, **R-202**.

[72] Kanté WS, paragraphs 22-29; Avidan First WS, paragraph 63.

which still belonged to Rio Tinto.[73] Another meeting between Avidan, Struik, Mme. Touré and President Conté occurred sometime in 2007 or 2008 (accounts are inconsistent) late at night, where the President asked for a progress update from BSGR and allegedly became angry at Mme. Touré's interruptions.[74]

232. A third meeting took place around December 2007 between President Conté, Prime Minister Lansana Kouyaté ("**Kouyaté**") (then Prime Minister of the Republic of Guinea), Kanté and Mme. Touré at which Kanté voiced objections to granting BSGR further permits until they had proven their abilities.[75]

233. It is alleged that a further meeting took place between Avidan, Issiaga Bangoura ("**Bangoura**") (Security Director for BSGR) and Mme. Touré (with Steinmetz joining by phone) at the President's house in early 2008. Avidan said that BSGR wanted Mme. Touré's assistance to secure Blocks 1 and 2. BSGR denies that this meeting occurred.[76] Shortly after this meeting allegedly occurred, it is alleged that BSGR Guinea BVI entered into two contracts with Matinda. The first Agreement (entitled a "**Commission Contract**") was dated 27 February 2008 and provided for a USD 4 million commission to be paid to Matinda for assistance in obtaining permits for Simandou Blocks 1 and 2. Of this USD 4 million, USD 2 million was to be paid to Matinda and the remaining USD 2 million was to be "distributed among the people of goodwill who would have contributed to the facilitation of the granting of said blocks."[77]

234. The second agreement, dated 28 February 2008, was a Memorandum of Understanding which provided Matinda with a 5% interest in Blocks 1 and 2 (the "**February 2008 MoU**").[78] Both Agreements bore BSGR's stamp and were allegedly signed by Avidan.[79]

235. BSGR has alleged that both of these agreements are forgeries.[80]

236. Around this time, Steinmetz visited Guinea and met with the President to discuss Simandou Blocks 1 and 2.[81] Also present at the meeting were Cilins, Mme. Touré and Struik. It is alleged that Steinmetz gave the President a small model car encrusted with diamonds as a gift. Steinmetz denies this.[82]

**I.    Share Buyback – Pentler**

237. On 24 March 2008, BSGR Steel and Pentler entered into a Share Purchase Agreement of Shares in BSG Resources (Guinea) Ltd (the "**Share Purchase Agreement**"),[83] under which BSGR Steel purchased Pentler's 17.65% holding in BSGR Guinea BVI for a total payment of USD 22 million (to be paid in four instalments). In addition, the parties agreed

---

[73] Kanté WS, paragraphs 27-29.
[74] Avidan First WS, paragraph 101; Struik First WS, paragraph 112.
[75] Kanté WS, paragraphs 30-34.
[76] Avidan First WS, paragraph 97.
[77] Commission Agreement between BSGR Guinea BVI and Matinda, 27 February 2008, **R-128**.
[78] Memorandum of Understanding between BSGR Guinea BVI and Matinda, 28 February 2008, **R-129** (see also p. 221, **C-6**).
[79] Commission Agreement between BSGR Guinea BVI and Matinda, 27 February 2008, **R-128**.
[80] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[81] Steinmetz First WS, paragraph 28.
[82] Steinmetz First WS, paragraph 61.
[83] Share Purchase Agreement between BSGR Steel and Pentler, 24 March 2008, **R-28**.

on a potential further payment of USD 8 million if BSGR Steel realised a profit in excess of USD 1 billion. Pursuant to clause 6 of the Share Purchase Agreement, "[t]he Consultant (Pentler's shareholders) will continue to advise and act as consultant for the period of 5 years from signing date hereof to the best interest of the Company". In 2010, following a renegotiation, the Parties agreed to increase the payment for the share purchase to USD 30 million.[84] Vale claims that Pentler received USD 34.5 million in payments from BSGR in total.[85]

238.    Mme. Touré held a 33.3% interest in Pentler, which effectively gave her a 5% interest in BSGR Guinea BVI. As Pentler was to sell its shares in BSGR Guinea BVI back to BSGR Steel, Vale alleges that BSGR offered Mme. Touré a direct 5% interest in Simandou Blocks 1 and 2 pursuant to the February 2008 MoU (discussed above).

## J.    GoG revokes Rio Tinto's mining concessions and grants exploration permits to BSGR

239.    A series of meetings took place in April 2008 between BSGR and the GoG to discuss the revocation of Rio Tinto's rights to Blocks 1 and 2. Avidan attended these meetings, with Steinmetz also attending two of the meetings.[86] Mme. Touré also attended this meeting. Steinmetz then returned to Guinea in May 2008 for a two-day visit. During this time, Prime Minister Kouyaté, who opposed the revocation of Rio Tinto's rights, was removed from office.[87]

240.    Rio Tinto's mining concession granted in 2006 was revoked by the GoG on 28 July 2008. According to the GoG, the concession was revoked because of Rio Tinto's prolonged failure to conduct exploration activities.[88] While Rio Tinto was allowed to retain some exploration licences in the area, it was required to retrocede half of its permit area back to the GoG. Consequently, on 4 December 2008, the Council of Ministers ordered the Ministry of Mines to withdraw half of the concession, corresponding to Simandou Blocks 1 and 2.[89] Rio Tinto retained exploration permits over Simandou Blocks 3 and 4.

241.    After the July 2008 decree, the GoG publicly announced that Simandou Blocks 1 and 2 were available for exploration and asked for applications from interested parties. BSGR submitted an application in August 2008.[90] Following these events, sometime in September or October 2008, Avidan, Steinmetz, Mme. Touré, and President Conté met to discuss BSGR's application.[91] Ibrahima Kassory Fofana ("**Fofana**") (allegedly working as a consultant for BSGR) also met with the new Minister of Mines, Nabé, to discuss the application.[92]

---

[84] See Noy First WS, paragraph 97.
[85] Vale's Pre-Hearing Written Submissions, paragraph 40.
[86] Avidan First WS, paragraphs 91-94.
[87] Vale's Pre-Hearing Written Submissions, paragraph 98(c); Guinée Information, "Ahmed Tidiane Souaré, le dernier premier ministre du Général Lansana Conté répond aux accusations de son prédécesseur Lansana Kouyaté", 15 May 2014, **C-77**.
[88] Decree No. D/2008/041/PRG/SGG, 28 July 2008, **C-27**.
[89] Email from M. Berkner of Skadden to M. Gordon of Clifford Chance, 9 April 2010, **C-47**.
[90] Letter from A. Avidan to Minister of Mines L. Nabé, 5 August 2008, **C-29**.
[91] Avidan First WS, paragraph 95.
[92] Nabé WS, paragraph 20; Transcript of Meeting between Minister of Mines M. Thiam and S. Mebiame, **C-81**. See also Nabé WS, paragraphs 8-9 where Nabé said he felt pressured to retrocede the Blocks to BSGR.

242.   On 9 December 2008, the GoG granted BSGR Guinea an exploration licence covering the area of Simandou Blocks 1 and 2. This permit was valid for three years and renewable for another two years.[93]

### K.   The death of President Conté

243.   President Conté died on 22 December 2008, following a long illness. Following his death, Captain Moussa Dadis Camara seized power in Guinea through a military coup until he was exiled in late 2009. General Konaté Sékouba then served as interim President. Finally, Alpha Condé was elected as President of Guinea in December 2010.

244.   After the death of President Conté, Mme. Touré was exiled to Sierra Leone. While living in Sierra Leone, Vale has alleged that Mme. Touré received from BSGR:

244.1.   a payment of USD 50,000 in early 2009; and

244.2.   a payment of USD 998,000 on 3 September 2009 from Ghassan Boutros ("**Boutros**") (Lebanese businessman and allegedly BSGR's agent/consultant), plus an additional $2,000 from Boutros in December 2009.

245.   In addition, Mme. Touré allegedly signed a contract with BSGR under which she would receive USD 4 million in instalments. BSGR alleges that this contract is a forgery.[94]

246.   During the interim period from January 2009 to December 2010, Thiam served as the Minister of Mines. Thiam was later convicted in the United States of corruption and money laundering charges in relation to certain mining rights granted to Chinese interests.[95] These charges were not related to BSGR.

247.   On 5 May 2009, Minister Thiam confirmed the validity of BSGR's exploration permit for Simandou Blocks 1 and 2. As noted below, Thiam also granted BSGR's request to renew the exploration permits for Simandou North and South on 10 June 2009.

248.   The Technical Committee (discussed below) would later allege that Minister Thiam worked aggressively to promote the interests of BSGR during this time, in return for travel benefits (including use of BSGR's airplane) and other gifts.[96] Vale has alleged that BSGR's payments to Thiam also enabled him to purchase USD 5.27 million worth of real estate in the United States.[97]

### L.   Renewal of Exploration Permits for Simandou North and South

249.   In January 2009, the three-year initial term for BSGR's exploration permits in Simandou North and South was about to expire. Avidan filed a request on behalf of BSGR for the renewal of the exploration permits to the CPDM together with a proposal to retrocede half of the area covered under the permits.[98] BSGR wanted to retain permits for the Zogota area in the South (around Mount Younon) which had yielded promising results and which

---

[93] Ministerial Order No. A 2008/I-4980/MMG/SGG, 9 December 2008, **C-31**.
[94] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[95] *USA v. Thiam*, Criminal Complaint, Dkt. No. 1, 12 December 2016, **C-828**.
[96] Letter from the Technical Committee to BSGR, 30 October 2012, pp. 6-7, **C-5**.
[97] Vale's Statement of Case, paragraph 172.
[98] Struik First WS, paragraph 59.

became known as the "Zogota Project". It therefore proposed to retrocede 50% of Simandou North and part of Simandou South that did not include Zogota.

250. In June 2009, the Minister of Mines granted the request as recommended by the CPDM.[99] As a result, BSGR reassigned 50% of Simandou North and 50% of Simandou South back to the GoG in accordance with the requirements of the 1995 Mining Code, leaving BSGR with exploration rights over the remaining area.

251. Therefore, as of June 2009, BSGR held exploration permits for Zogota in Simandou South, part of Simandou North and Simandou Blocks 1 and 2.

## M. Restructure by BSGR

252. On 10 February 2009, BSGR incorporated BSGR Guernsey. This new Guernsey-registered entity had the same corporate name, BSG Resources (Guinea) Limited, as the existing BVI entity referred to here as BSGR Guinea BVI, whose full corporate name was also BSG Resources (Guinea) Limited.

253. BSGR Guernsey was 100% owned directly by BSGR. It would later become the joint venture entity.

254. One week after incorporating BSGR Guernsey, on 17 February 2009, BSGR Guinea (the local Guinean subsidiary which held the mining rights) was transferred from BSGR Guinea BVI to BSGR Guernsey. As BSGR directly owned BSGR Guernsey, BSGR Steel and BSGR Guinea BVI (the two companies that had interacted with Pentler) were no longer part of the corporate structure involved in the Simandou project.

255. At that time, BSGR Steel and BSGR Guinea BVI were still owned by BSGR. However, in late March 2010, BSGR sold these two companies to BSG Metals and Mining which was owned by Nysco. As a result, these two companies were no longer within BSGR's corporate group – in other words, they had been completely separated from the entities involved in any future joint venture.

256. A comparison of the various corporate structures between February 2009 and March 2010 is shown below. These diagrams were prepared by the Tribunal as a convenient point of reference, based on uncontroversial facts in the record.

---

[99] Ministerial Order No. A 2009/1327/PR/MMEH/SGG, 10 June 2009, **C-25**.

**10 February 2009:**



**Mid-February 2009:**



**Late March 2010:**

### N. Dispute between Pentler and BSGR

257. On 15 April 2009, BSGR failed to pay Pentler one of the instalments that was due under the Share Purchase Agreement. Having made an initial demand for payment, several contentious letters were exchanged between Pentler and BSGR during May 2009.[100] These letters included allegations of breach of obligations by both sides.[101] On 8 June 2009, Noy wrote to David Barnett ("**Barnett**") (BSGR's internal legal counsel) noting that BSGR was two months late on the latest instalment and was therefore in default under

---

[100] Letters between A. Lev Ran, S. Merloni-Horemans, & M. Struik, 8 May – 5 October 2009, **C-552**.
[101] Letters between A. Lev Ran, S. Merloni-Horemans, & M. Struik, 8 May – 5 October 2009, **C-552**.

the Agreement. Pentler demanded payment of the entire amount due (not just the instalment) and said that it would not accept a settlement.[102] Three days later, Lev Ran wrote another letter to BSGR threatening to "properly ventilate[]" the communications of Steinmetz before the relevant court if payment was not made.[103]

258. On 17 June 2009, Lev Ran again wrote to BSGR saying that Pentler elected to cancel the Share Purchase Agreement and would seek to sell its shares in BSGR Guinea BVI to a third party.[104] He also demanded payment of the USD 1.5 million success fee Pentler claimed was due under the BSGR-Pentler Milestone Agreement in relation to Blocks 1 and 2.[105]

259. Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden Arps**") (BSGR's then external legal counsel) responded to Pentler on behalf of BSGR.[106] Skadden Arps rejected Pentler's ability to cancel the Share Purchase Agreement or sell the shares to a third party. Skadden Arps referred to Pentler's alleged breaches of its obligations to BSGR and also to "third parties that are causing our client loss."[107] This appears to be a reference to Bah who was threatening BSGR at the time (discussed at paragraph 261 below). Pentler's lawyers responded by providing notice that they intended to commence arbitration proceedings over the matter.[108]

260. Following settlement discussions, Pentler and BSGR Steel reached a Settlement Agreement on 25 July 2009 (the "**Settlement Agreement**") which set out a renewed payment schedule for the outstanding monies owed under the Share Purchase Agreement. On the same day, Pentler provided an indemnity to BSGR for any claims against BSGR made by Bah.

261. The reference to indemnifying BSGR against claims by Bah (one of the local contacts who had initially assisted BSGR in 2005–2006) relates to demands made by Bah for payments outstanding under the Pentler-Bah Milestone Agreement. Bah made a further demand for this money on 30 November 2009, when he wrote to BSGR demanding payment of USD 15.2 million pursuant to the Pentler-Bah Milestone Agreement.[109] BSGR threatened litigation in response, but Bah made a further demand in March 2010.[110]

## O. Payments to Mme. Touré

262. As noted in paragraph 208 above, in the Touré MoU, Pentler agreed to give Mme. Touré a 5% interest in BSGR Guinea in return for her assistance in gaining the mining rights. This interest was achieved by granting Mme. Touré a 33% interest in Pentler. After Pentler sold its interest in BSGR Guinea back to BSGR, Mme. Touré has alleged that

---

[102] Emails between M. Noy & D. Barnett, 8 June 2009, **C-294**.
[103] Letters between A. Lev Ran, S. Merloni-Horemans, & M. Struik, 8 May – 5 October 2009, **C-552**.
[104] Emails between M. Struik, B. Steinmetz, & M. Noy, 17 June 2009, **C-296** and Email from M. Struik to B. Steinmetz, enclosing Letter from A. Lev Ran to M. Struik, 17 June 2009, **C-297**.
[105] Email from M. Struik to B. Steinmetz, enclosing Letter from A. Lev Ran to M. Struik, 17 June 2009, **C-298**.
[106] Letter from Skadden Arps, 23 June 2009, p. 19, **C-552**.
[107] Letter from Skadden Arps, 23 June 2009, p. 19, **C-552**.
[108] Letter from John Walker Attorneys, 25 June 2009, p. 21, **C-552**.
[109] Letter from A. Bah to BSGR, 30 November 2009, **R-125**.
[110] See Letter from BSGR to A. Bah, 3 December 2009, **R-173**; Letter from A. Bah to M. Struik, 5 May 2010, **C-337**.

BSGR agreed to pay her USD 4 million, which represented the value of her 5% interest in BSGR Guinea and the assistance she provided in obtaining the mining titles for BSGR.[111]

263. It is alleged that the first payment under this arrangement came through the BSGR consultant named Boutros. On 18 August 2009, BSGR transferred USD 1.3 million to Boutros's bank account.[112] Boutros then transferred USD 998,000 to Mme. Touré on 3 September 2009 pursuant to an invoice from her company for heavy machinery.[113]

264. A further payment of USD 100,000 was transferred to Boutros on 12 November 2009.[114] Vale has alleged that the heavy machinery was never delivered, but BSGR maintains that the purchases were legitimate and the machinery was delivered.

## P. Base Convention

265. BSGR completed its Feasibility Study for Zogota (the "**Zogota Feasibility Study**") at the end of October 2009. On 16 November 2009, BSGR submitted the Zogota Feasibility Study to the Ministry of Mines, which approved it in early December.

266. On 16 December 2009, BSGR Guernsey, BSGR Guinea and the GoG entered into a "Basic Agreement between the Republic of Guinea and BSG Resources for the Exploitation of the Zogota / N'zerekore Iron Ore Deposits" (the "**Base Convention**").[115] The Base Convention defined "the rights and obligations of the Parties and the general economic, legal, administrative, financial, fiscal, customs and excise, mining, environmental, social, transport and shipping conditions according to which the Parties undertake to carry out the Project for working the iron deposits at Zogota" (clause 4). The "project" that was subject to the Base Convention was (i) the working, transportation, exporting and marketing of iron ore; and (ii) the rebuilding of a railway line from Conakry to Kankan.[116] The project had two phases – the first concerned the Zogota deposit and the second concerned Blocks 1 and 2.[117] BSGR was to present a feasibility study for Blocks 1 and 2 within 24 months of the date of the Base Convention.

## Q. The Joint Venture - Due Diligence and Negotiations

267. BSGR began looking for a joint venture partner in April 2009. It undertook initial discussions with a number of entities, all of which ultimately failed.[118] In July 2009, Struik and Paul Antaki (New Business Development Manager for Vale) had a preliminary discussion regarding BSGR's activities in Guinea. However, it was not until February 2010 that serious discussions between BSGR and Vale regarding a possible joint venture began. The joint venture negotiation was called "Project Hills". The Parties signed a non-

---

[111] Affidavit of M. Touré, 2 August 2009, **C-690**.

[112] Payment from BSGR Treasury Services to LMS, 18 August 2009, **R-187**.

[113] Email from G. Boutros to the Managing Director of the F.I.B., 3 September 2009, p. 195, **C-6**.

[114] Payment from BSGR Treasury Services to LMS, 12 November 2009, **R-188**.

[115] Basic Agreement among BSGR Guernsey, BSGR Guinea, and the Republic of Guinea, 16 August 2009, **C-34**; Report from Committee Analyzing BSGR's Feasibility Study, 14 December 2009, **C-696**.

[116] Basic Agreement among BSGR Guernsey, BSGR Guinea, and the Republic of Guinea, 16 August 2009, clause 10, **C-34**.

[117] Basic Agreement among BSGR Guernsey, BSGR Guinea, and the Republic of Guinea, 16 August 2009, clauses 10.1-10.2, **C-34**.

[118] BSGR's Statement of Defence, paragraphs 91-94.

disclosure agreement on 22 February 2010[119] and Vale conducted its due diligence during March and early April 2010.

268. During this time, BSGR and Vale held exploratory meetings at Vale's offices in Rio de Janeiro to discuss the joint venture. Steinmetz, Avidan, Tchelet and Barnett attended these meetings on behalf of BSGR. BSGR gave assurances that its mining permits and concessions had been obtained lawfully.[120] During the joint venture negotiations Skadden Arps acted for BSGR and Clifford Chance (London) acted for Vale.

269. Technical due diligence was completed by Clifford Chance and Vale during this time. As Vale was listed on the New York Stock Exchange, Clifford Chance used its Washington DC office to conduct a separate due diligence exercise on compliance with the US Foreign Corrupt Practices Act (the "**FCPA**").

270. The FCPA compliance due diligence process included the following elements:

270.1. review of documents provided by BSGR in an electronic data room;

270.2. separate review of the principal entities and persons connected with Project Hills;

270.3. legal advice from local counsel in Guinea regarding compliance with local law;

270.4. two compliance due diligence questionnaires addressed to BSGR;[121]

270.5. a legal due diligence questionnaire and a financial due diligence questionnaire which included questions related to anti-bribery and corruption issues;[122]

270.6. a follow-up due diligence request list dated 4 April 2010;[123]

270.7. anti-bribery certifications by BSGR as an entity given by David Clark ("**Clark**") (Director of BSGR) and an additional certification given by Steinmetz personally;

270.8. interview of BSGR's principals in London (Avidan, Tchelet, Struik and Cramer);[124] and

270.9. FCPA contractual protections, including several representations and warranties.

271. In the meantime, on 19 March 2010, the GoG granted BSGR Guinea mining concessions over the Zogota area and ratified the Base Convention.[125] On the same day, Thiam wrote

---

[119] Confidentiality Agreement, 1 March 2010, **C-42**.
[120] Monteiro First WS, paragraphs 11-15; Vale's Statement of Case, paragraph 53.
[121] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, **C-30**; Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, **C-43**.
[122] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, **C-233**; Project Hills Clifford Chance Due Diligence Request List, 29 March 2010, **C-235**.
[123] Project Hills Follow Up Diligence Request List, 4 April 2010, **C-44**.
[124] Kleinfeld WS, paragraph 20.
[125] Ordinance No. 003/PRG/CNDD/SGG/2010, 19 March 2010, **C-35**; Decree No. D2010/024/PRG/CNDD/SGG, 19 March 2010, **C-36**.

to Vale to confirm BSGR's mining rights were valid and to express his support of the joint venture.[126]

272. On 15 April 2010, BSGR and Liberia entered into a Memorandum of Understanding for the exportation of iron ore through Liberia as the distance from Simandou to the Liberian coast for exportation of the iron ore was substantially shorter than through a trans-Guinean railroad to the port of Conakry, the capital of Guinea.[127] This was known as the Liberian Transport Solution ("**LTS**"). Vale BSGR Guinea Limited ("**VBG**"), referred to in the following paragraph, and the Government of Liberia then began to negotiate the terms of the commercial agreement. Under the Framework Agreement, Vale would pay a further USD 500 million into the joint venture once agreement had been reached on the LTS.

273. Following the conclusion of the due diligence process and commercial negotiations, the GoG approved the joint venture.[128] On 30 April 2010, Vale and BSGR entered into the Framework Agreement and the Shareholders' Agreement.[129] Through these Agreements, Vale purchased a 51% share of BSGR Guernsey which owned BSG Guinea – the local company that held the mining rights. BSGR Guernsey was renamed "VBG – Vale BSGR Guinea" on 14 June 2010.[130] Vale's shareholding in VBG was held through Vale International Holdings GmbH ("**Vale GmbH**"), a wholly owned subsidiary registered and with its principal office in Austria.

274. Under the joint venture arrangements, Vale paid an initial sum of USD 500 million upon formation of the joint venture. Vale was due to pay a further USD 2 billion upon the achievement of specified milestones in the development of the project.[131] Vale's obligations under the joint venture were in part performed by subsidiaries, notably Vale International S.A. ("**Vale International**"), a wholly owned subsidiary registered and with principal office in Switzerland.

275. Over the course of 2010, VBG continued its work on the feasibility studies for Blocks 1 and 2 and for the Trans-Guinean Railway. Construction also commenced on part of the Conakry to Kankan railway, with authorisation from the Ministry of Mines. VBG conducted other environmental and social studies and began constructing camps and paving roads around Zogota and Blocks 1 and 2. During this time, Vale alleges that it invested a further USD 945 million in the development of the mining area and associated activities.[132] Vale also assumed full control of the joint venture in Guinea – BSGR was not involved in the day-to-day operations at this time.[133] By late 2011, the joint venture began to hit obstacles as described further in paragraphs 282 to 289 below.

---

[126] Letter from M. Thiam to E. Ledsham of Vale, 19 March 2010, **C-49**.
[127] Memorandum of Understanding between the Republic of Liberia, BSGR Guernsey, BSGR Guinea, BSG Resources (Liberia) Limited, and BSGR (Liberia) Limited, 15 April 2010, **C-61**.
[128] Letter from A. Avidan to M. Thiam with Endorsement from Thiam, 16 April 2010, **C-50**.
[129] Framework Agreement, 30 April 2010, **C-1**; SHA, 30 April 2010, **C-2**.
[130] Ministry of Justice Tribunal of the first instance, 14 June 2010, **R-42**.
[131] Framework Agreement, 30 April 2010, section 3, **C-1**.
[132] Vale's Statement of Case, paragraph 99.
[133] SHA, 30 April 2010, section 5.1, **C-2**; Saad First WS, paragraphs 10-12.

## R.  BSGR, Pentler and Various Contractors

276.    The involvement of Mme. Touré with Pentler continued when, sometime in 2010, Mme. Touré moved to the United States. She remarried and had a child. While in the United States, Mme. Touré continued to receive payments from Pentler. The evidence in the case *USA v Cilins* established the following payments:[134]

276.1.    USD 149,970 on 21 July 2010;

276.2.    USD 100,000 on 27 July 2010; and

276.3.    USD 50,000 and USD 99,970 on 5 August 2010.

277.    In total, it is alleged that Mme. Touré received USD 2,136,391.02 from Pentler between 2010 and May 2012.[135] This amount does not include separate payments made by Cilins to a title company in the United States allegedly to make more payments to Mme. Touré.[136] It also excludes payments made pursuant to the agreements described in the following paragraphs.

278.    On 8 June 2010, Mme. Touré (in the name of Matinda) demanded that BSGR honour the contracts of 27 and 28 February 2008 which included the payment of USD 4 million and the transfer of 5% of shares in Blocks 1 and 2.[137] She denounced an attestation dated 2 August 2009 which stated that she had received USD 4 million for her 5% interest. BSGR claimed that this was an extortion attempt using forged contracts.[138] BSGR threatened to bring criminal and civil proceedings against her.[139] Mme. Touré withdrew the claims on 23 June 2010[140] and once again on 30 July 2010.[141]

279.    The 30 July withdrawal may have been linked to a series of agreements signed in July and August 2010 between Pentler and Mme. Touré:

279.1.    Pentler and Mme. Touré allegedly signed an agreement on 8 July 2010 whereby Mme. Touré would receive USD 5 million from Pentler. The payment was subject to the "proper implementation and functioning and the next stages of the operation conducted by our partners on the Simandou project in Guinea."[142] Of the five agreements detailed in this paragraph, there are two agreements that reference the Simandou project by name: the one referred to in this subparagraph and the one referred to in the following subparagraph. BSGR

---

[134] Cheque number 96 dated 27 July 2010, p. 191, **C-6**; Cheque number 97 dated 5 August 2010, p. 192, **C-6**; *see also USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 3, **C-111**; *USA v. Touré Properties*, Complaint ¶ 25, Dkt. No. 1, 21 November 2014, **C-76**.

[135] *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, dated 18 July 2014, p. 4, **C-111**.

[136] Vale's Statement of Case, paragraph 187.

[137] BSGR's Statement of Defence, paragraph 115; Document invalidating the claimed attestation of 2 August 2009, 8 June 2010, **R-55**.

[138] BSGR's Statement of Defence, paragraph 116.

[139] Letter from BSGR Guinea to N. Moussi, 20 June 2010, **R-56**.

[140] Letter from N. Moussi to BSGR, 23 June 2010, **R-57**.

[141] Annulment of the Document Invalidating the Claimed Attestation of 2 August 2009, 30 July 2010, **R-130**.

[142] Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.

alleges (based on Noy's written evidence) that the agreement referred to in this subparagraph is a forgery.[143]

279.2.  On the same date, Mme. Touré and Pentler appear to have entered into another contract. The Tribunal has been provided with a translation of this contract (which was disclosed by BSGR during the arbitration) but it has not seen the original.[144] Its terms are similar to those in the undated agreement described below at paragraph 279.5, but the amount to be paid was USD 5.5 million. The contract also specifically states that Mme. Touré "agree to delivery [sic] all the originals & copies of the documents and agreements signed with the company Pentler Holdings Ltd. & its partners with regard to the SIMONDOU project in Guinea".

279.3.  On 3 August 2010, Mme. Touré and Pentler signed an agreement under which she would receive an "extra sum" of USD 5 million over the next four years following the successful completion of the next stages of Pentler's activities in Guinea.[145] Matinda agreed to "refrain from making use of this document … against company Pentler and/or its partners and/or its associates in Guinea." Mme. Touré agreed to take responsibility for "all actions taken in Guinea by any third party against Pentler and/or its associates".

279.4.  Yet another agreement, also signed on 3 August 2010, provided that Mme Touré would receive the sum of USD 5.5 million for her "participation in all activities conducted in Guinea."[146] Noy gave evidence that the two agreements of 3 August 2010 (which totalled USD 10.5 million) provided Mme. Touré with her share of the buyback money paid to Pentler by BSGR for the shares in BSGR Guinea BVI (i.e., 33% of USD 30 million).[147]

279.5.  An undated "Agreement" references Pentler's role in Guinea as "advisor and business provider" in the commercial, mining and medical fields and the contribution Matinda had made to Pentler's success in those areas. Under that agreement, in recognition of that contribution, Matinda would receive USD 3.1 million.[148] Noy has explained that this was the balance of the 5.5 million initially promised (2.4 million of which had already been paid).[149] This agreement also guaranteed the "absolute confidentiality" of all common business conducted in Guinea and that Matinda would not contact any of the Guinean companies with which they had collaborated. The agreement also formally terminated all previous contracts and obligations between the two parties. Finally, Matinda undertook responsibility for any "complaints, actions, concerns or any other requests" filed by Guinean institutions against Pentler.

---

[143] Noy First WS, paragraph 80.
[144] Contract between Matinda & Co. Ltd and Pentler, 8 July 2010, **C-563**.
[145] Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-237, **C-6**.
[146] Contract between Pentler and Mme. Touré / Matinda, 3 August 2010, **R-151**.
[147] Noy First WS, paragraph 74.
[148] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, **C-6**.
[149] Noy First WS, paragraph 77.

279.6.    There is also a statement confirming that Matinda had received USD 2.4 million from Pentler pursuant to a "collaboration agreement" signed in 2005.[150]

280.    By May 2010, BSGR had paid Pentler a total of approximately USD 30 million for its shares in BSGR Guinea BVI.[151] Two further payments totalling USD 4.5 million were made in August 2010 and March 2011 which were success fees due under the BSGR-Pentler Milestone Agreement.[152] Noy said in his First Witness Statement in this arbitration that:[153]

> Although we never formally transferred 33% of Pentler to Mamadie Touré, we felt we had entered into an agreement with her and therefore it was right to pay her. We had just received most of the $30 million agreed with BSGR for our share in BSGR (Guinea). I therefore calculated that a fair sum to pay Mamadie Touré for her share was around $10 million.

281.    It is also alleged that Mme. Touré received other payments from BSGR's consultants or intermediaries during 2009–2010, in particular from Boutros.

## S.    President Condé and the Revocation of Mining Rights

282.    During the second half of 2010, national elections were held to elect the President of Guinea. Following some controversy and a decision from the Supreme Court as to the result of the elections, Alpha Condé became the President of Guinea on 21 December 2010 ("**Condé**" or "**President Condé**"). In February 2011, President Condé decided that all iron ore from Simandou should be exported through Guinea.[154] Consequently, the GoG directed VBG to cease work on constructing the Conakry-Kankan passenger railway and refused to sign the *Protocole d'Accord* regarding that railway. The GoG also signalled its intention to reform mining practices so that the State would take a profit from all phases of mining activity.[155]

283.    In August 2011, the GoG established a new company called Société Guinéenne du Patrimoine Minier ("**SOGUIPAMI**") to hold the State's interests in mining projects and on 9 September 2011 a new Mining Code was introduced.[156]

284.    In October 2011, further to its earlier announcements that all ore should be exported through Guinea, the GoG formally advised VBG that it was not able to export iron ore extracted from Simandou Blocks 1 and 2 through Liberia.[157] Following this, on 4 October 2011, the GoG ordered VBG to stop all work in Guinea due to lack of proper authorisations and to produce its official documents and agreements with the GoG.[158] BSGR requested that the order to stop work be delayed by three months so that the relevant information and documents could be gathered. The GoG granted this request.[159] However, it also provided a long list of information and documents that BSGR was

---

[150] Undated Statement of Mme. Touré, p. 244, **C-6**.

[151] Tchelet First WS, paragraphs 61-62.

[152] Tchelet First WS, paragraph 62; BSGR's Statement of Rejoinder, paragraph 39.

[153] Noy First WS, paragraph 72.

[154] Vale Weekly Guinean Press Review, 28 February 2001, **C-214**.

[155] Policy Information for the Guinean Mining Sector, 10 February 2011, **R-67**.

[156] Mining Code 2011, 9 September 2011, **R-71**.

[157] Saad First WS, paragraph 20; Letter from Ministry of Mines to R. Saad, 11 October 2012, **R-68**.

[158] Letter from Minster of Mines to BSGR, 4 October 2011, **R-74**.

[159] Letter from Minster of Mines to BSGR, 31 October 2011, **R-75**.

required to produce within 30 days.[160] After further correspondence, BSGR responded in detail on 3 February 2012.[161]

285.   On 26 March 2012, a National Mining Commission ("**NMC**") with responsibility for mining titles was established by Presidential decree.[162] Two sub-committees were established by a further Presidential decree, dated 29 March 2012[163] – the Strategic Committee and the Technical Committee. The Technical Committee was the operational arm of the NMC, responsible for daily activities concerning issuance and withdrawal of mining permits.

286.   On 30 October 2012, the Technical Committee wrote to BSGR notifying it that it had learned of "several serious allegations concerning the manner in which BSGR obtained its Guinean mining titles" and that it had "decided to collect from [BSGR], in an adversarial proceeding, the information relevant to these allegations."[164] BSGR denied the allegations.[165]

287.   Following a further exchange of letters in May-June 2013,[166] the Technical Committee wrote to BSGR on 1 November 2013 repeating its allegations of bribery and misconduct.[167] Skadden Arps responded on behalf of BSGR on 8 December 2013 denying the allegations in detail.[168] Following previous requests from BSGR and Skadden Arps, the Technical Committee had provided some further documentation upon which it relied when making the allegations.[189]

288.   The Technical Committee held a hearing on 16 December 2013, which BSGR did not attend as it said it was concerned for the safety for its representatives.[170] Mme. Touré provided a written statement which formed part of the evidence relied upon by the Technical Committee,[171] but she was not called for oral questioning. On 21 March 2014, the Technical Committee recommended that VBG's rights be revoked.[172] The GoG consequently revoked VBG's mining rights on 19 April 2014.

289.   BSGR has alleged that the motivation for revoking BSGR's rights stems from President Condé's need to repay certain "backers" who provided logistical and financial assistance during the election.[173] BSGR has also alleged that other mining companies in Guinea that agreed to pay large sums to the GoG were exempted from the review process that stripped BSGR of its mining rights.[174] The Tribunal understands that the legality of the revocation of the mining rights, which according to BSGR was based on false allegations

---

[160] Letter from Minster of Mines to VBG, 17 November 2011, **R-76**.
[161] Letter from Veil Jourde to the Minister of Mines, 3 February 2012, **R-80**.
[162] Decree D/2012/041/PRG/SGG, 26 March 2012, **R-83**.
[163] Decree D/2012/045/PRG/SGG, 29 March 2012, **R-84**.
[164] Letter from the Technical Committee to BSGR, 30 October 2012, p. 1, **C-5**.
[165] Letter from BSGR to Technical Committee, 26 December 2012, **C-74**.
[166] Letter from Technical Committee to VBG Guinea, 7 May 2013, **C-194**; Letter from Skadden Arps to Technical Committee, 4 June 2013, **C-115**.
[167] Letter from Technical Committee to VBG Guinea, 1 November 2013, **C-196**.
[168] Letter from BSGR to Technical Committee, 8 December 2013, **C-206**.
[169] Letter from Technical Committee to VBG Guinea, 4 December 2013, **C-203**.
[170] BSGR's Statement of Defence, paragraph 160.
[171] Mme. Touré's Written Statement to the U.S. authorities, 2 December 2013, pp. 36-41, **C-6**.
[172] Recommendation and Report of the Technical Committee, 21 March 2014, p. 5, **C-6**.
[173] BSGR's Statement of Defence, paragraph 170(iii).
[174] BSGR's Statement of Defence, paragraph 171.

of corruption in obtaining these rights, is the subject of its ICSID proceedings against the Republic of Guinea, which proceedings Vale refused to join.

### T.     Frédéric Cilins in the United States

290.    During the investigation by the Technical Committee described above, Cilins travelled to the United States to visit Mme. Touré. Cilins' first visit was in 2012 and this was followed by visits in March/April 2013. The purpose of these visits was allegedly to convince Mme. Touré to destroy certain incriminating documents (including the allegedly forged contracts between Mme. Touré and BSGR) in return for payment and to sign allegedly false affidavits regarding her dealings with BSGR.

291.    Mme. Touré was, by this stage, co-operating with the FBI, which launched a criminal investigation into BSGR's activities in January 2013. Several phone calls and meetings in March – April 2013 between Cilins and Mme. Touré were recorded and transcribed by the FBI.[175]

292.    Cilins was arrested and charged with obstruction of justice in April 2013. He pleaded guilty and was sentenced to 24 months imprisonment with three years' supervised release. He was also fined USD 75,000.

293.    The revocation of VBG's mining rights by the GoG on 19 April 2014 has put an end to VBG's mining operations in Guinea and led to the dispute between the Parties. As Vale refused to join BSGR and BSGR Guinea in the ICSID proceedings against the Republic of Guinea relating to the alleged unlawful revocation of BSGR Guinea's mining rights, the Parties concluded a share purchase agreement dated 13 March 2015 under which Vale exited from the joint venture.[176] Vale's shares in VBG were sold to BSGR for USD 1 and the Framework Agreement and SHA were terminated by mutual agreement of the parties, without prejudice to any disputes being arbitrated in the present arbitration which had been instituted by Vale on 28 April 2014. Allegedly, the share purchase agreement enabled BSGR Guinea to join the ICSID proceedings as BSGR Guinea, by virtue of that agreement, became a (directly or indirectly held) wholly owned subsidiary. Prior to the share purchase agreement, it was majority controlled by Vale which had 51% of its share capital.

---

[175] See Transcripts contained in Recommendation and Report of the Technical Committee, 21 March 2014, Exhibit 3, **C-6**.
[176] Share Purchase Deed between Vale S.A., BSG Resources Limited & VBG – Vale BSGR Limited, 13March 2015, **C-487**.

## IV.    SUMMARY OF THE PARTIES' POSITIONS

### A.    Claimant's Position

#### 1.    Vale's Allegations

294.    Vale's makes three alternative claims in this arbitration:

294.1.    Vale claims that BSGR made fraudulent misrepresentations during the due diligence phase of contractual negotiations which induced Vale to enter into the joint venture with BSGR. Vale seeks relief in the form of rescission of the Framework Agreement and the SHA and damages in the amount of USD 1.45 billion (plus interest); or

294.2.    Vale claims that BSGR breached certain warranties provided in the joint venture agreements. Vale claims damages of USD 1.45 million (plus interest) for this breach; or

294.3.    Vale seeks a declaration that the Framework Agreement and the SHA are discharged by frustration, with restitution in the amount of USD 1.45 billion (plus interest).

295.    In addition, Vale seeks an order for costs (plus interest) and any other relief that the Tribunal deems just and proper.

296.    At the September 2016 Hearing, the Chairman sought clarification from Vale's Counsel as to the relationship between the three alternative claims described above. The Tribunal sets out the relevant extract from the transcript:

> THE CHAIRMAN:    Before you continue, if I may interrupt, can you explain to us what the relationship is between these three different freestanding causes of action? Is one an alternative cause of action, an alternative prayer for relief, as to the former one? You want us first to rule on fraudulent misrepresentation. If the end result is, dismissed, then we go to breach of warranty. If the end result is, dismissed, then we go to frustration? Is that how we have to see that relationship?
>
> MR KELLY:    Yes, Mr Chairman, that certainly may be one way of approaching the legal analysis. In practice, you will be looking at the same facts with each of those different legal cloaks on on those facts. So the fraudulent misrepresentation, if we cannot prove that BSGR was dishonest, that cause of action falls away. Into its place steps breach of warranty, which doesn't require dishonesty for these purposes. That requires an objective assessment of what the contract meant and what in fact happened. If that falls away, you look at frustration. Then you look at what were the circumstances and events surrounding the frustrating event, the revocation of the licences, and, to an extent, you then may have to look back at the involvement of one or other of the parties and whether they provided for it in their contract.
>
> THE CHAIRMAN:    It is the same question again, so to clarify, the road map for the Tribunal requested by Claimant is: first look into our

> fraudulent misrepresentation cause of action, then look into breach of warranties, and then only then look to frustration. Is that how we need to understand the relationship between the three causes of action?

MR KELLY:         Correct.[177]

297. The factual basis upon which Vale makes the above claims is that, from 2005 onwards, BSGR directly and indirectly engaged in bribery and corruption to obtain mining rights in the Simandou area of Guinea. BSGR then lied repeatedly to Vale during the joint venture due diligence process so as to hide all indications of such conduct, thereby inducing Vale to enter into the joint venture and invest significant amounts of money to buy a participation and to fund the joint venture's operations. As a result of the alleged misconduct, BSGR also breached warranties given in the joint venture agreements.

298. Vale alleges – with the help of evidence uncovered during this case – that it has been able to trace illicit payments from BSGR to Pentler and its principals, and through them to other agents of corruption, including Mme. Touré and the former Minister of Mines, Mahmoud Thiam.[178]

299. Specifically, Vale claims that BSGR (either itself or through intermediaries, agents or consultants) bribed these individuals, and the President himself, in order to gain their assistance in obtaining mining concessions in Simandou North and South and Simandou Blocks 1 and 2, as follows:

   299.1.   Mme. Touré, the fourth wife of President Conté, who influenced her husband to award mining rights to BSGR. Vale alleges that Mme. Touré received millions of dollars in illicit payments in return for exercising her influence over the President and other officials in BSGR's favour. She also provided access to the President for BSGR. In addition to the payments, she allegedly received a 5.88% indirect interest in BSGR Guinea through Pentler and other gifts, such as two Land Cruisers in July 2008.[179]

   299.2.   Mohammed Thiam, Minister of Mines from 2009-2010. Vale submits that Thiam oversaw key steps in confirming BSGR's rights prior to the signing of the Base Convention granting BSGR the right to exploit Zogota (Simandou South). Vale contends that BSGR bribed Thiam to help "fend off Rio Tinto's challenges to BSGR's newly-acquired rights"[180] and to assist in attracting potential joint venture partners (including Vale). Vale alleges that Thiam helped to induce it to enter into the Framework Agreement and Shareholders Agreement with BSGR by providing assurances that the mining rights had been legally obtained. Vale submitted evidence that BSGR rewarded Thiam for his assistance through (a) the purchase of real estate in the US (funds to acquire a USD 3.75 million property at 771 Duell Road in Dutchess County, New York[181]), (b) reimbursement for travel and (c) payments totalling approximately USD 23,000. According to BSGR's own witnesses these payments "would have been

---

[177] Transcript, Educatory Hearing, Day 2, p. 161, line 18 – p. 162, line 25.
[178] Vale's Statement of Reply, paragraph 4.
[179] Vale's Statement of Reply, paragraphs 594 and 877.
[180] Vale's Statement of Reply, paragraph 878.
[181] Vale's Statement of Reply, paragraph 879.

connected to work that BSGR was doing with Mr Thiam" and indeed "likely" related to BSGR's mining rights;[182] and

299.3.   President Conté was given gifts by BSGR, including:

299.3.1.   a gold watch presented by Oron inlaid with Steinmetz diamonds, which had an approximate value of USD 60,000;[183]

299.3.2.   a miniature Formula 1 car plated in gold and diamonds was presented to President Conté by Struik and another such car had been previously given to Souaré (Minister of Mines) who also gave the car to the President.[184]

## 2.   Fraudulent misrepresentation

300.   According to Vale, much of the alleged corruption was facilitated through intermediaries such as Pentler (a BVI company) sold by Onyx to Noy, Cilins and Lev Ran in 2006. Vale alleges that, during the joint venture due diligence phase, BSGR should have disclosed the role that Pentler and its principals played in obtaining the mining rights but did not do so. In particular:

300.1.   Pentler and its principals should have been disclosed as BSGR's consultants, agents and/or intermediaries.

300.2.   Contracts between BSG entities and Pentler should have been included in the data room. These include the BSGR-Pentler Milestone Agreement, the Shareholders Agreement, the Share Purchase Agreement and the Settlement Agreement.

300.3.   Pentler should have been revealed as the "minority shareholder" of the BSGR Guinea BVI shares that were the subject of the USD 22 million buyback.

300.4.   The assistance Pentler provided in obtaining the mining rights should have been revealed.

301.   Vale alleges that BSGR deliberately hid the role of Pentler by restructuring the BSG Group so as to remove entities from the group that had contracted directly with Pentler. However, Vale contends that the due diligence questions were broad enough to have required BSGR to disclose Pentler's interest in the mining rights (through its shareholding in BSGR Guinea BVI) and the role it played in securing those rights.

302.   Vale also relies on BSGR's direct relationship with Mme. Touré, which it says is evidenced as follows:

302.1.   Avidan stated in his written evidence in this case that he made a point of meeting with Mme Touré on many occasions and contemporaneous emails from Avidan described her as one of the "key people" in Guinea for advancing BSGR's plan to obtain mining rights. This is supported by Mme. Touré's

---

[182] Vale's Statement of Reply, paragraph 878.
[183] Vale's Statement of Reply, paragraphs 351 and 632.
[184] Vale's Statement of Reply, paragraphs 357 and 632.

attendance at many of the key meetings between BSGR and the President of the Republic of Guinea. Vale alleges that Mme. Touré was responsible for arranging many of these meetings.[185]

302.2. Three contracts between BSGR and Mme. Touré (dated 20 June 2007, 27 and 28 February 2008 respectively) which Cilins attempted to get Mme. Touré to destroy in 2013. Vale rejects BSGR's assertions that these contracts were forgeries, and notes that BSGR's records show that it produced company stamps around the time the February 2008 contracts were signed.[186] Vale points out that the contracts were signed in duplicate, which accounts for any discrepancies in the place and date of signing,[187] and that Cilins' efforts to get the contracts destroyed also supports the conclusion that they were genuine.[188]

303. According to Vale, other consultants involved in the alleged corruption included Fofana[189] and Boutros[190]. Vale alleges that both gentlemen assisted in making payments to Mme. Touré for her services in assisting BSGR to gain mining rights in the Simandou. Neither the roles played by these men nor any contracts between them and BSGR entities were disclosed by BSGR during the due diligence phase.

304. Vale submits that other misrepresentations made by BSGR during the due diligence phase included representing that:

304.1. all relevant consulting agreements had been disclosed;

304.2. all relevant documents and information relating to the share capital and ownership had been disclosed;

304.3. all requested contracts, including those incapable of performance within six months of date of entry and contracts otherwise than at arm's length had been disclosed;

304.4. all material settlements and potential litigation had been disclosed;

304.5. no BSGR personnel/shareholder or their families were Government Officials;

304.6. BSGR was not involved in the Government's decision to revoke Rio Tinto's mining rights;

304.7. BSGR had no financial or business relationship with any Government Official or spouse;

304.8. BSGR had not made any payments to Government Officials in connection with obtaining the mining rights; and

---

[185] Vale's Statement of Reply, paragraph 8.
[186] Vale's Pre-Hearing Written Submissions, paragraph 97.
[187] Vale's Statement of Reply, paragraphs 418 and 428.
[188] Vale's Statement of Reply, paragraph 484.
[189] See paragraphs 461-467 for the discussion on whether Fofana provided consulting services to BGSR.
[190] See paragraphs 429-458 for the discussion on whether Boutros provided consulting services to BGSR.

304.9.    BSGR had not engaged in bribery or corruption.

305.    Vale sets out the legal test for fraudulent misrepresentation and addresses each element in turn. Vale emphasises that these misrepresentations were made by BSGR deliberately to hide its corruption and to induce Vale to enter into the joint venture. Vale asserts that it relied on the statements and would not have entered into the joint venture had the relevant information been disclosed. Vale's witnesses confirm that, had the company been made aware of the "red flags" or indicia of corruption that existed, Vale would not have entered into the joint venture regardless of whether corruption had been proven. In this regard, Vale's counsel argued that the Tribunal was not required to make a positive finding of corruption in order for Vale to succeed on its fraudulent misrepresentation claim, [191] it was sufficient that the disclosure of the information would have caused Vale not to enter the joint venture due to heightened risk.

306.    In support of its position, Vale emphasises the importance of the due diligence exercise during the contract negotiation phase of Project Hills. It says that Vale's due diligence was designed to uncover red flags or indicia of bribery and corruption and that Vale insisted that BSGR represent, certify, warrant, and covenant that it had not engaged in bribery or corruption.

307.    Although Vale contends that the Tribunal is not required to make a finding of corruption in order to uphold its causes of action, Vale nonetheless submits that the evidence it has produced is sufficient to satisfy its burden of proving that corruption did occur. In particular:

307.1.    Cilins' conviction in the United States for obstruction of justice, based on recorded conversations with Mme. Touré, where she was asked to destroy incriminating documents and to lie about her association with BSGR.

307.2.    Contracts between Pentler and Mme. Touré and between BSGR and Mme. Touré for the payment of substantial sums of money in return for her assistance in obtaining the mining rights.

307.3.    Witness accounts of Mme. Touré's attendance at meetings regarding the mining rights and her influence over her ailing husband.

307.4.    Records of payments made to Mme. Touré, Pentler and others for which BSGR has provided no plausible explanation. For example, Pentler received around USD 34.5 million from BSGR, which cannot be explained by the limited role BSGR suggests Pentler played in introducing BSGR to the initial opportunity.

308.    Vale requests that, as a result of these fraudulent misrepresentations, the Tribunal rescinds the Joint Venture Agreements and upholds its damages claims.

### 3.    **Breach of Warranty**

309.    BSGR also gave a number of warranties in the Framework Agreement and the SHA which Vale alleges were breached, based on the same facts as those supporting the misrepresentation allegations above. The warranties include:

---

[191] Transcript, Educatory Hearing, Day 2, pp. 145-148.

309.1.   Section 2.1 of Schedule 4 to the Framework Agreement: "The information in [the] [Framework] Agreement, Disclosure Bundle and Disclosure Letter is accurate in all material respects".

309.2.   Section 3.1 of Schedule 4 to the Framework Agreement: "The business of each BSGR Guinea Group Company has been carried out in compliance with all Applicable Law".

309.3.   Section 3.2 of Schedule 4 to the Framework Agreement: "no BSGR Guinea Group Company is aware of the existence of circumstances which represent a real threat that any Relevant Permit […] is likely to be revoked".

309.4.   Section 3.5 of Schedule 4 to the Framework Agreement: No corrupt payment was made to a Government Official.

309.5.   Section 3.6 of Schedule 4 to the Framework Agreement: No violation of the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions was committed.

309.6.   Section 4.2 of Schedule 4 to the Framework Agreement: "No litigation [or other proceedings] are threatened or pending by or against any BSGR Guinea Group Company […] which would adversely affect any BSGR Guinea Group Company in the performance of its obligations under [the] [Framework] Agreement".

309.7.   Anti-corruption warranties contained in Section 16.1 of the SHA.

## 4.   Frustration

310.   Finally, Vale submits it is entitled to a declaration that the joint venture agreements have been frustrated because of the revocation of VBG Guinea's mining rights, and that it is entitled to recovery from BSGR of monies paid under those arrangements. Vale argues that since the mining rights have been revoked, it is no longer possible for the joint venture agreements to be fulfilled, through no fault whatsoever of Vale. It suggests those agreements are therefore frustrated, relieving Vale of any further obligations it would have under them and entitling Vale to recovery of monies paid to date by Vale thereunder.

## 5.   Response to BSGR's Defences

311.   Vale makes a number of submissions in relation to BSGR's defences:

311.1.   Vale addresses BSGR's submission that it was under no duty to disclose Pentler because of the limited scope of Vale's due diligence requests, that it was indeed advised not do so to by its legal counsel (Skadden Arps) and that in any case Pentler was implicitly disclosed. Vale asserts that BSGR not only failed to disclose the existence of Pentler, but also took affirmative steps to hide any connection between itself and Pentler or its principals.[192] Vale also submits that BSGR's reliance on Skadden Arps' alleged advice was not credible.[193] It

---

[192] Vale's Pre-Hearing Written Submissions, paragraphs 143-155.
[193] Vale's Pre-Hearing Written Submissions, paragraphs 156-157.

suggests BSGR's claim that Pentler was "disclosed" implicitly further evidences BSGR's obfuscation.[194]

311.2.   Vale submits that BSGR failed to produce any evidence suggesting a legitimate reason for granting Pentler a 17.65% interest in the mining rights, let alone making a payment of such a large sum for that interest.[195]

311.3.   Vale submits that BSGR's arguments regarding Mme. Touré's lack of credibility are meritless. Vale has provided evidence in support of its assertion that Mme. Touré has not profited from testifying in the US Department of Justice criminal investigation.

311.4.   Vale asserts that BSGR's "internal investigations" expose rather than disprove BSGR's involvement in corruption. The investigations were "deeply flawed" as they were commissioned by BSGR and the investigators were on BSGR's payroll.[196]

## 6.   Quantum

312.   Vale's claim for the recovery of USD 1.45 billion is based on the following breakdown of costs and monies paid:[197]

312.1.   USD 500 million paid for a 51% participation in the joint venture;

312.2.   USD 781 million in loans provided to VGB as operating funds (this includes loans totalling approximately USD 581 million, plus interest of USD 199 million as at 29 April 2014);

312.3.   USD 85.4 million to fund the feasibility study;

312.4.   USD 80.5 million costs relating to personnel, travel, services, and other costs incurred by Vale to support the joint venture's operations outside of Guinea in 2010-2013.

313.   Vale provided the above funding through its indirect subsidiary company Vale International SA incorporated in Switzerland. The shares in VBG were held by Vale's direct subsidiary, Vale GmbH. Vale provided the funding pursuant to its obligations under the Framework Agreement which specifically authorised Vale to provide the funds through a subsidiary if it so chose.

## B.   Respondent's Position

314.   BSGR refutes Vale's allegation that it engaged in bribery or corruption, or any wrongdoing whatsoever, in connection with obtaining the Simandou mining rights. BSGR asserts that the Republic of Guinea lawfully granted BSGR mining rights to Simandou North and South and Blocks 1 and 2. The withdrawal of these rights was brought about by the establishment of a new Mining Code introduced by the newly elected President

---

[194] Vale's Pre-Hearing Written Submissions, paragraphs 158-162.
[195] Vale's Pre-Hearing Written Submissions, paragraphs 163-167.
[196] Vale's Pre-Hearing Written Submissions, paragraphs 171-175.
[197] Vale's Statement of Reply, paragraph 318.

Condé and facilitated in part by extortion attempts launched against BSGR, as well as Vale's decision to back out of the joint venture at a critical moment.

### 1.   Response to Vale's Allegations

315.   In response to Vale's claim of fraudulent misrepresentation, BSGR denies that its responses during the due diligence phase of Project Hills were inadequate, stating that there is no basis for the allegation that its representations were false, let alone fraudulently so. BSGR denies any ill-motive in selling a participation in its mining rights to Vale, instead claiming that, as a small entity, it was in need of funding, and Vale was incentivised to buy in order to challenge Rio Tinto's holdings at the time.

316.   BSGR sets out its reasons for not disclosing Pentler, or the roles played by Cilins, Noy, Lev Ran and Boutros, of whom BSGR argues were not "intermediaries", "agents" or "consultants" to BSG Group companies, as defined in the relevant questionnaires.[198] BSGR acknowledges that Fofana was a consultant and should have been disclosed, but says that the non-disclosure was inadvertent.

317.   BSGR also asserts that it did not take steps to hide Pentler's shareholding (as Vale suggests), and that its changes to the ownership structure had nothing to do with concealing Pentler.[199] BSGR argues that the questions put to it during the due diligence phase did not require it to disclose Pentler's former shareholding in BSGR Guinea BVI or the various agreements between BSGR Steel and BSGR Guinea BVI and Pentler.[200] BSGR notes that it did reveal the $22 million payment to Pentler as minority shareholder.[201] Lastly, BSGR asserts that, contrary to Vale's submissions, the award and buyback of Pentler's shareholding in BSGR Guinea BVI was commercially reasonable. According to BSGR, the allegation that the award of the shareholding and its subsequent buyback made no commercial sense is contradicted by expert evidence, and that the factual evidence shows that the buyback of Pentler's shareholding was reasonable – hence, Vale had originally expressed no concerns when it first discovered the payment.[202]

318.   BSGR disputes Vale's account of the factual background. In particular, it denies any significant association with Mme. Touré and asserts that the affidavit she provided to the Technical Committee was false.[203] BSGR categorically denies bribing Mme. Touré either directly or through Pentler.[204] BSGR distances itself from any relationship that Pentler may have had with Mme. Touré, stating that this involved other business interests quite separate from BSGR. It similarly distances itself from Pentler's MoU with Bah and I.S. Touré and Pentler's MoU with Daou.[205] Finally, BSGR alleges that the three contracts between BSGR and Mme. Touré's company (Matinda), adduced as evidence of bribery

---

[198] See BSGR's Statement of Rejoinder, paragraphs 32-61.
[199] See BSGR's Statement of Rejoinder, paragraphs 62-70.
[200] BSGR's Statement of Rejoinder, paragraph 71.
[201] BSGR argues that Vale's characterisation of Pentler as a minority shareholder to be disclosed is inaccurate (BSGR's Statement of Rejoinder, paragraph 74).
[202] BSGR's Statement of Rejoinder, paragraphs 75-86.
[203] BSGR's Statement of Rejoinder, paragraph 245.
[204] For a summary of BSGR's submissions on Vale's bribery case, see BSGR's Statement of Rejoinder, paragraphs 205-209.
[205] BSGR's Statement of Rejoinder, paragraphs 115-116.

before the Technical Committee, were forgeries and that it had never entered into any such contracts.[206]

319. On BSGR's case, it had direct access to President Conté and did not need the assistance of Mme. Touré or I.S. Touré in this regard.[207] BSGR asserts that it obtained the mining rights in the Simandou area on its own merit, and its small size meant it could act quickly and decisively in developing the mining sites.[208] BSGR's commitment to building a trans-Guinean railway (from Conakry to the Eastern Guinean city of Kankan) also served as valuable consideration and made it an attractive proposition for the GoG.[209] It was for these reasons that the GoG decided to award BSGR the mining rights in the Simandou – not because of any misconduct.

320. BSGR contends that Vale exaggerated the importance of the due diligence and other steps it allegedly took to ensure the mining rights in question had been obtained lawfully, and that in any event BSGR was obliging and honest in regard to these processes because it felt it had nothing to hide. BSGR conducted the due diligence process in good faith. BSGR also submits that documents were provided quickly and that Yossie Tchelet ("**Tchelet**") (Chief Financial Officer of BSGR) ensured Vale had unfettered access to all documentation in the BSGR Guernsey office (the agreed upon scope of the due diligence), which included documents relating to Pentler.[210] BSGR says that it relied on its legal advisers, Skadden Arps, who advised that Pentler did not have to be disclosed.[211]

321. BSGR's position is that the GoG's withdrawal of BSGR Guinea's Simandou mining rights was without foundation. Because of BSGR's refusal to agree to the President's demand that it pay the Government USD 1.25 billion, the GoG decided to expel BSGR from the Simandou area.[212] BSGR points out that other companies paid the "bribe" and were not expelled. In addition, President Condé had promised to grant lucrative mining rights to his political backers in return for their assistance in rigging the 2010 President election. BSGR surmises that President Condé needed assets with which to reward these political backers.[213]

322. According to BSGR, Vale used BSGR to gain access to Simandou and then tried to shake off the joint venture. BSGR submits that there is a strong body of evidence from Vale's disclosure demonstrating that Vale treated the joint venture as a last resort, having tried and failed "to get a slice of the Simandou action through other means".[214] BSGR suggests that it was always Vale's intention to enter into the arrangement to secure rights in Simandou, and then push BSGR out.

---

[206] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[207] Although BSGR states that I.S. Touré was "of occasional assistance in arranging meetings with government officials" (BSGR's Statement of Rejoinder, paragraph 95).
[208] BSGR's Statement of Defence, paragraph 25.
[209] BSGR's Statement of Defence, paragraph 87.
[210] BSGR's Statement of Rejoinder, paragraphs 3-5.
[211] BSGR's Statement of Rejoinder, paragraphs 25-28.
[212] BSGR's Statement of Defence, paragraphs 9 and 130.
[213] BSGR's Statement of Rejoinder, paragraph 246.
[214] BSGR's Statement of Rejoinder, paragraph 18.

323. With regard to the Pentler contracts, BSGR submits that Pentler was a legitimate shareholder in BSGR Guinea BVI between 2006 and 2008. BSGR submits that its role was a valuable one, and thus it was paid a fair sum for its shares when it was inevitably bought out by BSGR.[215]

324. BSGR denies any corruption, and asserts that Mme. Touré's affidavit is "demonstrably false",[216] that she had motivation to lie about her encounters with Cilins, and that, in any case, Mr Cilins acted on his own accord.[217] According to BSGR, its inability to cross-examine Mme. Touré is a serious impediment to the persuasiveness of her evidence and indicative of Vale's own mistrust of her as a reliable witness.

325. BSGR refutes the allegation that it bribed Thiam (Minister of Mines in 2009–2010). It contends that Vale's evidence relating to the bribery of Thiam is speculative, and that evidence adduced from Government officials on the part of Vale is both irrelevant and biased (because such individuals are likely linked to President Condé's Government, BSGR's opponent in the ICSID proceedings).[218] BSGR states that Thiam acted properly in upholding BSGR's rights to Blocks 1 and 2 and that Thiam did not make payments on behalf of BSGR.[219] Thiam's limited involvement with BSGR (namely, his involvement in the joint venture negotiations and in BSGR's defence strategy) was in his own interests or in the interests of Guinea. BSGR says that it did not reward him in any way and that its continuing relationship with Thiam after his tenure as Minister of Mines ended is not evidence of any misconduct.

326. BSGR asserts that it always followed appropriate payment approval processes. The gifting of a miniature Formula 1 car in a very public setting to Souaré (Minister of Mines 2006) provides no basis for Vale's allegation of BSGR's "broader pattern of bribery".[220] BSGR's investigations (namely, Daniel Pollak's 2012 review and the Freeh-Lieberman Report) were instigated in good faith, and not, as Vale alleges, mere "whitewash".[221]

327. BSGR refutes Vale's submission that Steinmetz had ultimate control over BSGR and knew of the alleged corruption. BSGR states that Steinmetz was an advisor to BSGR, but was not an employee or director and had no control over the entity.[222] Steinmetz says that he did not travel to Guinea until 2008.[223]

## 2. Response to allegation of fraudulent misrepresentation

328. In relation to the Vale's claim for rescission and damages as a result of fraudulent misrepresentation, BSGR denies that any such misrepresentations were made:

328.1. BSGR provides analysis for each representation made by BSGR, arguing that, when read in context, many of the statements are far from fraudulent, or even false. In cases where incorrect statements were provided, for example the

---

[215] BSGR's Statement of Defence, paragraphs 33-34.
[216] BSGR's Statement of Defence, paragraph 215.
[217] BSGR's Statement of Defence, paragraph 223.
[218] BSGR's Statement of Rejoinder, paragraphs 9-10.
[219] BSGR's Statement of Rejoinder, paragraphs 159-161.
[220] BSGR's Statement of Rejoinder, paragraph 197.
[221] BSGR's Statement of Rejoinder, paragraph 198.
[222] BSGR's Statement of Rejoinder, paragraphs 181-187.
[223] BSGR's Statement of Rejoinder, paragraph 191.

         failure to disclose Fofana's role as a consultant, this was an inadvertent mistake and not sufficient to constitute a fraudulent misrepresentation. BSGR honestly believed that what it asserted was true.[224]

328.2.    BSGR reiterates that what is being represented must be fact, and not belief or opinion. BSGR provides legal authorities confirming that silence will not support an action for deceit and that the alleged representations must be precisely identified.[225]

328.3.    BSGR submits that Vale has failed to establish that BSGR knew the representations were false. Vale cannot simply assert that BSGR's "dishonesty is self-evident". BSGR asserts, with legal authorities, that:

        328.3.1.    there is no liability where an agent did not have knowledge that the statement was false (but does not state which misrepresentations this assertion would be applicable to);

        328.3.2.    a higher standard of proof than the normal "balance of probabilities" needs to be met. There is no English authority to support Vale's suggestion that this standard should shift from Vale to BSGR; and

        328.3.3.    adverse inferences should not be drawn in favour of Vale.[226]

328.4.    BSGR submits in any case that Vale did not rely to the necessary degree on the representations. Even if the representations were shown to be false, Vale would have gone ahead with the joint venture anyway because it wanted access to the Simandou deposits.[227] BSGR refutes the legal authorities provided by Vale on this point, saying that Vale has misconstrued the cases, which suggest that the defendant's intention is relevant (and that in any case BSGR's intent to deceive has not been made out). BSGR contends that actual reliance must be shown by Vale and it is not sufficient for Vale to assert that, had it known the truth it would not have entered into the contracts.[228]

328.5.    To show reliance, BSGR asserts that Vale must prove that the representations played a causative part in inducing the contract - "the question of reliance is to be decided by asking whether the Claimant would have entered into the contract but for the misrepresentation being made, not but for the misrepresentation having been false".[229] BSGR also argues that Vale is contractually estopped from arguing actual reliance on BSGR's alleged misrepresentations, because s 17.3(b) of the SHA holds that "representations" made by either party were superseded by the Agreement.[230]

328.6.    Finally, BSGR submits that Vale's loss was not caused by its reliance on the alleged misrepresentations, but by the GoG's political investigation and

---

[224] BSGR's Statement of Defence, paragraph 245.
[225] BSGR's Statement of Rejoinder, paragraph 273.
[226] BSGR's Statement of Rejoinder, paragraphs 308-363.
[227] BSGR's Statement of Defence, paragraph 251.
[228] BSGR's Statement of Rejoinder, paragraph 388.
[229] BSGR's Statement of Rejoinder, paragraph 393.
[230] BSGR's Statement of Rejoinder, paragraph 417.

revocation of the rights, which had nothing to do with whether Vale relied on the representations or not.[231]

### 3. Vale's Requests for Relief

329. In terms of remedies for misrepresentation, BSGR submits that Vale must elect either rescission and damages for fraudulent misrepresentation, or damages for breach of warranty.[232] In respect of Vale's claim for rescission, BSGR suggests such a remedy cannot be ordered because it is not possible to restore the parties to the position that they were in prior to the joint venture. BSGR would be unjustifiably worse off if the Agreements were rescinded because it no longer holds the mining rights.[233]

330. In respect to Vale's claim for damages, BSGR contends that the correct measure of damages is the loss directly flowing from the representee's reliance on the allegedly false statements. Vale's claim is therefore inappropriate, as the losses claimed by Vale were not directly caused by the transaction, but by the GoG's decision to withdraw its mining rights.[234] As to Vale's wasted costs claim (to the amount of USD 779,184,381.21), BSGR says that to grant this sum would be premature because Vale may still seek to be further involved in mining activities in Guinea, in which case funding spent on the Feasibility Study will not have gone to waste.[235]

331. Finally, BSGR contends that Vale failed to mitigate its losses.[236]

332. In relation to specific amounts claimed, BSGR disputes the amounts as follows:

332.1. Regarding capital equipment, BSGR says that Vale has failed to prove exactly what capital equipment was purchased. BSGR makes a similar evidentiary objection in relation to Vale's claim for personnel costs it says it incurred in Brazil.[237] These costs included those relating to a Swiss-based employee that Vale made available to the joint venture through a subsidiary – Vale International SA.

332.2. BSGR asserts that Vale's compound interest claim "is wrong as a matter of English law".[238]

### 4. Warranties

333. BSGR refutes Vale's claim that the warranties provided in the Framework Agreement were untrue:

333.1. BSGR says that Vale "goes on" at length to explain why the warranties were "untrue", yet it is unable to demonstrate, beyond broad unsupported assertions,

---

[231] BSGR's Statement of Defence, paragraph 252.
[232] BSGR's Statement of Defence, paragraph 255.
[233] BSGR's Statement of Defence, paragraph 257; BSGR's Statement of Rejoinder, paragraph 428.
[234] BSGR's Statement of Defence, paragraph 265.
[235] BSGR's Statement of Defence, paragraphs 266-267.
[236] BSGR's Statement of Defence, paragraph 269.
[237] BSGR's Statement of Rejoinder, paragraphs 458-459; BSGR's Statement of Defence, paragraphs 266-268.
[238] BSGR's Statement of Rejoinder, paragraph 464.

that BSGR was aware that any such matters were false, and that this is a "glaring omission in its case".[239]

333.2. BSGR considers each warranty in its context and interprets the wording differently from Vale in order to refute Vale's allegations of breach. For instance, BSGR notes that some warranties went to future conduct (and that Vale's allegations are historical in nature), or that the warranty included the phrase "as far as BSGR is aware" and therefore the warranty was true at the time it was made.[240]

334. Regarding remedies, BSGR submits that the purpose of damages in this instance would be to put Vale in the position it would have been in had the warranty been true, a notion that does not support Vale's claim for "lost expenditures" amounting to USD 1.45 billion. BSGR says that Vale cannot recover damages for wasted expenditure because these amounts would not have been recouped had the contract been performed given Vale's conduct which BSGR alleges led to all Liberian Transport Solution prospects being cut off.[241] BSGR also argues that Vale failed to mitigate its losses.[242]

## 5. **Frustration**

335. Finally, BSGR argues that a declaration of frustration is not an available remedy in this case. BSGR contends that the joint venture agreements were not frustrated because Vale has failed to make out bribery[243] and because, in any case, the *force majeure* clause in the Framework Agreement clearly anticipated present events.[244] BSGR also contends that it was foreseeable that a subsequent Guinean President might expropriate the mining rights – this being a risk that both parties took in contracting for those rights.[245] BSGR argues that any remedy under this head should be limited to the consideration paid directly to BSGR under the joint venture agreement.[246]

336. Ultimately, BSGR requests the Tribunal to dismiss Vale's claims and award BSGR all costs, plus interest in BSGR's favour.

## 6. **BSGR's Counterclaims**

337. BSGR advances a number of counterclaims pursuant to which BSGR claims damages flowing from Vale's numerous alleged breaches of the joint venture agreements.

337.1. Vale failed to take steps to resist the GoG's withdrawal of the mining rights[247] and failed to join the ICSID action against the GoG. More specifically, BSGR alleges that Vale breached its contractual obligations when it (i) failed to act in good faith and to promote the best interests of VBG; (ii) failed to exercise Vale's powers so as to give effect to the provisions of the joint venture agreements; (iii)

---

[239] BSGR's Statement of Rejoinder, paragraph 465.
[240] BSGR's Statement of Rejoinder, paragraphs 466-485.
[241] BSGR's Statement of Defence, paragraph 306.
[242] BSGR's Statement of Rejoinder, paragraphs 504-511.
[243] BSGR's Statement of Defence, paragraph 319. See also BSGR's Statement of Rejoinder, paragraphs 512-519.
[244] BSGR's Statement of Defence, paragraph 320.
[245] BSGR's Statement of Defence, paragraph 321.
[246] BSGR's Statement of Rejoinder, paragraph 525.
[247] BSGR's Statement of Defence, paragraphs 326-343.

failed to take reasonable and necessary steps to carry out the intended purpose of the joint venture agreements; and (iv) failed to enforce Vale's rights against a third party.

337.2. Vale refused to pursue the Liberian Transport Solution, which was obviously in the best interests of VBG and necessary for the joint venture to succeed.[248] Refuting Vale's assertion that there is no causal connection between the LTS and the revocation of mining rights, BSGR asserts that it need not show that the GoG would not have revoked the mining rights but for Vale's breach of contract, because the GoG was acting as a third party when it made this decision. It is sufficient to show that there was a chance that the rights would not have been revoked had Vale's breach of contract not occurred. BSGR submits that, had the LTS been approved, the GoG would have been under significant diplomatic pressure not to interfere with VBG's mining rights as they were to allow profits to flow to Liberia as agreed.[249]

337.3. Vale failed to comply with the Anti-Bribery Laws Solution ("**ABL Solution**"), a contractual mechanism intended to bring the parties together to find answers in the event of problems arising.[250] BSGR says that the ABL Solution was more comprehensive and even-handed than simply providing a right for Vale to dispose of its shares.[251]

337.4. Finally, Vale failed to comply with notice provisions and instead commenced proceedings just five days after the mining rights were revoked.[252] In response to Vale's suggestion that BSGR had waived any right to object, BSGR contends that it did object at the first reasonable opportunity and therefore that it did not waive the provision.[253]

338. BSGR also asks the Tribunal to declare that Vale is prohibited from participating in any tender for Simandou Blocks 1 and 2 because, amongst other reasons, English law prevents third parties to proceedings (in this case the ICSID proceedings) from taking action that would destroy the subject matter of the proceedings.[254]

339. As noted in paragraph 144 above, BSGR did not pay its share of the deposit funds for the arbitration to the LCIA. The LCIA wrote to BSGR on 16 March 2017 stating that, in accordance with Article 24.4 of the LCIA Rules, BSGR's counterclaims would be treated as withdrawn. For this reason, the Tribunal does not need to address the Counterclaims in this Award.

340. After a review of the Parties' respective positions, the Tribunal now moves to its discussion and analysis regarding Vale's claims. As indicated in paragraph 296 above, Vale indicated at the September 2016 Hearing that its prayers for relief were alternative to each other and suggested that the Tribunal first deal with its prayers for relief regarding fraudulent misrepresentation, then, if necessary, those regarding breach of warranty and,

---

[248] BSGR's Statement of Defence, paragraphs 344-348.
[249] BSGR's Statement of Rejoinder, paragraphs 581-598.
[250] BSGR's Statement of Defence, paragraphs 349-359.
[251] BSGR's Statement of Rejoinder, paragraphs 599-615.
[252] BSGR's Statement of Defence, paragraphs 370-373.
[253] BSGR's Statement of Rejoinder, paragraphs 625-636.
[254] BSGR's Statement of Rejoinder, paragraphs 616-623.

finally (but again, only if necessary), those based on frustration. The Tribunal will follow the ranking of Claimant's prayers for relief and, after discussing a preliminary jurisdictional issue (section V) below, in section VI of this Award deal with fraudulent misrepresentation, in part VII with breach of warranty and in section VIII with frustration.

## V.  PRELIMINARY JURISDICTION ISSUE

341.  Before turning to consider Vale's claims in this arbitration, the Tribunal addresses a preliminary jurisdictional point raised by BSGR in its counterclaims. Although BSGR's counterclaims have been treated as withdrawn (see paragraph 144 above), the Tribunal considers that it should nonetheless address this particular claim as it goes to the Tribunal's jurisdiction.

342.  BSGR has alleged that Vale failed to comply with the notice provisions in the SHA by commencing proceedings just five days after the mining rights were revoked.[255] Section 12 of the SHA states as follows.

> **Section 12. Dispute Resolution**
>
> In the event that either Party, acting reasonably, forms the view that the other Party has caused a material breach of the terms of any of the Ancillary Agreements or a breach of this Agreement or the Framework Agreement, then the Party that forms such a view <u>shall serve notice of the alleged breach on the other Party and both Parties shall work together in good faith to resolve any such alleged breach within 30 Business Days</u> of such notice and if any such alleged breach <u>is not so resolved, then a senior executive of each Party shall in good faith attempt to resolve any such alleged breach within the following 20 Business Days</u> of the referral of the matter to the senior executives. If no resolution is reached with respect to any such alleged breach in accordance with the procedures contained in this Section 12, then such matter will be referred to arbitration in accordance with Section 17.10. [emphasis added]

343.  At the outset, it is noted that the requirement to negotiate before commencing arbitration is found only in the SHA. It is not part of the arbitration clause which is contained in Section 17 of the SHA, but nonetheless features in the Section 12 "Dispute Resolution" clause and is therefore applicable to the Parties. The same provision has not been included in Section 16.10 of the Framework Agreement (as set out in paragraph 24 above). However, the clause states that it applies to disputes arising under the Framework Agreement as well as the SHA, therefore the Tribunal will consider the issue.

344.  Vale contended that BSGR had waived any right to object to jurisdiction by failing to object promptly and by participating in the proceedings.[256]  BSGR maintained that it raised its objection at the first reasonable opportunity (in its response to the request for arbitration) and therefore that it did not waive its right to object on the ground of non-compliance with Section 12.[257]

345.  Vale also initially argued that Section 12 was unenforceable for lack of certainty.[258] Vale did not pursue that argument in its Rejoinder to the Counterclaims, but reiterated that it

---

[255] BSGR's Statement of Defence, paragraphs 370-373.
[256] Vale's Statement of Reply, paragraphs 1095-1096.
[257] BSGR's Statement of Rejoinder, paragraph 636.
[258] Vale's Statement of Reply, paragraph 1092.

complied with the clause.[259]  The Tribunal has reviewed the evidence which Vale relies on in support of its submission and sets out its own analysis below.

345.1.  During the early stages of the Technical Committee's investigation, there was a series of letters between the parties urging co-operation and discussing the way forward.[260] However, the Tribunal notes that no formal allegation of breach of contract was contained in these communications.

345.2.  However, by April 2013, both parties had involved lawyers and a further series of letters were exchanged between April and July 2013 which contained allegations of breach. Vale repeatedly asks BSGR to explain what happened in relation to the corruption allegations that had been raised by the Technical Committee and in the US proceedings against Cilins. BSGR's response was general denials that it had done anything wrong, but it did not address the specific issues raised by Vale.

345.3.  Specific details of these letters are set out below.

345.3.1.  A letter from Cleary Gottlieb, on behalf of Vale, dated 19 April 2013, states:[261]

> "BSGR has repeatedly assured our client Vale, both in representations and warranties in the Framework Agreement and since that time... that BSGR did not engage in any bribery ... The statements in the criminal complaint [against Cilins] are directly at odds with these representations and assurances.
>
> It is essential ... that BSGR promptly provide Vale with answers to the following questions regarding its activities ... [4 questions posed]
>
> The matters alleged in the criminal complaint, if accurate, would constitute breaches inter alia, of the representations made by BSGR in ... the Framework Agreement and... would constitute fraudulent misrepresentation and deceit by BSGR.  It is therefore necessary that BSGR promptly address these matters, or Vale may be constrained to take action to protect its legal rights..."

345.3.2.  Skadden Arps responded on behalf of BSGR on 22 April 2013 with a short two paragraph letter stating that BSGR acknowledges the seriousness of the allegations against Cilins and that it has "stated publicly and to Vale that allegations of fraud ... are entirely baseless ... Accordingly, any action by Vale to protect its legal rights would be unnecessary and unfounded."[262]  The letter did not refer or respond to any of the specific questions posed by Vale in its previous letter.

345.3.3.  Cleary Gottlieb replied on 23 April 2013 notifying BSGR that it had received a grand jury subpoena in the Cilins case and to formally notify BSGR "of potential Third Party Claims ... that will or are likely to result in

---

[259] Vale's Statement of Rejoinder on Counterclaims, paragraphs 148-149.
[260] Email from P. Rodrigues to A. Avidan et al., 26 November 2012, **C-188**; Letter from G. Chaim (Vale) to BSGR & VBG Guinea, 27 December 2012, **C-190**; Emails between A. Avidan, P. Rodrigues and C. Torres, 14-22 November 2012, **C-676**.
[261] Letter from Cleary Gottlieb to Skadden, 19 April 2013, **C-154**.
[262] Letter from Skadden to Cleary Gottlieb, 22 April 2013, **C-155**.

claims for breach of warranties under ... the Framework Agreement, and related claims".[263]

345.3.4.     Cleary Gottlieb wrote again on 7 June 2013 referring to BSGR's statements to the Technical Committee that certain documents were forgeries and of past attempts to blackmail BSGR.[264] The letter stated that it was "inexplicable" that BSGR had not previously informed Vale of these matters (including in response to Vale's 19 April letter) or raised them with the Technical Committee earlier, so as to dispel the allegations of corruption. Cleary Gottlieb reasserted the potential breach of warranty claims and reserved all Vale's rights.

345.3.5.     On 18 June 2013, Skadden Arps responded noting that Vale was "setting up a position for dispute" and defended its previous actions before the Technical Committee and in relation to Vale. It stated "BSGR has made (and continues to make) every effort to cooperate with your client... we would urge you to adopt a more constructive approach".[265]

345.3.6.     By letter dated 20 June 2013, Cleary Gottlieb reiterated Vale's "deep concern" that BSGR had never informed it of the allegedly fraudulent documents.[266] The letter stated that BSGR had still not responded to the questions posed in its letter of 19 April 2013 and that "Vale is entitled to specific answers to its questions", not just broad denials of wrongdoing. The letter concluded that "BSRG's response to Vale and its treatment of this matter remain highly unsatisfactory. Vale continues to reserve all of its rights..."

345.3.7.     Skadden Arps responded on 4 July 2013 stating at the end of its letter:[267]

> "Our client has sought to create an open and constructive dialogue with you in order to keep you informed of the CTRTCM's "review process". You have simply frustrated that and, given your stance, we do not see the utility of corresponding further on these issues."

345.3.8.     Finally, on 21 February 2014, Cleary Gottlieb wrote to Skadden Arps with reference to the proceedings against Cilins and the clear link to BSGR that has emerged from that evidence.[268] The letter states:

> "Despite many months of asking, we have yet to receive any convincing explanation on this subject. Accordingly, our client continues to reserve all of its rights with respect to potential breaches of the Framework Agreement and the Shareholders Agreement and fraudulent misrepresentations by BSGR in connection with its entry into those agreements."

---

[263] Letter from Cleary Gottlieb to Skadden, 23 April 2013, **C-156**.
[264] Letter from Cleary Gottlieb to Skadden, 6 June 2013, **C-157**.
[265] Letter from Skadden to Cleary Gottlieb, 18 June 2013, **C-158**.
[266] Letter from Cleary Gottlieb to Skadden, 20 June 2013, **C-159**.
[267] Letter from Skadden to Cleary Gottlieb, 4 July 2013, **C-160**.
[268] Letter from Cleary Gottlieb to Skadden, 21 February 2014, **C-164**.

346.    There are a number of other instances where the Parties and their related entities correspond on these matters, but the sequence of letters detailed above is the most directly relevant to whether the Section 12 obligation has been clearly fulfilled.

347.    Based on these letters, the Tribunal finds that:

347.1.  Although Section 12 of the SHA was not specifically referenced in any of these letters, the sequence of letters between the Parties (through their lawyers) fulfil Vale's obligation under Section 12 of the SHA to "serve notice of the alleged breach" and to "work together in good faith to resolve" the dispute.

347.2.  Vale's letters expressly state the alleged breaches giving rise to the potential dispute, as required by Section 12.

347.3.  Through these letters, the Parties engaged in discussion to try to resolve the dispute and put forward their own respective positions in relation to the dispute (including requests for more information). Both Parties eventually alleged that the other did not participate in the process in a satisfactory manner (while defending their own conduct). BSGR eventually abandoned the discussions.

347.4.  Although both Parties alleged at the time that the other Party was not engaging in the process satisfactorily, there is nothing in the letters that would justify a finding that Vale did not engage in discussions in "good faith" and was therefore in breach of the Section 12 requirements (and not entitled to commence the arbitration). The Tribunal considers that Vale's request for more specific information was a genuine attempt to resolve the concerns that had arisen regarding corruption. In its Rejoinder on the Counterclaims, Vale stated:[269]

> "BSGR complains that this correspondence did not "resolve" the dispute. If that is its concern, the point is acknowledged – Vale could do nothing further to "work together," much less "resolve" this dispute with BSGR given the extensive evidence of its corruption, combined with BSGR's blanket denials of those facts without any attempt to provide explanations."

347.5.  The letters described in paragraph 345 above were exchanged over a period of 11 weeks. The Tribunal is therefore satisfied that they fulfil the requirement of engaging in discussion for 50 working days (being 30 working days, plus 20 working days at senior executive level).

347.6.  Given the gravity of the allegations and the vast amounts of money which were at stake (which Vale had paid and BSGR received), as well as the fact that the letters were being written by partners in top international law firms, the Tribunal is satisfied that senior executives from both sides would have been involved in this process for the entire duration. Thus, the requirement to escalate the dispute to senior executives after 30 days was met. Failing an amicable settlement at executive level though the Parties' lawyers, Vale was entitled to institute arbitration proceedings immediately after the revocation of the mining rights by the GoG.

---

[269] Vale's Statement of Rejoinder on Counterclaims, paragraph 148.

348. Finally, the Arbitral Tribunal does not read the language of Section 12 of the SHA as constituting a condition precedent preventing the institution of arbitration proceedings if the various steps of the multitier clause are not met. Rather, it interprets Section 12 as a roadmap for the Parties in case of a dispute outlining the steps to be followed to manage a dispute without elevating this dispute management technique to the level of a legally binding condition precedent affecting the admissibility of a claim or the jurisdiction of the Tribunal. This view is supported by the fact that Section 12 sits outside of the Arbitration Agreement found in Section 16 of the Framework Agreement and Section 17 of the SHA. In addition, Section 12 refers only to breach of contract and does not encompass Vale's causes of action based on fraudulent misrepresentation and frustration.

349. Based on the above analysis, the Tribunal finds that Vale complied with the requirements of Section 12 of the SHA and dismisses BSGR's allegation in this regard.

## VI.   FRAUDULENT MISREPRESENTATION

### A.   Standard of proof

350.   Before considering the individual legal components of the fraudulent misrepresentation, deceit and non-disclosure causes of action, it is appropriate to start by considering the appropriate standard of proof that Vale has to meet in order to succeed in its claims of fraudulent misrepresentation and non-disclosure.

### 1.   The appropriate standard of proof is the "balance of probabilities test", albeit there should be a high evidentiary threshold before the Tribunal finds that BSGR had committed fraudulent activities

351.   Vale submits that the Parties are "agree[d]" that the "standard of proof applied by international arbitral tribunals when evaluating allegations of fraud and corruption is the "balance of probabilities" standard"[270] citing paragraph 346 of BSGR's Rejoinder.

352.   However, having read BSGR's Rejoinder, it is not clear to the Tribunal that agreement has been reached. In paragraph 346, BSGR states that "it is clear that the standard of proof to be applied to deceit claims, *in English law*, is the balance of probabilities". However, BSGR then goes on to state that "it is the common practice of arbitral tribunals to apply a higher standard of proof than the normal "balance of probabilities" in claims concerning fraud and other dishonesty".[271] The Tribunal considers this to be incorrect. While there is controversy as to a higher standard of proof in investment arbitrations, the standard of proof in English law in comparable cases involving serious allegations is that set out by the House of Lords in *Re H* [1996] AC 563. In the judgment of Lord Nicolls:

> Where the matters in issue are facts that standard of proof required in non-criminal proceedings is the preponderance of probability, usually referred to as the balance of probability. This is the established general principle. […]. The balance of probability standard means that a court is satisfied that an event occurred if the court considers that, on the evidence, the occurrence of the event was more likely than not. When assessing the probabilities the court will have in mind as a factor, to whatever extent is appropriate in the particular case, that the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should be the evidence before the court concludes that the allegation is established in the balance of probability […]. Built into the preponderance of probability standard is a generous degree of flexibility in respect of the seriousness of the allegation. Although the result is much the same, this does not mean that where a serious allegation is an issue the standard of proof required is higher. It means only that the inherent probability or improbability of an event is itself a matter to be taken into account when weighing the probabilities and deciding whether, on balance, the event occurred. The more improbable the event, the stronger must be the evidence before, on the balance of probability, its occurrence will be established.[272]

353.   Whilst subsequent decisions have on occasions added a slight gloss to the *Re H* test, the general trend of subsequent authorities is to apply the *Re H* test as expressed in the opinions.

---

[270] Vale's Pre-Hearing Written Submissions, paragraph 278.
[271] BSGR's Statement of Rejoinder, paragraphs 357-358 citing *Waughih Elie George Siag and Clorinda Vecchi v The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award (4 May 2009), **RL-143**.
[272] *In Re H. and Others (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563, 586, **RL-121**.

354.  *Re H* establishes that where the allegation is a serious one, the standard remains at all times the civil standard.

355.  However, given the gravity of the allegations raised (in *Re H*, allegations of sexual abuse, or, in the present case, allegations of fraudulent misrepresentation or non-disclosure), the Tribunal requires to be satisfied in accordance with the available evidence that it is cogent and commensurate with the gravity of the allegations.

356.  Put another way, is it more likely or probable than not that the defendant was guilty of fraud in its dealings with Vale and during the Clifford Chance interrogations? As the Court will be more likely than not to find no fraud, the evidence it expects to support a finding of fraud must therefore be somewhat stronger or more cogent – i.e. sufficient to tip the balance from being unlikely in the ordinary course of events to likely, or more probable than not probable.

357.  Although some later House of Lords decisions do put a slight gloss on *Re H* and express the test a little differently, it was made clear by Lord Hoffmann in *Home Secretary v Rehman* [2001] UKHL 47 [55] that the test is as set out in *Re H* that "cogent evidence is generally required to satisfy a civil tribunal that a person has been fraudulent or behaved in some other reprehensible manner. But the question is always whether the Tribunal thinks it more probable than not".[273]

358.  Given the ambiguity and the absence of any confirmation from BSGR, it would be inappropriate for the Tribunal to conclude that the Parties were *ad idem.* Nevertheless, having considered the parties' submissions, it is clear that the applicable standard should be the "balance of probabilities", albeit that "the fact that fraud is a very serious allegation may be relevant to the inherent probabilities of its occurrence, [though] it does not affect the standard of proof".[274] The Parties' dispute is governed by English law, which should inform the applicable standard, particularly in international commercial arbitrations with a London seat. In any event, it makes no difference. After careful examination of the Parties' positions [and the drawing of appropriate adverse inferences (see below)], the Tribunal is satisfied – as set forth below – that the evidence put forth by Vale is sufficient to meet even the "heightened evidential standard" put forth by BSGR.

### 2.  The burden of proof may be shifted in "special circumstances" where appropriate

359.  Since the Tribunal has found – as to which further below – that Vale has satisfied its burden of proof in making good its claims, there is no need to consider whether this is an appropriate situation for shifting the burden of proof.

### 3.  The Tribunal is not precluded from drawing adverse inferences

360.  Given that the allegations of civil fraud and corruption (which are notoriously difficult to prove) are at the heart of the Parties' dispute, it is unsurprising that Vale has sought to rely on numerous adverse inferences which it has requested that the Tribunal order. BSGR resists the drawing of adverse inferences, arguing that adverse references should

---

[273] *Secretary of State for the Home Department v Rehman (AP)* [2001] UKHL 47 [55], **CL-43**.
[274] Lord Mackay of Clashfern (ed), *Halsbury's Laws of England*, vol 76 (5th edn, LexisNexis 2013) [757], **RL-75**.

not be drawn without "strong or [...] more cogent evidence".[275] Each adverse inference that Vale has argued for has been dealt with individually in the following sections as and when they arose. In this section, the Tribunal will simply deal with the Parties' dispute over the principles for drawing adverse inferences.

361.     As a general starting point, it cannot be doubted that the Tribunal has the power to draw adverse inferences wherever appropriate – this is a function of the broad discretion which the Tribunal possesses by virtue of the LCIA Rules 1998, the English Arbitration Act and the IBA Rules on Evidence.

    361.1.     Article 14.2 of the LCIA Rules 1998 states: "Unless otherwise agreed by the parties under Article 14.1, the Arbitral Tribunal shall have the widest discretion to discharge its duties allowed under such law(s) or rules of law as the Arbitral Tribunal may determine to be applicable; and at all times the parties shall do everything necessary for the fair, efficient and expeditious conduct of the arbitration."

    361.2.     Article 34(1) of the English Arbitration Act 1996 states: "It shall be for the tribunal to decide all procedural and evidential matters, subject to the right of the parties to agree any matter".

    361.3.     Article 9.1 of the IBA Rules on Evidence states: "The Arbitral Tribunal shall determine the admissibility, relevance, materiality and weight of evidence."[276]

    361.4.     Article 9.6 of the IBA Rules on Evidence states: "If a Party fails without satisfactory explanation to make available any other relevant evidence, including testimony, sought by one Party to which the Party to whom the request was addressed has not objected in due time or fails to make available any evidence, including testimony, ordered by the Arbitral Tribunal to be produced, the Arbitral Tribunal may infer that such evidence would be adverse to the interests of that Party."

362.     The question therefore is solely a matter of how this discretion should be exercised.

    362.1.     Vale argues that the Tribunal's drawing of adverse inferences against BSGR is justified in light of BSGR's failure to adduce counter evidence where *prima facie* evidence of its involvement in corruption has been produced.[277]

    362.2.     BSGR, on the other hand, argues that these adverse inferences should not be drawn for the following reasons.

        362.2.1.     Since the gravity of a claim in fraud requires stronger or more cogent evidence than would usually be sufficient to satisfy the burden of proof, "[t]he drawing of adverse inferences is not available where

---

[275] BSGR's Statement of Rejoinder, paragraph 361.
[276] Note that paragraph 12 of Procedural Order No. 2 states: "The IBA Rules on the Taking of Evidence in International Arbitration (2010) may be referred to by the Tribunal as guidelines."
[277] Vale's Pre-Hearing Written Submissions, paragraph 284.

such evidence is not put before the tribunal",[278] otherwise the requirement would be undermined.

362.2.2. Vale cites no English law which would allow the drawing of inferences in a fraudulent misrepresentation claim.[279]

362.2.3. Adverse inferences must be specific inferences to specifically pleaded issues whereas Vale's sought-after inferences are of a general nature.[280]

362.3. Vale makes the following points in response.

362.3.1. BSGR's argument that adverse inferences should not be drawn without the Claimant first having provided strong and cogent evidence is "counter-intuitive to the rationale behind the drawing of adverse inferences."[281]

362.3.2. It is clear from *The Commissioners of HMRC v Sunico A/S* (HC) (which was cited by BSGR) that English law allows for the drawing of adverse inferences.[282] There are also numerous arbitral cases where corruption has been found on the basis of "red flags" where direct exculpatory evidence was lacking, such as ICC Case No. 13914, Award of 2008, and *Metal-Tech Ltd v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3 (2013).

362.3.3. Vale *is* indeed requesting the Tribunal to draw adverse inferences in relation to specific issues.

363. Having carefully considered the Parties' submissions, the Tribunal disagrees with BSGR's suggestion that Vale has to present strong and cogent evidence first before adverse inferences can be drawn in its favour. If Vale were able to compile such evidence then it would already have satisfied its burden of proof and would not need to rely on adverse inferences. Such a requirement would therefore defeat the purpose of adverse inferences altogether. To be clear, this does not mean that Vale is relieved from its evidential burden completely. While adverse inferences may be used to strengthen a party's case, they must build on a foundation of existing evidence which may not quite get the party over the line. This in line with the English Court's approach in *Wisniewski v Central Manchester Health Authority* [1998] PIQR 324 (CA), cited in *The Commissioners of HMRC v Sunico A/S* (HC):

(1) In certain circumstances, a court may be entitled to draw adverse inferences from the absence or silence of a witness who might be expected to have material evidence to give on an issue in an action.

(2) If a court is willing to draw such inferences, they may go to strengthen the evidence adduced on that issue by the other party or to weaken the

---

[278] BSGR's Statement of Rejoinder, paragraph 361.
[279] BSGR's Statement of Rejoinder, paragraph 362.
[280] BSGR's Statement of Rejoinder, citing *The Commissioners of HMRC v Sunico A/S* [2013] EWHC 941 [98], **RL-46** (emphasis added).
[281] Vale's Pre-Hearing Written Submissions, paragraph 286.
[282] Vale's Pre-Hearing Written Submissions, paragraph 286.

evidence, if any, adduced by the party who might reasonably have been expected to call the witness.

(3) **There must, however, have been some evidence, however weak, adduced by the former on the matter in question before the court is entitled to draw the desired inference: in other words, there must be a case to answer on that issue.**

(4) If the reason for the witness's absence or silence satisfies the court then no such adverse inference may be drawn.[283]

364. In other words, a case cannot be built solely on adverse inferences. However, in the Tribunal's view, where the body of evidence adduced by Vale is sufficient to establish a *prima facie* evidence of BSGR's corruption, then appropriate adverse inferences may be drawn to strengthen Vale's case. Whether or not this condition has been met has been considered below in the context of the specific adverse inference that is sought.

365. A feature of these arbitration proceedings is that they have been conducted largely by default since September 2016 hearing. In the absence of the BSGR's full participation, the Tribunal has carefully reviewed, as discussed below, any adverse inferences to be drawn from BSGR's failure to cross-examine Claimant's witnesses and expert at the evidentiary hearing of February 2017.

366. Further, the Tribunal also finds that adverse inferences may be drawn in fraudulent misrepresentation claims. This was accepted by Proudman J in *The Commissioners of HMRC v Sunico A/S* (HC) when she stated that "[i]f I do accept HMRC has shown a *prima facie* case to answer, the effect of adverse inferences can be to strengthen that case."[284] In fact, she holds that "[the principles in *Wisniewski v Central Manchester Health Authority*] are especially applicable in cases which raise serious allegations of wrongdoing against a defendant."[285] This approach has been adopted in international arbitrations, as seen in *Metal-Tech Ltd. v. Republic of Uzbekistan*.[286]

367. Finally, the Tribunal notes that the parties are agreed on the existence of a specificity requirement in drawing adverse inferences.[287] Having carefully considered each of the adverse inferences requested by Vale, the Tribunal is satisfied that they have been framed with sufficient detail except as discussed below.

## B. Elements of the tort of deceit

368. Having dealt with the appropriate standard of proof that Vale has to meet, the Tribunal now turns to consider the individual elements of the tort of deceit.

369. The elements of the tort of deceit were summarised by Lord Justice Jackson in the English Court of Appeal:

---

[283] *Wisniewski v Central Manchester Health Authority* [1998] PIQR 324, 340, in *The Commissioners of HMRC v Sunico A/S* [2013] EWHC 941 [91] (emphasis added), **RL-46**.

[284] *The Commissioners of HMRC v Sunico A/S* [2013] EWHC 941 [99], **RL-46**.

[285] *The Commissioners of HMRC v Sunico A/S* [2013] EWHC 941 [92], **RL-46**.

[286] *Metal-Tech Ltd v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award (4 October 2013), **CL-44**.

[287] Vale does not dispute BSGR's argument that adverse inferences must be specific inferences in relation to specific pleaded issues but merely responds that this is "precisely" what Vale is requesting the Tribunal to do (Vale's Pre-Hearing Written Submissions, paragraph 287).

What the cases show is that the tort of deceit contains four ingredients, namely:

(i)    The defendant makes a false representation to the claimant.

(ii)    The defendant knows that the representation is false, alternatively he is reckless as to whether it is true or false.

(iii)    The defendant intends that the claimant should act in reliance on it.

(iv)    The claimant does act in reliance on the representation and in consequence suffers loss.

Ingredient (i) describes what the defendant does. Ingredients (ii) and (iii) describe the defendant's state of mind. Ingredient (iv) describes what the claimant does.[288]

370.    In its Statement of Case, Vale argues that, so long as the Tribunal finds that "bribery or corruption by or on behalf of BSGR occurred (as the evidence shows it did) the legal dominoes fall inexorably in Vale's favour".[289] However, BSGR disputes each of the elements, and so they will have to be taken in turn.

### 1.    The allegation that BSGR made numerous false representations to Vale

371.    During the negotiations prior to the formation of the joint venture, BSGR, at Vale's insistence, provided Vale with multiple representations via eight principal means:

371.1.    BSGR's responses to the Compliance Due Diligence Questionnaire;

371.2.    BSGR's responses to the Supplemental Compliance Due Diligence Questionnaire;

371.3.    BSGR's responses to the Follow Up Due Diligence Request List;

371.4.    BSGR's responses to the Legal Due Diligence Questionnaire;

371.5.    BSGR's responses to the Financial Due Diligence Questionnaire;

371.6.    Certifications provided by David Clark on behalf of BSGR and by Steinmetz;

371.7.    Interviews with BSGR principals conducted by Clifford Chance; and

371.8.    Pre-contractual discussions between the parties (e.g. between Alex Monteiro and Tchelet).

372.    These representations covered a wide range of subjects. Some were addressed directly and specifically to bribery and corruption, whereas others were designed to uncover indicia or red flags of bribery. Vale's position is that, either individually or taken as a collective representation (that BSGR had obtained the mining rights lawfully and without engaging in any bribery or corruption), BSGR had made false representation(s) to Vale.

---

[288] *Eco3 Capital Ltd and others v Ludsin Overseas Ltd* [2013] EWCA Civ 413 [77], **CL-8**.
[289] Vale's Statement of Case, paragraph 269.

373.    BSGR's main defence is a factual one – it asserts that its representations were true. However, BSGR also raises arguments which seek to characterise its representations as ones that are incapable of grounding a fraudulent misrepresentation claim, namely:

   373.1.    a statement of belief or opinion cannot constitute a misrepresentation;

   373.2.    silence cannot found an action in the tort of deceit; and

   373.3.    the representations pleaded by Vale are insufficiently precise to ground a fraudulent misrepresentation claim.

374.    If BSGR is correct, these arguments would have a significant impact on how each representation is viewed, and so it is here that the analysis of those arguments proceeds.

   **(a)    _A statement of belief or opinion can constitute a misrepresentation_**

375.    It is trite law that a representation must be one of fact. As _Clerk & Lindsell_ note, "a mere statement that one thinks a given state of affairs exists is not a statement that it does in fact exist: it follows that it cannot engender liability in deceit on that basis".[290]

376.    However, it is also settled law that a statement of opinion may still be sufficient to found a tort of deceit, provided that "the deceit is in the fact that the opinion was not, or not honestly, held or in some further implicit dishonest misrepresentation of fact to be derived from the statement of opinion".[291] Both Parties accept this.[292]

377.    The dispute between the Parties as to whether a statement of opinion can found a misrepresentation appears to have been caused by ambiguity in Vale's Statement of Reply, where it argued that "it was reasonable for Vale to understand and proceed on the basis that the opinion [Avidan's statement that Steinmetz and Balda were so focused on reputational risk that they would not allow improper activities to take place] was based on factual knowledge that no improper activities had taken place." BSGR argues that Vale has not made any attempt to justify its position that it should be inferred that Avidan's statement of opinion contained an implied assertion of fact that there had been no "improper activities".[293] BSGR then says that "Avidan's statement of opinion [could at most be said to contain] an implied assertion that he knew of no improper activities [which] is a much more limited representation."[294]

378.    Vale, in its Pre-Hearing Written Submissions, clarified that its position is indeed that Avidan's statement "contained an implied representation of fact that he knew of no improper activities", and so this dispute has now fallen away.

---

[290] M Jones, A Dugdale and M Simpson (eds), _Clerk & Lindsell on Torts_ (21st edn, Sweet & Maxwell 2014) [18-13], **RL-38**, cited by BSGR's Statement of Rejoinder, paragraph 274.
[291] _AIC Testing Services (UK) Ltd (The Kriti Palm)_ [2006] EWCA Civ 1601 [255], **RL-3**.
[292] BSGR's Statement of Rejoinder, paragraph 284; Vale's Pre-Hearing Written Submissions, paragraph 256.
[293] BSGR's Statement of Rejoinder, paragraph 284.
[294] BSGR's Statement of Rejoinder, paragraph 284.

### (b) Silence as compared to omission

379. In paragraphs 286 to 293 of its Statement of Rejoinder, BSGR asserts that silence will not support an action in deceit, citing *Clerk & Lindsell*,[295] *Cartwright*,[296] and *Peek v Gurney* (HL).[297] It then equates BSGR's "omissions" to silence,[298] concluding that Vale's case on BSGR's alleged "omissions" must fail.

380. Vale agrees that silence, as a general rule, may not found an action in deceit. However, Vale submits that there are several recognised qualifications to that principle. The key exception that Vale seeks to rely on pertains to half-truths, where a fragmentary or partial statement together with an omission conceals the truth.[299]

381. The Tribunal agrees with Vale. In *Peek v Gurney* (1873) LR 6 HL 377, 390 (HL), it was held that a representation could be founded on "a partial and fragmentary statement of fact, [if] the withholding of that which is not stated makes that which is stated absolutely false".[300] Vale says that it "does not allege that mere silence on the part of BSGR constitutes a representation of fact. Vale refers to "omissions" where specific enquiries were made of BSGR and BSGR made a representation of fact in response, but omitted to disclose certain information".[301] To the extent that BSGR has omitted to disclose certain information in response to specific enquiries, the Tribunal considers that there can be no doubt that such omissions can found the basis of a representation. Therefore, BSGR has misconstrued Vale's terminology. This distinction between silence and omission has been borne in mind by the Tribunal when reaching factual findings.

### (c) Are the representations pleaded by Vale sufficiently precise to ground a fraudulent misrepresentation claim?

382. BSGR, in its Statement of Defence, argued that the alleged representations by BSGR that Vale sought to rely on in its Statement of Case were too vague to ground a fraudulent misrepresentation claim.[302]

383. Vale, in its Statement of Reply, did not disagree that the representations had to be sufficiently clear and precise,[303] but cited *IFE Fund v Goldman Sachs International* [2006] EWHC 2887 (QB) (Comm) for the proposition that "[i]n determining whether there has been an express representation, and to what effect, the court has to consider what a reasonable person would have understood from the words used in the context in which they were used." [304] Judged in that manner, Vale submitted that BSGR's central misrepresentation was that BSGR had not committed bribery or corruption in obtaining the mining rights, and this is what BSGR's statement would objectively have meant to

---

[295] M Jones, A Dugdale and M Simpson (eds), *Clerk & Lindsell on Torts* (21st edn, Sweet & Maxwell 2014) [18-06], **RL-43**.
[296] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [3-03], **RL-21**.
[297] *Peek v Gurney* (1873) LR 6 HL 377, 390, **RL-115**.
[298] BSGR's Statement of Rejoinder, paragraph 286.
[299] Vale's Pre-Hearing Written Submissions, paragraph 258.
[300] *Peek v Gurney* (1873) LR 6 HL 377, 403, **RL-115**.
[301] Vale's Pre-Hearing Written Submissions, paragraph 260.
[302] BSGR's Statement of Defence, paragraph 235.
[303] Vale's Statement of Reply, paragraph 897.
[304] *IFE Fund v Goldman Sachs International* [2006] EWHC 2887 (QB) (Comm) [50], **CL-55**.

Vale at the time. Vale also set out a list of specific statements that it relied on to constitute misrepresentations.[305]

384. In response, BSGR asserted that there was nothing in *IFE Fund v Goldman Sachs International* that suggested that, in deciding what an express representation means, one should depart from the actual words used and look to the general gist or the "central misrepresentation". BSGR also argued that the fact that all the alleged misrepresentations were made in a commercial context, at arm's length, and with the significant involvement of lawyers, meant that BSGR's representations must be strictly confined to the words used, and more general implications should not be drawn from them.[306] In addition, BSGR noted that Vale had only set out a list of the specific statements that it was relying on in the Statement of Reply, which is said begged the question of why, "if they were as important to Vale's decision to enter into the agreements with BSGR as Vale says, and if they were so obviously untrue [...] they were overlooked in the initial pleadings."[307]

385. Vale did not see the need to make a further response in its Pre-Hearing Written Statement and chose to simply rely on its list of representations, which it contended would make it evident that its pleadings were sufficiently clear.

386. From the above narration of the Parties' arguments, it is clear that the Parties do not disagree over the need for specificity in defining the representations and merely contest whether or not this requirement has been satisfied. The Tribunal has already found that Vale has defined the representations it is relying on in sufficient detail during its discussion on adverse inferences at paragraphs 360 to 367 above. This is equally applicable to this section.

387. The Tribunal does not accept that BSGR intended to place much weight on its rhetorical question doubting (a) the importance placed by Vale on the alleged misrepresentations; and (b) Vale's current belief in their untruthfulness. At best, this constitutes a passing comment to be taken into consideration in ascertaining Vale's reliance on BSGR's representations, but, even in that context, it is hard to see how the mere fact that Vale did not explicitly mention certain representations in its Statement of Case can be given much weight.

## 2. BSGR made representations that were false

388. Having rejected each of BSGR's legal arguments, the Tribunal now turns to consider the nub of the Parties' disagreement – the alleged truthfulness or falsity of BSGR's representations. Given the numerous misrepresentations Vale has alleged, these have to be considered individually and in the light of the factual background that the Tribunal has set out in Section III above and further in this section below.

### *BSGR's representation that it had not used any agents, intermediaries and consultants in the process of obtaining the mining rights*

389. During the due diligence phase, BSGR represented that it had not used any consultants, agents or intermediaries in obtaining the mining rights (other than those specifically

---

[305] Vale's Statement of Reply, paragraphs 820-883.
[306] BSGR's Statement of Rejoinder, paragraph 304.
[307] BSGR's Statement of Rejoinder, paragraph 306.

referenced). Vale submits that BSGR knowingly and deliberately failed to disclose the roles of certain persons whom it says were consultants, intermediaries and/or agents assisting BSGR to obtain the mining rights in Guinea. The Tribunal analyses the relevant evidence below and sets out its conclusions.

*i.*    *The representations made by BSGR as to the non-use of consultants and agents*

390. In the First Compliance Due Diligence Questionnaire, Vale requested the following information: "[p]lease indicate if the BSG Group used any intermediaries to interact with the Government of Guinea in relation to BSG Group's efforts to obtain the Concessions."[308]

391. "BSG Group" was defined as BSGR Guernsey, BSGR Guinea (the local subsidiary that owned the mining rights) and two Liberian companies, BSGR (Liberia) Ltd and BSG Resources (Liberia) Ltd, which were involved in the Liberian element of the project. It excluded BSGR itself as well as the – at the time – former subsidiaries of BSGR that had contracted with Pentler (BSGR Steel and BSGR Guinea BVI), as indicated by the red circle in the diagram below. This diagram represents a convenient point of reference, prepared by the Tribunal, based on uncontroversial facts in the record showing the BSGR structure.



392. In response, BSGR stated that all concessions were gained through "formal application in writing" and that "BSGR Guinea did not use any intermediary in its application process nor during any further discussions with the CPDM."[309] BSGR specifically referenced the

---

[308] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, p. 5 (Question III.F), **C-30**.
[309] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, p. 5 (Question III.F), **C-30**.

exploration licences for Simandou North and South, Simandou Blocks 1 and 2 and the bauxite permits.

393. The First Compliance Due Diligence Questionnaire also asked BSGR to "identify any consultants, representatives, agents, brokers, or other intermediaries (collectively, "Consultants") retained by or acting on behalf of the BSG Group (directly or indirectly) in connection with the Simandou project or Project Hills."[310] In response, BSGR disclosed three names (Ian Cope, WSP and Bateman Engineering), followed by "etc." and referred Vale to the Section 1K contracts in the data room.

394. In the Supplemental Compliance Due Diligence Questionnaire, BSGR was asked to "identify the entire local advisory team, including counsel, public relations advisors and lobbyists, retained by or acting on behalf of the BSG Group (directly or indirectly) in connection with the Simandou project, Project Hills or the Liberian project (collectively "Consultants")."[311] In response, BSGR named Mohammed Doumbia (local counsel) and some labour brokers who acted on behalf of the Guinean subsidiary. It did not name Cilins, Noy, Lev Ran, Fofana and Boutros.

*ii.   Who were the alleged consultants?*

395. Vale alleges that the following people were consultants, intermediaries or agents acting on behalf of BSGR: Cilins, Noy, Lev Ran (who were the main shareholders of Pentler), as well as Fofana and Boutros. The relationship between BSGR or any BSG Group company and these individuals (or Pentler) was not disclosed at any stage during the due diligence process.

396. Vale states that it deliberately defined the term "Consultant" broadly in its Questionnaires, using it as a "catch-all term for all […] third parties" that "directly or indirectly, were used by BSGR in connection with its mining activities in Guinea."[312] The term included consultants, representatives, agents, brokers, or intermediaries acting directly or indirectly in connection to Project Hills.

397. This definition was further broadened in Vale's Supplemental Compliance Due Diligence Questionnaire to include "the entire local advisory team, including counsel, public relations advisors and lobbyists, retained by or acting on behalf of the BSG Group."

*iii.   Contracts between BSGR and Pentler*

398. In order to assess whether Pentler or any of its principals (Cilins, Noy or Lev Ran) was a consultant, intermediary or agent for BSGR, the Tribunal first considers the content of the various agreements between BSG entities and Pentler (or its principals). The following extracts from contracts between Pentler and BSGR entities refer to the services that Pentler would provide to BSG Group companies:

---

[310] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, p. 6 (Question IV.A), **C-30**.

[311] Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, p. 6 (Question IV.A), **C-43**.

[312] Kleinfeld WS, paragraph 33; Vale's Statement of Reply, paragraphs 93-94.

Milestone Agreement

"Pentler has agreed to continue its efforts to reach an agreement for Blocks 1 and 2 and assist in acquiring these blocks for the Simandou Iron Ore Project, and assist in any possible manner with the Simandou Iron Ore Project"

Share Purchase Agreement (clause 6)

"The Consultant (Pentler's shareholders) will continue to advise and act as consultant for the period of 5 years from signing date hereof to the best interest of [BSGR Guinea BVI]"

Shareholders Agreement (clause 4.2.2)

"BSGR Steel shall be entitled to call upon Pentler to provide such services and to assist BSGR Steel in its functions from time to time and Pentler undertakes to provide any such assistance to BSGR Steel as and when reasonably required by BSGR Steel and always on the basis that Pentler shall be entitled to remuneration in respect of any such services provided on a cost recovery basis only, (i.e. Pentler shall be entitled to be reimbursed all direct costs incurred by Pentler in providing any such services)"

399. In the Tribunal's view, the above extracts suggest, at first glance, that Pentler and its shareholders agreed to provide consultancy services to BSGR in Guinea.

400. BSGR defends its non-disclosure of the above agreements (or the role played by Pentler and its shareholders) by stating that:

400.1. The BSG companies that were party to these agreements were not included within the definition of "BSG Group" as contained in the due diligence questionnaires.

400.2. In any case, none of the services provided by Pentler or its principals were consulting services,[313] nor did Pentler (or any of the named individuals) act as an intermediary for BSGR.[314]

400.3. Neither Pentler nor any of its principals was involved in BSGR's applications for exploration permits.[315] While Pentler's principals made initial introductions, they were not involved in the application process (either for Simandou North and South or Simandou Blocks I and 2).[316]

400.4. The clause in the Share Purchase Agreement that referred to consulting services was "intended as a form of restrictive covenant"[317] and Pentler's shareholders did not actually provide any services pursuant to this clause.

---

[313] BSGR's Statement of Defence, paragraph 58.
[314] BSGR's Statement of Defence, paragraph 102.
[315] BSGR's Statement of Rejoinder, paragraph 34.
[316] BSGR's Statement of Defence, paragraphs 102 and 237(ii).
[317] BSGR's Statement of Defence, paragraph 58.

> **iv.** *Did Pentler, Cilins, Noy and Lev Ran provide consulting services to BSGR?*

401. Having identified the contractual framework between Pentler and BSGR, the Tribunal now records its findings as to the role played by Pentler and its principals – Noy, Cilins and Lev Ran – in applying for the relevant mining concessions included within Project Hills.

402. It is generally agreed by the Parties that Noy and Lev Ran initially introduced BSGR to opportunities in Guinea for mining iron ore (and other minerals). However, it was Cilins that provided the main assistance "on the ground" in the initial stages of the project. The nature and extent of this assistance is not agreed by the Parties.

403. The Tribunal observes that Cilins spent time in Guinea forming networks and relationships that he was then able to exploit to assist BSGR in obtaining the mining rights.

   403.1. In 2005, Cilins introduced BSGR to Bah and I.S. Touré, who became BSGR's local contacts.

   403.2. Cilins and Pentler cultivated a relationship with Mme. Touré. One of the issues in contention in this arbitration is whether Mme. Touré used her influence over the President to assist BSGR in obtaining the mining rights. There is no dispute, however, that Pentler and its principals had a relationship with her. Noy gave evidence that "Pentler had business relations with Mamadie Touré and later with her company, Matinda, in consumer goods, foods, pharmaceuticals and mining."[318]

404. As set out in Section III above, the Tribunal finds that the actual assistance provided by Pentler and its principals to BSGR included the following.

   404.1. Noy introduced Oron to the Simandou opportunity in early-mid 2005.

   404.2. Cilins arranged and attended a meeting between Oron and the Minister of Mines in July 2005.

   404.3. Cilins, together with I.S. Touré, undertook research at the CPDM for BSGR in relation to the mining opportunities in Simandou (including the process for applying for permits). Noy stated at paragraph 39 of his First Witness Statement:

   > At the time, BSGR did not have a presence in Guinea and so Mr Oron used Mr Cilins to get essential information from the CPDM and the Ministry of Mines. When Mr Cilins was not in Guinea, he would in turn ask Mr Touré to assist. A lot of this assistance comprised Mr Cilins or Mr Oron visiting the Ministry of Mines or CPDM to request geological information, such as maps of available deposits or geological studies, which they would in turn pass on to Mr Oron or to BSGR's geologists.

   404.4. Cilins also attended a meeting with the Minister of Mines, President Conté and BSGR in December 2005. It is noted that, through to at least mid-2006, Cilins appeared to attend every meeting that BSGR had with Guinean officials with

---

[318] Noy First WS, paragraph 8.

regard to mining opportunities. While BSGR has explained his attendance as being required for translation purposes (Struik did not speak French), it is clear that Cilins arranged these meetings and that he had the primary relationship with the Guinean officials attending such meetings. Struik described him as BSGR's "eyes and ears on the ground".[319]

404.5.   In early 2006, Noy and Cilins accompanied Oron to Guinea to assist him in finalising the MoU with the Government. All three men attended a meeting with representatives from the Ministry of Mines (and a lawyer from each side). Later that day, Noy and Cilins accompanied Oron to the Presidential palace to meet President Conté.[320] I.S. Touré and Mme. Touré were also present at this meeting.

404.6.   Cilins assisted in the negotiations of the 2006 MoU with the Government, including arranging and attending meetings and arranging BSGR's local legal counsel.[321] Noy gave evidence that he was also involved in assisting BSGR at this time and that he and Cilins paid local counsel on behalf of BSGR:

> Following the signing of the MOU, we requested the repayment of Mr Cilins' and my direct expenses relating to the MOU from BSGR. This related to local lawyer fees and other expenses incurred in the lead up to the signing of the agreement.[322]

404.7.   Cilins provided logistical advice and assistance, including sourcing and establishing a local office for BSGR in Conakry, Guinea.[323] He also assisted in hiring local staff for the office.[324]

404.8.   Cilins and I.S. Touré arranged for BSGR's geologists to visit the potential sites for which BSGR might apply for a permit. This included hiring helicopters to transport them to the field.[325] It appears that they may have used the President's helicopter for this purpose.[326]

404.9.   Together with Avidan, Oron and I.S. Touré, Cilins presented BSGR's mining plans for the Simandou project at a press conference held in conjunction with the official opening of the Conakry office in September 2006.

404.10.  For his work with BSGR, BSGR paid Cilins a monthly stipend of USD 10,000 from January 2006 to June 2006,[327] together with other payments described at paragraphs 410 and 413 below.[328] Noy also confirmed that BSGR paid Cilins a "consultancy fee" and reimbursed his expenses.[329]

---

[319] Struik First WS, paragraph 17.
[320] Noy First WS, paragraph 44.
[321] Noy First WS, paragraph 41.
[322] Noy First WS, paragraph 41.
[323] Noy First WS, paragraph 39.
[324] Avidan First WS, paragraph 13.
[325] Noy First WS, paragraph 39.
[326] See paragraph 190 above.
[327] Tchelet First WS, paragraph 31.
[328] See also Selected BSG Resources Guinea SARL Payments, 2006, **C-666**.
[329] Noy First WS, paragraph 42.3.

404.11. While it is clear that Pentler and its principals played less of a role in BSGR's Guinea operations from 2007 onwards, Vale alleges that the role of Pentler and its principals did not cease at this time. For example, when BSGR was preparing to apply for its exploration permits for Simandou Blocks 1 and 2 in 2008, Cilins (along with I.S. Touré) helped to present BSGR's progress at Zogota (Simandou South) to the Ministry of Mines.[330] Vale also highlighted that, during 2008, BSGR made a number of payments to Pentler for which it has offered no invoices or explanations whatsoever.[331]

404.12. Vale notes that:

> BSGR's entry into the joint venture with Vale did not mark the end of its close relationship with Pentler. BSGR continued to involve Pentler in its affairs; Pentler and Cilins worked on BSGR's behalf to broker a settlement with the GoG and to eradicate all evidence of their prior acts of corruption. BSGR's own witnesses confirm that Pentler lived up to its commitments "to continue to advise and act as consultant for the period of 5 years" under the Share Purchase Agreement by continuing to work closely with BSGR through April 2013, when Cilins was arrested in the United States.[332]

404.13. In April 2012, Cilins travelled to Florida to visit Mme. Touré. The purpose of this visit was to convince her to sign a declaration denying that she ever received bribes or entered into illegal contracts regarding BSGR's activities.[333]

404.14. Cilins travelled to Florida again in 2013 to meet Mme. Touré and offer her money in return for destroying documents related to BSGR. His conversations with her were recorded by the FBI (with Mme. Touré's co-operation).[334] As a result of these conversations, on 10 March 2014, Cilins pleaded guilty to obstructing a criminal investigation (being the investigation of BSGR). He was sentenced to two years' imprisonment and three years' supervised release.[335]

405. Despite this long list of activities and the intensity with which Cilins worked on BSGR's project, BSGR has maintained throughout these proceedings that:

> Cilins was not involved in the application for exploration permits over Simandou North and Simandou South. He provided basic services to Struik such as delivering letters or documents and helping to find a house in Conakry. He assisted Struik with communication, as Struik had only a basic level of French. Cilins took no part in mining discussions.[336]

406. BSGR also maintains that Cilins ceased to provide any assistance in Guinea at the end of 2006, and that Pentler played no part in the application for exploration permits over Blocks 1 and 2 in 2008.[337]

---

[330] Noy First WS paragraph 56.2; Vale's Statement of Reply, paragraph 91.
[331] Vale's Pre-Hearing Written Submissions, paragraph 50.
[332] Vale's Statement of Reply, paragraph 154.
[333] Affidavit of M. Touré, 27 April 2012, **R-114** (Vale disputes the authenticity of this document).
[334] Transcripts of recorded phone calls between Cilins and Mme. Touré, pp.71-188, **C-6**.
[335] *USA v. Cilins*, Superseding Information, Dkt. No. 60, 10 March 2014, **C-10**; *USA v. Cilins*, Plea Hr'g Tr., Dkt. No. 62, 10 March 2014, **C-150**.
[336] BSGR's Statement of Rejoinder, paragraph 34(2).
[337] BSGR's Statement of Rejoinder, paragraph 34(3).

407.    The Tribunal disagrees with BSGR's interpretation of the role played by Cilins and by Pentler more generally. The facts that the Tribunal has just set out in the preceding paragraphs belie BSGR's minimisation of Cilins' role, at least during the first 18 months of BSGR's venture into Guinea. Indeed, Avidan said in his First Witness Statement that:

> Mr Cilins told me that he had introduced BSGR to Guinea and he had assisted Mr Struik in establishing contacts and in dealing with a range of planning practicalities for the setting up of BSGR's offices. I think Mr Cilins had been in Guinea since the beginning of 2005. [...]: Mr Cilins kept talking about "his project" and that "he brought us over".[338]

408.    Others involved in the Project shared this perception. As noted above, Struik considered Cilins to be his eyes and ears on the ground in Guinea. Avidan gave evidence that the first time he met Mme. Touré she had told him that he "should not be there because Mr Cilins should be running things for BSGR."[339]

409.    The Tribunal considers that the importance of Cilins and Noy is further supported by an email from Struik to Oron dated 10 May 2006 in which Struik said:

> The Lady phoned Fred [Cilins] today (he is back in France) asking him whether I was happy now with these permits. Michael [Noy] also phoned me saying that we need to process the "first payment" now, hence the invoice attached (which I asked for).[340]

410.    The same email chain authorised a payment of USD 250,000 to FMA (a company owned by Cilins and Noy) in payment for "Fred [Cilins'] services and success fees".[341] The invoice itself indicated that the payment was for "Our assistance and consulting for acceptance of bauxite permits in Republic of Guinea."[342]

411.    The Tribunal notes that Cilins' role representing BSGR in 2006 extended to making payments on behalf of BSGR. Noy confirmed that:

> Mr Cilins offered to use his local bank account to cover some of BSGR's local expenses either before BSGR had its own local account or at times when BSGR personnel were not available to sign off on payments from BSGR's local company account. I believe that Mr Cilins also gave Mr I.S. Touré signing powers over his account for these purposes. When money needed to be transferred in this way, either BSGR would transfer money into Mr Cilins' account or Mr Cilins would lay out funds which would then be reimbursed by BSGR.[343]

412.    The evidence demonstrates that Cilins was integral to BSGR's operations in Guinea during the initial phase. Avidan's First Witness Statement confirms this conclusion:

> After Mr Cilins had left Guinea, I developed a closer relationship with Mr Touré. It took a while to gain his trust because he had been working closely with Mr Cilins until I asked Mr Cilins to leave, and I think he struggled to adjust to working with me at the beginning. He used to call Mr Cilins every time he felt he had an issue;

---

[338] Avidan First WS, paragraph 12.
[339] Avidan First WS, paragraph 37.
[340] Email chain between Y. Tchelet, R. Oron et al re: Invoice, 10-15 May 2006, p. 3, **R-179**.
[341] Email chain between Y. Tchelet, R. Oron et al re: Invoice, 10-15 May 2006, p. 2, **R-179**.
[342] Email chain between Y. Tchelet, R. Oron et al re: Invoice, 10-15 May 2006, p. 6, **R-179**.
[343] Noy Second WS, paragraph 6.

for example, if he felt he was not being paid enough he would complain to Mr Cilins about that.[344]

413. Noy confirmed that Cilins was compensated by BSGR.[345] Aside from the monthly stipend paid to Cilins of USD 10,000, the evidence shows that payments of approximately USD 661,000 in consulting fees were paid to Cilins or to his associated companies – including Pentler.[346] This level of compensation does not accord with Noy's description of the limited role played by himself and his colleagues in BSGR's activities – "[o]ur role was limited to providing the initial information and logistical assistance required to put BSGR in a position where it could apply for exploration permits."[347]

414. Noy further confirmed that, up until May 2007, Pentler paid for much of BSGR's local expenditure and then sought reimbursement from BSGR. For example, Pentler (or Cilins) paid for geologists, local lawyers, all work relating to renovating and equipping BSGR's offices in Conakry, helicopter hire, car purchases, travel expenses, security and costs relating to the camps set up on site.[348] These expenses were considerable.

415. The Tribunal finds that the above evidence establishes that Pentler and, in particular, Cilins provided consultancy services to BSGR in relation to the application for exploration rights in the Simandou area.

416. The role of Noy and Lev Ran was more limited, albeit that Noy was clearly the initial introducer of the mining opportunities in Guinea. The Tribunal considers that disclosure of the consulting role played by Pentler would have been sufficient to encompass the activities of Noy and Lev Ran undertaken in Pentler's name.

### *v.*     *Were Pentler, Cilins, Noy or Lev Ran BSGR's agents?*

417. The Tribunal now turns to consider whether Pentler and/or Cilins were also "agents" of BSGR whom BSGR ought to have disclosed in the due diligence questionnaires (since BSGR was asked not only to disclose its *consultants* but also its *agents*: see paragraph 393 above). The Parties not having argued otherwise, the Tribunal notes that the following statement on the English law of agency should be uncontroversial:

> whenever one person, called the 'agent,' has authority to act on behalf of another, called the 'principal,' and consents so to act. Whether that relation exists in any situation depends not on the precise terminology employed by the parties to describe their relationship, but on the true nature of the agreement or the exact circumstances of the relationship between the alleged principal and agent.[349]

418. In the Tribunal's view, the collective weight of the facts described above (in paragraphs 401 to 416) also justifies a finding of agency between BSG entities and Pentler (with Pentler's principals, in particular Cilins, as subagents). Pentler and Cilins were certainly authorised to do more than simply introduce opportunities to BSGR. They were authorised to communicate (speak and listen) on behalf of BSG parties with the GoG, to

---

[344] Avidan First WS, paragraph 22.
[345] Noy Second WS, paragraph 39.
[346] Crowe Howarth Agreed-Upon Procedures, 20 March 2016, p. 32, **R-367**; Crowe Horwath, "BSGR Resources Ltd.: Report on Agreed Upon Procedures", 29 January 2014, pp. 24-25, **C-812**.
[347] Noy First WS, paragraph 40.
[348] Noy Second WS, paragraph 38.
[349] Lord Mackay of Clashfern (ed), *Halsbury's Laws of England*, vol 1 (Lexis Nexis 2008) p. 1, **CL-90**.

organise and attend meetings, and to represent BSGR, if not negotiate the terms of the agreements. The role was more than being simply "eyes and ears", but Pentler was also to some extent a mouthpiece for BSGR during the early months of establishing the projects and obtaining the mining permits.

419. The Tribunal reiterates once again the following facts which strongly support a finding of an agency relationship in the present case.

419.1. The BSGR-Pentler Milestone Agreement effectively appointed Pentler as a negotiating – or at least communicating – agent for BSGR Guinea BVI. In return for a 17.65% interest in the mining concessions, Pentler agreed to "continue its efforts to reach an agreement for Blocks 1 and 2, and assist in acquiring these blocks for the Simandou iron ore project and assist in any possible manner with the Simandou iron ore project."

419.2. According to BSGR's witnesses, Cilins "acted as the project liaison person on the ground in Conakry."[350] He was effectively BSGR's "eyes and ears on the ground" in Guinea[351] – he attended all meetings at which BSGR was present and made all pertinent introductions. BSGR used Pentler, and Cilins specifically, to "build relationships"[352] with the Ministry of Mines and CPDM and to assist in its applications for mining licences. The fact that Cilins fronted the relationship with the Government on behalf of BSGR meant that he was not just BSGR's "eyes and ears", but effectively also BSGR's "mouthpiece" in Guinea.

419.3. Cilins was part of the BSGR delegation sent to meet the President in February 2006 when – according to BSGR's account – the President wanted to be introduced to BSGR. Cilins was also part of the BSGR team that presented BSGR's mining plans to the media in September 2006. Indeed, Cilins was present at all important events in Guinea involving BSGR during 2005 and the first half of 2006.

419.4. Pentler / Cilins performed a number of tasks on behalf of BSGR. As described in paragraph 414 above, they engaged and paid subcontractors on behalf of BSGR.[353] Struik also used Cilins to "open bank accounts with local banks, to buy cars, to get insurance".[354] BSGR gave Cilins money for this purpose as is demonstrated by the email below.[355]

---

[350] Tchelet First WS, paragraph 31.
[351] Struik First WS, paragraph 17.
[352] BSGR's Statement of Defence, paragraph 31.
[353] BSGR Guinea, Copies of Emails and Correspondence in Respect of Payments, 2006-2007, **C-526**.
[354] Struik First WS, paragraph 41.
[355] Emails between F. Cilins, M. Struik, R. Oron *et al*., 19 June 2006, **C-240**.

---- Original Message -----
**From:** cw@cwfr.net
**To:** marc@bsgresources.com
**Cc:** roy@bsgre-sources.com
**Sent:** Monday, June 19, 2006 2:44 PM
**Subject:** Following Michael's meeting

Dear Marc,

Following Michael's meeting with Roy and Beny I would like you please to clarify to Roy that all the money that you are sending to my account in Conakry is destined for your needs and has nothing to do with any of my expenses, personal or professional.

All the money is used by you or Ibrahim and this account was created just to make life easier for you.

Best regards,
Fred

419.5.   Pentler / Cilins sourced BSGR's office in Conakry and facilitated the hiring of local staff on behalf of BSGR (for example, I.S. Touré). Cilins had the primary relationship with BSGR's local staff, as attested to by Avidan.[356] Cilins purchased equipment for BSGR.[357]

419.6.   During a brief encounter with Eduardo Etchart ("**Etchart**") (Vale's then-General Manager for Exploration in Africa) and Marco Monteiro (Vale's then-Country Manager for Guinea), Cilins represented that he was working for BSGR.[358]

419.7.   While Pentler entered into the Pentler-Bah and Pentler-Daou Milestone Agreements, it was BSGR that paid the success fees due under those Milestone Agreements directly to Bah, I.S. Touré and Daou. Merloni-Horemans (Director of BSGR) approved the Pentler-Bah and Pentler-Daou Milestone Agreements before they were signed by Pentler. The evidence suggests that Pentler was inserted as the signatory company, rather than a BSGR entity.[359]

419.8.   Developments that occurred after the mining rights were granted as set out below, although not necessary for the Tribunal's findings, corroborate the existence of an agency relationship with BSGR. According to Noy, when the GoG and President Condé were having difficulties with BSGR in 2012, representatives from Guinea came to Cilins (not to BSGR itself) to attempt to resolve the issues. Noy said:

> we arranged for [Mr. de Combret – representing the GoG] to meet with BSGR, in the presence of Mr Cilins. Following this first meeting, Mr de Combret exchanged numerous emails and phone calls with Mr Cilins. Mr de Combret suggested a range of proposals to resolve the dispute, including BSGR agreeing to give its entire 49% shareholding in VBG to the GoG; BSGR staying in the project and paying a settlement fee to

---

[356] Avidan First WS, paragraph 22.
[357] See Vale's Statement of Reply, paragraphs 105-107.
[358] Etchart First WS, paragraph 14.
[359] Vale's Statement of Reply, paragraphs 408-410. See Letter of Commitment, last modified on 17 January 2006, **C-652**; Sale and Purchase Agreement for Monital Investments Limited, 16 January 2006, pp. 207-210, **C-244**; Written Memorandum of the Sole Director of Monital Investments Limited, 17 January 2006, p. 212, **C-244**.

the GoG; and VBG granting the GoG a larger free carry in the Simandou project.[360]

Once again, Cilins appears to be placed in the role of communicating with others on behalf of BSGR.

419.9. Cilins interacted with Mme. Touré in 2012–2013 on behalf of BSGR. The documents he was seeking to have destroyed included the contracts between Matinda and BSGR signed in February and July 2008. He told her that he was instructed – indeed had "strict orders"[361] – to witness the destruction of the documents in person and that he would have to report back on this.[362] She asked if "Beny" wanted them to meet and whether he agreed with giving her the money. Cilins answered "of course".[363] The conversation makes it clear that Cilins was acting on behalf of Steinmetz:

> Cilins: There will be the 5 [million dollars] and there will be the 800 [thousand dollars]… Depending on how it ends. If it's good for him, if we don't cut too right, left, I don't know, there will be more. I don't know how much. There will be 3, 4, 5 [million] more, I don't know. But there will be more. And that's the communication I was given directly by number 1, I don't even want to mention his name…
>
> Touré: Number one? Michael [Noy]?
>
> Cilins: No, no… Beny [Steinmetz] [whispering].
>
> Touré: Ok.
>
> Cilins: Ok? Everything I tell you is directly from Beny.[364]

Although Cilins "fronted" all of the interactions with Mme. Touré, the Tribunal finds that he was clearly doing so on behalf of BSGR – again as BSGR's representative.

419.10. A recorded conversation between Thiam and Mebiame (a businessman from Gabon) also strongly suggests that Cilins was acting on behalf of BSGR in the United States:

> [Mebiame:] […] BSGR sent me a delegation to Miami with a certain Frederic, who came to see me in Miami. "Listen, Samy, we know that you have some very interesting things that could help us, because we know that Conde is making life hard for you too, and let's try to put what we have together to fight back. But he was very clumsy…
>
> [Thiam:] This Frederic, is he French?
>
> [Mebiame:] Yes. He's French -one of their emissaries apparently.
>
> …

---

[360] Noy First WS, paragraph 106.
[361] *USA v. Cilins*, Complaint, Dkt. No. 1, 15 April 2013, paragraph 20(o), **C-8**.
[362] *USA v. Cilins*, Complaint, Dkt. No. 1, 15 April 2013, paragraph 20(k), **C-8**.
[363] Recommendation and Report of the Technical Committee, 21 March 2014, p. 87, **C-6**.
[364] Recommendation and Report of the Technical Committee, 21 March 2014, p. 213, paragraph 22(a) and p. 134, **C-6**.

[Thiam:] Was he really sent by DSGR [sic]? Because ..

[Mebiame:] No idea.

[...]

[Thiam:] [...] So, it interests me to know if it's them who sent him. Because if that is the case, it means that the connections are still there, contrary to what they say.

[Mebiame:] Yes. Because - you see, it's very interesting ... But they were coordinated.

[Thiam:] Who and who? Frederic and...

[Mebiame:] [...] Asher [Avidan].

[Thiam:] OK.

[Mebiame:] They always knew what Walter had said to...

[Thiam:] To Frederic?

[Mebiame:] To Asher. Frederic knew everything we had said to Asher in London in our offices. So I understood that they were connected and that the company- in my opinion, as far as I can tell- is called Pentler: Pentler Holdings Limited. It's the company that started to... to negotiate with... with Mamadi.[365]

420. The Tribunal recalls that some documents between Pentler and BSGR contain specific references that no agency relationship has been created. For example, the Pentler Shareholders Agreement states that it does not "make[] a Party the agent of another Party for any purpose. A Party has no authority or power to bind, to contract in the name of, or to create a liability for another Party in any way or for any purpose."[366]

421. The Services and Cooperation Agreement (backdated to 15 October 2005 between Pentler and BSG Metals and Mining) calls the parties "independent contractors" and states that "[n]othing contained in this Agreement shall authorise or empower either Party to enter into any contracts or other commitments on behalf of the other."[367]

422. Vale discounts these Agreements saying that both Agreements were backdated for convenience and notes that the Services Agreement offers no tangible benefit to either party. Vale calls the Agreements "meaningless "paper trail" documents that are devoid of any true substance, as apparent from the fact that they are both backdated by conspicuously long periods of time."[368] In the Tribunal's view, whether an agency relationship existed must be assessed on the facts of the case. Statements such as those found in the Pentler Shareholders' Agreement and the Services Agreement form part of the factual matrix, but cannot override or alter the actual relationship that existed on the facts. The Tribunal finds such agreements (especially when backdated) are not determinative as to whether an agency relationship existed.

---

[365] Transcript of Meeting between Minister of Mines M. Thiam and S. Mebiame, p. 10, **C-81**.
[366] Pentler Shareholders Agreement, 19 July 2007, section 12, **R-24**.
[367] Services Agreement, 15 October 2005, section 5.2, **R-23**.
[368] Vale's Statement of Reply, paragraph 135.

Finding that Pentler and Cilins were agents of BSGR

423. Based on the facts the Tribunal has just set out, and for the reasons set out in paragraph 418 above, the Tribunal finds that the communication role played by Pentler, its principals and, in particular, by Cilins, is amply sufficient to demonstrate an agency relationship under English law. The surrounding factual circumstances strongly support this conclusion.

> ***vi.*** *Did either of BSGR's agents/consultants (namely Pentler and Cilins) perform these services for a "BSG Group" Company?*

424. BSGR states that any services provided by Pentler and its principals were not provided to a BSG Group company as defined in the various Due Diligence Questionnaires. As noted above, the companies included in the definition of BSG Group were BSGR Guernsey (established in 2009), BSGR Guinea (the local subsidiary that owned the mining rights) and certain Liberian entities.

425. Pentler primarily dealt with BSGR Guinea BVI (in whom it held shares) and BSGR Steel. Both of these companies were removed from the Project Hills structure in 2009, prior to the commencement of the due diligence process.

426. Vale contends that this restructure was deliberately undertaken to enable BSGR to hide the role of Pentler and its principals. When Vale broadened the Questionnaires to include BSGR itself and its subsidiaries (which at the time included BSGR Guinea BVI and BSGR Steel), BSGR undertook a further restructuring whereby BSGR Guinea BVI and BSGR Steel were transferred to a related company, and therefore were no longer direct subsidiaries of BSGR. According to Vale, this was to ensure that BSGR could avoid making any disclosures about BSGR Steel and BSGR Guinea BVI, or their relationship with Pentler. The sale of these entities in 2010 to BSG Metals and Mining occurred on the same day that BSGR received the Supplemental Questionnaire from Vale with the broadened definition.[369]

427. Vale contends that neither the 2009 nor the 2010 restructure altered BSGR's obligation to disclose the consultancy / agency services provided by Pentler and Cilins.

428. The Tribunal notes that the due diligence questions relating to consultants and agents are broadly framed. They require disclosure of any consultants and agents acting "on behalf of the BSG Group (directly or indirectly)."[370] In this respect, the word "indirectly" is relevant as it implies that consultants and agents retained by affiliates of BSGR other than those which were the subject of the BSG Group definition, would fall within the scope of the disclosure obligations and could not be avoided by the restructurings. Because of the word "indirectly", no finding is necessary to pierce the corporate veil of any of the entities outside the BSG Group.

429. Moreover, the assistance provided by Pentler and Cilins was for the purpose of obtaining mining rights in Simandou, as stated in the Milestone Agreement between Pentler and BSGR Guinea BVI. It was BSGR Guinea – the local subsidiary company – that applied for and eventually obtained the mining licences. BSGR Guinea was a member of the

---

[369] Vale Pre-Hearing Written Submissions, paragraph 152; Emails between D. Cramer & S. Merloni-Horemans, 9-12 November 2012, **C-664**.
[370] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, p. 6, **C-30**.

BSG Group, as defined in the due diligence questionnaires. Given that Pentler and Cilins were working primarily to assist BSGR Guinea to obtain the mining rights, the fact that the BSGR-Pentler Milestone Agreement was with BSGR Guinea's (then) parent company does not preclude a finding that their "indirect" role should have been disclosed in response to the broadly framed questions.

430.    To conclude, the Tribunal finds that Pentler and Cilins rendered services for the primary benefit of BSGR Guinea and its parent companies, BSGR and (from 2009) BSGR Guernsey, on whose behalf they were acting. The Tribunal is satisfied that these services were provided – if not directly then at the very least "indirectly" – to BSGR Guinea, BSGR Guernsey and BSGR. It was BSGR Guinea that would ultimately benefit from the services provided by Pentler and Cilins by being granted the mining rights in the Simandou area. Similarly, Pentler and, in particular Cilins, acted as the agent for BSGR and its subsidiaries operating in Guinea. The role played by Pentler and Cilins should therefore have been disclosed by BSGR in response to the due diligence questionnaires.

### vii.    Did Ghassan Boutros provide consulting services to BSGR?

431.    Boutros was an engineer, originally from Lebanon. Boutros' company, Logistics & Maintenance Services S.à.r.l ("**LMS**"), specialised in services relating to telecommunications, electrical work, infrastructure, and equipment. Avidan described Boutros as BSGR's "main supplier in Guinea for machinery and various other equipment, including communications equipment".[371] Avidan also said he was a friend.[372]

432.    LMS was contracted by BSGR Guinea to provide certain services pursuant to a "Subcontracting and Service Provision Agreement" (the "**Boutros Contract**").[373] Under the Boutros Contract, LMS agreed to the following:

> LMS undertakes to provide all equipment, replacement parts and materials necessary to carry out the works.

> LMS has representatives throughout Guinea and shall provide technical intervention at any time and as quickly as possible in all BSG Resources camps.

> LMS shall maintain all electrical equipment, household appliances, IT hardware, VSAT installations and generating sets that have already been sold to BSG Resources, under its responsibility.

433.    The term of the Contract was one year. The "Payment" provision for the Boutros Contract was unusually vague for a services agreement. There was no mention of rates or payment amounts. It simply stated:

> Payment shall be made a maximum of 30 days after receipt of invoice, proven by acknowledgement of receipt, and after confirmation of the camp leaders, to the following bank account:

> LMS

> Banque populaire maroco guineen – Account: 21201714001-81

---

[371] Avidan First WS, paragraph 121.
[372] Avidan First WS, paragraph 122.
[373] Subcontract and Service Provision Agreement between LMS and BSG, **R-180**. The Contract is dated 2008, but no specific date is provided.

Payments to Boutros

434. In 2009 and 2010, BSGR made several payments to Boutros. The details of these payments are set out below.

435. A series of payments were made between 18 February 2009 and July 2009 totalling over USD 630,000:[374]

435.1. These payments were made to the bank account at Banque Populaire 2110 1524 802 (not the account specified in the Boutros Contract).

435.2. The payments were primarily for technical equipment, generator costs and siteworks. One invoice included a fee for "study complete / planning".[375]

435.3. The invoices provided little detail of the breakdown of costs and were generally for rounded amounts – USD 100,000, USD 200,000 etc.

436. On 18 August 2009, BSGR paid USD 1.3 million to Boutros which was described in BSGR's internal payment form as a "consulting fee".[376] Notable details about this payment include:

436.1. It was paid into a different bank account number from the payments above (and different again from the account specified in the Boutros Contract).

436.2. The fee was paid pursuant to an email instruction from Tchelet to Clark (Director of BSGR) and Helen Nicolle ("**Nicolle**") dated 17 August 2009 which stated:

> Hi-these are the banking details to be used for the USD1.3million consulting fee payment to Ghassan.
>
> You must enter these details NOT the regular ones-code to R1029/North/Consulting.[377]

436.3. The invoice from LMS for this payment appears to have been rendered the following day (18 August) – the same day on which the payment was made. The invoice refers to two Caterpillar pieces of equipment and a USD 40,000 charge for generator running costs.[378]

436.4. A hand-written note on the payment instruction directs that the fee should be removed from the "consulting" code and distributed amongst other codes.

437. Another payment for USD 100,000 was made to LMS on 12 November 2009 pursuant to an invoice which listed a range of items, but provided no breakdown of costs (just a total of USD 100,000).[379] The invoice was dated 23 November 2009 – nine days after the payment was made.[380] Once again, the payment was initially labelled "consulting fees"

---

[374] See Tchelet First WS, paragraph 37 for detail. See also **R-181** to **R-186** for evidence of payments.
[375] Payment from BSGR Treasury Services to G. Boutros, 6 April 2009, **R-183**.
[376] Payment from BSGR Treasury Services to LMS, 18 August 2009, **R-187**.
[377] Payment from BSGR Treasury Services to LMS, 18 August 2009, **R-187**.
[378] Payment from BSGR Treasury Services to LMS, 18 August 2009, **R-187**.
[379] Payment from BSGR Treasury Services to LMS, 12 November 2009, **R-188**.
[380] Payment from BSGR Treasury Services to LMS, 12 November 2009, **R-188**.

but a handwritten instruction on the payment form directed that it should be allocated to other codes instead.

438. Three months later, on 16 February 2010, an urgent "consulting fee" of USD 1 million was paid to Boutros.[381] The details of the payment are as follows.

438.1. The payment was made on 16 February 2010, pursuant to an email on 14 February from Tchelet to Clark which stated:

> Hi Dave,
>
> BSGR Guinea needs to make payment tomorrow morning amounting to USD 1,000,000 (One Million United States Dollars) as consulting fees in respect of Ghassan Boutros.
>
> Please note that payment is extremely urgent.
>
> I suggest that you arrange the necessary funding.
>
> Please note that payment needs to be made to the banking details below.
>
> Regards
>
> Yossie[382]

438.2. The payment was made into a different bank account to the previous payments, but once again, not the bank account contained in the Boutros Contract. It was made into a Belgian account bearing the name "Adama Sidibe" (Fortis Bank).

438.3. An email dated 24 February 2010 from Tchelet to Clark and others attaches an invoice from LMS dated 18 January 2010 and states "Hi-attached is the supporting invoice relating to the recent payment to Ghassan as consulting fees last week, slight difference due to bank charges etc, for your records."[383]

438.4. The invoice rendered by LMS was for USD 998,870. As indicated by Tchelet's email, this is slightly less than the $1 million that was paid. A hand-written note on the invoice (which appears to be from someone in BSGR) states "$1,130 Bank Charges".

438.5. The invoice stated that the fee was for certain equipment, generator running costs and "works" completed at Zogota.

438.6. As with the previous invoices, a hand-written instruction on the payment instruction sheet directs that the payment should be re-allocated from "consulting fees" to certain other codes.

439. On 1 March 2010, a further payment was made to LMS for USD 300,000.[384] In a series of emails on 1 March, Clark insisted that the payment be made immediately to the Belgian

---

[381] Payment from BSGR Treasury Services to A. Sidibe, 16 February 2010, **R-189**.
[382] Payment from BSGR Treasury Services to A. Sidibe, 16 February 2010, **R-189**.
[383] Payment from BSGR Treasury Services to A. Sidibe, 16 February 2010, **R-189**.
[384] Payment from BSGR Treasury Services to A. Sidibe, 1 March 2010, **R-190**.

account named "Adama Sidibe" – describing it as "very urgent".[385] A week later, on 8 March 2010, a further payment of $550,000 was made to the same Belgian bank account for consultation services. The payment was made pursuant to an email direction from Tchelet which stated:

> I have been informed this afternoon of a requirement to pay an amount of USD550,000 as R.A.S consulting fees in respect of services rendered by Ghassan. Invoice to follow.
>
> Please load to same Fortis Bank Belgian banking details as last time.[386]

Vale contends that R.A.S. in this email refers to Resources Advisory Services – a BSGR entity.[387]

440. Further payments followed on 24 March 2010 (USD 300,000),[388] 29 March 2010 (USD 250,000),[389] 9 April 2010 (USD 212,000),[390] 12 April 2010 (USD 325,000),[391] and 21 April 2010 (USD 200,000).[392] All payments were to the same Belgian account at Fortis Bank and Tchelet instructed that they be paid immediately with an invoice to follow. The invoice for the USD 300,000 payment referred to consultation services for an environmental study and solution, whereas the other invoices referred to certain costs (transport, solar panels, parts etc) and the completion of road and drainage works.

441. In relation to these payments, Tchelet said in a message to Clark:

> all payments to Ghassan relate to transport, electrical, site preparation etc-Sarah has the allocations, we are missing the last 3-4 invoices but they are en route from Guinea. all allocated to Simandou Blocks 1 & 2 -none of it is anything remotely resembling consulting but actual work as per the descriptions previously, I am pushing constantly on the outstanding invoices.[393]

Payments to Mme. Touré

442. Vale alleges that, in addition to providing consultancy services, Boutros also was used as an intermediary to make payments to Mme. Touré on behalf of BSGR. The basis for this allegation is as follows.

443. In 2009, BSGR allegedly asked Boutros to purchase two Caterpillar machines on its behalf for site works,[394] although it did not produce any contemporaneous documentary evidence of this request. Avidan said in his First Witness Statement:[395]

> The transaction Ms Touré refers to was one in which BSGR asked Mr Boutros (through his company, Logistics and Maintenance Services SARL) to obtain two

---

[385] Payment from BSGR Treasury Services to A. Sidibe, 1 March 2010, **R-190**.

[386] Payment from BSGR Treasury Services to A. Sidibe, 8 March 2010, **R-191**.

[387] Vale's Statement of Reply, paragraph 233.

[388] Payment from BSGR Treasury Services to A. Sidibe, 24 March 2010, **R-192**.

[389] Payment from BSGR Treasury Services to A. Sidibe, 29 March 2010, **R-193**.

[390] Payment from BSGR Treasury Services to A. Sidibe, 9 April 2010, **R-194**.

[391] Payment from BSGR Treasury Services to A. Sidibe, 12 April 2010, **R-195**.

[392] Payment from BSGR to A. Sidibe, 21 April 2010, **R-196**.

[393] Payment from BSGR Treasury Services to A. Sidibe, 29 March 2010, **R-193**.

[394] Avidan First WS, paragraph 121.

[395] Avidan First WS, paragraph 121.

Caterpillars for us. We had many of them in the field and needed two more for our exploration work. Mr Boutros obtained the Caterpillars for us, and we duly paid him the amount he invoiced for them. I did not know, and I am not aware that anyone else from BSGR knew, that Mr Boutros had used Ms Touré to obtain this equipment. It was certainly not a backhanded way of BSGR paying Ms Touré.

444.    Also in 2009, Mme. Touré allegedly demanded money from BSGR, although Avidan said that he now cannot locate the letters containing such demands.[396] Avidan also said that he was briefly detained by a General acting on Mme. Touré's behalf in relation to these demands.[397]

445.    Vale claims that the purchase of Caterpillar machines by Boutros was a ruse to allow BSGR to meet Mme. Touré's payment demands.[398] Circumstantial evidence that supports Vale's assertion includes:

445.1.    Vale states that the payments coincided with demands for payments made by Mme. Touré for amounts she claimed were owed pursuant to contracts with Pentler.[399] Vale also says that the payment was consistent with an affidavit signed by Mme. Touré on 2 August 2009 in front of Bangoura (BSGR's Security Director) which states that she and BSGR agreed:

> on the payment of the sum of four million U.S. dollars (USD 4,000,000), representing the total value of all of my shares of stock (a 5% interest), as well as of my services provided for obtaining the mining titles for the benefit of the company BSGR in Guinean territory.
>
> Said amounts shall be paid to me in full in instalments payable over four quarters, that is, one million dollars (USD 1,000,000) per quarter.[400]

445.2.    No correspondence has been provided evidencing BSGR's instruction to Boutros to purchase the Caterpillar machines.

445.3.    The initial invoice provided for the machines came from the unknown "Matilda & Co. Ltd." (not Matinda & Co).[401] The invoice itself does not specify the date on which it was generated, but the signature inside the company stamp appears to be dated 7 July 2009.

445.4.    On 17 August 2009, Tchelet instructed BSGR to pay Boutros the sum of USD 1.3 million. The payment was made to Boutros on 18 August 2009.[402]

445.5.    Boutros did not invoice BSGR for the Caterpillar machines until 18 August 2009, the day after the payment instruction had been issued. Boutros did not include with his invoice to BSGR any proof of purchase for the Caterpillar machines. The amount charged for the machines is different to the cost of the machines as specified in the "Matilda" invoice.

---

[396] Avidan First WS, paragraph 105.
[397] Avidan First WS, paragraph 105.
[398] Vale's Statement of Reply, paragraphs 445-449.
[399] Vale's Statement of Reply, paragraphs 452-454.
[400] Affidavit of M. Touré, 2 August 2009, **C-690**; see Vale's Statement of Rejoinder on Counterclaims, 15 August 2016, paragraphs 73-75.
[401] Guinean Import Declaration, 17 August 2009, **R-259**.
[402] Payment from BSGR Treasury Services to LMS, 18 August 2009, **R-187**

445.6. Boutros issued a transfer order to his bank on 20 August 2009 for the payment of USD 998,000 to Matilda Ltd which appears to have failed.[403]

445.7. A second invoice was generated for the machinery on 28 August 2009, this time the correct company – Matinda & Co – is used on the invoice.[404] The bank account for payment of the second invoice is different to the bank account in the original "Matilda" invoice.

445.8. Boutros then sent a message to his bank entitled "Request to change the name of the recipient of a transfer order" on 3 September 2009. He instructed his bank to make the payment of USD 998,000 to "Mamadie Touré" personally, rather than Matilda Ltd. [405] He did not, however, change the bank account number to correspond with the second invoice. The payment appears to have been made to Mme. Touré personally at the bank account specified on the original "Matilda" invoice.

445.9. Boutros made a further payment to Mme. Touré's personal account of USD 2,000 in December 2009.[406]

445.10. Vale contends that the Caterpillar machinery never arrived.

446. Conversely, BSGR states that the equipment was in fact delivered as evidenced by an import declaration dated 17 August 2009.[407]

447. As to this latter claim, Vale notes that:

> the Customs Invoice, on its face, does not confirm that the equipment was in fact delivered, but rather that it could be sent through customs for a period of 6 months.[408]

448. Vale also notes that BSGR attempted to keep Boutros' name out of the records provided to local BSGR contacts. Emails from Tchelet to Nicolle state:[409]

> What is sensitive is the names in respect of consulting fees paid – please always check with me first before sending reports which include those details to her or anyone inside Guinea …

> I am referring to cases where BSGR TS pay on behalf of newco consulting fees to for eg Ghassan or others – those are the type of consulting fees that you should check with me first before sending the details automatically to Guinea local.

449. A previous email from Tchelet to Nicolle included a hand-written note which said "*remove Ghassan Boutros' name from Guinea spreadsheet*".[410]

---

[403] Email from G. Boutros to the Managing Director of the F.I.B., 3 September 2009, p. 195, **C-6**.
[404] Invoice from Matinda dated 28 August 2009, p. 194, **C-6**.
[405] Email from G. Boutros to the Managing Director of the F.I.B., 3 September 2009, p. 195, **C-6**.
[406] Invoice 489 to LMS dated 20 December 2009, p. 196, **C-6**.
[407] Guinean Import Declaration, 17 August 2009, **R-259**.
[408] Vale's Pre-Hearing Written Submissions, note 316 (referencing **C-799**; **C-800**; **C-801**).
[409] Emails between Y Tchelet, D Clark, & H Nicolle of BSGR, 26-27 April 2009, **C-540**.
[410] Emails between Y Tchelet & H Nicolle of BSGR, 20-21 April 2009, **C-650**.

450.  Finally, Vale claims that Boutros also assisted in making a USD 2 million cash deposit into Mme. Touré's bank account in May 2010. This payment, Vale submits, was a reward for completion of the joint venture contracts.[411] BSGR rejects this argument, saying that no such payment occurred.

451.  In support of its claims, Vale has placed before this Tribunal transcripts of oral evidence provided by Boutros as part of court proceedings in Switzerland and Guinea regarding alleged corruption.[412] As Boutros has not appeared as a witness in the current arbitration and there has been no opportunity for the Tribunal or the parties to test his evidence, the Tribunal has placed no weight on these transcripts.

Tribunal's analysis of Boutros' role

452.  The Tribunal makes the following findings based on the evidence and submissions before it.

452.1.  In and around the time of the Project Hills due diligence, BSGR in its internal correspondence repeatedly referred to the services provided by Boutros as "consultancy services" and his invoices as being for "consultancy fees". At least three of Boutros' invoices specifically refer to "consultation services" or studies carried out by Boutros for BSGR (see payments of 6 April 2009, 8 March 2010 and 24 March 2010).

452.2.  In the Tribunal's view, it is clear that BSGR considered that Boutros was receiving consulting fees for providing consulting services (including of a technical nature).

452.3.  Tchelet's email to Nicolle on 26-27 April 2009 confirms BSGR's view of Boutros as a consultant, but also demonstrates BSGR's desire to keep his role secret.

> I am referring to cases where BSGR TS pay on behalf of newco consulting fees to for eg Ghassan or others – those are the type of consulting fees that you should check with me first before sending the details automatically to Guinea local[413]

452.4.  A previous email from Tchelet to Nicolle included a hand-written note which said "remove Ghassan Boutros' name from Guinea spreadsheet".[414]

452.5.  It is also clear that Boutros (through LMS) paid Mme. Touré USD 1 million in 2009, purportedly for two Caterpillar machines. The Tribunal notes that this payment was made at around the time that Mme. Touré was demanding money from BSGR and just after Mme. Touré had signed a document stating she would receive USD 4 million from BSGR in USD 1 million instalments.[415]

452.6.  The Tribunal has not been provided with any evidence that the Caterpillar machines actually arrived. As noted by Vale, the "Descriptive Declaration of Importation" ("**DDI**") exhibited by BSGR appears to provide a delivery window for

---

[411] Vale's Statement of Reply, paragraphs 10 and 450-451.
[412] See Report of questioning for Ghassan Boutros, 29 August 2013, **R-132;** Procès verbal of G. Boutros, 7 July 2015, **C-278**.
[413] Emails between Y Tchelet, D Clark, & H Nicolle of BSGR, 26-27 April 2009, **C-540**.
[414] Emails between Y Tchelet & H Nicolle of BSGR, 20-21 April 2009, **C-650**.
[415] Affidavit of M. Touré, 2 August 2009, **C-690**.

the machines between 17 August 2009 and 17 February 2010 but does not confirm whether they were actually delivered within this timeframe.[416]

452.7. The invoices for the Caterpillar machines support Vale's argument that the transaction was a sham:

452.7.1. The invoice attached to the DDI bore the wrong company name and stamp - "Matilda & Co."

452.7.2. After Boutros first attempted – but failed – to transfer the money to Matinda, a new invoice in the correct name was issued.

452.7.3. The bank account into which the fees were paid belonged to Mme. Touré.

452.8. Further supportive of Vale's position is that:

452.8.1. BSGR had many Caterpillar and other work machines at their sites, it is unclear why Boutros was requested to purchase additional machinery for BSGR, rather than BSGR sourcing the machines from its usual supplier.

452.8.2. Other contractors appeared to use their own machinery, not machinery purchased by BSGR.[417]

452.8.3. The evidence before the Tribunal suggests that the business interests of Mme. Touré (and by extension, Matinda) while she resided in Guinea primarily involved distributing pharmaceuticals, food, and consumer goods.[418] None of these activities suggest that Matinda or Mme. Touré (who was by 2009 living in exile in Sierra Leone [419]) would be a natural supplier of heavy construction machinery into Guinea.

452.8.4. Throughout the course of the relationship between BSGR and Boutros, it appears that these two Caterpillar machines were the only heavy construction machinery Boutros was asked to purchase for BSGR. All other invoices related to site works, consultations, generator costs and electrical and telecommunications equipment.

453. Based on the evidence above, the Tribunal considers that BSGR's version of events whereby Boutros sourced these machines from Matinda in Sierra Leone without the knowledge of BSGR is improbable.

454. Tchelet's desire to keep Boutros' name off the Guinea spreadsheets and effectively "secret" reinforces the Tribunal's view that the relationship between BSGR and Boutros was not a standard contracting relationship.

---

[416] Guinean Import Declaration, 17 August 2009, **R-259**.
[417] See Sub-Contract Agreement between Bassad-Guinée S.A. and BSG Resources (Guinea) Limited – S.A.R.L., 2 January 2010, clause 3(l)(b), **C-799**.
[418] See Noy First WS, paragraph 8; Avidan First WS, paragraph 45; Struik First WS, paragraph 41.
[419] Vale's Statement of Case, paragraph 170.

455. The unusual nature of the relationship between Boutros and BSGR is further confirmed by the curious payment process for Boutros' (forthcoming) invoices:

455.1. BSGR generally paid LMS on an "urgent" basis in round figures and before any invoice was actually rendered. The contemporaneous correspondence indicates that many invoices were backdated. No explanation has been provided as to why these payments were urgent, particularly when the Boutros Contract provided BSGR with 20 days to pay any such invoices. BSGR's practice of simply paying Boutros any amount requested without first having received invoices or receipts, has not been adequately explained by BSGR.

455.2. Vale argues that:

> These "consulting fee" payments are also notable because they were all approved and dispensed before BSGR had received any supporting invoices or documentation. In one instance, just a couple of weeks before Vale sent BSGR its compliance due diligence questionnaire, Clark emailed Tchelet and others at BSGR: "I have been informed this afternoon of a requirement to pay an amount of USD550,000 as R.A.S[.] [Resources Advisory Services, a BSGR affiliate] consulting fees in respect of services rendered by Ghassan. Invoice to follow." [R-189] This shows that Tchelet and Clark were instructing BSGR to make payments to Boutros, unsubstantiated by invoices, simply because Avidan or others on the ground in Guinea were demanding that these payments be made.[420]

455.3. The invoices themselves – including those for large sums of money – contain scant detail as to how these amounts were derived. For example, there is no breakdown of rates for services and no invoices for fixed costs were provided. Most invoices were also for "round numbers". On one occasion where the invoice was not a round number and did not match the amount that had already been paid, a hand-written note on the invoice stated that the difference was made up in "bank charges" which happened to bring the total to exactly USD 1 million. The urgency of payment and the scant detail provided in the invoices can be contrasted with other contractors who specified hours and rates and whose invoices appear to have been scrutinised in detail before payment approved.[421]

455.4. Overall, BSGR paid Boutros a total of over USD 5 million pursuant to these invoices during 2009-2010.

456. Vale also makes allegations about an alleged USD 2 million cash deposit made by Boutros to Mme. Touré's account. However, this payment occurred in May 2010 and is not relevant for the purposes of assessing whether the due diligence responses were accurate.

457. The Tribunal concludes, based on the above analysis, that Boutros' consultancy role is clear from the contemporaneous documents. There is also significant evidence which establishes, at least in relation to the USD 1 million allegedly paid for machinery, that Boutros was acting as an intermediary for BSGR. The apparent secrecy around Boutros' role; the urgent nature of payments without invoices; the timing of the payment just after

---

[420] Vale's Statement of Reply, paragraph 233.
[421] See, for example, Payment from BSGR to K. Amir of Bassad, 15 April 2010, **C-800** and Payment from BSGR Treasury to Global Travaux Publics Constructions, 28 July 2009, **C-801**.

Mme. Touré had demanded money from BSGR; the lack of evidence that the machines were delivered; and the unlikely coincidence that Boutros would have sourced heavy machinery from Mme. Touré after she was exiled (especially when sourcing such machinery does not appear to have been her core business) suggest that Vale's version of events are more likely accurate than BSGR's protestations that Boutros' dealings with Mme. Touré were unknown to it.

<u>Tribunal's findings on whether Boutros provided consulting or agency services</u>

458.    The Tribunal therefore finds that the arrangement with Boutros involved at least some consultancy services and indeed was viewed as such by BSGR. The Tribunal also considers that Vale has shown that, on the balance of probabilities, Boutros acted as an intermediary for BSGR. There is no evidence to suggest Boutros was BSGR's agent.

459.    Therefore, BSGR should have disclosed the role of Boutros in response to Vale's due diligence questions regarding consultants and intermediaries. BSGR's failure to do so meant that its responses to those questions were false.

460.    Moreover, even if the Tribunal were wrong in its conclusions above, BSGR still should have disclosed the Subcontracting and Service Provision Agreement with LMS in the "Third Party Service and Supply Agreements" in Section 1K of the due diligence data room, especially as this Agreement was with BSGR Guinea – one of the "BSG Group" companies.

### viii.   Ibrahima Kassory Fofana

461.    Vale alleges that BSGR also retained Fofana, Guinea's former Economy and Finance Minister, as a consultant. Vale points to the fact that BSGR admitted that Fofana provided "high level strategic advice" in relation to BSGR's acquisition of the Simandou mining rights as evidence of his role as a consultant.

462.    In July 2008, Fofana met with the Minister of Mines, Dr. Nabé, to discuss BSGR's application for Blocks 1 and 2.[422] Vale also noted the close relationship between Fofana and Mahmoud Thiam, the Minister of Mines in 2009-2010. Indeed, Thiam referred to the important role that Fofana played on behalf of BSGR several times in a recorded conversation with Mebiame.[423] Consequently, according to Vale, BSGR should have disclosed Fofana's consultancy role during the due diligence process.

463.    BSGR accepts that Fofana was a consultant and should have been disclosed in its responses to the due diligence questionnaires.[424] BSGR agrees that Fofana provided consultancy services in relation to Blocks 1 and 2, but said that the failure to disclose Fofana's role was an oversight. BSGR has pointed out that the wire transfers to Fofana were included in the disclosures, which belies Vale's contention that BSGR deliberately concealed his role.[425]

---

[422] Nabé WS, paragraph 20.
[423] Transcript of Meeting between Minister of Mines M. Thiam and S. Mebiame, **C-81**. For example, Thiam says at p. 9 "And BSGR can say to you: 'Yes, we used Kassory as a 'lobbyist' to help us' and Kassory does not keep this fact a secret."
[424] BSGR's Statement of Rejoinder, paragraph 51.
[425] BSGR's Statement of Rejoinder, paragraph 52.

464.  Avidan stated in his First Witness Statement that Fofana's advice was "primarily in relation to a potential issue with the IFC and the World Bank, which had a share in Rio Tinto's rights over blocks 1 to 4 in Simandou."[426]

465.  During the period from 2008 to 2014, BSGR made the following payments to Fofana:

465.1.  BSGR paid Fofana USD 100,000 in consulting fees on 15 December 2008;

465.2.  BSGR paid USD 23,592.10 for travel by Fofana and his family in November/December 2008;[427]

465.3.  BSGR paid Fofana EUR 80,000 in consulting fees on 5 February 2009;

465.4.  BSGR reimbursed Fofana (or paid) for certain travel costs between April 2009 and February 2010, to a total sum of USD 18,536.76.[428]

466.  In view of BSGR's admission that Fofana was a consultant, the Tribunal finds that Fofana was a consultant to BSGR, and that his role should have been disclosed in response to the due diligence questionnaires.

> ### ix.  Conclusion on representation that BSGR had not used any agents, intermediaries and consultants in the process of obtaining the mining rights

467.  In response to Vale's due diligence questions about the use of agents, intermediaries and consultants in the Compliance Due Diligence Questionnaire and the Supplemental Compliance Due Diligence Questionnaire, BSGR disclosed only "Ian Cope, WSP, Bateman Engineering, Mohammed Doumbia, Fist Interim" and referred Vale to the contracts in Section 1K of the data room.

468.  BSGR has admitted that it should have included Fofana in its list of consultants.

469.  The Tribunal has found that BSGR should also have disclosed as consultants Pentler, Cilins and Boutros. In addition, Pentler and Cilins acted as BSGR's agents in Guinea during the process of obtaining the mining rights for BSGR Guinea. This agency role should also have been disclosed by BSGR in its response to the due diligence questions.

### *BSGR's representation that it had disclosed all agreements with Consultants*

470.  In response to the due diligence questions outlined above with regard to consultants, BSGR represented that all agreements with consultants were disclosed in Section 1K of the data room.[429]

---

[426] Avidan First WS, paragraph 150.
[427] Diesenhaus-Unitours Spreadsheet of 2008 BSGR Travel, **C-539**.
[428] Payment from BSGR Treasury to Diesenhaus-Unitours, 7 May 2009, **C-268**; Payment from BSGR Treasury to Diesenhaus-Unitours, 7 January 2010, **C-269**; see also footnote 498 of Vale's Statement of Reply.
[429] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question IV, **C-30**.

471. Section 1K of the data room contained the following documents:[430]

| | K | | Third Party Service and Supply Agreements | | |
|---|---|---|---|---|---|
| 1. | | 1 | BSG Resources Guinée S.A.R.L/Foraco SAS Drilling Agreement 29/10/07 | Legal/ Tech | 1K |
| 2. | | 2 | Energold Drilling | Legal/ Tech | 1K |
| 3. | | 3 | Geoprospect Drilling | Legal/ Tech | |
| 4. | | 4 | Fugro Airborne Surveys | Legal/ Tech | 1K |
| 5. | | 5 | KPMG Conakry | Finance | 1K |
| 6. | | 6 | UIBG | Admin | 1K |
| 7. | | 7 | Probiz Guinea (hire of air transport services) | Admin | 1K |
| 8. | | 8 | Total | Admin | 1K |
| 9. | | 9 | DHL | Admin | 1K |
| 10. | | 10 | Contract Poubelles de Conakry (Bin hire and waste removal) | Admin | 1K |
| 11. | | 11 | 11.1 GTC (Bulldozers) | Admin | 1K |
| 12. | | | 11.2 GTC (Fuel Tank) | Admin | 1K |
| 13. | | | 11.3 GTC (Water Tank) | Admin | 1K |
| 14. | | | Technical Advisory and Royalty Agreement | | |

472. Vale alleges that, in response to these due diligence questions, BSGR should have disclosed the following agreements:

472.1. Milestone Agreement between BSGR Guinea BVI and Pentler dated 20 February 2006;[431]

472.2. Share Purchase Agreement between BSGR Steel and Pentler, dated 24 March 2008;[432]

472.3. Settlement Agreement between BSGR Steel and Pentler, dated 25 July 2009;[433]

472.4. Shareholders Agreement between BSGR Steel, Pentler and BSGR Guinea, dated 19 July 2007;[434] and

472.5. The Agreements with LMS (Boutros) and with Fofana.

473. In paragraph 458 above, the Tribunal has found that Boutros (through LMS) provided services to BSGR Guinea (a BSG Group Company), including consultancy services. The Tribunal has already found that the Boutros Contract should have been disclosed in

---

[430] Project Hills: FTP/Data Room Index, **R-216**.
[431] Letter from BSGR Guinea BVI to Pentler, 14 February 2006, **R-117**.
[432] Share Purchase Agreement between BSGR Steel and Pentler, 24 March 2008, **R-28**.
[433] Settlement Agreement between BSGR Steel and Pentler, 25 July 2009, **R-33**.
[434] Shareholders Agreement between BSGR Steel, Pentler and BSGR, 19 July 2007, **R-24**.

Section 1K of the data room, both as a third-party service and supply agreement as well as an agreement with a Consultant. BSGR provided no satisfactory explanation as to why the agreement was omitted from Section 1K, especially as Boutros was allegedly supplying these services over the very period that the due diligence was being conducted.

474. The Tribunal has also found that Cilins and Pentler were consultants to BSGR Guinea within the definition provided in the due diligence questionnaires (see paragraph 415 above). The BSGR-Pentler Milestone Agreement, the Share Purchase Agreement and the Pentler Shareholders Agreement all make references to the provision of services by Pentler, and specifically to Pentler (or its shareholders) as "consultants".[435] None of these Agreements was disclosed.

475. The Settlement Agreement does not contain any reference to the provision of services, so it is not discussed further here.

476. The Tribunal finds that, even if BSGR mistakenly considered that Cilins or Pentler were not "consultants", they provided services to BSGR and, on that basis, the agreements should still have been included in Section 1K of the data room.

477. BSGR contends that the various agreements with Pentler were not entered into directly by a BSG Group company (as defined in the due diligence questionnaires). This is true. The BSGR entities that had signed these agreements were BSGR Guinea BVI and BSGR Steel, which had been removed from the BSG Group during the 2009 restructuring (described at paragraph 256 above). This restructure meant that, while BSGR Guinea BVI and BSGR Steel were no longer part of the ownership chain of BSGR Guinea, they were still wholly owned subsidiaries of BSGR.

478. The Tribunal considers that, although the definition of BSG Group was limited initially to BSGR Guernsey and BSGR Guinea, plus certain Liberian companies, the question regarding consultants and agents in each Questionnaire was broader. As described at paragraph 428 above, the question asked BSGR to identify all consultants / agents "retained by or acting on behalf of the BSG Group (directly or indirectly)."[436] The Questionnaires asked for copies of any agreements with such consultants which were not already included in Section 1K of the data room.[437] None of the agreements with Pentler, Cilins, Boutros or Fofana[438] was provided.

479. In the Tribunal's view, the breadth of this question means that the fact that the signatory companies to these agreements fell outside of the narrow definition of a "Group company" did not exempt these agreements from being disclosed. The consultants performed

---

[435] Share Purchase Agreement between BSGR Steel and Pentler, 24 March 2008, **R-28**.
[436] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question IV.A, **C-30**, and Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, Question IV.A, **C-43**.
[437] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question V.B, **C-30**; Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, Question V.A, **C-43**.
[438] The Tribunal is aware of BSGR's assertion that no written agreement with Fofana existed, see BSGR's Statement of Rejoinder, paragraph 54(1).

services on behalf of BSGR Guinea to assist it in gaining the mining rights included within Project Hills (that is, "*Simandou Blocks 1 and 2, North Block and Zogota in Guinea*"[439]).

480.  BSGR submits that it did not disclose the Pentler agreements as its lawyers, Skadden Arps, told BSGR that it did not have to disclose this information. Steinmetz gave evidence of this advice in his First Witness Statement, stating:

> The only other aspect of the negotiations that related to the FCPA issues that I recall was a short deliberation that I participated in about whether the Pentler relationship should be disclosed. I cannot remember if it was someone from the BSGR side or Skadden themselves who mentioned it first. Skadden knew the relationship we had with Pentler because they had advised on the dispute I refer to above. I was ambivalent as to whether Pentler should be disclosed and listened to the advice that was given. The advice was that we did not have to disclose the relationship. They were our former partner and shareholder in the business and the existence of a minority shareholder in the business was a matter of record from the accounts and elsewhere.[440]

481.  Unfortunately, however, Steinmetz did not attend the hearing (either in person or by videolink). Avidan who also mentioned the Skadden Arps advice in his second witness statement also failed to attend the hearing (Avidan stated that "Mr Hatchard" was the lawyer who gave the advice[441]). Therefore, this evidence was unable to be tested under cross-examination.

482.  Vale requested copies of any such advice during the document production phase of these proceedings, but BSGR stated that no written advice from Skadden Arps was ever received and it did not possess any documents on this topic. Vale repeated its request on the basis that BSGR's efforts to locate responsive documents had been inadequate. Vale also requested an order from the Tribunal that BSGR disclose who gave the advice and when it was provided and noted that it would seek an adverse inference at the appropriate time.[442] BSGR objected to this request and said that the matter could be addressed at the evidentiary hearing and that the drawing of adverse inferences would be the appropriate remedy if necessary.[443]

483.  The Tribunal requested a certification from BSGR's Counsel detailing efforts made to find responsive documents and identifying the Skadden lawyer who provided the advice and to whom it was provided. Certifications were provided by BSGR's Counsel on 28 April 2016 detailing efforts made to search for responsive documents for outstanding requests and specifically, in relation to the alleged advice provided by Skadden Arps, the certifications stated that "the identity of the Skadden lawyer who gave the advice concerning Pentler is Michael Hatchard and the persons receiving the advice on behalf of BSGR were Mr Cramer, Mr Barnett and Mr Steinmetz."[444] The Tribunal notes that Avidan claims he was also at this meeting although this was not recorded in the certification.[445]

484.  In his second witness statement dated 14 July 2016, Mr Barnett described the extensive advisory role that Skadden Arps had in relation to BSGR's activities in Guinea. He also

---

[439] Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, note 1, **C-43**.
[440] Steinmetz First WS, paragraph 78.
[441] Avidan Second WS, paragraph 24.
[442] See Second Decision on Document Production, paragraphs 148-153.
[443] Second Decision on Document Production, paragraph 155.
[444] Mishcon de Reya Certification on "BSGR/Onyx/Mr Steinmetz", 28 April 2016.
[445] See Avidan Second WS, paragraph 24.

described the advice provided by Mr Hatchard in relation to the Pentler disclosure issue. Mr Barnett said that "BSGR's lawyers have approached Skadden in relation to this arbitration. As it currently stands, Skadden has said that it is not now prepared to engage with BSGR's lawyers in relation to this arbitration. I assume that they have concerns about their own position."[446]

485.    Given the close relationship that BSGR appeared to have with Skadden Arps throughout the relevant time, the fact that no witness from Skadden Arps (in particular, Mr Hatchard) was willing to provide evidence on behalf of BSGR to verify that the advice was provided or corroborate Steinmetz's account is most surprising indeed.

486.    The Tribunal observes that, in addition to the surprising unwillingness of Skadden Arps to cooperate, even the evidence of BSGR's witnesses on this alleged advice would have been insufficient to support a finding that no reliance was intended. While Steinmetz asserted that Skadden Arps was well aware of the Pentler relationship because it had advised on BSGR's dispute with Pentler, he did not clearly set out the basis for the purported view that the Pentler relationship need not be disclosed to Clifford Chance. Taken at face value, the rationale set out in Steinmetz's statement that Pentler was BSGR's "former partner and shareholder in the business and the existence of a minority shareholder in the business was a matter of record from the accounts and elsewhere"[447] is unpersuasive and the Tribunal doubts that this statement could really have been Skadden Arps' expressed views.

487.    In addition to the inherent improbability of Skadden Arps genuinely holding the view expressed by Steinmetz in his statement, BSGR cannot have its cake and eat it too. It cannot, on the one hand, assert that it took legal advice on whether or not to disclose the Pentler relationship, but, then, on the other hand, fail to produce any written record of such advice or to even proffer the lawyer who allegedly gave the advice (no privilege having been claimed).

488.    And finally, BSGR's witnesses (Steinmetz, Avidan and Barnett), having referred to and supposedly relied upon the alleged advice, chose not to appear in person to answer questions on their respective testimonies.

489.    In short, no corroborative documentary evidence has been adduced by BSGR (including meeting notes which the Tribunal would expect to exist) and Skadden Arps has allegedly refused to provide witness evidence in support of BSGR's assertions. As a result, the Tribunal simply cannot accept a bare statement by Steinmetz and his colleagues to this effect without more conclusive proof. All of the above circumstances lead the Tribunal to the conclusion that these allegations must be rejected.

490.    Vale submits that:

> BSGR's claim that – in the midst of an FCPA due diligence exercise, and all of the associated questions, certificates, representations, warranties, meetings and other antibribery inquiries made to Vale, and the numerous red flags that Pentler would have suggested – Skadden provided unwritten advice on which BSGR relied (i) to withhold agreements to pay a minority shareholder more than USD 30 million, (ii) to withhold all its other agreements with Pentler that were responsive

---

[446] Barnett Second WS, paragraph 12.
[447] Steinmetz First WS, paragraph 78.

to due diligence inquires, and (iii) to nonetheless represent to Vale that it had produced all documents involving the shareholders in BSGR Guernsey and all of its subsidiaries, is not credible. Either BSGR never was given any such advice or it never revealed to Skadden the extent of its relationship with Pentler. It is inconceivable that, if the facts had been fully disclosed to it, a law firm of Skadden's stature would have told BSGR that it did not need to disclose its relationship with Pentler or any of the associated documents. It is striking in this regard that to date BSGR has not produced or identified the mysterious Skadden lawyer who supposedly gave this advice

[…]

Even on the doubtful assumption that BSGR did receive this purported advice from Skadden, that there is not a single record of the request for or contents of this alleged advice – no emails, no meeting notes, no research or analysis, no memoranda – suggests that BSGR recognized its relationship with Pentler was so problematic that – if it disclosed it to Skadden at all – it instructed its lawyers not to put anything in writing.[448]

491.  The Tribunal accepts these submissions and considers that the lack of any written record of or related to Skadden Arps' alleged advice is surprising and telling. Even if the advice was provided orally at a meeting, as described by Steinmetz, it is standard practice to make file notes of such meetings and any advice provided. It would be unusual not to have had a junior lawyer or administrative assistant taking notes, which could have been produced in support of BSGR's account.

492.  The fact that:

492.1.  no corroborating evidence whatsoever (either in documentary form or from a witness from Skadden Arps) was provided by BSGR in circumstances where corroborating evidence should have been available; and

492.2.  Steinmetz did not present himself for cross-examination (nor did Avidan or Barnett who gave evidence on this issue),

leads the Tribunal to find it appropriate to attach no weight to this unsupported evidence regarding Skadden's alleged oral advice. Applying the principles on adverse inferences discussed at paragraphs 360 - 367 above and contained in the IBA Rules on Evidence, the Tribunal draws the inference that any evidence that does exist and that BSGR has failed to produce (including evidence from Mr Hatchard) must have been adverse to BSGR's interests. The Tribunal accordingly finds that no such advice was given by Skadden Arps to BSGR.

493.  Based on the above analysis, the importance of the due diligence process and BSGR's assertion that all relevant agreements were included in the data room, the Tribunal finds that BSGR should have disclosed the Boutros Contract, any agreements with Fofana, as well as the BSGR-Pentler Milestone Agreement, the Pentler Shareholders Agreement and the Share Purchase Agreement. All of these agreements should have been included in Section 1K of the data room.

---

[448] Vale's Statement of Reply, paragraphs 253-254.

494. BSGR's confirmation that it had disclosed all relevant agreements in the data room, despite having failed to disclose the documents just described, constituted a misleading and false statement.

***BSGR's representation that it had disclosed all relevant documents and information relating to the shareholder structure of BSGR Guernsey and its subsidiaries***

495. In the Legal Due Diligence Questionnaire, Vale asked BSGR to disclose copies of any of the following types of agreements entered into between any of the shareholders of any Group Company as follows:[449]

495.1. Any shareholders' agreements (and any other agreements between shareholders of a Group Company relating to their shareholding in such Group Company).

495.2. Agreements to transfer or to call for the transfers of any shares in the share capital of any Group Company, whether on a change of control or otherwise.

495.3. Agreements relating to the share capital or ownership, control, management or operation of a Group Company.

495.4. Copies of any such agreements between any Group Company and any third party.

496. Vale also requested:[450]

496.1. Any agreements dealing with the acquisition or disposal of shares in any Group Company entered into during the last 3 years or currently proposed, including the acquisition or disposal of shares in any company that was a Group Company during that 3-year period but that is no longer a Group Company.

496.2. All agreements relating to the acquisition or disposal of the business of any Group Company or a significant asset of any Group Company (such as shares in another company or fixed assets) entered into in the last 3 years or currently proposed.

497. BSGR represented that all such agreements were contained in Section 1A of the data room.

498. The definition of "Group Company" in the Legal Due Diligence Questionnaire was amended by BSGR to reduce its scope. Clifford Chance's Questionnaire had encompassed BSGR and all associated or subsidiary companies (which would have included BSGR Guinea BVI of which Pentler had been a shareholder). BSGR amended the definition to a much narrower group of companies under BSGR Guernsey. As a result of this amendment, BSGR Guinea BVI did not fall within the definition of "Group Company".

---

[449] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Requests 1.5 and 1.7, **C-233**.
[450] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Requests 3.14 and 3.15, **C-233**.

499.    In its Financial Due Diligence Questionnaire, Vale asked for all agreements relating to the acquisition or sale of shares in BSGR and BSGR Guernsey, or any of their subsidiaries, the business or a significant asset of such entities.[451]

500.    In its response to the Financial Due Diligence Questionnaire, BSGR crossed out the reference to itself (which would have required it to disclose documents related to Pentler's interest in BSGR Guinea BVI) and answered that all agreements were contained in Section 1A of the data room.

501.    Vale contends that, in response to these questions:

> BSGR should have disclosed – but did not – the existence of Pentler, including by providing to Vale all of the relevant documents evidencing Pentler's shareholding relationship with BSGR, such as the Shareholders Agreement dated 19 July 2007, Share Purchase Agreement dated 24 March 2008, and Pentler and BSGR's Settlement Agreement dated 25 July 2009, all of which relate to the acquisition or disposal of shares in a Group Company within the last three years prior to April 2010 (i.e., going back to April 2007).[452]

502.    However, the Tribunal notes that Vale does not explain why these agreements – which relate to the transfer of shares in BSGR Guinea BVI – should have been disclosed, given that BSGR Guinea BVI was not a "Group Company" under the amended definition inserted by BSGR. While Vale may have argued that BSGR deliberately amended the definition so as to avoid having to disclose these agreements (which would have been disclosable under the original definition in the Legal Due Diligence Questionnaire), this alone does not mean BSGR's disclosures under the amended definition constituted a misrepresentation.

503.    In contrast, the Tribunal considers that documentation relating to the transfer of BSG Group entities should have been disclosed. For example, BSGR Guinea was transferred from BSGR Guinea BVI to BSGR Guernsey on 17 February 2009 but this transfer was not disclosed.[453] Agreements documenting this transfer should have been provided to Vale, as they are "agreements dealing with the […] disposal of shares in any company that was a Group Company during [the last 3 years] but that is no longer a Group Company".[454]

504.    The Index to the data room indicates that the existing and proposed corporate structure charts were disclosed as well as a "Status Modification" which refers to "New BSG Resources (Guinea) Limited share certificates totalling 100 shares (see tab 17)".[455] It is not clear to the Tribunal exactly what this document refers to and whether it showed the transfer from the BVI company to the newly incorporated BSGR Guernsey. In any case, at the very least, the share purchase agreement dated 17 February 2009 between BSGR Guinea BVI and BSGR Guernsey should have been disclosed by BSGR in the data room.[456] This agreement detailed the transfer of BSGR Guinea BVI's shares in BSGR

---

[451] Project Hills Clifford Chance Due Diligence Request List, 29 March 2010, p. 2, **C-235**.

[452] Vale's Statement of Reply, paragraph 59.

[453] Emails between D. Cramer & S. Merloni-Horemans, 9-12 November 2012, p. 6, **C-664**.

[454] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Request 3.14, **C-233**; Vale's Pre-Hearing Written Submissions, paragraph 230.

[455] Project Hills: FTP/Data Room Index, **R-216**.

[456] Sale of BSG Resources Guinée S.A.R.L. from BSGR Guinea BVI to BSG Resources (Guinea) Limited (Guernsey), 25 February 2009, **C-285**.

Guinea to BSGR Guernsey, and clearly fell within this due diligence request. The Tribunal has no hesitation in finding that this agreement ought to have been disclosed by BSGR.

505.    On the basis of the above evidence, the Tribunal finds that BSGR was not compelled to disclose the agreements relating to Pentler's shareholding in BSGR Guinea BVI. However, BSGR was required to disclose the agreement relating to the sale of BSGR Guinea to BSGR Guernsey in February 2009. BSGR having failed to disclose this agreement despite its representation that all documents that had been requested by Vale had been disclosed in Section 1A of the data room, the Tribunal finds that BSGR made a false representation in this regard.

***BSGR's representation that it had disclosed to Vale all agreements between the shareholders of BSGR Guernsey and any of its subsidiaries, as well as all agreements relating to the share capital or ownership, control, management or operation of a Group Company***

506.    Unlike BSGR's other representations, the Parties' dispute over this representation is not factual (i.e. whether the facts represented were true) but legal (concerning the scope of BSGR's representation).

507.    Vale argues that BSGR should have disclosed the agreements between BSGR Steel and BSGR Guinea BVI either in response to (a) due diligence request 1.5 for "all agreements between the shareholders of BSGR Guernsey and any of its subsidiaries, as well as all agreements relating to the share capital or ownership, control, management or operation of a Group Company";[457] or (b) due diligence request 1.7 for "all agreements relating to the acquisition or sale of shares in the Holdco, or any of their subsidiaries, the business or a significant asset of such entities".[458]

508.    BSGR *accepts* that it did not disclose the agreements between BSGR Steel and BSGR Guinea BVI, but argues that there had been no misrepresentation as those agreements did not fall within the agreed scope of due diligence request 1.5 and 1.7. This argument is founded on the definition of "BSG Group" in the Compliance Due Diligence Questionnaire, which is reproduced below.

> BSG Resources (Guinea) Limited and BSGR Guinea SARL, BSG Resources (Liberia) Limited and BSGR (Liberia) Limited (collectively the "BSG Group"). For purposes of this questionnaire BSG Resources Limited (Guernsey) is excluded from scope.

509.    Since none of the Group Companies (as defined in the Compliance Due Diligence Questionnaire) was a party to the Pentler Shareholders Agreement, the Share Purchase Agreement or the Settlement Agreement, BSGR says that it was "not required to disclose its shareholding/settlement agreements with Pentler".[459]

510.    In reply, Vale alleges that the narrowing of the definition of a "Group Company" was proposed by BSGR "precisely to hide the existence of BSGR Steel and BSGR BVI".[460]

---

[457] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Requests 1.5 and 1.7, **C-233**.
[458] Project Hills Clifford Chance Due Diligence Request List, 29 March 2010, p. 2, **C-235**.
[459] BSGR's Statement of Rejoinder, Section header to paragraphs 71-73.
[460] BSGR's Statement of Rejoinder, paragraph 230.

Further, Vale argues that, even on BSGR's interpretation of the due diligence request, BSGR was still obliged to at least disclose any share purchase agreement or other similar documentation related to the transfer of the shares in BSGR Guinea from BSGR Guinea BVI to BSGR Guernsey, as BSGR Guinea falls squarely within the definition of a "Group Company".

511. After carefully considering the Parties' submissions, the Tribunal is of the view that BSGR – pursuant to request 1.5 for all agreements relating to the share capital or ownership, control, management or operation of a Group Company – should have disclosed all documents relating to the transfer of the shares in BSGR Guinea from BSGR Guinea BVI to BSGR Guernsey. As noted in paragraph 504 above, BSGR did not disclose the share purchase agreement that existed between BSGR Guinea BVI and BSGR Guernsey for the transfer of the shares in BSGR Guinea,[461] BSGR's failure to disclose this document, and any others that may have existed in relation to this transfer, constituted a breach of due diligence request 1.5.

512. Since BSGR Guinea BVI and BSGR Steel do not fall within the definition of "Group Company", the Tribunal accepts BSGR's position that no "Group Companies" were involved in the Pentler Shareholders Agreement, Share Purchase Agreement, and the Settlement Agreement. Consequently, BSGR did not have to disclose those agreements simply because BSGR Guinea BVI and BSGR Steel were a party to them.

513. The Tribunal also finds that BSGR's failure to disclose the Pentler Shareholders Agreement, Share Purchase Agreement and Settlement Agreement does not constitute an omission which "makes that which is stated absolutely false"[462] and which makes the representation false. Leaving aside BSGR's failure to disclose the share purchase agreement regarding shares in BSGR Guinea, BSGR's representation in response to due diligence request 1.5 is otherwise true, and BSGR's failure to disclose the Pentler Shareholders Agreement, Share Purchase Agreement and Settlement Agreement does not make that representation any less true.

514. Against Vale's accusations that BSGR had deliberately narrowed the definition of "Group Company", BSGR explains via Tchelet's first witness statement that the evolution of BSGR's corporate organisation of companies was in furtherance of the aim of improving its corporate governance by simplifying the corporate structure. Further, BSGR also points out Tchelet had revealed the corporate reorganisation to Alex Monteiro ("**Monteiro**") (of Vale),[463] which militates against the idea that the restructuring was intended to deceive. The Tribunal makes no comment on this matter here.

515. In any event, even if BSGR *had* deliberately moved to conceal BSGR Guinea BVI and BSGR Steel, this would not have changed the Tribunal's conclusion that BSGR's failure to disclose the Pentler Shareholders Agreement, Share Purchase Agreement and Settlement Agreement did not constitute a misrepresentation. Given the fact that both Parties are sophisticated commercial parties with legal representation, the Tribunal agrees with BSGR that its response to due diligence request 1.5 has to be taken literally, which thus omits BSGR Steel and BSGR Guinea BVI from its ambit. However, the

---

[461] Sale of BSG Resources Guinée S.A.R.L. from BSGR Guinea BVI to BSG Resources (Guinea) Limited (Guernsey), 25 February 2009, **C-285**.
[462] *Peek v Gurney* (1873) LR 6 HL 377, 403, **RL-115**.
[463] Tchelet First WS, paragraph 86; Monteiro Second WS, paragraph 11.

Tribunal accepts Vale's more limited argument that BSGR should still have disclosed the share purchase agreement regarding shares in BSGR Guinea for the reasons stated in paragraphs 493 and 504 above, and thus finds BSGR's representation to have been false to that extent.

### BSGR's representation that it had disclosed all contracts incapable of performance in full within six months of the date of entry, all contracts that were outside the ordinary course of business and all contracts that were entered into otherwise than at arm's length

516. Request 3.13 of the Legal Due Diligence Due Diligence Questionnaire requested "[a]ll contracts or arrangements entered into by any Group Company which [...] are outside the ordinary course of the relevant Group Company's business; [or] are incapable of performance in full within 6 months of the date being entered into."[464]

517. BSGR responded "n/a".

518. The same Request also asked for "[a]ll contracts or arrangements entered into by any Group Company which [...] are entered into otherwise than at arm's length."

519. In its answer, BSGR referred to a contract with another BSG group company – Resources Advisory Services – which had been disclosed in Section 1Q of the due diligence data room. Vale notes that this contract did not raise any red flags.[465]

520. Vale alleges that BSGR's representations in response to these questions were false. It submits that the BSGR-Pentler Milestone Agreement, the Share Purchase Agreement and the Settlement Agreement should have been disclosed in response to these questions as these Agreements were not capable of performance within six months.[466] Vale also alleges that the Agreements with Boutros and with Fofana were not in the ordinary course of business or at arm's length and therefore should have been disclosed.

521. Vale contends that:

> The Share Purchase Agreement specifically contemplated that Pentler would act as a consultant "for the period of 5 years from signing date hereof," and all three agreements set forth a payment schedule that required performance extending well beyond six months from the date of entry.[467]

522. BSGR rejects the contention that these Agreements should have been disclosed, stating that they fell outside the scope of the questions as they were not entered into by a Group Company, or a Shareholder of a Group Company at the time of the due diligence.[468]

523. As noted above, Pentler signed the Milestone Agreement with BSGR Guinea BVI. Pentler entered into the Share Purchase Agreement and the Settlement Agreement with BSGR Steel.

524. Leaving aside Vale's contentions that:

---

[464] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, **C-233**.
[465] Vale's Statement of Reply, paragraph 55.
[466] Vale's Pre-Hearing Written Submissions, paragraph 233.
[467] Vale's Statement of Reply, paragraph 139.
[468] BSGR's Statement of Rejoinder, paragraph 71.

524.1. BSGR deliberately restructured the group, so as to remove all companies that had a connection to Pentler (and thus hide the relationship with Pentler); and

524.2. BSGR unilaterally amended the definition of "Group Company" in the Legal Due Diligence Questionnaire so as to exclude BSGR Guinea BVI and BSGR Steel,

it is clear to the Tribunal that neither BSGR Guinea BVI nor BSGR Steel were included within the definition of Group Company for the purposes of the Legal Due Diligence Questionnaire.

525. The Tribunal finds that BSGR is therefore correct that these Agreements were beyond the scope of the questions asked, and it was not required to disclose them. The Tribunal finds that there was no misrepresentation by BSGR on this ground.

### *BSGR's representation that it had disclosed all material settlements and potential litigation*

526. Vale alleges that BSGR should have disclosed the Settlement Agreement between BSGR Steel and Pentler dated 25 July 2009,[469] whereby BSGR Steel and Pentler agreed amended payment terms for the share buyback arrangement previously agreed under the Share Purchase Agreement.

527. In the Legal Due Diligence Questionnaire, Vale asked BSGR to disclose all "[d]etails of all prior litigation, arbitrations, investigations or settlement agreements as a result of which any Group Company has been materially affected, either financially or by adverse publicity or in any other way."[470] BSGR responded "none whatsoever".

528. The circumstances surrounding the Settlement Agreement between BSGR Steel and Pentler are set out at paragraphs 257 to 261 above. The Tribunal observes that:

528.1. Because of the restructure that occurred in 2009, BSGR Steel was not a "Group Company" at the time the Legal Due Diligence questionnaire was answered.

528.2. The Settlement Agreement was not a public document and no suggestion has been made that the Agreement resulted in adverse publicity for a Group Company.

528.3. The Settlement Agreement set a new timetable for payment obligations that were already owed under the Share Purchase Agreement. No additional financial obligations were included in the Agreement, so it did not have a financial impact on any Group Company.

529. The Tribunal observes that BSGR Steel (the BSG party to the Settlement Agreement) did not fall within the definition of a "Group Company" under that amended definition in the Legal Due Diligence Questionnaire. Vale therefore must demonstrate that one of the companies that did fall within that definition was "materially affected, either financially or by adverse publicity or in any other way" by the Settlement Agreement. Vale has not provided any submissions on how a "Group Company" was materially affected by the Settlement Agreement. Given the Settlement Agreement did not impose any additional

---

[469] Settlement Agreement between BSGR Steel and Pentler, 25 July 2009, **R-33**.
[470] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Request 9.7, **C-233**.

financial liability on BSGR Steel (just a revised timetable for the payment of previously agreed financial commitments), it is difficult to see how it might have had any adverse impact on the wider BSG Group. The Tribunal therefore finds that there was no misrepresentation in this regard.

530. Further disputes information was provided as follows:

530.1. The Legal Due Diligence Questionnaire asked BSGR to disclose details of any current, pending, threatened or reasonably foreseeable disputes "in which any Group Company or any of its directors, employees, or officers are presently or may become involved".[471] BSGR responded "n/a".

530.2. The Financial Due Diligence Questionnaire asked BSGR to disclose "current or anticipated litigation/claims/court proceedings."[472] Holdco was defined as BSGR Guernsey. BSGR responded "n/a".

531. Vale submits that BSGR should have disclosed (either in response to the Financial or the Legal Due Diligence questions) pending disputes with Bah, Pentler, Mme. Touré and M'Bemba Camara ("**Camara**") (security agent).[473] A brief description of each of these disputes is set out below.

531.1. The Bah dispute arose out of demands for payment made by Bah against BSGR pursuant to the Pentler-Bah Milestone Agreement of February 2006.[474] Pursuant to that Agreement, Pentler had agreed to pay Bah and I.S. Touré a total of USD 15.2 million based on the achievement of specified milestones. In a letter dated 30 November 2009 to Struik,[475] Bah demanded implementation of the Pentler-Bah Milestone Agreement and full payment of the sum allegedly owed (USD 15.2m). BSGR states that Bah had made previous demands for payment earlier in 2009, although no documentary evidence is provided of these demands.[476] A flurry of activity[477] in mid-2009 resulted in Pentler indemnifying BSGR for any claims made by Bah. BSGR responded to Bah on 3 December 2009 disclaiming responsibility and threatening litigation.[478] The letter came from David Clark on behalf of BSGR. Bah made a further demand addressed to Pentler, but copied to BSGR, on 15 March 2010[479] – a few days before the Legal and Financial Due Diligence Questionnaires were answered by BSGR.

531.2. The Pentler dispute relates to BSGR's failure to pay instalments due under the Share Purchase Agreement, resulting in the Settlement Agreement (as described above).

---

[471] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Request 9.1, **C-233**.
[472] Project Hills Clifford Chance Due Diligence Request List, 29 March 2010, p. 2, **C-235**.
[473] Vale's Statement of Reply, paragraph 863.
[474] Memorandum of Understanding between Pentler, Bah and I.S. Touré, 20 February 2006, **C-96**.
[475] Letter from A. Bah to BSGR, 30 November 2009 **R-125**.
[476] See Barnett First WS, paragraph 25; Noy First WS, paragraph 89; and Struik First WS, paragraph 124.
[477] This is described in Vale's Statement of Reply, paragraphs 644-648.
[478] Letter from D. Clark to A. Bah, 3 December 2009, **R-173**.
[479] Letter from A. Bah to A. Lev Ran & F. Cilins (copy BSGR), 15 March 2010, **R-51**.

531.3. The detail around a potential dispute with Mme. Touré is vague. BSGR alleges that Mme. Touré demanded money in 2009, but no documentary evidence exists of any such demands. Avidan said in his First Witness Statement that:

> Ms Touré had also tried to demand money from BSGR in 2009, although I do not remember that she used the February 2008 Contracts then. I cannot now remember exactly what happened, and it seems that we no longer have the paperwork from this incident, but I believe a lawyer acting on behalf of Ms Touré sent a letter to me at our office in Guinea and demanded payment. I cannot now remember how much they demanded. I believe I asked Mr Touré to deal with it with our lawyers.[480]

Avidan described being arrested by a General on (he believes) Mme. Touré's instruction. Avidan said he reported the incident to Thiam – the Minister of Mines – who told him not to worry.[481]

531.4. The Camara dispute involved an alleged blackmail attempt by Camara, who was a security agent for Fist Interim – a firm that consulted for BSGR. Camara sent a letter to the Ministry of Mines on 25 February 2010 alleging that he was a founding member of BSGR Guinea who had initially assisted the company in obtaining its mining rights, and that he had been appointed Director of Logistics.[482] Camara's letter referred specifically to Cilins and others who were involved in obtaining the mining rights for BSGR Guinea. He said that he had been denied the privileges of this position and demanded backpay of 92,224,000 Guinean Francs, as well as reinstatement of his position as Director of Logistics. BSGR denied Camara's claims and demanded that Fist Interim terminate his employment ("**Camara Dispute**").

532. BSGR asserts that Skadden Arps was aware of the correspondence with Bah, but did not advise BSGR that it should be disclosed.[483]

533. The Tribunal notes that the dispute with Bah did not directly involve BSGR Guernsey or its subsidiaries and would not have resulted in any direct financial liability for these companies. There was however a publicity exposure for BSGR and its subsidiaries (including BSGR Guernsey and BSGR Guinea). In an email dated 26 March 2010 referring to Bah's demands for money, Struik said to Clark "This "schmuck" from Mali [i.e., Bah] has sent again an email to all and sundry and you should have received it as well."[484] The exposure that BSGR may have faced if Bah went public with his complaints is obvious from Bah's 15 March 2010 letter to Cilins and Lev Ran:

> Mr. Frederic Cilins. this game must stop. You have played with everyone and deceived everyone. [...]
>
> I agreed to sign this contract between Pentler Holding and myself because of the relations between BSGR and Pentler Holding.

---

[480] Avidan First WS, paragraph 105.
[481] Avidan First WS, paragraph 108.
[482] Letter from M. Camara to the Minister of Mines, 25 February 2010, p. 258, **C-244**.
[483] BSGR's Statement of Rejoinder, paragraph 26.
[484] Email from M. Struik to D. Clark & S. Bryce, 26 March 2010, **C-592**.

Mr. Frederic Cilins, do you recall that you came to see me in my office in Bamako with Mr. Dao Ismael? You begged me to do everything I could to help you by making it possible for BSGR to secure a contract in Guinea. All this in spite of the unsuccessful efforts you made in Guinea alongside Mr. Dao Ismael.

I have called the former minister, Mr. El hadj Fodé Soumah, who introduced you to Ms. Mamady Touré and Mr. Sory Touré.

As a result, it was thanks to my network and contacts that you met them, and this is how you established BSGR's activities.

Mr. Frederic Cilins, for 7 years. you have played with everyone and have involved everyone. You should remember that I am Guinean and Guinea is not like it was before. It is no longer a Guinea of injustice. The country will return to its values and rediscover its rights very soon.[485]

534.  On this basis, the Tribunal considers that there was significant risk to BSGR and its subsidiaries – particularly BSGR Guinea – of adverse publicity resulting from any claims Bah may have made public. However, the question in the Legal Due Diligence Questionnaire that directly referred to adverse publicity related to previous litigation, rather than anticipated disputes. The anticipated disputes question relates to disputes in which any Group company or its directors, employees or officers may become involved. Even if BSGR Guernsey or BSGR Guinea were not direct parties to any proceedings against Bah, it is likely that the companies and/or their directors (being Clark, Merloni-Horemans, Struik and Avidan[486]) would have been involved. This is not least because the contract at the centre of the dispute was also signed by I.S. Touré – an employee of BSGR in Guinea.

535.  Those involved in answering the Questionnaire were clearly aware of the Bah dispute as it was active at the time. In the Tribunal's view, the Bah dispute should have been disclosed in response to question 9.1 of the Legal Due Diligence Questionnaire and the failure to do so renders BSGR's response to that question misleading.

536.  The potential dispute between BSGR and Mme. Touré may well have involved BSGR Guinea (who signed the alleged 2007 Agreement with Mme. Touré) or directors and officers of BSGR Guernsey. However, the evidence surrounding these allegations is simply too vague to make any assessment as to whether disclosure was required under the Due Diligence Questionnaires. The Tribunal finds that evidence does not support a finding of false representation in this regard.

537.  The Pentler dispute has already been discussed above. The dispute had been settled and the Tribunal is not aware of any financial or other impact on BSGR Guernsey or its subsidiaries. It therefore was not captured within the due diligence questions discussed above.

538.  However, the Tribunal considers that the Camara Dispute is relevant. The allegations in Camara's letter to the Minister of Mines in February 2010 (the month before the due diligence commenced) were directed at BSGR Guinea – the local subsidiary that was included within the definition of BSG Group. While BSGR denies that Camara's allegations are true (and pointed to them as an example of blackmail typically

---

[485] Letter from A. Bah to A. Lev Ran & F. Cilins (copy BSGR), 15 March 2010, **R-51**.
[486] Project Hills Follow Up Diligence Request List, 4 April 2010, p. 4, **C-44**.

encountered in Guinea[487]), it does not explain why the attempted extortion was not disclosed in response to the Legal Due Diligence Questionnaire. As Vale notes:

> The Camara incident thus presented potential litigation in three respects: (1) BSGR could bring an action against Camara for his alleged blackmail, (2) Camara could bring an action against BSGR for his claimed back wages, and (3) Camara could bring an employment action against BSGR. Camara's claims, even if frivolous, triggered BSGR's disclosure requirements, as the Legal Due Diligence Questionnaire called for the disclosure of any threatened lawsuit or, at a minimum, an "active dispute".[488]

539. The Tribunal agrees with Vale and finds that BSGR should have disclosed the Camara dispute which directly involved BSGR Guinea.

540. In summary, the Tribunal finds that BSGR should have disclosed the potential disputes with Camara and Bah in its answers to the Legal Due Diligence Questionnaire. Consequently, BSGR's response to Question 9.1 that there were no pending, threatened or reasonably foreseeable proceedings was false and misleading.

### *BSGR's representation that no personnel or shareholders of BSGR or their immediate family were Government Officials*

541. The Compliance Due Diligence Questionnaire and Supplemental Compliance Due Diligence Questionnaire asked BSGR to disclose the names of any employees who were also "Government Officials" (as defined in the Questionnaires), and also to identify any family members of BSG employees who were Government Officials.

542. In its responses to the Compliance Due Diligence Questionnaire and the Supplemental Due Diligence Questionnaire, BSGR represented to Vale that no personnel, shareholders, or ultimate beneficial owners of the BSG Group (the "**UBO**"), or their spouses, siblings, or children, were Government Officials.[489]

543. Vale alleges that this response constituted a misrepresentation because Mme. Touré fell within the definition of "Government Official" in the Questionnaires and should have been disclosed, as she was the half-sister of I.S. Touré (a BSG employee).

544. The Tribunal is satisfied on the evidence that Mme. Touré was the President's fourth wife[490] and that she was also the half-sister of I.S. Touré. It is common ground that I.S. Touré was an employee of the BSG group.[491] Therefore, if Mme. Touré was a "Government Official", this fact should have been disclosed by BSGR.

545. The term "Government Official" is defined in the relevant Due Diligence Questionnaires in the following manner.

> For purposes of this questionnaire, "Government Official" means (i) an employee, officer or representative of, or any person otherwise acting in an official capacity

---

[487] BSGR's Statement of Defence, paragraphs 112-113.
[488] Vale's Statement of Reply, paragraph 678.
[489] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question II.D, **C-30**; Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, Question II.D, **C-43**.
[490] See Vale's Statement of Reply, paragraphs 483-492.
[491] Avidan First WS, paragraph 23.

for or on behalf of, (a) a national government, political subdivision thereof, or local jurisdiction therein; (b) an instrumentality, board, commission, court, or agency, whether civilian or military, of any of the above, however constituted; (c) a government-owned/government-controlled association, organization, business or enterprise; or (d) a political party (collectively, a "Government Authority"); (ii) a legislative, administrative, or judicial official, regardless of whether elected or appointed; (iii) an officer of or individual who holds a position in a political party; (iv) a candidate for political office; (v) an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or (vi) an officer or employee of a supra-national organization (e.g, World Bank, United Nations, International Monetary Fund, OECD)

546.    Vale discusses at length the evidence that supports its contention that Mme. Touré was the President's wife. Vale then asserts that she would fall within the definition of a "Government Official" as "an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies." Vale presents advice from the U.S. Department of Justice (the "**U.S. DOJ**") that, under the FCPA, the definition of "Government Official" could include a spouse of the Government Official who exerts significant influence over that Official.

547.    The Tribunal does not find the U.S. DOJ's views on the FCPA persuasive as (i) Vale has produced no evidence that it was made clear to BSGR that the definition was broad enough to include a spouse who was influential, but did not hold a formal Governmental position, or that the U.S. DOJ's views were known to BSGR; and (ii) in any case, the definition of "Government Official" under the FCPA is not the same as that provided in the due diligence questionnaires. This is particularly so in relation to the ceremonial position on which Vale concentrates its arguments.

548.    The Tribunal has considered whether Mme. Touré could be considered to hold a ceremonial position with the GoG or any of its agencies. Mme. Touré was the President's wife and acted in that capacity at public functions. An example of such a function was the occasion of the opening of BSGR's Conakry office in September 2006, as shown on a video during the Educatory Hearing in September 2016.[492] The video was also exhibited by Vale with its Statement of Case.[493] The video clearly demonstrates the ceremonial role played by the President's wife at such functions, which is supported by the fact that Mme. Touré attended a number of the meetings between BSGR and the President (and/or Government Ministers) as described in Section III above. Further evidence of Mme. Touré's ceremonial position within the GoG is contained in another video of her attending a ceremony marking the fiftieth anniversary of Guinea's independence in 2008.[494] The Tribunal considers that Vale has discharged its burden of proof that she held a ceremonial function with the government which was insufficiently challenged by BSGR. BSGR primarily argues that it remained unproven that Mme. Touré was the President's fourth wife which allegation runs counter to the Tribunal's finding at paragraph 544 above.

549.    Taking the above into account, together with the fuller analysis contained in paragraphs 583 to 591 below, the Tribunal finds that BSGR's answers to the Compliance Due Diligence Questionnaire and Supplemental Questionnaire that no BSG employee or their family members were "Government Officials" constituted a false representation. This

---

[492] Transcript, Educatory Hearing, Day 2, p. 45, line 2 ff.

[493] Global Witness Video, "BSGR and the former Guinean President's wife", September 2008, **C-99**.

[494] Video of the 50th Anniversary Ceremony of the Independence of Dubréka, 2 October 2008, **C-695**.

conclusion is corroborated by the Tribunal's finding below as to Avidan's separate representation regarding the relationship between I.S. Touré and Mme. Touré.

### Separate representation by Avidan

550.    Avidan made statements to George Kleinfeld ("**Kleinfeld**") (Vale's FCPA lawyer from Clifford Chance, Washington D.C.) during a pre-contractual interview on 8 April 2010 that went even further than the Questionnaire responses referred to above. Vale submitted that Avidan had positively stated that I.S. Touré and Mme. Touré were not related. Kleinfeld gave evidence in his Witness Statement that:

> Specifically, I asked during the interview about the BSGR employee in Guinea, Ibrahima Sory Touré, who handled public relations in-house, and whether he had any family ties to any government official. In response, Avidan volunteered that their public relations consultant in Guinea, who has the last name of "Touré," was not related to the former president of Guinea or his wife. Avidan said that he may have been from the same village as one of the former presidents, but to his knowledge, the employee is not related to anyone in the Government. Avidan said that Touré is a common name in the country.[495]

551.    In the Tribunal's view, Avidan's explanation for this statement was that, although he could not recall the specific questions, he thought he was asked about whether I.S. Touré was related to former President Ahmed Sékou Touré.[496] Importantly, Avidan also said that, had he been asked whether I.S. Touré was related to Mme. Touré, he would have said yes.[497] There is, therefore, no dispute between the Parties that BSGR knew that I.S. Touré was Mme. Touré's half-brother at the time of the due diligence process.

552.    Given that President Ahmed Sékou Touré died in 1984 and had nothing to do with the Simandou mining rights or BSGR's operations in Guinea, the Tribunal does not find Avidan's explanation plausible. It would have made no sense for Kleinfeld to have asked Avidan questions about a President who had died over 20 years before BSGR entered Guinea.

553.    The Tribunal notes that Kleinfeld is a respected FCPA specialist in a large international law firm. He provided a written witness statement and appeared at the February 2017 hearing to provide oral evidence. At the hearing, the Tribunal found him to be a credible witness. Avidan, on the other hand, did not make himself available for questioning at the February 2017 hearing (including by video link, as the Tribunal understands he could not travel out of Israel at the time). In addition, Avidan's written evidence on the matter is vague as he could not "remember precisely what [he] was asked about this point."[498] Given these circumstances, the Tribunal prefers the evidence of Kleinfeld that Avidan stated that I.S. Touré was not related to the President's wife and considers that this must have been a reference to Mme. Touré.

554.    Based on this evidence, the Tribunal finds that Avidan provided false information about the relationship between I.S. Touré and Mme. Touré. Avidan incorrectly told Vale that I.S. Touré was not related to the former President's wife or to any Government Official. This representation was false and misleading.

---

[495] Kleinfeld First WS, paragraph 35.
[496] Avidan First WS, paragraph 149.3.
[497] Avidan First WS, paragraph 149.3.
[498] Avidan First WS, paragraph 149.3.

***BSGR's representation that it was not involved in the Government of Guinea's decision to withdraw Rio Tinto's mining rights***

555. In the Compliance Due Diligence Questionnaire, Vale asked BSGR "[w]hat involvement (if any) has the BSG Group, directly or indirectly, had in the circumstances surrounding the decision of the Government of Guinea to seize the rights that Rio Tinto previously held to the North Block of the Simandou Project?"[499]

556. BSGR responded that "BSGR Guinea had no involvement directly or indirectly in any of the circumstances surrounding the decision, the Government held their own inter-ministerial committee, and it was passed in the ministers' cabinet and was ratified by Presidential decree."[500]

557. With regard to the process by which BSGR obtained the concessions for Simandou Blocks 1 and 2, BSGR stated in the Compliance Due Diligence answers that "BSGR Guinea applied in writing for the exploration licences for Simandou Blocks 1 and 2 in accordance with the Mining Code of Guinea. BSGR Guinea was awarded the exploration licences for Blocks 1 and 2 in December 2008 in accordance with the Mining Code."[501]

558. Avidan told the Clifford Chance lawyers during the pre-contractual interviews on 8 April 2010 that: "neither BSGR nor anyone acting on its behalf had interceded with the government officials in Guinea in an effort to get the Rio Tinto concession revoked."[502]

559. Vale alleges that the representations above were false as BSGR had lobbied the GoG to ensure that, when Rio Tinto's rights were revoked, the rights would be granted to BSGR.[503] Vale's allegation is that BSGR's answers omitted key information – BSGR's version of events was "not the whole story: far from being a passive bystander, BSGR actively lobbied the GoG to revoke Rio Tinto's rights, and more important, engaged in bribery to ensure that it would be the one awarded with research permits to the area once it became available."[504]

560. As set out in the Factual Background section of this Award, it is evident that BSGR had been interested in Blocks 1 and 2 from shortly after its entry into Guinea. The Tribunal recalls the following facts:

560.1. The MoU between the GoG and BSGR signed in February 2006 specifically included Blocks 1 and 2 in the areas subject to the MoU (see Appendix 1 of the MoU). Avidan gave evidence that he believed the MoU granted BSGR a right of first refusal over Blocks 1 and 2 if they became available.[505]

560.2. The BSGR-Pentler Milestone Agreement with Pentler (February 2006) included milestones and success fees related to obtaining permits over Blocks 1 and 2.

---

[499] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question III.E, **C-30**.
[500] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question III.E, **C-30**.
[501] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question III.F, **C-30**.
[502] Kleinfeld First WS, paragraph 30.
[503] Vale's Statement of Reply, paragraph 860.
[504] Vale's Statement of Reply, paragraph 694.
[505] Avidan First WS, paragraph 68.

560.3.  The Pentler-Bah and Pentler-Daou Milestone Agreements (February 2006) also contained milestones and success fees related to BSGR obtaining permits for Blocks 1 and 2.

560.4.  In December 2006, representatives of BSGR and the CPDM allegedly used the Presidential helicopter to visit areas of the Simandou that (at the time) were subject to Rio Tinto's exploration permits.

560.5.  From mid-2007, BSGR began to lobby the Government to grant BSGR mining rights to Simandou Blocks 1 and 2. In July 2007 and early 2008 BSGR allegedly signed an agreement with Mme. Touré to gain her assistance in obtaining these rights. Steinmetz flew to Guinea in February 2008 to meet with President Conté to discuss Blocks 1 and 2. Blocks 1 and 2 were subject to permits granted to Rio Tinto throughout this period.

560.6.  In April 2008, Avidan and Steinmetz met with the President (and Mme. Touré) to discuss the revocation of Rio Tinto's mining rights.[506] During this meeting, the President instructed relevant members of the Government that he wanted Rio Tinto's mining rights reviewed. Following a second meeting with Avidan, the President ordered that a Presidential decree revoking Rio Tinto's mining concession be prepared.[507] Avidan also attended meetings with Government officials, including the President's Secretary General, Mamady Sam Soumah ("**Soumah**"), at which the revocation of Rio Tinto's rights was discussed.[508]

560.7.  Fofana, consultant for BSGR in 2008-2009, also lobbied Government officials on BSGR's behalf. He was close friends with Nabé and Thiam who both held the position of Minister of Mines at different times between 2008-2010. Nabé said Fofana called him to discuss the granting of permits to BSGR.[509]

561.  Avidan said in his witness statement in this arbitration that BSGR wanted to position itself to ensure that it received the permits for Blocks 1 and 2 if they were revoked from Rio Tinto. He stated:

> When I learnt about the local community's frustration with Rio Tinto, I was even more convinced that these exploration areas would become available one day. BSGR therefore prepared to apply for the exploration permits. We decided to focus on blocks 1 and 2. We had started the preparation almost a whole year before they actually became available in 2008. It seemed that there was enough chance that Rio Tinto would lose its permits to warrant us investing the time and limited expense in getting ourselves ready.
>
> Whilst we did not advertise the fact that we were doing this, I did not keep it quiet either and would mention our interest in meetings I had with people influential in the industry and officials. In my regular meetings with the Minister of Mines, the President and the Prime Minister, I repeatedly explained the work that we were doing in Simandou North and South, and said that if Rio Tinto's blocks came up we would like to apply for them. Indeed, from late 2007, until he died in December 2008, I saw President Conte about seven or eight times - about once every couple of months - so that BSGR was always on his radar. I told Mr Struik that I

---

[506] Avidan First WS, paragraph 91.
[507] Vale's Statement of Case, paragraphs 163-164.
[508] Avidan First WS, paragraph 91.
[509] Nabé WS, paragraph 20.

was convinced that the blocks were going to be taken away from Rio Tinto and that I was going to prioritise conversations about blocks 1 and 2 with people of influence. I told Mr Steinmetz this too. By doing this, I hoped to keep BSGR foremost in the decision-makers' minds when the time came to make the application [...].[510]

562.    In the Tribunal's view, the evidence indicates that the influence of BSGR (and its supporters) on the ailing President was considerable. Senior officials – including the Prime Minister and the Minister of Mines – who were not receptive to BSGR's positioning with regard to Blocks 1 and 2 were removed by the President. Prime Minister Souaré, who was newly appointed in September 2008, noted the unusual level of interference by the Presidency in Ministerial business in relation to Blocks 1 and 2.[511]

563.    During the February 2017 arbitral hearing, former Minister of Mines, Louncény Nabé, gave evidence that the decision to retrocede Blocks 1 and 2 from Rio Tinto and to grant permits to BSGR was made by the Council of Ministers pursuant to the President's instruction. He said, "[t]he council took the decision by following the wish that the President had already expressed ... The council would not have taken that decision at all if the instruction had not been given by the President."[512]

564.    Nabé also said that he was summoned by the President to a meeting in September 2008 where he was told to "act quickly" with respect to the retrocession of part of Rio Tinto's area at Simandou.[513] Mme. Touré was also present at the meeting.[514] Nabé said that he was told to "hurry up" and grant the permits for Simandou Blocks 1 and 2 to BSGR as the President was becoming impatient.[515]

565.    Nabé also confirmed that, in his view, Mme. Touré and I.S. Touré favoured BSGR's interests and that they had a "definite impact" on the President's decisions in relation to these matters.[516] However, Nabé stated that he had no knowledge about the payment of any bribes, nor had he heard rumours that such bribes were paid.

566.    The Tribunal considers – also taking into account that Minister Nabé was not cross-examined by BSGR due to its failure to appear at the hearing – that Minister Nabé's evidence is reliable and truthful, and consistent with the evidence referred to above. In the Tribunal's view, the evidence establishes that BSGR decided at an early stage of its Guinea operations that it wished to obtain permits for Blocks 1 and 2. BSGR lobbied the Government to ensure that, if the rights were revoked from Rio Tinto, the Government would grant permits for these areas to BSGR. This appears to have been a key intention of the MoU signed in February 2006 with the GoG.

567.    BSGR and Mme. Touré met with the President on a number of occasions to press BSGR's position with regard to Blocks 1 and 2. These meetings impacted upon the way events unfolded. Indeed, in direct connection with these meetings, the President issued direct instructions for Rio Tinto's permits to be revoked and for BSGR to be granted permits for Blocks 1 and 2. Ultimately, the Government made Rio Tinto retrocede Blocks

---

[510] Avidan First WS, paragraphs 62-63.
[511] Souaré First WS, paragraph 40.
[512] Transcript, Merits Hearing, Day 2, p. 33, line 25 – p. 34, line 2 and p. 34, lines 6-7.
[513] Nabé WS, paragraphs 8-9.
[514] See Vale's Statement of Reply, paragraph 373.
[515] Nabé WS, paragraph 17.
[516] Transcript, Merits Hearing, Day 2, p. 35, lines 9-23.

1 and 2, rather than simply revoking all of its concessions. According to Nabé, this was a compromise position designed to keep the President happy.

568.  Leaving aside for later consideration the issue of whether any corruption occurred, the Tribunal finds that the facts demonstrate that BSGR's statement that it had no involvement – direct or indirect – in the GoG's decision to revoke Rio Tinto's rights was false and misleading. This is also the case with BSGR's description of the process by which it was granted the exploration licence for Blocks 1 and 2. BSGR lobbied for the revocation of Rio Tinto's rights and for BSGR to be granted those rights instead. The meetings in 2008 during which the President issued various instructions to his Secretary-General regarding what should happen with Simandou Blocks 1 and 2 are evidence of, at the very least, an indirect influence or involvement upon the circumstances surrounding Rio Tinto's loss of its mining rights. This information should have been disclosed to Vale in response to the Compliance Due Diligence Questionnaire.

569.  Based on the above, the Tribunal finds that the answers provided by BSGR to the due diligence questions which indicated that it was not involved in the GoG's decision to revoke Rio Tinto's concessions, were misleading and false.

***BSGR's representation that it had no financial relationships with Government Officials or their spouses and had not made any payments to Government Officials in connection with obtaining the mining rights***

570.  The Compliance Due Diligence Questionnaire asked BSGR to disclose any "business or financial relationship, directly or indirectly, between BSG Group and any Guinean Government Official or the spouse … of a Government Official". BSGR responded "[n]one whatsoever".[517]

571.  Leaving aside for the moment the allegations of corruption, the issue before the Tribunal here is whether there was any direct or indirect business or financial relationship between the BSG Group and Mme. Touré – President Conté's fourth wife.

572.  BSGR has attempted to downplay any such relationship, stating that Pentler had a business relationship with Mme. Touré that was unconnected to BSGR. Avidan suggested that the business venture between Pentler and Mme. Touré concerned the importation of chickens.[518]

573.  Noy stated in his First Witness Statement that:

> Pentler had business relations with Mamadie Touré and later with her company, Matinda, in consumer goods, foods, pharmaceuticals and mining. Mamadie Touré was a businesswoman, whose company had been granted mining permits of its own. The business Pentler conducted with Mamadie Touré and Matinda was unrelated to BSGR. It was also unconnected to the agreement we had reached with her in February 2006, in which we granted her an economic interest in Pentler. She was granted an interest following our local partners' agreement with her.[519]

574.  The Tribunal considers that the evidence does not support BSGR's position that it had no business or financial relationship whatsoever with Mme. Touré.

---

[517] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question III.C, **C-30**.
[518] Avidan First WS, paragraph 45.
[519] Noy First WS, paragraph 8.

574.1. The Tribunal has been provided with copies of several contracts between Pentler / BSGR and Mme. Touré (or her company Matinda) which relate to the Simandou project. These contracts are:

574.1.1. The MoU dated 20 February 2006[520] between Pentler and Mme. Touré, which granted her a 5% interest in BSGR Guinea BVI and thereby an indirect interest in BSGR Guinea. It was agreed that the interest would be created through granting Mme. Touré a shareholding in Pentler. The MoU stated that it was BSGR that proposed granting this interest to Mme. Touré and that she was "a local partner" of BSGR Guinea BVI. The MoU was reviewed by Merloni-Horemans (Director of BSGR).[521]

574.1.2. Two Engagement Letters dated 21 July 2006 between Pentler and Mme. Touré concerning her assistance in obtaining bauxite permits for BSGR Guinea. These two Engagement Letters both stated:

> The company BSGR Guinea contacted the Guinean authorities with the aim of establishing a partnership for the development and use of part of the SIMANDOU iron deposits.
>
> Within the framework of this project, BSGR Guinea submitted a proposal to the authorities allowing the Republic of Guinea a 15% shareholding and a 5% shareholding for Mrs. Mamadie TOURE as a local partner. To this end, the company BSGR Guinea along with the Republic of Guinea shall create a partially state-owned limited company named Compagnie Miniére de SIMANDOU.
>
> In order to incorporate the shareholding of Mrs. Mamadie TOURE, the company BSGR Guinea shall transfer 17.65% of its capital to the company Pentler Holdings Ltd, 33.30% of the capital of which shall be allocated to Mrs. Mamadie TOURE …
>
> It is understood that the procurement of these exploration permits to the company BSGR Guinea shall entail de facto the shareholding of Mrs. Mamadie Touré in this project, through her free shareholding of 33.30% stipulated under the terms of the Memorandum of Understanding between Mrs. Mamadie Touré, on one hand, and the company Pentler Holdings Ltd, on the other hand, dated February 20, 2006.[522]

574.1.3. Memorandum of Understanding between Matinda and BSGR Guinea dated 20 June 2007, which provided for the transfer of 5% interest in BSGR Guinea to Matinda in return for assistance in obtaining mining rights. BSGR has alleged that this agreement is a forgery.[523]

574.1.4. Commission Contract dated 27 February 2008 between Matinda and BSGR, pursuant to which BSGR undertook to pay a USD 4 million

---

[520] Touré MoU, 20 February 2006, pp. 223-224, **C-6**.
[521] Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-344**.
[522] Engagement Letter, 21 July 2006, pp. 226-229, **C-6**; Engagement Letter, 21 July 2006, pp. 231-232, **C-6**.
[523] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.

commission for assistance in obtaining the Simandou Blocks 1 and 2 mining rights. This agreement provided that USD 2 million would be paid to Matinda and the remaining USD 2 million would be paid to others who assisted. BSGR has alleged that this agreement is a forgery.[524]

574.1.5. Memorandum of Understanding between Matinda and BSGR Guinea BVI dated 28 February 2008, which granted Matinda a 5% interest in Simandou Blocks 1 and 2. BSGR has alleged that this agreement is a forgery.[525]

574.1.6. An untitled contract between Mme. Touré and Pentler dated 8 July 2010, which referred directly to the Simandou project in Guinea. Pentler undertook to pay Mme. Touré an additional USD 5 million.[526] Noy has claimed that this contract is a forgery.[527]

574.1.7. An untitled agreement between Pentler and Matinda dated 3 August 2010,[528] pursuant to which Pentler agreed to pay Mme. Touré USD 5 million in return for Mme. Touré not using the agreement against Pentler and taking "full responsibility for all actions taken in Guinea by any third party against Pentler."

574.1.8. An undated agreement between Pentler and Matinda/Mme. Touré, whereby Pentler agreed to pay Matinda USD 3.1 million for its contribution to Pentler's activities in Guinea. Matinda undertakes to keep the agreement confidential and not to contact any of the parties with which Pentler collaborated.[529] Under that agreement Matinda withdrew all undertakings and obligations contracted with Pentler "and its business partners". Matinda also agreed not to use "these documents" in relation to any third party and to take responsibility for any actions against Pentler. In this contract, Pentler also thanks Matinda for its collaboration and support since 2005.

574.2. Mme. Touré held a 33.3% interest in Pentler which held a 17.65% interest in BSGR Guinea BVI (the 100% owner of BSGR Guinea). In 2010, Pentler paid Mme. Touré over USD 10 million following the share buyback whereby the interest in BSGR Guinea BVI was returned to BSGR Steel.[530]

574.3. There is a dispute between the Parties as to the authenticity of the three contracts allegedly signed by Mme. Touré and BSGR in July 2007 and February 2008 and one agreement signed with Pentler. However, even if these agreements are forgeries (and the Tribunal makes no finding on their

---

[524] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[525] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[526] Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.
[527] Noy First WS, paragraph 80.
[528] Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-237, **C-6**.
[529] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, **C-6**.
[530] Noy First WS, paragraph 72.

authenticity here), there is considerable evidence of a financial or business relationship between BSG entities and Mme. Touré apart from these allegedly forged agreements.

574.4. As described in the Factual Background,[531] Avidan met Mme. Touré on multiple occasions to discuss the Simandou project. Mme. Touré also attended meetings with Avidan and President Conté where the revocation of Rio Tinto's rights was discussed. It is also evident that Mme. Touré helped BSGR obtain bauxite permits in Guinea in April 2006.[532]

574.5. It is also evident from the above contracts that Pentler and Mme. Touré collaborated closely on Pentler's activities in Guinea, despite Noy's repeated assertions in his Witness Statement that Mme. Touré played no role at all in obtaining the mining permits for BSGR. The facts simply do not support Noy's account of Mme. Touré's involvement (or lack of it) in the Simandou project.

574.6. Former Ministers Nabé and Souaré gave evidence for Vale that Mme. Touré advocated for BSGR to her husband, President Conté, who was clearly influenced by her views. Nabé added that when I.S. Touré (BSGR's employee) would visit the Ministry of Mines to "advocate for the granting of Simandou permits to" BSGR, "[h]e would introduce himself as the brother of the President's wife".[533]

574.7. The transcript of the conversation between Cilins and Mme. Touré recorded by the FBI in 2013, together with the evidence provided by Peter Kilpatrick (Special Agent, FBI) in the Complaint submitted to the New York District Court (Southern District), reveals that Cilins offered Mme. Touré a considerable sum of money to destroy certain documents – including the three contracts of February and July 2008 between Matinda and BSGR, which BSGR alleges are forgeries.[534] Cilins states expressly that the money was coming from "Beny" and that Cilins was delivering the message from "Beny".[535]

575. Aside from the contested 20 June 2007 contract, none of the agreements noted above were entered into directly by members of the BSG Group, but they all concerned (at least indirectly) BSGR Guinea and the assistance provided by Mme. Touré to secure the mining rights held by BSGR Guinea. Mme. Touré was an indirect owner of BSGR Guinea for a period of time and was called "a local partner".

576. It is clear to the Tribunal that Mme. Touré had a business/financial interest in the BSG Group and eventually received a third of the money that was paid to Pentler under the share buyback arrangement, as compensation for her interest in BSGR Guinea BVI. She was involved in many key meetings, and it cannot be seriously maintained that she had

---

[531] See Sections III.G to III.I of this Award. See also Mme. Touré's description of the meetings she attended with Avidan in Mme. Touré's Written Statement to the U.S. authorities, 2 December 2013, pp. 36-41, **C-6**.
[532] Email chain between Y. Tchelet, R. Oron et al re: Invoice, 10-15 May 2006, **R-179**; Struik First WS, paragraph 48; Engagement Letter, 21 July 2006, pp. 226-229, **C-6**; Engagement Letter, 21 July 2006, pp. 231-232, **C-6**; Vale's Statement of Reply, paragraphs 405-407.
[533] Nabé WS, paragraph 7.
[534] See *USA v. Cilins*, Complaint, Dkt. No. 1, 15 April 2013, paragraph 17, **C-8**.
[535] *USA v. Cilins*, Complaint, Dkt. No. 1, 15 April 2013, paragraph 22(a) and p. 134, **C-8**.

no business or financial relationship with BSGR – including BSGR Guinea, the local company holding the mining rights.

577. The Compliance Due Diligence Questionnaire asked about direct and indirect relationships with Government Officials or their spouses. It is the Tribunal's view that some of the above contracts individually or at least in aggregate constitute clear evidence of an indirect business and/or financial relationship between BSGR and Mme. Touré that should have been disclosed by BSGR.

578. In view of the above facts, the Tribunal finds that BSGR's representation that the BSG Group had no direct or indirect relationship (business or financial) with any Government Official or their spouse was false and misleading.

### BSGR's representation that it had not engaged in bribery or corruption

579. BSGR represented to Vale in section VI of its Compliance Due Diligence Questionnaire that it did not engage in bribery or corruption:

> In regard to the Simandou Project and Project Hill, the BSG Group has not and will not, and does not know or have reason to know that any of its directors, employees, shareholders, UBOs or Consultants have, or in the future, will, pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to any Government Officials while knowing or having reason to know that any portion of such exchange is for the purpose of:
>
> (a) influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business, or directing business to any third party; NONE WHATSOEVER
>
> (b) securing an improper advantage; NONE WHATSOEVER
>
> (c) inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Authority in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business, or directing business to any third party; or NONE WHATSOEVER
>
> (d) providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s). NONE WHATSOEVER[536]

580. This representation was also made in section VI of the Supplementary Compliance Due Diligence Questionnaire; section III.A. of the Compliance and Supplementary Compliance Due Diligence Questionnaires; and Steinmetz's and David Clark's anti-bribery certificates dated 9 April 2010 and 30 April 2010 respectively, albeit with minor differences which are inconsequential to the Tribunal's analysis in this section.

581. Vale alleges that this representation was false because BSGR had bribed:

581.1. Mme. Touré;

581.2. Mahmoud Thiam; and

---

[536] See also Compliance Due Diligence Questionnaire, section III.A, p. 7, **C-30**.

581.3. President Conté.

582. The Tribunal will deal with each of these allegations separately.

*i.  Mme. Touré*

583. The wording of BSGR's anti-bribery representations makes it clear that, to establish the falsity of BSGR's anti-bribery representations in respect of Mme. Touré, Vale must show that Mme. Touré was a "Government Official" within the meaning of BSGR's representations at the material time. If she was, Vale must then show that:

583.1. the BSG Group (a) paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré; or (b) knew or had reason to know that any of its directors, employees, shareholders, ultimate beneficial owners or Consultants paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré (the "**First Limb**");

583.2. such payment or offer was for the purpose of achieving one of the four aims referred to in BSGR's anti-bribery representations; (the "**Second Limb**"); and

583.3. BSGR knew that such exchange was for the purpose of achieving one of the four aims in the subsections in BSGR's anti-bribery representations (the "**Third Limb**").

**Whether Mme. Touré was a Government Official**

584. The Tribunal begins by observing that the term "Government Official" is defined in BSGR's representations as:

(i) an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of, (a) a national government, political subdivision thereof, or local jurisdiction therein; (b) an instrumentality, board, commission, court or agency, whether civilian or military, of any of the above, however constituted; (c) a government-owned/government-controlled association, organisation, business or enterprise; or (d) a political party (collectively, a "Government Authority");

(ii) a legislative, administrative or judicial official, regardless of whether elected or appointed;

(iii) an officer or individual who holds a position in a political party;

(iv) a candidate for political office;

(v) an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or

(vi) an officer or employee of a supra-national organisation (e.g., World Bank, United Nations, International Monetary Fund, OECD).[537]

585. Vale argues that that Mme. Touré fell within category (v) ("an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or

---

[537] Compliance Due Diligence Questionnaire, section II.D, p. 3, **C-30**.

any of its agencies") because her "marriage to President Conté, influence on government ministers and the President, and ceremonial role in representing the [GoG], made her a Government Official" within this category.[538]

586. The Tribunal considers that there is no proof that Mme. Touré held any official position within the GoG or other appointed or inherited position. It is true that the Tribunal found that Mme. Touré was President Conté's wife, but the mere spousal relationship does not confer upon her an official, appointed or inherited position.

587. Nevertheless, the Tribunal notes that Mme. Touré attended a reception hosted by BSGR on 19 September 2006 to mark the occasion of the opening of BSGR's Conakry office.[539] The Tribunal is persuaded that Mme. Touré was performing a *ceremonial* function for the GoG within the meaning of category (v). In the Tribunal's view, for category (v) to bite, it is not necessary that she was representing the GoG in the sense of being authorised to make commitments on behalf of the Republic of Guinea. It is sufficient that she attended a public ceremony, not in a private capacity as a businesswoman, but in the position of the spouse of the Head of State endorsing a foreign company investing in the country and, in this case, BSGR's investments in Guinea. She had therefore performed a ceremonial function in this capacity and was a "Government Official". The Tribunal's finding is corroborated by a further video recording of a ceremony of the fiftieth anniversary of independence of the Republic of Guinea[540] held in Dubréka, where Mme. Touré clearly performed a ceremonial function as the spouse of the Head of State, including laying a wreath on the local monument for martyrs. Moreover, Mme. Touré was issued a diplomatic passport, which identified her as the wife of the President of Guinea.[541]

588. The Tribunal also notes that the due diligence definition of a "Government Official" is broader than that contained in the FCPA. It bears repeating the definition in the Compliance Due Diligence Questionnaire quoted above:

> (i) an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of, (a) a national government, political subdivision thereof, or local jurisdiction therein; (b) an instrumentality, board, commission, court or agency, whether civilian or military, of any of the above, however constituted; (c) a government-owned/government-controlled association, organisation, business or enterprise; or (d) a political party (collectively, a "Government Authority");
>
> (ii) a legislative, administrative or judicial official, regardless of whether elected or appointed;
>
> (iii) an officer or individual who holds a position in a political party;

---

[538] Vale's Statement of Reply, paragraph 26(c); Vale's Pre-Hearing Written Submissions, paragraph 17(c).
[539] Presentation by BSGR Guinea BVI to the Minister of Mines, Dr Ousmane Sylla, 19 September 2006, **R-26**; BSGR's Chronicle of Events and Overview of BSGR's Iron Ore Investment in Guinea in Response to the Technical Committee, 26 December 2012, paragraph 45, p. 12, **C-23**; Global Witness Video, "BSGR and the former Guinean President's wife," September 2008, **C-99**; Vale's Statement of Case, paragraph 157; BSGR's Statement of Defence, paragraph 51; Vale's Statement of Reply, paragraph 360.
[540] Video of the 50th Anniversary Ceremony of the Independence of Dubréka, 2 October 2008, **C-695**.
[541] Diplomatic Passport of M. Touré, **C-75**.

> (iv)    a candidate for political office;
>
> (v)    an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or
>
> (vi)    an officer or employee of a supra-national organisation (e.g., World Bank, United Nations, International Monetary Fund, OECD).[542]

589.    By contrast, the FCPA has a shorter and more open-ended definition of "Government Official" (Section 30A(f)(1)(A) of the Exchange Act, 15 U.S.C. § 78dd-1(f)(1)(A); 15 U.S.C. §§ 78dd-2(h)(2)(A), 78dd-3(f)(2)(A), CL-76, p. 29 and footnote 112):

> any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization.

590.    The difference between the Compliance Due Diligence Questionnaire definition and the FCPA definition reinforces the Tribunal's view that the addition of a ceremonial function by the Parties in the Questionnaire's definition was deliberate, and ought to be given full effect. The Tribunal therefore concludes that Mme. Touré held a ceremonial position in her capacity as the spouse of the Head of State within the meaning of category (v) and finds that she was a "Government Official".

**The First Limb**

591.    There are two ways by which Vale can satisfy the First Limb.[543] The first is to show that the BSG Group itself paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré. The second is to show that the BSG Group knew or had reason to know that any of its directors, employees, shareholders, ultimate beneficial owners or Consultants paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré.

592.    The Tribunal proceeds to analyse if the BSG Group itself had paid or offered benefits to Mme. Touré (i.e. the first method of fulfilling the First Limb), noting that the BSG Group was defined as BSGR Guernsey and BSGR Guinea and two other related companies in the Compliance Due Diligence Questionnaire, and was later broadened to include BSGR and two more related companies in the Supplemental Compliance Due Diligence Questionnaire (so BSGR's conduct will also be scrutinised in the evidentiary analysis below). If Vale fails to satisfy the First Limb through the first method, the Tribunal will examine if Vale fulfils the First Limb through the second method.

593.    Vale argues that BSGR offered benefits to Mme. Touré, and its central case theory can be broken down into the following six episodes.

---

[542] Compliance Due Diligence Questionnaire, section II.D, p. 3, **C-30**.

[543] Under the First Limb, Vale must show that the BSG Group (a) paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré; or (b) knew or had reason to know that any of its directors, employees, shareholders, ultimate beneficial owners or Consultants paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré. See paragraph 583.1.

594. First,[544] in 2005 I.S. Touré introduced Cilins to Mme. Touré. Cilins told Mme. Touré that BSGR wanted to obtain rights to iron ore deposits, asked her to put BSGR in touch with President Conté and told her that USD 12 million would be distributed to Guineans (including her) if BSGR obtained the mining rights.

595. Second,[545] in 2006 BSGR hatched a plan to interpose an intermediary (Pentler) between BSGR and Mme. Touré so that Pentler could be used to grant shares in BSGR Guinea BVI to Mme. Touré. To carry out that scheme, Onyx sold Pentler to Cilins, Noy and Lev Ran on 14 February 2006, and Pentler executed powers of attorney in favour of Noy and Lev Ran. BSGR Guinea BVI then entered into a Milestone Agreement with Pentler on 14 February 2006 under which Pentler would receive 17.65% of the shares in BSGR Guinea BVI and be paid milestone payments. Pentler then entered into a MoU with Mme. Touré on 20 February 2006 (the Touré MoU),[546] which promised her a 5% interest in BSGR Guinea BVI, by giving to her a 33.3% interest in Pentler (which would own 17.65% interest in BSGR Guinea BVI).

596. Third,[547] subsequent to the Touré MoU, Mme. Touré helped BSGR to obtain exploration permits for bauxite in Northern Guinea. Pentler entered into two engagement letters with Mme. Touré on 21 July 2006, noting that BSGR Guinea BVI had obtained these bauxite permits and stating that this entitled Mme. Touré to shares in this bauxite project through her 33.3% share stipulated under the Touré MoU.[548]

597. Fourth,[549] Pentler's involvement in BSGR's Guinean operations ceased towards the end of 2006. BSGR started to deal directly with Mme. Touré. BSGR obtained exploration permits for uranium on 28 February 2007. Mme. Touré wanted reassurance that her shareholding interest remained secure, so on 20 June 2007, BSGR Guinea entered into a memorandum of understanding with Matinda, noting the procurement of the uranium permits and accepting the transfer of 5% of its shares to Matinda.[550]

598. Fifth,[551] over the course of 2007, relations between BSGR and Pentler deteriorated. BSGR Steel and Pentler therefore entered into a Share Purchase Agreement,[552] under which BSGR Steel purchased Pentler's 17.65% share in BSGR Guinea BVI for USD 22 million. This would cut out Mme. Touré's indirect shareholding in BSGR entities, so it was necessary for new contracts to be executed to retain her shareholding. On 28 February 2008, Matinda and "BSG Resources Guinée" entered into a memorandum of understanding, under which "BSG Resources Guinée" undertook to give a 5% shareholding in Simandou Blocks 1 and 2 to Matinda.[553] On 27 February 2008, Matinda and "BSG Resources" executed a commission contract, under which "BSG Resources" undertook to pay Matinda (and others) USD 4 million as commission for assistance in

---

[544] Vale's Statement of Case, paragraph 141; Vale's Statement of Reply, paragraph 429.
[545] Vale's Statement of Reply, paragraphs 383-410.
[546] Touré MoU, 20 February 2006, pp. 223-224, **C-6**.
[547] Vale's Statement of Reply, paragraphs 411-417.
[548] Engagement Letter, 21 July 2006, pp. 226-229, **C-6**; Engagement Letter, 21 July 2006, pp. 231-232, **C-6**.
[549] Vale's Statement of Reply, paragraphs 418-428.
[550] Memorandum of Understanding between BSGR and Matinda, 20 September 2007, **R-234**.
[551] Vale's Statement of Reply, paragraphs 418-428.
[552] Share Purchase Agreement between BSGR Steel and Pentler, 24 March 2008, **R-28**.
[553] Memorandum of Understanding, 28 February 2008, **R-129**.

obtaining the Simandou Blocks 1 and 2 mining rights.[554] The contract stated that USD 2 million would be paid to Matinda and the remaining USD 2 million would be paid to others who had assisted in this undertaking.

599.    Sixth,[555] subsequent to the execution of the Joint Venture Agreements, Pentler signed two agreements on BSGR's instructions with Mme. Touré and Matinda on 8 July 2010 to end its relationship with Mme. Touré. In one agreement, Pentler undertook to pay USD 5.5 million for Matinda's "participation in all activities conducted in Guinea".[556] In the other agreement, Pentler undertook to pay an additional USD 5 million "[s]ubject to the proper implementation and functioning and the next stages of the operation conducted by [Pentler's] partners on the Simandu [sic] project" (i.e. a conditional agreement).[557] However, these contracts contained references to Simandou which (if discovered) might expose BSGR, so Mme. Touré, Matinda and Pentler executed two replacement contracts on 3 August 2010[558] that removed the references. Pursuant to the replacement contract for the USD 5.5 million, Mme. Touré signed a declaration confirming that she had received USD 2.4 million. Pentler also signed an agreement with Mme. Touré and Matinda, promising to pay them USD 3.1 million.[559]

600.    The question is whether these episodes demonstrate that BSGR (or other entity in the BSG Group) did offer benefits to Mme. Touré. The Tribunal's view is that the first, third and fourth episodes clearly do not for the following reasons.

600.1.    With respect to the first episode, the only evidence which Vale adduces in support of this meeting is a declaration by Mme. Touré dated 2 December 2013, which was appended to the Technical Committee's Report.[560] Mme. Touré has not been produced in this arbitration for cross-examination so it is difficult to assess the veracity of her statement. It is arguable that her statement was made against her own interest and should be given weight but, even if that is taken into account, the declaration is still insufficient. The alleged fact took place over a decade ago in 2005, so the accuracy of Mme. Touré's recollection is critical and can only be tested by cross-examination before the Tribunal.

600.2.    In relation to the third and fourth episodes, the contracts and circumstances surrounding the bauxite and uranium permits are irrelevant because they do not concern the Simandou project for iron ore, to which BSGR confined the scope of its anti-bribery representations.

601.    This leaves the Tribunal with the second, fifth and sixth episodes, each of which will now be analysed.

602.    With regard to the second episode, the Tribunal finds that the evidence sufficiently shows that BSGR interposed an intermediary (Pentler) between itself and Mme. Touré so that

---

[554] Commission Agreement, 27 February 2008, **R-128**.
[555] Vale's Statement of Reply, paragraphs 429-437.
[556] Contract between Matinda & Co. Ltd and Pentler, 8 July 2010, **C-563**.
[557] Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.
[558] Agreement between Matinda & Co Limited and Pentler, 3 August 2010, **R-151**; Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-237, **C-6**.
[559] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, **C-6**; Undated Statement of Mme. Touré, p. 244, **C-6**.
[560] Recommendation and Report of the Technical Committee, 21 March 2014, p. 37, paragraph 8, **C-6**.

Pentler could be used to grant shares in BSGR Guinea BVI to Mme. Touré. The evidence shows that Merloni-Horemans (a director of BSGR) was not only involved in the sale of Pentler to Cilins, Noy and Lev Ran[561] and the execution of the BSGR-Pentler Milestone Agreement,[562] but also in reviewing the Touré MoU. In an email sent from Noy's assistant, Karine, to Merloni-Horemans, Karine said "As per you[r] discussion with [Noy] please find attached both Protocoles d'Accord", attaching drafts of both the Pentler-Bah Milestone Agreement and the Touré MoU.[563] This is a clear sign of her involvement in the review of the Touré MoU.

603.  Merloni-Horemans' explanation is that the original signature block provided that Margali Management Corporation (a former director of Pentler) would sign on behalf of Pentler, which was unworkable because Margali Management Corporation had resigned as director, so her discussions with Noy focused on replacing Margali Management Corporation with Lev Ran, who was authorised to enter into the contracts on behalf of Pentler. She maintains that she was not involved in reviewing the Touré MoU.[564] But the Tribunal is unpersuaded by Merloni-Horemans' explanation. It is true that there is documentary evidence that the amendments to the draft Pentler-Bah Milestone Agreement (following Merloni-Horemans' discussions with Noy) were limited to Pentler's signature block.[565] But there is no similar documentary proof that the amendments proposed by Merloni-Horemans to the Touré MoU were likewise limited to Pentler's signature block.[566] In the absence of such proof, and bearing in mind that Merloni-Horemans herself has admitted that she is unable to recall her discussions with Noy (although she denies that they concerned the substantive content of the drafts),[567] the Tribunal finds that Merloni-Horemans was involved in reviewing the substance of the Touré MoU on behalf of BSGR. There is simply no compelling evidence satisfactory for the Tribunal to believe otherwise.

604.  Merloni-Horemans' involvement in all stages of the second episode of Vale's case theory is cogent evidence that BSGR, the company of which she was a director, intentionally procured the sale of Pentler and entered into the BSGR-Pentler Milestone Agreement so as to set up an intermediary that could then effect payments to Mme. Touré in accordance with BSGR's wishes. On this basis, even though the Touré MoU was signed by Pentler and Mme. Touré, the First Limb was nonetheless fulfilled because BSGR (as a member of the BSG Group) had indirectly offered (or authorised the offer of) shares to Mme. Touré. Alternatively, it can be concluded that BSGR knew or had reason to know that Pentler (its Consultant) offered shares to Mme. Touré, fulfilling the First Limb via the second method.

---

[561] Merloni-Horemans First WS, paragraph 15; Emails between S. Merloni-Horemans and M. Noy, 14 February 2006, **C-331**; Emails between S. Merloni-Horemans and Y. Tchelet, 13 February 2006, **C-332**.

[562] Merloni-Horemans First WS, paragraph 27; Email from S. Merloni-Horemans to M. Noy, 13 February 2006, **C-335**.

[563] Email from Karine (assistant to Noy) to S. Merloni-Horemans, 15 February 2006 (attaching draft Memorandum of Understanding between Pentler, I.S. Touré, and Bah and draft Memorandum of Understanding between Pentler and Mme Touré) **C-344**.

[564] Merloni-Horemans First WS, paragraphs 5-6. See also Noy Second WS, paragraph 10.

[565] Emails between S. Merloni-Horemans & Karine (assistant to Noy), 15 February 2006, **C-341**; Email from Karine (assistant to Noy) to S Merloni-Horemans, 15 February 2006, **C-343**.

[566] Email from Karine (assistant to Noy) to S. Merloni-Horemans, 15 February 2006 (attaching draft Memorandum of Understanding between Pentler, I.S. Touré, and Bah and draft Memorandum of Understanding between Pentler and Mme Touré) **C-344**.

[567] Merloni-Horemans Second WS, paragraph 5.

605. The Tribunal turns to the fifth episode of Vale's case theory. In this episode, Vale relies on Mme. Touré's declaration appended to the Technical Committee's Report which alleged the following events.

> At the beginning of 2008, Asher Avidan and Issiaga Bangoura came to meet me at the President's house in Dubréka. Avidan really wanted my help to secure blocks 1 and 2, and he told me that BSGR needed new contracts because Struik was no longer manager of BSGR in Guinea (although he subsequently came back). At this meeting, Avidan called Beny Steinmetz and put the phone on speaker so that I could hear the voice of Steinmetz. I recognized his voice, and Steinmetz told them to give me what I wanted. I continued to refuse to sign the contracts and I dismissed Avidan and Bangoura.
>
> The next day, Issiaga Bangoura brought two draft contracts to my house in Dubréka. I told him to leave them. I read them carefully, and I made some changes. The following day, I called Bangoura asking him to come by and take the amended contracts. He did. He returned the next day with two typed contracts, none of which had been signed by Asher Avidan. I told him they should be signed and bear the stamp of BSGR, otherwise I would not sign them. When he returned with the contracts signed and stamped, I signed them both.[568]

606. Vale claims the result was that two contracts were signed with Matinda, one on 27 February 2008, under which "BSG Resources" (as party) undertook to pay USD 4 million as commission for assistance in obtaining the mining rights in Simandou Blocks 1 and 2, and another dated 28 February 2008 under which "BSG Resources Guinée" (as party) agreed that "BSG Resources" undertook to give a 5% shareholding in Simandou Blocks 1 and 2 to Matinda. Vale adduces documentary proof of the two contracts.[569] BSGR argues that that the two contracts were forged, which (if proven) would suffice to dispose of this episode of Vale's case theory.

607. The Tribunal observes that Avidan's signatures on the contracts resemble his signatures on his witness statements in this arbitration, and that both contracts bear the stamp of the BSGR Chief Operating Officer. However, Avidan has said that he was in Israel at the time the contracts were allegedly signed in Conakry, which is supported by two pieces of evidence provided to the Tribunal. One document is a ledger of Avidan's flight history recorded by BSGR's travel agent, Diesenhaus Unitours, which indicates that Avidan flew from Conakry to Tel Aviv on 17 February 2008 and returned on 23 April 2008,[570] and another ledger titled "Expenses of Conakry Head Office, February 2008" that indicates an entry "Rent a car, travel charges in Israel, Asher" dated 27 February 2008.[571]

608. Vale relies on three entries in the same ledger titled "Expenses of Conakry Head Office, February 2008" to prove that Avidan visited Mme. Touré in February 2008. The first entry dated 22 February 2008 refers to "Different expenses for the visit of delegation, Toure". The second dated 26 February 2008 records USD 1,000 for "Salary of Issiaga Bangoura

---

[568] Recommendation and Report of the Technical Committee, 21 March 2014, p. 38, paragraphs 18-19, **C-6**.
[569] Memorandum of Understanding, 28 February 2008, **R-129**; Commission Agreement, 27 February 2008, **R-128**.
[570] Diesenhaus Unitours' records of flights taken by Asher Avidan in 2008, **R-296**.
[571] Expenses of Conakry Head Office, February 2008, **C-346**.

(Benjamin)". The third dated 28 February 2008 identifies expenses for "Copy of documents, making of stamps".[572]

609. The Tribunal has reviewed this evidence in detail, but finds the evidence to be contradictory and inconclusive as to the validity of the contracts. For example, Avidan's flight history shows him to be in Tel Aviv up until 23 April 2008. However, in his written evidence Avidan said that he and Steinmetz met with President Conté in April 2008.[573] This is consistent with Steinmetz's evidence. [574] According to Steinmetz's travel information (including his stamped passport), Steinmetz was in Guinea on 9-11 April 2008 and therefore the meeting must have taken place on one of these dates. [575] Steinmetz's travel documentation indicates he was also in Guinea in February and May 2008, but Avidan appears to have also been out of the country on these dates. The Tribunal is simply unable to reconcile this evidence. Moreover, Avidan's travel record appears to be incomplete as it shows that he returned to Conakry (from Israel) on 28 November 2008, but the next entry is a flight from Tel Aviv to Paris on 14 December, with no indication of how or when Avidan travelled from Conakry to Tel Aviv. The Tribunal is unable to reach any conclusion, based on this evidence, as to Avidan's whereabouts on or about 27-28 February 2008.

610. Similarly, the expenses ledger does not provide any evidence as to Avidan's location on these dates. While the ledger includes an entry on 27 February 2008 for rental car costs in Israel claimed by Avidan, the Tribunal does not consider that this provides any indication of when the rental actually took place. For example, the ledger also indicates expenses of Avidan incurred in Paris and Israel which are recorded on 12 February 2008 – a date on which (according to his travel records) he was in Guinea, not Paris. This indicates that the date on which an expense is recorded in the ledger is not necessarily the date on which that expense was incurred by the person making the claim. The Tribunal therefore finds that the car rental entry on 27 February 2008 does not prove that Avidan was in Israel on that date or that he rented a car on that specific date. It is therefore of little probative value.

611. In sum, therefore, the evidence presented by BSGR in support of its case theory that the contracts are fraudulent is at best inconclusive as to the physical location of Avidan on or around 27-28 February 2008.

612. Equally, the evidence cited by Vale in support of its case theory is inconclusive. The Tribunal is unpersuaded that the three entries in the expense ledger referred to by Vale show that Avidan visited Mme. Touré in February 2008. The first entry only refers to "Toure". Avidan says that this ambiguous reference is likely to be a reference to I.S. Touré, who frequently accompanied Avidan on delegations to local villages.[576] Indeed, there are other references in the ledger to the organisation of ceremonies, concerts and meals for these delegations. It would not make sense for BSGR to organise such matters simply to get Mme. Touré to sign the contracts. Moreover, it is also unlikely that a company would record the name of the person being bribed in its expenses report.

---

[572] Expenses of Conakry Head Office, February 2008, **C-346**.
[573] Avidan First WS, paragraph 91.
[574] Steinmetz First WS, paragraph 30.
[575] Benjamin Steinmetz passports and flight documents, **R-115**.
[576] Avidan Second WS, paragraph 20.1.

613. As regards the second entry, the Tribunal does not find the payment of USD 1,000 to Bangoura to be particularly suspicious. In fact, the ledger identifies that Bangoura was paid monthly sums of USD 1,000 from December 2007, indicating that it was indeed a monthly salary. Finally, as regards the third entry, the Tribunal considers that the reference to "Copy of documents, making stamps" lacks sufficient specificity to provide conclusive proof of the validity of the contracts, especially given the doubt that exists over Avidan's whereabouts. Although it would be a remarkable coincidence, the entry could just be referring to a generic administrative expense. Vale points out that 28 February 2008 was the only day in that month that this expense was recorded, but even so, this is not a fact of sufficiently significant probative value to allow (without other supporting evidence) a finding that the contracts were not forgeries.

614. Vale also points out that Cilins confessed to asking Mme. Touré to destroy documents that were relevant to the U.S. Grand Jury proceedings and argues that he would not have offered money to Mme. Touré to destroy the documents if they were forgeries and would have reported the forgeries to the police.[577] However, while Cilins referred to documents bearing the dates 27 and 28 February,[578] the precise nature of these documents is not clear. Cilins did not provide any evidence in this arbitration on this point or attend the hearing for cross-examination. As previously noted, Mme. Touré has not provided any evidence before this Tribunal. Consequently, the Tribunal finds that Cilins' reference to documents to be destroyed is too vague to support a finding that the contracts of 27 and 28 February 2008 were not forgeries.

615. In sum, the Tribunal finds the evidence before it insufficient to prove whether or not the contracts of 27 and 28 February 2008 were forgeries. The Tribunal therefore makes no finding as to the validity of the contracts and therefore that the fifth episode cannot be relied upon as a ground for misrepresentation.

616. The Tribunal turns to the last episode of Vale's case theory. Vale avers that Pentler signed two contracts on BSGR's instructions with Mme. Touré and Matinda on 8 July 2010 in Sierra Leone to end its relationship with her,[579] before it signed replacement contracts on 3 August 2010 to remove the references to Simandou in the 8 July 2010 contracts.[580] Vale claims that, pursuant to one of the replacement contracts which promised USD 5.5 million to Mme. Touré, Mme. Touré signed a declaration confirming that she had received USD 2.4 million, and Pentler signed a new contract with Mme. Touré and Matinda, agreeing to pay USD 3.1 million.[581]

617. BSGR admits that Pentler signed the contracts on 3 August 2010, and that Mme. Touré executed a declaration and Pentler signed another contract for USD 3.1 million pursuant to the 3 August 2010 contracts. But BSGR denies Vale's case theory by arguing that the 8 July 2010 contract promising USD 5 million (the "**8 July USD 5 million contract**") (which contains Noy's signature) is a forgery. BSGR has adduced witness testimony from

---

[577] Transcript, Educatory Hearing, Day 2, p. 19, lines 5-13.

[578] Transcript of Call between Cilins and Mme. Touré, p.153, **C-6**.

[579] Contract between Matinda & Co. Ltd and Pentler, 8 July 2010, **C-563**; Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.

[580] Agreement between Matinda & Co Limited and Pentler, 3 August 2010, **R-151**; Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-237, **C-6**.

[581] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, **C-6**; Statement of Mme. Touré, p. 244, **C-6**.

Noy that he did not sign this contract,[582] and argues that Mme. Touré had simply taken the 3 August 2010 contract and manipulated it to refer to Simandou to implicate BSGR. As regards the second 8 July 2010 contract, BSGR does not express a clear view on it, and simply states that the document evidencing this contract is only a translation and it was not entered into by Noy.

618. The Tribunal accepts Vale's case theory that Pentler signed two contracts on 8 July 2010 with Mme. Touré and Matinda, before it signed replacement contracts on 3 August 2010 to remove the references to Simandou in the 8 July 2010 contracts. The allegation that the 8 July USD 5 million contract was forged is not credible in the light of the other 8 July 2010 contract (the "**8 July USD 5.5 million contract**"), the authenticity of which BSGR has not denied. This is unsurprising because the 8 July USD 5.5 million contract was produced by BSGR in this arbitration. The 8 July USD 5.5 million contract mirrors the terms of one of the 3 August 2010 contracts, as does the 8 July USD 5 million contract in respect of the other 3 August 2010 contract, save that the references to Simandou were removed. This is a clear indication that the 8 July contracts are both authentic, confirming Vale's case theory that they were amended to remove the Simandou references.

619. If Pentler signed these contracts, did BSGR authorise or know about the signing? On a balance of probabilities, the Tribunal finds that the evidence is insufficient to show that BSGR knew of or authorised the signing. Consider Vale's case theory. Vale points out that Mme. Touré's lawyer sent a letter to BSGR on 8 June 2010, attaching the February 2008 contracts and demanding that BSGR perform those contracts.[583] Unusually, three days later after BSGR's denial on 20 June 2010,[584] Mme. Touré's lawyer sent a letter to retract the allegations in the 8 June letter and to tender an apology.[585] A month after that, the 8 July 2010 contracts were signed and on 16 July 2010, BSGR agreed to pay USD 4.5 million to Pentler.[586] On 22 and 27 July 2010, Pentler transferred USD 149,970 and USD 100,000 to Mme. Touré respectively.[587] On 30 July 2010, another letter was sent by Mme. Touré's lawyer, confirming the retraction again.[588] On 3 August 2010, the replacement contracts were signed and, two days later, BSGR transferred USD 3 million to Pentler pursuant to the USD 4.5 million agreement.[589] Pentler transferred USD 149,970 to Mme. Touré on the same day.[590] Vale's case is that these events occurred within such a short span of time that they cannot be coincidental, and are indicators that BSGR instructed Pentler (following Mme. Touré's letter) to enter into the contracts to

---

[582] Noy First WS, paragraphs 81-82.
[583] Letter from N. Moussi to BSGR, 8 June 2010, **R-55**.
[584] Letter from BSGR Guinea to Nassif Moussi, 20 June 2010, **R-56**.
[585] Letter from N. Moussi to BSGR, 23 June 2010, **R-57**.
[586] Annotated Milestone Agreement, 16 July 2010, **R-113**; Noy First WS, paragraph 99; Steinmetz First WS, paragraphs 50-51.
[587] *USA v. Cilins*, Government's Mem. In Supp. of Detention Pending Trial, Dkt. No. 13, 6 June 2013, p. 13, **C-109**; *USA v. Cilins*, Government's Sentencing Mem, Dkt. No. 69, 18 July 2014, p. 4, **C-111**; Cheque number 96 dated 27 July 2010, p. 191, **C-6**.
[588] Letter from N. Moussi to BSGR, 30 July 2010, **R-130**.
[589] Payment from Windpoint Overseas to Pentler, 5 August 2010, p. 1, **R-211**; Payment from BSGR Limited to Windpoint Overseas Limited for USD 3 million, 5 August 2010, **C-484**; Payment Instructions for Windpoint Overseas to Pay USD 3 million to Pentler Holdings Limited on 5 August 2010, **C-497**; Windpoint Overseas Limited's Bank Statements for the Period 1 August 2010 to 31 August 2010, **C-480**.
[590] *USA v. Cilins*, Government's Mem. In Supp. of Detention Pending Trial, Dkt. No. 13, 6 June 2013, p. 13, **C-109**; *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 4, **C-111**; Cheque number 97 dated 5 August 2010, p. 192, **C-6**.

silence her, leading to her retraction and explaining Pentler's subsequent entry into these contracts.

620.   There are two reasons why Vale's case theory is problematic.

621.   First, on 15 July 2010 Merloni-Horemans (on behalf of BSGR Steel) wrote to Noy (on behalf of Pentler) to complain about the 8 June letter and stated that BSGR had no knowledge of the false allegations contained in that letter and demanded from Noy a written explanation of the allegations in that letter.[591] On 3 August 2010, Noy replied to apologise that BSGR had received that letter, stated that Pentler had dealt with Matinda since 2005, and urged BSGR to ignore the contents of the letter.[592] This correspondence seems to run counter to the theory that BSGR appreciated what Mme. Touré was doing and had instructed Pentler to enter into the July and August contracts. Vale's explanation is that this correspondence was a mere cover up,[593] but this is hardly persuasive.

622.   Second, BSGR's agreement to pay Pentler USD 4.5 million was based on Pentler's achievement of certain milestones in the BSGR-Pentler Milestone Agreement, which mirrored the milestones in the Pentler-Bah Milestone Agreement and the Pentler-Daou Milestone Agreement.[594] Payments made under the BSGR-Pentler Milestone Agreement would therefore be meant for Bah, Daou and I.S. Touré and not for Mme. Touré. The Amendment Protocol dated 20 February 2006, which BSGR says assigned the rights under the Pentler-Bah contract to Mme. Touré, does not in fact purport to assign these rights, and merely states in ambiguous terms that Pentler "shall now be bound to MATINDA" when Matinda was not even a party to this agreement.[595]

623.   For the above reasons, the Tribunal finds that the evidence is insufficient to show that BSGR knew of or authorised the signing of the July or August 2010 contracts. In coming to this conclusion the Tribunal has considered the opinion of Dr Shi (Vale's expert) that there exists a *prima facie* link between a USD 3 million payment made by BSGR to Pentler under the Milestone Agreement[596] and payments made by Pentler to Mme. Touré of around USD 150,000 on the same date (and earlier payment to Mme. Touré of around USD 250,000, paid just after BSGR had agreed to the additional Milestone payment).[597] Nothing in Dr Shi's analysis provides any conclusive evidence (and nor does Dr Shi purport to draw any final conclusions) as to whether BSGR did or did not know about the July or August 2010 agreements between Pentler and Mme. Touré. Dr Shi simply speculates that a *prima facie* link exists, but without further evidence this is insufficient to draw any conclusions on the issue.

624.   Vale insists that Noy was acting on BSGR's behalf when he entered into the July and August 2010 contracts, pointing out that Noy received a visa as a "consultant" to Koidu (BSGR's diamond mining operation in Sierra Leone), which he obtained with the help of

---

[591] D. Pollak's Internal Audit File, 21 May 2012, p. 157, **C-244**.

[592] D. Pollak's Internal Audit File, 21 May 2012, p. 158, **C-244**.

[593] Vale's Statement of Reply, paragraphs 459, 461.

[594] Annotated Milestone Agreement, 16 July 2010, **R-113**. Vale accepts that this agreement was based on the milestone schedule in the BSGR-Pentler Milestone Agreement: see Vale's Statement of Reply, paragraphs 76, 148; Transcript, Merits Hearing, Day 1, p. 106, line 21 – p. 108, line 15.

[595] Amendment to the Agreement Protocol between Pentler, A. Bah and I.S. Touré, 20 February 2006 **R-150**.

[596] See Annotated Milestone Agreement, 16 July 2010, **R-113**.

[597] Oxera Report, paragraphs 24-34.

Saada (the Director of Steinmetz Diamond Group), and claiming that Noy's trip was sponsored by BSGR. But the email chain on which Vale relies simply shows Noy requesting Saada to help with his visa application on 6 July 2010, which Saada forwarded to his secretary to process the application.[598] The application succeeded on the same day and the secretary forwarded it to Saada for his onward transmission to Noy.[599] Saada attests that it was common practice that "we arrange visas on a regular basis for staff members and for friends of people within the company" (including Noy who mixed in the same circles as Saada did) and recounts that this was "an entirely routine and unmemorable administrative event".[600] The Tribunal considers Saada's testimony to be believable on this factual point, and finds that the Noy-Saada email chain does not show that Noy was acting on BSGR's behalf.

625. The Tribunal concludes that there is insufficient evidence that BSGR knew of or authorised Pentler to sign the July and August 2010 contracts. It follows that the sixth episode of Vale's case theory does not satisfy the First Limb, whether through the first or second method.

**The Second Limb**

626. The Tribunal has so far found that the second of the six episodes satisfies the First Limb. The next question is whether that episode fulfils the Second Limb, i.e. whether the offer of monies under the second episode was for the purpose of achieving one of the four aims referred to in BSGR's anti-bribery representations.[601]

627. Vale's case theory is that the purpose of the offer of shares to Mme. Touré under the Touré MoU via the interposition of Pentler was to secure her assistance in influencing President Conté to grant the mining rights to BSGR. The first issue is whether BSGR's offer was indeed for such a purpose. If it was, the second issue is whether this falls under one of the four stated aims in BSGR's representations.

628. On the first issue, Vale provides an extensive case theory of how Mme. Touré sought to influence her husband from late 2005 (prior to the Touré MoU) all the way until September 2008. The case theory is set out in its Statement of Case and Statement of Reply and will not be repeated here. The Tribunal will simply set out its findings on Vale's case theory as follows.

628.1. **Late 2005 meeting.** The Tribunal accepts the witness testimony of Souaré[602] (who was Minister of Mines from March 2005 to April 2006) that (a) a meeting took place in November or December 2005 between at least Cilins, President Conté and Mme. Touré at the presidential palace; (b) President Conté called in Souaré to introduce Cilins to him, order him to assess how they could incorporate BSGR into the GoG's plans for Simandou and instructed him to return with a solution and; (c) Souaré subsequently told BSGR to apply for exploration permits in areas which were not already subject to permits.[603] The Tribunal accepts Souaré's inference of the meeting's context that BSGR had

---

[598] Emails between M. Noy, P. Saada and L. Foh of Koidu, 6 July 2010, **C-564**.
[599] M. Noy Visa to Sierra Leone, valid 7 July 2010 to 7 September 2010, **C-565**.
[600] Saada Second WS, paragraphs 14-15.
[601] See paragraph 583.2.
[602] Souaré WS, paragraphs 8-10.
[603] Souaré WS, paragraph 17.

approached Mme. Touré, and she had asked President Conté to help them.[604] BSGR has not adduced any sufficient evidence to rebut Souaré's testimony, apart from Struik's attestation that he was not aware of any meetings that Mme. Touré had organised on BSGR's behalf with President Conté.[605]

628.2. **February 2006 meeting and follow-up meeting.** The Tribunal finds that, after BSGR obtained the exploration permits in Simandou North and South, a meeting took place again in February 2006 at the presidential palace between Noy, Cilins, Oron, Saada, I.S. Touré, President Conté and Mme. Touré on the basis of the testimonies of Noy and Saada.[606] The Tribunal finds that Vale has failed to provide sufficient proof that Steinmetz and Struik were also present at the meeting, the only evidence being Mme. Touré's declaration attached to the Technical Committee's Report which has not been tested in this arbitration.[607] The Tribunal also finds that Vale has failed to provide sufficient evidence that this meeting was convened for BSGR to bring "the money" (which seems to be referring to the USD 12 million alluded to in paragraph 594 above that BSGR allegedly promised), or organised by Mme. Touré, in the light of Noy's and Saada's testimony that the meeting was for BSGR to be presented formally to President Conté.[608] The Tribunal also finds that there is insufficient evidence of a follow up meeting in Dubréka the next day (which BSGR and its witnesses vehemently deny[609]), during which Steinmetz allegedly thanked Mme. Touré for her help in obtaining the exploration permits in Simandou North and South and requested her assistance to obtain other Simandou Blocks 1 and 2 (over which Rio Tinto held exploration permits at the time), in exchange for 5% shareholding. Vale only adduces Mme. Touré's declaration appended to the Technical Committee Report which has not been tested in this arbitration.[610]

628.3. **August 2007 to December 2007 meetings.**

628.3.1. The Tribunal finds that BSGR then conducted exploration activities between mid-2006 and mid-2007 on Simandou North and South. By the end of that period, it became clear that the drilling results in Simandou North were unfavourable.

628.3.2. The Tribunal accepts Kanté's testimony[611] (which is corroborated by an email from Avidan to Steinmetz dated 18 September 2007[612]) that, in view of the drilling results, Avidan and I.S. Touré visited Kanté (who was Minister of Mines from March 2007 to August 2008) in

---

[604] Souaré WS, paragraph 10.
[605] Struik First WS, paragraph 104.
[606] Noy First WS, paragraphs 44-46.4; Saada First WS, paragraph 6; Saada Second WS, paragraph 10.
[607] Report of the Technical Committee, 21 March 2014, p. 37, paragraph 13, **C-6**.
[608] Noy First WS, paragraphs 44-46.4; Saada First WS, paragraph 6; Saada Second WS, paragraph 10.
[609] BSGR's Statement of Rejoinder, paragraph 103; Steinmetz First WS, paragraph 59; Avidan First WS, paragraph 90; Noy First WS, paragraph 46.5; Saada First WS, paragraph 7; Struik First WS, paragraph 106.
[610] Report of the Technical Committee, 21 March 2014, p. 37, paragraph 14, **C-6**; Vale's Statement of Case, paragraph 145; Vale's Statement of Reply, paragraphs 353-355.
[611] Kanté WS, paragraphs 11-20.
[612] Emails between A. Avidan, B. Steinmetz, M. Struik and P. Saada, 18 September 2007, **C-330**.

August 2007 to express BSGR's continued interest in Simandou Blocks 1 and 2. Kanté replied that BSGR should focus on developing Simandou South instead of fixating on areas occupied by another company.

628.3.3. The Tribunal accepts Kanté's testimony[613] that, in August 2007 after the meeting in paragraph 628.3.2 above, President Conté summoned Kanté to a meeting with Avidan and I.S. Touré (and Avidan said he was there to talk about his problem). The Tribunal agrees with Kanté's inference that Avidan and I.S. Touré had gone to President Conté directly because they were not satisfied with the answer given by Kanté at the earlier August 2007 meeting. The Tribunal also accepts Kanté's testimony that he advised President Conté that BSGR needed to prove itself regarding Simandou North and South and, in any event, Rio Tinto already held the mining rights to Simandou Blocks 1 to 4. After consideration, President Conté told Kanté to make the decisions that served Guinea's interests best. Avidan and I.S. Touré, however, were undeterred and went to Kanté's office after that to insist on the withdrawal of Rio Tinto's mining rights, which Kanté resisted.

628.3.4. The Tribunal accepts Kanté's testimony[614] (which is corroborated by Avidan's and Struik's testimony[615]) that, in December 2007, President Conté summoned Kanté to a meeting with Mme. Touré and Kouyaté (the then Prime Minister) to seek his explanation of BSGR's situation again, and Kanté did so by educating President Conté about BSGR's own slow progress in Simandou North and South, and explaining why the GoG had no reason to grant BSGR additional areas. Kanté's explanation led President Conté to turn towards Mme. Touré and say, "I had told you to stay out of these mining problems". No orders were given by President Conté at the end of the meeting.

628.3.5. The Tribunal accepts Kanté's testimony[616] that, the next day after the December 2007 meeting, Kouyaté summoned Kanté to his office where Mme. Touré was present to tell him "this is the President's fourth wife, we have to find a solution to her problem", to which Kanté replied that Rio Tinto's concession could only be withdrawn by Presidential decree and that he could not grant exploration permits to another company for an area that was subject to a mining concession. Kouyaté then turned to Mme. Touré and said, "see, this is what I was telling you about him."

628.4. **April 2008 – May 2008 meetings.** The Tribunal accepts Avidan and Steinmetz's testimony[617] that in April 2008, a meeting took place between Avidan, Steinmetz, President Conté and Mme. Touré, during which President

---

[613] Kanté WS, paragraphs 22-29; Transcript, Merits Hearing, Day 2, p. 3, lines 8-16.
[614] Kanté WS, paragraphs 30-34.
[615] Avidan First WS, paragraph 101; Struik First WS, paragraphs 112-114.
[616] Kanté WS, paragraphs 35-37.
[617] Avidan First WS, paragraphs 91-92; Steinmetz First WS, paragraphs 30, 58.

Conté summoned Soumah (then Secretary General) to instruct him to review Rio Tinto's mining rights, followed by further separate meetings with Soumah and Kouyaté (and Avidan testifies that Kouyaté seemed "less keen" on taking Rio Tinto's rights away during those meetings). In view of this meeting, the Tribunal finds Vale's assertion[618] (that a second meeting took place in May 2008 between President Conté, Mme. Touré and Avidan, where President Conté ordered Soumah to prepare a Presidential decree to revoke Rio Tinto's mining rights) to be believable. The Tribunal also notes that Kouyaté was dismissed on 22 May 2008,[619] that Soumah's first notification to Rio Tinto of the GoG's withdrawal of its mining rights was dated 22 May 2008,[620] and that there is evidence that Kouyaté takes the view that he was dismissed because he refused to give Rio Tinto's mining rights to BSGR.[621] The Tribunal notes that, on 28 July 2008, President Conté formally revoked Rio Tinto's mining concessions and permitting Rio Tinto to retain only 50% of the area in accordance with the Mining Code,[622] and that, in August 2008, BSGR Guinea submitted an application for Simandou Blocks 1 to 3.[623]

628.5. **September 2008 meeting.** The Tribunal accepts the testimony of Nabé[624] (who replaced Kanté as Minister of Mines on 27 August 2008 after Kanté's dismissal[625]) that, in September 2008, President Conté summoned Nabé to a meeting in his office when Souaré (the Prime Minister from 20 May 2008) and Mme. Touré were also present. President Conté told Souaré and Nabé that "If [Rio Tinto] do not comply [with the 50% retrocession], we must drive them out" and told them to act quickly. The Tribunal notes Nabé's understanding that "Mme. Touré was putting pressure on her husband on behalf of BSGR concerning Simandou, just like her brother was. The President was impatient. [...] the goal was to withdraw some of Rio Tinto's rights to give them to BSGR." Nabé has testified, that during this period, meetings continued to be held with Avidan and I.S. Touré and President Conté continued to issue orders to Nabé regarding the retrocession of Rio Tinto's rights.

628.6. The Tribunal notes that, on 4 December 2008, the Council of Ministers decided to retrocede Simandou Blocks 1 and 2 from Simfer (Rio Tinto's subsidiary) and issue exploration permits over them to BSGR Guinea.[626]

---

[618] Vale's Statement of Case, paragraphs 163-164; Vale's Statement of Reply, paragraphs 370-371.
[619] Guinée Information, "Ahmed Tidiane Souaré, le dernier premier ministre du Général Lansana Conté répond aux accusations de son prédécesseur Lansana Kouyaté", 15 May 2014, p. 3, **C-77**.
[620] Email from M. Berkner of Skadden Arps to M. Gordon of Clifford Chance *et al.*, 9 April 2010, **C-47**.
[621] Guinée Information, "Ahmed Tidiane Souaré, le dernier premier ministre du Général Lansana Conté répond aux accusations de son prédécesseur Lansana Kouyaté", 15 May 2014, p. 3, **C-77**.
[622] Decree No. D/2008/041/PRG/SGG, 28 July 2008, **C-27**; *see also* Letter from S. Mamady Soumah to CEO of Simfer S.A, 30 July 2008, **C-26**.
[623] Letter from A. Avidan to L. Nabé, 5 August 2008, **C-29**.
[624] Nabé WS, paragraphs 6-22.
[625] Transcript, Merits Hearing, Day 2, p. 18, lines 7-9; Nabé WS, paragraph 5.
[626] Nabé WS, paragraph 21; Transcript, Merits Hearing, Day 2, p. 31, lines 3-10. Nabé sent Simfer a retrocession plan for Simandou Blocks 1 and 2 to be retroceded the same day: Email from M. Berkner of Skadden Arps to M. Gordon of Clifford Chance *et al.*, 9 April 2010, **C-47**. Nabé issued a decree granting BSGR Guinea exploration permits in the same Blocks: Decree No. 2008/4980/MMG/SGG issued by Nabé, 9 December 2008, **C-31**.

629. Based on these findings, the Tribunal finds that the facts show on a balance of probabilities that Mme. Touré had exercised influence on President Conté in his decision-making from late 2005 to September 2008. Critically, Kanté's testimony paints the narrative in 2007 that, after BSGR learned the drilling results in Simandou North were not propitious, Avidan and I.S. Touré tried to convince Kanté to grant Rio Tinto's mining rights to BSGR. When those attempts failed, Avidan and I.S. Touré approached President Conté directly, who approached Kanté and heard his advice, and chose not to follow up on Avidan and I.S. Touré's requests. Avidan and I.S. Touré were undeterred, and they turned to Mme. Touré for assistance, who tried to persuade President Conté to grant the rights to BSGR. President Conté sought Kanté's advice once more and, when Kanté repeated his views, President Conté rebuked Mme. Touré for meddling. Mme. Touré then tried to convince Kouyaté to award the rights to BSGR, to which Kouyaté must have reluctantly obliged because he would have anticipated what Kanté would say. And when Kanté advised against giving BSGR the rights once more, Kouyaté said to Mme. Touré: "see, this is what I was telling you about him". In short, 2007 was a year of multiple failed attempts.

630. But the turning point came when Avidan and I.S. Touré approached Kanté once more after the last meeting with President Conté. This time, Kanté advised that Rio Tinto's mining concessions could only be revoked by Presidential decree. This must have galvanised Avidan and I.S. Touré to find ways to persuade President Conté to issue this decree. And they must have succeeded, because in April–May 2008, President Conté summoned Soumah to instruct him to review Rio Tinto's mining rights and prepare a decree to revoke those rights.

631. The evidence also indicates that Mme. Touré assisted in influencing President Conté's decision to revoke Rio Tinto's rights and give them to BSGR. Avidan met Mme. Touré as recently as February 2008, consistent with the narrative that Avidan had given instructions to her from December 2007 onwards.[627] Mme. Touré was present at all the 2008 meetings when this was not normal practice.[628] Nabé testified that Mme. Touré's conduct at the September 2008 meeting indicated that she was exerting influence on Conté.[629] This is all evidence that Mme. Touré assisted in influencing President Conté's decision.

632. It is also not surprising that President Conté succumbed to Mme. Touré's influence. He was critically ill from August 2008 onwards,[630] and prior to August 2008, Souaré attests that President Conté was already in a condition which rendered him susceptible to being used by "those who were working with him and had done so for many years".[631]

---

[627] This is corroborated by Avidan's admission that he met Mme. Touré four or five times between September 2006 and February 2008: Avidan First WS, paragraph 43.

[628] Transcript, Merits Hearing, Day 2, p. 38, line 17 – p. 39, line 14. The view that it was unusual for the President's wife to attend meetings is shared by Souaré (Transcript, Merits Hearing, Day 1, p. 224, line 17 – p. 25, line 5) and Kanté (Transcript, Merits Hearing, Day 2, p. 27, line 5 – p. 28, line 3) in respect of other meetings.

[629] Nabé WS, paragraphs 8-9; Transcript, Merits Hearing, Day 2, p. 31, line 18 – p. 32, line 7. More generally, Nabé and Souaré testify that Mme. Touré asserted influence on Conté: Transcript, Merits Hearing, Day 1, p. 228, line 19 – p. 229, line 20; Transcript, Merits Hearing, Day 2, p. 35, lines 16-22 and p. 38, lines 1-4.

[630] Transcript, Merits Hearing, Day 2, p. 26, lines 4-13.

[631] Transcript, Merits Hearing, Day 1, p. 231, lines 5-12.

633.    The result of Mme. Touré's influence was that President Conté dismissed both Kouyaté (as Prime Minister) and Kanté (as Minister of Mines) because they both opposed the transfer of the mining rights from Rio Tinto to BSGR.[632] When Nabé was appointed as Minister of Mines, President Conté hurried Nabé with respect to the grant of rights to BSGR,[633] notwithstanding that the revocation and grant of rights in Simandou Blocks 1 and 2 were separate issues that could be treated separately,[634] and that Souaré and Nabé had both expressed misgivings about President Conté's decisions.[635] The Council of Ministers implemented President Conté's wish of revoking Rio Tinto's rights and giving them to BSGR on the same day (4 December 2008).[636]

634.    In summary, the witness testimonies from Souaré, Kanté and Nabé and the surrounding evidence constitute clear and convincing evidence that Mme. Touré did in fact exercise influence on President Conté in his decision-making in relation to Simandou from late 2005 to September 2008. Coupled with the fact that BSGR authorised the Touré MoU, the witness testimonies lead this Tribunal to find that the Touré MoU was executed to secure Mme. Touré's assistance in influencing President Conté. At the very least, BSGR had reason to know that this was the Touré MoU's purpose. BSGR argues that the Touré MoU was "entered into following an agreement between Ms Touré and Pentler's local partners"[637] (i.e. an assignment by Bah and I.S. Touré of their own shares in BSGR Guinea BVI to Mme. Touré) and was not for securing Mme. Touré's assistance, but this argument is far-fetched. BSGR has not provided any explanation for why Bah and I.S. Touré would want to assign such a significant interest to her, and simply relies on Noy's testimony that Bah and I.S. Touré are "grown men and it was not for us to question their business deals".[638]

635.    Having found that the Touré MoU was executed to secure Mme. Touré's assistance in influencing President Conté, the next issue is whether this falls under one of the four stated aims in BSGR's representations. The Tribunal is satisfied that it falls at least under the third stated aim, namely that the offer of shares to Mme. Touré was for the purpose of securing an "improper advantage", the impropriety arising from exercising influence on the decision-making of another Government Official, President Conté. The Tribunal finds that Vale has satisfied the Second Limb.

**The Third Limb**

636.    As regards the Third Limb, the test is whether BSGR <u>knew</u> that the offer of shares under the Touré MoU was for the purpose of securing an improper advantage,[639] namely to secure Mme. Touré's assistance in influencing President Conté. Having found that BSGR authorised (or at least knew of) the Touré MoU, the Tribunal considers that there can be no other legitimate purpose which the Touré MoU served. On that premise, BSGR must have known the real purpose of the Touré MoU. Indeed, based on the findings in the

---

[632] Guinée Information, "Ahmed Tidiane Souaré, le dernier premier ministre du Général Lansana Conté répond aux accusations de son prédécesseur Lansana Kouyaté", 15 May 2014, p. 3, **C-77**; Transcript, Merits Hearing, Day 2, p. 23, line 3 – p. 24, line 10.
[633] Nabé WS, paragraph 17; Transcript, Merits Hearing, Day 2, p. 32, line 24 – p. 34, line 6.
[634] Kanté WS, paragraph 41; Transcript, Merits Hearing, Day 2, p. 24, lines 18-21.
[635] Nabé WS, paragraph 10; Transcript, Merits Hearing, Day 2, p. 37, lines 3-25.
[636] Transcript, Merits Hearing, Day 2, p. 32, lines 11-23.
[637] BSGR's Statement of Defence, paragraph 218(iii).
[638] Noy First WS, paragraph 60.2.
[639] See paragraph 583.3.

Tribunal's analysis of the Second Limb, Avidan (CEO of BSGR Guinea) was closely involved in BSGR's journey towards its ultimate aim of procuring the exploration permits in Simandou Blocks 1 and 2.

637. The Tribunal finds that BSGR knew that the offer of shares under the Touré MoU was for the purpose of securing Mme. Touré's assistance in influencing President Conté, and concludes that BSGR made a false representation in declaring that there had not been any bribery of Mme. Touré.

**The Mebiame Issue**

638. A final issue must now be dealt with before the Tribunal can proceed to Vale's bribery claim involving Thiam. On 31 October 2016, BSGR filed a memorial on a U.S. criminal complaint dated 12 August 2016 against Mebiame, explaining the relevance of the complaint to the issues in this arbitration. One main issue to which the complaint was said to be relevant to was Vale's bribery claim against Mme. Touré. However, the Tribunal has reviewed BSGR's submissions and the supporting evidence (as well as Vale's reply submissions dated 14 November 2016) and finds that this evidence does not affect the Tribunal's reasoning for its findings on BSGR's bribery of Mme. Touré. The Tribunal will now explain its reasoning in the passages below.

639. BSGR's central argument is that VBG's mining rights were revoked because President Conté was bribed to do so, and not because BSGR had obtained the rights by bribery in the first place. To support this argument, BSGR relies on the following case theory.

639.1. After Vale and BSGR entered into the Joint Venture Agreements in April 2010, Mebiame negotiated from June 2010 to June 2012 with Condé and other Guinean government officials for mining rights, including VBG's mining rights, on behalf of an individual named Walter Hennig, a wealthy South African, and his company, Palladino Holdings ("**Palladino**"). In exchange, Mebiame and Hennig assisted Condé to be elected as President in late 2010.[640]

639.2. After the election, Mebiame and Hennig helped redraft the Guinean mining code (which provided for a review of all mining rights),[641] and draft letters to existing holders of mining rights (including VBG) to inform them that there were legal issues with their mining rights.[642] Mebiame helped Condé set up SOGUIPAMI, a state-owned mining company that would take a minimum 15% share of all companies granted mining rights under the new Guinean mining code.[643]

639.3. Discussions followed between Hennig and Och-Ziff Capital Management Group ("**Och-Ziff**"), a large US hedge fund, on how to reward Mebiame and themselves. Hennig sought help from Och-Ziff, and together they conceived a plan whereby Hennig would buy 31.5 million shares in an unnamed London-based oil and gas company from an unnamed South African conglomerate for USD 25 million, and then resell 18.5 million of those shares to a company called

---

[640] BSGR's Memorial on the Mebiame Issue, paragraphs 12, 36, 38.

[641] BSGR's Memorial on the Mebiame Issue, paragraphs 43-45.

[642] BSGR's Memorial on the Mebiame Issue, paragraphs 46-49.

[643] BSGR's Memorial on the Mebiame Issue, paragraphs 36-37, 41-42. See also Decree D/2001/1218[ ]/PRG/SGG, 11 August 2011, Arts. 3 and 9, **R-70**; and Mining Code 2011, 9 September 2011, Art. 150, **R-71**.

African Global Capital II (which was a portfolio company of Africa Management Limited, a joint venture between Palladino and Och-Ziff) for USD 77 million.[644] Out of this USD 52 million, USD 25 million would be paid to Guinean government officials (including Condé) via a loan from Palladino, USD 1 million to Mebiame, USD 2.1 million to Och-Ziff to satisfy an outstanding debt and the rest to Hennig.[645]

639.4. The loan from Palladino was "designed to be defaulted upon", so as to result in Palladino gaining at least a 49% stake in SOGUIPAMI. However, the partnership with SOGUIPAMI did not eventuate because of negative press reports indicating that the partnership was corrupt.[646]

639.5. In or around August 2011, Mebiame's associates met with Condé and the then Minister of Mines in several meetings. Mebiame and Hennig had concerns that Condé was not keeping his side of the deal, so a new team made clear to him that this deal was not optional.[647]

639.6. Vale acquiesced in Condé's subsequent corrupt decision to strip VBG of its mining rights.[648]

639.7. Mebiame also paid other sums to Condé and other Guinean government officials from 2010 (prior to Condé's election) to 2012.[649]

640. The Tribunal finds that the evidence given by BSGR is insufficient to prove its case theory. All that BSGR has produced is (1) the U.S. criminal complaint against Mebiame;[650] (2) a letter from the U.S. DOJ to the U.S. Magistrate Judge seeking an order of detention against Mebiame as well as the corresponding order;[651] (3) an order by the U.S. Magistrate Judge allowing Mebiame to enter into plea negotiations with the U.S. authorities;[652] (4) a U.S. Cease and Desist Order against Och-Ziff;[653] (5) an email chain from Pedro Rodrigues of Vale to a person named Marcio Senne dated 29 September 2011;[654] and (6) certain press articles.[655] The totality of this evidence is insufficient for the following reasons.

---

[644] BSGR's Memorial on the Mebiame Issue, paragraphs 61-63.
[645] BSGR's Memorial on the Mebiame Issue, paragraphs 64-65.
[646] BSGR's Memorial on the Mebiame Issue, paragraph 65.
[647] BSGR's Memorial on the Mebiame Issue, paragraphs 66-69.
[648] BSGR's Memorial on the Mebiame Issue, paragraphs 71-85.
[649] BSGR's Memorial on the Mebiame Issue, paragraphs 50-55.
[650] *USA v. Samuel Mebiame, Dkt. No. 1*, Complaint, 12 August 2016, **R-403**.
[651] *United States v. Samuel Mebiame, Dkt. 6*, Letter to Judge Tiscione, 16 August 2016, **R-409**; *United States v. Samuel Mebiame, Dkt. 5*, Order of Detention, 16 August 2016, **R-410**.
[652] *United States v. Samuel Mebiame, Dkt. 10*, Order, 1 September 2016, **R-411**.
[653] *USA Securities and Exchange Commission – Och Ziff Capital Management Group LLC, OZ Management LP, Daniel S. Och, and Joel M. Frank* – Cease and Desist Order, 29 September 2016, **R-405**.
[654] Email chain Pedro Rodrigues to Marcio Senne, Re: "Soros dinner on Wednesday Sept 21, in New York", 29 September 2011, **R-414**.
[655] PR Newswire, "Mvelaphanda Holdings, Och-Ziff and Palladino Create Joint Venture to Focus on Natural Resources in Africa", 29 January 2008, **R-404**; New York Times, "Och-Ziff Said to Be Tied to Gabonese Fixer in Bribery Case", 16 August 2016, **R-406**; The Financial Times, "US seeks scalps in Och-Ziff bribery investigation", 12 September 2016, **R-407**; Africa Confidential, "Feds grab middleman", 26 August 2016, **R-412**; Africa Energy Intelligence "The Och-Ziff equity fund's double

640.1. As regards (1)-(3), these documents are not even court judgments and, in any event, it is difficult to assess the weight to be given to them without examining the evidence on which they were based.

640.2. As regards (5), the sender has not been called as a witness in this arbitration. In any event, BSGR relies on this document only for the limited purpose of proving the attendees at a meeting on 21 September 2011 at George Soros' home other than Vale's representatives.

640.3. As regards (6), these articles are simply hearsay evidence which do not carry very much weight in the circumstances.

640.4. The only document which might carry some little weight is the U.S. Cease and Desist Order against Och-Ziff because it contains *findings* by the U.S. Securities and Exchange Commission against Och-Ziff based on Och-Ziff's offer of settlement, which could be regarded as an admission. But even so, BSGR relies on this document only to prove certain parts of its case theory, so the probative value of this document is also limited. In particular, it does not help to establish the causative link between Mebiame's alleged bribes and the GoG's subsequent revocation of VBG's mining rights.

641. Quite apart from the issue of the evidentiary basis for BSGR's case theory, there are also inherent difficulties in BSGR's case theory. First, if the deal was simply that Mebiame would assist Condé's election in exchange for VBG's mining rights, the question arises why, *after providing such assistance*, Mebiame continued to pay monies to Condé, and Palladino extended the loan to the Guinean government. Second, even if the plan was that Palladino would obtain a 49% stake in SOGUIPAMI, BSGR does not clearly explain *how* this meant Palladino would thereby have a stake in VBG's mining rights (or how this was a necessary step towards getting a stake). Indeed, as Vale correctly points out,[656] neither the criminal complaint against Mebiame nor the U.S. Cease and Desist Order against Och-Ziff even mentions Simandou, Zogota or either of the Parties. There is not even any evidence that VBG's mining rights were subsequently given to Palladino, Hennig or Mebiame.

642. Finally, and most importantly, even if Condé had been bribed to revoke VBG's mining rights and to allow Palladino to have a stake in those rights, it does not follow (or imply strongly) that BSGR originally obtained those rights by lawful means. The Tribunal's finding that BSGR obtained those rights corruptly in 2008 was primarily based on the evidence regarding the period up to the granting of the mining rights, and the evidence adduced in support of BSGR's case theory from 2010 onwards does not affect the Tribunal's findings on the factual narrative from 2005 to 2008.

---

entry bookkeeping", 18 October 2016, **R-413**; BD Live, "Cape tycoon linked to mining bribery", 18 August 2016, **R-415**; Bloomberg, "US Case Into Fixer for Och-Ziff Venture Gets Support in Guinea", 18 August 2016, **R-416**.
[656] Vale's Reply Submission on the Mebiame Issue, paragraph 13.

### ii.   Mahmoud Thiam – Former Minister of Mines

643.   Vale argues that Thiam assisted BSGR in the following six ways.

643.1.   Thiam worked to secure BSGR's rights to Simandou Blocks 1 and 2 amidst Rio Tinto's challenges to the legitimacy of those rights;[657]

643.2.   Thiam assisted in BSGR's search for a potential joint venture partner;[658]

643.3.   Thiam induced Vale into participating in the joint venture by providing Vale with false assurances as to the validity of BSGR's rights to Simandou Blocks 1 and 2;[659]

643.4.   Thiam assisted in BSGR's press strategy;[660]

643.5.   Thiam used his niece to distribute monies to other parties for the purposes of advancing BSGR's position in Guinea;[661] and

643.6.   Thiam assisted BSGR in responding to blackmail attempts and crafting responses to the Technical Committee's allegations of bribery.[662]

644.   Vale argues that BSGR rewarded Thiam for his assistance in the following four ways.

644.1.   BSGR paid Thiam USD 8,017.60 in January 2009, USD 4,680 in May 2009 and USD 10,744.66 in November 2009.[663]

644.2.   BSGR paid money to Thiam to enable him to buy a property at 771 Duell Road, New York in November 2010.[664]

644.3.   BSGR paid money to Thiam to enable him to purchase a property at 170 East End Avenue, New York in October 2009.[665]

644.4.   BSGR paid Thiam for his consultancy services to BSGR in 2012, after his tenure as Minister of Mines, and other negotiation efforts.[666]

645.   There is no question that Thiam was a Government Official at all material times. The Tribunal will thus examine whether Vale has satisfied the Three Limbs (applied *mutatis mutandis*) as described in paragraph 583 above.

**The First Limb**

---

[657] Vale's Statement of Reply, paragraphs 518-523.
[658] Vale's Statement of Reply, paragraphs 524-529.
[659] Vale's Statement of Reply, paragraphs 531-532.
[660] Vale's Statement of Reply, paragraph 530.
[661] Vale's Statement of Reply, paragraphs 533-535.
[662] Vale's Statement of Reply, paragraphs 536-541.
[663] Vale's Statement of Reply, paragraphs 543-545.
[664] Vale's Statement of Case, paragraph 172; Vale's Statement of Reply, paragraphs 546-552.
[665] Vale's Statement of Case, paragraph 172.
[666] Vale's Statement of Reply, paragraphs 553-560.

646.    Vale does not adduce evidence of BSGR's offer of money to Thiam. Instead, Vale adduces evidence of BSGR's payments to Thiam, dividing them into the following four categories already mentioned above.

646.1.    BSGR's payments to Thiam of USD 8,017.60 in January 2009, USD 4,680 in May 2009 and USD 10,744.66 in November 2009.[667]

646.2.    BSGR's payments to Thiam to enable him to buy a property at 771 Duell Road, New York in November 2010.[668]

646.3.    BSGR's payments to Thiam to enable him to purchase a property at 170 East End Avenue, New York in October 2009.[669]

646.4.    BSGR's payments to Thiam for his consultancy services to BSGR in 2012, after his tenure as Minister of Mines, and other post-tenure negotiation efforts.[670]

647.    The Tribunal will deal with each category in turn.

First category

648.    As regards the first category of payments to Thiam in January, May and November 2009, the Tribunal has reviewed the documentary evidence and finds that BSGR paid the sum of USD 8,017.60 in January 2009 to Thiam. However, as regards the other two payments in May and November 2009, the Tribunal observes that the documentary evidence shows that these payments were made to BSGR's travel agent, Diesenhaus Unitours, rather than Thiam, and accordingly finds that no such payments were made to Thiam. Nevertheless, the Tribunal finds that the May and November 2009 payments were reimbursements for Thiam's flight costs in April and September 2009. The Tribunal therefore finds that BSGR has conferred a "thing of value" within the meaning of BSGR's anti-bribery representations to Thiam, being his flights in April and September 2009.

Second category

649.    As regards the second category of payments for the purchase of 771 Duell Road, New York, Vale alleged that there was a Mozambican company called Sociedade Saboiera De Nacala, LDA ("**Sociedade**")[671] whose registered address was one of Thiam's apartments at 340 East 64th Street, #14H, New York.[672] The agent of Sociedade was Aquil Rajahussen, Thiam's friend.[673] Pursuant to an arrangement with Thiam, Rajahussen consented on behalf of Sociedade to purchase the property at 771 Duell Road by a deed dated 13 November 2010,[674] and arranged for Sociedade to lease the property to Thiam.[675] These arrangements show that Thiam exercised actual control over the

---

[667] Vale's Statement of Reply, paragraphs 543-545.
[668] Vale's Statement of Case, paragraph 172; Vale's Statement of Reply, paragraphs 546-552.
[669] Vale's Statement of Case, paragraph 172.
[670] Vale's Statement of Reply, paragraphs 553-560.
[671] Vale's Statement of Reply, paragraph 549.
[672] Bargain and Sale Deed, 25 August 1998, **C-105**; Vale's Statement of Reply, paragraph 549.
[673] Vale's Statement of Reply, paragraph 549.
[674] Bargain and Sale Deed, 13 November 2010, **C-103**; Vale's Statement of Reply, paragraph 549.
[675] Email from McGregor to Rajahussen, 7 January 2011, **C-637**; Vale's Statement of Reply, paragraph 550.

purchase and was the real owner.[676] Thiam was therefore concealing the fact of the control over the property when he claimed in his first witness statement that the property was purchased by Rajahussen, who simply leased the property to Thiam as a *vacation home,* and that the property was not purchased by or for Thiam and had never belonged to Thiam.[677]

650.　Vale alleged that Sociedade purchased the property using funds from BSGR.[678] According to Vale, Rajahussen was involved in a coal business and was dissatisfied with his business partner at the time.[679] Rajahussen therefore needed a serious investor, and Thiam brought this investment opportunity to Steinmetz's attention, who expressed interest and agreed to pay a non-refundable amount for an exclusive opportunity to conduct due diligence.[680] In an email from Thiam to Rajahussen on 15 November 2011, Thiam said: "B would agree to pay a non-refundable amount to view the data exclusively, knowing that the funds were to go to [Thiam]" and that Thiam and Rajahussen agreed to use this "agreement between [Rajahussen] and B to transfer [Thiam's] funds to [Rajahussen]" so that "[Rajahussen] would purchase the house and hold in [Thiam's] name".[681]

651.　The Tribunal considers that this email amounts to a statement against self-interest because Thiam was effectively admitting that he and Rajahussen had agreed to use BSGR's due diligence payment to fund the purchase of 771 Duell Road. Thiam did not address this self-incriminating email in his second witness statement, although he had the opportunity to do so. In view of these circumstances, the Tribunal finds that the email sufficiently proves that BSGR's due diligence payment (which amounted to USD 5,000,000, according to BSGR's evidence[682]) did eventually go to Thiam, and that at least a part of this money was used to fund the purchase of 771 Duell Road (whether fully or partially). Based on this finding that BSGR's payment went to Thiam, the Tribunal finds that this sufficiently establishes the First Limb, irrespective of whether Thiam was the "real owner" of 771 Duell Road as Vale alleges.

652.　BSGR points out that Thiam has been convicted before the District Court for the Southern District of New York for charges relating to his acceptance of bribes of USD 8,500,000 from senior officers of a Chinese conglomerate in exchange for his assistance in securing mining rights for the conglomerate in Guinea.[683] BSGR argues that the FBI established in this trial "that Mr Thiam purchased this [771 Duell Road property] from

---

[676] Vale's Statement of Reply, paragraph 550.
[677] Thiam First WS, paragraph 131; Vale's Statement of Reply, paragraphs 547, 552; Email from F. Thiam to M. Thiam, 1 March 2013, **C-638**.
[678] Email from M. Thiam to Rajahussen, 15 November 2011, **C-636**; Statement of Reply, paragraph 551.
[679] Email from M. Thiam to Rajahussen, 15 November 2011, **C-636**; Vale Statement of Reply, paragraph 551.
[680] Email from M. Thiam to Rajahussen, 15 November 2011, **C-636**; Vale Statement of Reply, paragraph 551.
[681] Email from M. Thiam to Rajahussen, 15 November 2011, **C-636**; Vale Statement of Reply, paragraph 551.
[682] BSGR Board Information Sheet, 14 November 2010, **R-263**.
[683] Letter from BSGR to the Tribunal dated 9 June 2017, p. 2; *USA v. Thiam*, Criminal Complaint, Dkt. No. 1, 12 December 2016, **C-828**, *USA v. Thiam*, Trial Transcript, Dkt. No. 114, 1 May 2017, **C-833**; *USA v. Thiam*, Trial Transcript, Dkt. No. 116, 2 May 2017, **C-834**; *USA v. Thiam*, Trial Transcript, Dkt. No. 118, 3 May 2017, **C-835**.

funds provided by the Chinese company, not BSGR".[684] However, leaving aside the issue of the evidential value of foreign convictions in this arbitration, the Tribunal understands that the prosecution's case in that case (which the jury accepted) was simply that Thiam paid a part of the property's purchase price (USD 375,000 of USD 3,750,000) using bribe monies from the Chinese conglomerate. This is plainly clear from two sources. First, the criminal complaint alleged that:

> On or about November 12, 2010, THIAM also transferred **$375,000** from the Thiam Hong Kong Account to a company based in Kuala Lumpur, Malaysia (the "Malaysia Company"). As set forth below, I believe that THIAM made this transfer for the purpose of reimbursing an associate of THIAM's who agreed to assist THIAM's concealment of the bribe proceeds in the Thiam Hong Kong Account to fund, **in part**, the $3,750,000 purchase of THIAM's Dutchess County Estate.[685]

653. Second, the prosecution argued in its closing submissions that:

> [...] you see the ledger here that describes the $375,000 credit that came in through the Pacific Inter-Link account and the $375,000 debit that was related to the payment to McGregor [allegedly Thiam's attorney]. And then, of course, McGregor closes on the property in Dutchess County, **using that $375,000 as a deposit**, and the company nominally, in name, that owns the house at this point is [Sociedade Saboeira de Nacala].[686]

654. So it is not true to claim that the prosecution's case was that the entire *purchase price* was funded by the Chinese conglomerate. The Tribunal therefore holds that, even if Thiam's conviction were to be considered as proof of the facts found in that case, the facts so found do not rule out the possibility of BSGR's payments being used to fund the remainder of the purchase price of the 771 Duell Road property.

655. In sum, the Tribunal finds that at least part of BSGR's due diligence payment was used to pay the purchase price of the 771 Duell Road property. The Tribunal makes no finding at this juncture on whether BSGR knew that its payment would go to Thiam for the purposes of funding the 771 Duell Road property, being a question that will only be dealt with in the analysis of the third category.

Third category

656. As regards the third category of payments for the purchase of 170 East End Avenue, New York, Vale has not adduced evidence of the actual payments from BSGR to Thiam, which Thiam used to fund his purchase of an apartment at 170 East End Avenue in New York.[687] Vale only adduces evidence of Thiam's USD 1.52 million purchase of the apartment,[688] and claims that this was funded by BSGR's bribes. However, the Tribunal accepts Thiam's testimony that Thiam paid USD 1,300,000 of the consideration by October 2006, over two years before his appointment as Minister of Mines, using his earnings as a banker, so that was highly unlikely to have been funded by monies from

---

[684] Letter from BSGR to the Tribunal dated 9 June 2017, p. 2.
[685] *USA v. Thiam*, Criminal Complaint, Dkt. No. 1, 12 December 2016, ¶ 16(h) (emphasis added), **C-828**.
[686] *USA v. Thiam*, Trial Transcript, Dkt. No. 116, 2 May 2017, 168:15-168:20 (emphasis added), **C-834**.
[687] Vale's Statement of Case, paragraph 172.
[688] Bargain and Sale Deed for 170 East End Avenue, 20 October 2009, p. 12, **C-107**; Mortgage for 170 East End Avenue, dated 14 November 2012, **C-108**.

BSGR.[689] As regards the remainder of the consideration which Thiam said that he paid while he was Minister of Mines using his own money,[690] the Tribunal finds that there is no evidence to show or even suggest that the remainder was funded by BSGR's monies. Indeed, Thiam has testified that he was a banker at Merrill and UBS prior to his appointment as Minister of Mines,[691] which coheres with BSGR's claim that the purchase of the property was self-funded.

Fourth category

657. As regards the fourth category, Vale alleges that BSGR paid Thiam for providing certain consultancy services to BSGR in 2012.[692] Vale alleges that BSGR paid monies to entities controlled by Corchia (including Crown Capital and Securiport), which paid Thiam & Co. in turn,[693] for Thiam's involvement in finding an investor in 2012 on BSGR's behalf which would be interested to purchase BSGR's 49% shareholding in VBG Guernsey.[694] However, the Tribunal considers that any such payments from BSGR to Thiam would be irrelevant to the analysis of the First Limb, because they would be payments for services provided by Thiam *after* his ministerial tenure. The Tribunal agrees with BSGR that "Thiam's actions after his tenure as Minister of Mines [do not constitute] evidence that he was paid bribes".[695]

658. The Tribunal concludes that the First Limb is satisfied on the basis of the first and second categories of payments, i.e. BSGR's payment to Thiam in January 2009 and BSGR's flight reimbursements in May and November 2009, as well as BSGR's payments to Thiam for the purchase of 771 Duell Road. The Tribunal must now consider whether these payments were designed to achieve one of the four aims in BSGR's anti-bribery representations.

**The Second Limb**

659. Vale has consistently maintained that BSGR's payments to Thiam were rewards for the six forms of assistance provided by Thiam to BSGR, as stated in paragraph 643 above.[696] The first question is whether the payments were in exchange for those six forms of assistance. The second question is, assuming the first question is answered in the affirmative, whether this shows that the payments were for the purpose of achieving one of the four stated aims in BSGR's representations, namely:

    (a)    influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business, or directing business to any third party; […]

    (b)    securing an improper advantage; […]

---

[689] BSGR's Statement of Rejoinder, paragraph 174; Thiam First WS, paragraphs 126-130.
[690] BSGR's Statement of Rejoinder, paragraph 174; Thiam First WS, paragraphs 126-130.
[691] BSGR's Statement of Defence, paragraphs 12, 199; Thiam First WS, paragraphs 10, 125-132.
[692] Vale's Statement of Reply, paragraphs 553-555.
[693] Vale's Statement of Reply, paragraph 560.
[694] Vale's Statement of Reply, paragraphs 556-559.
[695] BSGR's Statement of Rejoinder, paragraph 170.
[696] Vale's Statement of Reply, paragraph 507; Vale's Statement of Case, paragraph 172.

(c)    inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Authority in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business, or directing business to any third party; or […]

(d)    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s). […][697]

*The first question: whether the payments were in exchange for the six forms of assistance*

660.    With regard to BSGR's payment that funded the purchase of 771 Duell Road, BSGR adduces evidence that it made this payment in exchange for an exclusive right to conduct due diligence in relation to a potential acquisition of a major stake in a coal opportunity in Mozambique.[698] Vale has not given any evidence to cast doubt on this, so it has not discharged its burden of proof that this payment was in exchange for the six forms of assistance described above.

661.    As regards the three payments in 2009, the Tribunal agrees with BSGR that these were reimbursements for flight costs in relation to work that BSGR was doing with Thiam.[699] The third payment for instance was to reimburse Thiam for his September 2009 flight to Israel and Hong Kong in relation to "BSGR's then negotiations in China with [China Investment Corporation] and/or Baosteel."[700] It is true that the first payment was not for Thiam's flight but for Fofana's flight in December 2008, but the background facts have been adequately explained by BSGR. The background was that, prior to Thiam's appointment, many mining companies sought to hold introductory meetings with Thiam, including BSGR. Thiam acquiesced to BSGR's request (as he did for other companies) but requested for Fofana's presence (BSGR's advisor) as Thiam was not familiar with BSGR and wanted to receive an opinion from another professional whom he trusted and could vouch for BSGR's promises. Thiam paid for his and Fofana's return flight tickets from Conakry to Washington, and BSGR reimbursed Thiam for Fofana's ticket because Fofana was advisor to BSGR.[701] So the upshot is that BSGR was merely reimbursing its *own advisor*, Fofana, for his ticket, for which Thiam happened to pay first, and that is why the payment was made to Thiam. No evidence has been adduced by Vale to counter Thiam's version of these facts.

662.    But although the Tribunal finds that these payments were for business-related flight costs, this does not rule out the possibility that these payments were in exchange for one the six alleged forms of assistance by Thiam. If it can be shown that the nature of the work done by Thiam (for which his flight expenses were reimbursed) fell under one of the six forms of assistance, and that Thiam would not have done the work had these expenses not been reimbursed, it stands to reason that these payments were ultimately in exchange for one of those forms of assistance.

---

[697] Compliance Due Diligence Questionnaire, section IV, p. 7, **C-30**.
[698] BSGR Board Information Sheet dated 14 November 2010, R-263; BSGR's Statement of Rejoinder, paragraphs 167, 169(1).
[699] BSGR's Statement of Rejoinder, paragraph 165; Tchelet First WS, paragraph 45.
[700] Tchelet First WS, paragraph 45.
[701] Thiam Second WS, paragraphs 30-31; BSGR's Statement of Rejoinder paragraph 145(2).

663. Applying this principle, the Tribunal finds that there is insufficient proof that the payments were in exchange for any of the six forms of assistance. In particular, there is no proof they were in exchange for Thiam's involvement in the negotiations with potential joint venture partners, including China Investment Corporation,[702] the Libyan Investment Authority,[703] Baosteel[704] and Alabbar.[705] It is true that Thiam was involved in these negotiations (a fact that BSGR does not deny) and that the flights for which he was reimbursed enabled him to participate in these negotiations. But there is no proof that Thiam only agreed to join the negotiations *if* his expenses were paid, or (to put it another way) that he would not have paid for his own flight to participate in the negotiations had BSGR not decided to reimburse him. Indeed, Thiam testifies that the GoG had an interest in participating in the negotiations, which was that it would give the GoG the opportunity to ensure its aims were met by the joint venture.[706] Thiam also points out that Article 62 of the Mining Code makes any joint venture agreement contingent on the approval of the Minister of Mines.[707] So there is a real possibility that Thiam would have made himself present at the negotiations *irrespective* of whether his flights were reimbursed.

*The second question: whether the payments were made to achieve one of the four aims*

664. Even if BSGR made the payments in exchange for Thiam's involvement in the negotiations, they were not made to achieve any of the four aims in BSGR's representations. In particular, they were not for the purpose of "influencing any act or decision of [Thiam] in [his] official capacity [...] in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business". First, the "thing of value"[708] given to Thiam was not actually money (since the sums were paid to reimburse his flights), but rather flight experiences and the ancillary benefits of visiting foreign countries, which are arguably not "things of value" to Thiam at all since they were flights for business and not leisure. Second and more important, Vale has not adduced sufficient evidence to contradict Thiam's testimony that his role in the negotiations was limited to providing "appropriate assistance to the parties in reaching agreement" (as he did in the negotiations for another joint venture between two investors, Bellzone and China International Fund (which are unrelated to BSGR and Vale), during which Thiam says he "effectively became a mediator"),[709] as opposed to promoting BSGR's interests actively in the negotiations. The emails between Thiam and the potential joint venture partners on which Vale relies[710] do not discredit Thiam's testimony. At worst, it can be said that Thiam promoted the GoG's interests in kickstarting the development of Simandou by assisting in the search for reliable joint venture partners so as to reap the economic benefits, and that the GoG's interests overlapped with BSGR's interests. His limited role was seen again during BSGR's negotiations with Vale, where his involvement was limited

---

[702] Vale's Statement of Reply, paragraphs 525-526.
[703] Avidan First WS, paragraph 137; Struik First WS, paragraph 134; Thiam First WS, paragraphs 76-77; BSGR's Statement of Defence, paragraph 92; Vale's Statement of Reply, paragraph 527.
[704] Vale's Statement of Reply, paragraph 528.
[705] Vale's Statement of Reply, paragraph 528.
[706] Thiam Second WS, paragraph 15.
[707] Thiam Second WS, paragraph 15.
[708] This term is used in BSGR's representations: *see* Compliance Due Diligence Questionnaire, section IV, p. 7, **C-30**.
[709] Thiam Second WS, paragraph 15.
[710] Emails between Minister Thiam, A. Avidan and A. Rocos dated 15 July 2009, **C-620**; Email from A. Rocos to B. Steinmetz and Minister Thiam dated 27 July 2009, **C-621**; Email from B. Steinmetz to Minister Thiam dated 4 January 2010, **C-622**; Emails between Minister Thiam and B. Steinmetz dated 30 December 2009, **C-623**; Email from M. Alabbar to Minister Thiam dated 1 August 2010, **C-624**.

to (a) participating in a conference call with Vale and BSGR to confirm that BSGR had the legal rights to Simandou Blocks 1 and 2 and (b) restating his confirmation in a letter to Vale on 19 March 2010.[711] This only illustrates that Thiam participated in the negotiations as a representative of the GoG's interests rather than BSGR's interests, just as he had done in BSGR's previous negotiations.

665.  Two consequences follow from Thiam's limited involvement. One, it follows that Thiam did not "assist the BSG Group […] in obtaining or retaining business", since his limited role would not have that effect. Two, the payments to Thiam for his limited involvement would arguably not be considered as bribery under §78dd-1(a) of the FCPA, after which BSGR's anti-bribery representations were modelled. §78dd-1(c) states that one affirmative defence against an allegation of bribery is where:

> the payment, gift, offer, or promise of anything of value that was made, was a reasonable and bona fide expenditure, such as travel and lodging expenses, incurred by or on behalf of a foreign official, party, party official, or candidate and was directly related to– (A) the promotion, demonstration, or explanation of products or services; […]

666.  The clear purpose of this section is to exclude reimbursements for accommodation and flights for government officials from the definition of bribery where the purpose of the visit is to introduce the government official to the business of an entity. In this case, the purpose of reimbursing Thiam's flight can be said to be to introduce Thiam to the business and key personnel of potential joint venture partners, so as to enable Thiam and the GoG to make a more informed decision on whether to approve the finalised joint venture agreement in accordance with Article 62 of the Mining Code. Vale itself had paid for Thiam's hotel on a trip to Carajás and placed its private jet at Thiam's disposal in May 2010, so that Thiam could view what Vale had achieved in its iron ore mine in Carajás.[712] The upshot is that the payments for Thiam's involvement in the negotiations would not count as bribery under the FCPA in the light of the affirmative defence, and they should not be regarded as bribery under BSGR's representations.

*Conclusion on Second Limb and relevance of USA v. Thiam proceedings*

667.  For the reasons stated above, the Tribunal finds that there is insufficient evidence that BSGR's payments were in exchange for any of the six forms of assistance from Thiam, or that, even if they were in exchange for Thiam's assistance in BSGR's negotiations, they were made to achieve one of the four stated aims in BSGR's representations. The Tribunal accordingly dismisses Vale's allegation that BSGR bribed Thiam in breach of BSGR's anti-bribery representations.

668.  The Tribunal concludes with a final word on the relevance of the *USA v. Thiam* proceedings. The Parties adduced evidence of the U.S. criminal proceedings against Thiam for allegedly accepting bribes from an unrelated Chinese conglomerate. The Parties draw diametrically opposite conclusions on the relevance of those proceedings to the issues in this arbitration. On the one hand, Vale argues that Thiam's admission of his

---

[711] Monteiro First WS, paragraphs 16-17; Monteiro Second WS, paragraph 24; Agnelli WS, paragraph 15; Thiam First WS, paragraph 80; Letter from Thiam to Ledsham dated 19 March 2010, **C-49**; Vale's Statement of Case, paragraph 74; Vale's Statement of Reply, paragraph 531.
[712] Email from B. Amadou to Etchart, Alves and others dated 24 May 2010, **R-262**; BSGR's Statement of Rejoinder, paragraph 165; Thiam First WS, paragraph 87.3; Thiam Second WS, paragraph 27.

repeated lies to banks and U.S. governmental agencies about taking bribes "go[es] directly to his credibility as a witness in this arbitration".[713] On the other hand, BSGR argues that the criminal proceedings support BSGR's case in this arbitration, because first of all, Thiam's "alleged corrupt scheme with Chinese interests – which he still denies – would have negatively impacted BSGR",[714] given that the award of investment rights to the Chinese conglomerate included the "near total control of Guinea's valuable mining sector",[715] and secondly, the FBI did not discover any evidence of BSGR's bribery despite its scrupulous examination of the evidence before it.[716]

669. The Tribunal finds that the *USA v. Thiam* criminal proceedings do not affect the Tribunal's conclusions in its analysis above. The Tribunal has found that there is insufficient evidence that BSGR's payments were in exchange for the six forms of assistance, let alone that they were made to fulfil one of the four corrupt aims in BSGR's representations. The criminal proceedings, which solely concern Thiam's alleged acceptance of bribes from an unrelated Chinese conglomerate, do not change this fact of insufficiency of evidence, no matter how gravely Thiam's testimony and conviction in those criminal proceedings taint his credibility as a witness for BSGR.

### *iii.* President Conté

670. Vale alleges the following events.

670.1. In 2005, during a meeting between Oron, Cilins, I.S. Touré and President Conté, Oron gave President Conté a gold watch inlaid with "Steinmetz" diamonds, which had an approximate value of USD 60,000.[717] To support this claim, Vale relied on the Technical Committee's Notification Letter dated 30 October 2012, which made this allegation.[718]

670.2. In 2006, after the signing of the Memorandum of Understanding between Guinea and BSGR Guinea BVI on 20 February 2006, a ceremony was televised featuring Souaré (who was Minister of Mines), Oron and Cilins. During the ceremony, Oron gave Souaré a miniature Formula 1 car encrusted with gold and diamonds, which Souaré gave to President Conté.[719] In support, Vale relies on witness statements from Struik,[720] Souaré,[721] Steinmetz[722] and BSGR,[723] all of which Vale regards as admissions. Vale points out[724] there are discrepancies between the testimonies of BSGR's witnesses on whether the watch was

---

[713] Letter from Vale to the Tribunal dated 26 May 2017, p. 3; see also Letter from Vale to the Tribunal dated 16 June 2017, pp. 2-3.
[714] Letter from BSGR to the Tribunal dated 9 June 2017, p. 2 (emphasis in original).
[715] Letter from BSGR to the Tribunal dated 9 June 2017, p. 2.
[716] Letter from BSGR to the Tribunal dated 9 June 2017, pp. 3-4; see also *USA v. Thiam*, Transcript of FBI's interview with Thiam, 13 December 2016, **R-524**.
[717] Vale's Statement of Case, paragraph 144; Vale's Statement of Reply, paragraphs 351, 632(b), 1005.
[718] Notification Letter, paragraph II.8, p. 5, **C-5**.
[719] Vale's Statement of Case, paragraph 144; Vale's Statement of Reply, paragraphs 357, 632(c), 1005.
[720] Struik First WS, paragraph 36.
[721] Souaré WS, paragraph 28.
[722] Steinmetz First WS, paragraph 61.
[723] BSGR's Statement of Defence, paragraph 47. *See also* Notification Letter, paragraph II.7, p. 5, **C-5**.
[724] Vale's Statement of Reply, fns. 896, 1652.

encrusted with gold (as Struik [725] and Avidan [726] claim) or diamonds (as Steinmetz claims[727]).

670.3. In 2006, during a meeting with President Conté to discuss the development of the project, Struik gave President Conté another miniature car.[728] Vale relies on a few passages from Struik's first witness statement [729] and Souaré's first witness statement,[730] which Vale regards as admissions.

671. Vale argues that "[t]hese show that BSGR bribed the President in relation to its obtaining Guinean mining rights."[731]

672. As regards the gold watch, the Tribunal finds there is insufficient evidence to prove that Oron gave a gold watch to President Conté. This is because the Technical Committee's Notification Letter on which Vale relies contains nothing more than a list of bare allegations by the Technical Committee against BSGR. The Tribunal also notes that the gold watch allegation in the Notification Letter did not culminate in any finding (or indeed any discussion) on this matter in the Technical Committee's Report. This only weakens the evidentiary value of the Notification Letter.

673. With regard to the two miniature cars, the Tribunal finds that Oron gave a miniature car to Souaré in a 2006 televised ceremony, and that Souaré gave that miniature car to President Conté in turn, based on the corroborating testimonies by Struik, Souaré, Steinmetz and BSGR. The Tribunal also finds that Struik gave President Conté another miniature car in a 2006 meeting regarding BSGR's Simandou project, based on Struik's admission that he "gave [President Conté] our company gift, a miniature golden replica of a Formula One car, the same we had given to the Minister of Mines before."[732]

674. While the Tribunal finds that Oron (through Souaré) and Struik gave miniature cars to President Conté, the Tribunal is unpersuaded that these cars constitute clear evidence of bribery. Steinmetz testifies that these cars are marketing devices that had BSGR's name engraved on them and only cost a few hundred dollars to make, and it is unlikely for any company to bribe government officials using a relatively cheap marketing device that has the company's name on it, let alone at a publicly televised ceremony.[733] Avidan confirms that these cars are simply corporate gifts, and even unabashedly attests that the two cars may not be the only ones as Avidan has also "[given] ministers [...] in total six small golden model cars". [734] Struik confirms that these are simply corporate gifts.[735] In the light of these testimonies, the Tribunal finds that these were gifts made for felicitous occasions,

---

[725] Struik First WS, paragraph 36.
[726] Avidan First WS, paragraph 117.
[727] Steinmetz First WS, paragraph 61.
[728] Vale's Statement of Reply, paragraphs 357, 632(c), 1005.
[729] Struik First WS, paragraph 111.
[730] Souaré WS, paragraph 28. Vale originally alleged that another meeting took place between February and July 2008 between President Conté, Steinmetz, Struik and Cilins, during which Steinmetz gave President Conté a miniature car as well: Vale's Statement of Case, paragraph 161. However, Steinmetz denied the meeting in 2008 took place: Steinmetz First WS, paragraph 61.
[731] Vale's Statement of Reply, paragraph 1005.
[732] Struik First WS, paragraph 111.
[733] Steinmetz First WS, paragraph 61.
[734] Avidan First WS, paragraph 117.
[735] Struik First WS, paragraphs 36, 111.

and that there is no evidence to show that they were given for the purpose of achieving one of the four improper aims in BSGR's representations.

675. On this basis, the Tribunal dismisses Vale's allegation that BSGR bribed President Conté in breach of its anti-bribery representations.

<u>Summary as to whether BSGR made false statements during the due diligence process</u>

676. In summary, and based on the analysis above, the Tribunal finds that BSGR made false or misleading statements in its responses to a number of questions asked by Vale during the due diligence process. These false or misleading statements arise out of the following ten circumstances.

676.1. BSGR's failure to disclose all consultants and agents – including Pentler, Cilins, Boutros and Fofana.

676.2. BSGR's failure to disclose agreements with consultants and agents.

676.3. BSGR's failure to disclose all relevant documents and information relating to the shareholder structure of BSGR Guernsey and its subsidiaries in relation to the share purchase agreement between BSGR Guinea BVI and BSGR Guernsey regarding the shares in BSGR Guinea.

676.4. BSGR's failure to disclose all agreements between the shareholders of BSGR Guernsey and any of its subsidiaries, as well as all agreements relating to the share capital or ownership, control, management or operation of a Group Company in relation to the share purchase agreement between BSGR Guinea BVI and BSGR Guernsey regarding the shares in BSGR Guinea.

676.5. BSGR's failure to disclose the pending disputes with Bah and Camara.

676.6. BSGR's representation that no personnel or shareholders of BSGR or their immediate family were Government Officials with regard to the relationship between I.S. Touré, an employee of BSGR Guinea and Mme. Touré.

676.7. Avidan's representation that I.S. Touré and Mme. Touré were not related.

676.8. BSGR's misleading description of its role in the GoG's decision to withdraw Rio Tinto's mining rights.

676.9. BSGR's failure to disclose financial and business connections to Mme. Touré / Matinda.

676.10. BSGR's representation that it had not engaged in bribery or corruption in relation to benefits granted to Mme. Touré.

### 3.   BSGR knew that its representations were false

677.   In addition to demonstrating that certain representations were false, Vale must prove that BSGR knew they were false. This is primarily an evidentiary question – can BSGR, based on all the evidence, be said to have known that its representations were false?

678.   In support of its argument that BSGR knew that the representations were false, Vale states:[736]

> BSGR knew that its representations were false. In many cases, BSGR was dealing with the very subject-matter of the representations at the same time as, in its parallel negotiations with Vale, it professed to have no knowledge of any such matters.

679.   Conversely, BSGR contends that "[s]howing that a statement was false (which is what Vale rely on [...]) is not sufficient. [...] one cannot fill the gap by saying that if it is false, the person making the statement must have known that to be the case. That is both a logical *non sequitur* and a legal nonsense".[737]

680.   The false or misleading statements made by BSGR during the due diligence phase are set out at paragraph 676 above. The Tribunal sets out below the factual circumstances and evidence that it considers relevant to the analysis of whether BSGR knew that the information provided in response to these questions was false.

681.   The most telling fact in relation to BSGR's knowledge is its decision not only to refrain from disclosing the role that Pentler and its principals played in securing the mining licences, but also to withhold disclosure of the relationship between Mme. Touré and Pentler, as BSGR's Consultant. As set out in paragraph 492 above, the Tribunal has found that, due to BSGR's failure to provide any corroborating evidence (including a statement from Mr Hatchard) to support its assertion that Skadden Arps advised it that there was no need to disclose the role of Pentler in response to the due diligence questionnaires, no such advice was provided.

682.   In the Tribunal's view, the following points are telling.

682.1.   BSGR restructured its holding companies prior to seeking a joint venture partner. That restructure resulted in all companies with formal ties to Pentler being removed from the ownership structure.

682.2.   BSGR proposed amendments to the definition of BSG Group which meant that companies with ties to Pentler fell outside the definition.

682.3.   BSGR deliberately chose not to disclose to Vale the existence of Pentler, or its role in assisting BSGR to obtain the mining licences, during the due diligence process (see paragraph 693 below).

682.4.   When Vale asked broader due diligence questions that would have encompassed those companies in the BSG Group with ties to Pentler, BSGR immediately restructured and moved those companies to a separate part of the

---

[736] Vale's Pre-Hearing Written Submissions, paragraph 191.
[737] BSGR's Statement of Rejoinder, paragraph 332.

business, with the result that they were not caught within the more expansive questions.

683. The two companies with the closest ties to Pentler were BSGR Steel and BSGR Guinea BVI. Pentler held shares in BSGR BVI Guinea. As indicated in Section III above, these two companies were removed from BSGR Guinea's ownership chain in 2009 as follows. As a convenient point of reference, the Tribunal has, based on uncontroversial facts in the record, prepared the following diagram showing the effect of the restructuring in 2009 and, for reasons of clarity, is repeated here.

**Pre-February 2009:**                    **Post-February 2009:**




684. Vale alleges that BSGR's restructuring in 2009 to remove BSGR Steel and BSGR Guinea BVI from the Simandou project was a deliberate attempt to hide the relationship with Pentler. Conversely, BSGR states that the restructuring was designed with good governance in mind:

> BSGR decided that it would be advantageous for the holding company of the Guinea project to be a Guernsey company rather than a BVI company, to ensure that the holding company was subject to the same high level of corporate governance as the parent company (which was already incorporated in Guernsey). This was designed to give comfort to potential investors.[738]

685. While both explanations are plausible on their face, when Vale widened the scope of its due diligence in March 2010 to include all subsidiaries of BSGR (and thus BSGR Steel and BSGR Guinea BVI), BSGR once again restructured. This time, BSGR transferred BSGR Steel and BSGR Guinea BVI to BSG Metals and Mining – a subsidiary of Nysco (BSGR's parent), but not directly connected to BSGR. A diagram depicting the

---

[738] BSGR's Statement of Rejoinder, paragraph 64.

restructuring in March 2010 has been created by the Tribunal (based on uncontroversial fact) and is reproduced below.

**Restructuring in March 2010:**



686. This restructuring meant that BSGR Steel and BSGR Guinea BVI (companies that had contracted with Pentler) were no longer directly linked to BSGR and were therefore not caught by the broader definition of "Group Company" that Vale insisted upon in its follow-up due diligence questions. This transfer occurred immediately after Vale broadened the scope of the due diligence questions. No explanation has been provided by BSGR for this restructuring.

687. These factors cannot be a coincidence. In the Tribunal's view, the lengths to which BSGR went in order to conceal the role of Pentler strongly supports a finding that BSGR wished to ensure that Vale remained ignorant of Pentler and its dealings with various contacts who had assisted BSGR Guinea in obtaining the mining rights.

688. BSGR points out that not all facts regarding Pentler or its role were concealed. A reference to the USD 22 million payment to Pentler for the buyback of its shares in BSGR Guinea BVI was contained in one of the financial documents disclosed in the data room. It was said to be a payment for "goodwill on acquisition."[739] Vale understood that this referred to a payment made to a minority shareholder. According to Monteiro (Vale's witness), when he queried this payment, Tchelet told him that:

---

[739] Statement of Financial Affairs for BSG Resources (Guinea) Limited (Guernsey) for Period Ended 31 December 2009 and Letter from Ernst &Young, December 2009 / February 2010, p. 9, **C-290**.

> The minority shareholder was not an external third party but rather was a company within the Balda Group that provided services for BSGR in Guinea, as did other group companies. He claimed that the affiliated entity received the shares in the first place simply for tax planning purposes and that the buy-out in April 2009 was likewise to optimize tax planning. I also had discussions with Dag Cramer regarding the buy-out and he, like Mr. Tchelet, told me that the entire transaction was internal to the Balda Group and was for tax-planning purposes.[740]

689. Conversely, Tchelet stated in his First Witness Statement that:

> The focus of the questions Mr Monteiro asked me, was why there had been a change in the company structure in April 2009. I explained that previously there was a minority shareholder in BSGR Guinea BVI and that subsequently there was a buy out of the minority partner in 2008 and that in accordance with the corporate governance and accounting policy of BSGR, the structure was amended such that the subsidiary BSGR Guernsey was incorporated and managed in Guernsey under the auspices of the BSGR Head Office in Guernsey. This was the extent of the questions I was asked by Mr Monteiro. I was not asked the identity of the minority shareholder or any further questions in this regard.[741]

690. Tchelet did not attend the February 2017 Hearing for a cross-examination on his witness statements. On the other hand, Monteiro attended the hearing and was asked questions by the Tribunal about the USD 22 million payment. He said:

> Then, the first time we met Mr Tchelet was here in London, and when we met him, we went through with him some documentation that was provided in part of the due diligence and asked him directly: what was the transaction about? And based on the organisation chart that they provided to us, he was explaining that that transaction was a transaction with a related party. Not only him, but also Mr Cramer mentioned that was the way they did tax planning to avoid the Guinean risk of bringing money to Guinea. So, also, they were using different entities that were providing services but, again, related parties always, all entities under the Balda Foundation.[742]

691. Monteiro confirmed that, at that stage, he had never heard of Pentler or seen any reference to it.[743] He therefore did not know how to ask questions about that entity.

692. The Tribunal accepts Monteiro's evidence and finds his account to be consistent with BSGR's efforts to conceal the existence of Pentler as described above. Moreover, it would be most surprising if, as Tchelet suggested, Monteiro asked questions about the USD 22 million goodwill payment, but never asked to whom the payment was made. Even if Tchelet is correct that the focus of the questions was on the restructuring and not the identity of the minority shareholder, it would still be expected that Tchelet would have mentioned the name of that minority shareholder when describing the restructuring and buyback process. The fact that he did not do so lends credibility to Monteiro's account and the conclusion that BSGR did not wish Vale to know of the role that Pentler played in obtaining the mining rights.

693. BSGR itself admits that it chose not to disclose the role of Pentler when responding to due diligence questions based on legal advice. The decision not to disclose Pentler was therefore a conscious one. The advice allegedly provided by Skadden Arps has already

---

[740] Monteiro Second WS, paragraph 12.
[741] Tchelet First WS, paragraph 86.
[742] Transcript, Merits Hearing, Day 2, p. 83 line 16 – p. 84 line 3 (Monteiro).
[743] Monteiro Second WS, paragraph 14.

been discussed at paragraphs 480–492 above and the Tribunal does not propose to discuss it again here. The primary point is that, according to BSGR, it did not forget to disclose the role of Pentler and its principals, it made the deliberate decision on alleged legal advice not to do so. The legal advice explanation has already been examined and rejected as unproven.

694. The concealment of Pentler is highly relevant to several misleading representations.

694.1. The disclosure of Cilins or Pentler as agents or consultants would have led to further investigation of their role, as would the disclosure of agreements between BSG Group entities and Pentler.

694.2. The disclosure of the pending dispute with Bah would have revealed the Pentler-Bah Milestone Agreement and the indemnities provided by Pentler to BSGR and would have likely prompted further investigation.

694.3. The Tribunal also found a misrepresentation regarding the share structure based on the share purchase agreement regarding the transfer of shares in BSGR Guinea from BSGR Guinea BVI to BSGR Guernsey. The Tribunal notes that this would likely have led Vale to discover the restructuring that took place and – potentially – the shareholding that Pentler held in BSGR Guinea BVI until 2008.

694.4. An accurate description of BSGR's involvement in the GoG's decision to withdraw Rio Tinto's mining rights would likely have revealed the role played by Pentler as BSGR's agent and consultant.

694.5. BSGR's business relationship with Mme. Touré included her indirect interest in BSGR Guinea which was held through Pentler.

694.6. The disclosure of the Pentler connection would also have revealed the connection between BSGR and Mme. Touré and raised red flags with Vale in relation to any role the President's wife might have played in the procurement of the mining rights.

695. In relation to the ten misrepresentations listed at paragraph 676 and based on the circumstances described in the preceding paragraph 694, the Tribunal considers that they individually or in any event in aggregate establish a pattern of conduct designed to hide the roles that Pentler and Mme. Touré played in the procurement of the mining rights and the large amounts of compensation that the Pentler principals and Mme. Touré received or expected to receive. This conclusion also applies to the equally large amounts paid to I.S. Touré, Bah and Daou. This pattern, in the opinion of the Tribunal, is more than sufficient for it to conclude that BSGR knew that its representations were false.

696. The Tribunal recalls that, with regard to one representation, BSGR stated that it made a mistake in its disclosure – the failure to disclose Fofana as a consultant. Avidan said that it did not occur to him to disclose Fofana's role, as he considered Fofana to be a "friend" by 2010 even though he was still providing advice (Fofana had previously been paid as a consultant).[744] Without making any determination as to the truthfulness of Avidan's

---

[744] Avidan First WS, paragraphs 150-151; Avidan Second WS, paragraphs 21-22.

written evidence (Avidan did not present himself for cross-examination), the Tribunal observes that the FCPA due diligence was a serious and extensive exercise undertaken by a team of specialised lawyers from an international law firm. Vale would have expected BSGR to investigate fully before providing its answers. Simply relying on one person's recollection or understanding is not sufficient. The fact that negotiations were expeditious, as BSGR points out, does not excuse BSGR from making proper enquiries before answering due diligence questions.

697. In the Tribunal's view, the factual evidence discussed above strongly supports the conclusion that BSGR deliberately concealed Pentler and the role it had played. On this basis, the Tribunal finds that BSGR knew that the relevant representations it had made to Vale during the due diligence process (listed in paragraph 676 above) were false and misleading. The Tribunal finds that BSGR knew that it had made false representations.

(a) **_BSGR's liability for statements made by "external advisors"_**

698. The issue of liability for statements made by "external advisors" was first raised by BSGR in paragraph 247 of BSGR's Statement of Defence, made with reference to the role of Steinmetz as "external advisor to BSGR / the Balda Foundation".[745] While maintaining that Steinmetz's statements were true, BSGR suggests that Steinmetz's statements are fundamentally irrelevant since BSGR could not be "vicariously liable for statements made by external advisors."[746]

699. Vale makes three arguments in response.

699.1. First, Vale points out that "[w]here a misrepresentation is made by a third party, but the principal has knowledge or notice of the representation at the time of contract, then the representee […] can avoid the contract".[747] BSGR could hardly disclaim knowledge of Steinmetz's representations or argue that he was acting entirely independently of BSGR. Vale says that this logic extends even to representations made by parties other than Steinmetz, given BSGR's integral involvement in the negotiation process[748] and the fact that BSGR has not disavowed its knowledge of those representations.

699.2. Second, Vale argues that BSGR should be bound by the representations from its agents due to the doctrine of actual and ostensible authority. This doctrine applies _even if BSGR were truly in the dark regarding its agent's representations_. Thus, representations by David Clark (the then Director and Group Treasurer of BSGR Guinea), Avidan (then Executive Officer & Chief Executive Officer of BSGR Guinea) or Steinmetz (the eponymous founder and ultimate controlling shareholder of BSGR) would bind BSGR.

---

[745] Framework Agreement, clause 1.8, **C-1**.
[746] BSGR's Statement of Defence, paragraph 247.
[747] Vale's Pre-Hearing Written Submissions, paragraph 263, relying on J Cartwright, _Misrepresentation, Mistake and Non-Disclosure_ (3rd edn, Sweet & Maxwell 2012) [4-75], **CL-124**, which states: "The courts have accepted that the representee may avoid the contract on the basis of a misrepresentation made by a third party where the other party has knowledge of it at the time of the contract."
[748] Vale's Pre-Hearing Written Submissions, paragraph 263.

699.3.   Last, Vale argues that BSGR would also be caught by the doctrine of vicarious liability:

699.3.1.   BSGR would be vicariously liable for its employees where the unlawful conduct was "closely connected" with the employment;[749] and

699.3.2.   BSGR would be vicariously liable for non-employees as it was fair, just and reasonable to impose vicarious liability on BSGR in the circumstances of the case based on the following factors:

699.3.2.1.   the tort would have been committed as a result of activity being taken by the tortfeasor on behalf of the defendant;

699.3.2.2.   the tortfeasor's activity is likely to be part of the business activity of the defendant; and

699.3.2.3.   the defendant, by employing the tortfeasor to carry on the activity, will have created the risk of the tort committed by the tortfeasor.

700.   Having carefully considered the evidence and the factual circumstances discussed throughout this Award, including (i) the precontractual Anti-Bribery Certification of Steinmetz;[750] (ii) Section 1.8 of the Framework Agreement attributing Steinmetz's awareness to BSGR and BSGR Guernsey; and (iii) the first and second witness statements of Steinmetz, the Tribunal agrees with Vale that BSGR cannot avoid liability for statements made by Steinmetz on the basis that he is simply an "external advisor" to BSGR. BSGR has not (and simply cannot) make a credible argument that it was unaware of Steinmetz's representations. Therefore, the Tribunal finds that BSGR is liable for statements made by Steinmetz as an external advisor. Having reached this finding, it is unnecessary for the Tribunal to consider the rest of Vale's arguments in this Section.

**(b)   _BSGR would not be liable if its agents had no knowledge that the misrepresentations were false, but the facts simply do not fall within this category_**

701.   BSGR's other legal argument, raised at paragraphs 333 to 339 of BSGR's Statement of Rejoinder, is that there can be no liability where an agent of BSGR (including its directors or employees) makes statements which he or she did not know were false, even if others in BSGR had such knowledge. BSGR argues that "Vale's attempt to attribute knowledge across the BSGR organisation is wrong in law and principle."[751]

702.   _Clerk & Lindsell_ state that:

Where a false representation has been made innocently by an agent acting within his authority, the mere fact that the principal knows the facts which render the representation false will not make the latter liable if he has not expressly

---

[749] _Mohamud v WM Morison Supermarkets_ [2016] UKSC 11, **CL-135**.
[750] Anti-Bribery Certification of Beny Steinmetz, 9 April 2010, **C-3**.
[751] BSGR's Statement of Rejoinder, paragraph 333.

> authorised the representation or deliberately concealed facts from the agent with a view to the claimant being misled.[752]

703. BSGR provides no detail on which agents or which representations would be affected by the application of this principle.

704. Vale replies that a claim in deceit is available where responsibility and knowledge is shared among several servants and agents.[753] This is based on paragraph 8.14 of *Spencer, Bower & Handley on Actionable Misrepresentation*, which cites Singleton LJ in *Armstrong v Strain* [1952] 1 KB 232, 244 (CA) in turn as follows:

> Difficulties may arise in a claim against a company which can only speak or act through its agents or officers, but if an officer of a company… represents that which is untrue when many other officers of the company know the true facts, it may well be found that he made the representation without belief in its truth…[754]

705. Vale further submits that, even based on BSGR's own authorities, BSGR would still be liable for the honest representations of an (honest) agent who lacked knowledge of the facts if:[755]

705.1. BSGR knew that the representation was untrue but expressly authorised it to be made;[756] or

705.2. BSGR deliberately engaged an agent, from whom BSGR concealed facts in the expectation that, as a result of ignorance, the latter would give false information to Vale.[757]

706. Lastly, Vale argues that the facts simply cannot support any suggestion that the parties making the representations on BSGR's behalf did not have knowledge to which BSGR was privy.[758] This is because the principals, directors and officers of BSGR making the representations to Vale were the very individuals who were at the forefront of BSGR's operations in the field, and must be expected to have had the relevant knowledge. Given that a company's knowledge is deemed to be held collectively by its employees, directors and officers,[759] it is implausible for BSGR to suggest that the particular employee, director or officer making the representation was unaware that the representations were false when BSGR (meaning the other employees, directors or officers) knew the representations were false.

707. The Tribunal considers that there is no evidential basis in the present case for applying the legal principles advanced in the abstract by BSGR in paragraphs 333–339 of its Statement of Rejoinder. Most of the representations discussed above were made in the

---

[752] M Jones, A Dugdale and M Simpson (eds), *Clerk & Lindsell on Torts* (21st edn, Sweet & Maxwell 2014) [18-27], **RL-40**.
[753] Vale's Pre-Hearing Written Submissions, paragraph 272.
[754] KR Handley, *Spencer Bower & Handley: Actionable Misrepresentation* (5th edn, LexisNexis 2014) [8.14], **CL-123**.
[755] Vale's Pre-Hearing Written Submissions, paragraph 274.
[756] HG Beale (ed), *Chitty on Contracts*, vol 1 (32nd edn, Sweet & Maxwell 2015) [7-053], **RL-30**.
[757] M Jones, A Dugdale and M Simpson (eds), *Clerk & Lindsell on Torts* (21st edn, Sweet & Maxwell 2014) [18-28], **RL-40**.
[758] Vale's Pre-Hearing Written Submissions, paragraph 276.
[759] *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500 (PC), **CL-138**.

Due Diligence Questionnaires which were answered on behalf of the BSG Group. David Clark signed the two Compliance Due Diligence Questionnaires as being true and correct. Importantly, the certification notes that inquiries were made of all relevant companies and their officers.[760]

708. In his written evidence, Clark states that he signed the Questionnaires in his capacity as a director, but they were "completed by those who were best placed to answer the questions".[761] In particular, key personnel such as Avidan, Tchelet and Struik were consulted. Leaving aside Vale's argument that a company's knowledge is deemed to be held collectively by their employees, directors and officers,[762] the evidence supports the contention that these people, who effectively ran BSGR in Guinea, knew the relevant facts relating to Pentler, Cilins and Mme. Touré, and the way in which mining permits were obtained. Of course, the primary defence advanced by BSGR is not that these people did not know all of the relevant facts and therefore had honestly misrepresented this situation as "agents" of BSGR – BSGR maintains its position that the information provided in the Due Diligence Questionnaires was true and correct.

709. As the Tribunal noted earlier, the only representation which BSGR admits is incorrect relates to BSGR's failure to disclose the consulting role played by Fofana. The Tribunal now considers whether the principle that BSGR cannot be liable if an agent had no knowledge that the representation was false has any application here.

710. Avidan does not suggest that he failed to disclose Fofana's consulting role because he was unaware of it. He simply says that it did not occur to him to disclose the work performed by Fofana. The Tribunal finds Avidan's explanation as to why the role of Fofana – whom BSGR does agree was a consultant – was not disclosed to be unconvincing on its face. Avidan said in his second witness statement:

> I have already addressed Mr Fofana's role at paragraphs 150-151 of Avidan-1. Vale alleges that it is "implausible that [I] simply forgot about [Fofana] during the Project Hills negotiations." I did not say in Avidan-1 that I forgot about Fofana; I said that "I never considered Mr Fofana to be a consultant and it never occurred to me that he should be disclosed." This is true.

> During the due diligence period, Yossie had carriage of the Due Diligence Questionnaires. When Yossie asked me about BSGR's consultants during the Project Hills negotiation, I understood this to mean BSGR's current consultants. By then, Fofana had become a friend. For example, when he commented on the terms of the Convention de Base in December 2009 and advised BSGR in relation to press articles which had been published in February 2010, he was not paid for his advice. This was simply the counsel of a trusted friend who understood local politics. It never occurred to me at the time that Fofana was a current consultant who should be disclosed.[763]

711. The Tribunal is unconvinced by Avidan's explanation that he had interpreted the question to mean only current consultants or that he now thought of Fofana as a "friend" rather than a consultant. Neither Avidan, Tchelet nor Clark attended the February 2017 Hearing in person to provide any further oral explanation of the nature of the inquiries made to verify that all consultants had been captured in the answers to the due diligence

---

[760] Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, p. 8, **C-43**.
[761] Clark First WS, paragraph 45.
[762] Vale's Pre-Hearing Written Submissions, paragraph 275.
[763] Avidan Second WS, paragraphs 21-22.

questionnaires. In any case, this is not a situation where Avidan had no knowledge of Fofana's consulting, and therefore a failure to disclose it could be excused under the legal principle expressed by BSGR.

712. The Tribunal finds that the proposition that BSGR would not be liable if its agents had no knowledge that the misrepresentations were false is not applicable to the facts of this case. Moreover, the Tribunal agrees with Vale that, on the facts of the present case, there is no realistic possibility that those making representations on behalf of BSGR were not aware of all relevant facts. They were all senior members of BSGR's management – including Steinmetz even though his official role was as an "advisor".

### 4. BSGR intended that Vale should act in reliance on its representation

713. It is common ground between the Parties that the finding of a fraudulent misrepresentation gives rise to a rebuttable presumption that BSGR intended Vale to rely on the false representation.[764]

714. In its Statement of Rejoinder, BSGR argues that the mere fact that the contract, if concluded, would have been a lucrative one for BSGR, did not mean that "it can be presumed that the defendant intended the claimant to rely on the misrepresentation",[765] pointing out that Vale has not been able to cite any cases to that effect. BSGR then distinguishes the cases cited by Vale in paragraphs 914 to 915 of Vale's Statement of Reply on the basis that those cases concerned the representee's reliance, rather than the representor's intention to cause reliance.

715. In its Pre-Hearing Written Submissions,[766] Vale then noted that Lord Clarke in the UK Supreme Court had opined that "the authorities seem to me to support the conclusion that it is very difficult to rebut the presumption [that the fraudulent representor intended the representee to rely on it].[767]

716. The Tribunal's view is that BSGR's submissions do not evince any attempt to rebut the presumption. Instead, after rebutting the cases cited in paragraphs 914 to 915 of Vale's Statement of Reply, BSGR's position reverts to saying that Vale "cannot show that there was any intent by BSGR to deceive Vale for the same reasons it cannot prove knowledge of the falsity of the statements. The due diligence was conducted speedily by BSGR, but in good faith and in reliance on legal advice".[768] However, given that BSGR has already accepted that the burden of proof shifts to BSGR once fraudulent misrepresentation is proved,[769] it is difficult to understand why BSGR still couches its statements as if the onus were still on Vale rather than seeking to satisfy its own burden of proof.

717. One possibility is that BSGR was working on the presumption that Vale would not be able to show that BSGR knew that its representations were false, in which case it would follow that BSGR would not have intended Vale to rely on the false representations. However, these arguments go towards the prior element (knowledge that the representations were

---

[764] BSGR's Statement of Defence, paragraph 248(ii); Vale's Pre-Hearing Written Submissions, paragraph 289.
[765] BSGR's Statement of Rejoinder, paragraph 375.
[766] Vale's Pre-Hearing Written Submissions, paragraph 290.
[767] *Hayward v Zurich Insurance Co Plc* [2016] UKSC 48 [37], **CL-139**.
[768] BSGR's Statement of Rejoinder, paragraph 387.
[769] BSGR's Statement of Rejoinder, paragraph 377.

false) and the Tribunal has already found at paragraphs 677 to 712 above that BSGR did in fact know that its representations were false so, to the extent that this was BSGR's argument, it cannot stand.

718. The other possibility is that BSGR is implicitly arguing that it has satisfied its burden of proof because it has shown that the due diligence was conducted in good faith and in reliance on legal advice. However, the Tribunal cannot see how, given that the Tribunal has found that BSGR knowingly made false representations to Vale, BSGR did not intend that Vale would rely on them. In short, BSGR has not raised any exceptional circumstances to rebut the strong presumption against it, and the Tribunal is compelled to find that BSGR must have intended Vale to rely on each of the ten misrepresentations referred to above at paragraph 676 that have been identified by the Tribunal.

719. The Tribunal finds the following facts significant in arriving at its final conclusions on BSGR's intentions to deceive.

719.1. BSGR repeatedly failed to disclose highly relevant information when it was evident that it should have been disclosed to Vale and/or its due diligence advisers, Clifford Chance.

719.2. BSGR deliberately restructured the BSG Group in order to avoid disclosure obligations which, if complied with, would have revealed certain "red flags" of corruption.

719.3. BSGR has failed to give any credible reasons for its non-disclosure.

720. Having regard to all these circumstances, the Tribunal concludes that BSGR intended that Vale should act in reliance on BSGR's false and misleading representations in order to benefit from this intended joint venture.

## 5. Vale acted in reliance on the representations and suffered loss

### (a) *Reliance*

721. Regarding reliance, *Clerk & Lindsell* state as follows:

> To entitle a claimant to succeed in an action in deceit, he must show that he acted in reliance on the defendant's misrepresentation. If he would have done the same thing even in the absence of it, he will fail. What is relevant here is what the claimant would have done had no representation at all been made.[770]

722. While Vale had previously submitted that the Tribunal should determine reliance based on what Vale would have done had BSGR told the truth when it made the representations, it appears that Vale is not against the formulation ("what the claimant would have done had no representation at all been made") described by *Clerk & Lindsell* and submitted by BSGR.[771]

---

[770] M Jones, A Dugdale and M Simpson (eds), *Clerk & Lindsell on Torts* (21st edn, Sweet & Maxwell 2014) [18-34], **CL-6**.
[771] Vale's Pre-Hearing Written Submissions, paragraph 293.

723. BSGR further notes that "a person to whom a misrepresentation is made is not deceived if he actually knows the truth".[772] This is of general application, but BSGR specifically mentions that this means that "Vale cannot establish an actionable misrepresentation in relation to Avidan's statement that I.S. Touré was not related to the former President of Guinea or his wife [because] Vale knew that I.S. Touré was related to Mme. Touré (whom Vale believed to have been President Conte's wife)".[773] BSGR supports its position with reference to the Nardello Report, a report commissioned by Clifford Chance during the Project Hills negotiations. The Nardello report states:

> A further report states that BSGR Guinea was "*close to the Conte clan*". Ibrahima Sory Touré, in charge of external relations for BSGR in Guinea, is a brother of Mamadie Conté, the 4[th] wife of the late President. Asher Avidan, country manager for BSGR, who has worked for Israeli foreign affairs and defence ministries in the past, was reportedly working with Ibrahima Sory Touré to "*manage the transition*" of its development at Simandou.[774]

724. Vale responds that it specifically confronted BSGR with this allegation, and BSGR denied it.[775] However, the first witness statement of George Kleinfeld (on which Vale relies for this assertion) is not so clear. Kleinfeld does not refer to the Nardello Report in his evidence or say that he specifically asked Avidan to refute the Nardello Report. This is clear from the following paragraph in Kleinfield's first witness statement:

> Specifically, I asked during the interview about the BSGR employee in Guinea, Ibrahima Sory Touré, who handled public relations in-house, and whether he had any family ties to any government official. In response, Avidan volunteered that their public relations consultant in Guinea, who has the last name of "Touré," was not related to the former president of Guinea or his wife. Avidan said that he may have been from the same village as one of the former presidents, but to his knowledge, the employee is not related to anyone in the Government. Avidan said that Touré is a common name in the country.[776]

725. Vale also relies on the evidence contained in the second witness statement of Ricardo Saad ("Saad") (former CEO of VBG Guinea) when stating:

> Avidan also claims that he told Ricardo Saad, who ran VBG for Vale, that I.S. Touré and Mme Touré were related, but that Saad took no action. However, Avidan "never mentioned I.S. Touré's family connection to Mamadie Touré" until I.S. Touré resigned from VBG on 31 August 2011, long after the deal with Vale in April 2010.[777]

726. While the Tribunal accepts Saad's evidence that he was not aware of the connection between I.S. Touré and Mme. Touré, the Tribunal considers that the Nardello Report was clear as to the link between the siblings. Clifford Chance was therefore aware, at the very least, that it had conflicting reports as to the relationship between the two Tourés. Vale's suggestion that it accepted Avidan's assertions at face value over the Nardello Report is unconvincing. The Tribunal therefore accepts BSGR's assertion that Vale cannot rely on Avidan's statement that I.S. Touré was not related to Mme. Touré.

---

[772] BSGR's Statement of Rejoinder, paragraph 389.
[773] BSGR's Statement of Rejoinder, paragraph 389.
[774] Nardello Report, undated, paragraph 4.4.2.7, **R-369**.
[775] Vale's Statement of Rejoinder on Counterclaims, footnote 8.
[776] Kleinfeld First WS, paragraph 35.
[777] Vale's Statement of Reply, paragraph 499; Saad Second WS, paragraphs 42-43.

727. BSGR asserts that Vale was also aware of Cilins' connection to BSGR as a result of a brief (chance) meeting between Etchart (of Vale) and Cilins in August 2006. They met during a monthly meeting called by the Minister of Mines in order to brief industry participants on recent developments. Etchart described the meeting as follows.

> As the attendees were leaving the room when the meeting ended, Marc Struik, a BSGR director, approached us, and Marco Monteiro made the introductions. Struik was with two or three people who also presented themselves as BSGR employees. One was introduced as country operations manager and another one introduced himself to me as Frédéric Cilins, and said he was working for BSGR. This conversation was brief and not very substantive; Struik was interested in learning about developments of Vale's bauxite projects in Guinea. Although Struik was based in Johannesburg, as was I, this was the first time I had met him. This was the one and only time I met with Cilins in person.[778]

728. The Tribunal considers that there is nothing that Vale could have gleaned from this conversation, other than that BSGR had once employed a person in Guinea called Frédéric Cilins. There is no suggestion that Vale could have known of the role of Pentler or would have had suspicions aroused because Cilins was not disclosed as a consultant or agent.

729. BSGR alleges that there was a second meeting between Etchart and Cilins in Paris where Etchart was told about Pentler.[779] During the February 2017 Hearing, Etchart denied any such meeting took place.

> Q: BSGR, in their case, have suggested that there was another meeting in Paris, in January of 2007, when Mr Cilins told you about Pentler?
>
> A: I saw that, but I don't -- I don't agree with that.[780]

730. Based on BSGR's allegation and Etchart's flat denial during examination at the February 2017 Hearing, the Tribunal does not accept BSGR's allegation. BSGR bore the burden to prove its allegation and did not discharge that burden. It defaulted on appearing at the February 2017 Hearing and did not avail itself of the opportunity to cross-examine Etchart. Echart's oral evidence at the February 2017 Hearing is consistent with his second witness statement where he testified as follows.

> At no time did we discuss Mr. Cilins's role with BSGR or the work he performed for them in Guinea. Nor did Mr. Cilins ever mention Michael Noy, Avraham Lev Ran, or Pentler Holdings to me. I never knew anything about the role he played in helping BSGR obtain the rights to Simandou Blocks 1 and 2, which happened later. By the time of the Project Hills negotiations, I had not had contact with Mr. Cilins for years and may have forgotten his connection to BSGR altogether, although I have been reminded of it as a result of this dispute.[781]

731. Regardless of these brief interactions, the Tribunal considers that the evidence does not support BSGR's contention that Vale was aware of all relevant facts and did not rely on BSGR's representations in the due diligence questionnaires. The Tribunal is satisfied that Vale did not know that Cilins, Pentler, Boutros or Fofana were agents or consultants for BSGR, or was aware of the role that Pentler and its principals played in obtaining mining

---

[778] Etchart First WS, paragraph 14.
[779] Noy Second WS, paragraph 33; **R-341**.
[780] Transcript, Merits Hearing, Day 2, p. 73 lines 19-22.
[781] Etchart Second WS, paragraph 18.

licences on behalf of BSGR Guinea. Nor was it aware of Mme. Touré's involvement with Pentler and her role regarding the granting of mining rights to BSGR Guinea.

732. BSGR also relies on *Halsbury's Laws of England* for the proposition that "where the representation is fairly capable of two or more constructions, in one of which it would be false and in the other or others true, it is for the representee to allege and prove in which of its possible meanings he understood it, and, so understanding, was induced by it to alter his position".[782] No elaboration was given on how this proposition was to be applied on the facts, and it does not appear to have been directly contested by Vale. Nevertheless, the Tribunal has borne this in mind when making its evidentiary findings.

733. Finally, BSGR argues that Vale cannot claim reliance on BSGR's representations because they have been excluded by Section 17.3(b) of the Shareholders Agreement (and Section 16.3(b) of the Framework Agreement which is to the same effect).[783] Though this argument was presented under the topic of reliance, in the Tribunal's opinion, the effect of Section 17.3(b) of the Shareholders Agreement, even if BSGR is correct, is more aptly categorised as a contractual estoppel which bars Vale from claiming reliance, rather than an argument going towards the fact of Vale's reliance. This will thus be dealt with separately at paragraphs 743 to 755 below.

734. The Tribunal accepts that during the due diligence process, Vale made numerous attempts to verify whether BSGR retained the services of any third parties in its efforts to obtain mining rights in Guinea. In the Tribunal's view, this investigation was a genuine attempt to uncover any "red flags" of corruption that may have existed.

735. BSGR alleges that Vale would have entered into the joint venture regardless of whether BSGR provided the requisite FCPA comfort, as Vale was intent on entering Simandou.[784] However, in its Pre-Hearing Written Submissions, Vale submitted that:

> If Vale had been informed, as it should have been, of BSGR's association and dealings with, and actual or promised payments to, Pentler and its principals, as well as Boutros, Fofana, and of course Mamadie Touré, this would have rung klaxon-like alarm bells. Vale would have recognised the implications and the risks would have been unacceptable.[785]

736. In addition, Roger Agnelli (Vale's former President and Chief Executive Officer) testified that:

> I knew from my team that extensive due diligence was conducted to ensure that BSGR had not used corrupt means or bribery to get its Mining Rights. I also knew that BSGR made representations to that effect and that Mr Steinmetz himself had signed certifications confirming that BSGR had not used any bribery or corruption to get Mining Rights in Guinea.
>
> This confirmation was absolutely critical to Vale doing the deal [...] in the end, given BSGR's assurances and certifications that their Mining Rights were clean and legitimate, we did the deal. Without those assurances, Vale was ready to

---

[782] Lord Mackay of Clashfern (ed), *Halsbury's Laws of England*, vol 76 (5th edn, LexisNexis 2013) [772], **RL-76**, cited at BSGR's Statement of Rejoinder, paragraph 400.
[783] BSGR's Statement of Rejoinder, paragraph 401.
[784] BSGR's Statement of Rejoinder, paragraph 211-239, 415; BSGR's Statement of Defence, paragraph 251.
[785] Vale's Pre-Hearing Written Submissions, paragraph 297.

walk away rather than expose ourselves to the reputational risk and exposure of paying USD 500 million for rights, and potentially up to USD 2 billion more, that were not legitimate. Any suggestion that we would have just ignored that risk and made a deal with a corrupt partner is a fantasy.[786]

737.  During the February 2017 Hearing, Jonathan Kelly (Counsel for Vale) also submitted that:

the idea that Vale with its FCPA responsibilities, with its personal and professional business reputation and franchises, with the amount that it was committing in the order of USD 2.5 billion under this transaction, that it would have invested in a country that is somewhere in the 150s in the Transparency International Index is just totally implausible. It only has to be stated to be known to be wrong, but that seems to be their position.[787]

738.  The Tribunal is satisfied that Vale undertook a thorough and complete FCPA due diligence exercise. Vale engaged FCPA specialists from Clifford Chance to undertake the due diligence. It required a personal anti-corruption affidavit from Steinmetz and Clark on behalf of BSGR. It asked follow-up due diligence questions and investigated further into issues that had – at times – been narrowed by BSGR. Vale is a public company with considerable reputational risk. It is true that the joint venture deal was negotiated quickly, but there is nothing about the due diligence process that suggests it was not thorough, despite the speed of negotiation of the commercial deal. Moreover, Vale's desire to be involved in mining in the Simandou area, to preclude its competitor Rio Tinto from re-entering Blocks 1 and 2 and to develop with BSGR a unique world class asset does not, of itself, indicate it would have entered the joint venture, had question marks remained regarding the legality of the mining concessions. Motive alone for entering a high-risk country such as Guinea because of its high upside potential does not suffice; there is just no evidence that Vale was aware that the mining rights were obtained by BSGR by paying substantial amounts of money or granting other benefits to Pentler and its principals or indirectly to Mme. Touré and – under the Pentler-Bah and Pentler-Daou Milestone Agreements to I.S. Touré, Bah and Daou. Moreover, Vale's business objectives for entering the iron ore sector in Guinea must be balanced against its reputational risk referred to above, but also against its duties as a listed company towards its shareholders and its regulatory risks, particularly under the FCPA. Considering its FCPA compliance efforts, the Tribunal is convinced that Vale was fully aware of its reputational, corporate and regulatory risks in entering into the iron ore sector in Guinea and, absent any evidence to the contrary, managed these risks properly and would have been alarmed if BSGR had made the required disclosures. The Tribunal considers that it is much more probable than not, and indeed highly likely, if not certain, that Vale – as a large, publicly-listed company whose shares are traded on the Sao Paulo and New York Stock Exchanges (amongst others) – would then have engaged in thorough investigations and, faced with a situation where substantial amounts of money or benefits had been paid or granted or were to be paid or granted to Pentler, its principals, Mme. Touré, I.S. Touré, Bah and Daou, would have walked away from the venture.

739.  The Tribunal finds that, with the exception of the oral representation made by Avidan as to the relationship between I.S. Touré and Mme. Touré, the evidence strongly supports the conclusion that Vale relied on the representations made during the FCPA due

---

[786] Agnelli First WS, paragraphs 16-17.
[787] Transcript, Merits Hearing, Day 1, p.150 lines 7-15.

diligence process and would not have entered into the joint venture had it not been satisfied as to the outcome of this process.

740. In particular, the Tribunal finds that the false and misleading representations listed below were relied upon by Vale as revealing no "red flags" of bribery, corruption or other improper conduct:

740.1. that BSGR had named all consultants, agents and intermediaries involved in obtaining the mining concessions in Guinea;

740.2. that BSGR had disclosed all agreements with consultants, agents and intermediaries;

740.3. that BSGR had disclosed all agreements regarding the corporate structure of BSGR Guernsey and BSGR Guinea;

740.4. that BSGR had disclosed all relevant pending disputes;

740.5. that BSGR had accurately described its involvement in the GoG's decision to revoke Rio Tinto's mining rights; and

740.6. that BSGR had no financial or business relationship with any Government Officials or their spouses.

**(b)** _**Loss**_

741. It is undisputed that Vale has suffered a loss of at least the initial consideration of USD 500 million it paid to BSGR.[788] However, BSGR has raised several arguments based on causation and an alleged failure on Vale's part to mitigate the damage it has suffered. These points will be dealt with in the section on damages for fraudulent misrepresentation below. At this juncture, it is sufficient to say that the Tribunal finds that Vale acted in reliance on BSGR's representations and suffered loss as a result.

742. Based on all of the above, the Tribunal concludes, subject to BSGR's contractual estoppel defence discussed below, that on nine counts (the ten misrepresentations in paragraph 676 above less the misrepresentation regarding I.S. Touré being the half-brother of Mme. Touré), BSGR engaged in fraudulent misrepresentations of which it had knowledge and which BSGR intended to cause Vale to enter into the Framework Agreement and the SHA and on which Vale relied in entering these agreements and suffered loss as a consequence. BSGR is thus liable to Vale on account of these fraudulent misrepresentations.

## C.    BSGR's contractual estoppel defence

743. BSGR argues that Vale is barred by Section 17.3(b) of the SHA (and Section 16.3(b) of the Framework Agreement) from now claiming reliance on BSGR's misrepresentations. Since Section 16.3(b) of the Framework Agreement has the same effect as Section 17.3(b) of the SHA,[789] the Tribunal will take the same approach as the Parties by focusing on the latter, though the conclusions reached would be equally applicable to the

---

[788] BSGR's Statement of Defence, paragraphs 258-259.
[789] BSGR's Statement of Rejoinder, paragraph 401.

202

former. Vale refers to Section 17.3(a) of the SHA in its response, and so it is worth setting out Section 17.3(a)-(b) in full:

> 17.3 Entire Agreement
>
> (a)  Without prejudice to the Framework Agreement and the Ancillary Agreements, this Agreement constitutes the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and none of the Parties has entered into this Agreement in reliance upon any representation, warranty or undertaking by or on behalf of any other Party which is not expressly set out herein or therein or in the BSGR ABL Certificate **provided that** this Section 17.3(a) shall not exclude any liability for fraudulent misrepresentation.
>
> (b)  Without prejudice to the Framework Agreement, the Ancillary Agreements and the BSGR ABL Certificate, this Agreement supersedes any or all prior agreements, understandings, arrangements, promises, representations, warranties and/or contracts of any form or nature whatsoever, whether oral or in writing and whether explicit or implicit, which may have been entered into prior to the date hereof between the Parties or on their behalf as to the subject matter of this Agreement, including, without limitation, the Memorandum of Understanding dated 19 March 2010.

744.  BSGR argues that Section 17.3(b) of the SHA "excludes reliance on any alleged representation, as made clear in *Peekay Intermark Ltd v Australia & New Zealand Banking Group Ltd* [2006] EWCA Civ 386".[790] In this case, Moore-Bick J opined that "[he could] see no reason in principle why it should not be possible for parties to an agreement to give up any right to assert that they were induced to enter into it by misrepresentation, provided that they make their intention clear, or why a clause of that kind, if properly drafted, should not give rise to a contractual estoppel".[791] This has been acknowledged by Cartwright[792] and in other cases.[793]

745.  Further, while BSGR accepts that "it is generally accepted that a contract cannot exclude liability for fraud",[794] BSGR points out that this proposition should be limited to the "far narrower" proposition that a party cannot by a term in the contract exclude liability for *his own* fraud. This is confirmed by *Chitty on Contracts*, which states as follows.

> At common law a person could not contract out of liability for fraud inducing the making of a contract with him, at least where the fraud was his own. It is, however, possible that he could do so where the fraud was that of his employees or agents […].[795]

746.  For its part, Vale argues that Section 17.3(a) of the SHA is fatal to BSGR's argument that Section 17.3(b) applies to fraudulent misrepresentation claims because it explicitly

---

[790] BSGR's Statement of Rejoinder, paragraph 401; BSGR's Statement of Defence, paragraphs 205-251.
[791] *Peekay Intermark Ltd v Australia & New Zealand Banking Group Ltd* [2006] EWCA Civ 386 [57], **RL-116**.
[792] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [9-03], **RL-21.8**.
[793] E.g. *Springwell Navigation Corp v JP Morgan Chase Bank* [2010] 2 CLC 705, **RL-134**; *EA Grimstead & Son Ltd v McGarrigan* [1999] All ER (D) 1163, **RL-56**; *Watford Electronics Ltd v Sanderson CFL Ltd* (2001) 3 TCLR 14, **RL-142**; and *Trident Turboprop (Dublin) Ltd v First Flight Couriers Ltd* [2008] EWHC 1686, **RL-140**.
[794] BSGR's Statement of Defence, paragraph 250.
[795] HG Beale (ed), *Chitty on Contracts*, vol 1 (32nd edn, Sweet & Maxwell 2015) [7-143], **RL-34**.

addresses (and excludes from the operation of the clause) liability for such claims.[796] From a plain reading of Section 17.3 in its entirety (meaning both Section 17.3(a) and 17.3(b)), Section 17.3(a) was meant to be the non-reliance clause ("none of the parties has entered into this agreement in reliance upon any representation") while Section 17.3(b) concerns supersession. Since claims for fraudulent misrepresentation are expressly permitted under Section 17.3(a) of the SHA, there can be no argument that Vale is barred from bringing its fraudulent misrepresentation claim due to Section 17.3(b) of the Shareholders Agreement.

747. By contrast, Vale submits that Section 17.3(b) is simply designed to prevent the Parties from asserting contractual rights based on previous drafts of the SHA that are not expressly incorporated into the executed version of the SHA. Accordingly, it has nothing to do with Vale's misrepresentation claims at all, and the cases concerning supersession clauses cited by BSGR are completely irrelevant.

748. Alternatively, Vale argues that, even if one were to disregard Section 17.3(a), the language in Section 17.3(b) is not capable of excluding liability for misrepresentation under English law.[797] This is based on the Court of Appeal's ruling in *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 ("*AXA Sun Life Services plc*") where Rix LJ ruled that clear and unequivocal wording is required to preclude misrepresentations.

749. BSGR responds to Vale's alternative argument by seeking to distinguish *AXA Sun Life Services plc* in the following ways.

749.1. Rix LJ's reasoning was that the wording used in the clause as a whole indicated that it was concerned only with contractual agreements between the parties. The clauses in the present case refer not only to representations, but also "understandings" and "arrangements" which were not in the clause in AXA. The inclusion of those words plainly extends to matters which do not amount to a prior contractual agreement between the Parties.

749.2. It was important to Rix LJ's reasoning that the clause contained another operative part, the "entire agreement" provision, whose purpose, he said, was obviously only to define the scope of any contract. Section 17.3(b) of the SHA and Section 16.3(b) of the Framework Agreement contain no such provision.

749.3. A decision in which a provision similar to Section 17.3(b) was implicitly interpreted by a court to exclude liability for non-contractual misrepresentations is *MAN Nutzgahrzeuge AG v Freightliner Ltd* (HC).[798] The clause there being interpreted provided that the agreement superseded all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. Like Section 17.3(b), this clause included reference to matters which fell short of contractual relationships. Moore-Bick J said (at paragraph 128) that the clause was intended to make it clear that the agreement contains the definitive statement of the parties' rights and liabilities arising out of the negotiations. Although a proviso at the end of the clause specifically preserved the right to

---

[796] Vale's Pre-Hearing Written Submissions, paragraph 308.
[797] Vale's Pre-Hearing Written Submissions, paragraph 312.
[798] *MAN Nutzgahrzeuge AG v Freightliner Ltd* [2005] EWHC 2347 (Comm), **RL-97**.

bring an action for fraudulent misrepresentation, it was clear that Moore-Bick J considered the clause generally effective to exclude liability for other types of tortious misrepresentation.

750.    Having carefully considered the Parties' arguments, the Tribunal rejects BSGR's contention that Vale is contractually estopped from claiming that it relied on BSGR's misrepresentations.

751.    Since Section 17.3(a) of the SHA expressly permits Vale to bring claims for fraudulent misrepresentation, the question is whether, on a proper interpretation of Section 17.3(b), this provision has the effect of excluding claims for fraudulent misrepresentation notwithstanding Section 17.3(a). In the Tribunal's view, this simply cannot be. It is important to remember that the meaning of Section 17.3(b) is a matter of construction and would "[depend] on the precise words of the clause and indeed of the Agreement as a whole.[799] To hold that Section 17.3(b) precludes claims for fraudulent misrepresentation would be to nullify the express permission granted in Section 17.3(a), which would be contrary to the principle that, in construing a contract, all parts of it must be given effect where possible, and no part of it should be treated as inoperative or surplus. This alone would be sufficient for the Tribunal to reject BSGR's arguments on contractual estoppel.

752.    However, even if Section 17.3(a) did not exist, the Tribunal does not agree that the effect of Section 17.3(b) is to prevent Vale from claiming reliance on BSGR's misrepresentations. As Vale argues, the effect of a supersession clause is to "prevent the parties from asserting contractual rights based on the MoU, or previous drafts of the SHA, that are not expressly incorporated into the execution version of the SHA."[800] In the context of representations, Section 17.3(b) ensures that the terms of the executed version of the SHA would *supersede* representations, but only "as to the subject matter of this Agreement".[801] In fact, as Burnton LJ in *AXA Sun Life Insurance plc* opined:

> [There is] difficulty in seeing how a written agreement can "supersede" a representation that does not relate to the terms of the agreement. Thus I think that a representation by AXA such as "We are the largest insurance company in the country", if false and relied upon, is not superseded by the clause.[802]

753.    Thus Section 17.3(b), being a clause on supersession, is solely concerned with defining the terms of the contract and has nothing to do with misrepresentations. BSGR's attempts to distinguish *AXA Sun Life Insurance plc* are of no assistance to it. By over-emphasising the minor differences between *AXA Sun Life Insurance plc* and this case, BSGR misses the point. The crux of the matter was stated by Rix LJ in *AXA Sun Life Insurance plc*:

> No doubt all such cases are only authority for each clause's particular wording: nevertheless it seems to me that there are certain themes which deserve recognition. Among them is that the exclusion of liability for misrepresentation has to be clearly stated. It can be done by clauses which state the parties' agreement that there have been no representations made; or that there has been no reliance on any representations; or by an express exclusion of liability for misrepresentation. However, *save in such context, and particularly where the*

---

[799] *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 [35], **CL-56**.
[800] Vale's Pre-Hearing Written Submissions, paragraph 310.
[801] SHA, Section 17.3(b).
[802] *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 [36], **CL-56**.

> *word "representations" takes its place alongside other words expressive of*
> *contractual obligation, talk of the parties' contract superseding such prior*
> *agreement will not by itself absolve a party of misrepresentation where its*
> *ingredients can be proved.*[803]

754.    In this case, the word "representations" does take its place alongside other words which are clearly expressive of contractual obligation ("agreements, promises, representations, warranties and/or contracts of any form or nature whatsoever"[804]). The fact that Section 17.3(b) of the SHA includes references to the terms "understandings" and "arrangements" is neither here nor there. While "understandings" and "arrangements" may not amount to prior contractual agreements, neither do "promises" and "representations" (which were also present in *AXA Sun Life Insurance plc*) which have not crystallised into contractual terms. In any event, it is clear that the presence of "words expressive of contractual obligations" was not crucial to Rix LJ's reasoning – the presence of such words did not form the basis for his conclusion that the clause at issue did not exclude misrepresentation, but only made the real bases "particularly" persuasive.

755.    On the facts of this case, not only is Section 17.3(b) of the SHA not "[a clause] which state[s] the parties' agreement that there have been no representations made; or that there has been no reliance on any representations; or [...] an express exclusion of liability for misrepresentation",[805] Section 17.3(a) expressly permits Vale to bring an action for fraudulent misrepresentation. The Tribunal accordingly dismisses BSGR's contractual estoppel defence.

---

[803] *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 [94] (emphasis added), **CL-56**.
[804] SHA, Section 17.3(a).
[805] *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 [94], **CL-56**.

## VII.    BREACH OF WARRANTIES

### A.    Analysis of applicable legal principles

#### 1.    <u>Liability for breach of warranty</u>

756.    Even if the Tribunal is wrong to hold that BSGR is liable for fraudulent misrepresentation, the Tribunal would still hold BSGR liable to Vale for breach of warranty. This section deals with breach of warranty, starting with some preliminary or general issues.

#### 2.    <u>BSGR's interpretation of "knowledge" as referring to "actual knowledge (or the equivalent) by a defined group of BSGR people" is wrong</u>

757.    A number of the warranties discussed below refer to BSGR's knowledge, using phrases such as "so far as BSGR is aware." BSGR argues that this means actual knowledge (or the equivalent) by a defined group of BSGR personnel in Section 1.8 of the Framework Agreement, which states:

> A reference in this Agreement to "so far as BSGR is aware", "so far as any BSGR Guinea Group Company is aware" or "to the knowledge of any BSGR Guinea Group Company" or any similar reference shall be construed as the **actual knowledge as at the date of this Agreement** of Yossie Tchelet, Marc Struik, Asher Avidan and David Clark of BSGR, David Barnett (in his capacity as an external advisor) and Benjamin Steinmetz (in his capacity as an external advisor to BSGR/the Balda Foundation) (the "BSGR Principals"), **together with such knowledge as the BSGR Principals should have had, taken into consideration their office and respective duties, had they each made all reasonable enquiry in relation to the matter in question as at the date of this Agreement.**[806]

758.    Vale, for its part, points out that BSGR's reading of the phrase "so far as BSGR is aware" misses out the second limb of Section 1.8 of the Framework Agreement, which is that the phrase includes "such knowledge as the BSGR Principals should have had, taking into consideration their office and respective duties, had they each made all reasonable enquiry in relation to the matter in question as at the date of this Agreement."[807]

759.    The Tribunal agrees with Vale, and this forms the basis for the analysis that follows. This implies that, for the purposes of the Framework Agreement and pursuant to the definitions of that Agreement in its Schedule 1:

759.1.    "BSGR" means BSGR,

759.2.    "BSGR Advisory Company" means any and each of BSGR Treasury Services Limited, Resources Advisory Services Limited and Onyx Financial Advisors Limited;

759.3.    "BSGR Group" means BSGR and its affiliates from time to time excluding with effect from completion any BSGR Guinea Group Company;

---

[806] Framework Agreement, Section 1.8 (emphasis added); BSGR's Statement of Defence, paragraph 275.
[807] Vale's Pre-Hearing Written Submissions, paragraph 371.

759.4.  "BSGR Guinea" means BSGR Guernsey; and

759.5.  "BSGR Guinea Group Company" means, to the extent relevant for these proceedings, any and each of BSGR Guernsey and BSGR Guinea.

**B.    Has there been a breach of warranty?**

760.    BSGR gave a number of warranties in the Framework Agreement and the SHA which Vale alleges were breached, based on the same facts as those supporting the misrepresentation allegations above. The warranties under the Framework Agreement are to be found in Schedule 4 of the Framework Agreement; the warranties contained in the SHA are situated in Schedule 3. The seven relevant warranties will be discussed in turn and the Tribunal will conclude that four of these warranties have been breached. The relevant seven warranties are as follows:

760.1.  Section 2.1 of Schedule 4 to the Framework Agreement: "The information in [the] [Framework] Agreement, Disclosure Bundle and Disclosure Letter is accurate in all material respects".

760.2.  Section 3.1 of Schedule 4 to the Framework Agreement: "The business of each BSGR Guinea Group Company has been carried out in compliance with all Applicable Law".

760.3.  Section 3.2 of Schedule 4 to the Framework Agreement: "no BSGR Guinea Group Company is aware of the existence of circumstances which represent a real threat that any Relevant Permit […] is likely to be revoked".

760.4.  Section 3.5 of Schedule 4 to the Framework Agreement: No corrupt payment was made to a Government Official.

760.5.  Section 3.6 of Schedule 4 to the Framework Agreement: No violation of the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions was committed.

760.6.  Section 4.2 of Schedule 4 to the Framework Agreement: "No litigation [or other proceedings] are threatened or pending by or against any BSGR Guinea Group Company […] which would adversely affect any BSGR Guinea Group Company in the performance of its obligations under [the] [Framework] Agreement".

760.7.  Anti-corruption warranties contained in Section 16.1 and Schedule 3 to the SHA.

761.    As the facts and matters regarding the warranties by and large overlap with those regarding the fraudulent misrepresentation claims, the Tribunal – using the same approach adopted by the Parties in relation thereto (see Vale's Statement of Reply, paragraph 976) – will rely on such facts and matters without repeating them and just cross-reference them. Any such facts and matters are deemed to be incorporated into this section of the Award.

**1.    Section 2.1 of Schedule 4**

762.    Section 2 contains BSGR's warranties on "Information". Section 2.1 of Schedule 4 to the Framework Agreement provides:

> So far as BSGR is aware, the information set out in this Agreement, the Disclosure Bundle and the Disclosure Letter is accurate in all material respects and is not misleading. The documents contained in the Disclosure Bundle were collected in good faith for the purpose of providing a description of the material areas of the BSGR Guinea Group's business as at the date of this Agreement. So far as BSGR is aware, no document or other information, which would otherwise have been material to the business of the members of the BSGR Guinea Group and is in the possession or under the control of the BSGR Group has been knowingly withheld or fraudulently concealed from the Disclosure Bundle.[808]

763. Vale alleges that this broad warranty has been breached while BSGR alleges that it is superseded by more specific warranties regarding compliance with anti-bribery legislation discussed further below. The plain language of Section 2.1 and its non-exclusion or non-references to specific warranties confirms Vale's interpretation.

764. Vale relies primarily on the non-disclosure of the Pentler-related contracts and documents. For the reasons already given in section VI.B.2 of this Award regarding fraudulent misrepresentations of the non-existence of contracts with consultants, the Tribunal finds that BSGR breached Section 2.1. There was no disclosure in all material respects, given the relevance of these documents for the due diligence process.

## 2. Section 3.1 of Schedule 4

765. Section 3.1 of Schedule 4 to the Framework Agreement is included in the "Regulatory Matters" part of BSGR's warranties and relate to the business of BSGR Guernsey and BSGR Guinea operating in compliance with applicable law.

766. Section 3.1 of Schedule 4 provides:

> The businesses of each BSGR Guinea Group Company have been carried on and are being carried on in compliance with all Applicable Law and in compliance with all constitutional documents of such BSGR Guinea Group Company and there has been and there is at the date of this Agreement no investigation or enquiry by, or order, decree or judgment of, any Governmental Entity outstanding or, to the knowledge of any BSGR Guinea Group Company, threatened against any BSGR Guinea Group Company, nor any notice or other communication from any Governmental Entity with respect to any alleged violation and/or failure to comply with any such Applicable Law that would prevent any BSGR Guinea Group Company from performing its obligations under this Agreement and/or any Ancillary Agreement to which it is a party.[809]

767. "Applicable Law", in relation to any person, property, transaction or event, is defined as "(i) all applicable provisions of laws, statutes, ordinances, rules, regulations, directives, guidelines and orders of any Governmental Entity; and (ii) the terms of all judgments, orders, awards and decrees issued by any Governmental Entity, in each case, by which such person is bound or submits or having application to the property, transaction or event in question."[810]

768. Vale asserts that BSGR's acts of bribery and corruption amounted to a violation of Guinean law (an Applicable Law) in breach of Section 3.1, relying on the Technical Committee's finding that BSGR obtained the mining rights via corrupt practices in

---

[808] Framework Agreement, Schedule 4, Section 2.1, **C-1**.
[809] Framework Agreement, Schedule 4, Section 3.1, **C-1**.
[810] Framework Agreement, Schedule 1, **C-1**.

violation of the mining code of Guinea.[811] This assertion is contested by BSGR, which argues that Vale has not pinpointed the particular legal provision in Guinean law which BSGR allegedly breached, and that the Technical Committee's Report is inadmissible in any event.[812] The Tribunal finds that, while the Technical Committee's Report is admissible, it is not sufficient evidence of a breach of Guinean law. The Tribunal is required to make its own findings on Guinean law, and it is not able to do so because Vale has not identified the specific provision in the Guinean mining code or other Guinean law that BSGR allegedly violated, let alone explain how that provision was breached. Vale argues in the alternative that the Applicable Law which had been breached is the FCPA,[813] but does not explain how the FCPA applies to BSGR (a Guernsey company) and how BSGR had violated the FCPA. The Tribunal finds in the light of the above that a breach of Section 3.1 has not been established.

### 3.   Section 3.2 of Schedule 4

769.   Section 3.2 of Schedule 4 is also part of the "Regulatory Matters" section of BSGR's warranties. The relevant part of Section 3.2 provides:

> As of the date of this Agreement, no BSGR Guinea Group Company is aware of the existence of circumstances which represent a real threat that any Relevant Permit (including any Exploration Permit, the Mining Concession and the Basic Agreement) is likely to be revoked or restricted or amended in such a manner which is materially prejudicial to the interests of a BSGR Guinea Group Company.[814]

770.   Vale asserts that this warranty should be construed broadly to refer to circumstances which represent a real threat to BSGR's mining rights while BSGR interprets this warranty strictly to require proof of an actual threat to the mining rights. The plain language of the warranty, in the Tribunal's opinion, confirms Vale's broad interpretation as it relates to "the existence of circumstances which represent a real threat that any Relevant Permit [...] is likely to be revoked or restricted or amended". An actual or imminent threat to the relevant mining rights is thus not required and the knowledge of circumstances which represent a threat is sufficient.

771.   It follows from the Tribunal's discussion and analysis in section VI of this Award that substantial benefits were paid or granted by BSGR entities to Pentler, and its principals, Mme. Touré, I.S. Touré, Bah and Daou. If these payments or grants had been discovered, they would have exposed the mining rights of BSGR Guinea to revocation, restriction or amendment which would have been materially prejudicial to the interests of BSGR Guinea and BSGR Guernsey. For the reasons adopted in section VI.B.3 of this Award, BSGR cannot plead that no relevant person within a BSGR entity or no relevant BSGR entity had knowledge of such exposure. The Tribunal concludes that BSGR breached this warranty as circumstances did exist at the material time which threatened the mining rights and exposed them to cancellation, restriction or amendment.

---

[811] Vale's Statement of Reply, paragraph 991; Vale's Statement of Case, paragraph 300.
[812] BSGR's Statement of Rejoinder, paragraph 471; BSGR's Statement of Defence, paragraph 280.
[813] Vale's Pre-Hearing Written Submissions, paragraph 374.
[814] Framework Agreement, Schedule 4, Section 3.2, **C-1**.

4.  **Section 3.5 of Schedule 4**

772.  Section 3.5 of Schedule 4 also pertains to "Regulatory Matters" and BSGR's warranties in relation thereto. Section 3.5 of Schedule 4 provides as follows:

> In regard to the operations of the BSGR Guinea Group and all matters governed by this Agreement, none of BSGR nor any BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their respective agents have paid, offered, promised, or authorised the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:
>
> (a)  corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;
>
> (b)  securing an improper advantage;
>
> (c)  corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or
>
> (d)  providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),
>
> and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.[815]

773.  The Parties' arguments regarding this warranty overlap with those made in relation to fraudulent misrepresentations, which are incorporated herein as well as the Tribunal's discussion and analysis in section VI of this Award, in particular with respect to payments or grants of benefits to Government Officials. The Tribunal has found insufficient evidence of such payments or grants in relation to Thiam and President Conté, but has found that payments or grants to Mme. Touré qualified as bribes under the relevant representation. On this basis, the Tribunal finds that the payments to Mme. Touré breached Section 3.5 of Schedule 4 to the Framework Agreement.

5.  **Section 3.6 of Schedule 4**

774.  Section 3.6 of Schedule 4 also deals with BSGR's warranties for "Regulatory Matters". Section 3.6 of Schedule 4 provides as follows:

> In connection with this Agreement, and any Ancillary Agreements, and (where relevant) their respective obligations thereunder, no BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their agents:
>
> (a)  has taken any action, directly or indirectly, that has resulted or would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "OECD Convention") or any similar laws or regulations to which any BSGR Guinea Group Company, any BSGR Advisory Company or any of their respective agents is subject; or

---

[815] Framework Agreement, Schedule 4, Section 3.5, **C-1**.

(b) have paid, offered, promised, or authorized the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

(i) corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;

(ii) securing an improper advantage;

(iii) corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or

(iv) providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.[816]

775. Vale argues that BSGR's bribery and corruption triggers the application of Section 3.6. Conversely, BSGR submits that Vale has failed to plead the violation of any applicable laws implementing the OECD Convention on which it relies. The wording of Sections 3.5 and 3.6 are very similar, but their introductions differ. While Section 3.5 refers to the operation of BSGR Guinea and BSGR Guernsey and all matters governed by the Framework Agreement and covers bribes and corruption in relation to the mining rights, Section 3.6 relates to the Framework Agreement and any Ancillary Agreements[817] and, where relevant, the respective obligations thereunder. As Vale's arguments relate to the mining rights (and thus the operations of BSGR Guinea) and not to bribes or corruption in relation to the Framework Agreement and the Ancillary Agreements, the Tribunal considers that Section 3.6 is inapplicable to the case at hand, and that there was no breach of warranty of BSGR regarding Section 3.6.

## 6. <u>Section 4.2 of Schedule 4</u>

776. Section 4 of Schedule 4 to the Framework Agreement contains BSGR's warranties in relation to litigation. Section 4.2 of Schedule 4 provides as follows:

No litigation, arbitration or administrative proceedings are threatened or pending by or against any BSGR Guinea Group Company where, in each case, or in aggregate, the negative resolution of which would adversely affect any BSGR Guinea Group Company in the performance of its obligations under this Agreement and/or any Ancillary Agreement and/or the Basic Agreement to which

---

[816] Framework Agreement, Schedule 4, Section 3.6, **C-1**.
[817] Schedule 1 to the Framework Agreement defines Ancillary Agreements as "the Shareholders' Agreement, the Off-take Term Sheet, the Off-take Agreement, the Vale Loan and the Vale Loan Term Sheet and any technical services agreement entered into by any member of the BSGR Guinea Group with any member of either Party's Group as contemplated by Section 5.6 and any agreement entered into by any member of the BSGR Guinea Group with any member of either Party's Group as contemplated by Section 5.8, or any of them."

it is a party and to the knowledge of BSGR no fact or circumstance exists which may give rise to any such litigation, arbitration or proceedings.[818]

777. In section VI.B.2 of this Award, the Tribunal has discussed Vale's allegation that BSGR made misrepresentations regarding pending or threatened litigation and proceedings. The Tribunal has concluded that BSGR falsely misrepresented that there was none as it should have disclosed the potential disputes with Camara and Bah in its answers to Question 9.1 of the Legal Due Diligence Questionnaire. The Tribunal's discussion, analysis and conclusion are deemed incorporated into this section of the Award. The Tribunal also considers that the litigation threatened by Bah might have adversely affected BSGR Guinea, the Framework Agreement and the Base Convention as it might have exposed BSGR, BSGR Guinea and its affiliates to allegations of corruption. The Tribunal thus concludes that BSGR breached Section 4.2 of Schedule 4 to the Framework Agreement.

### 7. Section 16.1 and Schedule 3 of the SHA

778. Vale also alleges that BSGR breached warranties in the SHA, namely Section 16.1 of the SHA and Schedule 3(a), (b) and (d) to the SHA.

779. Section 16.1 of the SHA, headed "No Bribery", provides:

> Neither the Company nor any of the Parties know or have reason to believe that the Company or any other member of the BSGR Guinea Group or any of their respective Agents will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for the purpose of:
>
> (a) corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist the Company or any other person in obtaining or retaining business, or directing business to any third party;
>
> (b) securing an improper advantage;
>
> (c) corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Government Authority in order to assist the Company or any other person in obtaining or retaining business, or directing business to any third party; or
>
> (d) providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).[819]

780. Under Section 16.2 of the SHA, Vale, BSGR and BSGR Guernsey covenanted that they would comply with their respective obligations in Schedule 3 to the SHA. Schedule 3(a), (b) and (d), headed "Bribery Compliance Provisions", to the SHA provide:

> (a) The Parties shall require, and take no action to impair or impede that, the Company and each other member of the BSGR Guinea Group will remain in full compliance with Anti-Bribery Laws and with Applicable Sanctions Laws and Regulations.

---

[818] Framework Agreement, Schedule 4, Section 4.2, **C-1**.
[819] SHA, Section 16.1, **C-2**.

(b)     The Parties shall use all reasonable efforts to ensure that no member of their respective Groups and none of their directors, officers, employees nor anyone acting on their behalf (whether as an agent, in an advisory capacity or otherwise) shall, directly or indirectly, take any action or engage in any activity to promote the business activities and interests of, or to secure an advantage for, or act, or purport to act or hold themselves out as acting on behalf of, the BSGR Guinea Group and/or the Project with respect to any Government Authority or Government Official, without having obtained the prior approval of the Board (and the Board shall consider any such request for approval in accordance with the Compliance Program); and the relevant Party shall be liable for any breach of this paragraph (b) of this Schedule 3 by it or a member of its Group or any director, officer, employee or any other person acting on behalf of it or any member of its Group.

[...]

(d)     In connection with this Agreement, and any Ancillary Agreements, and (where relevant) their respective obligations thereunder, (i) the Parties shall use all reasonable efforts to ensure that no BSGR Guinea Group company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "OECD Convention") or any similar laws or regulations to which any BSGR Guinea Group company or any of its Agents is subject; (ii) BSGR shall use all reasonable efforts to ensure that no BSGR Advisory Company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention or any similar laws or regulations to which any BSGR Advisory Company or any of its Agents is subject and (iii) Vale shall use all reasonable efforts to ensure that none of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention or any similar laws or regulations to which any Agent of Vale is subject.[820]

781.    Both Parties agree that these warranties relate to future conduct.

782.    Vale argues that BSGR is in breach of those provisions because "BSGR's corrupt activities continued after the SHA was executed, including through the activities of Noy, Lev Ran, and Cilins, and in breach of the express terms of the relevant warranties."[821]

783.    BSGR, on the other hand, contends that there was no bribery after that date because:

783.1.   Any contact between Mr Noy, Mr Lev Ran and Mr Cilins, and Mme Touré was (says Noy) for their legitimate business. More importantly, it had nothing to do with BSGR;[822] and

783.2.   No payments could have been made following the entry into the SHA for the purpose of influencing the act of a Government Official in relation to the mining rights. By that time, the mining rights had been granted pursuant to the Base Convention of 16 December 2009 and the Mining Concession of 19 March 2010, so there was nothing to influence.[823]

---

[820] SHA, Schedule 3, Sections 3(a), 3(b), 3(d), **C-2**.
[821] Vale's Statement of Reply, paragraph 1021.
[822] BSGR's Statement of Defence, paragraph 299.
[823] BSGR's Statement of Defence, paragraph 300.

784. The SHA was concluded on 30 April 2010. The issue is thus whether Section 16.1 of the SHA and Schedule 3(a), (b) or (d) to the SHA were breached after such date. Section 16.1 is similarly drafted as the due diligence representation in Section VI of the Compliance Due Diligence Questionnaire as referred to in paragraph 579 of this Award. The term "Parties" in Section 16.1 of the SHA refers to BSGR and Vale, and the term "Company" or "BSGR Guinea" refers to BSG Resources (Guinea) Limited or the BSGR Guernsey entity (Schedule 1 SHA referring to the Preamble of the SHA). Pursuant to the same Schedule 1, "BSGR Guinea Group" means BSGR Guernsey together with its subsidiaries (including BSGR Guinea) and "agents" is defined with respect to an entity as its directors, officers, employees and any other persons for whose acts it may be vicariously liable and anyone acting on its behalf.

785. In two respects, Section 16.1 of the SHA differs from the Due Diligence Questionnaires. First, BSGR is now a party to the anti-bribery covenant and secondly, the personal scope extends to agents and not to consultants. The latter is less relevant in relation to Pentler and Cilins, as the Tribunal has already found that Pentler and Cilins acted as agents of BSGR, BSGR Guernsey and BSGR Guinea and had to be disclosed at the occasion of the due diligence investigation (see section VI.B.2 of this Award).

786. In addition, the Tribunal found that Mme. Touré was a Government Official for the purposes of the answers to the Due Diligence Questionnaire. However, on 30 April 2010 when the SHA was concluded, President Conté (who had died on 22 December 2008) was no longer the President and Mme. Touré was exiled to Sierra Leone. She moved to the United States in 2010. On 30 April 2010, she no longer performed ceremonial functions as her husband had died sixteen months earlier, which raises the question of whether benefits, if any, given to a former Governmental Official may qualify as bribes under Section 16.1 of the SHA. Schedule 1 to the SHA, in this respect, contains the same definition as the one used for purposes of the due diligence:

> **Government Official** means (i) an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of a Government Authority; (ii) a legislative, administrative, or judicial official, regardless of whether elected or appointed; (iii) an officer of, or individual who holds a position in, a political party; (iv) a candidate for political office; (v) an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or (vi) an officer or employee of a supranational organization (including, without limitation, World Bank, United Nations, International Monetary Fund and OECD).[824]

787. The Tribunal considers that Sections 16.1(b) and (d) of the SHA also contemplate benefits granted to a former Government Official if the consideration for such benefits relates to efforts of such Government Official in the past. This is clear from a plain reading of Sections 16.1(b) and (d), which provide:

> Neither the Company nor any of the Parties know or have reason to believe that the Company or any other member of the BSGR Guinea Group or any of their respective Agents will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for the purpose of:
>
> (a)     […]

---

[824] SHA, Schedule 1, **C-2**.

(b)    securing an improper advantage;

(c)    [...]; or

(d)    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).[825]

788.    Sections 16.1(b) and (d) relate to future benefits to secure an improper advantage and/or to provide an unlawful personal benefit and are not restricted to future acts or omissions of a Government Official. On a plain reading of the provisions quoted, any benefits given to Mme. Touré after the SHA was concluded to compensate for past services would fall within the scope of Sections 16.1(b) and (d) of the SHA.

789.    In addition, for the reasons explained in the paragraph above, the Tribunal considers that Sections 16.1(b) and (d) do not (in principle) exclude payments made after the conclusion of the SHA pursuant to threats of economic extortion related to bribes paid when a person was still a Government Official. In cases where payments are made to silence the extorter to forestall the disclosure of the bribes and to avoid the reputational, legal or contractual consequences of such disclosure, the Tribunal considers that benefits granted pursuant to threats of economic extortion would also fall within the scope of Sections 16.1(b) and (d).

790.    Vale complains about the following post-SHA payments which have been reviewed by the Tribunal:

790.1.    USD 149,970 on 21 July 2010:[826] a bank record in the U.S. criminal proceedings against Cilins indicates a payment by Lev Ran from an account in Israel to an account in Florida belonging to Mme. Touré.

790.2.    USD 100,000 on 27 July 2010:[827] a bank record in the US criminal proceedings against Cilins indicates his payment to Mme. Touré; a copy of the cheque is included in **C-6**, p. 191.

790.3.    USD 50,000[828] and USD 99,970[829] on 5 August 2010: a bank record in the US criminal proceedings against Cilins indicates his payment to Mme. Touré and the cheque at **C-6**, p. 192; a bank record in the US criminal proceedings against Cilins indicates the second payment as having been made by Lev Ran to an account in Florida belonging to Mme. Touré.

---

[825] SHA, Section 16.1, **C-2**.

[826] *USA v. Cilins*, Government's Mem. In Supp. of Detention Pending Trial, Dkt. No. 13, 6 June 2013, p.13, **C-109**; *USA v. Cilins*, Detention Hr'g Tr. At 38:1-5, Dkt. No. 79, 3 July 2013, **C-110**; *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 3, **C-111**; *USA v. Touré Properties*, Complaint, paragraph 25, Dkt. No. 1, 21 November 2014, **C-76**.

[827] Cheque number 96 dated 27 July 2010, p. 191, **C-6**; Cheque number 97 dated 5 August 2010, p. 192, **C-6**; *see also USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 3, **C-111**; *USA v. Touré Properties*, Complaint, paragraph 25, Dkt. No. 1, 21 November 2014, **C-76**.

[828] Cheque number 96 dated 27 July 2010, p. 191, **C-6**; Cheque number 97 dated 5 August 2010, p. 192, **C-6**; *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 3, **C-111**; *USA v. Cilins*, Detention Hearing Transcript, 39:3-7, Dkt. No. 79, 3 July 2013, **C-110**; *USA v. Touré Properties*, Complaint, paragraph 25, Dkt. No. 1, 21 November 2014, **C-76**.

[829] *USA v. Cilins*, Government's Mem. In Supp. of Detention Pending Trial, Dkt. No. 13, 6 June 2013, p. 13, **C-109**; *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 4, **C-111**; *USA v. Touré Properties*, Complaint, paragraph 25, Dkt. No. 1, 21 November 2014, **C-76**.

790.4. Pentler and Mme. Touré allegedly signed an agreement on 8 July 2010 whereby Mme. Touré would receive USD 5 million from Pentler. The payment was subject to the "proper implementation and functioning and the next stages of the operation conducted by our partners on the Simandou project in Guinea."[830] Of the five agreements detailed hereafter, there are two agreements that reference the Simandou project by name: one is referred to in this subparagraph and the other is referred to in the next subparagraph. BSGR alleges (based on Noy's written evidence) that this agreement is a forgery.[831] The Tribunal has found at paragraph 618 above that this agreement was not forged.

790.5. On the same date, Mme. Touré and Pentler appear to have entered into another contract. The Tribunal has been provided with a translation of this contract (which was disclosed by BSGR during the arbitration) but it has not seen the original.[832] Its terms are similar to those in the undated agreement described below at paragraph 790.8, but the amount to be paid was USD 5.5 million. The contract also specifically states that Mme. Touré "agree to delivery [sic] all the originals & copies of the documents and agreements signed with the company Pentler Holdings Ltd. & its partners with regard to the SIMONDOU project in Guinea".

790.6. On 3 August 2010, Mme. Touré and Pentler signed an agreement under which she would receive an "extra sum" of USD 5 million over the next four years following the successful completion of the next stages of Pentler's activities in Guinea.[833] Matinda agreed to "refrain from making use of this document […] against company Pentler and/or its partners and/or its associates in Guinea." Mme. Touré agreed to take responsibility for "all actions taken in Guinea by any third party against Pentler and/or its associates".

790.7. Yet another agreement also signed on 3 August 2010, provided that Mme Touré would receive the sum of USD 5.5 million for her "participation in all activities conducted in Guinea."[834] Noy gave evidence that the two agreements of 3 August 2010 (which totalled USD 10.5 million) provided Mme. Touré with her share of the buyback money paid to Pentler by BSGR for the shares in BSGR Guinea BVI (i.e., 33% of USD 30 million).[835] In reviewing these two contracts and, on the basis of Noy's evidence, the Tribunal finds that there were indeed two contracts dated 3 August 2010 by which Pentler conferred benefits for an amount of USD 10.5 million to Mme. Touré.

790.8. An undated "Agreement" that references Pentler's role in Guinea as "advisor and business provider" in the commercial, mining and medical fields and the contribution Matinda has made to Pentler's success in those areas. In recognition of that contribution, Matinda would receive USD 3.1 million. Noy explained that this was the balance of the 5.5 million initially promised (2.4 million of which had already been paid).[836] This agreement also guarantees the

---

[830] Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.
[831] Noy First WS, paragraph 80.
[832] Contract between Matinda & Co. Ltd and Pentler, 8 July 2010, **C-563**.
[833] Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-37, **C-6**.
[834] Contract between Pentler and Mme. Touré / Matinda, 3 August 2010, **R-151**.
[835] Noy First WS, paragraph 74.
[836] Noy First WS, paragraph 77.

"absolute confidentiality" of all common business conducted in Guinea and that Matinda will not contact any of the Guinean companies with which they had collaborated. The Agreement also formally terminates all previous contracts and obligations between the two parties. Finally, Matinda undertook responsibility for any "complaints, actions, concerns or any other requests" filed by Guinean institutions against Pentler.[837] To these points can be added a statement confirming that Matinda had received USD 2.4 million from Pentler pursuant to a "collaboration agreement" signed in 2005.[838] Although the contract and the statement are not signed and the original, likely to be in the French language, has not been submitted, the Tribunal finds, in combination with Noy's first witness statement, that payments were made or benefits granted pursuant to this agreement.

790.9. In 2011, Cilins transferred more than USD 3.6 million from a bank account in Israel to a title company in the United States,[839] which might have been used to make further payments to Mme. Touré. Vale provided a bank record for a wire transfer of (i) USD 400,000 on 12 April, 2011;[840] (ii) USD 709,600 on 12 May 2011;[841] (iii) USD 2,211,000 on 12 September 2011;[842] and (iv) USD 295,220 on 7 November 2011.[843] The bank records indicate that the wire transfers came from Cilins, but have been redacted so that the beneficiary of the payments is unclear. Hence, there is insufficient evidence for the Tribunal to base any finding on it.

790.10. In 2012, Cilins transferred more than USD 100,000 from the same bank account in Israel to the same title company in the United States.[844] The Claimant provided a bank record for a wire transfer of USD 25,000 on 14 May 2012[845] and of USD 78,000 on 24 May 2012.[846] For the same reason as in the previous sub-paragraph, the Tribunal is unable to make any findings on these transfers without clear evidence of the identity of the recipient.

791. Based on the findings in subparagraphs 790.1–790.10 above, the Tribunal concludes that payments were made after the conclusion of the SHA by Cilins to Mme. Touré. The Tribunal also concludes that some of these payments related to Simandou, as Simandou is specifically mentioned in some agreements. The Tribunal also considers that Noy's statement that some of the agreements were not related to Simandou but to other past Guinean business ventures of Mme. Touré is not credible in view of the evidence accepted. In addition, the Tribunal finds that these payments relate to past services from Mme. Touré, before she was exiled to Sierra Leone and moved to the U.S.

792. However, for the reasons at paragraphs 619 – 625 above, the Tribunal is not convinced that, on a balance of probabilities, BSGR authorised or knew about the relevant contracts

---

[837] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, **C-6.**
[838] Undated Statement of Mme. Touré, p. 244, **C-6**.
[839] *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, pp. 3-4, 38-41, **C-111**.
[840] **C-111** p. 38.
[841] **C-111**, p. 39.
[842] **C-111**, p. 40.
[843] **C-111**, p. 41.
[844] *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, pp. 3-4, 42-43, **C-111**.
[845] **C-111**, p. 42.
[846] **C-111**, p. 43.

and the payments to bring these within the scope of Section 16.1(b) and/or 16.1(d) of the SHA. The Tribunal is, thus, notwithstanding the suspicious nature of these contracts and payments, not able to make a finding that BSGR breached Sections 16.1(b) and 16.1(d) of the SHA and has paid bribes to Mme. Touré post SHA.

793. The Tribunal now turns to examine whether BSGR and/or BSGR Guernsey breached the bribery compliance covenants of Schedule 3 to the SHA of (1) ensuring that they complied with anti-bribery laws (Schedule 3(a)); (2) not contacting a Government Authority or Government Official without prior Board approval (Schedule 3(c)) and (3) not violating the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions or any similar laws or regulations (Schedule 3(d)).

794. Under Schedule 3(a), BSGR and BSGR Guernsey undertook to require and to take no action to impair or impede that BSGR Guinea and BSGR Guernsey will remain in full compliance with Anti-Bribery Laws. "Anti-Bribery Laws" is defined in Schedule 1 to the SHA as "the US Foreign Corrupt Practices Act, 15 U.S.C. §78-dd-1, et seq., as amended (the "FCPA") and any anti-bribery law, anti-corruption law, conflict of interest law, or any other applicable law, rule or regulation of similar purpose and effect applicable to the Parties hereto or the BSGR Guinea Group". Vale simply argues that BSGR's corrupt acts after the execution of the SHA amounted to a breach of such Anti-Bribery Laws, without specifying which particular Anti-Bribery Laws were breached and, as regards the FCPA, how the FCPA was breached. The Tribunal accordingly finds that a breach of Schedule 3(a) has not been established.

795. Under Schedule 3(b), BSGR and BSGR Guernsey undertook to:

> use all reasonable efforts to ensure that no member of their respective Groups and none of their directors, officers, employees nor anyone acting on their behalf (whether as an agent, in an advisory capacity or otherwise) shall, directly or indirectly, take any action or engage in any activity to promote the business activities and interests of, or to secure an advantage for, or act, or purport to act or hold themselves out as acting on behalf of, the BSGR Guinea Group and/or the Project with respect to any Government Authority or Government Official, without having obtained the prior approval of the [board of directors of BSGR Guernsey] (and the [board of directors of BSGR Guernsey] shall consider any such request for approval in accordance with the Compliance Program); and the relevant Party shall be liable for any breach of this paragraph (b) of this Schedule 3 by it or a member of its Group or any director, officer, employee or any other person acting on behalf of it or any member of its Group.[847]

796. For the reasons above related to absence of sufficient evidence that BSGR authorized or knew about the payments by Pentler and Cilins to Mme. Touré post SHA, no breach of Schedule 3(b) to the SHA can be established.

797. Under Schedule 3(d), BSGR and BSGR Guernsey undertook in connection with the SHA to:

> use all reasonable efforts to ensure that no BSGR Guinea Group company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "OECD

---

[847] SHA, Schedule 3, Sections 3(b), **C-2**.

Convention") or any similar laws or regulations to which any BSGR Guinea Group company or any of its Agents is subject; [...].[848]

798.    BSGR also undertook under Schedule 3(d) to:

> use all reasonable efforts to ensure that no BSGR Advisory Company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention or any similar laws or regulations to which any BSGR Advisory Company or any of its Agents is subject [...].[849]

799.    Vale has not identified the "applicable laws implementing the OECD Convention [...] or any similar laws or regulations to which any BSGR Guinea Group company or any of its Agents is subject" that BSGR allegedly breached, apart from the FCPA. Vale however has not sufficiently briefed the Tribunal on how the FCPA has been breached by BSGR. The Tribunal therefore finds that a breach of Schedule 3(d) has not been established.

---

[848] SHA, Schedule 3, Sections 3(d), **C-2**.
[849] SHA, Schedule 3, Sections 3(d), **C-2**.

## VIII. FRUSTRATION

### A. Introduction

800. As with the discussion on breach of warranties, since the Tribunal has found that Vale has been successful in its misrepresentation claim, the result of Vale's claim for frustration is academic. Nevertheless, for the sake of completeness, the Tribunal sets out its discussion below.

801. The Parties cite the following five propositions in *J. Lauritzen A/S v Wijsmuller B.V. (The Super Servant Two)* [1990] 1 Lloyd's Rep 1 (CA) ("**Super Servant Two**") to set out the doctrine of frustration.

> 1. The doctrine of frustration was evolved to mitigate the rigour of the common law's insistence on literal performance of absolute promises […]. The object of the doctrine was to give effect to the demands of justice, to achieve a just and reasonable result, to do what is reasonable and fair, as an expedient to escape from injustice where such would result from enforcement of a contract in its literal terms after a significant change in circumstances […].

> 2. Since the effect of frustration is to kill the contract and discharge the parties from further liability under it, the doctrine is not to be lightly invoked, must be kept within very narrow limits and ought not to be extended […].

> 3. Frustration brings the contract to an end forthwith, without more and automatically […].

> 4. The essence of frustration is that it should not be due to the act or election of the party seeking to rely on it […]. A frustrating event must be some outside event or extraneous change of situation […].

> 5. A frustrating event must take place without blame or fault on the side of the party seeking to rely on it […].[850]

802. BSGR also cites the following passage in *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675 (HL) ("**National Carriers**") to shed further light on the doctrine of frustration.

> Frustration of a contract takes place where there supervenes an event (without default of either party and for which the contract makes no sufficient provision) which so significantly changes the nature (not merely the expense or onerousness) of the outstanding contractual rights and/or obligations from what the parties could reasonably have contemplated at the time of its execution that it would be unjust to hold them to the literal sense of its stipulations in the new circumstances; in such case the law declares both parties to be discharged from further performance.[851]

---

[850] *J. Lauritzen AS v Wijsmuller BV (The Super Servant Two)* [1990] 1 Lloyd's Rep 1, 8 (CA), **CL-17**.
[851] *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, 700, **RL-47**.

803.  In this case, Vale has submitted that the revocation of the mining rights by the GoG constituted a supervening event which made it commercially impossible for the Parties to perform their obligations under the Joint Venture Agreements.[852]

804.  The Tribunal is tasked to analyse Vale's frustration claim. But before it does so, the Tribunal will first address a preliminary issue which BSGR has raised to assert that the frustration claim stands or falls by Vale's corruption claim, and which the Tribunal considers is apposite to discuss at the outset.

## B.  Preliminary Issue: whether frustration is "parasitic" on other heads of claim

805.  BSGR argues that Vale's frustration claim is "parasitic on the bribery claims", in the sense that "If Vale fails to make out its case on bribery and corruption, then this frustration claim also fails because it is pleaded solely on the basis of that conduct."[853] According to BSGR, "if Vale cannot prove that BSGR engaged in bribery, then it fails in its argument that the present situation is not covered by the Joint Venture Agreements' force majeure clauses. If force majeure clauses apply, then the joint venture agreements cannot have been frustrated."[854]

806.  Vale's response is that the legal analysis for frustration is distinct from the legal analyses for deceit and breach of warranty. The legal analysis for frustration does not require Vale to show that "bribery took place or even that any of the underlying allegations against BSGR that formed the basis of the revocation of the Mining Rights were true".[855] The legal analysis only requires Vale to show that the frustrating event was of such a nature that performance of the contract could not continue (through no fault of Vale) and that the event was one to which the *force majeure* clause did not apply.[856] This latter assessment only requires, for example, a decision as to whether the frustrating event was for reasons "connected to any direct or indirect action by [BSGR]".[857] Vale therefore argues that BSGR is incorrect to say that the frustration claim is parasitic on the bribery claims.[858]

807.  The Tribunal begins its discussion by observing that the analysis of frustration consists of three key stages. The first examines if the doctrine of frustration has been excluded by an express contractual term. The second examines if the doctrine of frustration has been precluded in the alternative by the bar of foreseeability (see section VIII.D of the Award below). If the analysis overcomes both bars, the analysis proceeds to the third stage, which applies the doctrine of frustration to determine if a supervening event has occurred which rendered further performance impossible. This is the basic structure of any legal analysis of frustration, and the Tribunal is required to proceed in accordance with this structure.

808.  The Tribunal next observes that, of these three stages, the second and third stages do not require the Tribunal to make findings on the allegations against BSGR regarding

---

[852] Vale's Statement of Case, paragraph 310; Vale's Pre-Hearing Written Submissions, paragraph 310.
[853] BSGR's Statement of Defence, paragraphs 311, 317, 319.
[854] BSGR's Statement of Rejoinder, paragraph 514.
[855] Vale's Pre-Hearing Written Submissions, paragraph 394.
[856] Vale's Pre-Hearing Written Submissions, paragraph 394; Vale's Statement of Reply, paragraph 1031.
[857] Vale's Statement of Reply, paragraph 1032.
[858] Vale's Statement of Reply, paragraph 1030; Vale's Pre-Hearing Written Submissions, paragraph 393.

bribery or non-disclosure. The issues of whether the revocation of the mining rights in this case was foreseen or foreseeable, and whether the revocation constituted a frustrating event, are matters which do not require the Tribunal to ascertain the veracity of Vale's allegations that BSGR had committed bribery and corruption.

809.  By contrast, as regards the first stage, the Tribunal notes Vale's position that the *force majeure* clause in the Joint Venture Agreements does not exclude the doctrine of frustration. The Tribunal notes that one of Vale's supporting arguments is that the revocation of mining rights in this case is not an event to which the *force majeure* clause applies. In particular, the Tribunal notes Vale's argument that the *force majeure* clause only covers revocations of mining rights "for reasons which are beyond the control of the Parties and are not otherwise connected to any direct or indirect action by either Party against or in violation of any of the Basic Agreement, the Mining Concession and the Guinea Exploration Permits, as the case may be",[859] and does not cover the revocation in this case, which was the result of BSGR's bribery and which was thus connected to BSGR's actions. In other words, at the first stage, it must be determined whether *force majeure* was self-induced. This is an argument which requires the Tribunal to determine Vale's bribery allegations against BSGR. This implicates that the first stage would stand or fall by the Tribunal's findings on corruption.

810.  But the assumption of Vale's argument is that the Tribunal is required to address this argument, and in this case the Tribunal is not so required. The reason to conclude that the *force majeure* clause does not exclude the doctrine of frustration is that the *force majeure* clause does not make full and complete provision for the events which it purports to apply to. The Tribunal refers to paragraphs 820–825 of the Award, which explain the point more fully. What is important to conclude for now is that there is no merit in BSGR's argument that the frustration claim is parasitic on Vale's claims of bribery and corruption *in this case*, because the *force majeure* clause does not make full and complete provision for the events which it purports to apply to and, hence, does not exclude the application of the doctrine of frustration.

811.  BSGR's preliminary objection is accordingly dismissed. The Tribunal will begin its analysis of the frustration claim, starting with the issue of whether the doctrine of frustration has been excluded by an express contractual term.

**C.  Bar I: *Force majeure* clause**

812.  The Parties are agreed that the applicability of the doctrine of frustration would ordinarily be precluded if the parties made express provision in their contract for the consequence of the particular event that has occurred.[860] The issue is therefore whether the revocation of the mining rights, even if it were to amount to a supervening event for the purposes of the common law doctrine of frustration, was nevertheless an event for which the Parties had made express provision, so as to preclude the operation of the common law doctrine of frustration.

---

[859] Framework Agreement, Section 12.6(b)(iv). A similar phrasing is also used in Section 12.6(b)(v) of the Framework Agreement, which provides for the "implementation of any action without either Party having had any direct or indirect involvement in causing the implementation of such action, which materially and adversely affects the rights granted to ProjectCo under the Basic Agreement, the Mining Concession and/or any of the Guinea Exploration Permits."
[860] Vale's Statement of Case, paragraph 320; BSGR's Statement of Defence, paragraph 315.

813. The Framework Agreement contains a *force majeure* clause in Section 12.6, which provides for the suspension of each Party's obligations under the Framework Agreement and obliges the Parties to "cooperate in good faith with a view to reaching a mutually viable solution to the Force Majeure Event" in the event that a Force Majeure Event (as defined in Section 12.6) is reasonably determined by Vale to have occurred. Section 12.6 states as follows.

(a) Without prejudice to the operation of Section 5.2, if, during the time in which this Agreement is in force, the circumstances under which it was concluded are fundamentally changed such as to have a material adverse impact on the Project as a result of events or circumstances as specified in Section 12.6(b) below which are outside of the control of Vale (a "Force Majeure Event"), either Party may propose appropriate revisions to this Agreement, and both Parties will endeavor to find a mutually acceptable solution. Each Party acknowledges that a spirit of mutual co-operation and long term goodwill underlies this Agreement and agrees that in the event that unforeseen hardships arise affecting either Party, the Parties shall meet promptly and in good faith with a view to attempting to find a mutually acceptable means of alleviating such hardship.

(b) A Force Majeure Event shall be:

(i) (A) a natural catastrophe or cataclysm; (B) revolution, military or political coup, regime change, civil disturbance, act of terrorism, sabotage, vandalism or the threat of any such act; (C) an act of God, natural disasters such as lightning, flood, fire, storm, earthquakes and lack of water arising from environmental problems or weather; (D) chemical contamination; (E) an event or circumstance resulting in it becoming impossible, unsafe or not economically viable to access the Concession Areas to the extent required or to export iron ore from any of the Concession Areas to any other area within or outside of Guinea or Liberia, including, for the avoidance of doubt, extensive damage to any part of the infrastructure that forms part of the Liberian Transport Solution; (F) unforeseeable geological, environmental or ground (including ground water) conditions affecting the construction of all or some of the works relating to the Project; and/or (G) breakdown, inoperability, failure or partial failure of any part of the energy source required to run any key component of the Project, in each case, such that the development, exploitation or continued operation of the Project is not reasonably practicable or commercially viable;

(ii) a major financial and/or economic crisis, either worldwide or in major market(s) that could reasonably be expected to materially and adversely affect or alter the iron ore demand from customers and downstream industries and/or inventory levels;

(iii) the price for the target guaranteed specification of iron ore calculated in accordance with the Off-take Term Sheet (or the Off-take Agreement) being less than $27 per metric tonne on an ex-works mine basis for a continuous period of not less than 60 days;

(iv) the revocation, annulment or materially adverse restriction of the Basic Agreement, the Mining Concession or any of the Guinea Exploration Permits for reasons which are beyond the control of the Parties and are not otherwise connected to any direct or indirect action by either Party against or in violation of any of the Basic Agreement, the Mining Concession and the Guinea Exploration Permits, as the case may be; or

(v) the implementation of any action, without either Party having had any direct or indirect involvement in causing the implementation of such action, which materially and adversely affects the rights granted to ProjectCo under the Basic Agreement, the Mining Concession and/or any of the Guinea Exploration Permits.

(c) Without prejudice to the operation of Section 5.2, in the event that Vale reasonably determines that a Force Majeure Event has occurred then:

(i) Vale shall notify BSGR and BSGR Guinea of its determination of the occurrence of a Force Majeure Event within 10 Business Days of such determination;

(ii) Vale and each member of its Group shall, with effect on and from the date of such determination, not be required to satisfy any of its or their payment or other obligations that have not then already fallen due for payment or performance in accordance with their respective terms under this Agreement (including, without limitation, Vale's obligations to pay the First Deferred Consideration, the Second Deferred Consideration and/or the Additional Consideration pursuant to Section 3; Vale's obligation to fund the Feasibility Study; and any obligations of the lender under the Vale Loan to provide funding pursuant to the terms of the Vale Loan, as applicable) and the Parties agree and shall, to the fullest extent they are able to do so, procure that BSGR Guinea and its subsidiaries shall not make payments of dividends or other distributions without the prior approval of Vale, so that such payments and/or obligations shall be suspended, in all such cases, for such period as Vale reasonably and in good faith determines that a Force Majeure Event is continuing;

(iii) the Parties will continue to cooperate in good faith with a view to reaching a mutually viable solution to the Force Majeure Event; and

(iv) if the Force Majeure Event is of a type as contemplated in section 12.6(b)(ii) or (iii) above, it is the current intention of Vale that, in determining the course of action (if any) to be adopted in respect of the Project in response to such Force Majeure Event, it would make its assessment by reference to criteria which are not materially more onerous than those applicable to other comparable projects of Vale and its Affiliates and after having regard to all applicable factors and circumstances (including, without limitation, the quality and quantity of the iron ore produced or expected to be produced by the Project) and the prevailing and anticipated market conditions at that time.

814. The provisions of Section 12.6 are extended to the Shareholders' Agreement. Section 15.1 of the Shareholders' Agreement provides as follows.

The Parties agree that if a Force Majeure Event occurs, the provisions of Section 12.6 of the Framework Agreement shall apply to this Agreement mutatis mutandis with respect to the suspension of the payment of dividends or other distributions by the Company or any of its subsidiaries and of the obligations of the Parties as well as those of the Company or any of its subsidiaries hereunder which are not capable of performance as a result of such Force Majeure Event.

815. Vale argues that Section 12.6 does not exclude the doctrine of frustration in the present case for the following reasons.

816.    First, Vale argues that the operative part of the *force majeure* clause (Section 12.6(c)) is only triggered "in the event that Vale reasonably determines that a Force Majeure Event has occurred." This operative part allows Vale to notify BSGR of a Force Majeure Event, suspend any payment obligations and try to reach a mutually viable solution with BSGR. It is a one-sided clause written in Vale's favour, and does not explain what should happen to BSGR's obligations. BSGR cannot rely on this right to exclude the doctrine of frustration, because BSGR could never have used this clause to trigger the operative part.[861]

817.    Second, Vale argues that the *force majeure* clause "does not adequately provide for the revocation of the mining rights from VBG caused by BSGR's bribery". Section 12.6(a) only encouraged the Parties to "propose appropriate revisions" to the Framework Agreement, "endeavour to find a mutually acceptable solution" and to "meet promptly and in good faith with a view to attempting to find a mutually acceptable means of alleviating such hardship." If Section 12.6(c) worked in BSGR's favour (and according to Vale's first argument, it does not), it would only provide for the Parties to negotiate to attempt to reach a mutually viable solution. The effect of these Sections is that, if a revocation occurs, the lawyers are to sort it out. For example, it is contemplated that it could be sorted out if licenses were revoked pending an increase in licence fees and the Parties had to allocate the burden of that increase.[862] But the supervening event in this case (the revocation of the mining rights) would be a catastrophic event which would irrevocably strip VBG's rights from it, so that there would be no possible mutually acceptable solution that the lawyers could sort out.[863] The authorities in the UK, the US, Switzerland, Guinea, and Guernsey were investigating the allegations of corruption against BSGR.[864] BSGR's argument that President Condé and George Soros orchestrated a conspiracy, if proven, would only show that there was no way to reach a resolution.[865] VBG was disqualified from any substitute licence following the revocation, and there is no prospect of VBG developing the project since the revocation.[866] In view of the fact that there is no time limit on the Parties' obligation to find a mutually acceptable solution in Section 12.6,[867] Vale argues that the revocation is an event from which the mechanism of the *force majeure* clause could not rescue the Parties. In these circumstances, the doctrine of frustration applies.[868]

818.    Third, Vale submits that the revocation of the mining rights does not fall within the definition of a "Force Majeure Event". In particular:

818.1.    The revocation does not fall within the ambit of Sections 12.6(b)(iv) and 12.6(b)(v), because the revocation did not take place "for reasons which are beyond the control of the Parties and are not otherwise connected to any direct or indirect action by either Party" or "without either Party having had any direct or indirect involvement in causing [it]." On the contrary, Vale has shown that

---

[861] Vale's Pre-Hearing Written Submissions, paragraph 396.
[862] Vale's Pre-Hearing Written Submissions, paragraph 397.
[863] Vale's Pre-Hearing Written Submissions, paragraph 400(a).
[864] Vale's Pre-Hearing Written Submissions, paragraph 400(b).
[865] Vale's Pre-Hearing Written Submissions, paragraph 400(c).
[866] Vale's Pre-Hearing Written Submissions, paragraphs 400(d), 402; Statement of Case, paragraph 323.
[867] Vale's Pre-Hearing Written Submissions, paragraph 398.
[868] Vale's Pre-Hearing Written Submissions, paragraphs 401-402.

BSGR had engaged in corruption which caused the revocation.[869] Moreover, if Sections 12.6(b)(iv) and (v) covered revocations unconnected to the Parties' actions, the natural reading of the Framework Agreement would be that all other Sections are not intended to refer to revocations which are connected to the Parties' actions.[870]

818.2. The revocation does not fall within the ambit of Section 12.6(b)(i)(B). The election of President Condé could hardly be described as a political upheaval, which was an implied feature of a "regime change". In any event, "it is not the 'regime change' that caused the revocation of the mining rights and the frustration of the contract, but BSGR's corrupt acts".[871] Furthermore, the slew of political events which took place in Guinea from the death of President Conté to the election of President Condé could not collectively be regarded as a "regime change", because this "stretches past breaking point the meaning of the phrase 'Force Majeure Event.'"[872] The surrounding language of Section 12.6(b)(i)(B) shows that the Parties did not intend a string of events to fall within the meaning of a "regime change": "revolution, military or political coup ... civil disturbance, act of terrorism, sabotage, vandalism or the threat of any such act." All of these other terms envisaged a sudden event, not a six-year sequence of events.[873]

818.3. The revocation does not fall within the ambit of Section 12.6(b)(i)(E), in that the revocation is not "an event or circumstance resulting in it becoming impossible, unsafe or not economically viable to access the Concession Areas."[874] First, the revocation of mining rights is already covered elsewhere in Section 12.6(b)(iv), and is impliedly excluded from this terminology.[875] Second, the type of event or circumstance that would render it impossible, unsafe or not economically viable is clearly intended to refer to infrastructural problems so that reaching Simandou became physically or economically impossible. This explains the further language in the same Section: "including, for the avoidance of doubt, extensive damage to any part of the infrastructure that forms part of the Liberian Transport Solution."[876]

819. BSGR has not furnished any argument in response to Vale's first and second arguments. BSGR only argues that the revocation of the mining rights constituted a Force Majeure Event within the meaning of Sections 12.6(b)(iv), 12.6(b)(i)(B); and 12.6(b)(i)(E).[877]

819.1. As regards Section 12.6(b)(iv), BSGR argues that the reason for the revocation was "beyond the control of the parties" and was "not otherwise connected to any direct or indirect action by [BSGR] against or in violation of any of the Basic

---

[869] Vale's Statement of Case, paragraphs 321-322; Vale's Statement of Reply, paragraph 1034; Vale's Pre-Hearing Written Submissions, paragraph 404.
[870] Vale's Statement of Reply, paragraph 1035(a).
[871] Vale's Statement of Reply, paragraph 1035(b).
[872] Vale's Pre-Hearing Written Submissions, paragraph 406.
[873] Vale's Pre-Hearing Written Submissions, paragraph 408.
[874] Vale's Statement of Reply, paragraph 1035(c).
[875] Vale's Pre-Hearing Written Submissions, paragraph 409.
[876] Vale's Statement of Reply, paragraph 1035(c); Vale's Pre-Hearing Written Submissions, paragraph 408.
[877] BSGR's Statement of Defence paragraph 320; BSGR's Statement of Rejoinder, paragraphs 515-519. BSGR seemed also to rely on Section 12.6(b)(v) in its Statement of Defence at paragraph 320. However, BSGR did not invoke Section 12.6(b)(v) in its subsequent pleadings.

Agreement, the Mining Concession and the Guinea Exploration Permits" within the meaning of Section 12.6(iv). The basis for this was that, even if BSGR did engage in bribery, that bribery did not cause the revocation as "President Condé was determined to get BSGR out of Simandou regardless of any wrongdoing on its part. The result is that the reason for the revocation was not within the control of either of the parties, and was unconnected with any action that violates the terms on which the mining rights had been granted."[878] BSGR therefore argues that the revocation constitutes a Force Majeure Event under Section 12.6(iv).

819.2. As regards Section 12.6(b)(i)(B), BSGR argues that there have been several regime changes between the time the mining rights were granted and the time they were revoked, which involved a political upheaval.[879] In particular, the election which brought President Condé into power was marked by a high degree of political upheaval.[880] This was the regime change which brought about the revocation of the mining rights, part and parcel of which was President Condé's abolition of the 1995 Mining Code, his hostility to those granted mining rights under the previous regime and his reallocation of those rights to pay off debts which he had incurred in bringing about the regime change.[881]

819.3. Finally, as regards Section 12.6(b)(i)(E), BSGR argues that the revocation of the mining rights "makes it practically impossible for either BSGR or Vale to visit the Concession Areas. Nothing in the terms of the force majeure clause supports the interpretation Vale would give to this clause, namely that it applies only to problems with infrastructure."[882]

820.    In the Tribunal's view, the question is whether the contract has excluded the operation of the doctrine of frustration in the present case. The answer to this depends on whether the contract has made *full and complete provision* for the frustrating event in question, so as to exclude frustration. This is clear from *National Carriers*, in which the UK House of Lords held that the doctrine of frustration would continue to operate if "the contract makes no *sufficient* provision".[883]

821.    In this respect, the Tribunal considers that Vale's first argument misses the point, because it does not seek to demonstrate that the contract has made full and complete provision. It only seeks to point out that the *force majeure* clause is structured in a way that only allows *Vale* to trigger the suspension under the express terms of the contract. In other words, all it does is to demonstrate how the *force majeure* clause works. The Tribunal is therefore unable to see how this has any bearing on the issue of whether the doctrine of frustration has been excluded by the terms of the contract.

822.    With regard to Vale's second argument, the Tribunal understands the argument to be that adhering to the mechanism of the *force majeure* clause would be a futile exercise for two reasons. One is that there is no prospect of the Parties reaching a mutually viable solution (in accordance with the provisions of the *force majeure* clause), and the other is that the *force majeure* clause neither imposes a time limit on the obligation to cooperate

---

[878] BSGR's Statement of Rejoinder, paragraph 516.
[879] BSGR's Statement of Rejoinder, paragraph 517.
[880] BSGR's Statement of Rejoinder, paragraph 518.
[881] BSGR's Statement of Rejoinder, paragraph 518.
[882] BSGR's Statement of Rejoinder, paragraph 519.
[883] *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, 700 (emphasis added), **RL-47**.

in good faith, nor provides for the scenario where the Parties are unable to reach a solution. Vale concludes that "the clause does not provide a real contractual mechanism to deal with the event and does not allocate the risk of the event in case the situation is not one that the lawyers can sort out."[884]

823.  The Tribunal might have been persuaded that a *force majeure* clause, *which only imposes a bare obligation on the parties to cooperate with a view to finding a mutually viable solution*, would not constitute a full and complete provision. However, the clause in this case does not only impose such an obligation, but also imposes a *suspension* on future performance of the Framework Agreement. For this reason, the suspension effect must also be taken into account (in addition to the obligation to co-operate) when deciding if the *force majeure* clause constitutes a full and complete provision to cover the supervening event.

824.  In this case, if the *force majeure* clause provided for the suspension of the obligations of *both Parties* under the Framework Agreement, the contract would probably be deemed to have made full and complete provision. The Parties would be taken to have intended the loss to lie where it falls if the Parties were to attempt to co-operate but were unable to reach a viable solution. But the situation here is not comparable, because the *force majeure* clause only provides for the suspension of *Vale's* obligations and does not provide for the suspension of *BSGR's* obligations. Section 12.6(c)(ii) of the Framework Agreement states that "Vale and each member of its Group shall, with effect on and from the date of such determination, not be required to satisfy any of its or their payment or other obligations that have not then already fallen due for payment or performance in accordance with their respective terms under this Agreement", but does not deal with BSGR's obligations. This means that BSGR's obligations under the Joint Venture Agreements will continue to operate, even upon the occurrence of a supervening event to which Section 12.6 applies.

825.  In view of this omission, the Tribunal considers that the Framework Agreement does not provide for all the effects of the supervening event on the obligations of the Parties. So even if the revocation of the mining rights had been an event to which the *force majeure* clause applied, the *force majeure* clause could not be considered to have excluded the doctrine of frustration, because it did not make full and complete provision for the revocation. On this basis, the Tribunal holds that the *force majeure* clause does not exclude the doctrine of frustration, and it is open for the Tribunal to apply the doctrine of frustration to the facts of this case. In view of this conclusion, the Tribunal considers that it is unnecessary to address Vale's third argument (that the revocation was an event to which the *force majeure* clause does not apply) and BSGR's arguments in response.

### D.  Bar II: Foreseeability

826.  BSGR argues that there is a requirement that the event is *unforeseeable* for frustration to operate, which is separate and distinct from the requirement the contract makes insufficient provision for the supervening event.[885] So if the Parties would have seen the supervening event as a possibility (and accepted that as a risk of entering into the

---

[884] Vale's Pre-Hearing Written Submissions, paragraph 399.
[885] BSGR's Statement of Rejoinder, paragraph 521.

contract), the doctrine of frustration would be precluded, and Vale would not be able to rely on it.[886]

827. BSGR relies on two authorities to support this view. The first is a passage from *Chitty on Contracts*.[887]

> [T]he fact that the parties have foreseen the event but not made any provision for it in their contract will usually, but not necessarily, prevent the doctrine of frustration from applying when the event occurs.[888]

828. The second is a passage from *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, 700 (HL).[889]

> Frustration of a contract takes place where there intervenes an event (without default of either party and for which the contract makes no sufficient provision) which so significantly changes the nature […] of the outstanding contractual rights and/or obligations from what the parties could reasonably have contemplated at the time of its execution that it would be unjust to hold them to the literal sense of its stipulations in the new circumstances; in such case the law declares both parties to be discharged from further performance.[890]

829. On this footing, BSGR argues that it was foreseeable that a subsequent Guinean President might expropriate the mining rights, and that it was a risk which both Parties had taken in contracting for those rights.[891] Expropriation of the mining rights was foreseeable, because the mining rights "were rooted in a country with a significant history of political upheaval, ethnic tension and violence."[892]

830. In addition, BSGR relies on paragraph 21 of Etchart's first witness statement to argue that Etchart had "candidly admitting that Vale was aware of (and went ahead in spite of) the risks of mining operations in a country such as Guinea".[893] BSGR argues that, in the context of Vale's admission that Guinea was a country "that has been governed by a series of dictators for almost all of its existence, has suffered multiple coups, and was recently involved in lengthy civil wars in neighbouring countries",[894] Vale can no longer realistically assert that "only one year later, when the [Joint Venture Agreements] were signed, the political situation would have so radically stabilised and moderated that the chance of expropriation would have evaporated."[895]

831. BSGR also argues that the prospect of there being corruption or bribery was expressly addressed in the Joint Venture Agreements in the ABL Solution, which provides a detailed procedure for dealing with such matters.[896]

---

[886] BSGR's Statement of Defence, paragraph 316.
[887] BSGR's Statement of Defence, paragraph 315.
[888] HG Beale (ed), *Chitty on Contracts*, vol 1 (32nd edn, Sweet & Maxwell 2015) [23-059], **CL-36**.
[889] BSGR's Statement of Rejoinder, paragraph 520.
[890] *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, 700, **RL-47**.
[891] BSGR's Statement of Defence, paragraph 321.
[892] BSGR's Statement of Rejoinder, paragraph 522.
[893] BSGR's Statement of Defence, paragraph 321.
[894] BSGR's Statement of Rejoinder, paragraph 523. BSGR cited Statement of Case, paragraphs 18-20.
[895] BSGR's Statement of Rejoinder, paragraph 523.
[896] BSGR's Statement of Defence, paragraph 320(iii).

832. Vale disagrees with BSGR's contention that foreseeability is a bar to frustration. Vale's view is that "a contract may be discharged by frustration even though the parties foresaw or ought to have foreseen the frustrating event", and that "[t]he key element is not whether an event was foreseen or in the contemplation of the parties, but whether it was provided for in the contract."[897] In support, Vale relies primarily on the following passage from *The Eugenia* [1964] 2 QB 226, 239 (CA).[898]

> It has frequently been said that the doctrine of frustration only applies when the new situation is 'unforeseen' or 'unexpected' or 'uncontemplated,' as if that were an essential feature. But it is not so. The only thing that is essential is that the parties should have made no provision for it in their contract. The only relevance of it being 'unforeseen' is this: If the parties did not foresee anything of the kind happening, you can readily infer they have made no provision for it. whereas, if they did foresee it, you would expect them to make provision for it.[899]

833. As regards BSGR's quotation of *Chitty on Contracts*, Vale emphasises that the quotation specifically says that foreseeability "will usually, **_but not necessarily_**, prevent the doctrine of frustration".[900] BSGR also cites a paragraph from Treitel's *Frustration and Force Majeure* to argue that "There is only a prima facie inference that a foreseen or readily foreseeable event will preclude the doctrine of frustration. Depending on the circumstances, the event can be readily foreseeable, actually foreseen and even provided for in the contract but the doctrine of frustration can still apply."[901]

834. Even if it is accepted that foreseeability is a separate bar to frustration, Vale argues that the revocation of the mining rights was not foreseeable.

834.1. First, in relation to the quotation from Etchart's witness statement, Vale asserts that BSGR has taken the quote out of context.[902] Etchart is describing the political instability in 2009 to make the point that only an agreement with the government conferring actual mining rights would carry "sufficient weight to overcome the naturally high sovereign risk in Africa."[903] Etchart is explaining his view that the mining rights were only secured when the basic agreement with the GoG was executed.[904] Indeed, in his second witness statement, Etchart says that this agreement "significantly decreased the risk of the rights being lost, absent some wrongdoing by their holder."[905] Etchart makes it clear in his second witness statement that "it certainly never occurred to me that BSGR's mining rights would be revoked because of wrongdoing by BSGR itself".[906]

834.2. Second, in relation to the ABL Solution, Vale submits that the contemplation of allegations being made regarding bribery and corruption is not the same as the contemplation of the complete revocation of the mining rights, owing to BSGR's corrupt actions.[907] Indeed, the ABL Solution does not provide a viable

---

[897] Vale's Statement of Reply, paragraph 1037.
[898] Vale's Statement of Reply, paragraph 1037.
[899] *The Eugenia* [1964] 2 QB 226, 239 (CA), **CL-64.**
[900] Vale's Pre-Hearing Written Submissions, paragraph 411 (emphasis added).
[901] Vale's Pre-Hearing Written Submissions, paragraph 411.
[902] BSGR's Statement of Rejoinder, paragraph 1038.
[903] BSGR's Statement of Rejoinder, paragraph 1039; Etchart First WS, paragraph 21.
[904] BSGR's Statement of Rejoinder, paragraph 1039.
[905] BSGR's Statement of Rejoinder, paragraph 1039; Etchart Second WS, paragraph 22.
[906] BSGR's Statement of Rejoinder, paragraph 1040; Etchart Second WS, paragraph 23.
[907] Vale's Statement of Reply, paragraph 1036.

contractual framework for a situation where the mining rights are revoked: "The 'exit strategy' in the ABL Solution necessitated a buyer buying out the Parties, but no buyer could have been found for a worthless project with no underlying mining rights."[908]

835.    The Tribunal agrees with BSGR that there is a "foreseeability" bar to frustration, which is separate from the "express contractual provision" bar that was discussed in section VIII.C. of the Award above. The implication is that, even if there is no express contractual provision to cover the supervening event, the doctrine of frustration may nevertheless be precluded by this "foreseeability" bar if the requirements of this bar are fulfilled. But the question then arises as to what these requirements are, and on this issue, the Tribunal is not persuaded by BSGR's view that the sole criterion is that the event was "foreseeable". This cannot be the case, because foreseeability only justifies a *prima facie* inference that the risk of the frustrating event has already been assumed by the parties, so as to preclude the operation of the doctrine of frustration. This *prima facie* inference may therefore be excluded by other relevant factors, including evidence that the parties had intended otherwise. The Tribunal is entitled to take these factors into account when determining if the *prima facie* inference is excluded.

836.    But there is no need for the Tribunal to commence a balancing exercise of these factors, because the facts of this case indicate that the revocation of the mining rights was not a foreseeable event in the first place. The Tribunal agrees with Vale that the quotation from Etchart's witness statement was taken out of context, and that the quotation does not prove that the revocation was a foreseeable event. The Tribunal agrees with Vale's view that the ABL Solution may show that the parties had contemplated the possibility of allegations of bribery but does not show that the parties had contemplated the revocation of mining rights. The Tribunal considers that the (general) political climate in Guinea is not sufficient proof that the (specific) occasion of the revocation of the mining rights was a foreseeable event.

837.    The Tribunal accordingly holds that the doctrine of frustration is not precluded by the bar of foreseeability.

## E.    Application of the doctrine of frustration

838.    Vale argues "The revocation of VBG Guinea's Mining Rights in respect of the Concession Areas (which is an indisputable fact) has made it commercially impossible for the parties to perform their obligations under the [Joint Venture Agreements]" and that "the [Joint Venture Agreements] have been frustrated".[909] Vale asserts that the revocation of the mining rights "made it commercially impossible for the parties to perform their obligations under the [Joint Venture Agreements]", and that the revocation "both 'defeat[ed] the practical purpose' of the joint venture and [made] it 'manifestly incapable of performance.'"[910] Vale draws a comparison between this case and *BP Exploration Co. (Libya) Ltd. v Hunt (No. 2)* [1983] 2 AC 352 (HL), where the UK House of Lords ruled that the expropriation of an oil concession by the Libyan government amounted to a

---

[908] Vale's Statement of Reply, paragraph 1036; Vale's Pre-Hearing Written Submissions, paragraph 412.
[909] Vale's Statement of Case, paragraph 310-311.
[910] Vale's Statement of Case, paragraph 315.

frustrating event.[911] Vale emphasises that the revocation was not attributable to any conduct, act or omission on the part of Vale, pointing out "the Technical Committee found in its Report that the evidence showed no wrongdoing by Vale."[912]

839.    BSGR's only argument in response is that:

> In *BP Exploration Co (Libya) Ltd v Hunt (No. 2)* [1981] 1 WLR 232 (appeal to HL dismissed [1983] 2 AC 352), the court was concerned with expropriation of an oil concession by the Libyan government (for which the state had paid compensation). It was an external event brought about through no default of the parties and fell squarely within the doctrine of frustration (and there was no appeal against that finding). Vale's reliance on that case is misplaced. In that case, there were no allegations of fraud (or any wrongdoing) by the defendant. Here, Vale's frustration case is dependent on it making out fraud and *BP v Hunt* says nothing about that situation.[913]

840.    Having considered the Parties' submissions, the Tribunal agrees with Vale that the revocation of the mining rights by the GoG amounted to a frustrating event. The revocation led to the unavailability (if not the destruction) of the subject matter of the Joint Venture Agreements, which is the legal right to commence mining activities in Zogota as well as the legal right to commence exploration activities of Simandou Blocks 1 and 2. These two legal rights form the subject matter of the Joint Venture Agreements, the unavailability or destruction of which would render the performance of the Joint Venture Agreements (which oblige Vale and BSGR to "pursue the development of the Project"[914]) wholly impossible. The Tribunal's view is fortified by the English case of *BP Exploration Co. (Libya) Ltd. v Hunt (No. 2)* [1983] 2 AC 352 (HL), which makes it manifestly clear that revocations of permits by governments can amount to frustrating events which discharge the parties from further performance of the contract.

841.    BSGR's counterargument seems to be that there is no frustrating event if that event arose from the fault (or default) of one party. The revocation would not amount to a frustrating event if Vale successfully establishes that the revocation was the result of BSGR's bribes.

842.    If that is BSGR's counterargument, the Tribunal disagrees. When a frustrating event occurs without the fault or default of any party, the contract is automatically discharged, and either party may rely on the frustrating event to establish that automatic discharge. But when a frustrating event occurs by reason of the fault or default of one party, that party will not be allowed to rely upon the self-induced frustrating event (as supported by the fifth proposition in *The Super Servant Two*), although the other party will be allowed to rely on it. In such an exceptional situation, discharge does not occur automatically, but only takes place upon the election of the innocent party.

843.    In the present case, it does not matter whether the revocation was due to BSGR's fault. If it was due to neither Party's fault, either Party (including Vale) would be entitled to rely on the revocation to show the Joint Venture Agreements have automatically been discharged; if the revocation was due to BSGR's bribery, Vale as the innocent Party

---

[911] Vale's Statement of Case, paragraphs 316-317; *B.P. Exploration Co. (Libya) Ltd. v Hunt (No. 2)* [1983] 2 AC 352 (HL), **CL-3**.
[912] Vale's Statement of Case, paragraphs 318-319.
[913] BSGR's Statement of Defence, paragraph 317.
[914] Framework Agreement, Section 7; *see also* SHA, Section 3.1 and Section 5.1.

would still be entitled to rely on the frustrating event (and such reliance would serve to trigger the discharge of the Joint Venture Agreements). So there is no merit in BSGR's argument that a supervening event ceases to be one if it is established that the event arose from BSGR's fault. BSGR would not be able to rely on such an event; but Vale as the innocent Party most certainly would.

844. The Tribunal holds that, applying the doctrine of frustration to the facts of this case, the revocation of the mining rights constituted a frustrating event which discharged the Parties from the performance of their obligations under the Joint Venture Agreements which had not yet arisen at the time of discharge.

845. However, for the reasons set out in paragraph 982 below, the Tribunal has no need to make any substantive order for specific relief following its findings in paragraphs 838-844 above.

## IX.   REFLECTIVE LOSS

846.   The Tribunal has found so far that:

846.1.   BSGR is liable for fraudulent misrepresentation;

846.2.   BSGR is liable for breach of warranties; and

846.3.   the elements of frustration have duly been established.

847.   However, before the Tribunal turns to the issue of remedies, the Tribunal wishes to address a preliminary matter which was raised by the Tribunal and dealt with by Vale at some length during the February 2017 Hearing – the issue of reflective loss.

## A.   The Parties' Positions

848.   Vale claims in this arbitration that it is entitled to the following heads of damages under deceit or breach of warranties which amount to **USD 1,446,618,523** in total.

848.1.   **Initial Consideration.** Section 3(a) of the Framework Agreement obliged Vale to pay (or procure Vale's subsidiary to pay) USD 500,000,000 to BSGR as "Initial Consideration" (defined under the Framework Agreement) for the purchase of 51% of the shares in BSGR Guernsey from BSGR.[915] Vale claims that, pursuant to Section 3(a), Vale International transferred USD 500,000,000 to BSGR by wire transfer on 30 April 2010.[916] Vale now claims it is entitled to this **USD 500,000,000** from BSGR.

848.2.   **Feasibility Study Funding.** Section 6.1 of the Framework Agreement required Vale to fund (or procure one of its subsidiaries to fund) a feasibility study in respect of Simandou Blocks 1 and 2. Vale claims this was ultimately funded by Vale GmbH and Vale International[917] in the amount of USD 85,365,652.[918] Vale now claims it is entitled to this **USD 85,365,652** from BSGR.

848.3.   **Loan.** Section 6.3 of the Framework Agreement obliged Vale to lend (or procure one of Vale's subsidiaries to lend) money to VBG Guinea, VBG Guernsey, VBG Liberia and VBG BVI. Vale argues that, pursuant to Section 6.3, Vale International lent money between 2010 and 2015 to VBG Guinea, VBG Liberia and VBG Logistics, all of which issued promissory notes to Vale International to acknowledge their indebtedness. Vale argues that the outstanding amount under the promissory notes is USD 780,734,781 (comprising the outstanding principal of USD 581,197,104 and the outstanding sum of simple interest accrued of USD 199,537,678 up to 28 April 2014). Vale now claims it is entitled to this **USD 780,734,781** from BSGR (the "**Outstanding Loan Amount**").

---

[915] The shares in VBG were held by Vale's direct subsidiary company, Vale GmbH (see Transcript, Merits Hearing, Day 3, p. 72, lines 7-11).
[916] Vale's Statement of Reply, paragraph 935(a); Oxera Report, paragraphs 52-56.
[917] Transcript, Merits Hearing, Day 1, p. 201, lines 24-25 and p. 202, line 1-4; Day 3, p. 86, lines 3-18 and p. 91, lines 6-13.
[918] Vale's Statement of Reply, paragraph 935(c); Oxera Report, paragraph 8.

848.4. **Internal costs.** Vale claims that it is entitled to additional costs of **USD 80,518,090** which Vale incurred outside of Guinea and Liberia during 2010 to 2013 to operate the joint venture.[919]

849. In its Statement of Defence, BSGR argued that Vale was not entitled to recover at least the sum of **USD 1,097,805** (which forms part of the Internal Costs of **USD 80,518,090**), because the **USD 1,097,805** was a sum "that 'Vale Intl' (not the present Vale Claimant) paid for R&D work by an employee based in Switzerland. Money spent by a different Vale company to the claimant in these proceedings is not recoverable".[920] BSGR cited *Peterson Farms v C&M Farming Ltd* [2004] EWHC 121 (Comm) in support.[921]

850. In its Statement of Reply, Vale responded that it was not seeking to extend the arbitration clause in the Joint Venture Agreements to cover claims by a non-party such as Vale International (a wholly-owned indirect subsidiary of Vale). For this reason, "the issue in these proceedings cannot conceivably be one of jurisdiction, as BSGR suggests, but simply whether Vale can recover as lost expenditures disbursements incurred by Vale International on Vale's behalf and at Vale's direction."[922] Framed as such, Vale argued that the answer is yes for two reasons. First, "[t]he parties expressly agreed that Vale may rely upon other members of its group of companies to perform its obligations under the [Joint Venture Agreements], including to make payments in furtherance thereon". Second, English law allowed for such recovery, as evidenced by *George Fischer (Great Britain) Ltd v Multi-Construction Ltd* [1995] BCC 310, an English Court of Appeal case in which the parent company was awarded recovery for the losses suffered by its subsidiary.[923] In this connection, Vale contested the relevance of *Peterson Farms* on the basis that the issue in *Peterson Farms* was entirely different, being whether the claimant could recover damages suffered by entities belonging to its group of companies that were not parties to the arbitration agreement. The Court of Appeal partially set aside the award for want of jurisdiction because the arbitral tribunal did not consider whether the claimant was entitled to recover those damages under the applicable Arkansas *lex causae*.[924]

851. In its Statement of Rejoinder, BSGR challenged Vale's reliance on *George Fischer* as authority for the proposition that losses suffered by a subsidiary might be recovered by the parent company. BSGR argued that this mischaracterised the decision in *George Fischer* as the issue which the Court of Appeal decided was whether "a shareholder in a company [was] entitled to recover damages for a diminution in the value of its shareholding in the company or in the distribution by way of dividends or otherwise of profits of the company, where such diminution results from loss inflicted on the company by the defendant's breach of its contract with the plaintiff". It was only in this capacity that a parent company was able to recover for losses primarily suffered by the subsidiary, so unless Vale was able to show a diminution in the share price of Vale International, or a diminution of its dividends in Vale International, as a consequence of a Swiss-based

---

[919] Vale's Statement of Case, paragraph 128; Oxera Report, paragraphs 104-130.
[920] BSGR's Statement of Defence, paragraph 268(i).
[921] *Peterson Farms v C&M Farming Ltd* [2004] EWHC 121 (Comm), **RL-45**.
[922] Vale's Statement of Reply, paragraph 964.
[923] Vale's Statement of Reply, paragraph 965.
[924] Vale's Statement of Reply, paragraph 966. Vale reiterates these arguments in its Pre-Hearing Written Submissions, paragraphs 353-355.

employee being made available for work on the joint venture, *George Fischer* did not assist Vale.[925]

852.    On the first day of the February 2017 Hearing, the Tribunal noted that the issue was not confined to the **USD 1,097,805** relating to the Swiss employee but extended to other amounts provided by Vale International, including the Outstanding Loan Amount.[926] Vale's counsel clarified at the Hearing that the Initial Consideration was funded through Vale International and the Tribunal learned that the Feasibility Study was also funded by the subsidiary company (although the Internal Costs were incurred by Vale).[927] The Tribunal therefore asked Vale if it was claiming reflective loss and, if so, whether this was allowed under English law.[928]

853.    In response, on the third day of the February 2017 Hearing, Vale's counsel provided oral submissions on reflective loss, arguing that the rule was inapplicable to the present case. Vale claimed its loss consisted in the diminution of the value of its shares in Vale International[929] and provided reasons why such loss was recoverable under English law relying on case law referred to below.[930] In the course of its submissions, Vale said the onus was on the defendant to raise the issue of reflective loss as a defence, and BSGR had not raised this issue in the arbitration.[931] In other words, the burden fell on BSGR as defendant to prove that recovery was barred by the rule against reflective loss, and BSGR did not satisfy that burden. Vale also submitted that the present circumstances did not amount to a claim for reflective loss in any case, so the rule was inapplicable on the facts. Consequently, according to Vale, the reflective loss issue was on the "fringes of the debate between the parties".[932]

854.    The transcript of the February 2017 Hearing was provided to BSGR. No further comment was received from either Party in relation to the rule against reflective loss. The Tribunal wishes to put it on the record that it is satisfied that BSGR had the clear opportunity to challenge Vale's damages claim on grounds of reflective loss, and it has not availed itself of this opportunity (aside from the Swiss employee costs). The transcripts were provided to BSGR daily, and a simple reading of the transcripts would have shown that the reflective loss issue had been raised by the Tribunal and counsel for Vale had correctly stated that the rule against reflective loss had not been invoked by BSGR. Had BSGR sought leave to raise the reflective loss issue, the Tribunal would in all likelihood have granted leave. However, BSGR chose not to do so.

855.    In summary, the Tribunal recalls the following.

---

[925] BSGR's Statement of Rejoinder, paragraph 459-461.
[926] Transcript, Merits Hearing, Day 1, p. 198, line 17 – p. 201, line 7.
[927] Transcript, Merits Hearing, Day 1, p. 201, line 13 – p. 202, line 5. See also Vale's Statement of Reply, footnote 2368; Vale's Pre-Hearing Written Submissions, footnote 757.
[928] Transcript, Merits Hearing, Day 1, p. 201, lines 8-11; p. 202, lines 6-18.
[929] Transcript, Merits Hearing, Day 3, p. 8, lines 13-18; p. 9, lines 16-23. The Tribunal understands Vale's argument extends to Vale International's contributions to the *Feasibility Study Funding* (and not just the Initial Consideration and the Loan).
[930] Transcript, Merits Hearing, Day 3, p. 19, line 3 – p. 29, line 18.
[931] Transcript, Merits Hearing, Day 3 p. 27, lines 3-9; p. 18, line 12 – p. 19, line 2 and p. 20, lines 4-25.
[932] Transcript, Merits Hearing, Day 3 p. 18, lines 11-12.

855.1. Although BSGR did not use the term "reflective loss", the rule was raised by BSGR in relation to the costs incurred by Vale International connected to the provision of the Swiss employee (**USD 1,097,805**).

855.2. On its own accord, the Tribunal raised the possibility that the doctrine might apply to other parts of Vale's damages claim.

855.3. Vale provided its submissions as to why the reflective loss doctrine did not apply to the present case, including that BSGR had not raised the issue as a defence, nor did it apply to amend its defence to raise a formal objection to Vale's claims for losses described above.

855.4. BSGR did not make any further submissions on the issue and did not pursue a reflective loss argument in relation to other heads of damages.

## B. The Rule Against Reflective Loss

856. Before addressing the facts of this case, the Tribunal briefly outlines the law on reflective loss.

857. The rule against reflective loss in English law can be traced back to the English Court of Appeal case of *Prudential Assurance v Newman Industries* [1982] Ch 204 ("**Prudential Assurance**"), which explained the rule in the following terms:

> [...] what [the shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. **He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a loss is merely a reflection of the loss suffered by the company.** The shareholder does not suffer any personal loss. His only loss is through the company, in the diminution of the value of the net assets of the company, in which he has (say) a 3 per cent. shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. **There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company.**[933]

858. The rule against reflective loss was briefly doubted by the New Zealand Court of Appeal in *Christensen v Scott* [1996] 1 NZLR 273 and the English Court of Appeal in *Barings plc*

---

[933] *Prudential Assurance v Newman Industries* [1982] Ch 204, 222-223 (CA) (emphasis added).

*(in administration) v Coopers* [1997] 1 BCLC 427. However, these cases were disapproved of by the English House of Lords in *Johnson v Gore Wood* [2002] 2 AC 1 (HL) ("***Johnson***"), and the rule against reflective loss was roundly endorsed. Today, the modern authoritative statement of the rule against reflective loss may be found in a passage in Lord Bingham's judgment in *Johnson*, the full text of which is set out below.

> 1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss. So much is clear from *Prudential*, particularly at pages 222-3, *Heron International*, particularly at pages 261-2, *George Fischer*, particularly at pages 266 and 270-271, *Gerber* and *Stein v. Blake*, particularly at pages 726-729.
>
> 2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding. This is supported by *Lee v. Sheard*, at pages 195-6, *George Fischer* and *Gerber*.
>
> 3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to that other. I take this to be the effect of *Lee v. Sheard*, at pages 195-6, *Heron International*, particularly at page 262, *R. P. Howard*, particularly at page 123, *Gerber* and *Stein v. Blake*, particularly at page 726. I do not think the observations of Leggatt L.J. in *Barings* at p. 435B and of the Court of Appeal of New Zealand in *Christensen v. Scott* at page 280, lines 25-35, can be reconciled with this statement of principle.[934]

859.    *Johnson* also explained that the rationale for the rule against reflective loss was twofold: first, it precluded the prospect of double recovery and second, it protected the interests of the creditors and other shareholders (if any) of the company. In the words of Lord Millett:

> If the shareholder is allowed to recover in respect of such loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders. Neither course can be permitted. This is a matter of principle; there is no discretion involved. Justice to the defendant requires the exclusion of one claim or the other; protection of the interests of the company's creditors requires that it is the company which is allowed to recover to the exclusion of the shareholder.[935]

860.    The upshot of the above is that, under English law today, a shareholder is precluded from pursuing its cause of action to recover its loss if (a) the company (in which the shareholder holds shares) has its own cause of action ("**Criterion A**") and (b) the company's cause of action has resulted in loss to the company which reflect the shareholder's loss ("**Criterion B**"). The test for Criterion B is whether or not the

---

[934] *Johnson v Gore Wood & Co* [2002] 2 AC 1, 35-36 (HL).
[935] *Johnson v Gore Wood & Co* [2002] 2 AC 1, 62 (HL).

shareholder's loss would be made good if the company were to enforce its own rights against the responsible party.

861. The Tribunal notes that Vale (through its counsel, Mr Jonathan Kelly) accepted a formulation which is identical in substance to this restatement as an accurate summary of the rule against reflective loss:

> What Lord Bingham -- and I can give you a summary of what Lord Bingham says in the Johnson case. I am sure the Tribunal will be familiar with it, but for the record, the reflective loss principle is that a shareholder in a company can't bring a claim for loss where (i) the company itself has a claim, (ii) all loss to the shareholder is caused by the wrong done to the company and, (iii) all of the shareholders' loss would be made good if the company's assets were replenished through action against the party responsible.[935]

## C. Was the burden on BSGR to raise the issue of reflective loss?

862. While BSGR raised the issue of Vale's ability to recover the costs incurred by Vale International in relation to the Swiss employee provided to VBG, it is clear from the written submissions that BSGR did not raise the issue of reflective loss more generally, and did not specifically plead that this rule prevents Vale from recovering the Initial Consideration, the Outstanding Loan Amount or the Feasibility Study Funding.

863. When the Tribunal raised the issue of reflective loss at the February 2017 Hearing and engaged with Counsel for Vale on the issue, Counsel for Vale submitted that the burden fell on BSGR to raise the issue and it had not done so (at least apart from the **USD 1,097,805**). Counsel for Vale said:

> One might expect [...] that if BSGR were going to raise such an issue, then they would have raised it. There are a series of cases, Johnson v Gore Wood is the leading House of Lords case; Prudential Assurance is a Court of Appeal case and there have been subsequent cases on reflective loss, none of which are in this record or one of which have ever been raised by BSGR, which is why I say the Tribunal reference to reflective loss, on Monday, was the first time -- to our knowledge -- those words have been used in this arbitration.
>
> [...]
>
> The second point -- which I alluded to earlier in my submissions -- is that the onus is on the defendant to raise this as a defence.
>
> Now, we would say, even accepting, Mr Chairman, your description, for these purposes, of the issue as being on the table, that is very far away from BSGR having raised a defence.[937]

864. The English Court of Appeal in *Shaker v Al-Bedrawi* [2002] EWCA Civ 1452 ("**Shaker**") supports Vale's position. In that case, the Court held that the burden lay on the defendant to show that the rule against reflective loss applied to bar the plaintiff's *prima facie* claim. Peter Gibson LJ for the Court stated:

> As the Prudential principle is an exclusionary rule denying a claimant what otherwise would be his right to sue, the onus must be on the defendants to establish its applicability.[938]

---

[935] Transcript, Merits Hearing, Day 3, p. 23, lines 8-17.
[937] Transcript, Merits Hearing, Day 3, p. 19, lines 4-16 and p. 27, lines 3-9.

865.   This reasoning is consistent with *Barnett v Creggy* [2014] EWHC 3080 (Ch), in which David Richards J barred the defendant from raising the rule against reflective loss because it had not been pleaded and was only raised after evidence had been called.

866.   In the present case, the Tribunal is satisfied that BSGR has properly raised the issue of reflective loss in relation to the **USD 1,097,805** claimed for the Swiss employee costs, but has not done so in relation to the other heads of damages claimed. BSGR chose not to raise a reflective loss argument in relation to other amounts claimed by Vale despite the Tribunal raising the issue during the February 2017 Hearing.

867.   The Tribunal accepts Vale's submission, which is consistent with the *Shaker* case, that the onus is on BSGR to raise the rule against reflective loss and to prove the application of the doctrine to the facts. As noted above, BSGR had an opportunity to raise the issue had it wished to do so – both before and after the February 2017 Hearing. BSGR chose not to raise the issue of reflective loss other than in relation to the employee costs.

868.   The above however is not the end of the matter. Irrespective of a Tribunal's power to raise legal arguments on its own motion or to expand upon a legal argument raised by a party provided due process is respected, the Tribunal recalls that BSGR by and large chose not to participate in the present arbitration from the September 2016 Hearing onwards. The Tribunal considers that it was wholly appropriate, given such default, for the Tribunal to raise the issue of reflective loss at the February 2017 Hearing, as a defence of reflective loss follows from the basic rule of company law regarding separate legal personality. Given BSGR's default, including the fact that it failed to respond in writing to the reflective loss discussion at the February 2017 Hearing although it had received the hearing transcripts, the Tribunal inclines to the view that BSGR, save for the costs of the Swiss employee, has waived its right to invoke the principle or is estopped from raising it. However, the Tribunal will, out of an abundance of caution, examine the reflective loss issue.

869.   Reflective loss, however, cannot be applied in an isolated manner and needs to be tested against the specific circumstances of the case and the contractual arrangements applicable between the parties. As the Tribunal will discuss in the next section, a share purchase agreement concluded between the Parties on 13 March 2015 sheds new light on the applicability of the rule against reflective loss and implies that Vale's prayers for relief in this arbitration are not barred by the application of the rule.

**D.    Application of the Rule Against Reflective Loss to the Facts – the Effect of the Share Purchase Deed of 13 March 2015 on any Application of the Rule Against Reflective Loss**

870.   In the light of the conclusion above, the Tribunal now considers whether any damages or costs can be claimed by Vale even though these were incurred by Vale International or any other Vale subsidiary.

---

[938] *Shaker v Al-Bedrawi* [2002] EWCA Civ 1452 [83].

871. As noted in paragraph 860 above, there are two criteria for the rule against reflective loss which must be made out for the doctrine to prevent recovery of a loss by a parent company. The first is that the subsidiary must have a cause of action against the defendant available to it to recover that loss. With regard to the costs of **USD 1,097,805** incurred by Vale International in relation to its Swiss-based employee, the Tribunal finds that there is no evidence that Vale International has any cause of action to claim back this sum from BSGR or VBG. The Swiss employee was provided to VBG in satisfaction of Vale's obligations under the Joint Venture Agreements. Vale procured the secondment of the employee so as to comply with its joint venture obligations under the Framework Agreement. The claim for these costs forms part of the damages claim following rescission (or termination) of the Framework Agreement. There is no evidence that Vale International has separate arrangements or any agreement or relationship with BSGR or VBG which could provide a direct cause of action of Vale International to pursue to recover the losses related to that employee. Therefore, this first criterion has not been satisfied, and the rule against reflective loss does not operate to bar recovery of the employee-related costs by Vale.

872. The lack of cause of action regarding the employee costs can be contrasted with the cause of action that Vale International might have against VBG in relation to the Outstanding Loan Amount. Although the Tribunal has found that BSGR failed to plead reflective loss in relation the other heads to loss claimed by Vale (including the Outstanding Loan Amount), the Tribunal observes that the Parties have (in any event) entered into an agreement that preserves Vale's right to pursue these claims. The specifics of that agreement are as follows.

  872.1. Vale, BSGR and VBG Guernsey entered into a Share Purchase Deed on 13 March 2015,[939] under which Vale agreed to procure Vale GmbH to sell its shares in VBG Guernsey (51% participation) to BSGR for USD 1. Under Clause 6.1 of the Share Purchase Deed, the Parties and VBG Guernsey terminated the Joint Venture Agreements, subject to Vale's right to pursue its claims in this arbitration. Clause 6.2 of the Share Purchase Deed specifically preserves Vale's right to pursue claims against BSGR in this arbitration for:

    872.1.1. the "VBG Debt" (defined as the loans made by Vale International to VBG subject to the promissory notes, including any claim for damages based on the loss caused by the non-repayment of VBG Debt and interest thereon);

    872.1.2. the "Vale Expenditures", defined as the aggregate of all expenditures made by Vale in connection with the activities and assets of VBG; and

    872.1.3. the payment made by Vale to BSGR pursuant to the Joint Venture Agreements.

  872.2. Clause 6.3 of the Share Purchase Deed states: "Vale and its Affiliates shall not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than as part of the LCIA Arbitration, in which case the reservation of rights set forth in Clause 6.2 shall be applicable."

---

[939] Share Purchase Deed between Vale, BSGR and VBG Guernsey dated 13 March 2015, **C-487**.

872.3.   Also on 13 March 2015, Vale International and the four VBG companies that had issued promissory notes to Vale International entered into an Amendment Agreement so as to amend the terms of the Promissory Notes. As explained in paragraph 848.3 above, these Promissory Notes were issued by various VBG companies to Vale International in relation to the loans that form a significant portion to Vale's damages claim in this arbitration. The Amendment Agreement acknowledges Vale's claim against BSGR for the VBG Debt and preserves that claim in Clause 6.3 as follows.

(a)   The provisions of this Deed shall not affect, shall be without prejudice to and shall be without restriction on the assertion or prosecution of any claims or counter-claims that have been or may in the future be made in the LCIA Arbitration between Vale and BSGR and in particular, shall not preclude Vale from making any claim in the LCIA Arbitration, including but not limited to any claim based on the VBG Debt (including without limitation any claim for damages based on the loss caused by non-repayment of the VBG Debt and interest thereon that has accrued through 29 April 2014 or that would have accrued thereafter).

(b)   For the avoidance of doubt, following completion of the Share Transfer, and the execution of this Deed, none of the fact or content of the parties' negotiations, the Share Transfer, the termination of the Joint Venture Agreement and Shareholder's Agreement, nor the execution of this Deed shall be used as a defence (whether by way of an alleged affirmation, waiver, release or otherwise) by BSGR to any claim against BSGR and its Affiliates in the LCIA Arbitration or to bar, limit or affect in any way any such claim in the LCIA Arbitration (including, without limitation any claim for damages, rescission of the Joint Venture Agreement or Shareholders' Agreement or any other claim whatsoever) and Vale and its Affiliates shall not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than (i) as part of the LCIA Arbitration, in which case the reservation of rights set forth in the preceding paragraph shall be applicable, or (ii) based on the terms of this Deed or the Amended Promissory Notes.[940]

873.   The Tribunal observes that these Agreements were entered into after the commencement of this Arbitration and after Vale had filed its Statement of Case which set out the damages claimed, but before BSGR filed its Statement of Defence. The Agreements acknowledge Vale's right to pursue the damages claimed in this arbitration, despite the fact that some of the funds were provided by Vale International. The damages in this arbitration include – as is specifically acknowledged in these 2015 Agreements – the VBG Debt (or Outstanding Loan Amount, as defined in this Award) which makes up around half of Vale's damages claim. These Agreements did not limit claims in this arbitration to the VBG Debt as is clear from the wording "including but not limited to". Therefore, claims related to costs made by Vale's subsidiaries may also be considered in this arbitration. Section 6.1 of the Framework Agreement required Vale to fund (or procure one of its subsidiaries to fund) a feasibility study in respect of Simandou Blocks 1 and 2. Vale claims this was ultimately funded by Vale GmbH and Vale International in the

---

[940] Amendment Agreement relating to Certain Promissory Notes Issued by the VBG Subsidiaries dated 13 March 2015, Clause 6.3, **C-521**.

amount of USD 85,365,652 and seeks reimbursement, which has not been contested by BSGR. These costs may thus be considered Vale Expenditures without violating the rule against reflective loss.

874. BSGR's decision not to pursue a reflective loss argument aside from in relation to the Swiss employee costs is likely explained by these Agreements, which expressly allow Vale to pursue these heads of loss in this arbitration. The only decision left for the Tribunal is thus whether the costs for the Swiss employee qualify as Vale Expenditures. BSGR has contested only these costs on account of reflective loss while the question here is whether there is a contractual arrangement under which Vale could procure services from a subsidiary. As the Framework Agreement contained many provisions regarding the performance of the Parties' obligations thereunder, including participation of their respective subsidiaries, as already indicated above regarding the Feasibility Study but also as demonstrated by Section 7 providing that each of BSGR and Vale shall, and shall procure that its Affiliates shall, co-operate in good faith to promote the success of BSGR Guinea and develop the Project in the most efficient and expeditious manner possible, the Tribunal also holds that the expenses for the Swiss employee are not barred by the rule against reflective loss. It also notes that this issue is not one of jurisdiction as Vale is not claiming on behalf of Vale International as a non-party to the arbitration but is claiming its own loss which is a substantive issue.

## E. Tribunal's Conclusion

875. The Tribunal concludes as follows.

875.1. BSGR had a duty to plead the issue of reflective loss if it wished to rely on that defence to answer to any part of Vale's claims.

875.2. BSGR raised the issue only in relation to the Swiss employee costs.

875.3. The rule against reflective loss does not prevent Vale from claiming the Swiss employee costs, as the Framework Agreement provided for the participation of subsidiaries in the conduct of the business of the joint venture.

875.4. In any event, BSGR has directly acknowledged the ability of Vale to pursue losses incurred by Vale international or Vale GmbH in this arbitration -- including the Outstanding Loan Amount and Vale Expenditures by entering into the Share Purchase Deed of 13 March 2015.

876. The Tribunal finds that the rule against reflective loss is not applicable in the present circumstances and now turns to consider the relief requested by Vale.

## X.  REMEDIES

877.  The Tribunal concluded at the end of Section IX that Vale is not precluded by the rule against reflective loss to pursue any of its heads of damages. The next task for the Tribunal is to determine the remedies to which Vale is entitled. But before the Tribunal addresses this matter, there is an antecedent question of cumulative remedies which was raised by BSGR in its Statement of Defence. This is an important issue which warrants the Tribunal's attention before considering each remedy claimed by Vale.

### A.  Cumulative remedies

#### 1.  Chronological history of pleadings

878.  In its Request for Arbitration, Vale requested the Tribunal to grant the following relief.

> Relief for Fraudulent Misrepresentation
> a. Rescission of the Framework Agreement and the Shareholders' Agreement;
> b. Damages in the sum of approximately $1.25 billion for fraudulent misrepresentation in respect of the misrepresentations set forth in Section III.C, above, of whatever nature in an amount to be determined in the course of this arbitration, as well as interest on such sum at an appropriate rate;
>
> and/or
>
> Relief for Frustration
> c. A declaration that the Framework Agreement and Shareholders' Agreement are discharged by frustration;
> d. Recovery of monies paid by Vale under the Framework Agreement and Shareholders' Agreement, as well as interest on such sum at an appropriate rate;
>
> and/or
>
> Relief for Breach of Warranty
> e. An award of damages for breach of contract in respect of all losses and costs caused to Vale in respect of the breaches set forth in Section III.D, above, of whatever nature in an amount to be determined in the course of this arbitration, as well as interest on such sum at an appropriate rate;[941]

879.  In its Statement of Case, Vale made the same requests, albeit in a slightly different order.

> Relief for fraudulent misrepresentation
> a. Rescission of the Framework Agreement and the Shareholders' Agreement; and
> b. Damages in the sum of approximately USD 1.45 billion for fraudulent misrepresentation in respect of the misrepresentations, of whatever nature in an amount to be determined in the course of this arbitration, as well as interest on such sum at an appropriate rate; or
>
> Relief for breach of warranty
> c. An award of damages for breach of contract in respect of all losses and costs caused to Vale in respect of the breaches, of approximately USD 1.45 billion, as well as interest on such sum at an appropriate rate; or
>
> Relief for frustration

---

[941] Vale's Request for Arbitration, paragraph 49.

> d. A declaration that the Framework Agreement and Shareholders' Agreement are discharged by frustration; and
>
> e. Recovery of approximately USD 1.45 billion paid by Vale under the Framework Agreement and Shareholders' Agreement, as well as interest on such sum at an appropriate rate.[942]

880. In its Statement of Defence, BSGR argued that "[a] claimant cannot obtain rescission or an award of damages in deceit and an award of damages for breach of contract: he must elect."[943] To support BSGR's argument, BSGR cited two excerpts from *Misrepresentation, Mistake and Non-Disclosure*.

880.1. Paragraph 5-04 states: "it will generally not be possible for [a claimant] to obtain an award of damages in deceit concurrently with an award of damages for breach of contract: although his claim may be made in the alternative, in the end he must elect which basis of loss to assert."[944]

880.2. Paragraph 2-13 states: "Rescission cannot be awarded with any remedy which presupposes that the contract remains in place beyond its formation: damages for breach of contract cannot therefore be awarded if the contract is rescinded, since the obligation to pay damages under the contract requires the continued existence of the contract".[945]

881. In its Statement of Reply, Vale responded that:

> Contrary to BSGR's suggestion, it does not seek cumulative remedies, but remedies that are alternative to each other. BSGR's assertion that 'Vale cannot obtain rescission or an award of damages in deceit and an award of damages for breach of contract' is therefore wholly misguided. Vale's entitlement to be awarded lost expenditures totalling USD 1.45 billion, plus interest, arises under each and every one of the causes of actions Vale asserts in these proceedings. It is therefore only to the extent that Vale is not awarded the USD 1.45 billion it claims under the tort of deceit that Vale claims USD 1.45 billion as a result of BSGR's breach of warranty.[946]

882. Vale's prayers for relief in its Statement of Reply are substantially in the same form as its prayers in its Statement of Case.[947] As indicated in paragraph 296 above, this is also how Vale explained its prayers for relief at the September 2016 Hearing in answer to a question of the Chairman of the Tribunal.

## 2. Tribunal's decision

883. The Tribunal agrees with BSGR that the remedies of rescission and damages for deceit on the one hand and the remedy of damages for breach of warranties on the other hand are alternative and inconsistent remedies which cannot both be awarded to Vale, even if Vale limits its claim under breach of warranties to those sums which it is unable to claim

---

[942] Vale's Statement of Case, paragraph 333.
[943] Paragraph 254 of BSGR's Statement of Defence
[944] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [5-04], **RL-37**.
[945] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [2-13], **RL-37**.
[946] Vale's Statement of Reply, paragraph 1022. Vale's Pre-Hearing Written Submissions, paragraph 379.
[947] Vale's Statement of Reply, paragraph 1097.

under deceit. To understand why this is the case, there needs to be a clear understanding of the concept of rescission and the distinct measures of damages which apply to deceit and contractual breaches.

884. Rescission refers to the process of extinguishing the contract *ab initio* so as to impose the obligation on each party to make restitution as regards assets which he had received from the other party. The objective of rescission is to restore the parties to the *status quo ante*, i.e. their original positions before their entering into the contract as regards their rights and obligations under the contract. Once a contract is rescinded, the contract is treated as never having come into existence. The concept of rescission is further elaborated on in paragraphs 896–899 below.

885. The function of damages for fraudulent misrepresentation is to compensate the claimant for his *reliance loss*. In other words, the function is to place the claimant in the position he would have been in had the defendant not made the fraudulent misrepresentation in the first place, and had the claimant not entered into the contract in reliance on that fraudulent misrepresentation. For this simple reason, the primary method of measuring damages for fraudulent misrepresentation is to calculate the total sum of the claimant's expenditures which he incurred *in reliance on the fraudulent representation.* The measure of damages in deceit is further elaborated on in paragraphs 926–928 below.

886. The function of damages for contractual breaches is to compensate the claimant for his *expectation loss*. Put simply, the function is to place the claimant in the position he would have been in *had the contract been performed*. In line with this function, English law permits the claimant to calculate damages for breach of contract in one of two primary ways. The first is to calculate the value of the benefits which the claimant would have gained had the contractual term in question been performed. This is a true measurement of the claimant's expectation loss. The second is to calculate the expenditures incurred by the claimant in reliance on his expectation of the defendant's fulfilment of the contractual term in question, *subject to the limit that* the claimant is not allowed to claim expenditures beyond such value which would *place the claimant in a better position than if the contract had been performed*. This is a measurement of the claimant's reliance loss, which the law permits the claimant to claim in acknowledgement of the evidentiary difficulties which claimants sometimes face in proving expectation losses, but on which the law imposes the limitation that the award cannot place the claimant in a better position than if the contract had been performed, so as to uphold the basic principle that contractual damages are purposed to compensate expectation losses and nothing more.

887. The consequence of the above is twofold.

887.1. It is not possible to award rescission on the one hand and contractual damages on the other. The Tribunal agrees with Cartwright's explanation that "Rescission cannot be awarded with any remedy which presupposes that the contract remains in place beyond its formation: damages for breach of contract cannot therefore be awarded if the contract is rescinded, since the obligation to pay damages under the contract requires the continued existence of the contract".[948]

---

[948] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [2-13], **RL-37**.

887.2.   Even if rescission is not awarded, it is not possible to award damages for deceit and then award contractual damages for those parts of the claim which were unsuccessful under deceit. Cartwright explains that "Damages on inconsistent measures cannot normally be awarded together, and so an award of both contract measure and tort measure damages would be impossible, since it would give the claimant both his financial equivalent of performance, and at the same time a financial release from the transaction which he entered in reliance on the misrepresentation."[949] This is why the House of Lords cited *Treitel* in *Smith New Court Securities Ltd. v Citibank N.A.* [1997] AC 254, 282, who advised that a claimant should pursue the remedy he viewed to be most advantageous to him financially, which in turn depended on whether or not the bargain was good: "If the plaintiff's bargain would have been a bad one, even on the assumption that the representation was true, he will do best under the tortious measure. If, on the assumption that the representation was true, his bargain would have been a good one, he will do best under the first contractual measure (under which he may recover something even if the actual value of what he has recovered is greater than the price)."[950]

888.   The situation is different in relation to rescission on the one hand and damages for deceit on the other. Here, the two remedies are consistent, because they both function to put the claimant in the position he would have been in had he not entered into the contract. In fact, it is quite common for claimants to seek rescission and to supplement that with damages to cover all other wasted expenditures which would not be covered by rescission. The Parties acknowledge that a successful claim in deceit entitles the claimant to rescission, damages or both.[951]

889.   Vale is no doubt perfectly entitled to present one contractual cause of action and another tortious cause of action and to state its order of preference, so that if one cause of action fails, the claimant will still have another cause of action to fall back on which the Tribunal will have the opportunity to determine. But if it turns out that both causes of action succeed, Vale will not be entitled to ask the Tribunal to award damages for both causes of action in full, because that will give rise to double recovery. Even if Vale only seeks contractual damages in respect of those remaining parts of the claim which are not successful under the tortious cause of action, Vale is not entitled to do so because, even though there is no double recovery, the remedies are still inconsistent in view of the fact that the function of damages for contract and damages for deceit are fundamentally at odds with each other, one being to put the claimant in the position he would have been in had the contract been performed, and another to put the claimant in the position he would have been in had the tort not been committed and the claimant not entered into the contract. For this reason, Vale is obliged to elect between the remedies for tort and contract. It cannot split its claim to ask for both.

890.   This leads the Tribunal to the next question: has Vale made that election in this arbitration? Having perused the Parties' pleadings and submissions, the Tribunal finds that the answer is yes. Vale has consistently taken the position in this arbitration that it is

---

[949] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [2-13], **RL-37**.
[950] *Smith New Court Securities Ltd. v Citibank N.A.* [1997] AC 254, 282, **RL-126**.
[951] Vale's Statement of Case, paragraphs 287 – 293; BSGR's Statement of Defence, paragraphs 254 – 255.

seeking rescission and damages for tort as its primary claim in its prayers for relief. When BSGR pointed out in its Statement of Defence that "[a] claimant cannot obtain rescission or an award of damages in deceit and an award of damages for breach of contract",[952] Vale clarified that it is "only to the extent that Vale is not awarded the USD 1.45 billion it claims under the tort of deceit that Vale claims USD 1.45 billion as a result of BSGR's breach of warranty."[953] It is therefore clear that Vale has elected the remedies of rescission and damages for deceit as its primary prayer for relief as confirmed in paragraph 296 above.

891. In conclusion, the remedies for fraudulent misrepresentation on the one hand and the remedy of damages for breach of contract on the other hand are inconsistent and it will not be possible for Vale to seek both remedies. This is even if Vale limits its claim to contractual damages to sums which Vale is not successful in claiming under deceit. Vale is required to make an election, and a review of Vale's pleadings shows that Vale has consistently elected the option of remedies for deceit as its primary prayer for relief. The Tribunal will therefore constrain its analysis to the remedies for deceit. It has not been requested and does not see a reason to analyse the remedies for breach of warranties.

## B. Remedies for Fraudulent Misrepresentation

892. A successful claim for fraudulent misrepresentation will entitle the claimant to (1) rescission, (2) damages or (3) both. The Parties are agreed that English law entitles the claimant to any of these three options.[954]

893. In this arbitration, Vale has elected the third option by seeking rescission and damages.

893.1. Vale seeks <u>rescission</u> of the Joint Venture Agreements.[955] Vale claims rescission will also enable Vale to "obtain from BSGR restitution of the disbursements and expenditures made thereunder, totalling [**USD 1,446,618,523**]".[956]

893.2. Vale seeks <u>damages</u> for losses suffered as a result of BSGR's deceit.[957] According to Vale's quantification, Vale has suffered and is entitled to damages of **USD 1,446,618,523**.

894. To recall, the claimed sum of **USD 1,446,618,523** (which Vale seeks under rescission and damages in the alternative) consists of:

894.1. the Initial Consideration paid by Vale International to BSGR on 30 April 2010, totalling **USD 500,000,000**;[958]

894.2. the Outstanding Loan Amount of the Loan which Vale International lent to BSGR Guinea under the promissory notes from 2010 to 2013, totalling **USD**

---

[952] BSGR's Statement of Defence, paragraph 254.
[953] Vale's Statement of Reply, paragraph 1022.
[954] Vale's Statement of Case, paragraphs 287–293; BSGR's Statement of Defence, paragraphs 254–255.
[955] Vale's Statement of Case, paragraphs 287–289.
[956] Vale's Statement of Reply, paragraph 941; Vale's Pre-Hearing Written Submissions, paragraph 325.
[957] Vale's Statement of Case, paragraphs 290–293.
[958] Statement of Reply, paragraph 935(a); Oxera Report, paragraphs 52-56.

**780,734,781** (comprising the outstanding principal sum of USD 581,197,104 and the interest sum of USD 199,537,678 accrued up to 29 April 2014);

894.3.  the Feasibility Study Funding, i.e. the expenditures incurred by Vale International and Vale GmbH [959] in connection with the preparation of the Simandou Feasibility Study from 2010 to 2015, totalling **USD 85,365,652;**[960] and

894.4.  Vale's Internal Costs, i.e. the personnel, travel, services, and other costs incurred by Vale to support the joint venture's operations outside of Guinea from 2010 to 2013, totalling **USD 80,518,090.**[961]

895.  Vale's prayers for rescission and damages will be considered in turn.

### 1.  Rescission

*General principles*

896.  The Tribunal begins its analysis by laying down the concept of rescission and the general principles that govern rescission, as informed by the authorities submitted by the Parties, so as to provide the context within which the Parties' arguments are taking place.

897.  If the defect is fraudulent misrepresentation which affects the innocent party's consent and thus the formation of the contract, the defect entitles the innocent party to extinguish the contract *ab initio*, obliging each party to return property which it had received from the other party. This is known as rescission, and its purpose is to restore the parties to the *status quo ante* as regards the rights and obligations which were created by the contract. By contrast, if the defect only relates to the performance of the contract, such as breach of contract or frustration, then the victim party is only entitled to terminate *de futuro*, so that the parties are only absolved of their unaccrued, executory obligations under the contract, and rights and obligations which have unconditionally accrued prior to termination remain enforceable. This is known as termination, and it is a distinct concept from rescission.

898.  Within the field of rescission, there are two forms of rescission: common law and equitable rescission. The chief distinction between the two forms is the process by which rescission takes place. Common law rescission takes place upon the claimant's election to rescind. The role of the tribunal would only be to pronounce upon the effectiveness of that election and to give effect to its consequences by awarding judgment on claims and cross-claims for the restitution of benefits that have passed under the contract. By contrast, equitable rescission takes place by way of a tribunal's order. A party would ask the tribunal to order rescission, and (if satisfied) the tribunal would make the necessary orders to implement the rescission, and typically on condition that the requesting party make counter restitution for any benefits he received from the other party under the contract.

899.  A common bar that applies to both forms of rescission is "*restitutio in integrum* impossible*", the burden of proof of which falls on the defendant. However, the way in

---

[959] Transcript, Merits Hearing, Day 1, p. 201, lines 24-25 and p. 202, lines 1–4; Transcript, Merits Hearing, Day 3, p. 86, lines 3–18 and p. 91, lines 6–13.
[960] Statement of Reply, paragraph 935(c); Oxera Report, paragraph 8.
[961] Statement of Case, paragraph 128; Oxera Report, paragraphs 104-130.

which this bar is applied differs between the two forms. Common law rescission requires it to be possible for the parties to be restored to the exact same position they were in before the contract was made, otherwise the claimant's election to rescind is ineffective. By contrast, equity's concern is to achieve a practically just result, so equitable rescission only requires it to be possible to place the parties in as good a position as they were in before (i.e. substantial *restitutio in integrum*). The tribunal is empowered to achieve this result by directing accounts to be taken, balances to be struck and adjustments to be made, all of which are impossible at common law. For example, deterioration of an asset which the claimant had received from the defendant would bar common law rescission but not equitable rescission because the tribunal is permitted to order compensation by allowance. An equitable allowance may be accorded to the defendant for its work and skill if the tribunal is of the view that this would do substantial justice. This difference in application means in practice that the bar of *restitutio in integrum* impossible is easier to establish for common law rescission than for equitable rescission.

### *Vale's claim*

900. Since its Request for Arbitration, Vale has consistently requested the Tribunal to "grant" rescission: see paragraph 878-882 of this Award.

901. However, as noted above, after Vale filed its Statement of Case on 30 January 2015, an unusual turn of events occurred on 13 March 2015 when this arbitration was active, and which is relevant to the issue of rescission. Vale, BSGR and VBG Guernsey entered into a Share Purchase Deed[962] under which they agreed to two important matters.

902. First, they agreed that BSGR would "purchase" the 51% shares in VBG Guernsey for USD 1.

    902.1. Clause 2 provides: "At Completion, on the terms and subject to the conditions of this Deed, Vale shall procure the sale of the Shares by Vale GmbH, and BSGR shall buy the Shares free from all Encumbrances."

    902.2. Clause 3 provides: "The purchase price for the Shares and for the mutual waivers referred to herein is USD 1.00, which Vale acknowledges has been paid by BSGR in cash on the date of this Deed."

    902.3. Clause 4 contains the usual terms for completion, including the delivery of a duly executed instrument of transfer for the shares and payment of USD 1.00 to Vale in cash on completion date.

903. Second, they agreed to "terminate" the Joint Venture Agreements, subject to a number of conditions. The full text of Clause 6 is set out below.

    6.    **CLAIMS BETWEEN VALE AND BSGR**

        **Termination of Agreements**

        6.1    Subject to Clause 6.2 and 6.3, the Vale Investment Agreements[963] (and all rights and obligations thereunder, including, for the avoidance of doubt,

---

[962] Share Purchase Deed between Vale, BSGR and VBG Guernsey dated 13 March 2015, **C-487**.
[963] This refers to the Framework Agreement and the SHA: Section 1.1 of the Share Purchase Deed.

any rights which are stated as surviving termination) shall terminate with immediate effect upon Completion; provided, however, that (as contemplated by Section 6.2) nothing in this Section 6.1 shall be deemed to affect any claims between Vale and BSGR that have been or may be brought in the LCIA Arbitration in relation to events that occurred prior to the Completion Date.

**Claims between Vale and BSGR**

6.2     The provisions of the Vale Exit Agreements[964] shall not affect, shall be without prejudice to and shall be without restriction on the assertion or prosecution of any claims or counter-claims that have been or may in the future be made in the LCIA Arbitration between Vale and BSGR and in particular, shall not preclude Vale from making any claim in the LCIA Arbitration, including but not limited to any claim based on:

(a)     the VBG Debt (including any claim for damages based on the loss caused by the non-repayment of VBG Debt and interest thereon that has accrued through 29 April 2014 or that would have, notwithstanding the Vale Debt Amendment Agreement, accrued thereafter);

(b)     the Vale Expenditures; and

(c)     the payment made by Vale to BSGR pursuant to the Vale Investment Agreements.[965]

6.3     For the avoidance of doubt, following Completion: (i) none of the fact or content of the parties' negotiations, nor the transactions contemplated by the Vale Exit Agreements shall be used as a defence (whether by way of an alleged affirmation, waiver, release or otherwise) by BSGR to any claim against BSGR and its Affiliates in the LCIA Arbitration or to bar, limit or affect in any way any such claim in the LCIA Arbitration (including, without limitation any claim for damages, rescission of the Vale Investment Agreements or any other claim whatsoever); and (ii) Vale and its Affiliates shall not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than as part of the LCIA Arbitration, in which case the reservation of rights set forth in Clause 6.2 shall be applicable, or based on the terms of the Vale Debt Amendment Agreement.

904.    At the February 2017 Hearing, the following exchange took place on Day 1.

MR HWANG:      I am not sure who should answer this, but Vale is claiming damages -- sorry. First of all, under the misrepresentation claim, Vale is claiming that the relevant agreements be rescinded; does that mean to say it has not been rescinded so far?

MR KELLY:        It is slightly complicated. The position was –

MR HWANG:      It is not really explained in your Statement of Claim, so I am a bit puzzled by it.

MR KELLY:        Yes, the position -- because in the Statement of Claim they had not been rescinded as at that date. What subsequently

---

[964] This refers to the Share Purchase Deed (**C-487**) and the Vale Debt Amendment Agreement (**C-521**): Section 1.1 of the Share Purchase Deed.
[965] Share Purchase Deed, Clauses 6.1 –6.3, **C-487**.

happened was that Vale returned the 51% shareholding to BSGR for a nominal consideration in March 2015, I think it was. 29th March 2015. At that point, the parties agreed that transaction would be entirely without prejudice to their positions in this arbitration.

MR HWANG: Except then there is no rescission, is there, because the passing of Title has been reversed?

MR KELLY: Well, that's why we disagree with their proposition that you couldn't be restored to your previous positions, because we say that's exactly what has happened. The rescission goes to whether the contract still had any force prior to that transaction, because the transaction, as I say, was without prejudice to that.

CHAIRMAN: Are you still seeking a declaration of rescission?

MR KELLY: **Well, what we do seek is relief to the extent that they continue to claim it from any further obligations under the transaction documents and so if there's a residual life in those documents -- in those contracts from before March 2015, we seek.**

MR HWANG: But do you have an amended statement of relief somewhere?

MR KELLY: We don't, but we can certainly -- I think we have covered or alluded to --

CHAIRMAN: What does your reply say, at the end of the prayer for relief?

MR KELLY: I think it is covered in our pre-hearing brief from recollection, but I can check that.

MR HWANG: Moving on, then your contractual claim is just a pure claim for damages, as a result of the breach of warranty. Again, you don't claim that the contract has been repudiated and therefore terminated. So neither have you rescinded the misrepresentation, nor have you terminated for breach. So, theoretically, you are having an existing contract. All you are asking for is damages. When you calculate damages and the contract is still alive, you know, it is calculated on a different basis. So we need to know whether or not your client's position is that the contract, for whatever reason, is now at an end. Therefore you are totalling up your entire loss, as opposed to the losses suffered so far without prejudice to any further claims for losses.

MR KELLY: The former is our position. The contract is dead.

MR HWANG: You have to rationalise that, I think, for us. On what basis do you say the contract has come to an end?

CHAIRMAN: Doesn't the reply say in case of fraudulent misrepresentation, you can request either rescission or damages or both, and that you are seeking both.

MR KELLY: Yes, it does.

MR HWANG: Yes, but --

253

CHAIRMAN: You are seeking declaration of rescission and damages.

MR HWANG: For misrepresentation is either fraud or nothing; right? You are not making any intermediate claim for negligent misrepresentation.

MR KELLY: Correct.[966]

905.   On Day 3 of the February 2017 Hearing, the following exchange took place:

MR KELLY: I am just conscious of time, Mr Chairman. I mentioned that I would just like to finish off on rescission. I can put this fairly briefly. There are documents but I don't think I need to trouble the Tribunal with them.

The reason that we claim rescission is that there is a five-year period at present which -- during which the Framework Agreement and the Shareholders' Agreement subsisted. That five-year period went from 30 April 2010 to 29 April 2015.

In 2015 Vale and BSGR agreed to terminate the Shareholders' Agreement and the Framework Agreement. They agreed to do so for their own perfectly sensible, self-interested reasons.

On BSGR's side, BSGR wished to be able to pursue the Government of Guinea, which it needed the Joint Venture company to do in its ICSID arbitration. It could not do so as a 49% shareholder, because Vale did not want to pursue the Government of Guinea.

On Vale's side, **Vale -- for reasons that we would say are obvious -- did not want to be associated with BSGR any longer as a matter of principle and, as a matter of practice, continued to be responsible for all the operating costs and everything you have heard about for as long as it was the 51% shareholder, so the parties agreed to tear up the agreements.** They did so expressly without prejudice to both parties' positions in this arbitration. Perhaps it's an abundance of caution and perhaps BSGR would say, "Well, we are forward-looking. We are not going to go back and worry about that five-year period", but **where that leaves us is with a series of contracts and obligations that, certainly in this arbitration, have been argued to give rise to continuing obligations on the part of Vale, hard obligation in some cases. There's a claim for several hundred million dollars, $680 million I believe, from BSGR in the counterclaim to Vale, which is one of the future payments. Also, claims, as we know, in the counterclaim based on what we would say are softer obligations, such as the provision that requires both parties to promote best interests of VBG and cooperate in good faith.**

**So the reason we seek rescission is because, as we are entitled to under the remedies for fraud, that will be rescission ab initio and we would never want there to be any suggest that there were -- still less there are or may in the future be -- obligations on the part of Vale S.A. under**

---

[966] Transcript, Merits Hearing, Day 1, p. 197, line 2 -- p. 199, line 22 (emphasis added).

> **the Framework Agreement or Shareholders' Agreement.** I wouldn't propose to say anything --
>
> MR HWANG: Is there a formal defence from them on this point?
>
> MR KELLY: Sorry?
>
> MR HWANG: What is defence of BSGR to the specific relief of rescission?
>
> MR KELLY: They have two defences. The first defence is that the parties cannot be restored restitutio in integrum. We say that simply does not fly, because what we are doing, and what we have done, is we have given back to them the very same shares that they sold to us. We sold back to them the 51%. They seek to counter that –
>
> MR HWANG: There is a difference between giving and selling; what is it? Did you give or did you sell?
>
> MR KELLY: We sold for USD 1. We would have given it back if there had not been a consideration issue underneath, but as it was I think we received a dollar for it -- probably more than it was worth, to be honest. The second point that they make is that they would be unjustifiably worse off as a result of our giving or conveying back to them these shares. We say that also does not fly for the very obvious reason that, under this hypothesis, the reason they are in an unjustifiably worse position -- if they are -- is entirely their own misconduct. Sorry, if I could just finish on that, Dr Hwang. We would not even necessarily say they are in an unjustifiably worse position, because they sold us an asset that was inherently flawed at the time. We are simply returning that asset to them and asking for all our money back.
>
> MR HWANG: They have not raised the issue of lapse of time?
>
> MR KELLY: No.[967]

906. The Tribunal takes the view that it is not the Tribunal's business to inquire into the strategic reasons why Vale has continued seeking rescission after the Share Purchase Deed was concluded on 13 March 2015 which terminated the Framework Agreement and the SHA. The Tribunal takes the position that its only task is to determine whether Vale is entitled to rescission (as requested by Vale) in view of the fact that the Share Purchase Deed did not prejudice Vale's position in the present arbitration and the remedies it was seeking herein.

907. The Tribunal understands Vale's position to be that it is seeking *equitable* rescission, based on the wording of Vale's pleadings. Vale has repeatedly requested the Tribunal to "grant" rescission and has not asked the Tribunal to declare the effectiveness of any prior election by Vale to rescind the Joint Venture Agreements. On this footing, the Tribunal will apply the principles which are applicable to equitable rescission.

908. Vale is *prima facie* entitled to equitable rescission because the Tribunal has found that BSGR is liable for fraudulent misrepresentation (which is a ground for equitable rescission). The next question is whether BSGR has satisfied its burden to prove one of

---

[967] Transcript, Merits Hearing, Day 3, p. 38, line 17 – p. 41, line 24 (emphasis added).

the bars to rescission. In this regard, BSGR argues that the bar of *restitutio in integrum* impossible applies in this case.[968]

909.    It has already been noted at paragraph 899 above that the way in which this bar is applied differs between common law rescission and equitable rescission. But insofar as equitable rescission is concerned, it is accepted that there are at least two ways to establish this bar. The first is to show that the asset has been altered to such an extent as to have changed in nature. The second is to show that the defendant would be unjustifiably prejudiced upon rescission. Both of these grounds are now relied upon by BSGR.[969] The Tribunal will deal with each ground in turn.

### *The "alteration of nature of asset" argument*

910.    BSGR cites at least three authorities with respect to alteration of nature of assets:

910.1.    *Misrepresentation, Mistake and Non-Disclosure*: "The most common circumstances in which the courts have found rescission barred are where restitution is impossible because the property cannot be returned—either at all, or because even though it appears still possible to return the property, its essential character has changed since the time it was transferred under the contract."[970]

910.2.    *Chitty on Contracts*: "it is impossible to make substantial restitution of property transferred under the contract if it has altered its character."[971]

910.3.    *Halsbury's Laws of England*: "If the representor can show that the representee received under the contract anything which, whether a thing in possession or a thing in action, was on its acquisition capable of being specifically retransferred, and which the representee has [...] so dealt with as to produce an entire alteration of its physical, commercial or legal character, quality or substance, as distinct from mere depreciation, decay or deterioration in the ordinary course of events, the plea is valid [...]."[972]

911.    BSGR avers that the GoG's cancellation of the mining rights fundamentally altered the nature of the shares in BSGR Guernsey, so that rescission is no longer possible:

> The joint venture project has so fundamentally changed its character that restitutio in integrum is impossible. The joint venture's only asset of worth was the mining rights. This was the very essence of the joint venture, and the reason for both Vale and BSGR participating in it. The cancellation of the mining rights renders the joint venture devoid of purpose, substance and value: it is, effectively, an empty shell. If Vale were to return its shareholding in the joint venture to BSGR, it would be returning something of an entirely different nature to that which was granted to it by BSGR. It is irrefutable that BSGR would be receiving

---

[968] BSGR's Statement of Defence, paragraph 257; BSGR's Statement of Rejoinder, paragraphs 427–428.
[969] BSGR's Statement of Defence, paragraph 257; of BSGR's Rejoinder, paragraphs 427–428.
[970] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [4-57], **RL-37**.
[971] HG Beale (ed), *Chitty on Contracts*, vol 1 (32nd edn, Sweet & Maxwell 2015) [7-125], **RL-33**.
[972] Lord Mackay of Clashfern (ed), *Halsbury's Laws of England*, vol 76 (5th edn, LexisNexis 2013) [829], **RL-79**.

back property in an entirely different condition to that in which he received it. In this situation, rescission is not available.[973]

912. Vale contends that the fact that Vale had already returned to BSGR the shares in BSGR Guernsey shows that *restitutio in integrum* is possible:

> rescission is not impossible: Vale has already returned to BSGR the 51% interest in the joint venture acquired under the [Joint Venture Agreements] and now seeks restitution of all disbursements and expenditures it made under the [Joint Venture Agreements]. BSGR's restitution to Vale of the foregoing sums constitutes *restitutio in integrum*.[974]

913. The Tribunal is not convinced by Vale's argument that the Share Purchase Deed (which returned the shares to BSGR) demonstrates the possibility of restitution as it was without prejudice to the Parties' positions in this arbitration. However, the Tribunal is satisfied that *restitutio in integrum* is possible because the assets in question are simply shares in BSGR Guernsey. The Joint Venture Agreements involve a simple sale of shares in BSGR Guernsey from BSGR to Vale. The loss of the mining rights may affect the *value* of the shareholding, but it does not alter the essential *identity* of the assets at issue, namely as *shares* in BSGR Guernsey. So there has been no fundamental alteration of the character of the shares in BSGR Guernsey which renders *restitutio in integrum* impossible.

914. The cancellation of the mining rights merely leads to the deterioration of the value of the shares, which is not sufficient to show impossibility of rescission. For such situations, the remedy for the defendant is to request for compensation on account of deterioration. But to obtain this remedy, the defendant must show that any such deterioration was due to the fault of the claimant. On the facts, the Tribunal finds that there is no proof that any deterioration of the value of the shares was due to Vale's fault. The Tribunal accordingly concludes that, if rescission is ordered, the Tribunal will not order compensation for such deterioration.

915. The Tribunal finds that the cancellation of the mining rights did not alter the nature of the shares in BSGR Guernsey so as to establish the bar of *restitutio in integrum* impossible.

### *The "unjustifiably worse position" argument*

916. A change of circumstances will only bar equitable rescission if the defendant would be *unjustifiably* prejudiced upon rescission. There is no single test for whether any particular prejudice would be justifiable, and the question is one of degree and each case must be considered on its facts. On the other hand, three factors that are often referred to are (1) the wrongfulness of the defendant's conduct; (2) the extent of any delay on the part of the innocent party in asserting his rights; and (3) the reversibility of the prejudice. In respect of (1), the general principle is that a wrongdoer is not entitled to complain that he would be unjustifiably prejudiced by reason of steps which *he* has taken in reliance on the validity of the contract. In respect of (2), prejudicial changes of circumstances that occur after the innocent party has sufficiently learnt the facts entitle him to rescind will usually bar rescission, even in cases of fraud. Finally, as regards (3), the only changes of circumstances that will bar rescission are those that are irreversible. So if the defendant

---

[973] BSGR's Rejoinder, paragraph 427.
[974] Vale's Pre-Hearing Written Submissions, paragraph 319.

can avoid any detriment by rearranging his affairs or pursuing any course of action, then there is no bar. This is the background of legal principles against which the Parties' arguments below are taking place.

917. BSGR argues that:

> Rescission is also not possible because it would put BSGR in an unjustifiably worse position than it was in before the contracts with Vale were entered into. Like Vale, BSGR has lost an interest in very valuable rights in Simandou, and has lost the substantial amounts spent in obtaining those rights and developing its project. If BSGR were required not only to bear those losses, but to return the amounts Vale paid to it under the contracts in return for a worthless shareholding in a joint venture agreement, with no valuable assets, then BSGR would be in a significantly worse position than it was before the contract was entered into. It would effectively be deprived both of the benefits it obtained under the contract, and of its property before the contract was entered into.[975]

918. Vale denies that restitution would place BSGR in an unjustifiably worse position for the following reasons.

918.1. Rescission would place BSGR in exactly the same position had the Joint Venture Agreements not been entered into, because BSGR had no valid and legal claim to the mining rights it obtained through bribery and corruption in the first place prior to the execution of the Joint Venture Agreements.[976]

918.2. It was BSGR's own corruption which caused the mining rights to be revoked.[977]

918.3. Even if there is no corruption, and BSGR thinks it has been unfairly deprived of the mining rights by the GoG, BSGR has the option to pursue its claim to these rights against the GoG (as it is doing), as would be the case had the Joint Venture Agreements not been executed.[978]

918.4. BSGR cannot set up its own wrong as a reason for the Tribunal not to order relief against it.[979]

919. The Tribunal finds that rescission would not place BSGR in an unjustifiably worse position. BSGR relies on the GoG's revocation to argue that rescission would, but the Tribunal has found that BSGR made fraudulent misrepresentations on bribery, which indicates that the GoG's revocation was justified, and BSGR cannot rely on its own wrongdoing to oppose restitution. Even if BSGR did not commit bribery, and the GoG's revocation had no factual basis, BSGR can pursue its claim to the mining rights against the GoG, so any prejudice arising from restitution would be reversible. Indeed, BSGR has already commenced ICSID proceedings against Guinea for the alleged wrongful revocation of the mining rights.

---

[975] BSGR's Statement of Rejoinder, paragraph 428.
[976] Vale's Pre-Hearing Written Submissions, paragraphs 320–321.
[977] Vale's Pre-Hearing Written Submissions, paragraph 322.
[978] Vale's Pre-Hearing Written Submissions, paragraph 320.
[979] Vale's Pre-Hearing Written Submissions, paragraphs 323-324, citing *Spence v Crawford* [1939] SLT 305, 312, **RL-44**.

### *Conclusion*

920. The Tribunal holds that BSGR has not fulfilled its burden to establish the bar of *restitutio in integrum* impossible, and that Vale is entitled to equitable rescission of the Joint Venture Agreements.

921. In considering the orders to make to achieve *restitutio in integrum*, the Tribunal recalls that the objective of rescission is to place the Parties in their original positions as far as possible by ordering each side to return the benefits it had received from the other side. In this connection, the Tribunal notes that rescission only envisages the return of benefits which one party transferred to the other party, and does not envisage the return of benefits that one party originally transferred to a third party.

922. In this case, Vale claims the return of (1) the Initial Consideration; (2) the Outstanding Loan Amount; (3) the Feasibility Study Funding; and (4) Internal Costs. The Tribunal considers that the first three heads cannot be claimed under rescission, and the Tribunal cannot order BSGR to pay these sums to Vale as part of its rescission order, because they do not involve transfers of money *from Vale* but involved transfers of money *from Vale's subsidiaries*:

    922.1. The Initial Consideration was paid *by Vale International* to BSGR.

    922.2. The principal sum of the Outstanding Loan Amount - under Section 6.3 of the Framework Agreement – was paid by Vale International to VBG Guinea, VBG Guernsey, VBG Liberia and VBG BVI pursuant to an obligation of Vale to lend or procure that a member of its Group so lend.

    922.3. Pursuant to Section 5.1(b) of the Framework Agreement under which Vale was to undertake the Feasibility Study on behalf of VBG, the Feasibility Study Funding was paid *by Vale International and Vale GmbH*, and in any event were *not payments to BSGR*.

923. The Tribunal also considers that the fourth head of Internal Costs cannot be claimed under rescission because, although the Internal Costs were paid by Vale, the recipient of these payments was *not BSGR*.

924. Accordingly, the Tribunal must next consider if these sums can be claimed as damages for fraudulent misrepresentation.

### 2.   Damages

925. Having found that Vale is entitled to equitable rescission, but that such rescission will not entitle Vale to any component of its **USD 1,446,618,523** claim, the Tribunal must now consider Vale's damages claim to determine if Vale is entitled to the various components of its **USD 1,446,618,523** claim as damages for fraudulent misrepresentation. But before the Tribunal delves into its analysis, the Tribunal will first explain how damages are measured for fraudulent misrepresentation.

### *General principles: measure of damages for fraudulent misrepresentation*

926. **Function and measure of damages.** The function of damages for deceit is to compensate the claimant for his *reliance loss*. In other words, the function is to place the

claimant in the position he would have been in had the defendant not committed the fraudulent misrepresentation in the first place, and had the claimant not entered into the contract in reliance on that misrepresentation. For this reason, the primary method for measuring damages for deceit is to calculate <u>the total sum of the claimant's expenditures which he incurred *in reliance on the fraudulent representation*,</u> giving credit for any benefits received by the claimant.

927. **Not subject to remoteness.** The measure of damages is the *total sum* of the claimant's expenditures, which means to say that damages for fraudulent misrepresentation are not subject to the ordinary rules of remoteness for tort. This is why the House of Lords held in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd.* [1997] AC 254, 267 (HL) that the defendant is bound to make reparation for *all* the damage directly flowing from the claimant's reliance on the transaction, and that such damage need not have been foreseeable.[980]

928. **Subject to mitigation.** On the other hand, as accepted by the House of Lords in *Smith New Court*, the measure of damages is subject to the rules of mitigation of losses. There are three such rules. (1) The claimant cannot recover damages for any part of his loss consequent upon the defendant's breach that the claimant could have avoided by taking reasonable steps. (2) If the claimant in fact avoids or mitigates his loss consequent upon the defendant's breach, he cannot recover for such avoided loss, even though the steps he took were more than could be reasonably required of him under (1). (3) Where the claimant incurs loss or expense in the course of taking reasonable steps to mitigate the loss resulting from the defendant's breach, the claimant may recover this further loss or expense from the defendant.

929. The Parties do not disagree over these generally accepted principles of law.[981]

930. The Tribunal will now proceed to analyse Vale's damages claim. First, the Tribunal will examine if Vale's evidence proves that Vale incurred the expenditures which it now claims. If the evidence does so prove, the Tribunal will then address the various legal arguments made by BSGR in relation to Vale's claim for damages.

*Vale's claim*

931. Vale claims that it is entitled to damages of USD 1,446,618,523 for its lost expenditures in the course of the joint venture. The USD 1,446,618,523 claim comprises the same items of (1) Initial Consideration; (2) Outstanding Loan Amount; (3) Simandou Feasibility Study Funding; and (4) Internal Costs, as detailed in paragraph 894 above.

932. The breakdown of the sum of USD 1,446,618,523 is as follows and its four heads will be discussed further below:

932.1. The Initial Consideration paid by Vale International to BSGR on 30 April 2010, totalling USD 500,000,000.

932.2. The Outstanding Loan Amount of the Loan which Vale International lent to BSGR Guinea under the promissory notes from 2010 to 2013, totalling USD

---

[980] *Smith New Court Securities Ltd. v Citibank N.A.* [1997] AC 254, 267, **RL-126**.
[981] Vale's Statement of Case, paragraphs 290–293; BSGR's Statement of Defence, paragraph 260; Vale's Statement of Reply, paragraph 942.

780,734,781 (comprising the outstanding principal sum of USD 581,197,104 and the interest sum of USD 199,537,678 accrued up to 29 April 2014).

932.3. The Feasibility Study Funding, i.e. the expenditures incurred by Vale International and Vale GmbH in connection with the preparation of the Simandou Feasibility Study from 2010 to 2015, totalling USD 85,365,652.

932.4. Vale's Internal Costs, i.e. the personnel, travel, services, and other costs incurred by Vale to support the joint venture's operations outside of Guinea from 2010 to 2013, totalling USD 80,518,090.

933. Pursuant to Section 3(a) of the Framework Agreement, the Initial Consideration of USD 500,000,000 was to be paid at Completion, which took place on 30 April 2010, and records of wire transfers have been submitted at Exhibit C-212. The Tribunal finds that payment of this amount is proven.

934. The second head of damages totalling USD 780,734,781 corresponds to the alleged Outstanding Loan Amount of the Loan which Vale International lent to BSGR Guinea, VBG Logistics and VBG Liberia under the promissory notes from 2010 to 2013. Exhibit C-69 (revised) contains a 111-page document starting with a spreadsheet indicating the promise, the promisor, the date of the promissory note, its currency, the principal amount of the promissory note, the interest accrued until 29 April 2014 and the amount of principal and interest accrued. It also contains the repayments made and the outstanding balance. All promissory notes are issued to Vale International and expressed in USD and confirm the outstanding balance of principal sums of USD 581,197,103.53 (rounded up by Vale to USD 581,197,104) and the interest sum of USD 199,537,677.83 (rounded up by Vale to USD 199,537,678) accrued up to 29 April 2014. The total amount is thus USD 780,734,781.36 (rounded down by Vale to USD 780,734,781). The promisors under the promissory notes are VBG Guinea, VBG Logistics and VBG Liberia, the latter two being Liberian subsidiaries of VBG Guernsey. VBG Logistics was funded by Vale International for the development of the Liberian railway and port and VBG Liberia to explore other potential mineral deposits in Liberia, which in the end never materialised. The promissory notes are attached to the spreadsheet at pages 4–111 of Exhibit C-69 (revised). On the basis of the above, the Tribunal finds that the promissory notes and their amounts have been proven. Whether any of these amounts are to be awarded will be discussed in the following section.

935. The third head of damages is for a total of USD 85,365,652 regarding the Feasibility Study Funding, i.e. the expenditures incurred by Vale International and Vale GmbH in connection with the preparation of the Simandou Feasibility Study from 2010 to 2015. Vale in this respect relies on the expert report of Dr Min Shi of Oxera dated 24 March 2016 filed with its Statement of Reply. Dr Min Shi was examined at the February 2017 Hearing and the Tribunal found her a competent and credible expert. Dr Shi reports in her expert report at paragraphs 96 ff. that she extracted 854 entries from the AP_Guine and Base Exec spreadsheets which record VBG Guinea's expenditures respectively for the period 2010-2013 and for 2014, related to the Simandou Feasibility Study. She reviewed all of these entries with the underlying supporting documents and found that an amount of USD 73,000,000 was verified to be correct and that an amount of USD 12,400,000 regarding 235 entries had no supporting documents which she attributed to documents destroyed as a result of a fire at a Vale facility in Brazil in 2014, documents seized by the GoG in early 2013 or documents located in the Conakry office of BSGR Guinea to which

Vale no longer has access. She then compared the total amounts of Feasibility Study Expenditures with the information related thereto in the information provided to the VBG Guernsey's board of directors on 14 June 2011, 6 September 2011, 19 December 2011, 18 April 2012 and 10 July 2012 (respectively C-440, C-441, C-443, C-444 and C-445). Dr Shi concluded that the Joint Venture's record of expenditures relating to the Simandou Feasibility Study at USD 85.4 million was accurate. On the basis of the full review of all entries claimed by Vale regarding the Feasibility Study and the full review of supporting documents available, the Tribunal considers that an amount of USD 73,000,000 is sufficiently verified and can be accepted as having been spent by Vale on the Feasibility Study. The remainder amounting to USD 12,400,000 are not supported by documentary evidence, and Vale's explanation is that they were either destroyed by a fire in Brazil in 2014, seized by the GoG in early 2013, or are located in the Conakry office to which Vale no longer has access. Nonetheless, the Tribunal accepts the USD 12,400,000 because this was a sum which was reported to VBG Guernsey's board of directors. Hence, the Tribunal accepts a total amount of USD 85,365,652 regarding the Feasibility Study Funding as Vale Expenditures. This amount, however, is still to be tested against BSGR's defences as further elaborated below.

936.    The fourth head of damages is for a total of USD 80,518,090 allegedly representing Vale's Internal Costs, i.e. the personnel, travel, services, and other costs incurred by Vale to support VBG Guernsey's operations outside of Guinea from 2010 to 2013. These costs relate to (1) Vale's personnel working in Brazil on the project (including salaries, incentives, hardship and mobility premiums, social security taxes, etc.), (2) Vale's office in Belo Horizonte, Brazil, where teams not working on the ground in Guinea, such the Procurement and Engineering teams, were based, (3) services contracted in Brazil on behalf of the project, and (4) travel expenses.[982] Once again, Vale relies on the expert report of Dr Min Shi of Oxera. Dr Shi reports in her expert report at paragraphs 104 ff. that Vale had created a special cost accountancy centre to which all expenditures related to the joint venture project were charged. These costs were USD 44.8 million for personnel, USD 20.2 million for travel, USD 15 million for services and USD 0.5 million for other expenses. She also reported that there were no invoices for personnel charges, or travel expenses using Vale's own aircrafts for the period 2011–2012 at USD 15.4 million. Further, receipts for the remainder of travel expenses including travel incidents at USD 4.8 million had not been kept. As to costs for services, she concluded that these costs – totalling 16,147 entries in the joint venture's records – were consistent with or lower than the amounts in the supporting documents. She could not verify or cross check costs categorised as "Other".

937.    On the basis of the above evidence, the Tribunal accepts the amounts for services as sufficiently supported by underlying documents.

938.    It also accepts the amounts for personnel on the basis of Dr Shi's review of the number of employees who had worked on the Simandou project for each month between 2010 and 2014, the position of each employee and the midpoint of monthly salaries for each category of employee and the social security contributions payable on these amounts.

939.    It also accepts USD 15.4 million as the costs of the use of Vale's aircraft in 2011–2012 as Dr Shi reviewed these expenses regarding transporting 2,834 passengers at an average cost of USD 5,425 per flight from Belo Horizonte to Guinea compared to an average

---

[982] Vale's Statement of Case, paragraph 128.

business class ticket of USD 4,000. The Tribunal considers that these expenses are sufficiently substantiated and reasonable. Although no supporting documents are available for other travel expenses, the Tribunal is prepared to accept this amount of USD 4.8 million as reasonable, considering that the international costs were reported to the VBG Guernsey's board of directors without apparent objection.[983]

940. On the other hand, the Tribunal cannot accept other expenses at USD 0.5 million as no explanation has been given as to the nature of these expenses and Dr Shi also could not verify them.

941. Having found that the evidence proves that Vale incurred the expenditures it claims, save for the USD 0.5 million categorized as other expenditures, the Tribunal must next address BSGR's legal arguments in relation to Vale's damages claim. BSGR makes one general argument against Vale's claim and several specific arguments against individual items in Vale's claim for damages. The Tribunal will first deal with BSGR's general argument before it deals with the specific arguments.

### *General argument: Vale's losses were directly caused by BSGR*

942. BSGR's general argument is that, even if BSGR committed fraudulent misrepresentation, Vale's losses were not directly caused by BSGR's fraudulent misrepresentation.[984] BSGR argues that any losses suffered by Vale were in fact caused by:[985]

942.1. The GoG's cancellation of the mining rights, which would have happened irrespective of whether BSGR had engaged in bribery; or

942.2. The slump in the value of iron ore, rendering the project unprofitable.

943. Vale responds with the following points.

943.1. First, the involvement or intrusion by the GoG in State-granted and supervised mining licences is *not* a separate or unrelated feature of the transaction between Vale and BSGR.[986]

943.2. Second, although BSGR claims to have been the victim of improper conduct, this cannot relieve BSGR of its liability to Vale, otherwise BSGR would be able to keep Vale's USD 500 million, avoid any responsibility for the USD 1 billion invested by Vale and walk away having made a windfall from its own fraudulent conduct.[987]

---

[983] VBG Presentation to the Board, June 2011, **C-440**; VBG Presentation to the Board, September 2011, **C-441**; VBG Presentation to the Board, October 2011, **C-442**; VBG Presentation to the Board, December 2011, **C-443**; VBG Presentation to the Board, April 2012, **C-444**; VBG Presentation to the Board, July 2012, **C-445**; VBG Reporting Pack, October 2011, **C-446**; VBG Reporting Pack, December 2011, **C-447**; VBG Reporting Pack, April 2012, **C-448**; VBG Reporting Pack, July 2012, **C-449**.
[984] BSGR's Statement of Rejoinder, paragraphs 429–437.
[985] BSGR's Statement of Rejoinder, paragraph 436.
[986] Vale's Pre-Hearing Written Submissions, paragraph 336.
[987] Vale's Pre-Hearing Written Submissions, paragraphs 338–339.

943.3. Third, BSGR's position is offensive to public policy under English law,[988] which dictates that a tribunal should be flexible to ensure that the victim should obtain full compensation for the wrong suffered.

944. As the Tribunal has explained at paragraph 926 of this Award, the claimant is entitled to all expenditures which he had incurred *in reliance* on the defendant's representation. So when the question arises as to the causative link between the tort of deceit and the losses suffered, the law only asks one question: did the claimant incur those losses *in reliance* on the defendant's representation? Once it is shown that the claimant did so rely, the causative link is established, and the loss is taken to have directly flowed from the deceit. BSGR may claim that there was a slump in iron ore value, or an intervening act in the form of the GoG's revocation of the mining rights, but these arguments are wholly immaterial. All that matters is whether Vale incurred these losses *in reliance* on BSGR's deceit for the purpose of establishing the causative link. Framed as such, this must be answered in the affirmative. The Tribunal has found at paragraph 742 above that Vale relied on BSGR's deceit to enter into the Framework Agreement and the SHA and suffered loss as a result.

### *Specific arguments relating to individual items in Vale's breakdown*

945. In the context of damages, BSGR makes several arguments contesting specific items in Vale's breakdown.

#### *i. Feasibility Study Funding*

946. BSGR argues that "Vale has not proven that it cannot get any value from the Feasibility Study and the other expenditures by the joint venture project, if it were to obtain rights to the Simandou Concession in the future or if it were to obtain other mining rights in Guinea".[989] In doing so, BSGR notes that Vale has provided a witness statement from Saad attesting to the uselessness of the Feasibility Study, but says that Saad's assertions in his testimony are "self-serving and unsupported".

947. Vale argues that BSGR's contention is wholly speculative because it rests upon what Vale might or might not do in the future and should fail for this reason alone.[990] Further, Vale points out that, since BSGR now wholly owns the former joint venture, the benefits of any money spent on the joint venture now vest solely in BSGR. Lastly, Vale stands by Saad's testimony that the Simandou Feasibility Study has no value because it is out-of-date and would need to be revised and reassessed before it can be used by any future-rights-holder.

948. The Tribunal agrees with Vale that there is no remaining value in the Feasibility Study for Vale after the termination of the Framework Agreement and the SHA. The record does not provide any clue as to what Vale might do in relation to the Concession Areas in respect of which the mining rights were revoked. The Tribunal therefore rejects BSGR's argument as unsubstantiated and conjectural.

---

[988] Vale's Pre-Hearing Written Submissions, paragraphs 340–343.
[989] BSGR's Statement of Rejoinder, paragraph 454.
[990] Vale's Pre-Hearing Written Submissions, paragraph 346.

### ii. Vale's Internal Costs

949. BSGR objects to Vale's claim for personnel, travel, services and other costs which Vale incurred in Brazil in relation to the Simandou project on the basis that Vale's evidence is insufficiently detailed to allow the Tribunal to identify:

949.1. what Vale company incurred which costs;

949.2. what each amount claimed relates to, and that it was an expense caused directly by Vale's entry into the joint venture;

949.3. the steps taken by Vale to mitigate its losses; and

949.4. that the employees in Brazil were engaged solely in relation to the Simandou project and did not undertake other work for Vale.

950. BSGR also criticises Vale for relying "on a single witness statement, irregular submissions presented to the joint venture board, and a report commissioned by [Vale]", instead of more specific, detailed and reliable documents such as "employment contracts, timesheets, travel requisition forms, and employee reports". [991] BSGR requests the Tribunal to draw adverse inferences from Vale's failure to present this evidence.

951. In response, Vale reasserts that it is entitled to recover this head of costs and that the costs related to the Vale employees allocated to the joint venture were incurred directly by Vale, and were regularly discussed between Vale and the joint venture, and were regularly reported to the board of the joint venture, including BSGR's representatives. [992]

952. The Tribunal refers to its discussion on Internal Costs above at paragraphs 936–940. Save for the USD 0.5 million, the Tribunal considers that the Internal Costs have been sufficiently substantiated and proven and can be awarded.

### iii. Outstanding Loan Amount – the principal

953. BSGR argues that Vale cannot claim for the sums loaned to the joint venture because the sums were "spent on things such as capital equipment which has a value and for which credit must be given". [993] So until Vale provides a more detailed breakdown of what those sums were spent on, what the current value of any assets purchased were, and what efforts were taken to mitigate Vale's losses by selling any asset, "Vale will have failed to prove its losses" [994] and BSGR invites the Tribunal to draw adverse inferences against Vale for its failure to produce evidence concerning the value and dealings with capital equipment when that evidence is in Vale's control. [995]

954. Vale makes the following arguments in response.

954.1. BSGR's argument neglects that the capital equipment acquired through the Loan "belongs to the joint venture, which is now wholly-owned by BSGR.

---

[991] BSGR's Statement of Rejoinder, paragraph 458.
[992] Vale's Pre-Hearing Written Submissions, paragraph 352.
[993] BSGR's Statement of Defence, paragraph 266(iii).
[994] BSGR's Statement of Defence, paragraph 266(iii).
[995] BSGR's Statement of Defence, paragraph 266(iii).

Accordingly, even assuming *arguendo* the assets that were purchased through the loan had a residual value, that value is with BSGR, not Vale."[996] BSGR's assertion also "overlooks that it was not Vale, but the joint venture and its subsidiaries, that used the proceeds of the shareholder loan."[997]

954.2. BSGR must have had knowledge of the loan amount since the process of issuing promissory notes required the joint venture to provide BSGR with breakdowns of the expenses that would be funded through the loans in order to obtain BSGR's consent.[998] This is backed up by a significant body of other evidence, which shows that BSGR was fully aware of and regularly approved the joint venture's expenditures that were being funded by Vale through the Loans.[999]

954.3. BSGR's claim to ignorance "conveniently overlooks that Vale agreed, in reliance on BSGR's fraudulent misrepresentations, to fund the joint venture's operations through the shareholder loan, the terms of which were memorialized in the [Joint Venture Agreements]."[1000]

954.4. BSGR has never asserted in the nearly four years of operations of its joint venture with Vale that Vale breached its funding commitments under the Joint Venture Agreements and cannot do so now.[1001]

955. Pursuant to Section 6.3 of the Framework Agreement, Vale International through promissory notes financed the amounts necessary to comply with the Business Plan and transferred money to VBG Guinea, VBG Logistics and VBG Liberia, resulting in an outstanding principal sum of USD 581,197,104, which the Tribunal has accepted at paragraph 934 above. BSGR does not contest that these amounts were received and used by VBG Guinea, VBG Logistics and VBG Liberia on capital and other expenditures.[1002] This is confirmed by Dr Shi's expert report at paragraphs 65 ff. showing expenditures over the period 2010–2014 of USD 583.1 million. BSGR's essential argument is that the residual value of capital equipment is to be accounted for, and needs to be deducted from the outstanding loan balance. Vale deducted USD 600,000 on the 24 July 2014 promissory note[1003] and USD 1,677,896 from the 7 June 2010 promissory note on account of the proceeds from auctions of VGB Guinea equipment[1004] related to the balance of the proceeds of the auction at USD 4.5 million less expenses including USD 1.3 million per year storage costs. The deductions are also reflected in the net amount of the outstanding principal of the promissory notes at USD 581,197,103.53, the quantification of which has already been accepted by the Tribunal.

---

[996] Vale's Statement of Reply, paragraph 953.
[997] Vale's Statement of Reply, paragraph 953.
[998] Vale's Pre-Hearing Written Submissions, paragraph 347.
[999] Vale's Pre-Hearing Written Submissions, paragraph 347.
[1000] Vale's Pre-Hearing Written Submissions, paragraph 348.
[1001] Vale's Pre-Hearing Written Submissions, paragraph 349.
[1002] Transcript, Merits Hearing, Day 2, p. 120, lines 8-22.
[1003] Promissory Notes Partial Payment Agreement dated 24 July 2014, p. 13, **C-468**; Phase I, Trans-Guinean Railway and Simandou Feasibility Study Expenditures, Tab "Base Exec.", row 672, **C-482**. The principal amount for the promissory notes dated 7 June 2010 and 24 July 2014 is USD 2,0750,000.00 and USD 600,000.00 respectively. See VBG Guinea, VBG Liberia and VBG Logistics' Promissory Notes (Updated), p. 1 – 3, **C-69 (revised)**.
[1004] Transcript, Merits Hearing, Day 1, p. 189, line 15 – p. 190, line 5.

956. The Tribunal rejects BSGR's defences in relation to deductions to be made regarding the outstanding principal of the promissory notes. First, any residual value of assets bought with the proceeds of the promissory notes lie with VBG, VBG Logistics and VBG Liberia and not with Vale, which is entitled to repayment of the outstanding principal. Second, the Board of VBG, including BSGR's representatives, in its meeting dated 31 January 2013 approved of the sale of the assets:

> **5.   Sale of VBG Guinea Assets**
>
> A summary of assets and e-mail correspondence were tabled in relation to the sale of VBG Guinea equipment and machinery to Vale and/or to third parties, in light of the demobilisation of operations on the project site. After due discussion it was agreed to ratify the approval of the sale of the equipment and machinery.[1005]

957. The Tribunal thus finds that Vale's failure to furnish particulars of the capital bought, the capital sold, and the current value of the remaining capital does not prevent Vale from claiming the sums owing under the Loan. The capital equipment was purchased *by VBG Guinea* using the sums loaned by Vale. The owner of the capital equipment was never Vale but was always (and continues to be) VBG Guinea. Vale therefore did not derive any benefit from the purchase of this capital equipment. Accordingly, Vale is not required to give credit to the value of any remaining capital equipment.

958. The Tribunal therefore rejects BSGR's invitation to draw an adverse inference from Vale's failure to furnish the abovementioned particulars.

> ***iv.*** *Outstanding Loan Amount – contractual simple interest of 16%*

959. The last of BSGR's specific objections to Vale's claim for damages relates to interest on the amounts loaned by Vale to the joint venture.

960. Vale first claimed interest on the amounts loaned to the joint venture in its Statement of Case.[1006]

961. BSGR then argued that Vale was not entitled to recover interest on its Loan because that would entail compensating Vale for "loss of bargain damages [...] that it would have received had the transaction gone ahead".[1007]

962. Vale then submitted its Statement of Reply, in which it disagreed with BSGR on the basis that the interest accrued on the Loan is "payable on demand" and unrelated to any profits that the joint venture would earn. Vale further cited *Black v Davies* [2015] EWCA Civ 531 in support to argue that, since the Court ruled that interest income directly linked to a fraudulent misrepresentation must be compensated, it would apply *a fortiori* where the interest sought was specifically contemplated in the Loan.[1008]

963. This was followed by BSGR's Statement of Rejoinder, in which BSGR argued that Vale had mischaracterised the case of *Black v Davies* (CA) and was not entitled to "compound interest on any sum to which it is entitled". According to BSGR, *Black v Davies* (CA)

---

[1005] VBG Board Minutes dated January 2013, **C-466**.
[1006] Vale's Statement of Case, paragraph 126.
[1007] BSGR's Statement of Defence, paragraph 266(ii).
[1008] Vale's Statement of Reply, paragraph 952, citing *Black v Davies* [2015] EWCA Civ 531, **CL-87**.

simply stood for the proposition that the Tribunal had an equitable jurisdiction to award interest on damages for monies that were obtained by fraud.[1009] Therefore, Vale's claim for compound interest was unsustainable other than the sum of USD 500 million paid to BSGR under the Joint Venture Agreements.

964.   Vale seems to have accepted BSGR's point relating to *Black v Davies* (CA) because it has not made any mention of the case in subsequent submissions. However, Vale continues to maintain that the fact that the interest accrued on the shareholder's loan is "payable on demand" means that interest is payable to Vale.

965.   The situation in this case is that the promissory notes provide for simple interest of 16% on the principal owing under the promissory notes. According to Vale, the total sum of the accrued simple interest is USD 199,537,678, which Vale includes as part of its claim. The question is whether Vale can claim the interest as damages for the tort of deceit.

966.   The Tribunal begins its analysis by returning to its discussion in paragraphs 926–928. The measure of damages for the tort of deceit is the loss directly flowing from the claimant's reliance on the defendant's representation. The "reliance" measure is designed to put the claimant in the position he would have been in had the defendant not made the representation, and had the claimant not entered into the loan agreement as a result. The consequence is that the claimant is entitled in principle to damages for losses denoting the interest which the principal *would have generated elsewhere* had the claimant not entered into the loan agreement. Conversely, the claimant is not entitled to claim the interest at the contractual rate of the loan agreement, because this denotes the loss which the claimant would not have suffered had the loan agreement been performed.

967.   This is the point made by *Chitty on Contracts* when it explains that "damages for fraud will not compensate the claimant for loss of bargain but may cover loss caused by passing up other profitable opportunities".[1010]

968.   So the task for Vale is to provide evidence of how much interest the principal would have generated elsewhere had Vale not loaned the principal to BSGR. If Vale fails to furnish such evidence, the law will not assume that Vale incurred losses of such a nature.

969.   In this case, Vale only claims the simple interest accrued at the rate stipulated in the promissory notes. The Tribunal finds that Vale is not entitled to claim this amount because it denotes the loss which the claimant would not have suffered had the contract been performed. The Tribunal accordingly holds that Vale is not entitled to the simple interest of USD 199,537,678. As to whether Vale has provided sufficient evidence to prove the interest which the principal would have generated elsewhere had it not been transferred to BSGR Guinea, the Tribunal further holds that Vale has failed to provide any evidence on this matter.

970.   Vale relies on *Black v Davies* (CA) to support its claim to the interest of USD 199,537,678. However, the Tribunal is unable to appreciate the relevance of that case to this matter. The issue in *Black v Davies* was whether the court had jurisdiction to award compound interest on damages, which raises the question of whether the court ought to exercise its statutory discretion to impose interest *on the damages awarded*. This is different from the

---

[1009] BSGR's Statement of Rejoinder, paragraph 464.
[1010] HG Beale (ed), *Chitty on Contracts*, vol 1 (31st edn, Sweet & Maxwell 2012) [6-057], **RL-38**.

issue in this case of whether the claimant is entitled to interest <u>as damages,</u> which raises the question of whether the court ought to award interest as part of the damages claim.

971. In view of the above, the Tribunal rejects Vale's contention that *Black v Davies* supports Vale's claim to the interest of USD 199,537,678 accrued under the promissory notes.

972. The above does not imply that Vale cannot obtain any interest on the amount of the principal due under the promissory notes at all. The Tribunal will return to this issue in the section of the Award on interest.

### *Mitigation of losses*

973. *McGregor on Damages* states:

> The extent of the damage resulting from the wrongful act, whether tort or breach of contract, can often be considerably lessened by well-advised action on the part of the person wronged. In such circumstances the law requires him to take all reasonable steps to mitigate the loss consequent on the defendant's wrong, and refuses to allow him damages in respect of any part of the loss which is due to his neglect to take such steps. **Even persons against whom wrongs have been committed are not entitled to sit back and suffer loss which could be avoided by reasonable efforts** […].[1011] (emphasis added)

974. BSGR alleges that Vale has not sufficiently mitigated its losses in the following ways.[1012]

974.1. Vale failed to follow the ABL Solution, which required it *inter alia* to assist in efforts against the GoG's unlawful expropriation.

974.2. Vale did not join BSGR in seeking to rebut the Technical Committee's allegations, but was apparently negotiating with the GoG to take the rights once they had been expropriated.

974.3. Vale refused to authorise VBG to join the ICSID case.

974.4. Vale has not provided evidence of the steps taken to mitigate its loss.

975. Vale makes three points in reply.

975.1. A claimant's duty to mitigate loss only extends to "reasonable steps to mitigate the loss consequent on the breach".[1013]

975.2. There is no requirement "to do anything other than in the ordinary course of business".[1014]

975.3. The onus is on BSGR to discharge its burden of proving that Vale has failed to mitigate its loss.[1015]

---

[1011] H McGregor, *McGregor on Damages* (19th edn, Sweet & Maxwell 2015) [9-014], **RL-104**.
[1012] BSGR's Statement of Defence, paragraph 269.
[1013] Vale's Pre-Hearing Written Submissions, paragraph 356.
[1014] Vale's Pre-Hearing Written Submissions, paragraph 356.
[1015] Vale's Pre-Hearing Written Submissions, paragraph 356.

976. Vale further points out that it *has* in fact taken steps to mitigate its losses, albeit not the steps that BSGR wished it to take. These include: (a) phasing out staff; (b) terminating contracts with its suppliers; (c) moving equipment to secure facilities in Guinea; and (d) retaining heavy equipment and machinery in storage in the Netherlands. These measures, Vale submits, are sufficient to satisfy Vale's obligations under English law.

977. Vale rebuts BSGR's points as follows.

977.1. The ABL Solution is not Vale's exclusive remedy for an ABL breach. It is a contractual alternative which Vale had the option to exercise. Hence, the ABL solution is simply an additional contractual mechanism over and above the other remedies which would be available to it.[1016]

977.2. Vale was under no obligation to join BSGR in attempting to rebut the Technical Committee's allegations. Under the SHA, Vale was not required to "take any action which in its reasonable view would be materially detrimental to the interests of its Group". Vale believed in good faith that the joint venture's interests would best be protected by co-operating with and providing a full response to the Technical Committee.[1017]

977.3. It was absurd for BSGR to expect Vale to authorise VBG Guinea, when it was still under Vale's control, to join in the ICSID proceedings. This would be tantamount to having Vale take a false position in defence of BSGR's bribery and corruption. The ICSID claim is meritless, and it would serve no purpose to allow VBG Guinea to join it.[1018]

978. The Tribunal agrees with Vale that the burden falls on BSGR to prove that Vale did not mitigate its losses. The Tribunal then has to address the three specific instances mentioned above where BSGR complains of Vale's failure to mitigate its losses.

978.1. First, as regards the ABL solution under which there was an exit for Vale from the joint venture in the case of anti-bribery allegations or investigations, the Tribunal agrees with Vale that this was an option for Vale and not an obligation. It was an additional safeguard for Vale to be capable of avoiding or mitigating FCPA exposure, but did not imply that it could not exercise other courses of action such as commencing arbitral proceedings to protect its interests as it has done in the present case.

978.2. Second, faced with allegations regarding bribery in procuring mining rights allegedly paid by its joint venture partner prior to the conclusion of the joint venture, it was – in the opinion of the Tribunal – at the time of the start of the investigations by the Technical Committee (and, thus, without the perspective of what transpired later as corroborated by the findings of corruption in this Award to avoid hindsight bias) an acceptable course of action by Vale to stand by and to have BSGR alone do the heavy lifting to convince the Technical Committee that the mining rights had been procured lawfully, and that no bribes had been paid. This is further confirmed by the fact that Vale made substantial efforts in

---

[1016] Vale's Pre-Hearing Written Submissions, paragraph 360.
[1017] Vale's Pre-Hearing Written Submissions, paragraph 361.
[1018] Vale's Pre-Hearing Written Submissions, paragraph 362.

the due diligence and the Joint Venture Agreements to ensure that its investment in the joint venture was compliant with the FCPA as well as other anti-bribery laws.

978.3. Third, the reasons above also apply in relation to Vale's refusal to join the ICSID proceedings as the majority-controlling shareholder of VBG Guinea. In this respect, the Tribunal also considers that it was acceptable for Vale not to antagonise the GoG and instead to avoid escalating a dispute with the GoG – in the interests of VBG Guinea, the protection of its investment in the project and future relationships with the GoG – in refusing to have VBG Guinea join the ICSID proceedings regarding a problem that was pre-joint venture and was basically BSGR's problem.

979. The Tribunal therefore rejects BSGR's argument that Vale was obliged to present a united front with BSGR against the GoG in order to mitigate its losses. Vale has adduced evidence that it believed in good faith that the allegation that BSGR had been involved in bribery and corruption had merit or, at least, was not meritless. Given that the Tribunal has confirmed BSGR's corruption in its findings, there is no indication that Vale had reason to believe otherwise. To hold that Vale should have supported BSGR in its defence of a position that Vale knew or had reason to believe to be false is plainly beyond the scope of reasonable mitigation. Vale cannot be faulted for not supporting BSGR in its legal travails.

### 3. Conclusion

980. The Tribunal concludes from its analysis above as follows.

980.1. As regards rescission, Vale is entitled to rescission of the Joint Venture Agreements.

980.2. As regards damages in deceit:

980.2.1. Vale is entitled to damages for:

980.2.1.1. the Initial Consideration of **USD 500,000,000**;

980.2.1.2. the Feasibility Study Funding of **USD 85,365,652**;

980.2.1.3. the Internal Costs of **USD 80,518,090** less USD 500,000 for costs categorised as other expenses (see paragraph 940) and

980.2.1.4. the principal of **USD 581,197,104** under the Outstanding Loan Amount.

980.2.2. Vale is precluded from claiming the interest sum of **USD 199,537,678** under the Outstanding Loan Amount for the reasons set out by the Tribunal in paragraphs 969–972.

## C. Remedies for Breach of Warranty

981.    As Vale elected the remedies for deceit over contractual remedies, and the remedies for deceit completely pre-empt contractual remedies, Vale is not entitled to claim the interest sum of **USD 199,537,678** under the Outstanding Loan Amount under a contractual cause of action in relation to that part of its claims which was unsuccessful in deceit.

## D. Remedies for Frustration

982.    Vale elected the remedies for deceit, including the remedy of rescission. The Tribunal´s view is that rescission is inconsistent with the remedies for frustration, because if a contract is rescinded *ab initio*, the result is that there would no longer be any contract to frustrate in the first place. The correct conclusion is therefore that Vale is no longer entitled to remedies under frustration by virtue of its election of remedies for deceit and the Tribunal´s conclusion is that Vale is entitled to equitable rescission on the facts of this case.

## E. Interest

983.    Finally, Vale claims compound interest on each of the items that comprise its USD 1.45 billion claim pursuant to Section 49(3) and 49(4) of the English Arbitration Act 1996, which provides:

> (3)    The tribunal may award simple or compound interest from such dates, at such rates and with such rests as it considers meets the justice of the case—
>
>     (a)    on the whole or part of any amount awarded by the tribunal, in respect of any period up to the date of the award;
>
>     (b)    on the whole or part of any amount claimed in the arbitration and outstanding at the commencement of the arbitral proceedings but paid before the award was made, in respect of any period up to the date of payment.
>
> (4)    The tribunal may award simple or compound interest from the date of the award (or any later date) until payment, at such rates and with such rests as it considers meets the justice of the case, on the outstanding amount of any award (including any award of interest under subsection (3) and any award as to costs).

984.    Vale submits that the circumstances of the case are such that "an award of pre- and post-award compound interest would be just and proper in this case".[1019]

985.    In view of Vale's request based on Section 49(3) and 49(4) of the English Arbitration Act 1996, the Tribunal considers that it meets the justice of the case to award both pre- and post-award interest on any amounts due by BSGR to Vale.

986.    As regards pre-award interest, the Tribunal recalls that any amount due is on the basis of damages as a remedy for deceit where such damages are to compensate for reliance losses. The objective of damages for deceit is to place the innocent party in the same position as he was in prior to the execution of the contract. As regards damages for the

---

[1019] Vale's Pre-Hearing Written Submissions, paragraph 365.

loss of the use of money, any interest on damages would be to reflect the loss of capital income and any amounts invested which could have been earned in the absence of the contract. The Tribunal considers that Vale would likely have invested such amounts in its business and that simple interest is to be preferred for that reason. Absent further information as to Vale's cost of capital, the Tribunal considers that simple interest at LIBOR USD 3-month rates plus 7% is an appropriate pre-award interest rate as of the following out-of-pocket dates:

986.1.   as from 30 April 2010 for the Initial Consideration of USD 500,000,000 paid on that date;

986.2.   as from the respective dates of the promissory notes as indicated for each promissory note on pages 1–3 of Exhibit C-69 (revised), taking into account the deductions on the promissory notes issued on 7 June 2010 and 24 July 2014;

986.3.   as of 1 December 2011, for the Feasibility Study expenditures of USD 85,365,652 discussed in paragraph 935 above based on Figure 8 of Dr Shi's report which the Tribunal considers an approximate assessment of the average time any such expenditures constituted an out-of-pocket expense:

**Figure 8 – Comparison of FS Expenditure Schedule and the amounts reported to the Joint Venture's Board of Directors (US$ million)**



Note: Board papers sometimes contain information on expenditures at several points in time. Where information on expenditures at a specific point in time is presented in multiple sets of Board papers, I show the information in the latest Board papers.

Source: Phase I, Trans-Guinean Railway and Simandou Feasibility Study Expenditures (Exhibit C-482).

and

986.4.   as of 1 December 2011 for Vale's Internal Costs of USD 80,518,090 (less USD 500,000 for other costs) discussed in paragraph 936-940 above based on Figure 9 of Dr. Shi's report which the Tribunal considers an approximate assessment of the average time any such expenditures constituted an out-of-pocket expense:



**Figure 9 – Joint Venture's record of Vale's internal costs (US$ million)**

Note: Board papers sometimes contain information on expenditures at several points in time. Where information on expenditures at a specific point in time is presented in multiple sets of Board papers, I show the information in the latest Board papers.

Source: Internal Costs (Exhibit C-483).

987. As regards post-award interest, the Tribunal considers it appropriate to compound interest on the unpaid amount so as to incentivize the Respondent to settle its just dues within a reasonable time period. Since post-award interest does not reflect reliance loss, but loss as a result of late payment under the Award, an interest rate that corresponds more closely to market rates for financial instruments is appropriate. The Tribunal therefore sets the post-award interest rate at the market rate of LIBOR USD 3-month rates plus 5%, compounded on each anniversary of this Award on any sums due under this Award that remain unpaid.

## XI. COSTS

988. Each Party has requested for an order that the other Party bear its costs of legal representation including counsel's fees and expenses as well as the LCIA administrative expenses and the fees and expenses of the arbitrators.

989. The total amount of the costs of the arbitration (other than the legal or other costs incurred by the Parties themselves) have been determined by the LCIA Court, pursuant to Article 28.1 of the LCIA Rules, to be as follows:

| | | | |
|---|---|---|---|
| 989.1. | Registration fee | GBP | 1,750.00 |
| 989.2. | LCIA's administrative charges | GBP | 112,652.78 |
| 989.3. | Tribunal's fees and expenses | GBP | 1,590,435.39 |
| 989.4. | Division's fees and expenses | GBP | 159,751.90 |
| 989.5. | Total costs of arbitration | GBP | 1,864,590.07 |

990. Vale has lodged a registration fee and deposits amounting to GBP 1,429,540.61, including interest accrued. BSGR has lodged deposits amounting to GBP 435,049.46, including interest accrued. Total funds lodged by the Parties as advances on costs to the LCIA therefore amount to GBP 1,864,590.07 which has been applied to the costs of the arbitration, as specified at paragraph 989 above.

991. By virtue of Article 28.3 of the LCIA Rules, the Tribunal has the power in its award to order that all, or part, of the costs incurred by a party be paid by another party, and shall determine and fix the amount of each item comprising such costs on such reasonable basis as it thinks fit. Pursuant to Article 28.4 of the LCIA Rules, the Tribunal shall make its orders on arbitration and party costs on the general principle that the costs should reflect the parties' relative success and failure in the arbitration, except where it appears to the Tribunal that in the particular circumstances this general approach is inappropriate. On the basis of the Tribunal's discretionary powers under the above provisions, the Tribunal shall allocate both the costs of the arbitration fixed by the LCIA Court as well as the Parties' legal costs in the proportions mentioned below.

992. Vale by and large has prevailed on the substantive issues decided in this Award regarding fraudulent misrepresentation, breach of warranties and frustration of contract as well as the remedies of rescission and damages regarding deceit. The Tribunal considers the starting point to be that BSGR (in view of the findings of the Tribunal regarding bribery) should bear the entirety of the costs of the arbitration as determined by the LCIA Court in the amount of GBP 1,864,590.07. Vale has contributed GBP 1,429,540.61.

993. The Tribunal considers that one qualification is to be made to the above as BSGR prevailed in relation to a challenge to the former Chairman of the Tribunal before the LCIA Division. As there have been two challenge proceedings before the LCIA Division involving in total five arbitrators (the first proceedings against the full tribunal of three

arbitrators and the second against the two arbitrators), BSGR will not be ordered to reimburse Claimant for the full costs of the arbitration as set out above but 10% of the total costs of the LCIA Division will be borne by Vale. The total fees of the LCIA Division amounted to GBP 157,972.50 and its expenses to GBP 1,779.40. BSGR will thus be ordered to reimburse Vale for the total costs of the arbitration at GBP 1,864,590.07, less BSGR's advances of GBP 435,049.46 including interest accrued thereon but less 10% of the LCIA Division's fees at GBP 157,972.50 and its expenses at GBP 1,779.40 (or GBP 15,975.19). Thus, BSGR will be ordered to pay to Vale a total amount of GBP 1,413,565.42 on account of the costs of the arbitration.

994.  In addition, and based on the above, the Tribunal considers that BSGR also has to contribute to the costs of legal representation of Vale which amount to USD 20,834,491.05 which the Tribunal considers to be reasonable given the immense amount of work on this complex case, its procedural complications and the extensive evidence gathering that was required. On the other hand, compared to BSGR's costs of legal representation at GBP 5,709,839.21 (GBP 6,143,680.35 less GBP 435,049.46 paid to the LCIA), Vale's costs almost treble those of BSGR. In exercising its discretion, the Tribunal considers that it is reasonable and fair – given the outcome of the case and its constituent parts and the findings of the Tribunal regarding bribery – that BSGR must compensate Vale for the costs of its legal representation and ancillary costs in relation that legal representation for an amount of USD 16 million as the currency in which they were primarily incurred.

995.  As Vale also seeks interest on any costs order, the Tribunal, for the reasons given in the interest part of this Award, will order BSGR to pay interest on the costs awarded at a rate of LIBOR USD 3-month rates plus 5% compounded annually from the date of this Award until full payment.

## XII. SUMMARY OF FINDINGS

996. For all the foregoing reasons and rejecting all submissions to the contrary, the Tribunal will rescind, on account of fraudulent misrepresentation by BSGR, the Framework Agreement and the SHA and award damages to Vale for a total amount of **USD 1,246,580,846**, with interest as determined in paragraphs 986 and 987, subdivided as follows:

| 996.1. | Initial Consideration | USD | 500,000,000 |
| --- | --- | --- | --- |
| 996.2. | Vale Loan | USD | 581,197,104 |
| 996.3. | Feasibility Study | USD | 85,365,652 |
| 996.4. | Internal Costs | USD | 80,018,090 |

997. BSGR will also be ordered to account for the costs of the arbitration save for 10% of the fees and expenses of the LCIA Division and to reimburse USD 16,000,000 for Vale's cost of legal representation and other costs related to the present proceedings.

998. Having come to the end of this Award, the Tribunal considers it appropriate to provide a bird eye's view of the proceedings and of its Award.

999. As regards the proceedings, it is regrettable that the Tribunal, as of the September 2016 Hearing, did not have the benefit of BSGR's participation. In discharging its duties, it attempted at all times to be mindful of BSGR's interests, both procedurally and as to substance. During the September 2016 Hearing and the February 2017 Hearing, it attempted to have BSGR's views heard in its exchanges with Vale's Counsel and in examining Vale's witnesses and Vale's expert. In reading the transcripts of those hearings, the Tribunal is satisfied that it did what was reasonably possible without losing its impartiality and acting as BSGR's counsel. In preparing this Award and during its deliberations, the Tribunal critically and comprehensively reviewed the file, particularly BSGR's submissions, fact exhibits, legal authorities, witness statements and expert report.

1000. While the Tribunal regrets that the calendar of Mr. Wolfson QC initially indicated that he would not have been available to appear on first few days of the three weeks scheduled for the Merits Hearing (although it transpired that his previous commitments changed and he was in fact available on these dates[1020]), the Tribunal decided to proceed with the Merits Hearing on the planned dates as suitable alternative dates were not readily available and BSGR had available to it many other lawyers, including other barristers, that could have been briefed in the available time before the Hearing. As a result, at the end of these proceedings and, having reviewed Procedural Orders Nos. 17, 18 and 19 again, it is satisfied that the decisions in these procedural orders were appropriate in the circumstances and sufficient to preserve BSGR's due process rights.

1001. As regards the ICSID proceedings which the Tribunal assumes are still pending but which may be withdrawn shortly as a result of a reported settlement between BSGR and

---

[1020] See Transcript, Merits Hearing, Day 1: p.239, lines: 6-14.

the GoG, the Tribunal reiterates that they involve different parties and involve not only different causes of action but also operate at the level of public international law regarding alleged breaches of investor protection under a Bilateral Investment Treaty. As the present proceedings and the ICSID proceedings had different timetables, it was difficult to coordinate both proceedings. It was also not necessary to do so as there is no *lis pendens* principle between tribunals belonging to different legal regimes or a risk of conflicting decisions based on rules of claim or issue preclusion.

1002. As regards substance, Vale presented its case as one of bribery and corruption initially, but gradually qualified its narrative to emphasise that its claim was not dependent on proving bribery and could succeed by proving fraudulent misrepresentation and breach of warranties on matters which, would have raised "red flags" if disclosed. Vale's narrative of an innocent party being induced by its partner BSGR to invest large amounts of money when its partner had bribed local officials in Guinea and hidden these corrupt practices through obscure intermediaries and opaque BSG Group business structures could have been avoided by the Tribunal without making inquiries and findings on bribery. The Tribunal chose not to do so in order to give justice to the case in view of Vale's narrative as well as BSGR's narrative that it was an innocent investor affected by policies of the newly-elected President of the Republic of Guinea intending to revisit existing investments by false pretexts of bribery under the former government. A central plank of BSGR's case was, thus, that it had not engaged in bribery in procuring its mining rights, and this plank needed to be addressed by this Tribunal.

1003. There is another reason for the Tribunal not to avoid looking into bribery allegations. The Tribunal considers that it is not the task of arbitral tribunals to be engaged in fights against corruption but also not to accept bribery as a fact of life in some countries and keep eyes shut when faced with allegations of corruption. It considers that a middle course can be found in view of the limited evidentiary and coercive powers in private commercial arbitration and the uphill task of establishing corruption which by its very nature is secretive and hidden. While the Tribunal did make findings of bribery in the present case, its findings are limited to those individuals and companies where the Tribunal felt comfortable that it could make such findings. There may be more individuals or companies that were involved in corrupt practices regarding BSGR procuring its mining rights in Guinea, but the Tribunal considers that it was not its task to investigate private corruption by local businessmen, to inquire into the question whether certain payments made were genuine compensation for advisory, consulting or other services, or whether they encompassed monies to bribe Guinean government officials. Nor was it the Tribunal's duty to look further into BSGR companies to identify which entity or individual had knowledge or participated in bribing schemes or to look upstream of BSGR whether its parents, the Balda Foundation or Steinmetz or any other individual should be accountable for bribery. The Tribunal did not make findings in relation thereto as this was not possible or necessary for the disposition of the case and to do justice to Vale's prayers for relief and BSGR's defences thereto.

## XIII.   DISPOSITIF

1004.   For all of the foregoing reasons and rejecting all submissions to the contrary, the Tribunal hereby **FINDS** (paragraph 676) that the Claimant has established its case alleging fraudulent misrepresentation. All other causes of action by Vale are hereby dismissed.

1005.   As a consequence of its finding in paragraph 1004, the Tribunal hereby **ORDERS AND AWARDS** the following relief:

1005.1.   The Tribunal hereby rescinds the Framework Agreement and the SHA on account of fraudulent misrepresentation (paragraph 920).

1005.2.   The Tribunal orders BSGR to pay forthwith to Vale damages of USD 1,246,580,846 on account of fraudulent misrepresentation (paragraph 980).

1005.3.   The Tribunal orders BSGR to pay forthwith to Vale simple pre-award interest at LIBOR USD 3-month rates plus 7% from the following dates to the date of this Award (paragraph 986):

1005.3.1.   from 30 April 2010 for the Initial Consideration of USD 500,000,000;

1005.3.2.   from the date of issuance of each of the promissory notes as indicated for each promissory note on pp. 1–3 of Exhibit C-69 (revised), taking into account the deductions on the promissory notes issued on 7 June 2010 and 24 July 2014 (paragraph 955);

1005.3.3.   from 1 December 2011 for the Feasibility Study expenditures of USD 85,365,652; and

1005.3.4.   from 1 December 2011 for Vale's Internal Costs of USD 80,018,090.

1005.4.   The Tribunal orders BSGR to pay to Vale post-award interest at LIBOR USD 3 month rates plus 5% on all amounts due under this Award from the date of this Award until the date of full payment, with all unpaid sums to be compounded on each anniversary of the date of this Award (paragraph 987).

1005.5.   As regards costs and expenses, the Tribunal orders BSGR to pay to Vale (a) GBP 1,413,565.42 being the total costs of arbitration less the deposits made by BSGR (including interest) and 10% of the fees and expenses of the LCIA's Division that is to be borne by Vale (as set out in paragraph 993), and (b) USD 16,000,000 for Claimant's costs of legal representation and other related costs (including expert fees), plus interest on any such amounts at a yearly compounded rate of LIBOR USD 3-month plus 5% from the date of this Award until full payment (paragraphs 994-995).

1005.6.   Each interest award above shall continue to be binding and effective until full payment of the principal sum awarded above (as well as compounded interest on such principal sum where applicable).

Award signed by the Tribunal:

London, 4 of _April_ , 2019

_Filip De Ly_

Chairman

Sir David A.R. Williams, QC                    Michael Hwang, SC

Co-arbitrator                                  Co-arbitrator

Case 1:18-cv-03068-VND Document 31-1 Filed 04/26/20 Page 226 of 282

**AWARD 4 APRIL 2019**

## APPENDIX – CHART OF KEY INDIVIDUALS

