# Exhibit 5
# (Part 1)

[emblem]
TECHNICAL COMMITTEE FOR THE
REVIEW OF MINING TITLES
AND AGREEMENTS

No. 039/CTRTCM/2014

Subject: Transmission of recommendation issued
by the CTRTCM to the Strategic Committee

REPUBLIC OF GUINEA
Work, Justice, Solidarity

Conakry, March 28, 2014

CONFIDENTIAL

*The President*

to

The Chief Executive Officer of
VBG – VALE BSGR GUINEA
Cité Chemin de Fer –Pita Building– 5ᵗʰ Floor
Conakry – Republic of Guinea

Mr. Chief Executive Officer,

Please find enclosed, for your information, the report presented today to the Strategic Committee, by the Technical Committee for the Review of Mining Titles and Agreements (Comité Technique de Revue des Titres et Conventions Miniers - CTRTCM), in accordance with its mandate, after the review of your Mining Titles in the Republic of Guinea. This complete report contains the recommendation of the CTRTCM to the Strategic Committee.

Yours truthfully,

[signature]
Nava TOURÉ
[stamp]
TECHNICAL COMMITTEE FOR THE REVIEW OF MINING
TITLES AND AGREEMENTS
CTRTCM
PRESIDENT

Enclosure: CTRTCM Report to the Strategic Committee

---

**TECHNICAL COMMITTEE FOR THE REVIEW OF MINING TITLES AND AGREEMENTS**

**RECOMMENDATION CONCERNING THE TITLES
AND MINING AGREEMENT HELD BY THE COMPANY
VBG**

To the attention of the Strategic Committee

3/21/2014

CONFIDENTIAL

To the attention of the Strategic Committee

## SUMMARY

In the mining sector, BSGR obtained the benefit of several mining titles and one mining agreement:

- **four exploration permits covering a total area of 2047 square kilometers (km$^2$) in the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A2006/023/DIGM/CPDM according to Ministerial Order No. A2006/706/MMG/SGG of February 6, 2006, which permits were renewed for a total area of 1667 km2 and recorded in the Register of Mining Titles under number A2009/124/DIGM/CPDM CPDM pursuant to Ministerial Order No. A 2009/1327/PR/MMEH/SGG of June 10, 2009;**

- **three exploration permits covering a total area of 1286 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2006/024/DIGM/CPDM pursuant to Ministerial Order No. 2006/707/MMG/SGG of February 6, 2006;**

- **one exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008.**

- **one basic agreement dated December 16, 2009, for the granting of a mining concession in the "Zogota" zone, with a total area of 1024 km$^2$ straddling the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2010/171/DIGM/CPDM pursuant to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010.**

Today, VBG is the holder of the following Mining Titles and mining agreement:

- **one exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008;**

- **one basic agreement dated December 16, concerning the "Zogota" zone;**

- one mining concession concerning the prospection and exploitation of the iron deposits of Zogota, resulting from the transformation of four exploration permits initially granted for the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2006/171/DIGM/CPDM pursuant to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010.

Under the Program for the Review of Mining Titles and Agreements, the Technical Committee reviewed the titles and agreement held by VBG in order to make recommendations to the Strategic Committee, in charge of delivering an opinion on these titles and agreement to the competent authorities.

The administrative proceedings carried out by the Technical Committee were organized so as to allow the company holding the mining titles and mining agreement conveniently to present its observations, both orally and in writing.

Especially based on the exhibits obtained in a legal proceeding currently being conducted by American authorities and whose authenticity does not seem doubtful, actually contested only by the minority shareholder of VBG, but without any evidence supporting its position, the Technical Committee considers that the titles and agreement held today by VBG were obtained by corrupt practices, concerning the deposits of Simandou as well as those of Zogota.

In conclusion, and taking into account all of the above, the Technical Committee considers that:

- there is a series of precise and concurring indications, establishing with sufficient certainty the existence of corrupt practices tarnishing the mining titles and mining agreement for the deposit of Simandou, as well as for those of Zogota, granted to BSGR; and

- such corrupt practices render null and void the Mining Titles and the mining agreement currently held by VBG.

Such being the case, the Technical Committee considers that:

- these administrative acts could not create rights for the company that had obtained them, due to the irregularity tarnishing their granting proceedings;

- VBG which, in all events, is the current

holder, may have this irregularity held against it;

- If, based on the information obtained by the Technical Committee, it is likely that the majority shareholder of VBG did not participate in the corrupt practices, this circumstance should not affect at all or even in part the recommendation to be submitted by the Technical Committee to the Strategic Committee, since the validity of a mining title or mining agreement is appreciated intrinsically.

Consequently, the Technical Committee submits the following recommendation to the Strategic Committee:

- to propose to the Minister of Mines to withdraw the exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008;

- to propose to the President of the Republic to withdraw the mining concession in the "Zogota" zone, with a total area of 1024 km$^2$ straddling the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2010/171/DIGM/CPDM pursuant to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010;

- then, to propose to the Minister of Mines to declare the cancellation of the basic agreement dated December 16, 2009;

- to propose to the competent authorities to order VBG to communicate to the services of the Ministry of Mines all studies, reports, data, results, samples, etc. that would have been realized or obtained in the mining operations of VBG in Guinea;

- to propose to the competent authorities to take all useful measures to exclude VBG, holder of the titles and agreement subject to this recommendation, as well as the companies that originated these corrupt practices, i.e. BSGR and the directly or indirectly affiliated or controlled companies of the BSGR Group, from the proceedings of reattribution of the titles and agreement in question.

The Technical Committee for the Review of Mining Titles and Agreements (the "**Technical Committee")**;

Having regard to the Constitution;

Having regard to Law L/95/036/CTRN of June 30, 1995, containing the Mining Code of the Republic of Guinea;

Having regard to Law L/2011/006/CNT/2011 of September 9, 2011, concerning the Mining Code of the Republic of Guinea, amended by Law L/2013/053/CNT of April 8, 2013;

Having regard to Decree D/2012/041/PRG/SGG of March 26, 2012 concerning the attributions, composition and operation of the National Mining Commission;

Having regard to Decree D/2012/045/PRG/SGG of March 29, 2012, concerning the methods for implementing a Review Program for Mining Titles and Agreements by the National Mining Commission;

Having regard to Decree D/2013/098/PRG/SGG of May 23, 2013, concerning the methods for implementing a Review Program for Mining Titles and Agreements by the National Mining Commission;

Having regard to the Rules of Procedure of the Technical Committee of September 9, 2013;

Having regard to all the exhibits produced and enclosed with the file, concerning in particular the written proceedings;

After hearing Mr. Joao Vidoca, representative of VBG, and Messrs. Jean-Yves Garaud, Barthelémy Faye and Sekou Koundiano during the meeting of December 16, 2013 in the presence of Mr. Nava Touré, President, Mr. Ibrahim Camara, Vice President, and Messrs. Saadou Nimaga, Alhassane Camara, Salim Ahmed Halaby, Ousmane Keita, Mamadou Taran Dallo, El Hadj Ibrahima Bodie Baldé, Ibrahima Bodie Baldé, Ibrahima Kalil Kourouma, members, the minutes of this meeting also being attached to the file;

After deliberating during the meeting of March 21, 2014, in the presence of Mr. Nava Touré, President, Mr. Ibrahima Camara, Vice President, and Messrs. Alkhaly Yamoussa Bangoura, Halaby Ahmed Salim, Saadou Nimaga, Mamadou Taran Dallo Ibrahima Kalil Kourouma, Ibrahima Bodie Baldé, El Hadj Ibrahima Baldé, Abdoul Karim Sylla, Ousmane Keita, Morciré Sylla, Seydou Bari Sidibé, members, Sidikiba Kaba and Bangaly Oularé, alternate members,

**Submits the following recommendation to the Strategic Committee.**

\* \*

\*

1.  Pursuant to the aforementioned laws, the Technical Committee is in charge of submitting recommendations to the Strategic Committee concerning the mining titles and agreements examined during the review process, so that the Strategic Committee would be able to issue an opinion to the Competent Authorities in the name of the National Commission of Mines.

