**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE APPLICATION OF BENJAMIN
STEINMETZ FOR AN ORDER TO TAKE
DISCOVERY FROM VALE S.A., VALE
AMERICAS, INC., RIO TINTO PLC, AND
RIO TINTO LIMITED PURSUANT TO
28 U.S.C. § 1782

No. 20 Misc. 212 (AJN)

## RESPONDENTS RIO TINTO PLC AND RIO TINTO LIMITED'S MEMORANDUM OF LAW IN OPPOSITION TO APPLICANT BENJAMIN STEINMETZ'S APPLICATION FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Dated: June 26, 2020

James H. Mutchnik, P.C. (*pro hac vice*)
jmutchnik@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: +1 312 862 2000
Facsimile: +1 312 862 2200

Joseph M. Sanderson
joseph.sanderson@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: +1 212 446 4800
Facsimile: +1 212 446 4900

*Attorneys for Respondents Rio Tinto plc and Rio Tinto Limited*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ....................................................................................................... 3

    A.    Rio Tinto. ....................................................................................... 3

    B.    BSGR's Alleged Bribe-Paying And Subsequent Investigations. ........................... 4

    C.    Vale Wins an Arbitration Award Against BSGR and Sues Steinmetz. ................. 6

    D.    This Application and Steinmetz's Press Interviews................................. 7

ARGUMENT .......................................................................................................... 7

I.       RIO TINTO DOES NOT RESIDE AND IS NOT FOUND IN THIS DISTRICT............ 9

II.      STEINMETZ'S PUBLIC ADMISSIONS ABOUT THE PURPOSE OF THIS
PROCEEDING UNDERMINE HIS ASSERTIONS THAT HE SEEKS
DISCOVERY FOR USE IN THE ENGLISH HIGH COURT PROCEEDINGS. ........... 12

III.    STEINMETZ FAILS TO SHOW THAT THIS CASE WARRANTS EXERCISE
OF THE COURT'S DISCRETION TO GRANT DISCOVERY................................... 14

    A.    Rio Tinto's Documents Are Within the English Court's Jurisdictional
Reach....................................................................................... 14

    B.    Because Steinmetz Seeks Information About Vale's State of Mind, He
Should Obtain it from Vale.............................................................. 16

    C.    Because Steinmetz Is Seeking Relief from this Court While Absenting
Himself from the Jurisdiction, Steinmetz's Requests Violate Public Policy........ 18

    D.    The Documents Overwhelmingly Originate and Are Stored Overseas. ............... 20

    E.    The Requests Are Egregiously Overbroad Relative to Steinmetz's Stated
Purpose and Highly Burdensome........................................................ 21

        1.    Despite Justifying His Request by Reference to Vale's State of
Mind, Steinmetz Broadly Seeks All Documents About Simandou
and Investigations into Steinmetz. .......................................... 22

        2.    Compliance Would Cost Rio Tinto, A Non-Party, Millions of
Dollars, Yet Steinmetz Has Made No Offer to Defray Those Costs. ....... 23

        3.    Under Rule 45(d)(1), Rio Tinto Is Entitled to Its Fees in Opposing
this Application. ............................................................... 25

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Int'l Life Assur. Co. of New York v. Vazquez*,
No. 02 Civ. 141 (HB), 2003 WL 548736 (S.D.N.Y. Feb. 25, 2003)......................................25

*In re Application of Hanwei Guo*,
No. 18-MC-561 (JMF), 2019 WL 917076 (S.D.N.Y. Feb. 25, 2019)....................................13

*Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*,
No. 17-MC-00216 (VEC), 2017 WL 3841874 (S.D.N.Y. Sept. 1, 2017) ..............................10

*Bd. of Governors of Fed. Reserve Sys. v. Mahfouz*,
No. 92 CIV. 5096 (MGC), 1992 WL 183556 (S.D.N.Y. July 23, 1992)................................20

*BNSF Ry. Co. v. Tyrrell*,
137 S. Ct. 1549 (2017)............................................................................................................9

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012)....................................................................................................21

*Brown v. Lockheed Martin Corp.*,
814 F.3d 619 (2d Cir. 2016)....................................................................................................9

*Burns v. Bank of Am.*,
No. 03 Civ. 1685 (RMB) (JCF), 2007 WL 1589437 (S.D.N.Y. June 4, 2007) .....................17

*In re China Petrochemical Dev. Corp.*,
No. 3:17-MC-00157 (SRU), 2017 WL 10841339 (D. Conn. Nov. 28, 2017)........................13

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014)..............................................................................................................9

*In re Degitechnic*,
No. C07-414-JCC, 2007 WL 1367697 (W.D. Wash. May 8, 2007) ......................................22

*In re Del Valle Ruiz*,
342 F. Supp. 3d 448 (S.D.N.Y. 2018)....................................................................................10

*In re del Valle Ruiz*,
939 F.3d 520 (2d Cir. 2019)............................................................................................ *passim*

*In re Edelman*,
295 F.3d 171 (2d Cir. 2002)...................................................................................................25

*In re Elvis Presley Enterprises LLC*,
   No. 15MC386 (DLC), 2016 WL 843380 (S.D.N.Y. Mar. 1, 2016) .......................................22

*In re Fornaciari*,
   No. 17 Misc. 521, 2018 WL 679884 (S.D.N.Y. Jan. 29, 2018)...............................................10

*Forsythe v. Midland Funding LLC*,
   No. 18CV03276ARRCLP, 2019 WL 245459 (E.D.N.Y. Jan. 17, 2019) ...............................17

*G & E Real Estate, Inc. v. Avison Young-Washington, D.C., LLC*,
   317 F.R.D. 313 (D.D.C. 2016).................................................................................................24

*Glock v. Glock, Inc.*,
   797 F.3d 1002 (11th Cir. 2015) ..............................................................................................13

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014).......................................................................................................9

*In re Hansainvest Hanseatische Inv.-GmbH*,
   364 F. Supp. 3d 243 (S.D.N.Y. 2018)......................................................................................24

*Haworth, Inc. v. Herman Miller, Inc.*,
   998 F.2d 975 (Fed. Cir. 1993)..................................................................................................18

*In re Michael Page do Brasil Ltda.*,
   No. CV 17-4269-KM-JBC, 2019 WL 168828 (D.N.J. Jan. 10, 2019) ...................................22

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004)........................................................................................................ *passim*

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   No. 17 Civ. 6221 (KPF), 2019 WL 7283254 (S.D.N.Y. Dec. 26, 2019)................................24

*In re IPC Do Nordeste, LTDA2*,
   No. 12-50624, 2012 WL 4448886 (E.D. Mich. Sept. 25, 2012).............................................15

*Jhirad v. Ferrandina*,
   536 F.2d 478 (2d Cir. 1976).....................................................................................................20

*Kestrel Coal Pty. Ltd. v. Joy Glob., Inc.*,
   362 F.3d 401 (7th Cir. 2004) ...................................................................................................21

*Kiobel v. Cravath, Swaine & Moore LLP*,
   895 F.3d 238 (2d Cir. 2018)....................................................................................7, 8, 12, 21

*In re Kleimar N.V.*,
   220 F. Supp. 3d 517 (S.D.N.Y. 2016)......................................................................................10

*Legal Voice v. Stormans Inc.*,
 738 F.3d 1178 (9th Cir. 2013) .................................................................24

*Linder v. Calero-Portocarrero*,
 251 F.3d 178 (D.C. Cir. 2001) .................................................................24

*In re Macquarie Bank Ltd.*,
 No. 2:14 Civ. 00797 (GMN) (NJK),
 2015 WL 3439103 (D. Nev. May 28, 2015) ...............................................17, 18, 22

