**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE APPLICATION OF BENJAMIN STEINMETZ FOR AN ORDER TO TAKE DISCOVERY FROM VALE S.A., VALE AMERICAS, INC., RIO TINTO PLC, AND RIO TINTO LIMITED PURSUANT TO 28 U.S.C. § 1782 | No. 20 Misc. 212 (AJN) |

**DECLARATION OF THE RIGHT HONORABLE LORD MANCE, PC**

I, Jonathan Hugh Mance, declare under penalty of perjury under the laws of the United States of America as follows:

1.      A true and correct copy of my CV is attached hereto as **Exhibit 1**. It includes a list of the publications I authored in the last ten years and a list of all cases in which I have testified as an expert at trial or deposition in the last four years.

2.      Until June 2018, I was Deputy President of the United Kingdom Supreme Court, having been a member of that Court from its inception in October 2010 and of its predecessor, the Appellate Committee of the House of Lords, from 2005. I am currently active in the law as an arbitrator in chambers at 7 King's Bench Walk, Temple, London EC4Y 7DS, as well as sitting in an appellate capacity in the Singapore International Commercial Court and serving as Chief Justice of the Astana International Financial Center Court.

3.      I studied jurisprudence at University College, Oxford from 1961 to 1964 receiving a first class degree. Following this, I was called to the Bar by the Middle Temple in 1965. I took silk as a Queen's Counsel in 1982 and became a Bencher at Middle Temple in 1989. At the Bar, I specialized in commercial law including insurance and reinsurance, professional negligence, banking and international trade.

4.      In 1990, I became a recorder (which is a part-time judicial position) and in October 1993, I was appointed a Judge of the Queen's Bench Division in the High Court. I was appointed a Lord Justice of Appeal and a Privy Counsellor in April 1999 and served on the Court of Appeal until appointed to the House of Lords, which was at that time the highest appellate court in the United Kingdom, in 2005. Whilst on the Bench, I sat on the Council of Europe's Consultative

2

Council of European Judges, serving as chair from 2000 to 2003. I also served from 2010 to 2018 as a member of the seven-person panel responsible under article 255 of the Treaty on the Functioning of the European Union for scrutinizing and reporting on the suitability of all candidates for appointment to the Court of Justice of the European Union.

5.      I became a member of the Supreme Court of the United Kingdom on its creation in October 2009, and its Deputy President in September 2017, serving in that capacity until I reached the statutory retiring age in June 2018. Before the creation of the Supreme Court, I sat from 2005 as a Lord of Appeal in Ordinary in the House of Lords, then the highest appellate court in the United Kingdom, as well as in the Judicial Committee of the Privy Council, which is still responsible for appeals from some thirty overseas jurisdictions. At the bar and in my various judicial roles I have been involved in a considerable number of cases relating to conflicts of laws and the civil procedure rules. **Exhibit 2** lists a number of such cases in these areas in which I sat in the Supreme Court, including cases where I gave the lead judgment.

6.      As an arbitrator, since June 2018, I have been and am involved in a wide range of arbitrations (in many cases as a sole arbitrator or chair) under ICC, LCIA, UNCITRAL, and ICSID Rules. I am the Chair of the International Law Association, Chair of the Conduct Committee of the House of Lords, and a member of the Judicial Integrity Group. I have for many years sat on, and am currently co-chair (with the Advocate-General for Scotland) of, the Lord Chancellor's Advisory Committee on Private International Law. Over the last three months, I  played a leading role in debates in the House of Lords on the Private International Law (Implementation of Agreements) Bill, one of the measures proposed by the Government to fill (in part) gaps which will potentially arise in the private international law area after the "Implementation [or

"Transition"] Period" (due to end on 31st December 2020) relating to the United Kingdom's departure from the European Union.

7.      I am being compensated for my work in connection with this matter at a rate of £800 per hour.  My fees are in no way contingent on the nature of my conclusions, the presentation of those conclusions in testimony, or the outcome of any proceeding.

8.      I have not previously been retained by any party in connection with any filing made in this or any other court and consider myself to be a disinterested and impartial authority on English law and practice with relevant professional experience.  I disclose that both I and my self-employed pension fund have shareholdings in Rio Tinto PLC (among other investments administered on my or my pension fund's behalf by independent fund managers exercising discretionary powers), but this has not in any way affected the opinions stated herein.

