# EXHIBIT 11

**1 W.L.R.**        Gamlen Chemical Ltd. v. Rochem Ltd. (C.A.)        Templeman L.J.

A    That raises the third question, namely, are there exceptional reasons why the court should impose terms on the defendants modifying the usual practice? In my judgment, there are no grounds for modifying the usual practice. This action was begun in 1974; the appellants acted until June 1979 and the action was set down for March 1980—possibly a little optimistically. Whether the defendants this day can lay their hands on the money to pay the appellants' demands, I know not, but

B    the defendants dispute the appellants' right to be paid in principle and in quantum. It would be disastrous for the defendants if their new solicitors could not, at this stage, obtain the papers held by the appellants.

For these reasons, and the reasons given by Oliver J. and by Goff L.J., I agree that the appeal must be dismissed.

C                                    *Appeal dismissed with costs.*

Solicitors: *Amhurst, Brown, Martin & Nicholson; Douglas Goldberg & Co.*

A. R.

D

[HOUSE OF LORDS]

* LONRHO LTD. AND ANOTHER  .    .    .    .    .    APPELLANTS

AND

SHELL PETROLEUM CO. LTD. AND ANOTHER .    .  RESPONDENTS

E                              (FIRST APPEAL)

LONRHO LTD. AND ANOTHER    .    .    .    .    .    APPELLANTS

AND

SHELL PETROLEUM CO. LTD. AND ANOTHER .    .  RESPONDENTS

F                             (SECOND APPEAL)

[1980 L. No. 202]

1980   April 23, 24, 28, 29;        Lord Diplock, Lord Edmund-Davies,
       May 22                       Lord Fraser of Tullybelton,
                                    Lord Russell of Killowen and
G                                   Lord Keith of Kinkel

*Company — Powers — Foreign   subsidiaries — Discovery — Multinational company—Subsidiaries' refusal to disclose documents in their possession—Whether " power " in company to compel disclosure—R.S.C., Ord. 24, rr. 2 (1), 3 (1)* [1]
*Crown — Privilege — Objection to produce documents — Statutory inquiry—Confidential information volunteered to inquiry— Public interest in persons giving evidence voluntarily to inquiry—Whether outweighing public interest that decision in proceedings be based on all relevant facts*

H

[1] R.S.C., Ord. 24, r. 2 (1): ". . . each party must . . . make and serve on [the] other party a list of the documents which are or have been in his possession, custody or power relating to any matter in question between them in the action."
R. 3 (1): ". . . the court may order any party . . . to make and serve on any other party a list of the documents which are or have been in his possession, custody or power relating to any matter in question in the cause or matter, . . ."

The plaintiffs were the owners of an oil pipeline running  **A**
from Beira in Mozambique to Umtali in Zimbabwe, then
called Rhodesia. It was completed in January 1965 and was
operated under an agreement between the plaintiffs and a
number of major oil companies including the defendants. On
November 11, 1965, Rhodesia unilaterally declared its inde-
pendence of the United Kingdom (" U.D.I.") and, as a result
of sanctions imposed on the direction of the United Nations,
the pipeline could not be used for importing oil into Rhodesia  **B**
so long as U.D.I. continued. The plaintiffs consequently
suffered loss of profits. Oil continued, however, to reach
Rhodesia by other routes. In 1977, pursuant to article 15
of and Schedule 1 to the Southern Rhodesia (United Nations
Sanctions) (No. 2) Order 1968, the Secretary of State for
Foreign and Commonwealth Affairs appointed a private inquiry
to conduct an investigation into the supply of petroleum and
petroleum products to Rhodesia since the coming into force  **C**
on December 17, 1965, of the Southern Rhodesia (Petroleum)
Order 1965. The defendants agreed to cooperate fully with
the inquiry. On May 31, 1977, the plaintiffs commenced an
action against the defendants and 31 others, the substance of
their claim being that the defendants and others had con-
spired together to supply oil to Rhodesia in breach of the
Order of 1965, that by doing so they had enabled the rebel
government of Rhodesia to prolong U.D.I. and that they had  **D**
thereby made it impossible for use of the pipeline to be
resumed. They claimed damages for unlawful conspiracy,
alternatively for breach of implied covenants in the agreement.
On July 27, 1977, the chairman of the inquiry said in a
letter to the second defendants that the members appreciated
that on commercial grounds and because of the proceedings
commenced by the plaintiffs certain of the answers to their
questions might well involve information that the second  **E**
defendants would regard as confidential and that if, in answer-
ing, they would indicate any areas of particular concern, the
members would do their utmost, consistently with the duty
laid on them by the Secretary of State, to respect that con-
fidentiality. After receiving the inquiry's report in August
1978, the government announced its intention of publishing
it as soon as the necessary consents to disclosure required
under the Order of 1968 had been obtained. On September  **F**
5, 1978, the Foreign and Commonwealth Office wrote to
the defendants asking for their consent to the disclosure in
the report of information and documents furnished by them
to the inquiry. They consented subject to the qualification
that their consent applied to the disclosure of information
and documents to the extent only that they were contained
in the report and any appendices thereto; they did not consent
to publication of any more extensive information or docu-  **G**
ments that could then be available for the purposes of other
proceedings.

