# EXHIBIT 13

Court of Appeal                                          A

## *Three Rivers District Council and others *v* Governor and Company of the Bank of England (No 4)

### [2002] EWCA Civ 1182

2002  July 15, 16;                    Lord Phillips of Worth Matravers MR, Chadwick    B
       Aug 7                                              and Keene LJJ

*Practice — Discovery — Third party — Classes of documents — Action alleging misfeasance in public office in respect of defendant's supervision of bank — Application for disclosure against non-party of documents produced for inquiry — Whether documents "likely" to support applicants' case — Whether documents in control of non-party — CPR rr 31.8, 31.17*                                          C

Prior to its collapse in 1991, BCCI carried on business in the United Kingdom as a deposit taker under a licence from the Bank of England. Following its collapse, an inquiry into the supervision of BCCI under the Banking Acts was conducted by Bingham LJ, who submitted his report to the Chancellor of the Exchequer and the Bank in July 1992. The documents provided to or generated by the inquiry were stored in an archive. In 1992 the claimants, who were former depositors in BCCI, commenced proceedings alleging misfeasance in public office by officials of the Bank.    D
Much of the claimants' pleaded case was based on material from the Bingham report. After the House of Lords in interlocutory proceedings had established the test to be applied in determining whether there had been misfeasance in public office and had ordered that the claim should be allowed to proceed to trial, the claimants applied for discovery of documents contained in the Bingham archive, under CPR r 31.17[1], against HM Treasury and other non-parties to the action. Disclosure was sought of documents or classes of documents listed in a schedule. A second application was    E
made against the Bank of England under rule 31.12 for specific disclosure of material in the archive on the basis that the archive was in the control of the Bank within rule 31.8. The Treasury accepted for the purposes of the first application that the documents sought were in its control for the purposes of rule 31.8 but contended, inter alia, that the threshold conditions imposed by rule 31.17(3)(a) were not met. On hearing both applications, the judge declared that the requirements of    F
rule 31.17(3)(a) were satisfied in respect of the scheduled material, but that the Bank did not have control of the archive within rule 31.8 and was under no obligation to disclose its contents to the claimants under rules 31.6 or 31.12.
On appeals by the Treasury against the declaration that the requirements of rule 31.17(3)(a) were satisfied, and by the claimants against the declarations in relation to the Bank—
*Held*, dismissing both appeals, (1) that, in determining under CPR r 31.17(3)(a)    G
whether the documents to be disclosed by a non-party were "likely" to support the applicant's case or adversely affect that of another party, the test to be applied by the court would be satisfied where the documents "might well" support or adversely affect a party's case; that the word "likely" took its meaning from its context and, where the context was a jurisdictional threshold to the exercise of a discretionary power, a modest threshold of probability was sufficient and it was not necessary to show that the disclosure was more probable than not to support or adversely affect a party's case; that where the disclosure sought was of a class of documents the    H
threshold test had to be applied to each document in the class; that the test would not be satisfied if there were documents within the class which were not relevant to any issue within the proceedings, but could be satisfied by critical examination of each

[1] CPR rr 31.8 and 31.17: see post, para 4.

211

[2003] I WLR                     Three Rivers DC v Bank of England (No 4) (CA)

A  sub-class without requiring individual scrutiny of each document; that in the very
   unusual circumstances of the case the claimants were not required to demonstrate
   precisely how each and every document or class of documents of which they sought
   disclosure would support their case or damage that of the Bank; and that the judge
   had directed himself correctly as to the threshold condition required by
   rule 31.17(3)(a) and had been entitled on the evidence to conclude that the condition
   was satisfied (*post*, paras 17–18, 22, 32–33, 36, 38–40, 43–45, 52).
B      *Black v Sumitomo Corpn* [2002] I WLR 1562, CA applied.
       (2) That, although it was difficult to determine where ownership of the archive
   lay, the question to be determined under CPR r 31.8 was whether the Bank, which
   had never had physical possession of the archive, had a present right to possession or
   to inspect and take copies; and that since the Bank plainly had neither of those rights
   it was not in control of the archive and therefore could not be required to disclose the
   archive to the claimants (*post*, paras 47, 50–52).
C      Decision of Tomlinson J [2002] EWHC 1118 (Comm) affirmed.

   The following cases are referred to in the judgment of the court:

   *American Home Products Corpn v Novartis Pharmaceuticals UK Ltd* (unreported)
       18 December 2000, Laddie J; [2001] EWCA Civ 165; [2001] FSR 784, CA
   *Black v Sumitomo Corpn* [2001] EWCA Civ 1819; [2002] I WLR 1562, CA
   *Cie Financière et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD
D      55, CA
   *Consumer and Industrial Press Ltd, In re* [1988] BCLC 177
   *Harris Simons Construction Ltd, In re* [1989] I WLR 368
   *Howglen Ltd, In re* [2001] I All ER 376
   *Panayiotou v Sony Music Entertainment (UK) Ltd* [1994] Ch 142; [1994] 2 WLR
       241; [1994] I All ER 755
   *Primlaks (UK) Ltd, In re* (1989) 5 BCC 710
E  *SCL Building Services Ltd, In re* (1989) 5 BCC 746
   *Swain v Hillman* [2001] I All ER 91, CA
   *Tanfern Ltd v Cameron-MacDonald (Practice Note)* [2000] I WLR 1311; [2000]
       2 All ER 801, CA
   *Three Rivers District Council v Bank of England (No 3)* [2001] UKHL 16; [2001]
       2 All ER 513, HL(E)
   *Three Rivers District Council v Governor and Company of the Bank of England
F      (No 3)* [2000] 2 WLR 1220; [2000] 3 All ER 1, HL(E)
   *Wakefield v Outhwaite* [1990] 2 Lloyd's Rep 157

   The following additional cases were cited in argument:

   *Anselm v Anselm* (unreported) 15 December 1999, Neuberger J
   *Clark v Ardington Electrical Services* [2001] EWCA Civ 585, CA
   *Continental Reinsurance Corpn (UK) Ltd v Pine Top Insurance Ltd* [1986] I Lloyd's
G      Rep 8, Staughton J and CA
   *Lonrho Ltd v Shell Petroleum Co Ltd* [1980] I WLR 627, HL(E)
   *Lyle v Chipchase* (unreported) 26 February 1998; Court of Appeal (Civil Division)
       Transcript No 348 of 1998, CA
   *Macmillan Inc v Bishopsgate Investment Trust plc* [1993] I WLR 1372; [1993] 4 All
       ER 998, CA
   *Pride Valley Foods Ltd v Hall & Partners (Contract Management) Ltd* (unreported)
H      8 May 2002, Judge Toulmin QC
   *R v Chief Constable of West Midlands Police, Ex p Wiley* [1995] I AC 274; [1994]
       3 WLR 433; [1994] 3 All ER 420, HL(E)
   *Rowbotham Baxter Ltd, In re* [1990] BCC 113
   *Science Research Council v Nassé* [1980] AC 1028; [1979] 3 WLR 762; [1979] 3 All
       ER 673, HL(E)

*Wallace Smith Trust Co Ltd v Deloitte Haskins & Sells* [1997] 1 WLR 257; [1996]   A
    4 All ER 403, CA

The following additional cases, although not cited in argument, were referred to in
the skeleton arguments:

*Davies (Joy Rosalie) v Eli Lilly & Co* [1987] 1 WLR 428; [1987] 1 All ER 801, CA
*Harrison v Bloom Camillin* The Independant, 28 June 1999
*Soden v Burns* [1996] 1 WLR 1512; [1996] 3 All ER 967          B
*Sunderland Steamship P and I Association v Gatoil International Inc* [1988] 1 Lloyd's
    Rep 180
*Woolgar v Chief Constable of Sussex Police* [2000] 1 WLR 25; [1999] 3 All ER 604,
    CA

**APPEALS** from Tomlinson J

By an application notice dated 12 March 2002 the claimants, Three   C
Rivers District Council and some 6,000 other creditors of the Bank of Credit
and Commerce International SA ("BCCI") and the Bank of Credit and
Commerce International SA (in liquidation), applied under CPR r 31.17
against HM Treasury and other non-parties to the claimants' action against
the Bank of England ("the Bank"), and by application notice dated 21 March
2002 under rule 31.12 against the Bank itself, for disclosure of "the Bingham
archive", the body of material assembled by Bingham LJ during the course of   D
the inquiry, held at the Public Record Office, into the Bank's supervision of
BCCI.  At the hearing before Tomlinson J the claimants pursued a more
limited request for disclosure from the archive, namely of certain documents
and classes of documents set out in a schedule.  By order of 31 May 2002
[2002] EWHC 1118 (Comm) Tomlinson J declared (1) that the archive was
not in the control of the Bank within the meaning of rule 31.8; (2) that the   E
Bank was under no obligation to disclose the archive to the claimants
pursuant to rules 31.6 or 31.12; and (3) that the requirements of
rule 31.17(3)(a) were satisfied in respect of the scheduled material.