2.  In this framework, the Technical Committee reviewed the mining titles and the mining agreement currently held by VBG on the deposits of Zogota and Simandou;

    -   one exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM according to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008.

    -   one basic agreement dated December 16, 2009 concerning the "Zogota" zone;

    -   one mining concession concerning the prospection and exploitation of the iron deposits of Zogota, resulting from the transformation of four exploration permits initially granted for the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2010/171/DIGM/CPDM according to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010.

3.  The examination of the file in question implies, pursuant to article 3 of the Rules of Procedure, a written phase and an oral phase, guaranteeing the rights of defense, which will be summarized below.

4.  At the end of these proceedings, which were not contested by VBG but only by this company's minority shareholder – BSGR - the Committee considers that the series of indications listed below, gathered by the Technical Committee, and which were not denied during the written and oral proceedings, leads to the reasonable certainty that the mining titles and the mining agreement in question were obtained under conditions vitiating their issuance.

5.  At this stage, the Technical Committee intends to recall three series of elements concerning the nature and perimeter of this recommendation.

6.  First of all, the Technical Committee based itself on the elements of proof in its possession – communicated to VBG and cited in the annex of this report – to prepare the recommendation it submits to the Strategic Committee.

7.  In fact, given the severity and importance of the facts in question, the Technical Committee focused its analysis only on the conditions

for obtaining the mining titles and the mining agreement held today by VBG, and does not mention the other defaults of this company on its administrative or tax obligations. These defaults, which in fact could be seen, are also likely to affect the validity of the mining titles and the mining agreement in question.

8. Finally, neither the analysis nor the conclusions of the Technical Committee – consultative administrative instance – prejudge the criminal qualifications that the facts in question would actually be likely to receive in the criminal proceedings conducted in parallel by the competent courts.

9. Consequently, the Technical Committee submits the following recommendation to the Strategic Committee:

- **to propose to the Minister of Mines to withdraw the exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008;**

- **to propose to the President of the Republic to withdraw the mining concession on the "Zogota" zone, with a total area of 1024 km$^2$ straddling the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2010/171/DIGM/CPDM pursuant to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010;**

- **then, to propose to the Minister of Mines to declare the cancellation of the basic agreement dated December 16, 2009;**

- **to propose to the competent authorities to direct VBG to communicate to the services of the Ministry of Mines all studies, reports, data, results, samples, etc. that would have been realized or obtained in the mining operations of VBG in Guinea;**

- **to propose to the competent authorities to take all useful measures to exclude VBG, holder of the titles and agreement subject to this recommendation, as well as the companies that originated these corrupt practices, i.e. BSGR and the directly or indirectly affiliated or controlled companies of the BSGR Group, from the proceedings of reattribution of the titles and agreement in question.**

These various points are developed below.

## TITLE I – REMINDER OF THE FACTS AND PROCEEDINGS

10. After a brief reminder of the facts, the Committee will present the main stages of the proceedings it carried out concerning the titles and the agreement currently held by VBG.

### I. THE FACTS

**1.  The origin of the interventions of BSGR with the authorities**

11. The family group Beny Steinmetz Resources Group (**"BSGR Group"**) essentially carried out its activity in the sector of diamond and natural resources.

12. In order to expand its activity in this sector, according to the information in the possession of the Committee, at the beginning of 2000, the BSGR Group decided to invest in the mining sector in the Republic of Guinea.

13. In this context, the BSGR Group used the services of Mr. Frédéric Cilins.

14. The latter, who was experienced in business in the Republic of Guinea and who had already worked for the BSGR Group in other West African countries, served as representative of this entity in the Republic of Guinea starting in 2005. As indicated by Mr. Frédéric Cilins, the essential part of his work consisted of presenting the company and promoting its penetration strength into Guinea.

15. The BSGR Group also resorted to several companies for the development of its activities in Guinea (together **"BSGR"**), especially the companies BSG Resources Limited recorded in Guernsey, BSG Resources (Guinea) Limited, also recorded in Guernsey, and BSG Resources (Guinée) Sarl – a Guinean company fully and exclusively held, at the time of the facts, by BSGR – created to carry the titles and agreements of which the BSGR Group could benefit.

16. Legal representatives of BSGR – successively Mr. Roy Oron, assisted by Mr. Marc Struik then, starting in 2006, Mr. Asher Avidan, director of BSG Resources (Guinée) Sarl – and Mr. Frédéric Cilins, agent of BSGR in Guinea, as explained below, contacted the Guinean authorities in order to indicate to them the wish of the BSGR Group to invest in mines in Guinea.

17. In this framework, Mr. Frédéric Cilins contacted Mr. Ibrahima Sory Touré, journalist, whom he knew, who then introduced Mr. Frédéric Cilins to his half-sister, Mrs. Mamadie Touré.

18. Thus, on September 19, 2006, Mrs. Mamadie Touré was invited, particularly in the company of Messrs. Roy Oron, Marc Struik, Asher Avidan and Frédéric Cilins, to a presentation made by BSGR, obviously as a "public relations" effort.

19. In these circumstances, Mr. Beny Steinmetz and the successive representatives of BSGR in Guinea – especially Mr. Asher Avidan and Mr. Frédéric Cilins – asked Mrs. Mamadie Touré several times to intervene with the Head of State, her husband, to make him give all the instructions necessary for mining rights to be attributed to BSGR in the Republic of Guinea.

20. Several meetings were organized, especially by Mrs. Mamadie Touré, during which the representatives of BSGR insisted that the company be given mining rights, first on the Zogota deposits and, afterwards, on Simandou blocks 1 and 2. The representatives of BSGR – including Mr. Beny Steinmetz – attended several of these meetings and, in particular, were able to meet with President Lansana Conté.

21. In exchange, BSGR promised that financial compensation would be paid to the persons who contributed to the favorable outcome of these interventions.

**2.   Granting of mining titles and agreement to BSGR on the deposits of Zogota and Simandou**

22. As of February 2006, BSGR obtained two series of mining titles:

   - four exploration permits covering a total area of 2047 square kilometers ($km^2$) in the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A2006/023/DIGM/CPDM pursuant to Ministerial Order No. A 2006/706/MMG/SGG of February 6, 2006, renewed for a total area of 1667 $km^2$ and recorded in the Register of Mining Titles under number A2009/124/DIGM/CPDM CPDM pursuant to Ministerial Order No. A2009/1327/PR/MMEH/SGG of June 10, 2009; and

   - three exploration permits covering a total area of 1286 $km^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2006/024/DIGM/CPDM pursuant to Ministerial Order No. 2006/707/MMG/SGG of February 6, 2006.