*Mees v. Buiter*,
 793 F.3d 291 (2d Cir. 2015) .................................................................21

*In re Metallgesellschaft AG*,
 121 F.3d 77 (2d Cir. 1997) .................................................................17

*In re Microsoft Corp.*,
 428 F. Supp. 2d 188 (S.D.N.Y. 2006) .................................................................15

*Nat'l Broad. Co. v. Bear Stearns & Co.*,
 165 F.3d 184 (2d Cir. 1999) .................................................................13

*Night Hawk Ltd. v. Briarpatch Ltd., L.P.*,
 No. 03 Civ. 1382 (RWS), 2003 WL 23018833 (S.D.N.Y. Dec. 23, 2003) ............................25

*Obregon v. Superior Court*,
 67 Cal. App. 4th 424 (1998) .................................................................23

*In re OOO Promnefstroy*,
 No. M 19-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) .................................15

*In re Petrobras Sec. Litig.*,
 393 F. Supp. 3d 376 (S.D.N.Y. 2019) .................................................................13

*In re Pioneer Corp.*,
 No. MC 18-0037 UA (SS), 2018 WL 2146412 (C.D. Cal. May 9, 2018) ..............................17

*In re Porsche Automobil Holding SE*,
 No. 15 Misc. 417 (LAK), 2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) .................................17

*In re Postalis*,
 No. 18-MC-497 (JGK), 2018 WL 6725406 (S.D.N.Y. Dec. 20, 2018)...................................13

*In re Qualcomm Inc.*,
 162 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................15

*Matter of Requested Extradition of McMullen*,
 No. 86 CR. MISC. 1, 1988 WL 70296 (S.D.N.Y. June 24, 1988) .........................................20

*S.E.C. v. Roman*,
  No. 94 CIV. 3621 (SAS), 1996 WL 34146 (S.D.N.Y. Jan. 30, 1996)....................................19

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*,
  376 F.3d 79 (2d Cir. 2004).................................................................................................22

*Staudinger+Franke GMBH v. Casey*,
  No. 13 Civ. 6124 (JGK), 2015 WL 3551256 (S.D.N.Y. June 8, 2015)...............................23

*United States Sec. & Exch. Comm'n v. Ahmed*,
  No. 3:15-CV-675 (JBA), 2016 WL 10572640 (D. Conn. Aug. 22, 2016) ...........................20

*United States v. Rivera-Ventura*,
  72 F.3d 277 (2d Cir. 1995)..................................................................................................20

*Williams v. City of Dallas*,
  178 F.R.D. 103 (N.D. Tex. 1998) ........................................................................................24

*In re WinNet R CJSC*,
  No. 16 Misc. 484 (DLC), 2017 WL 1373918 (S.D.N.Y. Apr. 13, 2017) ..............................13

*Zoological Soc. of Buffalo, Inc. v. Carvedrock, LLC*,
  No. 10-CV-35A SR, 2013 WL 5652759 (W.D.N.Y. Oct. 15, 2013)......................................17

**Statutes**

28 U.S.C. § 1782.......................................................................................................... *passim*

**Rules**

Civ. Proc. R. 31.8 (Eng.)..........................................................................................................16

Civ. Proc. R. 31.17 (Eng.)........................................................................................................16

Fed. R Civ. P. 26.......................................................................................................................21

Fed. R. Civ. P. 45 ................................................................................................................ *passim*

## PRELIMINARY STATEMENT

Applicant Benjamin Steinmetz ("Steinmetz") was charged with bribery in Switzerland for paying millions of dollars to Guinean government officials, including the wife of the then-President and the Minister of Mines, between 2008 and 2010 to procure mining concessions at Simandou, one of the world's most valuable iron ore deposits.  Respondent Vale S.A. was Steinmetz's joint venture partner in Simandou.  Steinmetz was (and may still be) under investigation by a grand jury in this District; one of his associates, Frédéric Cilins, was convicted of obstructing that investigation after saying that an unnamed co-conspirator would pay a cooperating witness to give false testimony, destroy documents, and flee the United States.

Steinmetz's conduct in Guinea spawned an assortment of litigation and arbitration, in recent years primarily between Steinmetz or his company BSG Resources Limited ("BSGR"; BSG stands for Benjamin Steinmetz Group) and Vale.  Steinmetz claims that he is seeking discovery in this proceeding from Vale and from Rio Tinto plc and Rio Tinto Limited (together, "Rio Tinto"[1]) solely for use in proceedings in England in which Vale is suing Steinmetz for allegedly deceiving Vale about the fact that he had obtained the Simandou concession through bribery.  As explained below, however, Steinmetz's interviews with a number of publications immediately after filing this proceeding call into doubt whether that was his true motive.

Regardless, this proceeding does not belong here.  The litigation for which Steinmetz claims he needs these documents is in England.  Rio Tinto plc has one of its headquarters in England, is incorporated there, and has the contractual right to all information of Rio Tinto Limited and its subsidiaries.  The information Steinmetz seeks appears to originate primarily

---

[1]   Rio Tinto has a dual listed companies (DLC) structure in which Rio Tinto plc and Rio Tinto Limited and their respective groups operate together as a single economic enterprise.

overseas; virtually none of it appears to have originated from or be stored in the United States, let alone New York.  English courts have jurisdiction to compel discovery from non-parties, including not only documents that the non-party may possess in England, but also those that they have the right to obtain wherever located.  This application is thus a clear example of forum-shopping, with Steinmetz hoping that this Court will be more lenient in scrutinizing the breadth of his requests, and less likely than the English courts to order him to bear the costs of review and production if discovery is ordered.

What is more, the only specific reasons why Steinmetz *says* he needs information from Rio Tinto are to find out about "*Vale's* knowledge of any issues with the procurement of the mining rights" and "*Vale's* own wrongdoing with respect to the JV Agreement and/or mining rights." Doc. 3 at 7 (emphasis added).  Of course, the best source of information about what Vale knew is Vale, not a third party.  Steinmetz's brief similarly focuses on Vale, often treating Rio Tinto as an afterthought.  The proposed subpoenas to Rio Tinto reflect this point:  they are mostly copied from the proposed subpoenas to Vale.  The subpoenas are, in any event, grossly overbroad and untethered to his stated reasons:  they seek categories of information like "[a]ll documents and communications concerning BSGR and/or Benjamin Steinmetz" and "[a]ll documents and communications concerning Simandou."  Doc. 5-4 at 7.

Thus, even if this Court had jurisdiction over Rio Tinto for discovery purposes—and under the *Del Valle* test, it does not—this case would be a poor candidate for this Court's exercise of its discretion under Section 1782.  The discretionary *Intel* factors weigh strongly against Steinmetz.  The documents at issue are within the English court's jurisdictional reach.  Steinmetz's stated reason for seeking discovery—to find out what Vale knew—is information more readily available from Vale than from a third party.  Steinmetz's conduct in seeking

2

discovery here while absenting himself from the jurisdiction with knowledge of the criminal investigations into him weighs against granting him relief.  The relevant documents overwhelmingly originate and are stored overseas.  And the requests are astonishingly overbroad and burdensome.  The application should be denied.[2]

## BACKGROUND

### A.    Rio Tinto.

Rio Tinto is composed of two companies operating as a single economic enterprise:  Rio Tinto plc, incorporated under the laws of England & Wales, headquartered in England, and traded on the London Stock Exchange with American Depositary Receipts traded on the New York Stock Exchange; and Rio Tinto Limited, incorporated under the laws of the State of Victoria, Australia, headquartered in Australia, and traded on the Australian Stock Exchange. Sanderson Decl. Ex. 1 (2019 Annual Report) at 151.[3]  Under this dual listed companies structure, each company is required to, among other things, "ensure that the businesses . . . are managed on a unified basis," Ex. 2 (DLC Agreement) § 2, have the same boards, id. § 3, and share "all information . . . relating to their respective businesses," id. § 8.1.  Under Section 8.1 of the DLC Merger Sharing Agreement, Rio Tinto plc, headquartered in England, has the right to obtain all Rio Tinto documents, whether stored at Rio Tinto plc or Rio Tinto Limited.