9.      I have been retained by Kirkland & Ellis LLP, counsel for Rio Tinto PLC and Rio Tinto Limited (together, "**Rio Tinto**") to provide my expert opinion on certain questions of English law that I understand may be relevant to the proceedings in the United States in this matter. I have been asked, specifically, to give expert evidence as to the jurisdiction of the English court and as to the circumstances in which an English court can and may make an order against a non-party to disclose or produce documents potentially relevant in proceedings before the English courts.

10.      I set out in the Appendix to this Affirmation the materials which I have considered when forming my opinion.

A.      **The jurisdiction of the English court**

11.     Like all sovereign countries, the courts of England & Wales have jurisdiction over individuals and companies domiciled within their physical jurisdiction.  Normally, this jurisdiction is exercised between parties to proceedings. But there are circumstances in which it is exercised towards non-parties, e.g. by witness summonses or by disclosure orders. Statutory underpinning for the exercise of such jurisdiction commonly exists in the form of Acts of Parliament, such as the Supreme Court Act 1981 and the Civil Procedure Act 1997, as amended by the Constitutional Reform Act 2005, or Rules of Court supplemented by Practice Directions, made thereunder. The current procedural code in higher courts is constituted by the Civil Procedure Rules and Practice Directions (the "**CPR**"), made under powers conferred by sections 1, 2 and 5 of the Civil Procedure Act 1997 (as amended by the Constitutional Reform Act 2005) (a true and correct copy of which are attached hereto as **Exhibit 3**). There also exist common law principles which inform the meaning, or supplement the provisions, of this procedural code. Finally, the higher courts have certain inherent powers.

B.      **English Courts may order non-parties to proceedings to provide documents**

12.     The CPR provide a party to English proceedings with two potential routes to obtain documents from a person who or entity which is not a party to those proceedings (a "**non-party**" or "**third party**"):

        (a)     An order can be made for non-party disclosure pursuant to CPR 31.17 (a true and correct copy of which is attached hereto as **Exhibit 4**); or

(b)     A witness summons can be issued pursuant to CPR 34.2 (a true and correct copy of which is attached hereto as **Exhibit 5**).

**(i)       Non-party disclosure under CPR 31.17**

13.     A person who is not a party to proceedings, but is nonetheless within the jurisdiction of the Court may be made subject to a disclosure order in the course of proceedings between others in the circumstances set out in CPR 31.17. Such an order may relate to the disclosure of documents which are in England and Wales or in another jurisdiction worldwide.  Deliberate failure to comply would be enforceable ultimately as a contempt of Court.

14.     CPR 31.17 provides that:

"(1) This rule applies where an application is made to the court under any Act for disclosure by a person who is not a party to the proceedings.

(2) The application must be supported by evidence.

(3) The court may make an order under this rule only where–

(a)     the documents of which disclosure is sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings; and

(b)     disclosure is necessary in order to dispose fairly of the claim or to save costs.

(4) An order under this rule must –

(a)     specify the documents or the classes of documents which the respondent must disclose; and

(b)     require the respondent, when making disclosure, to specify any of those documents –

(i)     which are no longer in his control; or

(ii)     in respect of which he claims a right or duty to withhold inspection.

(5) Such an order may –

(a)     require the respondent to indicate what has happened to any documents which are no longer in his control; and

(b)     specify the time and place for disclosure and inspection." (**Exhibit 5**) [emphasis added]

15.     The relevant Act under CPR 31.17(1) is for present purposes the Senior Courts Act 1981, section 34(2) of which provides that:

> "On the application, in accordance with rules of court, of a party to any proceedings to which this section applies, the High Court shall, in such circumstances as may be specified in the rules, have power to order a person who is not a party to the proceedings and who appears to the court to be likely to have in his possession, custody or power any documents which are relevant to an issue arising out of the said claim—
>
> (a) to disclose whether those documents are in his possession, custody or power; and
>
> (b) to produce such of those documents as are in his possession, custody or power to the applicant or, on such conditions as may be specified in the order -
>
> (i) to the applicant's  legal advisers; ….."
>
> (a true and correct copy of which is attached hereto as **Exhibit 6**)

16.     I highlight some points arising from the wording of CPR 31.17.

17.     <u>First</u>, the jurisdiction is discretionary.  The inclusion of the word "may" within the wording of CPR 31.17(3) makes clear that the Court has discretion to act where the criteria set out in the subsequent sub-paragraphs have been met. In other words, the Court is not compelled to order disclosure of documents but may, on exercising its discretion in the light of all the circumstances, decide that it is appropriate to do so if the criteria in CPR 31.17 are met.