The plaintiff's action having been stayed as against the
defendants and their claim against them sent to arbitration
the arbitrators made directions for discovery of documents,
but the plaintiffs were dissatisfied with the discovery made by
the defendants and took out the originating summons against
them that was the subject of these appeals. The summons  **H**
was heard by Robert Goff J. in two parts.

The summons related, first, to documents in the possession
of subsidiary companies in the defendants' groups of companies
in Rhodesia, South Africa and Mozambique. In the case of
Rhodesia and South Africa, the boards of the subsidiaries
refused to disclose the documents of which the plaintiffs sought
discovery to do so on the grounds that it would constitute
a criminal offence to do so without a ministerial licence and

A     that, in any event, it would not be in the companies' best
interests. In the case of the Mozambique subsidiary, the
defendants offered to do their best to facilitate the plaintiffs'
inspection of the documents in Mozambique between March
3 and April 3, 1980, but their offer was not accepted by the
plaintiffs. The plaintiffs' application for discovery of the
documents was dismissed by Robert Goff J., and the Court
of Appeal dismissed an appeal by the plaintiffs from his
B     decision. They gave the plaintiffs leave to appeal.

     The summons secondly related to documents that had come
into existence in connection with or for the purposes of the
inquiry. The defendants refused disclosure of those documents
on the ground of public interest immunity, supported by a
certificate of the Lord Privy Seal lodged by the Attorney-
General, who was given leave to intervene in the proceedings
to assert the immunity of the documents from disclosure on
C     behalf of the Crown. The documents included copies of the
transcripts of the oral evidence of witnesses including managers
and directors of the subsidiaries in Southern Africa, written
submissions made by the defendants to the inquiry and corre-
spondence between the defendants and the Foreign Office and
the members of the inquiry. The plaintiffs' application for
disclosure of those documents was also dismissed by Robert
Goff J., and an appeal by the plaintiffs was dismissed by the
D     Court of Appeal, who again gave the plaintiffs leave to appeal.

     On the first appeal: —

     *Held,* dismissing the appeal, that on the true construction
of R.S.C., Ord. 24, a party had a document in his " power "
only if he had a presently enforceable legal right to obtain
inspection of the document from whoever actually held it
without the need to obtain the consent of anyone else; and
that, since the documents in the possession of the subsidiaries
E     could not be obtained without their consent (failing alteration
of their articles of association) and, in the case of the sub-
sidiaries in Rhodesia and South Africa, ministerial consent,
they were not in the power of the defendants (post, pp. 635E—
636A, F–H).

     Decision of the Court of Appeal [1980] 2 W.L.R. 367
affirmed.

F          On the second appeal: —

     *Held,* dismissing the appeal, that, since the likelihood of
success of an inquiry of the kind in question in discovering
the truth as to what had happened was greatly facilitated if
those persons who knew what had happened came forward
to volunteer information, and since without an assurance of
complete confidentiality information was less likely to be
volunteered, particularly where the inquiry was directed to
matters that were the subject matter of a pending civil action
G     to which the possessor of the information was a defendant,
the judge's decision that in the particular circumstances of
the case the public interest against disclosure of the documents
outweighed the general public interest that in the administra-
tion of justice the decision should be based on all the
relevant facts should be upheld (post, pp. 637G–H, 638G–H).

     Decision of the Court of Appeal affirmed.

H          *Per curiam.* In neither of these cases was it appropriate
to give leave to appeal to the House of Lords against con-
current and unanimous judgments of the judge and of the
Court of Appeal. If the size of the damages claimed in the
arbitration, of the order of £100,000,000, was thought to
justify giving leave to appeal, that is not a valid reason in an
appeal on an interlocutory matter, such as discovery, which
would not have qualified for leave on any other grounds,
particularly where the discovery is sought in an arbitration
(post, pp. 631H, 632C–D).

**Lonrho Ltd. v. Shell Petroleum (H.L.(E.))**                          **[1980]**

The following case is referred to in the opinion of Lord Diplock:     A

*Conway* v. *Rimmer* [1968] A.C. 910; [1968] 2 W.L.R. 998; [1968] 1
    All E.R. 874, H.L.(E.).