By an appellant's notice dated 14 June 2002 the claimants appealed
against the judge's first two declarations on the grounds, inter alia, that the
Bingham archive was within the control of the Bank within the meaning of
rule 31.8 and the Bank was under an obligation to disclose the Bingham   F
archive to the claimants or, in the alternative, that the decision of
Tomlinson J was unjust because of a serious procedural or other irregularity
in the proceedings, in that the judge did not decide who had control of the
Bingham archive.

By an appellant's notice dated 14 June 2002 the Treasury appealed
against the judge's third declaration on, inter alia, the following grounds.   G
(1) On a proper construction of rule 31.17 the claimants were required to
satisfy the court on evidence in respect of each document or class of
documents that that document or class of documents was likely to support
the case of the claimant or adversely affect the case of the defendant. (2) The
judge was wrong to hold that the claimants had satisfied the jurisdictional
requirements of rule 31.17(3)(a) simply by identifying a class of documents
sufficiently connected with the subject matter of the dispute capable of   H
advancing their argument or damaging the counter-argument,
characterising the Bingham archive as a whole. (3) The judge was wrong so
to hold because it would be contrary to the purpose and proper construction
of rule 31.17 for its jurisdictional requirements to be capable of being

213

[2003] 1 WLR                    Three Rivers DC v Bank of England (No 4) (CA)

A   satisfied by characterising an extensive and varied body of materials, the Bingham archive, which constituted 708 files, as a "class" of documents. (4) There was no evidence before the court to show that such a class of documents was likely to support the case of the claimants or adversely affect the case of the Bank, and accordingly the judge should not have been satisfied in that regard. (5) The judge should have held that the word "likely" bore its usual English meaning, or bore the meaning "more probable

B   than not". He was wrong to hold that for the purposes of rule 31.17(3)(a) it meant only "may well". In any event he should not have been satisfied that the claimants had fulfilled even the lower "may well" test in respect of any particular document or class of documents. (6) The judge was wrong to treat the present case as exceptional, since such questions were relevant to discretion rather than jurisdiction. (7) The effect of the judge's decision on

C   jurisdiction was to place a greater burden on a non-party to give disclosure under rule 31.17 than could be placed on a party to litigation. (8) The judge failed to apply the Court of Appeal's decision in *American Home Products Corpn v Novartis Pharmaceuticals UK Ltd* [2001] FSR 784 and Pumfrey J's decision in *In re Howglen Ltd* [2001] 1 All ER 376.

    By a respondent's notice filed on 28 June 2002 the Bank appealed against the judge's declaration that the requirements of rule 31.17(3)(a) were

D   satisfied in respect of the scheduled material and his failure to dismiss the claimants' application under rule 31.17, on the grounds that (1) the judge was wrong to hold that the claimants had satisfied the jurisdictional requirement for non-party disclosure in rule 31.17(3)(a); (2) the judge ought to have dismissed the claimants' application under rule 31.17 on the grounds that the jurisdictional requirements for non-party disclosure in

E   rule 31.17(3)(b) were not satisfied, and/or that, in the exercise of his discretion, the application did not satisfy the overriding objective in rule 1.1(1) of doing justice between the parties and because of the likely effect on the trial timetable of making such an order.

    The facts are stated in the judgment of the court.

    *Charles Hollander QC* and *Sarah Lee* for the Treasury.
F   *Nicholas Stadlen QC, Bankim Thanki* and *Ben Valentin* for the Bank.
    *Gordon Pollock QC, David Mildon QC* and *Barry Isaacs* for the claimants.

*Cur adv vult*

    7 August. **CHADWICK LJ** handed down the following judgment of the
G   court.

    1   For some 19 years prior to its collapse in July 1991, Bank of Credit and Commerce International SA ("BCCI") carried on business in the United Kingdom as a deposit taker. From June 1980 it did so under a licence granted by the Bank of England ("the Bank") pursuant to section 3(2) of the Banking Act 1979. The widespread concern in the financial community—

H   and, more generally, amongst those members of the public who were depositors—as to the circumstances in which senior employees of BCCI had been able to perpetrate what was perceived as fraud on a vast scale led, within a very short time of its collapse, to the setting up of an inquiry into the supervision of BCCI under the Banking Acts. Bingham LJ was appointed to

conduct that inquiry.  He submitted his report Inquiry into the Supervision   A
of the Bank of Credit and Commerce International ("the Bingham report")
to the Chancellor of the Exchequer and the Governor of the Bank in July
1992.   The report—but not the eight appendices to the report—were
published in October 1992 as HC Paper (1992–93) No 198.

2   These proceedings were commenced in May 1993.  The claimants are
former depositors in BCCI.  The claim includes allegations of misfeasance in
public office by officials of the Bank.  Much of the claimants' pleaded case is,   B
necessarily, based upon material taken from the Bingham report.  As Lord
Hope of Craighead observed, on the second of the two occasions on which
interlocutory appeals have been before the House of Lords, in *Three Rivers
District Council v Bank of England (No 3)* [2001] 2 All ER 513, 544,
para 98:

> "The present case is, as everyone concerned with it has recognised, one   C
> of a quite exceptional character.  The issues of fact which the claimants
> seek to raise are highly complex.  They relate to matters in which they
> were not directly involved, as they were third parties to the system of
> regulation which was set up to protect them.  They involve meetings and
> discussions between many parties at which they were not represented and
> they extend, through no fault of theirs, over a very long period."   D

The procedural history of the action so far is fully set out in the speech of
Lord Hope to which we have just referred.  It is unnecessary to rehearse that
history in this judgment.  It is sufficient to note that, in the first interlocutory
appeal, *Three Rivers District Council v Governor and Company of the Bank
of England (No 3)* [2000] 2 WLR 1220, the House of Lords established the
test to be applied in determining whether there has been misfeasance in   E
public office; and, in the second appeal [2001] 2 All ER 513, held (Lord
Hobhouse of Woodborough and Lord Millett dissenting) that the claim in
respect of misfeasance in public office should proceed to trial.

3   In the course of his speech in the second appeal, after pointing out that
the claimants had not had the benefit of discovery of documents or the
obtaining of answers to interrogatories, Lord Hope observed [2001] 2 All
ER 513, 523, para 30:   F

> "The assumption can properly be made at this stage that the narrative
> which the [Bingham] report contains will in due course be capable of
> being established by evidence once the claimants have obtained access to
> the relevant documents."

And, at p 524, para 32:   G

> "It can, as I have said, be assumed that if the claim is not struck out the
> claimants will in due course have access to the evidence which provides
> the source material for that narrative, and that that evidence will be
> capable of being led by them at the trial."

Lord Steyn, at p 517, para 6, said that he did not share the confidence of the
judge and the Court of Appeal that discovery and cross-examination would   H
not produce significant materials assisting the claimants.  This, he thought,
was a case which should be examined and tested with the procedural
advantages of a fair and public trial; and was a case in which the judge "will
wish to proceed to trial with due despatch and a minimum of technical

A  interlocutory hearings": see p 517, para 8. Lord Hutton expressed similar views, at pp 563 and 564, paras 147 and 151.

*The applications for disclosure*

4   It is against that background that the claimants made the applications for disclosure of documents with which we are now concerned. They are
B  made, respectively, under CPR rr 31.12 and 31.17. It is convenient to set out the relevant provisions in those rules:

"31.12(1) The court may make an order for specific disclosure or specific inspection.
"(2) An order for specific disclosure is an order that a party must do one or more of the following things—(a) disclose documents or classes of
C  documents specified in the order . . ."
"31.17(1) This rule applies where an application is made to the court under any Act for disclosure by a person who is not a party to the proceedings.
"(2) The application must be supported by evidence.
"(3) The court may make an order under this rule only where—(a) the
D  documents of which disclosure is sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings; and (b) disclosure is necessary in order to dispose fairly of the claim or to save costs.
"(4) An order under this rule must—(a) specify the documents or the classes of documents which the respondent must disclose . . ."

E  Each of those rules must be read in conjunction with rule 31.8, which provides:

"(1) A party's duty to disclose documents is limited to documents which are or have been in his control.
"(2) For this purpose a party has or has had a document in his control
F  if—(a) it is or was in his physical possession; (b) he has or has had a right to possession of it; or (c) he has or has had a right to inspect or take copies of it."