23. After obtaining these titles, BSGR tried to obtain Simandou blocks 1 and 2, at the time held by another company.

24. On July 28, 2008, a presidential decree removed all the rights to Simandou blocks 1 and 2 from the company which held them at the time.

25. A few months later, BSGR was able to obtain the rights to Simandou blocks 1 and 2, i.e. an exploration permit for the Simandou blocks 1 and 2, covering a total area of 369 $km^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008.

26. Finally, on December 16, 2009, BSGR executed a basic agreement with the Republic of Guinea which led to the subsequent grant of a mining concession in the "Zogota" zone, with a total area of 1024 km$^2$ in the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A2010/171/DIGM/CPDM according to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010.

**3.   Parallel granting of financial advantages and gifts to Mrs. Mamadie Touré and to the authorities.**

27. Previously, then in parallel to granting the mining titles and the mining agreement on the deposits of Zogota and Simandou mentioned above, BSGR offered gifts and granted advantages to Guinean authorities and their direct entourage.

28. Among the more substantial advantages there were, in particular, those offered to Mrs. Mamadie Touré, if we believe documents that:

- either indicate them as explicit compensation for successful interventions to obtain mining titles and the mining agreement;

- or do not indicate such explicit compensation, but are found in a context that demonstrates this link, since the absence of technical or commercial skills of the beneficiary cannot justify otherwise such advantages granted to it by a company that was trying to obtain mining titles.

29. Actually, the interested party herself has expressly recognized the facts in her affidavit dated December 2, 2013.

30. Thus, two series of documents were established in the framework of the intervention of Mrs. Mamadie Touré on behalf of BSGR.

o   **The commitments undertaken by BSGR**

31. On the one hand, contractual commitments were signed by BSGR – represented by its general director– for the benefit of the company Matinda and Co Limited, where Mrs. Mamadie Touré was apparently the "manager":

- **a memorandum of understanding dated June 20, 2007** between BSGR and Matinda and Co Limited, indicating that *"BSGR Guinée contacted Guinean authorities in order to establish a partnership for the development and the exploitation of part of the iron deposits of Simandou on the one hand, and Matinda and Co Limited SARL so that the latter would assist it with the measures and means allowing to obtain mining exploration permits."* The memorandum of understanding also stipulated that "*such being the case, and [by] joined efforts, by order No.A2007/582/MMG/SGG of February 28, 2007, of the Ministry of Mines and*

*Geology four mining exploration permits of uranium, covering a total area of 1413* km², *were granted to BSGR Resources Guinée in the Prefectures of Lola and N'Zérékoré."* Consequently, *"in order to reward the efforts made, BSGR Guinée accepts to transfer 5% of all its shares to Matinda and Co Limited SARL, which accepts"*;

- **a commission contract executed on February 27, 2008** between BSGR and Matinda and Co Limited– represented by Mrs. Mamadie Touré, *"businesswoman in Dubreka"*- by which *"BSGR Resources undertakes to give a total amount of four million dollars as commission to obtain Simandou blocks 1 and 2 located in the Republic of Guinea and covering the prefectures of Kereouane and Beyla."* In addition, *"Matinda and Co Limited undertakes, in turn, to take all measures necessary to get the signature from the authorities in order to obtain said blocks for BSGR Resources Guinée."* Moreover, it was planned that *"BSGR Resources Guinée would consider distributing the above commission as follows: an amount of two (2) million of Matinda and Co Limited, with deduction of US$ one hundred (100) already paid as advance"* and that *"the rest of the amount will be distributed between the persons of good will who had contributed to the facilitation of the grant of said blocks, in which BSGR Resources Guinée will act upon the quality of the contribution of each party."* Finally, *"the entire amount will be paid without delay after signing said document"*;

- **a memorandum of understanding executed on February 28, 2008** between BSGR and Matinda and Co Limited– represented by Mrs. Mamadie Touré, *"businesswoman in Dubreka"*- by which BSGR Resources Guinée – represented by Mr. Asher Avidan - *"undertakes to give* [to Matinda and Co Limited] *5% of the shares of Simandou blocks 1 and 2 located in the Republic of Guinea and covering the prefectures of Kérouané and Beyla."*

32.     These contracts thus expressly conditioned the payment of significant amounts and participations in the mining rights corresponding to Matinda and Co Limited for BSGR to obtain mining rights, especially in the area of Zogota and Simandou blocks 1 and 2.

        o     **The commitments undertaken by the company Pentler Holdings**

33.     On the other hand, certain contracts or commitments were signed directly for the benefit of Mrs. Mamadie Touré by the company Pendler Holdings, where Mr. Frédéric Cilins was one of the executives:

- **a memorandum of understanding was executed on February 20, 2006** between Pentler Holdings and Mrs. Mamadie Touré. This memorandum of understanding mentioned in particular that BSGR had to transfer 17.65% of its capital to Pentler Holdings. In turn, Pentler Holdings undertook to transfer, free of charge, 33.30% of its capital to Mamadie Touré *"as soon as Compagnie Minière de Simandou was incorporated and had obtained the mining titles needed for the exploitation of the mining area of Simandou, which will be attributed to it by the Republic of Guinea";*

- **two letters of commitment – legalized on July 21, 2006 – from Pentler Holdings to Mrs. Mamadie Touré were also executed**. The first letter indicates that *"in the framework of the development of its activities in Guinea, BSGR Guinée filed a request for a bauxite exploration permit in the areas of Tougé Nord, Boké and Télémélé Nord (…). It is understood that the issuance of these exploration permits for BSGR Guinée will actually cause Mrs. Mamadie Touré to become a shareholder in this project by the free holding of 33.30% set forth in the terms of the Memorandum of Understanding signed between Mrs. Mamadie Touré, on the one hand, and Pentler Holdings Ltd., on the other hand, dated February 20, 2006."* The second letter indicates that *"in the framework of the development of its activities in Guinea, BSGR Guinée obtained bauxite exploration permits in the areas of Tougué, Kéniéba, Bafing Makana and Dinguiraye (…). It is understood that the delivery of these exploration permits to BSGR Guinée actually causes Mrs. Mamadie Touré to become a shareholder in this project by the free holding of 33.30% set forth in the terms of the Memorandum of Understanding signed between Mrs. Mamadie Touré, on the one hand, and Pentler Holdings Ltd. on the other hand, dated February 20, 2006."*

- **a document of commitment of Pentler Holdings towards Mrs. Mamadie Touré signed by both parties was prepared on July 8, 2010,** indicating that *"subject to the good development and correct functioning and the continuation of the operation conducted by our partners in the project of Simandu[sic] in Guinea, Pentler Holdings Ltd. undertakes to pay to Mrs. Mamadie Touré the additional amount of US$5 million, payable in two portions (each payment of US$2.5 million)";*