---

[2]    If the Court nonetheless grants the application, Rio Tinto respectfully requests that compliance be conditioned on Steinmetz paying the costs, including attorneys' fees, for collection, review, and production.  Additionally, Rio Tinto limits itself at this stage to issues that weigh against issuing subpoenas at all; if the application is granted, Rio Tinto will raise objections to individual requests at the appropriate time.  See Fed. R. Civ. P. 45(d)(2)(B).

[3]    Unless otherwise specified, "Ex." refers to exhibits to the Declaration of Joseph M. Sanderson.

Prior to 2008, Rio Tinto had a concession granted by the government of Guinea authorizing it to develop certain iron ore deposits in Guinea's Simandou region. *See* Ex. 3 (Nov. 2, 2012 Financial Times article) at 4. The Rio Tinto group employees assigned to the project were overwhelmingly outside the United States; the few Rio Tinto affiliates' employees based in New York primarily work on diamond marketing and had nothing to do with the Simandou project. Sanderson Decl. ¶ 31-32. In 2008, the government of Guinea removed part of Rio Tinto's concession. *See* Ex. 3 (Nov. 2, 2012 Financial Times article) at 4.

### B.   BSGR's Alleged Bribe-Paying And Subsequent Investigations.

A few months later, BSGR, controlled by Steinmetz, was granted those rights by Guinea for the price of $160 million. *Id.* at 1. Two years later, Steinmetz sold 51% of those rights to Vale for $2.5 billion. *Id.* Press reports later began to emerge that BSGR had bribed assorted government officials with millions of dollars and promises of shares of the profits to win the rights, including an approximately $2.5 million "commission" paid by a company associated with BSGR to Mamadie Touré, the then-President of Guinea's fourth wife. *Id.* at 2; Ex. 4 (Nov. 7, 2012 Financial Times article) at 2-3; Ex. 5 (ANCIR article) at 2.

As BSGR's bribery scheme came to light, press reports indicate that investigations began in Guinea, the United States, Switzerland, the United Kingdom, and Israel. *See, e.g.*, Ex. 6 (Dec. 19, 2016 Associated Press article) at 2. Shortly thereafter, according to filings by the government in this District, on April 14, 2013, one of Steinmetz's business associates, Frédéric Cilins, met with Mamadie Touré at the Jacksonville Airport, and asked her to hand over, among other things, copies of contracts for $12 million in bribes to be distributed to government officials as needed, the $2.5 million "commission" for Touré, and assorted contracts whereby a share of the profits of Simandou would go to companies controlled by Touré. Cilins wanted the contracts so that they could be destroyed. Ex. 7 (Cilins Criminal Complaint) ¶¶ 11-17. Cilins

had promised at least a million dollars for these documents to be destroyed.  *Id.* ¶ 20m.

Unknown to Cilins, Touré was wearing a wire and the FBI was waiting at the airport.  *Id.* ¶ 23.

Cilins was arrested and charged in this District with obstruction of justice.  Ex. 8 (Cilins

Indictment).  He later pleaded guilty.  Ex. 9 (Change of Plea Transcript).

According to the indictment, Cilins paid Touré to lie about her relationship with "a

company affiliated with a co-conspirator not named herein ('CC-1')."  Ex. 8 ¶ 5a.  He "said that

CC-1 would pay for" Touré to sign a false attestation.  *Id.*  He told Touré "that CC-1 told [him]

to destroy documents in the possession of the CW, including documents related to the allegations

concerning mining concessions in the Simandou region of Guinea, and to report back to CC-1

that CILINS had witnessed the destruction of those documents."  *Id.* ¶ 5g.  Cilins claimed to be

working closely with CC-1, and was recorded saying "I just went to see him [CC-1]. . . . Just last

week I told him . . . 'She'll never betray you.  She'll never betray you.  She'll never hand over

any document whatsoever . . .'  He said to me 'Listen, that's good, but I want you to go see and I

want you to destroy those documents.'  He told me 'Fine, you go.  Do what you want, but I want

you to tell me that 'I saw that the documents were destroyed.  It's over.  There are no more

documents.'"  Ex. 10 (Gov't Motion in Limine) at 5.  According to Cilins "Everything I'm

telling [you] is directly from CC-1."  Ex. 11 (Sentencing Mem. Ex. 7) at 59.  "Nobody can

guarantee you anything except for him, the one up top."  Ex. 12 (Sentencing Mem. Ex. 8) at 7-8.

The government indicated that the company was BSGR.[4]  And a Guinean government

report containing unredacted versions of the transcripts confirms that CC-1 is Steinmetz.[5]

---

[4]   *See, e.g.*, Ex. 13 (April 18, 2013 Transcript) at 20:1-8; Ex. 14 (Jan. 15, 2015 Order) at 1-3.

[5]   Ex. 15 (Guinean Government Report); *see also* Ex. 16 (April 25, 2013 Transcript) at 30:22-
24, 31:1-2, 66:23-25; Ex. 17 (Sentencing Mem. Ex. 4) at 5 ("I've never . . . seen a billionaire
as simple."); *see* Ex. 18 (New Yorker article) at 16 ("Cilins said that he had seen CC-1—
Steinmetz—the previous week.").

At least one of the investigations into Steinmetz, in Switzerland, has led to criminal charges being filed against him for public corruption and for fabricating contracts and invoices to hide the payment of bribes from the banks and authorities.  Ex. 20 (Geneva Public Prosecutor Press Release); Ex. 19 (Aug. 12, 2019 Reuters article).

Likewise—and unsurprisingly given the indications that he was an unnamed co-conspirator in the *Cilins* indictment—Steinmetz has been (and may still be) the subject of an investigation in this District.  For example, it has been reported that grand jury subpoenas "requested information not just on 'the Simandou concession' but on Steinmetz himself."  Ex. 18 (New Yorker article) at 20.  Similarly, a partially-unsealed order tolling statutes of limitations pending various requests to foreign governments contains indications that one of the redacted names of subjects of the investigation is Steinmetz.  Ex. 21 (Tolling Order).  The current status of the investigation is not public.

### C.    Vale Wins an Arbitration Award Against BSGR and Sues Steinmetz.

In the wake of the discovery of Steinmetz's bribery, the Guinean government moved to strip the BSGR-Vale joint venture of its concession, prompting an assortment of litigation and arbitration proceedings.  Most relevant to this proceeding, Vale won an approximately $2 billion arbitral award against BSGR in an arbitration hosted by the London Court of International Arbitration (which is a private arbitral body akin to the American Arbitration Association).  Ex. 22 (Award).  In the wake of that, BSGR went into administration in the Bailiwick of Guernsey and sought Chapter 15 recognition of that proceeding in this District.  *In re BSG Resources Ltd.*, No. 19-11845-shl (Bankr. S.D.N.Y., filed June 3, 2019).  In the meantime, both the English High Court and this Court confirmed Vale's arbitration award and rejected BSGR's efforts to vacate it.  Ex. 23 (English order); Ex. 24 (S.D.N.Y. judgment).  Vale then sued Steinmetz and a variety of entities and individuals associated with him individually in the English High Court on

substantially similar theories to those at issue in the arbitration.  Doc. 5-6.  Rio Tinto has no

involvement in the recent arbitration or litigation between Vale and Steinmetz.