18.     <u>Second</u>, CPR 31.17 is addressing disclosure of documents within the "control" of the third party. The concept of "control" governs disclosure by both parties and non-parties to proceedings: see CPR 31.8 and 31.17(4) and (5) (**Exhibit 5**). After providing that the English Court can order that a party produce "documents which are or have been in his control" (CPR 31.8(1)), CPR31.8(2) goes on to specify that

"[…] a party has or has had a document in his control if -

(a)     It is or was in his physical possession;

(b)     he has or had a right to possession of it; or

(c)     he has or has had a right to inspect or take copies of it." (**Exhibit 5**).

19.     According to public records, Rio Tinto PLC's registered office is at 6 St James's Square London, United Kingdom, SW1Y 4AD (a true and correct copy of those public records is attached hereto as **Exhibit 7**). A company's registered office is the official address of the incorporated entity and, under section 86 of the Company Act 2006, the location where all communications and notices may be addressed as outlined in section 1182 of the Company Act 2006 (a true and correct copy of which is attached hereto as **Exhibit 8**).  As it is domiciled in England, Rio Tinto PLC is an English company and therefore is within the physical jurisdiction of the Courts of England & Wales. The English courts would have no difficulty exercising their jurisdiction to order Rio Tinto plc as a non-party to English proceedings to make disclosure, if the other requirements of CPR 31.17 were satisfied.

20.     In contrast, Rio Tinto Limited has its registered office at Level 33, 120 Collins Street, Melbourne, 3000, Victoria, Australia. (a true and correct copy of those public records is

attached hereto as **Exhibit 9**). Rio Tinto Limited is therefore prima facie outside the jurisdiction of the English Courts.  I have however been provided with a copy of the "DLC Merger Sharing Agreement" between Rio Tinto Limited and Rio Tinto PLC dated 21 December 1995, as subsequently amended (the "MSA") (a true and correct copy of the document I was provided with is attached hereto as **Exhibit 10**; I do not have personal knowledge of this document but understand that other witnesses will authenticate it).  This MSA is governed by English law (see clause 21).  "'DLC Merger' is defined to mean "the merger of RTL and RTO so that, inter alia, RTL and RTP have a unified management structure and so that the businesses of both the RTL Group and the RTP Group are run on a unified basis", and clause 2 of the MSA provides under the heading "Management of the Businesses" that

> "Each party will do ….. all acts and things which may be necessary or desirable to ensure that and within their respective powers to ensure that the businesses of both the RTL Group and the RTP Group are managed on a unified basis for the benefit of the shareholders of RTL and RTP as a combined group and that full effect is given to this Agreement."

21.    Clause 8.1 of the MSA states that:

> "Subject to any relevant obligation owed to a third party and to Clause 8.4, each party shall disclose, and agrees to procure that each of its Subsidiaries shall disclose, to the other all information (including Intellectual Property rights) from time to time relating to their respective businesses and agrees to use, and to procure that its Subsidiaries shall use, all reasonable endeavours either:
>
> (a)    to obtain a waiver of any relevant obligation owed to a third party to the extent that such obligation would prevent disclosure to the other of any information; or
>
> (b)    to obtain the third party's acceptance that members of the RTL Group or members of the RTP Group, as the case may be, are to be treated as permitted recipients under the terms of the relevant confidentiality agreement".