The following additional cases were cited in argument:

*B.* v. *B. (Matrimonial Proceedings: Discovery)* [1978] Fam. 181; [1978]
    3 W.L.R. 624; [1979] 1 All E.R. 801.                     B
*Bartlett* v. *Barclays Bank Trust Co. Ltd. (Nos. 1 and 2)* [1980] 2 W.L.R.
    430; [1980] 1 All E.R. 139.
*Burmah Oil Co. Ltd.* v. *Governor and Company of the Bank of England*
    [1979] 3 W.L.R. 722; [1979] 3 All E.R. 700, H.L.(E.).
*Clinch* v. *Financial Corporation* (1866) L.R. 2 Eq. 271.
*D.* v. *National Society for the Prevention of Cruelty to Children* [1978]
    A.C. 171; [1977] 2 W.L.R. 201; [1977] 1 All E.R. 589, H.L.(E.).
*Daimler Co. Ltd.* v. *Continental Tyre and Rubber Co. (Great Britain)*  C
    *Ltd.* [1916] 2 A.C. 307, H.L.(E.).
*Mertens* v. *Haigh* (1863) 3 De G.J. & Sm. 528.
*Mustad (O.) & Son* v. *Dosen (Note)* [1964] 1 W.L.R. 109; [1963] 3 All
    E.R. 416, H.L.(E.).
*Revlon Inc.* v. *Cripps & Lee Ltd.*, November 22, 1979; Court of Appeal
    (Civil Division) Transcript No. 601 of 1979, C.A.
*Sankey* v. *Whitlam* (1978) 21 A.L.R. 505.                            D
*Science Research Council* v. *Nassé* [1979] 3 W.L.R. 762; [1979] I.C.R.
    921; [1979] 3 All E.R. 673, H.L.(E.).
*Taylor* v. *Rundell* (1841) Cr. & Ph. 104.
*Woolfson* v. *Strathclyde Regional Council* (1978) 38 P. & C.R. 521; 1978
    S.L.T. 159, H.L.(Sc.).


APPEALS from the Court of Appeal.                                     E

    By writ of May 31, 1977, the plaintiffs, Lonrho Ltd. and Companhia
Do Pipeline Moçambique Rodesia S.A.R.L. (a company incorporated
under the laws of Mozambique) claimed against the defendants, Shell
Petroleum Co. Ltd. (" Shell ") and British Petroleum Co. Ltd. (" B.P."),
28 other oil companies and three individual defendants (1) an injunction
restraining the defendants from (i) conspiring with each other or with   F
any other person in breach of the Southern Rhodesia (Petroleum) Order
1965 or otherwise unlawfully to supply or agree to supply petroleum to
any person, (ii) committing or participating in any breach of an agree-
ment of October 30, 1962, between the plaintiffs and the first four
defendants, (iii) by the supply of petroleum unlawfully causing damage
and loss to the plaintiffs; (2) damages for breach of contract, unlawful
interference with contract, conspiracy, negligence and the committing of  G
unlawful acts causing loss and injury.   By order of Brightman J. in
January 1978 the action was stayed so far as concerned Shell and B.P.
and the proceedings against those two defendants went on by way of
arbitration.

    By originating summons issued on January 18, 1980, the plaintiffs
applied for orders for further discovery by the defendants of, inter alia,  H
documents in the possession of subsidiaries in the defendants' groups of
companies in Rhodesia, South Africa and Mozambique, and documents
including the written submissions of the defendants and any of their
subsidiaries to the Bingham inquiry, copies of the transcripts of the
oral evidence given by officers and employees of the defendants and
the subsidiaries to the inquiry and certain correspondence between the
defendants and the Foreign Office and the members of the inquiry.   The

**1 W.L.R.**          **Lonrho Ltd. v. Shell Petroleum (H.L.(E.) )**

A   summons was heard by Robert Goff J. in two parts. On January 25, 1980, he refused the plaintiffs' application in so far as it related to documents in the possession of the subsidiaries, giving the plaintiffs leave to appeal. They appealed, on the grounds that he had been wrong in law and on the facts in holding that the documents in question were not within the power of the defendants for the purposes of R.S.C., Ord. 24, r. 3. The Court of Appeal (Lord Denning M.R., Shaw and Brandon L.JJ.) on February 12, 1980, dismissed the appeal, giving the plaintiffs leave to appeal. They appealed. On March 4, 1980, Robert Goff J. refused the plaintiffs' application in so far as it related to the Bingham inquiry documents and dismissed the summons, giving the plaintiffs leave to appeal. They appealed, on the grounds that the judge had been wrong in law and fact in holding that the documents in question should not be disclosed on the ground of public interest. The Court of Appeal (Lord Denning M.R., Waller and Dunn L.JJ.) on March 12, 1980, dismissed the appeal, giving the plaintiffs leave to appeal. They appealed.

The appeals were heard consecutively. The facts are set out in the opinion of Lord Diplock.

D   *Mark Littman* Q.C., *Charles Sparrow* Q.C., *Gavin Lightman* Q.C. and *Alan Boyle* for the plaintiffs.

*Peter Curry* Q.C., *Brian Davenport* Q.C. and *Gordon Langley* for the first defendants, Shell Petroleum Co. Ltd.