And it must be kept in mind that disclosure is not sought as an end in itself. The object of disclosure (at least in this case) is to enable the claimants to inspect the documents disclosed. In that context, the provisions of
G  rule 31.3(1) are relevant:

"A party to whom a document has been disclosed has a right to inspect that document except where—(a) the document is no longer in the control of the party who disclosed it; (b) the party disclosing the document has a right or a duty to withhold inspection of it . . ."

H  5   The first (in time) of the applications with which we are now concerned was issued on 12 March 2002. Those named as respondents included HM Treasury. The claimants sought an order against the Treasury, pursuant to rule 31.17, for disclosure of the documents or classes of documents listed in a schedule to the application. Put shortly, those are documents provided to, or generated by, Bingham LJ in the course of his

inquiry.  The second application was issued on 21 March 2002.  It sought an   *A*
order against the Bank, pursuant to rule 31.12, for specific disclosure of

> "the evidence and other material obtained and produced by and on
> behalf of Bingham LJ and the inquiry team (including the secretariat)
> during the course of the Bingham Inquiry into the supervision of
> BCCI from 1991 to 1992 ('the archive')."
                                                                               *B*

6    It is obvious—and not in dispute—that the documents sought from
the Bank must include the documents sought from the Treasury.  In those
circumstances it is obvious, also, that if and in so far as the documents
sought are now in the control of the Bank—so that success on the second
application leads to inspection of those documents by the claimants—the
first application is misconceived—because disclosure of those documents by
the Treasury could not be necessary to dispose fairly of the claim or to save   *C*
costs: see paragraph (b) of rule 31.17(3).

7    The applications were heard by Tomlinson J over three days in May
2002.  He handed down his written judgment on 31 May 2002.  He directed
himself—correctly, in our view—that the first question which he had to
decide was whether the Bank had a right to possession, or a right to inspect
and take copies, of the material described in the second application as the   *D*
archive.  He held that the Bank did not have that right.  The order which he
made on 31 May 2002 contains declarations which reflect that decision.  He
declared (1) that the archive is not in the control of the Bank within the
meaning of rule 31.8 and (2) that the Bank is under no obligation to disclose
the archive to the claimants pursuant to rule 31.6 or 31.12.  The claimants
appeal to this court against those declarations.

8    The judge's conclusion on that question made it necessary for him to   *E*
address the application of 12 March 2002—that is, the application for an
order under rule 31.17 against the Treasury.  He recorded that it was
common ground that—if he were satisfied that the threshold conditions in
paragraph (3) were met—he could not make an order for disclosure because
questions of confidentiality and public interest immunity would remain to be
investigated.  Plainly, those are questions which are likely to arise under   *F*
rule 31.3(1)(b) on any request to inspect the material of which disclosure is
sought in this case; and there would be little or no purpose in an order for
disclosure under rule 31.17 if the documents disclosed could not be
inspected.

9    For that reason—if for no other—it seemed to us that the judge was
correct, also, to take the view that he could not reach a conclusion in relation
to threshold condition (b) of rule 31.17(3).  As he put it at paragraph 82 of   *G*
his written judgment:

> "Obviously I could not at this stage consider and I am not asked to
> consider the requirement under rule 31.17(3)(b) that disclosure be
> necessary in order to dispose fairly of the claim.  That will involve
> amongst other things consideration of confidentiality and [public interest
> immunity].  There also remains for consideration the question whether   *H*
> the court's discretion should be exercised in the applicant's favour."

The Bank sought to challenge the judge's refusal to dismiss the application of
12 March 2002 on the ground that threshold condition (b) was not met—

A   alternatively as a matter of discretion—but we declined to entertain an appeal on those grounds.

10   The judge confined his consideration of the application of 12 March 2002 to the question whether threshold condition (a) of rule 31.17 was met. He held that it was. In expressing his conclusion, the judge said, at the first of two paragraphs numbered 81 in his judgment:

B       "My conclusion is that in the very unusual circumstances of this case the claimants are not required, in order to satisfy CPR r 31.17(3)(a), to make a detailed application identifying each and every document or class of documents of which they seek disclosure from the archive demonstrating in relation to each such document or class of documents how precisely it will support their case or damage that of the Bank. By the same token the claimants are not required to eliminate the possibility that

C       the documents of which they seek disclosure might include some which on inspection have no probative value in the case. Given the nature of the archive that would be an entirely pointless, time-consuming and expensive exercise, and in my judgment the authorities to which I have referred show that I am not required to interpret rule 31.17 in a manner which brings about what would be, in the special circumstances of this

D       case, an absurd and very undesirable situation."

The Treasury appeals against the declaration, made in paragraph (3) of the order of 31 May 2002, that the requirements of rule 31.17(3)(a) are satisfied in respect of the material identified in the schedules to that order ("the scheduled material").

E   *The appeals to this court*

11   There are, therefore, two appeals before this court: (i) the Treasury's appeal (2002/1276) from the declaration that the requirements of rule 31.17(3)(a) are satisfied in respect of the scheduled material; and (ii) the claimants' appeal (2002/1280) from the declaration that the archive is not in the control of the Bank and the consequential declaration that the Bank is

F   under no obligation to disclose the archive to the claimants. It is convenient to consider the appeals in that order; although this inverts the logical sequence adopted by the judge. The reason is that it was made clear to us by Mr Pollock, on behalf of the claimants, that—if the Treasury's appeal were dismissed—his clients would be content to pursue their objectives of disclosure and inspection under the application of 12 March 2002; and that

G   he would not be pressing for a reversal of the judge's decision that the Bank was not in control of the archive.

*The Treasury's appeal*

12   The material described in the schedule to the application of 12 March 2002—so far as it now exists—is now held at the Public Records Office in Kew. The Treasury are content to accept, for the purposes of the

H   application, that—whatever the true legal analysis of the circumstances in which that material was transferred to the Public Records Office in or about 1993 (following the completion of the inquiry)—the documents of which disclosure is sought are in its control within the meaning of rule 31.8. As the judge put it at paragraph 14: "It is evident that whether de facto or de jure

218
**Three Rivers DC v Bank of England (No 4) (CA)** [2003] 1 WLR

HM Treasury have the power to decide who may or may not inspect the   A
archive and who may or may not have physical possession of it." The
Treasury opposes the order sought, first, on the ground that the threshold
condition imposed by paragraph (a) of rule 31.17(3) is not met—that is to
say, that it has not been established by evidence that the documents of which
disclosure is sought "are likely to support the case of the applicant or
adversely affect the case of [the Bank]"—and, second, on the ground that, in
any event, disclosure has not been shown to be "necessary in order to dispose   B
fairly of the claim or to save costs": see sub-paragraph (b) of that paragraph.
As we have already indicated, we are not concerned with the second of those
grounds on this appeal.

   13   The first part of the schedule to the application notice of 12 March
2002 comprised a list of 138 documents or classes of documents cross-
referenced to numbered paragraphs in, it seems, appendix 2 to the Bingham   C
report. Appendix 2 to the report contained a description of the role of the
Treasury in relation to the supervision of BCCI and had been disclosed by
the Bank to the claimants in December 2001. The second part of the
schedule was headed "The Bingham Inquiry Archive". It sought, in relation
to each of the individuals and entities listed in annex 1 to the Bingham
report, (a) any witness or other statements, (b) any written proof of
evidence, (c) any transcript of oral evidence and (d) any other document or   D
documents recording the evidence, observations or written material
provided, in each case, to the inquiry by or on behalf of that individual or
entity; and any other material obtained and produced by or on behalf of
Bingham LJ during the course of the inquiry. Annex 1 to the Bingham
report—a copy of which was attached to the application—contains a list of
those "who gave evidence to, or made observations relevant to the terms of
reference of, the inquiry; or otherwise provided written material to the   E
inquiry". The list includes 79 individuals who gave evidence, made
observations or provided written material on their own account, a further
74 individuals who did so on behalf of 11 institutions or entities (including
12 officials from the Bank, eight members of the Board of Banking
Supervision and 32 former ministers and officials from the Treasury) and a
further 46 institutions or entities who made observations or provided   F
written material, but who did not do so through named individuals. It can
be seen, therefore, that the application, as made, was wide ranging.

   14   The extent of the disclosure sought on the application of 12 March
2002 was reduced, substantially, in the course of the hearing before the
judge. The claimants were content to identify those named in annex 1 to the
Bingham report who were said to be "of prime importance at present"; and,   G
without formally abandoning the application for disclosure of material
provided by others named in that list, pursued the application on that basis.
This exercise in "pruning" had the effect of reducing the number of
individuals providing material on their own account to 17 and the total
number of entities or institutions to 37. It seems, also, that the applicants
did not press for disclosure of the documents identified in the first part of the
schedule to the application notice of 12 March 2002—save to the extent that   H
those documents would be found in material provided by those named in the
"pruned" annex 1.