- **a document of commitment of Pentler Holdings towards Mrs. Mamadie Touré was prepared on August 3, 2010,** indicating that *"subject to the good development and correct functioning conducted by Pentler and its partners in all activities in Guinea (commercial drugs-related, mining-related, etc.), Pentler Holdings Ltd. undertakes to pay to Mrs. Mamadie Touré the*

*additional amount of US$5 million, payable in two portions (each payment of US$2.5 million). The first payment will be made 24 months after signing this document. The second payment of 2.5 million will be made 24 months after the first payment";*

- **a signed, but undated declaration of Mrs. Mamadie Touré** was also drafted. This document indicated that the interested person, *"representative of the company Matinda & Co. Ltd., hereby declares that she received from Pentler Holdings Ltd. the amount of US$2,400,000 (two million four hundred thousand dollars) as part of our collaboration contract signed in 2005";*

- **a signed but undated contract apparently terminating the relationships between Pentler Holdings and Mrs. Mamadie Touré** was finally executed. This contract indicated in particular that *"our collaboration contract signed in 2005 has reached its end. Our role of advisor and business finder for all our projects in Guinea in the commercial, mining and medical fields was conducted professionally and with great success. The role of Matinda & Co. Ltd. contributed to the great accomplishment of our mutual business. Following your decision to stop your activities in Guinea, we came to an agreement, as follows: Matinda and Co. Ltd. will receive the amount of 3.1 million for its share of all the activities conducted in Guinea."*

o   **Payments made by Mr. Frédéric Cilins to Mrs. Mamadie Touré**

34.    Finally, the payments to Mrs. Mamadie Touré continued after BSGR obtained the mining titles and the mining agreement. Thus:

- On July 27, 2010, a check for 100,000 U.S. dollars was issued by Mr. Frédéric Cilins to Mrs. Mamadie Touré;

- On August 5, 2010, a check for 50,000 U.S. dollars was issued by Mr. Frédéric Cilins to Mrs. Mamadie Touré.

**4.      The holding taken in BSGR by Vale**

35.    On April 30, 2010 – i.e. less than five months after BSGR obtained the Basic Agreement – the Brazilian company Vale ("**Vale**"), major player in the mining sector, executed a Shareholders' Agreement and a Joint Venture Framework Agreement with BSGR.

36.    This operation precisely consisted of Vale taking a majority holding (51%) in BSGR Resources (Guinea) Limited, a company registered in Guernsey and holding 100% of the capital of BSGR Resources (Guinée) Sarl. BSGR remained shareholder with 49% of BSGR Resources (Guinée) Limited.

37.     After this operation, BSGR Resources (Guinea) Limited took the name "**VBG Guernsey**" and BSGR Resources (Guinée) Sarl took the name VBG – Vale BSGR Guinea ("**VBG**") (together "**VBG**").

38.     The operation thus led to a modification of the capital holding by BSGR Resources (Guinée) Sarl and a change of name of this company, but no transfer of mining titles or mining agreement took place.

39.     Today, VBG is the holder of the mining titles and mining agreement currently under review by the Technical Committee.

**5.     The attempt to destroy certain pieces of evidence**

40.     In March 2013, the American Federal police (the Federal Bureau of Investigation, "FBI") intercepted and taped several conversations, locally and by telephone, between Mr. Frédéric Cilins and several other interlocutors, including Mrs. Mamadie Touré. These recordings were transmitted by the American authorities to the Guinean authorities.

41.     In these conversations, Mr. Frédéric Cilins asked Mrs. Mamadie Touré, in particular, several times, to destroy the copies of the aforementioned contracts.

42.     New payments made by Mr. Frédéric Cilins – who said that he acted on behalf of BSGR and in particular of Mr. Beny Steinmetz - to Mrs. Mamadie Touré were mentioned during these conversations.

43.     Based on these elements, on April 15, 2013 the FBI filed a complaint before the federal criminal court in New York against Mr. Frédéric Cilins, on three counts:
-       subornation of witness
-       obstruction of a criminal proceedings;
-       attempt to destroy exhibits.

44.     The criminal proceedings conducted in the United States of America continue independently from the administrative proceedings conducted by the Technical Committee, a Guinean administrative instance, which is not obligated to stay proceedings on matters coming under the jurisdiction of another State.

## II. THE PROCEEDINGS

45. The proceedings were conducted in several stages.

46. On October 4, 2011, the Minister of Mines requested VBG, the company holding the mining titles and agreement under review, to send all acts, agreements or conventions linking this Company to the State or other partners.

47. Afterwards – on November 17, 2011 and December 13, 2011 – the Minister of Mines requested VBG to send a series of information and documents concerning the mining titles and the mining agreement, for which purpose it had sent a detailed questionnaire.

48. On February 3, 2012, BSGR – minority shareholder of VBG – provided certain information concerning the mining titles and the mining agreement.

49. On March 1, 2012, BSGR sent to the President of the Republic a letter showing the difficulties in the performance of the basic agreement executed on December 16, 2009.

50. This phase allowed, in particular, national authorities to examine in detail the mining titles and the mining agreement held by VBG and especially to obtain information on the investment modalities of Vale in the Republic of Guinea.

51. In the course of this analysis, national authorities were informed about various allegations concerning the conditions and modalities according to which the mining titles and the mining agreement on the deposits of Simandou and Zogota would have been obtained by BSGR.

52. On October 30, 2012, the Technical Committee sent VBG – the only party to the proceedings in its capacity as holder of the titles in question – a letter containing the aforementioned allegations and asking VBG for its observations.

53. According to these allegations, the BSGR mining titles and mining agreement in the Republic of Guinea related to the deposits of Zogota and Simandou had been obtained due to the corruption of people close to the President of the Republic, Lansana Conté, and certain members of the Guinean Government.

54. On November 26, 2012, Vale – shareholder of VBG – indicated that it had no information concerning the facts alleged in the letter of the Technical Committee.

55. On November 28, 2012, VBG indicated to the Technical Committee that the allegations concerned elements that seemed to have taken place before Vale's investment in Guinea. In the same letter, VBG concluded that, consequently, the investigations of the Committee had to be addressed to BSGR. However, in this

letter, VBG indicated that it would cooperate with the investigations of the Committee.

56.     In reply, on December 26, 2012, BSGR, minority shareholder of VBG, provided a legal opinion signed by a French Professor of Law (Professor Denys de Béchillon) and a former Section President at the Conseil d'Etat de France [Council of State, France] (President Daniel Labetoulle) expressing doubts as to the legality of the proceedings. In fact, the minority shareholder of VBG gave incomplete answers to the allegations presented by the Technical Committee.

57.     On December 28, 2012, VBG communicated to the Technical Committee information and documents related to the allegations in question.

58.     On February 15, 2013, the Technical Committee indicated by letter that VBG was the only party to the administrative proceedings and invited this company to complete the answers given on December 28, 2012.

59.     By a letter of February 22, 2013, VBG indicated to the Technical Committee that it had provided in its previous letters all the information this company had in order to answer the questionnaire.

60.     By a letter dated March 4, 2013, BSGR sustained that the Technical Committee could not request new answers to its questions without imposing an "excessive burden." BSGR repeated, on this occasion, its theory that the proceedings were illegal.