      **D.**      **This Application and Steinmetz's Press Interviews.**

Steinmetz filed this application on May 21, 2020, claiming that the requests were in aid

of the English High Court proceedings.  Doc. 1 at 2.  Immediately after this proceeding was

initiated, however, Steinmetz gave interviews or provided quotes to numerous publications that

told a different story.  Steinmetz told Reuters that he had just "filed documents . . . with a U.S.

court" that he claimed "show[] Vale was aware of potential bribery."  Ex. 25 (May 22, 2020

Reuters article) at 2.  BSGR, he informed Reuters, "is seeking to reopen an arbitration case that

ordered it to pay $1.25 billion to Brazilian miner Vale SA."  *Id.* at 1.  And he told the Financial

Times "he has new evidence that will help him reverse a $2bn arbitration award," namely the

transcripts of conversations with Mr. Martins filed in this proceeding, and "he was confident the

London arbitration court would reopen the case."  Ex. 26 (May 24, 2020 Financial Times article)

at 3.  In short—to the extent that Steinmetz's goal even is to get discovery, rather than using this

Court's docket for public relations purposes—Steinmetz has admitted that it is in aid of *private*

*arbitration* proceedings, not the English litigation.

## ARGUMENT

Section 1782 "authorizes, but does not require," courts to provide assistance to parties

with an interest in proceedings before foreign tribunals.  *Intel Corp. v. Advanced Micro Devices,*

*Inc.*, 542 U.S. 241, 247 (2004).  "[E]ven if a court has jurisdiction under the statute to grant a

petition, the decision to grant it is discretionary."  *Kiobel v. Cravath, Swaine & Moore LLP*, 895

F.3d 238, 242 (2d Cir. 2018).

Three "jurisdictional requirements" are necessary before a district court can order Section

1782 discovery:  (1) the respondent must "reside (or be found)" in the district; (2) the discovery

must be "for use in a proceeding before a foreign tribunal"; and (3) the applicant must be either the tribunal or "any interested person."  *Id.* at 243.

If those three mandatory requirements are satisfied, a court then may exercise its discretion whether to grant or deny the application.  "To guide district courts in the decision to grant a Section 1782 petition, the Supreme Court in *Intel* discussed non-exclusive factors (the '*Intel* factors') to be considered in light of the 'twin aims' of Section 1782: 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'" *Id.* at 244 (internal citation omitted).  The four *Intel* factors are:  (1) whether the "person from whom discovery is sought is a participant in the foreign proceeding" or otherwise within "the foreign tribunal's jurisdictional reach"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether requests are "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 264-65.  These non-exclusive factors are "not to be applied mechanically," and "[a] district court should also take into account any other pertinent issues arising from the facts of the particular dispute."  *Kiobel*, 895 F.3d at 245.

Here, Steinmetz fails on two of the threshold requirements, and presents a poor case for this Court to exercise its discretion.  Rio Tinto is a foreign company, and the information sought concerns foreign activities with no causal link to New York; Rio Tinto thus does not reside and is not found in this District.  Steinmetz, meanwhile, has admitted that his true purpose is to use the documents before private arbitrators to get them to reverse the award against BSGR, not

before a foreign or international tribunal.  And there is no good reason to let Steinmetz impose

enormous costs on Rio Tinto, a third party, when any information it has is within the English

court's jurisdiction—especially while Steinmetz evades and obstructs a grand jury investigation

in this District.

## I.     RIO TINTO DOES NOT RESIDE AND IS NOT FOUND IN THIS DISTRICT.

For Rio Tinto to reside or be found in this District, for Section 1782 purposes, Steinmetz

must show that it is subject to this Court's general or specific personal jurisdiction.  *In re del*

*Valle Ruiz*, 939 F.3d 520, 527-28 (2d Cir. 2019).  Rather than attempt to apply the tests for

general or specific personal jurisdiction, Steinmetz instead alleges a mishmash of links between

Rio Tinto and New York without attempting to show how they fit into the tests in this Circuit for

personal jurisdiction, and instead, he cites a case applying an overruled test.  Doc. 3 at 20-21.

First, Rio Tinto is not subject to general jurisdiction in New York.  "[G]eneral

jurisdiction requires affiliations so continuous and systematic as to render the foreign corporation

essentially at home in the forum State, i.e., comparable to a domestic enterprise in that State."

*Daimler AG v. Bauman*, 134 S. Ct. 746, 758 n.11 (2014).  "The 'paradigm' forums in which a

corporate defendant is 'at home,'" are "the corporation's place of incorporation and its principal

place of business."  *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).  In *BNSF*, the

Supreme Court held that 2,000 miles of track and 2,000 employees in Montana did not suffice to

make BNSF "at home" there.  *Id.* at 1559.  Similarly, the Second Circuit has held that branch

offices in New York do not make a defendant subject to all-purpose jurisdiction.  *Gucci Am., Inc.*

*v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014).  Nor does registration to do business suffice for

general jurisdiction.  *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 626 (2d Cir. 2016).

Here, Rio Tinto plc is incorporated under English law and headquartered in England and

Rio Tinto Limited is incorporated under the laws of Victoria, Australia and headquartered in

Australia.  Ex. 1 (2019 Annual Report); Mance Decl. Exs. 7 & 9.  The allegations that Steinmetz

makes—that Rio Tinto plc offers ADRs in New York, has subsidiaries with (relatively small)

offices in New York, has registered to do business in New York, did not contest jurisdiction in a

securities lawsuit arising from its New York-listed ADRs, and has subsidiaries that own mines

and have employees elsewhere in the United States, Doc. 3 at 20—do not come close to making

Rio Tinto plc (let alone Rio Tinto Limited) "at home" in New York.  Courts dealing with similar

allegations in Section 1782 petitions have consistently found them inadequate to establish

general jurisdiction in New York.  *In re Del Valle Ruiz*, 342 F. Supp. 3d 448, 455 (S.D.N.Y.

2018) (branch in New York, ADR offering, management of subsidiaries, and prior litigation in

New York not enough for general jurisdiction); *In re Fornaciari*, No. 17 Misc. 521, 2018 WL

679884, at *2 (S.D.N.Y. Jan. 29, 2018) (branch); *Australia & New Zealand Banking Grp. Ltd. v.

APR Energy Holding Ltd.*, No. 17-MC-00216 (VEC), 2017 WL 3841874, at *4 (S.D.N.Y. Sept.

1, 2017) (branch).  Plaintiff cites *In re Kleimar N.V.*, but that case applied the rejected

"systematic and regular business" test.  220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016).  Rio Tinto is

not "at home" in New York, and thus is not subject to general jurisdiction here.