22.     Reading this clause, Rio Tinto PLC has the right to call for Rio Tinto Limited to disclose to Rio Tinto PLC, and to procure that its subsidiaries disclose to it, documents held by Rio Tinto Limited or its subsidiaries.  As such, the English Court could make an order against Rio Tinto PLC that it provide any documents held by Rio Tinto Limited relating to the latter's business. Those documents are within the "control" of Rio Tinto PLC in the sense used in CPR 31.8 and 31.17, since Rio Tinto PLC has "a right to inspect or take copies of" them.  If the English Court was persuaded that Rio Tinto Limited had relevant documents, and the other tests for non-party disclosure were met, I see no problem in principle about it relying upon the terms of the MSA to ensure that documents held by Rio Tinto Limited were produced by Rio Tinto PLC.

23.     The factual and legal position is, on this basis, in sharp contrast with that which existed in _Lonrho Ltd v Shell Petroleum Co Ltd_ [1980] 1 WLR 27 (H.L.) (Eng.) (a true and correct copy of which is attached hereto as **Exhibit 11**), a case decided under the predecessor Rules of the Supreme Court Order 24, which provided that

> ".... the court may order any party ..... to make and serve on any other party a list of the documents which are or have been in his possession, custody or power relating to any matter in question in the cause or matter".

24.     Disclosure was sought by Lonrho Ltd from Shell Petroleum Co Ltd ("Shell") and British Petroleum Co Ltd ("BP") of documents of African subsidiaries within Shell's  and BP's corporate groups which Shell and BP owned indirectly through a company, Consolidated Petroleum Co Ltd in which Shell and BP each held a 50% interest. The boards of the subsidiaries refused to disclose the documents on the grounds that it would constitute a criminal offence to do so under local law without a ministerial licence. Lonhro argued  that Shell Petroleum and British Petroleum could nevertheless, as ultimate beneficial owners, by elaborate corporate moves procure

Consolidated to change both its own and the subsidiaries' articles of association, so as to entitle Consolidated and then Shell and BP to inspect the subsidiaries' documents and also to require the subsidiaries at least to apply for a ministerial licence. The argument failed decisively. It was unclear how it could be in Consolidated's best interest to act as suggested. Further, the Rule looked to current or past possession, custody or power, not to some future position. Lord Diplock speaking on behalf of the whole House said (at 635) that

> " …. in the context of the phrase 'possession, custody or power', the expression 'power' must, in my view, mean a presently enforceable legal right to obtain from whoever actually holds the document inspection of it without the need to obtain the consent of anyone else".

Despite the difference in the former and present Rules' terminology, Lord Diplock's definition of "power" under the old Rules is an obvious precursor of the modern Rule which refers to "a right to inspect or take copies of" a document. The terminology of the modern Rule therefore dovetails with that of section 34(1) of the Senior Courts Act 1981 (see paragraph 15 above) in the same way as the terminology of the old Rules. Unlike the facts arising in the *Lonhro* case, the present circumstances fall directly within Lord Diplock's definition set out in *Lonhro* as well as within the language of CPR 31.8(c).  Rio Tinto PLC therefore has control over documents held by Rio Tinto Limited.

25.    <u>Third</u>, it is "only" if both the conditions indicated in CPR 31.17(3) are shown to be satisfied that the court may make an order against a third party under this Rule. Thus, it must be shown both that: (i) the documents sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to proceedings; and (ii) their disclosure is necessary in order to fairly dispose of the claim or save costs.

26.     As to the first condition, in _Frankson v Home Office (alias Rowe v Fryers)_ [2003]
EWCA Civ 655; [2003] 1 WLR 1952 (a true and correct copy of which is attached hereto as
**Exhibit 12**), Lord Justice Scott Baker (with whose judgment Mr Justice Wilson agreed) explained
the resulting position as follows:

> "10. The word 'only' in paragraph (3) emphasises that disclosure from third parties
> is the exception rather than the rule. Disclosure will not be routinely ordered but
> only where the conditions there specified are met. The first condition in (3)(a) is
> that the documents sought are likely to support the case of the applicant or adversely
> affect the case of one of the other parties. In other words they must have a
> potentially relevant bearing on one or more of the live issues in the case. The
> question is whether they are likely to help one side or the other. In _Three Rivers_
> _District Council and Others v Governor and Company of the Bank of England_
> (No.4) [2003] 1 WLR 210 Chadwick L.J, giving the judgment of the court, explored
> in some depth the meaning of the word 'likely' in this rule before concluding in para
> 32:

>> 'In those circumstances, unless there were reasons which compelled a
>> different conclusion, we would think it right to reject the submission that
>> the work 'likely', in the context of the threshold condition in rule
>> 31.17(3)(a), means "more probable than not"; and to hold that the word has,
>> in that context, the meaning 'may well' which this court thought it should
>> bear in rule 31.16(3)(a) and (b). We are not persuaded that there are reasons
>> which compel a different conclusion. Indeed, it seems to us that the reasons
>> which led this court to reach the conclusion which it did in _Black v_
>> _Sumitomo Corporation_ [2002] 1 WLR 1562 have equal force in the context
>> of rule 31.17(3)(a).'

> He went on to say in the following paragraph:

>> "We think that the word 'likely' when used in the Civil Procedure Rules,
>> connotes a rather higher threshold of probability than merely 'more than
>> fanciful'. But a prospect may be more than fanciful without reaching the
>> threshold of 'more probable than not'.""

27.     In _Three Rivers District Council and others v HM Treasury and others_ _[2002]_
_EWCA Civ 1182_ (a true and correct copy of which is attached hereto as **Exhibit 13)** cited and
followed in this passage, Lord Justice Chadwick also said at paragraph 29 that the qualification

"likely to" lowered the threshold condition, in the sense that it meant that it was not necessary to show that the documents would actually support the applicant's own case or adversely affect the case of another party.

28.     Whether disclosure of documents sought is necessary in order to dispose fairly of the case or to save costs (CPR 31.17(3)(b)) involves the Court in a weighing of all relevant circumstances, to arrive at an overall evaluation. This exercise will be informed by the "overriding objective" set out in CPR 1.1, as amended. CPR 1.1 and 1.2 (a true and correct copy of which is attached hereto as **Exhibit 14**) read as follows:

"The overriding objective

1.1

(1) These Rules are a new procedural code with the overriding objective of enabling the court to deal with cases justly and at proportionate cost.

(2) dealing with a case justly and at proportionate cost includes, so far as is practicable –

(a) ensuring that the parties are on an equal footing;

(b) saving expense;

(c) dealing with the case in ways which are proportionate –

(i) to the amount of money involved;

(ii) to the importance of the case;

(iii) to the complexity of the issues; and

(iv) to the financial position of each party;

(d) ensuring that it is dealt with expeditiously and fairly;

(e) allotting to it an appropriate share of the court's resources, while taking into account the need to allot resources to other cases; and

(f) enforcing compliance with rules, practice directions and orders.

13

Application by the court of the overriding objective

1.2

The court must seek to give effect to the overriding objective when it –

(a) exercises any power given to it by the Rules; …."

29.     The relevant factors could for example include:

(a)     how likely it is that the documents would add significantly to what is already known;

(b)     w ether the likely benefits of disclosure justify the inconvenience and expense for the non-party who or which would be involved in making disclosure;

(c)     whether the considerations militating in favour of disclosure in the interests of justice in the proceedings are outweighed by any legitimate countervailing private or public interest{s} in their non-disclosure.

30.     An example of the exercise of the discretion in the light of the overriding objective to refuse to order disclosure against a non-party is provided by the decision of the High Court in *Fox v Boulter* [2013] EWHC 4012 (QB) (a true and correct copy of which is attached hereto as **Exhibit 15**). Mr Justice Tugendhat was there asked to order disclosure pursuant to requests under CPR 31.17. The request was described by him as one which "could hardly be more wide ranging" (paragraph 11). He instanced the request for:

"All documentation, notes, memos and correspondence (including e-mails) in the period between January 2010 and November 2011, relating to:

"5.1 Mr Boulter, Porton Capital (and its associated entitles); Cellcrypt; 3M (and its associated entities); BacLite; Acolyte, and the blackmail proceedings issued by 3M against Mr Boulter;

5.2 the appointment or position of Mr Werrity as an advisor to the Claimant;

5.3 the arrangement of any meeting between the Claimant and Mr Werrity."