*Robert Alexander* Q.C., *Roger Buckley* Q.C., *Jonathan Sumption* and *Stephen Ruttle* for the second defendants, British Petroleum Co. Ltd.

*Simon D. Brown* and *John Laws* for the Attorney-General.

E

Their Lordships took time for consideration.

May 22. LORD DIPLOCK. My Lords, these two appeals, which have occupied four days of your Lordships' time despite the fact that it was not found necessary to call on the respondents save briefly on a minor F   point in one of the appeals, are both about discovery of documents. The discovery sought is for the purposes of an arbitration and so required the issue of an originating summons by the appellants (whom I will refer to collectively as " Lonrho "); but the essential nature of the orders sought was interlocutory. The summons was heard by Robert Goff J. in two parts. In decisions on January 25 and March 5, 1980, he refused the orders sought by Lonrho. In each case Lonrho appealed to the G   Court of Appeal. The first appeal (which I will call " the subsidiaries appeal ") came before a court consisting of Lord Denning M.R. and Shaw and Brandon L.JJ.; the second (which I will call " the Bingham appeal ") came before a court consisting of Lord Denning M.R. and Waller and Dunn L.JJ. In each appeal the judgment of the court dismissing the appeal was unanimous.

H   It is very rarely that your Lordships would yourselves give leave to appeal to this House on a question that is essentially interlocutory, in the sense that the answer to it will not dispose finally of the main proceedings either in law or as a matter of practical reality—as may be the case with some other orders granting or refusing interlocutory injunctions. In neither of the instant cases would I myself have thought it appropriate to give leave to appeal to this House against concurrent and unanimous judgments of the judge and of the Court of Appeal. The

632

**Lord Diplock**          Lonrho Ltd. v. Shell Petroleum (H.L.(E.) )          **[1980]**

circumstances which have given rise to the disputes about discovery are  **A**
quite exceptional; they are unlikely to recur in any other case and, for
that reason, they do not in my view provide a suitable occasion for any
general disquisition by this House upon the principles of law applicable
to the discovery of documents. This was also the view that was taken
in the courts below. In the subsidiaries appeal Robert Goff J. delivered
an ex tempore judgment which cited no authorities, and, in the Court
of Appeal, although a few authorities were referred to in the judgments  **B**
of Lord Denning M.R., that court was at pains to make it clear that
their judgment was directed to the particular facts of the case before
them. In the Bingham appeal, except for a minor cavilling against one
adverb that the judge had used, as savouring of hyperbole, there was no
dispute about the law that was applicable. All that was in issue was
the application of well-settled law to very special facts. One is left to  **C**
suppose that the size of the damages claimed in the arbitration, which
are of the order of £100,000,000, may have been thought to justify
giving leave to appeal in a case in which, if the amount at stake had
been smaller, leave would have been refused. For my part, I do not
accept this as a valid reason for giving leave to appeal to this House,
in *an appeal upon an interlocutory matter,* such as discovery, which
would not have qualified for leave on any other grounds. This is  **D**
particularly so where the discovery is sought in an arbitration. In reflects
discredit upon English arbitral procedure that so much delay and so
much costs (which in the instant appeal, in which 13 counsel were
engaged, must have been enormous) should be permitted to be incurred
by reason of the intervention of a court in matters that are merely
preparatory to the hearing of the arbitration by the arbitrators of the  **E**
parties' choice.

    The relevant allegations in the claim made by Lonrho against the
two respondents (" Shell " and " B.P.") in the arbitration need be stated
in barest outline only. Lonrho are the owners of an oil pipeline which
runs from the port of Beira in Mozambique to a refinery at Umtali in
Zimbabwe, then called Rhodesia. It came on stream a few months
before the unilateral declaration of independence by Rhodesia (" U.D.I.")  **F**
and was operated under an agreement (" the shippers' agreement ")
between Lonrho and a number of major oil companies including Shell
and B.P. As a result of sanctions imposed on the direction of the United
Nations the pipeline could not be used for importing oil into Rhodesia
so long as U.D.I. continued; so Lonrho lost the profits that it would
have made under the shippers' agreement if the pipeline had remained  **G**
in use. As a matter of public knowledge, however, despite the sanctions,
oil continued throughout the period of U.D.I. to reach Rhodesia by other
routes.

    Lonrho started an action in the High Court on May 31, 1977, against
Shell and B.P. and 31 other defendants including all those subsidiary
companies belonging to the Shell and/or B.P. groups disclosure of whose  **H**
documents is sought in the subsidiaries appeal. The substance of the
claim was that the 33 defendants had conspired together to supply oil
to Rhodesia in breach of the Southern Rhodesia (Petroleum) Order 1965,
that by doing so they enabled the rebel government of Rhodesia to
prolong U.D.I., and thereby made it impossible for use of the pipeline
to be resumed. The losses incurred by Lonrho through inability to use
the pipeline during the resulting prolongation of U.D.I. were claimed

A    in the alternative as damages for unlawful conspiracy or for breach of implied covenants in the shippers' agreement.