   15   The scheduled material—identified in the schedules to the order of
31 May 2002—is derived from the pruned version of "The Bingham Inquiry

[2003] I WLR                    Three Rivers DC v Bank of England (No 4) (CA)

A   Archive" which had formed the second part of the schedule to the
application of 12 March 2002. Schedule 1 to the order comprises the names
of those identified as "of prime importance at present" in the course of the
hearing before the judge, with the omission (i) of the Bank and its officials
and (ii) of one individual, Mr S A Hussein. Schedule 2 to the order of 31 May
2002 is in these terms:

B       "In respect of each person or entity ('the witness') identified at
    Schedule 1: (1) documents provided by the witness to the inquiry;
    (2) submissions and observations of the witness; (3) witness statements
    and proofs of evidence of the witness; (4) transcripts of the witness's
    evidence; (5) witness bundle used when Bingham LJ interviewed the
    witness; and (6) post-interview correspondence in respect of the witness.
C   Provided that nothing herein shall require production of 'Maxwellisation'
    drafts or responses to 'Maxwellisation' drafts and that the claimants are
    at liberty to proceed with their applications against the non-parties in
    relation thereto."

It is relevant to note that, of those listed in schedule 1 to the order, oral
evidence was given only by members of the Board of Banking Supervision
D   (six), commissioners or officials of HM Customs and Excise (four),
ministers or officials of HM Treasury (12) and partners or employees of
Price Waterhouse (six). It is only in relation to those 28 witnesses that
there can be expected to be transcripts of evidence. A further
12 individuals were seen informally. It is, perhaps, possible that in relation
to those 12 individuals—in addition to the individuals who gave oral
evidence—there may be something in the nature of a "witness bundle" and
E   there may be "post interview correspondence"; but it is, we think, clear
that, in relation to the other individuals and entities named in schedule 1 to
the order, the scheduled material is likely to be confined to documents
within category 1 (documents provided by the witness to the inquiry) or
category 2 (submissions and observations of the witness) in schedule 2 to
the order.

F   16   The grounds upon which Mr Hollander, on behalf of the Treasury,
submitted that the judge had been wrong to reach the conclusion that the
threshold condition in paragraph (a) of rule 31.17(3) was satisfied—as
developed in argument in this court—may, we think, fairly be considered
under two main heads. First, that the judge failed to direct himself correctly
in relation to the requirement that the only documents which a person who is
not party to the proceedings can be ordered to disclose are documents "likely
G   to support the case of the applicant or adversely affect the case of one of the
other parties to the proceedings", in that (i) he failed to give to the word
"likely" the meaning "more probable than not" which (it is said) that word
should bear in that context and (ii) he failed to appreciate that the test "likely
to support . . . or adversely affect" had to be applied to each individual
document or (if the documents were to be described as a class) to each
H   document in the class. Second, that the judge failed to recognise that the
effect of rule 31.17(2) is to require the applicant to adduce evidence of the
matters on which he relies to establish that the threshold condition in
rule 31.17(3)(a) is met. In the present case, it is said, the claimants made no
attempt to adduce evidence of the matters on which they relied.

*The need for evidence*                                                                A

17   It is, we think, convenient to address the second of those criticisms
before turning to examine what rule 31.17(3)(a) requires.  It is plain that an
application for an order for disclosure under rule 31.17 must be supported
by evidence—paragraph (2) so provides.  And it is plain that there was, at the
least, formal compliance with that requirement—see paragraph 3(a) of the
witness statement (his fourth) made by Mr Christopher Grierson, a partner      B
in Lovells (the claimants' solicitors), on 8 March 2002.  It is plain, also, from
paragraphs 6, 13 and 14, and 48 of that witness statement, that the
claimants were relying on the Bingham report and its appendices.  The judge
appreciated that.  He said at paragraph 64 of his judgment:

>   "The claimants accept that they could go away and devise long and
>   detailed targeted requests for documents and passages in transcripts of      C
>   evidence based upon references thereto in the report or based on
>   references to meetings likely to have generated memoranda or references
>   to the evidence of those who are identified as having given it to the
>   inquiry.  They submit however that that exercise would be extremely
>   time-consuming and costly and it is, they submit, unnecessary."

                                                                                       D
The judge accepted that submission when he said, in the passage which we
have set out earlier in this judgment that, in the very unusual circumstances
of this case, the claimants were not required to demonstrate precisely how
each and every document or class of documents of which they sought
disclosure would support their case or damage that of the Bank.

18   In our view, the judge was entitled to approach the matter on that
basis.  The judge had been concerned with this litigation for some time.  He      E
should be taken to have a comprehensive and detailed knowledge of the
issues.  We were told that the judge had read the Bingham report; and that he
had read, or had the opportunity to read, the relevant appendices.  It is, we
think, fanciful to suggest that the Bingham report was not "in evidence",
notwithstanding that it may not have been exhibited formally to a witness
statement on this application.  And although the report is not evidence of the      F
matters in issue in these proceedings, it is, plainly, evidence of what material
was before Bingham LJ and the conclusions which he drew from that
material.  The judge was entitled to accept the report and the appendices
which he had read as evidence of what the scheduled material, identified in
his order of 31 May 2002, was likely to contain.  If he were correct in his
view as to the test which the threshold condition in rule 31.17(3)(a) required,      G
then he was entitled to take the view that the evidence before him enabled
him to decide whether or not that test was satisfied.

19   We would accept that if (as Mr Hollander contends) the threshold
condition required a more stringent test—that is to say, a test of "more
probable than not" applied to each and every document—there is force in
the criticism that the judge did not have the evidence that he needed in order
to decide whether that more stringent test were satisfied.  But that is      H
immaterial.  If the judge applied the wrong test, it is irrelevant that he did not
have the material on which to apply the correct test.  If the test which he did
apply was the correct test, it is irrelevant that he did not have the material on
which to apply a more stringent (and, on this hypothesis, an incorrect) test.

221

A    *The test which the threshold condition requires*

20    We turn, therefore, to consider the criticism that the judge failed to apply the correct test when reaching the conclusion that the claimants had satisfied the threshold condition in paragraph (a) of rule 31.17(3) in relation to the scheduled material. As we have indicated, there are two limbs to that criticism. The first is that the judge failed to give to the word "likely" the
B   meaning "more probable than not".

21    The meaning of the word "likely" in a statutory or regulatory context has been considered by the courts on a number of occasions; in particular, in the context of the requirement, in section 8(1)(b) of the Insolvency Act 1986, that an administration order may only be made if the court considers that the making of an order "would be likely to achieve" one or more of the statutory purposes set out in section 8(3) of that Act. In *In re*
C   *Consumer and Industrial Press Ltd* [1988] BCLC 177, 178, Peter Gibson J held that the evidence must go beyond establishing a mere possibility that a statutory purpose would be achieved: it must enable the court to hold "that the purpose in question will more probably than not be achieved". In *In re Harris Simons Construction Ltd* [1989] 1 WLR 368, Hoffmann J took a different view. He pointed out, at p 370D–E, that on a scale of probability of
D   0 (impossibility) to 1 (absolute certainty) the test of "more probable than not" required a factor greater than 0·5—which he thought too high. Two of the reasons which he gave are of general application:

    "First, 'likely' connotes probability but the particular degree of probability intended must be gathered from qualifying words (very likely, quite likely, more likely than not) or context. It cannot be a misuse of language to say that something is likely without intending to suggest that
E   the probability of its happening exceeds 0·5, as in 'I think that the favourite, Golden Spurs at 5–1, is likely to win the Derby' . . . Fourthly, as Peter Gibson J said, section 8(1) only sets out the conditions to be satisfied before the court has jurisdiction. It still retains a discretion as to whether or not to make the order. It is therefore not unlikely that the legislature intended to set a modest threshold of probability to found jurisdiction
F   and to rely on the court's discretion not to make orders in cases in which, weighing all the circumstances, it seemed inappropriate to do so."

He preferred, in the context of section 8(1)(b) of the Insolvency Act 1986, a test of "real prospect". His view was followed by Vinelott J in *In re Primlaks (UK) Ltd* (1989) 5 BCC 710, and was adopted, in preference to his own earlier view, by Peter Gibson J in *In re SCL Building Services Ltd* (1989)
G   5 BCC 746.