61.     On March 15, 2013, BSGR gave some specifications in answer to the questions asked by the Technical Committee, while sustaining that the proceedings were "illegal."

62.     On March 26, 2013, BSGR sent a letter to the Technical Committee in order to contest the good faith of the Technical Committee. In particular, BSGR sustained in its letter that the Guinean authorities worked hard to "*tarnish the reputation of BSGR.*"

63.     On May 7, 2013, the Technical Committee sent to VBG three documents concerning the allegations of which it had been previously notified: a copy of the criminal complaint filed with the American federal criminal courts (with translation into French), a copy of the bill of indictment (with translation into French) and a copy of several contracts related to the facts in question.

64.     VBG, holder of the examined titles and agreement, answered on May 13, 2013, indicating that it had no information on the documents transmitted and that it sent these documents to its minority shareholder, BSGR.

65.      In turn, BSGR answered on June 4, 2013 through its counsels. Although this letter was drafted in English, while the official language of the Republic of Guinea and the procedural language is French, the Technical Committee accepted to examine the document. It noted that, in particular, BSGR sustained that the proceedings would be illegal and the documents transmitted would be "crude forgeries," prepared with the help of members of the Government of Republic of Guinea.

66.      Careful to detail even further the rules applicable to the procedure of review of the mining titles and agreements, on September 9, 2013 the Technical Committee adopted Rules of Procedure. These Rules, approved the same day by the Minister of Mines, the President of the Strategic Committee, indicate that, to guarantee the rights of mining companies, written and oral proceedings must be conducted by the Technical Committee.

67.      The written procedure was conducted by the Technical Committee under these conditions.

68.      By a letter of November 1, 2013, the Technical Committee notified VBG of its decision to continue the review proceedings. Thus, in this letter, VBG was asked to specify the answer that had been given on December 26, 2012.

69.      By the same letter of November 1, 2013, the Technical Committee invited the representatives of VBG to a hearing before the Technical Committee on December 10, 2013.

70.      In its letter of November 7, 2013, VBG indicated in particular that it was *"extremely concerned"* by the allegations concerning the conditions for obtaining its mining rights.

71.      By a letter of November 19, 2013, the Technical Committee informed VBG that it would see no impediment, if it deems it useful, for this company to request the presence of representatives of its minority shareholder BSGR at the hearing. In this event, the Technical Committee indicated that it could facilitate the consular formalities for the interested persons, in cooperation with the competent authorities.

72.      On November 25, 2013, VBG answered the previous letter indicating, in particular, that it would be represented in the hearing by Mr. Joao Vidoca, its general director, and he would be assisted by its counsels.

73.      On November 29, 2013, the Technical Committee reminded in a letter to VBG that VBG had the possibility to arrange for the participation of representatives of its minority shareholder, BSGR, in the hearing and, in this regard, it confirmed that the Technical Committee could study special measures to be

taken by the competent authorities to allow the exit and entrance of the interested persons in the national territory.

74.     On December 2, 2013, VBG indicated by letter that it had *"done everything in its power to cooperate with the requests of the Technical Committee"* and that, concerning the alleged corrupt practices, it would have done everything possible to convince BSGR, its minority shareholder, to answer the questions of the Technical Committee.

75.     Since the American authorities had communicated to the Republic of Guinea new elements of proof confirming the allegations sent to it, under the judicial cooperation between the two countries, the Technical Committee decided to send them to VBG on December 4, 2013.

76.     To allow VBG to make observations about these documents in the hearing, the Technical Committee indicated to VBG that it could request a postponement of the hearing until December 18, 2013.

77.     By letter dated December 5, 2013, VBG asked the Technical Committee to postpone the hearing until December 16, 2013.

78.     On December 8, 2013, BSGR sent a new letter to the Technical Committee, affirming that the proceedings carried out by the latter were irregular and indicating that no representative of BSGR would be present in the hearing.

79.     Since the request of VBG for postponement had been accepted by the Technical Committee, the hearing of the VBG representative and its counsels took place on December 16, 2013 in Conakry, in the premises of the Ministry of State in charge of Economy and Finance.

80.     During the hearing, VBG was represented by Mr. Joao Vidoca, general director of VBG, assisted by his counsels, *Maître* Jean-Yves Garaud, Attorney with the Paris Bar, *Maître* Barthélemy, Faye Attorney with the Paris Bar, and *Maître* Sekou Koundiano, Attorney with the Conakry Bar .

81.     This hearing allowed the representative of VBG, assisted by its counsels, to make observations concerning the proceedings and the exhibits transmitted to VBG and to the Technical Committee, and ask the questions he deemed appropriate on the facts in question.

82.     A transcript of the exchanges held in this hearing was sent to VBG on December 23, 2013, giving it a week to make observations on this document.

83.     On December 30, 2013, the Technical Committee received the observations of VBG.

84.     On January 4, 2013, the Technical Committee, sitting in plenary meeting, took cognizance of the observations of VBG and approved the minutes of the transcript of the hearing of December 16, 2013.

85.     By a letter of January 16, 2014, BSGR affirmed again, in particular, that the proceedings would be irregular.

86.     On February 6, 2014, the Technical Committee, sitting in plenary session, held a meeting in order to adopt a draft recommendation.

87.     In a letter dated February 17, 2014, the Committee answered a letter of BSGR dated January 16, 2014, containing certain criticisms on the proceedings followed. In particular, the Committee reminded that it took into account all the exchanges with VBG and its minority shareholder – although the latter was not a party to the proceedings – and that BSGR was unable to present objective and serious elements demonstrating in particular that the elements of proof would be forgeries.

88.     On February 21, 2014, the draft recommendation was submitted for observations to VBG.

89.     On February 25, 2014, the Technical Committee received the first observations from VBG, which requested to be sent the "complete report" containing the motivation of the draft recommendation.

90.     In addition, VBG declared itself *"extremely concerned"* in this letter, because the recommendation seemed *"based only on actions carried out by BSGR when it was the **sole** owner of VBG."*

91.     Finally, VBG asked the Technical Committee to start *"discussions"* after receipt of its observations, if it or its minority shareholder wanted to do so.

92.     On February 27, 2014, in fact, VBG sent to the Technical Committee a letter in English of the counsel of BSGR – accompanied by its translation – in which the latter contested again the regularity of the proceedings and the authenticity of the elements of proof.

93.     The President of the Technical Committee gave VBG an answer on all these various points, in a letter of March 7, 2014.

94.     First of all, it was again pointed out that the review proceedings evaluated only the validity of the administrative acts. If the validity of the titles or of the agreement is affected by original defects, a subsequent modification of the shareholders of the owner company, which has no incidence on these original defects, cannot be enough to eliminate them.

95.     In addition, although there is no obligation from this viewpoint, and in a concern for transparency, the summary of the de facto and de jure elements that appear from the elements of proof and which motivate the draft recommendation of the Technical Committee was communicated to VBG.

96.     Finally, it was pointed out that, since the proceedings had already been completed, nothing justified a new hearing of VBG or its minority shareholder, the latter having actually refused systematically to participate along with VBG in a constructive dialogue with the Technical Committee.