        Nor is Rio Tinto subject to specific personal jurisdiction here.  "Translated to account for

a § 1782 respondent's nonparty status," the Second Circuit has held that "where the discovery

material sought proximately resulted from the respondent's forum contacts, that would be

sufficient to establish specific jurisdiction for ordering discovery."  *del Valle Ruiz*, 939 F.3d at

530.  "That is, the respondent's having purposefully availed itself of the forum must be the

primary or proximate reason that the evidence sought is available at all."  *Id.*  In certain

circumstances "where the respondent's contacts are broader and more significant, a petitioner

need demonstrate only that the evidence sought would not be available but for the respondent's

forum contacts." *Id.* But "we have always required some *causal* relationship between an entity's in-forum contacts and the proceeding at issue." *Id.*

Guinea is, to state the obvious, not in the Southern District of New York, and there are no meaningful contacts, alleged or otherwise, between Rio Tinto's operations in Simandou and this District. The Rio Tinto employees involved in the project were overwhelmingly overseas, and its affiliates' New York employees had nothing to do with Simandou. Sanderson Decl. ¶ 31-32. Rio Tinto group offices in the United States (let alone New York) had minimal involvement with any aspect of the Simandou project. *Id.* ¶ 32. Steinmetz does not allege to the contrary. Rather, he alleges that Rio Tinto personnel briefly visited Cleary Gottlieb's office in New York to discuss selling mining rights in Simandou to Vale between November 2008 and February 2009. Doc. 3 at 21. The *del Valle Ruiz* court held that similar allegations—using New York-based advisors to pursue a transaction and a roadshow that included meetings in New York—were inadequate to subject a foreign company to specific personal jurisdiction for Section 1782 discovery. 939 F.3d at 531.

Likewise, Steinmetz's theory that Rio Tinto, "in advance of and during" prior litigation had (presumably privileged) "internal discussions" and "prepared" (presumably work product) "written records," Doc. 3 at 21, similarly misses the point. First of all, the prior litigation was here because Rio Tinto alleged that Vale and Steinmetz availed themselves of New York as part of an effort to induce Guinea to strip Rio Tinto of mining rights, not because New York had anything significant to do with Rio Tinto's management of its Guinean assets. But in any event, Steinmetz makes clear that he is not only seeking information about specific meetings or (again, presumably privileged) documents generated in the course of litigation filed more than six years ago, but *anything* about Simandou and *anything* about the investigations into Simandou. The

overwhelming majority of what Steinmetz seeks are documents created overseas that would have existed whether or not Rio Tinto had abortive sale negotiations in New York and whether or not there had been prior litigation.  Under the *del Valle Ruiz* test, that information has no causal link to activities in New York and is thus not discoverable under Section 1782 in New York.[6]

## II.    STEINMETZ'S PUBLIC ADMISSIONS ABOUT THE PURPOSE OF THIS PROCEEDING UNDERMINE HIS ASSERTIONS THAT HE SEEKS DISCOVERY FOR USE IN THE ENGLISH HIGH COURT PROCEEDINGS.

Steinmetz identifies one proceeding for which he seeks discovery:  the proceedings in "the High Court of Justice in the [sic] London, in England & Wales" between Vale and certain of its affiliates and Steinmetz and certain of his businesses and associates.  Doc. 3 at 1; *see also* Doc. 1 at 1.  But, immediately after filing the application, Steinmetz admitted that what his lawyers told this Court was mere window-dressing for his true purpose.  When Reuters reported on Steinmetz's filings in this action, he told it that BSGR "is seeking to reopen an arbitration case that ordered it [BSGR] to pay $1.25 billion to Brazilian miner [Vale]."  Ex. 25 (May 22, 2020 Reuters article) at 1.  When the Financial Times similarly reported on filings in this case, Steinmetz told it that "he has new evidence that will help him reverse a $2bn arbitration award" and "he was confident the London arbitration court would reopen the case."  Ex. 26 (May 24, 2020 Financial Times article).  Thus, to the extent that Steinmetz's goal in filing this proceeding was actually to obtain discovery, rather than to publicize evidence through this Court's docket and impose expense, it was in aid of arbitration, not in aid of the English litigation.

---

[6]    In any event, Steinmetz's reliance on the existence of largely-privileged documents from prior litigation as a basis for bringing this proceeding weighs heavily against granting the request, even if the Court has the discretion to do so.  *See Kiobel*, 895 F.3d at 246-47 (holding that it was an abuse of discretion to grant a Section 1782 application for foreign client's litigation-related documents, in evasion of protective order issued in prior litigation).

That is significant, because binding Second Circuit precedent holds that a private arbitral tribunal like the LCIA is *not* a foreign court or tribunal for Section 1782 purposes. *Nat'l Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184, 191 (2d Cir. 1999) ("In sum, policy considerations of some magnitude reinforce our conclusion, based upon an analysis of the text and legislative history of § 1782, that Congress did not intend for that statute to apply to an arbitral body established by private parties."). If Steinmetz had admitted his true goal in this Application, it would have thus required denial. *See In re Petrobras Sec. Litig.*, 393 F. Supp. 3d 376, 385 (S.D.N.Y. 2019) ("[T]his Court concludes that *NBC* remains good law."); *In re Application of Hanwei Guo*, No. 18-MC-561 (JMF), 2019 WL 917076, at *3 (S.D.N.Y. Feb. 25, 2019) ("Nor is the Court persuaded by Guo's fallback argument that *NBC* is no longer good law"); *In re China Petrochemical Dev. Corp.*, No. 3:17-MC-00157 (SRU), 2017 WL 10841339, at *3 (D. Conn. Nov. 28, 2017) ("[T]he Second Circuit's decision in *NBC* is still good law"). And courts in this district have emphasized that it is an application's true purpose, not the stated purpose, that matters. *In re Postalis*, No. 18-MC-497 (JGK), 2018 WL 6725406, at *4 (S.D.N.Y. Dec. 20, 2018) ("Given Postalis's public statements that this application is an attempt to gain pre-litigation discovery for a prospective lawsuit in the United States, Postalis's assertions that the requested discovery is for use in the Brazilian proceedings are not credible."). In short, in light of the substantial evidence that Steinmetz's stated reasons for seeking discovery are pretextual, the application must be denied.[7]

---

[7] Moreover, even if Steinmetz could show that he *also* could use the information in the English High Court, his dishonesty is itself sufficient reason for this Court to deny discovery in the exercise of its broad discretion. *See Glock v. Glock, Inc.*, 797 F.3d 1002, 1009 (11th Cir. 2015) ("[T]his kind of subterfuge is a valid reason to reject a § 1782 application in the first place."); *In re WinNet R CJSC*, No. 16 Misc. 484 (DLC), 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017) (finding lack of candor warranted denial of Section 1782 application).

III.   **STEINMETZ FAILS TO SHOW THAT THIS CASE WARRANTS EXERCISE OF THE COURT'S DISCRETION TO GRANT DISCOVERY.**

Nor does Steinmetz show that he is deserving of a favorable exercise of this Court's broad discretion under Section 1782.  His application largely deals with Vale, often treating Rio Tinto as an afterthought.  He shows no good reason to force Rio Tinto—whose documents are within the English court's jurisdiction—to export documents to New York, incurring English data protection law compliance costs, so that they can be sent back to England, especially where the information sought has nothing to do with activities in New York in the first place.  He shows no good reason to make Rio Tinto, which has no involvement in the English litigation, spend millions of dollars to subsidize it when the stated reason for discovery—determining what Vale knew—is far more obviously available from Vale.  His requests are egregiously overbroad and burdensome relative to their stated purpose, and he has made no offer to pay for review and production.  And his obstruction of a grand jury investigation into Simandou in this District means that granting him judicial assistance under Section 1782 would offend public policy.

A.   **Rio Tinto's Documents Are Within the English Court's Jurisdictional Reach.**

Firstly, this case simply does not belong in New York.  Steinmetz seeks to require Rio Tinto to engage in "boomerang" discovery—to export documents from England to the United States, to the extent that any such documents exist, in order to re-export them to England so they can be used in England.  There is a court with jurisdiction over Rio Tinto's documents far better placed to make the decision as to whether this information really matters to its proceedings—the court before which Steinmetz's English litigation is pending.