31.    Dismissing the application for third party disclosure, Tugendhat J referred to the relevance of the overriding objective (at paragraphs 23 to 24) and concluded at paragraphs 53 to 55:

"53. The issues on the pleadings (to which the disclosure is said to be relevant) are now narrow. The disclosure sought is largely directed to Mr Werrity's position and business relationship with Dr Fox, as it was understood by Mr Boulter. The order sought would, in my view, be likely to cause the time and resources of the parties, and of the court at trial, to be directed away from the real issues between the parties, and to maximise the burden on the litigants and the court. I do not think it likely that my refusing to order the disclosure will lead to any vindication that Dr Fox obtains being on a false basis.

54. Of course, there is always a risk of a court reaching a result that is wrong in the sense that it is not the result that would have been reached if indefinite further resources had been devoted to the case. But it is not the law that unlimited resources are to be devoted to a case. If it were, then the burden on litigants would be such that many cases could not be brought at all, and justice (including any vindication to which a claimant might be entitled) would be denied on that account. It seems to me that the approach adopted by Mr Boulter in the applications now before the court pays no proper regard to the reforms in the law brought about by the CPR, or the considerations described by Jacob LJ in *Nichia Corp v. Argos Ltd* (supra).

55. In my judgment the disclosure orders sought are not necessary for disposing fairly of the action, and they would not save costs. The documents sought include classes of documents which are likely to include many which are outside the class of documents required to be disclosed in this case. The descriptions of the classes are too wide, and too vague. The exercise that the non-parties would be required to perform in the short period before the trial is due to start would be disproportionate, and, in the case of Mr Werrity, it would be oppressive."

32.     It follows from what I have said that it would under CPR 31.17 be open to Mr. Steinmetz, in order to assist him in defending the claim Vale has brought against him, to apply to the English Court for an order that Rio Tinto PLC make disclosure of documents held both by Rio Tinto PLC and by Rio Tinto Limited relating to their respective businesses, since both types of document are in Rio Tinto PLC's control.  Applications under CPR 31.17 are not uncommon in English litigation. However, Mr. Steinmetz would need to introduce evidence to satisfy the conditions set out in CPR 31.17(3) that the documents sought are likely to support his case or adversely affect the case of another party to the proceeding and that their disclosure is, in the light of the overriding objective, necessary in order to dispose fairly of the claim or to save costs.  He must satisfy these conditions with respect to each document specifically identified or falling within each class of document sought: _re Howglen Ltd_ [2001] 1 All ER (Ch), page 250 (a true and correct copy of which is attached hereto as **Exhibit 16**) and the _Three Rivers_ case, paragraph 36.  He would also need to show that the case was appropriate for the court's exercise of its discretion, again in  the light of the overriding objective, although in practice one core area relevant to the exercise of such discretion will already have been covered when considering the necessity of disclosure to dispose fairly of the claim or to save costs.

33.     I understand my role as expert to be limited to explaining the rules and principles of English law, which would govern and determine the outcome of an application for third-party documents. I have set these out in this declaration. My only comment at this stage would be that the breadth and range of the documentation sought in the current United States proceedings would, if reproduced in an application to an English court under CPR 31.17, clearly be likely to attract close examination in the context of the two conditions, as well as of the residual discretion, identified in CPR 31.17(3).

34.     One final point that I mention is that the general rule is that the court will award a non-party against whom an application is made under CPR 37.17 its costs (which include lawyers' fees) of (i) dealing with the application; and (ii) complying with any order to produce documents (see CPR 46.1(1)(b) and 46.1(2) (a true and correct copy of which is attached hereto as **Exhibit 17**).  A different order may be made, having regard to all the circumstances, to the extent that the application was unreasonably opposed (CPR 46.1(3)(a)).

**(ii)     Witness summons pursuant to CPR 34.2**

35.     CPR 34.2 provides an alternative route for an applicant to obtain documents from a non-party.  The provisions states:

"(1) A witness summons is a document issued by the court requiring a witness to –

(a)     attend court to give evidence; or

(b)     produce documents to the court.

(2)     A witness summons must be in the relevant practice form.

(3)     There must be a separate witness summons for each witness.

(4)     A witness summons may require a witness to produce documents to the court either –

(a)     on the date fixed for a hearing; or

(b)     on such date as the court may direct.