      The shippers' agreement, to which Shell and B.P. were parties, contained an arbitration clause. As this was not a domestic arbitration agreement within the meaning of the Arbitration Act 1975, Shell and B.P. successfully applied to have the action stayed as against them, and

B    this was done in January 1978. The action apparently remains on foot against the other defendants including the subsidiary companies of the Shell and/or B.P. groups; but it has been allowed to go to sleep. In the meantime the arbitration between Lonrho and Shell and B.P. has started before a distinguished team of two arbitrators and an umpire, (the " arbitrators "), by whom the usual directions for pleading and discovery of documents were made in February 1979, and dates have now been

C    fixed for the hearing of the reference from June 23 running through to October 1980. If the hearing were to be postponed it would be another two years before the same arbitrators would be available for what is expected to be a very protracted hearing—if it is ever held.

      On December 18, 1979, Lonrho expressed dissatisfaction with the discovery made by Shell and B.P. in a number of respects (of which

D    your Lordships are concerned only with those that have given rise to the subsidiaries appeal and the Bingham appeal respectively) and applied for a hearing before the arbitrators for directions for further discovery. January 18 and 19, 1980, were fixed by the arbitrators for the hearing of the application; but on January 18 Lonrho issued its originating summons in the High Court.

E    *The Bingham report*

      As is well known, an investigation into the supply of petroleum and petroleum products to Rhodesia since the Southern Rhodesia (Petroleum) Order 1965 came into force was undertaken by Mr. Bingham Q.C., as he then was, and Mr. Gray, a chartered accountant. They were appointed for this purpose by the Secretary of State for Foreign and Commonwealth

F    Affairs pursuant to article 15 of and Schedule 1 to the Southern Rhodesia (United Nations Sanctions) (No. 2) Order 1968. This investigation, in which Shell and B.P. cooperated upon terms to which I shall have to refer later when I come to the Bingham appeal, started in the summer of 1977 and ended with the publication of " the Bingham report " in August 1978. It contains some useful charts of the complicated company structure of the Shell and B.P. groups so far as their operations in

G    Southern Africa, including Rhodesia, are concerned. Reference may be had to these if what I have to say later about subsidiary companies of the groups lacks clarity.

      *The subsidiaries appeal*

      The relevant rule of the Supreme Court dealing with the discovery

H    that is sought in the subsidiaries appeal is Ord. 24, r. 3, which empowers the court to make an order upon any party to a cause or matter to make and serve on any other party a list of the documents " which are or have been in his possession, custody or power relating to any matter in question in the cause or matter, . . ." The documents of which discovery is sought are documents which, although they do relate to matters in question in the arbitration, are not and never have been in the possession or custody of Shell or B.P. They are and always have

**Lord Diplock**      **Lonrho Ltd. v. Shell Petroleum (H.L.(E.) )**      **[1980]**

been in the sole possession and custody of the subsidiary companies of A
the groups which operated in Southern Africa and, with only one
exception that has been drawn to your Lordships' attention, are resident
in South Africa or Rhodesia and, for the most part, also incorporated
there. Lonrho's contention in the subsidiaries appeal is that because
of the company structure of the groups these documents are in the
" power " of either Shell or B.P. severally or Shell and B.P. jointly.

My Lords, neither Shell nor B.P. is a direct shareholder in any of the B
relevant subsidiary companies. In some Shell is a shareholder at one
remove and B.P. at two removes through a company, the Consolidated
Petroleum Co. Ltd. (" Consolidated "), in which Shell holds 50 per cent. of
the share capital and B.P., through a wholly-owned subsidiary, Britannic
Estates Ltd., holds the remaining 50 per cent. Some of the operating
companies in Southern Africa are wholly-owned subsidiaries of Consoli- C
dated; Shell Moçambique Ltd. is one of these. In others the shares are
held by subsidiaries of Consolidated and in yet others the shares are held
not through Consolidated at all but as to 50 per cent. by another wholly-
owned subsidiary of Shell and as to the remaining 50 per cent. by another
wholly-owned subsidiary of B.P.

It is unnecessary for present purposes to distinguish between sub- D
sidiaries that are incorporated in the United Kingdom and those incor-
porated in South Africa or Rhodesia. The company law of those two
countries is substantially the same as that to be found in the Companies
Act 1948; and the articles of association of each of the subsidiaries
contain the usual " short cut " provisions appropriate to subsidiaries,
enabling the shareholders by unanimous agreement in writing to exercise
all the powers of a general meeting of the company. E

The articles of association of all the subsidiaries vest the management
of the company in its board of directors. It is the board that has control
of the company's documents on its behalf; the shareholders as such have
no legal right to inspect or to take copies of them. If requested to
allow inspection of the company's documents, whether by a shareholder
or by a third party, it is the duty of the board to consider whether to F
accede to the request would be in the best interests of the company.
These are not exclusively those of its shareholders but may include those
of its creditors. Needless to say, if the local law of the country in
which the company is resident forbids disclosure, the company through
its board must comply with that local law.