22    Decisions on the meaning of the word "likely" in the context of section 8(1)(b) of the Insolvency Act 1986 are not, of course, determinative of the meaning to be given to that word in the context of CPR r 31.17(3)(a). In particular it is pertinent to have in mind that a "real prospect" test is adopted, expressly, in rule 24.2 (grounds for summary judgment) and in rule 52.3 (permission to appeal); and it may be supposed, at least prima
H   facie, that if the rule-making body had intended the test under rule 31.17(3)(a) to be a "real prospect" test it would have said so. But the decisions on section 8(1)(b) of the Insolvency Act 1986 to which we have referred illustrate the point—which may perhaps need no authority—that "likely" does not carry any necessary connotation of "more probable than

not".  It is a word which takes its meaning from context.  And where the     A
context is a jurisdictional threshold to the exercise of a discretionary power,
there may be good reason to suppose that the legislature—or the rule-
making body, as the case may be—intended a modest threshold of
probability.

   23    The context in which the meaning of "likely" in rule 31.17(3)(a) has
to be determined includes (i) the statutory power to which rule 31.17 was     B
intended to give effect, (ii) the corresponding provisions in rule 31.16
(disclosure before proceedings start) and the statutory power to which that
rule was intended to give effect, and (iii) the circumstances in which the new
rules as to disclosure, contained in Part 31, were introduced.  It is necessary,
therefore, to examine those provisions.

   24    Section 33(2) of the Supreme Court Act 1981 empowers the court to
order pre-action disclosure; section 34(2) empowers the court to order     C
disclosure against a non-party.  The two sections—as amended by the Civil
Procedure (Modification of Enactments) Order 1998 (SI 1998/2940)—are in
these terms, so far as material:

      "33 . . . (2) On the application, in accordance with rules of court, of a
   person who appears to the High Court to be *likely* to be party to
   subsequent proceedings in that court, the High Court shall, in such     D
   circumstances as may be specified in the rules, have power to order a
   person who appears to the court to be *likely* to be a party to the
   proceedings and to be *likely* to have or to have had in his possession,
   custody or power any documents which are relevant to an issue arising or
   *likely* to arise out of that claim—(a) to disclose whether those documents
   are in his possession, custody or power; and (b) to produce such of those     E
   documents as are in his possession, custody or power to the applicant . . ."

      "34(2) On the application, in accordance with rules of court, of a party
   to any proceedings, the High Court shall, in such circumstances as may be
   specified in the rules, have power to order a person who is not a party to
   the proceedings and who appears to the court to be *likely* to have in his
   possession, custody or power any documents which are relevant to an
   issue arising out of the said claim—(a) to disclose whether those     F
   documents are in his possession, custody or power; and (b) to produce
   such of those documents as are in his possession, custody or power to the
   applicant . . ." (Emphasis added.)

It can be seen that the structure of the two sections is very similar.  They are
derived, respectively, from sections 31 and 32 of the Administration of
Justice Act 1970.  They must be regarded as complementary provisions     G
extending the powers of the court in relation to disclosure.

   25    Each of sections 33(2) and 34(2) of the 1981 Act provides that
the power which it confers shall be exercisable "in such circumstances as
may be specified in the rules".  The relevant rules are now, respectively,
CPR rr 31.16 and 31.17.  We have already set out the provisions of
rule 31.17, so far as material.  The corresponding provisions in rule 31.16     H
are these:

      "(1) This rule applies where an application is made to the court under
   any Act for disclosure before proceedings have started.
      "(2) The application must be supported by evidence.

223

[2003] 1 WLR                     Three Rivers DC v Bank of England (No 4) (CA)

A       "(3) The court may make an order under this rule only where—(a) the
respondent is *likely* to be a party to subsequent proceedings; (b) the
applicant is also *likely* to be a party to those proceedings; (c) if
proceedings had started, the respondent's duty by way of standard
disclosure, set out in rule 31.6, would extend to the documents or classes
of documents of which the applicant seeks disclosure; and (d) disclosure
before proceedings have started is desirable in order to—(i) dispose fairly
B       of the anticipated proceedings; (ii) assist the dispute to be resolved
without proceedings; or (iii) save costs.
        "(4) An order under this rule must—(a) specify the documents or the
classes of documents which the respondent must disclose . . ." (Emphasis
added.)

C       26    Again, it can be seen that the structure of rules 31.16 and 31.17 is
very similar; indeed, paragraphs (2), (4) and (5) are identical and
paragraph (1) differs only in identifying the different circumstances in which
each rule is to apply.   In each case paragraph (3) imposes threshold
conditions.  The threshold conditions in rule 31.16(3)(a) and (b) require that
the applicant and the person against whom the order for disclosure is sought
are likely to be parties to subsequent proceedings.   There is, of course, no
D       corresponding provision in rule 31.17(3)—for the obvious reason that
rule 31.17 applies to a case where there are existing proceedings to which the
person against whom disclosure is sought is not, and is not likely to be, a
party.    The threshold conditions in rule 31.16(3)(d)(i) and (iii) are
reproduced in rule 31.17(3)(b).
        27    Rule 31.16(3)(c) requires that, if proceedings had started, the
E       respondent's duty by way of standard disclosure, set out in rule 31.6, would
extend to the documents or classes of documents of which the applicant
seeks disclosure.  Standard disclosure requires a party to disclose only (a) the
documents on which he relies, (b) the documents which (i) adversely affect
his own case, (ii) adversely affect another party's case or (iii) support another
party's case, and (c) the documents which he is required to disclose by a
relevant practice direction.  It is to be noted that the rule-making body has
F       not adopted the wider test of "relevance" which is found in section 33(2) of
the 1981 Act.  There can be no doubt that that reflects a deliberate intention
to curtail the process of discovery; to get away from the traditional approach
based on "telling the story" or "leading to a train of inquiry" as exemplified
by the decision in *Cie Financière et Commerciale du Pacifique v Peruvian
Guano Co* (1882) 11 QBD 55—see Lord Woolf's report "Access to Justice:
Final Report to the Lord Chancellor on the Civil Justice System in England
G       and Wales" (July 1996), Section III, chapter 12, paras 37–40 and *Civil
Procedure*, Spring 2002, vol 1, pp 650–651, para 31.6.3.  The statutory
power to order disclosure (in accordance with rules of court) where a
prospective party is likely to have had in his possession custody or power any
documents which are relevant to an issue has been curtailed by the new rules
so as to be exercisable only in respect of documents which fall within the first
H       two categories identified by Lord Woolf in paragraph 38 of "Access to
Justice".
        28    Rule 31.17(3)(a) reflects a similar approach.  The rule-making body
has eschewed the wider test of relevance which is found in section 34(2) of
the 1981 Act.  It has confined the documents of which disclosure may be

224
**Three Rivers DC v Bank of England (No 4) (CA)**                    [2003] 1 WLR

A
ordered to those within categories (a) and (b) of rule 31.6, but with
modifications which take account of the twin premises (i) that the applicant
does not have, and may never have seen, the documents of which he seeks
disclosure and (ii) that the person against whom an order for disclosure is
sought is a stranger to the dispute. So, "documents on which he relies" in
rule 31.6(a) and "documents which adversely affect another party's case" in
rule 31.6(b)(ii) have become "documents likely to support the case of the
B
applicant" and "documents likely to adversely affect the case of one of the
other parties to the proceedings" in rule 31.17(3)(a). The statutory power to
order disclosure where a person who is not a party is likely to have had in his
possession custody or power any documents which are relevant to an issue
has been curtailed by rule 31.17(3)(a) in much the same way as the
corresponding statutory power to order pre-action disclosure has been
curtailed by rule 31.16(3)(c). But there is a difference in language in two
C
respects. First, rule 31.17(3)(a) does not provide, in terms, for disclosure of
"documents which adversely affect his own case" or of "documents which
support another party's case"; that is to say, there is no mention in
rule 31.17(3)(a) of the categories identified in rule 31.6(b)(i) and (iii). An
obvious explanation for that apparent omission is that the rule-making body
thought it unnecessary to provide for the possibility that a party would
D
pursue an application, supported with evidence, for disclosure of documents
which would adversely affect his own case or which would support the case
of his opponent. The difference in language does not reflect any difference in
substance.

29  Second, the threshold condition in rule 31.17(3)(a) is lowered by the
qualification "likely to". It is not necessary that the documents of which
disclosure is ordered will support the applicant's own case or that they will
E
adversely affect the case of another party; it is enough that they are likely to
do so. The explanation for that difference is also obvious; the rule-making
body appreciated that an applicant cannot be expected to specify which
documents under the control of another—which he may never have seen—
will support his case or adversely affect that of another party, or to know
whether he will wish to rely upon them. It further appreciated that the
F
person against whom disclosure is sought—being a stranger to the dispute—
cannot be expected to decide for himself which of the documents under his
control do support the applicant's case or adversely affect the case of one of
the other parties to an action in which he is not a party. Nor can the court be
expected to decide whether documents which it has not seen will support the
applicant's case or adversely affect that of another party. The test has to be
one of probability. The question, of course, is what degree of probability
G
does the test require.