97.     On March 13, 2014, VBG sent a letter in answer to the Technical Committee. In this letter, VBG repeated its request for a copy of the complete report *"to be made available to it before the Government makes a final decision concerning the validity of its mining rights."*

98.     On the other hand, VBG communicated again to the Committee that, according to it, (**i**) only BSGR would be *"in a position to provide an answer on the main points raised in the letter of the Technical Committee,"* that (**ii**) since Vale took the control of VBG, VBG would not have committed any reprehensible act and (**iii**) VBG agreed to make *"a significant investment in Guinea, by investing 700 million of US dollars in this project with funds advanced by Vale."*

99.     Also, on March 13, 2014, the counsel of BSGR sent a letter to the Technical Committee in which it indicated that BSGR *"will not be able to submit its answer to the Technical Committee"* within the timeframe given for this purpose. In addition, the counsel of BSGR indicated that this company will submit its answer *"before Monday March 21, 2014 at 5 p.m.,"* i.e. outside of the timeframe established by the Technical Committee.

100.    In answer, it was indicated to VBG that its observations would be analyzed. It was also reminded in this letter that VBG – holder of the titles and agreement under review – cannot remain uninvolved in the discussion on the merits that started on the validity of the titles and of the agreement.

101.    In addition, it was indicated again that "*the original defects which seem, in the current state of the analysis of the Technical Committee, to vitiate the proceedings of granting of the titles and agreements today held by VBG cannot, in any case, be eliminated by the mere fact of a change of capital composition of this company after the granting.*"

102.    Finally, concerning the observations communicated to the Technical Committee by the counsel of the minority shareholder, BSGR, it was reminded for all useful purposes that VBG – the only party to the proceedings – did not request an extension of the term for itself.

103.    In all events, it was specified in his letter that the minority shareholder of VBG *"cannot substitute itself to the Technical Committee and its President to conduct the proceedings before the Technical Committee."*

104.   After the expiration of the term for filing observations established by the Technical Committee, the latter received, through the intermediary of VBG, a letter from the counsel of the minority shareholder of VBG dated March 17, 2014. In his letter, the counsel of the minority shareholder of VBG contested again the legality of the proceedings conducted by the Technical Committee.

105.   The Technical Committee met on March 21, 2014 to examine the observations received on the draft recommendation.

106.   The Technical Committee noted that the observations made by VBG or its minority shareholder did not contribute any new de facto or de jure element justifying a modification of the draft recommendation.

107.   Consequently, the Technical Committee decided to maintain its recommendation, which it submits to the Strategic Committee.

**TITLE II – ANALYSIS OF THE CONDITIONS FOR OBTAINING THE MINING TITLES AND THE MINING AGREEMENT**

108.   Various indications, arising from the various elements of proof available to the Technical Committee, were reported to VBG during the written proceedings and discussed during the oral proceedings.

109.   These indications lead to two conclusions, which will be detailed below:

-   corrupt practices were carried out to obtain the mining titles and the mining agreement in question (**I**);
-   attempts were carried out to destroy certain elements of proof of the corrupt practices in question (**II**).

110.   First of all, it must be specified that the indications in question are taken from elements of proof whose authenticity was contested not by VBG, holder of the titles and of the agreement in question and the only party to the proceedings, but by the minority shareholder of this company, BSGR.

111.   The Technical Committee, however, overrode this contestation for the following reasons:

-   on the one hand, the intrinsic analysis of the elements of proof led to the finding that they support each other, and this articulation does not seem to be the result of a construction or manipulation;

-   on the other hand, the holder of the mining titles and of the mining agreement in question – VBG – on its part, did not issue any criticism or expressed any serious doubt during the proceedings. Indeed, this company limited itself, during the written proceedings, to send requests for production of documents or information to its minority shareholder and, during its hearing, to indicate that, since the file was currently examined by the American judicial authorities, in particular, they were better placed to conduct additional investigations;

-   finally, although BSGR, minority shareholder of the company holding the titles and the agreement in question, contested in particular the authenticity of the contracts communicated to it by the Technical Committee on May 7, 2013, the same as the documents communicated to VBG on December 4, 2013 and transmitted by it to this company; this criticism was not accompanied by any serious corroborating evidence.

     Thus, in order to demonstrate that the contracts communicated to it constituted "forgeries," BSGR limited itself to stating that the numbering of the legal stamps was not in a logical order. Yet, this element does not prove that these contracts would be forgeries; actually, it is specified that the basic agreement held by VBG presents the same characteristic.

Equally, the affirmations of BSGR concerning the lack of credibility of the affidavit of Mrs. Mamadie Touré are not supported by any serious corroborating element.

I. **CORRUPT PRACTICES IN ORDER TO OBTAIN MINING TITLES AND THE MINING AGREEMENT IN QUESTION**

112.    It appears from the various elements of proof available to the Technical Committee that the mining titles and the mining agreement in question were granted, at the time of the facts, following corrupt practices used by BSGR with the Guinean authorities in place at the same time.

113.    Thus, several facts seem sufficiently established.

1.    **It is because Mrs. Mamadie Touré was the wife of the President of the Republic, Lansana Conté, that BSGR contacted her**

114.    The fact that Mrs. Mamadie Touré had been, since 2000, the wife of the President of the Republic, Lansana Conté, is not questionable in light of the various elements of proof available to the Technical Committee concerning her.

115.    Thus, several objective elements of proof confirm the declarations of Mrs. Mamadie Touré on this point, especially the diplomatic passport she had, which designated her as "wife PRG" (meaning wife of the President of the Republic of Guinea).

116.    It is because of the closeness of Mrs. Mamadie Touré with President Lansana Conté that the representatives of BSGR – especially Messrs. Roy Oron, Marc Struik, Asher Avidan and Frédéric Cilins – contacted her through her half-brother, Mr. Ibrahima Sory Touré.

117.    Otherwise, at the time of the facts, Mrs. Mamadie Touré did not have any special competence or expertise justifying that a company of the size of BSGR and the BSGR group would have contacted her to obtain her services.

118.    Consequently, the Technical Committee is convinced that the only reason for which BSGR, especially through Mr. Frédéric Cilins, contacted Mrs. Mamadie Touré was that she was likely to exercise an influence on the Head of State, as his wife.

119.    The elements of proof available to the Technical Committee – and which were sent to VBG – show that this influence was real.

120.    In addition, these elements were confirmed by the declarations of Mrs. Mamadie Touré dated December 2, 2013.

**2.** **It was in exchange for her intervention with the President of the Republic for BSGR to obtain the mining titles and agreements that Mrs. Mamadie Touré benefitted from various advantages**

121. Various documents that were available to the Technical Committee and that it was able analyze indicate the following points:

- Mr. Frédéric Cilins, agent of BSGR, on the one hand, and Messrs. Roy Oron and Marc Struik, then Mr. Asher Avidan, legal representatives of BSGR in Guinea, on the other hand, acted starting in 2005 in the Republic of Guinea on behalf of BSGR, to facilitate the installation of this company in the country and to obtain mining titles for it;

- As of its installation in Guinea, BSGR introduced, directly through its legal representatives or through Mr. Frédéric Cilins, a systematic policy of giving valuable gifts to Guinean authorities.