Where the party from whom discovery is sought is within "the foreign tribunal's jurisdictional reach," it strongly weighs against discovery in the United States, because the foreign tribunal can decide for itself whether it sees fit to require discovery and how much.  *Intel*,

14

542 U.S. at 264.  While most frequently encountered in Section 1782 cases involving parties to the foreign proceedings or their affiliates or employees, *see, e.g.*, *id.*, that principle applies with full force to a third party whose documents are accessible to the foreign tribunal.  *See, e.g.*, *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006) ("While IBM and Cleary Gottlieb are not 'participants,' *per se,* in the underlying antitrust proceeding, all of the documents sought by Microsoft are within the Commission's reach."); *In re OOO Promnefstroy*, No. M 19-99 (RJS), 2009 WL 3335608, at *6 (S.D.N.Y. Oct. 15, 2009) ("In this case, while Feldman may be beyond the reach of the Dutch courts, the information Promnefstroy seeks most certainly is not.");[8] *In re IPC Do Nordeste, LTDA2*, No. 12-50624, 2012 WL 4448886, at *6 (E.D. Mich. Sept. 25, 2012) ("In sum, as it is uncontested that the Brazilian court has the power to order the production of the evidence sought by IPC, the first *Intel* factor weighs in favor of Dow Chemical and against IPC."); *In re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1039 (N.D. Cal. 2016) ("[I]n some circumstances, evidence may be available to a foreign tribunal even if it is held by a non-participant to the tribunal's proceedings.").  Section 1782's purpose is not to make the United States an international discovery clearinghouse for information accessible in the jurisdiction where foreign proceedings are ongoing; it is "to assist foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons having no bearing on international comity, they cannot obtain under their own laws."  *Intel*, 542 U.S. at 262.

Here, there is no doubt that the English court has the power to compel production of Rio Tinto's documents if it sees fit.  Rio Tinto plc is incorporated under English law and headquartered just over a mile from the Royal Courts of Justice.  Mance Decl. Ex. 7.  Under

---

[8]   While both of these cases separately concluded that § 1782 does not authorize discovery of foreign-located documents, a position rejected by *del Valle Ruiz*, their analysis of the discretionary factors remains good law.

Section 8.1 of the DLC Agreement, Rio Tinto plc has access to documents in the possession of Rio Tinto Limited or its subsidiaries too:  it requires that both halves of Rio Tinto "shall disclose, and agrees to procure that each of its Subsidiaries shall disclose, to [the other] all information (including Intellectual Property rights) from time to time relating to their respective businesses." Ex. 2 (DLC Agreement) § 8.1.  The English courts have broad jurisdiction to compel discovery against third parties, and Rio Tinto plc is within their jurisdiction.  Civ. Proc. R. 31.17 (Eng.); Mance Decl. ¶¶ 11-15, 19.  "Control," for discovery purposes in England, is similar to the definition in the United States.  *See* Civ. Proc. R. 31.8 (Eng.) ("For this purpose a party has or has had a document in his control if – (a) it is or was in his physical possession; (b) he has or has had a right to possession of it; or (c) he has or has had a right to inspect or take copies of it."); Mance Decl. ¶ 18.  Thus, because Rio Tinto plc has the right to access information of Rio Tinto Limited and its subsidiaries, the English court has jurisdiction to order Rio Tinto plc to make them available in England, if the English court sees fit to issue such an order.  *Id.* ¶¶ 20-22.

There is thus a far more convenient forum with full jurisdiction to decide whether and what documents Rio Tinto must produce.  Steinmetz's resort to this Court, then, has nothing to do with the documents being unavailable to the foreign court.[9]

**B.      Because Steinmetz Seeks Information About Vale's State of Mind, He Should Obtain it from Vale.**

Another independent reason not to grant third-party discovery is Steinmetz's stated reason for seeking it.  Courts consistently hold that, where the information sought from a third party is available from a party to the foreign proceedings, Section 1782 relief is unwarranted.

---

[9]      It is instead likely a recognition of the fact that (a) the evidentiary showing in the English court to get third-party discovery would likely be higher, (b) the breadth of his requests would likely be closely scrutinized, and (c) the normal rule in the UK is that a party must pay a non-party's costs and lawyers' fees.  *See* Mance Decl. ¶¶ 17, 25-34.

*See, e.g.*, *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997) ("[I]f it were clear that discovery were equally available in both foreign and domestic jurisdictions, a district court might rely on this evidence to conclude that the § 1782 application was duplicative."); *In re Pioneer Corp.*, No. MC 18-0037 UA (SS), 2018 WL 2146412, at *7 (C.D. Cal. May 9, 2018) ("The Court is reluctant to subject a third party to the burden of searching for and producing documents that appear to be more logically in the possession of a party."); *In re Macquarie Bank Ltd.*, No. 2:14 Civ. 00797 (GMN) (NJK), 2015 WL 3439103, at *9 (D. Nev. May 28, 2015) ("When the information sought is equally available through the foreign proceeding from a party to that proceeding, such requests targeting a different person in the United States are by their very nature unduly burdensome.").

Information about what Vale knew is most obviously in the possession of Vale, and before burdening a third party, Steinmetz should demonstrate why he cannot get it from Vale.[10] Steinmetz's application reflects this, focusing extensively on Vale and often treating Rio Tinto as an afterthought that is relevant only to the extent Vale supposedly learned things from Rio Tinto. The sole basis Steinmetz asserts for needing this information from Rio Tinto, as opposed to Vale, is that he claims Vale spoliated unspecified evidence—without specifying whether the supposedly spoliated evidence even related to anything Rio Tinto may have disclosed to Vale.

---

[10]   While Section 1782 does not include a "foreign-discoverability" requirement or a requirement to apply to the foreign court first, *see, e.g.*, *In re Porsche Automobil Holding SE*, No. 15 Misc. 417 (LAK), 2016 WL 702327, at *9 (S.D.N.Y. Feb. 18, 2016), that does not excuse Steinmetz from complying with the standard rules of third-party discovery under Rule 45.  And under Rule 45, courts routinely hold that non-party subpoenas for information more obviously available from a party are inappropriate.  *E.g.*, *Burns v. Bank of Am.*, No. 03 Civ. 1685 (RMB) (JCF), 2007 WL 1589437, at *14 (S.D.N.Y. June 4, 2007); *Forsythe v. Midland Funding LLC*, No. 18CV03276ARRCLP, 2019 WL 245459, at *2 (E.D.N.Y. Jan. 17, 2019); *Zoological Soc. of Buffalo, Inc. v. Carvedrock, LLC*, No. 10-CV-35A SR, 2013 WL 5652759, at *3 (W.D.N.Y. Oct. 15, 2013).

Doc. 3 at 8-9.  The only evidence Steinmetz relies on for the allegation of spoliation is his Defenses (the equivalent of an Answer) in the English proceeding.  *Id.*  He did not attach to his application Vale's supposed admissions that documents were destroyed.  Even if it were true, however, Steinmetz's obvious remedy would be to seek discovery from Vale regarding the scope of the supposed spoliation and to seek spoliation sanctions in England.  The English court, with Steinmetz and Vale before it, is better placed than this Court to decide whether there is an actual spoliation issue here or merely a collateral dispute about custodians of borderline relevance.  At any rate, if Steinmetz wished to rely on supposed spoliation by Vale to justify burdening Rio Tinto with reconstructing Vale's knowledge, he should have introduced actual evidence of the information sought being unavailable from Vale with his application, not a mere pleading of his own creation.[11]  *See Haworth, Inc. v. Herman Miller, Inc.*, 998 F.2d 975, 978 (Fed. Cir. 1993).