(5)     The only documents that a summons under this rule can require a person to produce before a hearing are documents which that person could be required to produce at the hearing." (**Exhibit 5**)

36.     However, it is now clear, since the decision of the Court of Appeal in _Tajik Aluminium Plant v Hydro Aluminium AS_ [2005] EWCA Civ 1218 (a true and correct copy of which

is attached hereto as **Exhibit 18**) that there is a distinction between an order for disclosure under CPR 31.7 and under CPR 34.2. An order of the latter nature has the effect of a subpoena requiring the person to whom it is addressed to attend court with the documents to which it refers, and (unlike an order under CPR 31.17) it carries a penal notice, expressly addressing the risk of contempt in the event of any material failure to comply. The Court of Appeal held accordingly in *Tajik Aluminium* that regard should be had to the principle applicable to subpoenas duces tecum, which is that "the documents to be produced had to be specifically identified, or at least described in some compendious manner that enabled the individual documents falling within the scope of the subpoena to be clearly identified (paragraphs 25 and 27). The Court of Appeal went on to recognize situations in which "without describing  them individually, it may be possible to identify the documents to be produced with sufficient certainty to leave no real doubt in the mind of the person to whom the summons is addressed about what he is required to do" (paragraph 28); and to adopt that as indicating the test to apply under CPR 34.2 (paragraph 28). It added that this test "is unlikely to be met if the documents are described simply by reference to a particular transaction or event which is itself described in broad terms, although in cases where the transaction is self-contained and sufficiently well-defined that might be satisfactory" (paragraph 28).  In general, the Court said, "doubts about the adequacy of the description should be resolved in favour of the witness" (paragraph 28) (**Exhibit 18)**.

37.     The English rules would therefore provide Mr. Steinmetz with a further route to obtain documents necessary for his case beyond that in CPR 31.17.  However, the level of specification required for an order that documents be produced pursuant to CPR 34.2 is, in circumstances such as this, likely to make it less attractive than CPR 31.17 for an applicant such as Mr. Steinmetz.

A list of the materials I considered in forming the opinions expressed above are attached hereto as Appendix A.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: London,                    England
       June 25, 2020

<br>

_____

The Right Honorable Jonathan Hugh Mance, PC

**Appendix**

I have reviewed the following materials:

1. The Particulars of Claim;

2. Defence

3. Memorandum of Law

4. *C-281/02 Owusu v Jackson*

5. *Lonrho v Shell [1980] 1 WLR 27* (attached as exhibit)

6. *Three Rivers District Council and others v HM Treasury and others [2002] EWCA Civ 1182* (attached as exhibit)

7. *Frankson and others v Home Office [2003] EQCA Civ 655* (attached as exhibit)

8. *Omers Administration Corporation & Ors (the "SL Claimants") v Tesco Plc* [2019] EWHC 109 (Ch) (attached as exhibit)

9. *Re Howglen Ltd [2001] 1 All ER 376* (attached as exhibit)

10. *Fox v Boulter[2003] EWHC 4012* (attached as exhibit)

11. *Tajik Aluminium Plant v Hydro Aluminium AS [2005] EWCA Civ 1218* (attached as exhibit)

12. Civil Procedure Rules Parts 1, 2, 5, 31, 34, and 46 (attached as exhibit)

13. The Senior Courts Act 1981 (as amended) (attached as exhibit)

14. Companies Act 2006 (attached as exhibit)

15. Regulation EU No 1215/2012 of the European Parliament and of the Council

16. Agreement on Withdrawal of the United Kingdom from the European Union

17. English Companies House public records for Rio Tinto PLC (attached as exhibit)

18. Australian Companies House public filings for Rio Tinto Limited (attached as exhibit)

19. The Proposed Subpoena to testify at a deposition in a civil action directed at Rio Tinto PLC which constitutes Exhibit 4 to the declaration of Josef M Klazen in support of Mr. Steinmetz' §1782 Application.

20. The Proposed Subpoena to testify at a deposition in a civil action directed at Rio Tinto Limited which constitutes Exhibit 5 to the declaration of Josef M Klazen in support of Mr. Steinmetz' §1782 Application.