Such is the case with the subsidiaries that are resident in South
Africa or Rhodesia. In each of those countries it would have been a G
criminal offence for the board of a subsidiary to disclose the company's
documents to Shell or B.P. unless they could obtain a ministerial licence
permitting them to do so. Shell and B.P. did in fact inquire of the
boards of the subsidiary companies resident in South Africa and Rhodesia
whether they were willing to disclose their companies' documents of
which Lonrho seeks discovery in the subsidiaries appeal. The boards H
refused upon the grounds that it would constitute a criminal offence to
do so and that, in any event, it would not be in the best interests of
the company.

My Lords, in the circumstances it seems to me to be quite unarguable
that the documents of subsidiaries resident in South Africa or Rhodesia
are or have ever been in the " power " of Shell or B.P. within the
meaning of R.S.C., Ord. 24. Nevertheless your Lordships were pressed

A   with the contention that there were a series of steps open to Shell and
B.P. which, if taken, might have the result of giving them a legal right
to inspect and take copies of documents belonging to those subsidiaries.
I can restrict myself to those operating companies which are subsidiaries
of Consolidated, since the steps suggested in respect of the other operat-
ing companies were essentially the same. The suggested steps would be
for Shell and B.P., as holders between them of all the shares in Con-
B   solidated, to procure the board of Consolidated to exercise that company's
power to alter the articles of association of each of those companies of
which Consolidated is itself the sole shareholder, so as to entitle the
shareholders to inspect and take copies of the documents of any of
the subsidiaries or sub-subsidiaries of Consolidated. Any copies taken
by Consolidated would be the property of that company; so a similar
C   alteration at least would be needed in the articles of association of Con-
solidated itself; nor is it clear how the board of Consolidated could be
procured to act as suggested in relation to its subsidiaries if it did not
consider that it was in the best interest of Consolidated to do so. Clearly,
however, no alteration in the articles of association of the operating
subsidiaries could overcome the obstacle of the prohibition upon dis-
closure of the documents imposed by the local law. So, it is said, Shell
D   and B.P. ought to procure Consolidated to procure the operating sub-
sidiaries to apply for a ministerial licence permitting the disclosure. It
is Lonrho's contention that until all this has been done and the licence
has actually been refused, neither Shell nor B.P. will be in a position
to say that the documents in the possession of the operating subsidiaries
are not in Shell and B.P.'s own power.

E       My Lords, this argument only requires to be stated to be rejected.
Your Lordships are not concerned with any other consequences of the
relationship between parent and subsidiary companies than those which
affect the duty of a parent company of a multi-national group, whose
company structure is that of the Shell or B.P. groups, to give discovery
of documents under R.S.C., Ord. 24; and this, as I have pointed out,
depends upon the true construction of the word " power " in the phrase
F   " the documents which are or have been in his possession, custody or
power."

       The phrase, as the Court of Appeal pointed out, looks to the present
and the past, not to the future. As a first stage in discovery, which is the
stage with which the subsidiaries appeal is concerned, it requires a party
to provide a list, identifying documents relating to any matter in question
G   in the cause of matter in which discovery is ordered. Identification of
documents requires that they must be or have at one time been available
to be looked at by the person upon whom the duty lies to provide the
list. Such is the case when they are or have been in the possession or
custody of that person; and in the context of the phrase " possession,
custody or power " the expression " power " must, in my view, mean
H   a presently enforceable legal right to obtain from whoever actually holds
the document inspection of it without the need to obtain the consent of
anyone else. Provided that the right is presently enforceable, the fact
that for physical reasons it may not be possible for the person entitled
to it to obtain immediate inspection would not prevent the document
from being within his power; but in the absence of a presently enforce-
able right there is, in my view, nothing in Order 24 to compel a party

636

**Lord Diplock**       **Lonrho Ltd. v. Shell Petroleum (H.L.(E.) )**       **[1980]**

to a cause or matter to take steps that will enable him to acquire one A
in the future.