30  The judge found assistance in the judgment of Rix LJ in *Black v
Sumitomo Corpn* [2002] 1 WLR 1562. The question in that case was
whether pre-action disclosure should be ordered pursuant to section 33(2) of
the Supreme Court Act 1981 and CPR r 31.16. Rix LJ, with whose
judgment Ward and May LJJ agreed, identified two questions: (i) whether
H
section 33(2) of the 1981 Act required that it be likely that proceedings are
issued, or only that the persons concerned are likely to be parties if
subsequent proceedings are issued; and (ii) whether "likely" means "more
probable than not" or "may well". He held, at p 1584, para 71, in answer to
the first of those questions, that the requirement was no more than that the

A  persons concerned were likely to be parties in proceedings if those proceedings were issued. He went on to say, at pp 1584–1585, para 72:

"As to the second question, it is not uncommon for 'likely' to mean something less than probable in its strict sense. It seems to me that if I am wrong about the first question, then it is plain that 'likely' must be given its more extended and open meaning (see Lord Denning MR in *Dunning v*
B  *United Liverpool Hospitals' Board of Governors* [1973] 1 WLR 586), because otherwise one of the fundamental purposes of the statute will have been undermined. If, however, I am right about the first question, the second question is of less moment. Even so, however, I am inclined to answer it by saying that 'likely' here means no more than 'may well'. Where the future has to be predicted, but on an application which is not merely pre-trial but pre-action, a high test requiring proof on the balance
C  of probability will be both undesirable and unnecessary: undesirable, because it does not respond to the nature and timing of the application; and unnecessary, because the court has all the power it needs in the overall exercise of its discretion to balance the possible uncertainties of the situation against the specificity or otherwise of the disclosure requested. Clearly, the narrower the disclosure requested and the more
D  determinative it may be of the dispute in issue between the parties to the application, the easier it is for the court to find the request well founded, and vice versa."

He observed, at p 1585, para 73, that, apart from the two questions of principle which he had identified, the word "likely" itself presented no difficulties: "Temptations to gloss the statutory language should be resisted.
E  The jurisdictional threshold is not, I think, intended to be a high one."

31  Mr Hollander submitted that the judge was wrong to place reliance on those observations. It is said that there is no real parallel between the provisions relating to pre-action discovery which were under consideration in *Black v Sumitomo Corpn* [2002] 1 WLR 1562 and the provisions relating to discovery against third parties which fall for consideration in the present case. We reject that submission. It seems to us that there is a close parallel
F  between rules 16 and 17 in rule Part 31; as there is between the statutory provisions to which those rules are respectively intended to give effect. In particular, it is plain that the word "likely" has a common root in the provisions of sections 31 and 32 of the Administration of Justice Act 1970; that that word is used in the same sense wherever it appears in sections 33(2) and 34(2) of the Supreme Court Act 1981; and that that word is used in the
G  same sense in CPR r 31.16(3)(a) and (b). It would be remarkable if the rule-making body had intended the same word to be understood in a different sense in rule 31.17(3)(a).

32  In those circumstances, unless there were reasons which compelled a different conclusion, we would think it right to reject the submission that the word "likely", in the context of the threshold condition in rule 31.17(3)(a), means "more probable that not"; and to hold that the word has, in that
H  context, the meaning "may well" which this court thought it should bear in rule 31.16(3)(a) and (b). We are not persuaded that there are reasons which compel a different conclusion. Indeed, it seems to us that the reasons which led this court to reach the conclusion which it did in *Black v Sumitomo Corpn* have equal force in the context of rule 31.17(3)(a). As Rix LJ pointed

226
**Three Rivers DC v Bank of England (No 4) (CA)**                    [2003] 1 WLR

out, a high test requiring proof on the balance of probability would be both    A
undesirable and unnecessary, for the reasons which he gave.

33   In rejecting the submission that the test which the threshold
condition in rule 31.17(3)(a) requires is "more probable than not", we
should not be taken to accept that the hurdle posed by that condition is,
necessarily, as low as that which has to be surmounted when applying the
"real prospect" test under other provisions in the Civil Procedure Rules. In    B
the context of rule 24.2, or rule 52.3, "real prospect" has been held to mean
"realistic, as opposed to fanciful": see *Swain v Hillman* [2001] 1 All ER 91,
92J and *Tanfern Ltd v Cameron MacDonald (Practice Note)* [2000] 1 WLR
1311, 1316, para 21.  We have already pointed out that if the rule-making
body had intended the test under rule 31.17(3)(a) to be a "real prospect" test,
it may be supposed that it would have said so.  We think that the word
"likely", when used in the Civil Procedure Rules, connotes a rather higher    C
threshold of probability than merely "more than fanciful".  But a prospect
may be more than fanciful without reaching the threshold of "more probable
than not".  We share the view expressed by Rix LJ in *Black v Sumitomo
Corpn* that, properly understood, the word "likely" presents no difficulties;
and that the temptation to gloss the statutory (or regulatory) language
should be resisted.  We should add, also, that it follows from our conclusion
that in the context of rule 31.17(3)(a) "likely" does not mean "more    D
probable than not", that it is no bar to an order for disclosure that the court
is of the view that the document to be disclosed is as likely—or more likely—
to support the case of one of the other parties to the proceedings, as it is to
support the case of the applicant.  It is enough that the court is satisfied that
the document is likely to support the case of the applicant.  The fact that the
court (without sight of the document) may think that, if it turns out not to
support the case of the applicant then it is likely that the document will    E
support the case of one of the other parties, is irrelevant.

*Documents or classes of document*

34   The second limb of the submission that the judge failed to direct
himself correctly in relation to the threshold condition in rule 31.17(3)(a) is
found in the criticism that he failed to appreciate that the test "likely to    F
support . . . or adversely affect" had to be applied to each individual
document or, if the documents were to be described as a class, to each
document in the class.  It would be surprising if that criticism could be made
good in the circumstances that the judge considered, at some length, the
decision of this court in *American Home Products Corpn v Novartis
Pharmaceuticals UK Ltd* [2001] FSR 784, in which the point was addressed,    G
and directed himself in the light of that decision.

35   The application in the *Novartis* case was for an order under
rule 31.17 that Fisons Ltd (who were not party to the proceedings) make
disclosure of documents relating to the validity of the patent in suit ("the use
of rapamycin for the preparation of a medicament for inhibiting organ or
tissue transplant rejection in a mammal in need thereof") which were
identified by Dr Gordon Wright, a patent attorney, on a visit to Fisons Ltd's    H
offices "and separated by him into a box".  The documents comprised
records of the patent department of the pharmaceutical division of Fisons in
respect of collaboration between Fisons and a Japanese company, Fujisawa,
in relation to an immunosuppressant, FK-506.  It was said that knowledge

[2003] I WLR                     Three Rivers DC v Bank of England (No 4) (CA)

A    that FK-506 was a potent inhibitor of transplant rejection was an important
     factor in support of the defendant's challenge to the patent in suit on the
     grounds that the invention was obvious.  Dr Wright's evidence, at p 789,
     was:

         "(1) I asked to see all the patent department collaboration files.
         (2) I have no reason to believe that I was not provided with all of them.
B        (3) All of them, and not just those which I considered to be of relevance,
         were put into a box and separated from the other non-collaboration
         documents held at Holmes Chapel"—Fisons' offices—"(4) I do not believe
         that it is likely that other documents relating to the collaboration will be
         held by Fisons Ltd other than the patent department collaboration
         files."