- Above all, the aforementioned representatives of BSGR approached, through her half-brother, Mr. Ibrahima Sory Touré, Mrs. Mamadie Touré, wife of the President of the Republic Lansana Conté, so that she would intervene for BSGR with the Head of the State to grant the company mining rights, especially in the area of Zogota and on Simandou blocks 1 and 2;

- Several meetings were organized, at the request of BSGR, by Mrs. Mamadie Touré, at her house in Dubréka or in the presidential palace, in particular in order to allow BSGR to present to the Head of the State and the Guinean authorities its wish to obtain mining titles in Guinea.

122. **First of all**, as of obtaining mining titles in 2006, substantial payments and free rights of participation were received by Mrs. Mamadie Touré, either explicitly in exchange for her intervention in order to obtain mining titles and the mining agreement by BSGR on the deposits of Zogota and Simandou, or under circumstances and according to modalities that establish directly a link between these advantages and BSGR's obtaining mining rights;

   i. In particular, on June 20, 2007, a memorandum of understanding was executed between BSGR and Matinda and Co Limited, where apparently Mrs. Mamadie Touré is the manager, indicating that, in exchange for the effort made, which allowed BSGR to obtain mining exploration permits on February 28, 2007 in the area of Zogota – in the prefectures of Lola and N'Zérékoré -, this company accepted to transfer 5% of all its shares to Matinda and Co Limited.

ii.     On February 27, 2008, a commission contract was executed by the same parties, indicating that BSGR committed to give four million dollars to Matinda and Co Limited *"as commission"* to obtain Simandou blocks 1 and 2*;*

iii.    On February 28, 2008, a memorandum of understanding was executed between the same parties, indicating that BSGR committed to transfer to Matinda and Co Limited 5% of the shares of the operating company of Simandou blocks 1 and 2;

iv.     Indeed, on December 9, 2008, a Ministerial Order was issued to deliver to BSGR an exploration permit on Simandou blocks 1 and 2 (Ministerial Order No. 72008/4980/MMG/SGG);

v.      The declarations of Mrs. Mamadie Touré confirm the above elements and show, in detail and precisely, the conditions in which, in her presence and at her request, instructions were given by the President of the Republic to the Minister of Mines to withdraw the mining title on Simandou blocks 1 and 2 from the company that held it at the time, and grant it to BSGR.

123.   **In fact,** several contracts and commitments were executed directly by Mrs. Mamadie Touré with Pentler Holdings, a company where Mr. Frédéric Cilins was one of the executives and which, at the time, obviously acted on behalf of BSGR;

i.      Thus, on February 20, 2006, i.e. soon after obtaining the exploration permit, a memorandum of understanding was executed between Pentler Holdings and Mrs. Mamadie Touré, indicating that Pentler Holdings undertook to transfer free of charge 33.30% of its capital to Mrs. Mamadie Touré as soon as *"the mining titles needed for the exploitation of the mining area of Simandou were obtained";*

ii.     By two letters of commitment from Pentler Holdings to Mrs. Mamadie Touré, legalized on July 21, 2006, it was agreed that the delivery of the exploration permits on the areas of Tougué, Kéniéba, Bafing Makana and Dinguiraye to BSGR would "automatically" entail the free transfer to Mrs. Mamadie Touré of 33.30% of the capital of Pentler Holdings;

iii.    On July 8, 2010, Pentler Holdings committed to pay to Mrs. Mamadie Touré the amount of five million U.S. dollars in order to take into account the success of the operations concerning the granting of the mining rights of Simandou;

      iv.  On August 3, 2010, Pentler Holdings also promised to pay to Mrs. Mamadie Touré the amount of five million U.S. dollars in order to take into account the success of the operations conducted in Guinea.

124.   **In addition,** it also appears from signed but undated documents, especially from a declaration of Mrs. Mamadie Touré and a contract apparently terminating the relationships between Pentler Holdings and Mrs. Mamadie Touré, that payments to her were actually considered, then made, by Pentler Holdings.

125.   **Finally**, on July 27, 2010 and August 5, 2010, two checks, respectively for 100,000 and 50,000 U.S. dollars, were issued by Mr. Frédéric Cilins to Mrs. Mamadie Touré, who, in her affidavit, specified indeed that she received several payments from BSGR through Mr. Frédéric Cilins.

126.   **All the above elements form a series of serious and concurring indications, which allow stating that:**

-   Through its legal representatives, including in particular Messrs. Roy Oron and Marc Struik, then, starting from 2006, Mr. Asher Avidan, and its agent in Guinea, Mr. Frédéric Cilins, BSGR contacted Mrs. Mamadie Touré, wife of the President of the Republic Lansana Conté and likely to influence him, for her to intervene with the Head of the State to actually obtain mining titles and mining agreements on the national territory;

-   Mrs. Mamadie Touré used her influence with the Head of the State, especially by organizing meetings with the representatives of BSGR, to motivate him to give instructions to the Minister of the Mines in order that mining titles and mining agreements be actually delivered to BSGR;

-   Due to these repeated interventions of Mrs. Mamadie Touré with Guinean authorities at the request of BSGR, several mining titles and a mining agreement related to the deposits of Zogota and Simandou were actually granted, as of February 2006, to this company which, however, did not have any significant experience in the mining sector concerned by the deposits in question, and therefore allowing to doubt the existence of sufficient technical and financial capacity to succeed in these mining operations, a condition required by the mining law in force;

-   Directly related to these interventions, financial advantages were contractually promised and grated by BSGR to Matinda

and Co Limited, where apparently Mrs. Mamadie Touré was manager (memorandum of understanding of June 20, 2007, commission contract of February 27, 2008, memorandum of understanding of February 28, 2008);

- These contracts are devoid of any ambiguity, establishing expressly a direct link between the significant advantages for Matinda and Co Limited – whose real activity in the "*medical or commercial*" field, as mentioned in the contracts, has not been established – and BSGR obtaining mining rights, especially in Simandou blocks 1 and 2;

- In direct exchange for the aforementioned interventions, financial advantages were also promised and granted to Mrs. Mamadie Touré by Pentler Holdings – obviously acting on behalf of BSGR – especially taking in it a free holding of 33.30% of the capital and, twice, the payment of 5 million U.S. dollars (memorandum of understanding of February 20, 2006, letters of commitments legalized on July 21, 2006, letters of commitment of July 8, 2010 and August 3, 2010, in particular);

- Just as the above, these documents are devoid of any ambiguity, establishing expressly a direct link between the significant advantages for Mrs. Mamadie Touré and BSGR obtaining mining rights in the deposits of Zogota and Simandou blocks 1 and 2;

127. Thus, it results from the above that BSGR obtained the mining titles and the mining agreement in question promising to pay, and indeed paying, several times, directly or indirectly, significant amounts to Mrs. Mamadie Touré, wife of the Head of State, for her to use her influence on behalf of BSGR.

128. Thus, the Technical Committee considers that BSGR obtained the mining titles and the mining agreement currently under review subsequent to corrupt practices.

129. In addition, no other logical and complete interpretation of the aforementioned elements of proof is plausible and, in fact, no such other interpretation has been proposed by the holder of the titles and the agreement in question or by the shareholders of this company, be they majority or minority.