### C.   Because Steinmetz Is Seeking Relief from this Court While Absenting Himself from the Jurisdiction, Steinmetz's Requests Violate Public Policy.

Public policy also strongly favors denial of the application.  *See Intel*, 542 U.S. at 265 ("[A] district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.").  Here, Steinmetz's application offends public policy:  he is attempting to obtain the benefits of this Court's jurisdiction while absent from the United States with knowledge that he has been at minimum the subject, and possibly the target, of a grand jury investigation in this District that has already resulted in an indictment in which he was alleged to be a co-conspirator.

This Court's records strongly suggest that Steinmetz is or was under investigation in this District, likely in connection with both the alleged bribery of Guinean officials and efforts to

---

[11]   If Steinmetz produces such evidence on reply, that would of course be too late.

obstruct this District's investigation.  Steinmetz's associate, Frédéric Cilins, was charged in this

District with obstruction offenses for attempting to pay Mamadie Touré to destroy evidence and

testify falsely, and ultimately pleaded guilty.  Ex. 8 (Indictment).  The indictment and other

documents filed in this District indicate that on recorded conversations, Cilins repeatedly

indicated that he was acting at the express direction of CC-1, whom Cilins said would pay for

Touré to sign a false attestation, directed Cilins to ensure Touré destroyed documents, and with

whom Cilins said he was coordinating closely.  *Id.* ¶ 5.  In Cilins' own words:  "I just went to see

him [CC-1]. . . . Just last week I told him . . . 'She'll never betray you.  She'll never betray you.

She'll never hand over any document whatsoever . . .'  He said to me 'Listen, that's good, but I

want you to go see and I want you to destroy those documents.'  He told me 'Fine, you go.  Do

what you want, but I want you to tell me that 'I saw that the documents were destroyed.  It's

over.  There are no more documents.'''  Ex. 10 (Gov't Motion in Limine) at 5.  According to

Cilins, "[e]verything I'm telling [you] is directly from CC-1."  Ex. 11 (Sentencing Mem. Ex. 7)

at 59.  "Nobody can guarantee you anything except for him, the one up top."  Ex. 12 (Sentencing

Mem. Ex. 8) at 7-8.  The unredacted versions of the transcripts, which appear in a Guinean

government report, unequivocally state that CC-1 is Steinmetz.  Ex. 15 (Guinean Report).  The

partially-unsealed tolling order also contains indications that one of the redacted names is

Steinmetz's.  Ex. 21 (Tolling Order).  Press reports have indicated that grand jury subpoenas in

the investigation "requested information not just on 'the Simandou concession' but on Steinmetz

himself."  Ex. 18 (New Yorker article) at 16.

       Courts in this District have held that parties who are evading criminal investigations by

leaving or refusing to return to the jurisdiction cannot seek discovery in the United States, at

least in an action related to the investigation.  *S.E.C. v. Roman*, No. 94 CIV. 3621 (SAS), 1996

WL 34146, at *2 (S.D.N.Y. Jan. 30, 1996); *Bd. of Governors of Fed. Reserve Sys. v. Mahfouz*, No. 92 CIV. 5096 (MGC), 1992 WL 183556, at *2 (S.D.N.Y. July 23, 1992); *see also United States Sec. & Exch. Comm'n v. Ahmed*, No. 3:15-CV-675 (JBA), 2016 WL 10572640, at *2 (D. Conn. Aug. 22, 2016) (noting that court cannot effectively enforce protective orders in such circumstances).[12]  Similar principles apply with even more force under Section 1782, where discovery is committed to the Court's broad discretion and the Supreme Court has expressly stated that district courts should consider policy considerations in exercising their discretion.

Steinmetz, in short, is seeking this Court's approval for a discretionary remedy—Section 1782 discovery—while he may potentially be evading this Court's jurisdiction in connection with the grand jury investigation.  Before granting him this discretionary relief, this Court should assure itself that Steinmetz is willing to take the bitter with the sweet—that he can only obtain the benefits of discretionary relief from this Court if he is willing to accept the burdens of this Court's jurisdiction over the related criminal investigation.

### D.    The Documents Overwhelmingly Originate and Are Stored Overseas.

A further reason to deny discovery is the foreign location of the documents at issue.  The *del Valle Ruiz* court, while holding that Section 1782 did not categorically bar discovery of foreign-located documents, held that "a court may properly, and in fact should, consider the location of documents and other evidence when deciding whether to exercise its discretion to authorize such discovery."  939 F.3d at 533.  Here, the overwhelming majority of the relevant information, to the extent it exists, originates from and is stored outside the United States.  Based

---

[12]  *Cf. Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976) (declining to return while knowing of an investigation is "constructive flight"); *United States v. Rivera-Ventura*, 72 F.3d 277, 283-84 (2d Cir. 1995) (similar); *Matter of Requested Extradition of McMullen*, No. 86 CR. MISC. 1, 1988 WL 70296, at *4 (S.D.N.Y. June 24, 1988) (applying constructive flight doctrine even though defendant lived openly outside the jurisdiction investigating him).

on preliminary inquiries, Rio Tinto believes that the overwhelming majority of the custodians

who may have information related to Simandou were located overseas, and none in New York.

Sanderson Decl. ¶ 32.  *Id.*[13]  And, as noted above, much of the information originates in—and *all*

*of it* is accessible on request from—the jurisdiction where the foreign proceedings are pending.

There is no reason here "to require evidence to be imported from a foreign nation so that it may

be handed over here and then exported."  *Kestrel Coal Pty. Ltd. v. Joy Glob., Inc.*, 362 F.3d 401,

404 (7th Cir. 2004).

### E.   The Requests Are Egregiously Overbroad Relative to Steinmetz's Stated Purpose and Highly Burdensome.

Finally, the breadth and burden imposed by the requests warrant denial.  "[A] district

court evaluating a § 1782 discovery request should assess whether the discovery sought is

overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal

Rules of Civil Procedure."  *Mees v. Buiter*, 793 F.3d 291, 302 (2d Cir. 2015).  While, similar to

other subpoenas, "a closely tailored discovery order" is generally preferable to "denying relief

outright," *id.*, outright denial is permissible where a request "is made in bad faith, for the purpose

of harassment, or unreasonably seeks cumulative or irrelevant materials," *Brandi-Dohrn v. IKB*

---

[13]   Rio Tinto's understanding is that any information gathered in connection with prior litigation several years ago would be archived on hard drives stored initially in Australia and now in England. *Id.* ¶ 33.  In addition to potential challenges recovering review data from litigation almost half a decade ago, Steinmetz in any event is bound by a protective order in that litigation that adopted language he himself advocated for expressly prohibiting him from using documents in other proceedings and permitting him only to use information *derived* from protected material.  Ex. 27 (Protective Order) § VI.  Steinmetz's company, BSGR, sought to modify that provision in 2016 to allow use of Rio Tinto's documents in other proceedings, but Magistrate Judge Peck denied the motion.  Ex. 28 (Apr. 18, 2016 Order).  To allow Steinmetz to bypass the restrictions he agreed to (and advocated for) and that Magistrate Judge Peck has already made clear he does not intend to modify by bringing a separate Section 1782 proceeding "would undermine confidence in protective orders," warranting denial of the application.  *Kiobel*, 895 F.3d at 247.

*Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012), or where "narrowly tailored

discovery orders" are not possible, *Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79,

85 (2d Cir. 2004).  Courts thus have outright denied Section 1782 discovery where there has

been no effort to tailor discovery or minimize burdens.  *E.g.*, *In re Elvis Presley Enterprises*

*LLC*, No. 15MC386 (DLC), 2016 WL 843380, at *6 (S.D.N.Y. Mar. 1, 2016); *In re Macquarie*

*Bank Ltd.*, 2015 WL 3439103, at *9 ("When a party chooses to serve overly broad discovery, it

runs the risk that the discovery will be denied outright without an opportunity to narrow it."); *In*

*re Michael Page do Brasil Ltda.*, No. CV 17-4269-KM-JBC, 2019 WL 168828, at *13 (D.N.J.

Jan. 10, 2019) (same); *In re Degitechnic*, No. C07-414-JCC, 2007 WL 1367697, at *5 (W.D.

Wash. May 8, 2007) (quashing in entirety "extremely broadly-worded and sweeping requests").

     Here, Steinmetz makes no effort to tailor the discovery he seeks to his stated reason for

seeking it, raising the inference that his stated reason is pretextual and that his true intent may be

to impose burdens on parties he blames for the criminal investigations and prior judgments he

faces.  Nor has Steinmetz offered to defray the costs of compliance or taken any steps

whatsoever to protect Rio Tinto, a non-party to the foreign proceedings, from the significant

burdens of reviewing and producing the sweeping categories of documents Steinmetz seeks and

of complying with foreign data privacy laws in doing so.  His request should be denied, and he

should be required under Rule 45(d)(1) to pay Rio Tinto's attorneys' fees.

     **1.**     **Despite Justifying His Request by Reference to Vale's State of Mind,**
                **Steinmetz Broadly Seeks All Documents About Simandou and**
                **Investigations into Steinmetz.**

     The only reasons Steinmetz is able to enumerate for why it needs discovery from Rio

Tinto are "Vale's knowledge of any issues with the procurement of the mining rights" and

"Vale's own wrongdoing with respect to the JV Agreement and/or mining rights."  Doc. 3 at 7.

Rather than serve narrowly-targeted requests for specific documents or at least carefully

circumscribed categories, however, Steinmetz has served astoundingly broad requests.  It seeks "[a]ll documents and communications concerning Vale's activities in Guinea from June 1, 2005 until December 31, 2014."  Request No. 1.  It seeks "[a]ll documents and communications concerning BSGR and/or Benjamin Steinmetz."  Request No. 2.  Virtually all of its requests are not limited to information Rio Tinto communicated to Vale.  Perhaps most egregiously, it seeks "[a]ll documents and communications concerning Simandou," that is, every single document concerning a region of Guinea in which Rio Tinto has had involvement since the 1990s and where it still has operations to this day.  Request No. 15.

Steinmetz, in short, makes no effort whatsoever to tailor his requests to his stated justification for this application (or to the issues being litigated in London) or to reduce the burden on Rio Tinto—a non-party—in any way whatsoever.  The requests are so "grossly overbroad on their face," indeed, that "a reasonable inference can be drawn of an intent to harass and improperly burden."  *Obregon v. Superior Court*, 67 Cal. App. 4th 424, 431 (1998); *see also Staudinger+Franke GMBH v. Casey*, No. 13 Civ. 6124 (JGK), 2015 WL 3551256, at *2 (S.D.N.Y. June 8, 2015) (requests for "literally every financial document" over a five-year period "appeared to be calculated to burden and harass.").  No reasonable person could think that "[a]ll documents and communications concerning Simandou," is a reasonable, proportionate, and targeted discovery request even to a party, let alone a non-party.  The only plausible inference is that these broad requests are calculated to harass and impose cost on Rio Tinto.

### 2.    Compliance Would Cost Rio Tinto, A Non-Party, Millions of Dollars, Yet Steinmetz Has Made No Offer to Defray Those Costs.

Complying with the subpoenas would likely cost Rio Tinto millions of dollars. Sanderson Decl. ¶ 33.  While databases from prior litigation are archived offline and detailed statistics are unavailable, Rio Tinto collected millions of documents; the discovery process was

highly contentious and Rio Tinto believes that the majority of the collected documents had not

been reviewed, even for responsiveness to the discovery requests in *that* case, by the time that

the prior litigation was dismissed.  *Id.*  The breadth of Steinmetz's requests—including "[a]ll

documents and communications concerning Simandou," Request No. 15—might require even

broader collection and review of documents over a period of more than a decade.

There is no basis to make Rio Tinto subsidize litigation between Steinmetz and Vale.

Rule 45(d)(2)(B)(ii) "obligates, and not merely empowers, the Court to protect third parties from

significant expenses resulting from compliance with subpoenas."  *Iowa Pub. Employees' Ret.*

*Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 17 Civ. 6221 (KPF), 2019 WL 7283254,

at *2 (S.D.N.Y. Dec. 26, 2019).  Courts have found that $9,000 and $20,000 were "significant,"

requiring mandatory cost-shifting.  *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1185 (9th Cir.

2013); *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001) (citing *Williams v.*

*City of Dallas*, 178 F.R.D. 103, 113 (N.D. Tex. 1998)); *see G & E Real Estate, Inc. v. Avison*

*Young-Washington, D.C., LLC*, 317 F.R.D. 313, 320 (D.D.C. 2016) ($3,148.44 "significant").

Consistent with Rule 45(d)(2)(B)(ii), courts must require parties seeking discovery under

Section 1782 to pay for review and production if the cost is significant.  Judge Sullivan recently

conditioned the grant of a Section 1782 application on the applicant paying for measures

necessary to comply with foreign data protection laws (including the GDPR, which still applies

in England) and providing indemnities against liability for violating foreign data protection laws.

*In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 252 (S.D.N.Y. 2018).  If

discovery is ordered, this Court should impose similar conditions.[14]

---

[14]    Given that Steinmetz has apparently secreted his wealth in asset-protection "foundations" in
      Liechtenstein, is subject to asset freezing injunctions in England, and has absented himself

###### 3.     Under Rule 45(d)(1), Rio Tinto Is Entitled to Its Fees in Opposing this Application.

Finally, Rio Tinto is entitled to its fees in opposing this application.  The protections of Rule 45 apply in Section 1782 proceedings.  *In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002). Rule 45(d)(1) mandates an award of attorneys' fees when a party fails to take reasonable steps to avoid undue burden and expense to the subpoenaed person and forces the latter to have to resort to the court instead.  *E.g.*, *Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, No. 03 Civ. 1382 (RWS), 2003 WL 23018833, at *9 (S.D.N.Y. Dec. 23, 2003); *Am. Int'l Life Assur. Co. of New York v. Vazquez*, No. 02 Civ. 141 (HB), 2003 WL 548736, at *3 (S.D.N.Y. Feb. 25, 2003) (imposing attorneys' fees award for issuing "sweeping subpoena").  Steinmetz issued Rio Tinto, a non-party, incredibly broad requests that on their face would likely require reviewing millions of documents and did not offer to defray Rio Tinto's costs of review and production.  That amply justifies an award of attorneys' fees under Rule 45(d)(1).

## CONCLUSION

For the foregoing reasons, Steinmetz's application should be denied, and Steinmetz should be ordered to pay Rio Tinto's fees in opposing this application.

---

from the jurisdiction making it difficult to enforce any orders the court may issue, if this Court requires production, it should require Steinmetz to post a bond for these expenses.

Dated: June 26, 2020

Kirkland & Ellis LLP

/s/ James H. Mutchnik
James H. Mutchnik, P.C. (pro hac vice)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: +1 312 862 2000
Facsimile: +1 312 862 2200

Joseph Myer Sanderson
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: +1 212 446 4800
Facsimile: +1 212 446 4900

*Attorneys for Respondents Rio Tinto plc and
Rio Tinto Limited*