   I turn then to the case of Shell Moçambique Ltd., the only subsidiary
of Consolidated that is not resident in South Africa or Rhodesia but is
incorporated in the United Kingdom and resident in Mozambique—a
country in which the local law does not prohibit the disclosure of that
company's documents.   Shell Moçambique is a defendant to the original
High Court action and before that action went to sleep steps were taken B
by its solicitors, who are also solicitors to B.P. in the arbitration,
preparatory to Shell Moçambique's giving discovery on its own behalf
in the High Court action.   Some political and physical obstacles were
encountered but in spite of these a list of documents was obtained
together with somewhat illegible copies of some of the documents in
the list.   In an affidavit sworn on behalf of B.P. on January 10, 1980, C
for the purpose of the hearing of the application to the arbitrators for
further discovery that had been fixed for January 18 and 19, the list
and copies of documents were exhibited, and an offer was made to
Lonrho that if the arbitrators took the view that discovery of these
documents should be made, then " without prejudice to whatever the
legal position may be " B.P. would do their best to facilitate the inspection D
by Lonrho of Shell Moçambique's documents in Mozambique where
they were situated, provided that the inspection took place between
March 3 and April 3, 1980.   The limitation as to date was to prevent
lateness of discovery providing an excuse for postponing the date of
hearing of the arbitration.

   As already mentioned, the hearing before the arbitrators accom-
plished nothing, as Lonrho had by then decided to proceed by originating E
summons in the High Court.   For what, in the absence of any plausible
explanation, I can only suppose to have been tactical reasons, the offer
was never accepted before the time stipulated for inspection in Mozam-
bique had expired.   Shell and B.P. are therefore now entitled to stand
upon their legal rights if as a matter of arbitral tactics they think fit to
do so.

   For the reasons already indicated Shell Moçambique's documents are F
not in my opinion within the " power " of either of Shell or B.P. within
the meaning of R.S.C., Ord. 24.   They could only be brought within
their power either (1) by their taking steps to alter the articles of associ-
ation of Consolidated and procuring Consolidated through its own board
of directors to take steps to alter the articles of association of Shell
Moçambique, which Order 24 does not require them to do; or (2) by G
obtaining the voluntary consent of the board of Shell Moçambique to
let them take copies of the documents.   It may well be that such
consent could be obtained; but Shell and B.P. are not required by Order
24 to seek it, any more than a natural person is obliged to ask a close
relative or anyone else who is a stranger to the suit to provide him
with copies of documents in the ownership and possession of that other H
person, however likely he might be to comply voluntarily with the
request if it were made.

   In dismissing the subsidiaries appeal on its own special facts, I
expressly decline any invitation to roam any further into the general
law of discovery.   In particular, I say nothing about one-man companies
in which a natural person and/or his nominees are the sole share-

A holders and directors.  It may be that, depending upon their own particular facts, different considerations may apply to these.

*The Bingham appeal*

   This appeal relates to documents which only came into existence in connection with or for the purposes of the Bingham inquiry.  The only
B ground on which disclosure is refused is public interest immunity.  This is supported by a certificate of Sir Ian Gilmour, the Lord Privy Seal, which was lodged by the Attorney-General who was given leave to intervene in the proceedings to assert on behalf of the Crown an immunity from disclosure of a kind which used to be called " Crown privilege."

C    At the Bingham inquiry, as has already been mentioned, both the Shell group and the B.P. group cooperated fully.  They produced to the inquiry many contemporaneous documents.  All of these have also been disclosed to Lonrho in the current arbitration.  They arranged for many witnesses including managers and directors of subsidiary companies operating in Southern Africa to appear at the inquiry and to give oral evidence.  Three new classes of documents came into existence and
D into the possession of Shell and B.P. in the course of the inquiry:  (1) copies of the transcripts of the oral evidence of those witnesses, (2) written submissions made by Shell and B.P. to the inquiry and (3) certain correspondence between Shell and B.P. and the Foreign Office and the members of the inquiry.  It is of these documents, which I shall call "the Bingham documents," that discovery is sought in the Bingham
E appeal.

   Schedule 1 to the Southern Rhodesia (United Nations Sanctions) (No. 2) Order 1968, under which the Bingham inquiry was held, makes it an offence for anyone to refuse to furnish to the persons appointed to conduct an inquiry under the Order any document or information requested by them; but it protects from disclosure to any third party (such as Lonrho) who is not charged with official duties in connection
F with the enforcement of sanctions any document or information furnished to the inquiry without the consent of the person who furnished it, or, when he did so in the capacity of an employee or agent, without the consent of his employer or principal.  So the consent of Shell and B.P. was required to the disclosure of the Bingham documents to Lonrho.

   Many judges have at some time in their lives had experience of
G conducting official inquiries or investigations in private.  Even without the Minister's certificate I should not have needed evidence to satisfy me that the likelihood of success of an inquiry of this kind in discovering the truth as to what happened is greatly facilitated if those persons who know what happened come forward to volunteer information rather than waiting to be identified by the inquiry itself as likely to possess
H relevant information and having it extracted from them by question and answer.  Nor would I need any evidence to satisfy me that without an assurance of complete confidentiality information is less likely to be volunteered; particularly where the inquiry is directed to matters that are the subject matter of a pending civil action to which the possessor of the information is a defendant.