C    The application was refused by Laddie J on the ground (amongst others) that
     it appeared from that evidence—and, in particular, from paragraph (3)—
     that it was clear that some of the documents in the box of which disclosure
     was sought were not relevant.  He held, following the observations of
     Pumfrey J in *In re Howglen Ltd* [2001] 1 All ER 376, 382–383, that: "If the
     order covers disclosure which, on any basis, includes material which is
     accepted to be irrelevant, then I do not think the court has power to make
D    the order."
         36   Aldous LJ, with whose judgment Robert Walker LJ and Sir Anthony
     Evans agreed, accepted that the court had no power to make an order under
     rule 31.17 in respect of a class of documents if it were established that there
     were documents within the class that were not relevant to any issue in the
     proceedings—in the sense that they did not satisfy the threshold condition of
     "documents . . . likely to support the case for the applicant or adversely
E    affect the case of one of the other parties".  That, if we may say so, must be
     right.  The rule gives no power to order a non-party to disclose documents
     which do not meet the threshold condition in sub-paragraph (a) of
     paragraph (3); and that cannot be circumvented by including documents
     which do not meet that threshold condition in a class which also includes
     documents which do meet that condition.  In particular, the threshold
F    condition cannot be circumvented by an order which puts upon the non-
     party the task of identifying those documents within a composite class which
     do, and those which do not, meet the condition: see *Wakefield v Outhwaite*
     [1990] 2 Lloyd's Rep 157, 163–164 and *Panayiotou v Sony Music
     Entertainment (UK) Ltd* [1994] Ch 142, 151F.
         37   Aldous LJ then turned to consider whether the documents sought by
G    the applicant were relevant "in the sense that they meet the criteria laid
     down by rule 31.17": see [2001] FSR 784, 794, para 32.  He concluded, at
     p 794, para 33, that the evidence established that "the box contains relevant
     documents which the court has power to require to be disclosed".  He then
     addressed, and rejected, the submission that the box also contained
     documents that were not relevant.  That submission was based, of course, on
H    paragraph (3) of the passage in Dr Wright's evidence (set out in paragraph 35
     above).  Aldous LJ said, at p 794, para 34:

         "Dr Wright's view of 'relevance' cannot be determinative particularly
         when clearly he was considering the stature of individual documents,
         rather than the class.  To decide what weight to place on any particular

document, it will be necessary to consider it in a context. If so, a selection     *A*
limited to documents Dr Wright thought were individually relevant or
even those Fisons thought were relevant could provide a false picture . . .
No doubt particular documents may turn out to be more relevant than
others; some individual documents may not be 'relevant' at all."

It is, we think, plain that Aldous LJ placed the word "relevant" between
quotation marks in paragraph 34 to emphasise that he was using the word in     *B*
a different sense from that in which he had used the same word (without the
quotation marks) in paragraphs 32 and 33. In paragraphs 32 and 33
relevant is synonymous with "likely to support . . . or adversely affect". In
paragraph 34 "relevant" documents are those which will, in the event, turn
out to support the case for the applicant or adversely affect the case of one
of the other parties. Unless the word "relevant" is understood in that sense     *C*
in the context of paragraph 34 it is impossible to reconcile his readiness to
contemplate the possibility that an order under rule 31.17 might lead to
disclosure of "individual documents [which] may not be 'relevant' at all"
with his acceptance, in paragraph 32 of the proposition that an order for
disclosure is not to be made unless "the documents . . . to be disclosed . . .
are relevant in the sense that they meet the criteria laid down by rule 31.17".
The distinction is between documents which are *likely* to support the case of     *D*
the applicant or adversely affect the case of one of the other parties—which
can be the subject of an order for disclosure—and documents which, in the
event, turn out not to support the case for the applicant or adversely affect
the case of one of the other parties—the presence of which within a class
does not lead to the conclusion that the class ought not to have been the
subject of an order for disclosure.                                              *E*

38   The judgments of this court in the *Novartis* case may be taken as
authority for the following propositions. First, as we have said, (i) rule 31.17
gives no power to order a non-party to disclose documents which do not
meet the threshold condition in sub-paragraph (a) of paragraph (3); and
(ii) that cannot be circumvented by including documents which do not meet
that threshold condition in a class which also includes documents which do     *F*
meet that condition. Second, the test under the threshold condition is
whether the document is likely to support the case for the applicant or
adversely affect the case of one of the other parties. Third, when applying
that test it has to be accepted, and is not material, that some documents
which may then appear likely to support the case of the applicant or
adversely affect the case of one of the other parties will turn out, in the event,
not do so. Fourth, in applying the test to individual documents, it is     *G*
necessary to have in mind that each document has to be read in context; so
that a document which, considered in isolation, might appear not to satisfy
the test, may do so if viewed as one of a class. Fifth, there is no objection to
an order for disclosure of a class of documents provided that the court is
satisfied that all the documents in the class do meet the threshold condition.
In particular, if the court is satisfied that all the documents in the class,     *H*
viewed individually and as members of the class, do meet that condition—in
the sense that there are no documents within the class which cannot be said
to be "likely to support . . . or adversely affect"—then it is immaterial that
some of the documents in the class will turn out, in the event, not to support

A    the case of the applicant or adversely affect the case of one of the other parties.

    **39**   With those propositions in mind, we turn to consider the way in which the matter was addressed by the judge. After setting out paragraphs 33 and 34 in the judgment of Aldous LJ in the *Novartis* case [2001] FSR 784, 794, he said, at paragraph 78:

B       "From that passage two, possibly three, points emerge. Firstly, in paragraph 33 Aldous LJ was plainly not requiring it to be shown that the material of which disclosure was sought would support the applicant's case. It was enough that it was shown that it could. Secondly, in paragraph 34 Aldous LJ held, as I read his judgment, that a document may be relevant for the purposes of rule 31.17 because it places another document or documents in context, even though it may not itself contain anything which goes directly to the issues in the case. The third point

C    I offer with more diffidence. However it seems to me that Aldous LJ recognised that it would be a perfectly proper exercise of the jurisdiction to order disclosure of a class of documents some documents within which class might ultimately prove not to be documents which supported the applicant's case or damaged that of his adversary—that

D    I apprehend is what he intended to convey by putting the word relevant at the end of paragraph 34 in quotation marks so as to emphasise that some documents might not, although ordered to be disclosed, satisfy the test of relevance as it is spelled out in rule 31.17. The Court of Appeal must in my view be taken to have impliedly overruled the decision of Pumfrey J, relied on by Laddie J, to the effect that the court must be satisfied that all of the documents falling within the class are documents which satisfy the

E    requirements of rule 31.17(3)(a)."

    It will be apparent, from the propositions which we have already set out, that we endorse each of the three points identified by the judge. We comment, only, that the judge's reference to "the test of relevance as it is spelled out in rule 31.17", in the penultimate sentence of that passage, is not to be understood as a reference to a test of "likely to support . . . or adversely

F    affect" but—as the context shows the judge must have intended—to the different test that "relevant" documents are those which will in fact turn out to support the case for the applicant or adversely affect the case of one of the other parties. The judge's reference to "documents which satisfy the requirements of rule 31.17(3)" in the final sentence of that passage must be understood in the same sense. This court, as the judge appreciated, did not

G    hold in the *Novartis* case that there was power to order disclosure of a class of documents where not all the documents in the class satisfied the test of "likely to support . . . or adversely affect". The real difference between this court and Laddie J in the *Novartis* case, as it seems to us, is that this court did not accept Laddie J's view—based on a concession which he thought had been made—that some of the documents in Dr Wright's box were bound to turn out not to be "relevant" in the sense to which we have just referred.

H    This court was satisfied that, subject to an adjustment of the cut-off date, any and all of the documents in the box were likely to be "relevant".

    **40**   It follows that we reject the criticism that the judge failed to appreciate that the test "likely to support . . . or adversely affect" had to be applied to each individual document or, if the documents were to be

230
**Three Rivers DC v Bank of England (No 4) (CA)**                    [2003] 1 WLR

described as a class, to each document in the class.  We are satisfied that he    A
recognised the need to apply the test to each document in the classes with
which he was concerned.  The remaining question is whether he did so.

*Application of the test in this case*

41    It is important to keep in mind the circumstances in which the                B
scheduled material, identified in the order of 31 May 2002, came into
existence.  On 1 August 1991, shortly after his appointment as the person to
undertake the inquiry, Bingham LJ issued a press statement.  That set out the
terms of reference which determined the scope of the inquiry: "To inquire
into the supervision of BCCI under the Banking Acts; to consider whether
the action taken by all the United Kingdom authorities was appropriate and
timely; and to make recommendations."  The press statement invited
submissions and evidence:                                                          C

    "The inquiry is seeking assistance from the parties most directly
    involved in the supervision of BCCI but I am concerned to ensure that all
    reasonable lines of inquiry are pursued and to that end written
    submissions and evidence are invited from any party or member of the
    public with an interest in the subject matter of this inquiry."

                                                                                   D
Parties responding to that invitation were sent a statement of the procedure
which the inquiry proposed to adopt.  That statement contained the
following paragraphs:

    "1. An invitation is being extended to the public at large inviting
    written submissions and evidence.
    "2. Written evidence and documents are being and will be sought from
    the Bank of England, the Treasury and others who may be able to give        E
    evidence relevant to the inquiry's terms of reference.
    "3. Selected witnesses will thereafter be invited to give oral evidence."