130. Moreover, the Technical Committee vainly asked itself, given the perfectly concurrent character of the indications gathered, about the plausible character of a different analysis: no element of the file allows giving a different interpretation than that of the Technical Committee on the facts in question.

131. Concerning alternative explanations, proposed, as the case may be, by the interested parties, the Technical Committee points out that, under article 3 of the Rules of Procedure, *"in the absence of answer to the questions asked, or in the event of manifestly insufficient answers, the holder is reputed to have agreed with the facts mentioned in the notification, if the entire file cannot reasonably lead to a different conclusion."*

132. In this precise case, the facts stated above were not the subject of plausible explanations from VBG or, communicated through this company, from its shareholder BSGR.

133. Indeed, during the written proceedings as well as the oral proceedings, neither VBG nor its shareholders (Vale or BSGR) proposed any explanation of the various facts.

o  **During the written proceedings**

-  VBG, the company currently holding the mining titles and agreement, and which has two shareholders (BSGR with 49% and Vale with 51%), indicated that it cannot give answers concerning facts prior to the entry of Vale into its capital and therefore, according to its affirmations, systematically transmitted to BSGR the questions and requests of the Technical Committee for information;

-  BSGR, in turn, provided imprecise or dilatory answers, and then, when documents were sent to it, limited itself to denying overall facts that were proven, and contesting the authenticity of the exhibits as well as the competence of the Technical Committee, without otherwise supporting its denials.

    Thus, BSGR did not provide any evidence to contest the elements of proof of which this company was notified.

    In addition, although, in turn, Mr. Frédéric Cilins prepared an affidavit, it actually contradicted several of the affirmations of BSGR during these proceedings.

o  **During the oral proceedings**

-  VBG, represented during the hearing by persons who obviously were closer to the majority shareholder than the minority shareholder, indicated that Vale had initiated verifications before acquiring the rights it currently holds in VBG, but that it had not found elements that would lead it to doubt the legality of the mining titles and the mining agreement held at the time by BSGR.

    It gave as an example demonstrating the accomplishment of such steps the fact that, by a letter dated March 19, 2010, VBG had asked the Guinean authorities whether they had any

knowledge of corrupt practices taking place when the mining titles and mining agreement in question had been delivered.

As to the documents communicated by the Technical Committee and materially establishing the corrupt facts, VBG considered that it was not the best place to appreciate their evidentiary force and scope  and that these documents only reinforced the worries it may have felt and the questions it may have had.

So, in substance, VBG did not have any concrete element to bring to the Technical Committee concerning its investigations prior to the time when it had been sent the documents mentioned above, and it affirmed that it could not give any useful explanations when it was in the presence of these documents either.

- BSGR, in turn – it seems, if we believe what VBG says – had been requested several times by the latter to participate in the hearing organized by the Technical Committee. VBG also affirms that it had told BSGR that the Technical Committee was willing to facilitate the consular formalities for the representatives of BSGR who wanted to participate in the hearing. Consequently, BSGR refused to participate in this hearing along with VBG, yet a company in which it is a 49% shareholder.

134.    Taking into consideration all of the above, the Technical Committee is convinced that both the mining titles and the mining agreement currently under review were obtained as a result of corrupt practices.

## II. **THE ATTEMPTS TO DESTROY CERTAIN ELEMENTS OF PROOF**

135.    In addition, the Technical Committee finds, in fact, that various elements of proof obtained indicate that:

-    since March 2013, Mrs. Mamadie Touré was repeatedly approached by Mr. Frédéric Cilins, who obviously tried to maintain the contact with her and presented himself several times as acting on behalf of BSGR, especially on behalf of Mr. Beny Steinmetz, as he expressly mentioned in a conversation with Mrs. Mamadie Touré on April 11, 2013;

-    Mr. Frédéric Cilins asked Mrs. Mamadie Touré several times and especially on March 25, 2013 and April 11, 2013, to destroy contracts signed by her and establishing the remuneration for her intervention with President Lansana Conté for the purpose of the delivery of the mining titles and agreement to BSGR;

-    Mr. Frédéric Cilins promised to make new payments to Mrs. Mamadie Touré (especially one million U.S. dollars on April 11, 2013 and "400," i.e. 400,000 U.S. dollars on April 14, 2013); the conversations between these two persons concerned mainly the amount claimed by Mrs. Mamadie Touré.

136.    In addition, the Technical Committee notes  that the attempts to destroy these contracts at the initiative of Mr. Frédéric Cilins, acting on behalf of BSGR, would have been completely irrelevant if these contracts were forgeries, as affirmed by the minority shareholder of VBG. Indeed, the Technical Committee cannot understand the interest of these attempts and the payment of significant amounts to destroy documents which were just "crude forgeries," as affirmed by the minority shareholder of VBG.

137.    Such being the case, the Technical Committee considers that these attempts to destroy evidence referred to in the complaint provide sufficient proof concerning the actions of Mr. Frédéric Cilins who, acting on behalf of BSGR, intended to prevent the discovery of the truth concerning the corrupt facts in question.

138.    On the other hand, there are no consistent and complete alternatives of the aforementioned elements of proof. On this point, the Technical Committee refers to the developments presented in the two previous pages.

139.    In conclusion, and given all of the above, the Technical Committee considers that:

- There is a series of precise and concurring indications that establish with sufficient certainty the existence of corrupt practices tarnishing the granting of mining titles and the mining agreement in question to BSGR; and

- Such corrupt practices nullify the mining titles and the mining agreement currently held by VBG.

**Such being the case, the Technical Committee considers that:**

- these administrative acts could not create rights for the company that had obtained them, due to the irregularity tarnishing their granting proceedings;

- VBG which, in all events, is the current holder, may have this irregularity held against it;

- If, based on the information obtained by the Technical Committee, it is likely that the majority shareholder of VBG did not participate in the corrupt practices, this circumstance should not affect at all or even in part the recommendation to be submitted by the Technical Committee to the Strategic Committee, since the validity of a mining title or mining agreement is appreciated intrinsically.

**As a consequence of all the above, the Technical Committee submits the following recommendation to the Strategic Committee:**

- **to propose to the Minister of Mines to withdraw the exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008;**

- **to propose to the President of the Republic to withdraw the mining concession in the "Zogota" zone, with a total area of 1024 km$^2$ straddling the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2010/171/DIGM/CPDM pursuant to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010;**

- **then, to propose to the Minister of Mines to declare the cancellation of the Basic agreement dated December 16, 2009;**

- **to propose to the competent authorities to enjoin VBG to communicate to the services of the Ministry of Mines all studies, reports, data, results, samples, etc. that would have been realized or obtained in the mining operations of VBG in Guinea;**

-       **to propose to the competent authorities to take all useful measures to exclude VBG, holder of the titles and agreement in question, as well as the companies that originated these corrupt practices, i.e. BSGR and the directly or indirectly affiliated or controlled companies of the BSGR Group, from the proceedings of reattribution of the titles and agreement subject to this recommendation.**

Decided by the Technical Committee during its meeting of March 21, 2014.

President
[handwritten] Nava Touré
[signature]
[stamp]
TECHNICAL COMMITTEE FOR THE REVIEW OF MINING
TITLES AND AGREEMENTS
CTRTCM
PRESIDENT