   Mr. Bingham himself was well aware of this and, in a letter to B.P. of July 27, 1977, expressing his pleasure at learning from the Foreign

Secretary that B.P. had undertaken to cooperate fully in the investigation, A
he added the following paragraph:

> " We appreciate that on commercial grounds and because of civil
> proceedings recently commenced by Lonrho and C.P.M.R. certain
> of the answers to our questions may well involve information which
> your company would regard as confidential. If, in answering, you
> will indicate any areas of particular concern, we will do our utmost
> (consistent with the duty laid upon us by the Secretary of State) to
> respect this confidentiality."

My Lords, as was fully recognised by the judge and the Court of
Appeal, this claim to public interest immunity from discovery was a
claim for non-disclosure not because of the contents of the individual
documents but because of the class to which they belong. Like all class
claims the basis of it is pour encourager les autres. As the Minister
put it in his certificate:

> " It is important to the proper working of such an investigation as
> that chaired by Mr. Bingham and also of many other bodies who
> have the statutory duty of investigation and of finding facts, that
> witnesses should not be discouraged from coming forward to give
> evidence or from giving evidence fully and freely. In my opinion,
> there is serious risk that such witnesses would be discouraged if,
> despite express or implied assurances of confidentiality, the infor-
> mation which they provide could be made public, and they them-
> selves laid open to possible attack at the suit of anyone with whom
> they may have business dealings, including competitors. In my
> opinion, the disclosure of information and documents furnished
> and produced to Mr. Bingham and Mr. Gray would impede the
> work of any body which may be set up in the future to obtain
> evidence and information or to establish whether or not any offences
> may have been committed in similar circumstances. In my view,
> it is necessary for the proper and efficient functioning of such an
> investigation that the [Bingham documents] should be withheld
> from production."

Robert Goff J. accepted that, while weight ought to be given to this
certificate, it was for him not for the Minister to decide whether the
public interest against disclosure relied on by the Minister outweighed
the general public interest that in the administration of justice, whether
by courts of law or by arbitrators, the decision should be based upon
all the facts that are relevant, to the fullest extent that available
procedures enable them to be ascertained. The various matters that he
ought to take into consideration in balancing the one public interest
against the other are summarised in his judgment with clarity and
accuracy by reference to the relevant authorities dating from *Conway*
v. *Rimmer* [1968] A.C. 910. He came to the confident conclusion that
the public interest immunity from disclosure ought to prevail in the H
particular circumstances of the instant case. The Court of Appeal
unanimously agreed with him—and so do I

I can deal briefly with an alternative submission on behalf of Lonrho
that, whatever confidentiality may have attached initially to the Bingham
documents, Shell and B.P. forfeited their right to it when they consented
to the publication of the Bingham report. Although this submission
does not appear to have loomed large before the learned judge it was

A   put in the forefront of the argument advanced on behalf of Lonrho before this House and argued forcefully.

After receiving the Bingham report in August 1978, the government announced its intention of publishing it as soon as the necessary consents to disclosure required under the Southern Rhodesian (United Nations Sanctions) (No. 2) Order 1968 had been obtained. Those factual parts of the report which dealt with the activities of the Shell and B.P. groups
B   had been shown to Shell and B.P. in draft; and, on September 5, 1978, the Foreign and Commonwealth Office wrote to Shell and to B.P. asking for their consent to the disclosure which would be made in the report when it was published of information and documents furnished by Shell and B.P. to the inquiry. Such consent was given; but it was subject to a qualification expressed by Shell in the following terms in its reply of
C   September 8, 1978:

> " Every consent expressed in this letter is subject to two general qualifications: (a) It applies to the disclosure of information and documents to the extent only that they are contained in the report of the inquiry and any appendices thereto. Our reason for specifying this is that we do not consent to publication of any more extensive
D   information or documents which could then be available for the purposes of other proceedings."

B.P.'s reply was to the same effect. Nothing could be plainer.

My Lords, in the face of this express qualification, it appears to me to be too plain for argument that the consent to disclosure did not extend to the Bingham documents. I would therefore dismiss the Bingham
E   appeal as well.

LORD EDMUND-DAVIES. My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Diplock. For the reasons he gives, which I entirely accept, I concur in holding that these two appeals should be dismissed.

F       LORD FRASER OF TULLYBELTON. My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Diplock. I entirely agree with it, and, for the reasons therein stated, I would dismiss these appeals.

LORD RUSSELL OF KILLOWEN. My Lords, I have had the advantage
G   of reading in draft the speech of my noble and learned friend Lord Diplock stating his reasons for the dismissal of these appeals. I agree that these appeals should be dismissed for the reasons given by him.

LORD KEITH OF KINKEL. My Lords, for the reasons given in the speech of my noble and learned friend Lord Diplock, which I have had the opportunity of reading in draft and with which I agree entirely,
H   I too would dismiss these appeals.

*Appeals dismissed with costs.*

Solicitors: *Cameron Kemm Nordon; Slaughter & May; Linklaters & Paines; Treasury Solicitor.*

M. G.