As indicated in paragraph 2 of the statement of procedure, specific requests
for assistance on matters within the terms of reference were made to the
Bank, the Treasury and others.  We have been shown one of those requests;
and it is reasonable to assume that others were in much the same terms.          F

42    It is reasonable, also, to assume that those named in annex 1 to the
Bingham report as witnesses "who gave evidence to, or made observations
relevant to the terms of reference of, the inquiry; or otherwise provided
written material to the inquiry" did so in response to the request in the press
statement or to specific requests; and that the observations made and
material provided were (as requested) confined to matters relevant to the         G
terms of reference.  Further, it is reasonable to assume that those witnesses
who gave oral evidence were selected on the basis that the evidence which
they might give was of particular relevance; and that the interviews,
conducted by a judge as eminent and experienced as Bingham LJ, were
carefully focused.

43    The scheduled material can be seen as a single class; but a more          H
accurate analysis of that material is that it comprises a number of discrete
classes, each defined by the source from which the material comes, which
themselves comprise a number of discrete sub-classes, each defined by the
nature of the material supplied (for example, documents, submissions,
witness statements, transcripts of evidence).  The question for the judge,

231

[2003] I WLR                     Three Rivers DC v Bank of England (No 4) (CA)

A   therefore, was whether, in relation to each of the documents in each sub-class, the test of "likely to support . . . or adversely affect" was satisfied. If it were, then there can be no objection to an order for disclosure of all the documents in that sub-class (identified and described as members of that sub-class). Nor can there be objection to an order for disclosure of a class of documents comprising a number of such sub-classes.

B   44   The judge recognised that. He said, at paragraph 79:

"Although obviously on a very different scale the present case is in many ways similar to the patent case. The compilation of the archive by Bingham LJ may be said to be broadly analogous to the compilation of the box of documents by Dr Wright. Both were focused exercises. Just as in the patent case, so here, if disclosure is ordered the non-party will not be required to perform any critical judgment as to relevance—disclosure would be ordered on the basis that the identified part of the archive, for example the material supplied by and the evidence of the British Banker's Association, was required to be disclosed in its entirety."

C

D   After explaining in the first of the two paragraphs numbered 81 (in a passage set out earlier, in paragraph 10 of this judgment) that it was unnecessary in the very unusual circumstances of this case to demonstrate in relation to each and every document in each class how precisely it would support the claimants' case or damage that of the Bank or to eliminate the possibility that some of the documents might turn out on inspection to have no probative value, he went on to say, in the second of those paragraphs:

E   "As I have mentioned, during the course of the hearing Mr Pollock produced a request for disclosure which was limited to material emanating from persons who might reasonably be expected to have been imparting information to the Inquiry concerning supervision or what was known about BCCI in the banking community rather than information concerning the commission of crime."

F   He pointed out that there could and should be excluded from the request material emanating from the Bank (on the grounds that that would be disclosed in the course of inter-party disclosure) and continued:

"The list includes two persons without an adequate or any description of their role, Mr N Hodges and Mr S A Hussein. For the time being I exclude them from consideration also. Subject to those observations I regard the claimants as having satisfied in relation to this limited request for disclosure the jurisdictional requirement represented by rule 31.17(3)(a)."

G

It is clear that the judge had subjected both the original and the revised requests for disclosure to critical examination on a sub-class by sub-class basis and had satisfied himself that all the documents in each sub-class met the threshold test.

H   45   For the reasons which we have set out, we are satisfied that the judge directed himself correctly as to the test which the threshold condition imposed by rule 31.17(3)(a) required; that the evidence before him enabled that test to be applied; and that, in applying that test, the judge was entitled to reach the conclusion which he did. We dismiss the Treasury's appeal against the declaration in paragraph (3) of the order of 31 May 2002.

232
**Three Rivers DC v Bank of England (No 4) (CA)**          [2003] 1 WLR

*The claimants' appeal*                                                A

46   As we have said, Mr Pollock made it clear that, if the Treasury's
appeal were dismissed, his clients would be content to pursue their
objectives of disclosure and inspection under the application of 12 March
2002 and would not be pressing for a reversal of the judge's decision that the
Bank was not in control of the archive.  In those circumstances it would,
perhaps, be sufficient to say that we agree with the judge, for the reasons      B
which he gave.  Indeed, we are tempted to say no more than that, because we
find it difficult to think that any reasons which we might express would be
more compelling than his.   Nevertheless, in deference to the arguments
advanced in this court, we add some short observations of our own.
47   "Control" for the purposes of disclosure and inspection under
CPR Pt 31 is defined by rule 31.8(2), which we have set out earlier in this
judgment.  It is not suggested that the documents which comprise the archive    C
held by the Public Records Office at Kew are now in the physical possession
of the Bank.  To the extent that some of those documents may once have
been in the Bank's possession—that is to say, documents provided by the
Bank to the inquiry—the Bank accepts the obligation, subject to questions of
public interest immunity and confidentiality, to provide such copies as it has
retained.  That is not the area of dispute on this appeal.  The issue on this    D
appeal is whether, in respect of documents comprised in the archive of which
the Bank has never had physical possession, the Bank has a present right to
possession or a present right to inspect and take copies.
48   Mr Pollock accepts that the Bank had no right to possession of, or to
inspect or take copies of, those documents while they remained in the
possession of Bingham LJ—or, to put the matter a little more broadly, while
those documents remained in the possession of the "Inquiry", including in     E
that expression Mr R A D Jackson, the secretary to the inquiry, while acting
in that capacity.  To suggest otherwise would be to ignore the basis upon
which the inquiry was established and upon which material was provided
and evidence given to Bingham LJ—namely, that the inquiry was to be
"independent".  It is, we think, obvious that the independence of the inquiry
would have been compromised in the eyes of those who were invited to        F
provide material or give evidence if they had thought that sight of the
material which they were to provide or the evidence which they were to give
(which might well be critical of the Bank) could be demanded by the Bank.
49   Accepting that as the starting point, Mr Pollock submits that the
Bank's right to possession or right to inspect and take copies—or, as he put
it, "ownership"—of the archive material, arose on the conclusion of the
inquiry.  The difficulty is to explain how that occurred.  "Ownership", in so   G
far as it is a useful concept at all in this context, means no more than the right
to alienate or dispose, the right to possess to the exclusion of others or the
right from which others derive their rights to possess.  But there can be no
question, in the present case, of ownership or a right to possess reverting to
the Bank on the conclusion of the inquiry, or of the Bank's right "reviving",
because the Bank never had such a right before or during the inquiry.  For the
Bank to acquire a right on the conclusion of the inquiry, it is necessary to     H
postulate either (i) that someone with the right to dispose of the documents
(or of some relevant right in respect of the documents) did so in favour of the
Bank or (ii) that a previous owner abandoned the documents in
circumstances which enabled the Bank to acquire rights analogous to those

233

[2003] 1 WLR                    Three Rivers DC v Bank of England (No 4) (CA)

A  of a "finder". There is no factual basis for an analysis under either of those heads.

50   Those with a previous right to dispose of the documents included (i) those who provided the documents to Bingham LJ for the purposes of the inquiry and (ii) Bingham LJ himself, in so far as he generated the documents or received them in circumstances in which it may be held that the previous owner intended that he should thereby have the right to dispose of them. But
B  it is unnecessary to make the distinction because there is no basis for a finding that the previous owners or Bingham LJ (or Mr Jackson on his behalf) ever intended to dispose of the documents in favour of the Bank. The judge has set out, in detail, the memoranda of the meeting on 11 November 1992, attended by representatives of the Treasury, the Bank and the Public Records Office and by Mr Jackson, at which the future
C  arrangements for custody of, and control of access to, the archive were discussed and the correspondence which followed that meeting. The outcome of that meeting was a decision to transfer physical custody of the archive to the Public Records Office and to establish an ad hoc committee which would, at least in the medium term, control access to it. The Bank was to be represented on that committee; but there is nothing to suggest that it was to have more than a consultative role. In particular, there is nothing
D  to suggest that the Bank was, itself, to have any right to possess or to inspect the documents in the archive.

51   The judge accepted that it was difficult to be confident that any analysis of where "ownership" of the archive now lay was correct. We agree. We also agree that it is unnecessary to decide that question. The relevant question in the context of the present appeal is whether the Bank has a present right to possession or to inspect and take copies. The judge held that
E  the answer to that question was not in doubt. It was plain that the Bank did not have either of those rights. In our view he was correct to reach that conclusion; and in the light of that conclusion he was bound to hold that the Bank was under no obligation to disclose the archive.

*Conclusion*
F  52   Each of these appeals is dismissed.

*Appeals dismissed.*

*Solicitors: Treasury Solicitor; Freshfields Bruckhaus Deringer; Lovells.*

S L D
G

H