# EXHIBIT 15

# The RT Hon Dr Liam Fox MP v Harvey Boulter, Cabinet Office; Ministry of Defence, Adam Werrity

No Substantial Judicial Treatment

**Court**
Queen's Bench Division

**Judgment Date**
18 December 2013

Case No: HQ12D02414

High Court of Justice Queen's Bench Division

**[2013] EWHC 4012 (QB), 2013 WL 6536621**

Before: The Honourable Mr Justice Tugendhat

Date: 18/12/2013

Hearing dates: 5 December 2013

**Representation**

    Jonathan Barnes (instructed by Simon Smith ) for the Claimant.
    Matthew Nicklin QC (instructed by DLA Piper ) for the Defendant.
    Catrin Evans (instructed by The Treasury Solicitor ) for the The Cabinet Office and the Ministry of Defence.
    Jacob Dean (instructed by Manleys ) for Mr Werrity.

**Approved Judgment**

Mr Justice Tugendhat:

1. The trial of this libel action is listed to start on 3 February 2014, only a few working weeks away.

2. The parties, and the events giving rise to the action, were described by Bean J in his judgment handed down on 4 June 2013 (Neutral Citation Number [2013] EWHC 1435 (QB)) in which he determined the meanings of the words complained of.

3. The Claimant ("Dr Fox") is the Member of Parliament for North Somerset. From 12th May 2010 until 14th October 2011 he was Secretary of State for Defence.

4. The Defendant ("Mr Boulter") is a British businessman principally resident in Dubai (but who, according to the Particulars of Claim, also maintains a residence in the UK) and is Chief Executive Officer of Porton Capital Inc, a Cayman Islands based legal entity which conducts business in the UK, Dubai and other jurisdictions.

5. In June 2011 Mr Boulter was the subject of widely reported allegations ("the Allegations") which he has characterised as being to the effect that he was guilty, or there were strong grounds to suspect that he was guilty, of an unlawful campaign of blackmail against the US corporation 3M Co. in an effort to extort millions of dollars in settlement of a hopeless piece of litigation. The Allegations arose following Mr Boulter's sending of two emails to 3M's lawyers on 18th and 19th June 2011. The allegations were the basis of a civil claim for blackmail brought against Mr Boulter by 3M. The Defendant counter-sued 3M for libel in England.

6. Some months later Mr Boulter was interviewed by Sky News or Sky Television. Short extracts from that interview were broadcast on Sky News on 7th November 2011. A longer version was posted on Sky News' website, in a posting which remained there until it was removed in October 2012. Bean J's ruling on meaning has the effect that it is only the website publication which is now relevant to what I have to decide.

7. After Dr Fox's resignation the Cabinet Secretary, Sir Gus O'Donnell, had made a report to the Prime Minister in which he had said that Dr Fox had acted in breach of the Ministerial Code, and that, in particular, his

> "close and visible association with Mr Werrity in the UK and overseas and the latter's use of misleading business cards, has fuelled a general impression that Mr Werrity spoke on behalf of the UK Government".

**The Applications**

8. By his application notice dated 8 November 2013 Mr Boulter asks for an order for specific disclosure ( CPR r31.12 ) against Dr Fox. He also asks for non-party disclosure ( CPR r31.17 ) against three non-parties: The Cabinet Office, the Ministry of Defence and Mr Werrity.

9. The documents and classes of documents of which disclosure is sought against Dr Fox, The Cabinet Office and the Ministry of Defence are the same. They are set out in Annex A to the application notice. Annex A is headed "Documents in the Treasury Solicitor's Control". The Treasury Solicitor was initially named as a Respondent, but has been substituted by the Cabinet Office and the Ministry of Defence. Annex B is headed "Documents in Mr Werrity's control".

10. In so far as an order is sought against Dr Fox, it is an order that he list the documents. It is accepted for the purposes of the present application that he does not now have these documents in his control. Such control as he had of documents relating to his office as Secretary of State came to an end when he resigned from office. And documents in his Blackberry and other databases have been routinely destroyed.

11. The list of documents in Annex A includes 13 items, one of which has 10 sub-headings, but it is accepted now that item 1 does not exist. Annex A covers three pages. The list of documents in Annex B includes 9 items, and covers one page. The requests could hardly be more wide ranging. For example, Annex A para 5 reads:

> "All documentation, notes, memos and correspondence (including e-mails) in the period between January 2010 and November 2011, relating to:
>
>> 5.1 Mr Boulter, Porton Capital (and its associated entitles); Cellcrypt; 3M (and its associated entities); BacLite; Acolyte, and the blackmail proceedings issued by 3M against Mr Boulter;

> 5.2 the appointment or position of Mr Werrity as an advisor to the Claimant;
>
> 5.3 the arrangement of any meeting between the Claimant and Mr Werrity…"

12. The applications followed the exchange of lists of documents on 19 August 2013 and inspection on 27 August.

13. It is Mr Boulter's complaint that Dr Fox's list is defective in a number of respects. These include that he had omitted to list documents which fell within standard disclosure but were no longer in his possession. What he stated in the list in the part of the form relating to documents no longer in his control was entirely generic:

> "Documents, correspondence and emails lost or destroyed in the ordinary course of business which were last in the Claimant's control on the date of deletion or destruction".

14. It is Mr Boulter's case that he should list documents that are or have been in his custody or power or control, including those held by the MoD and the Cabinet Office. In particular, he should identify in his list documents that were referred to by the Cabinet Secretary in his report. But he accepts that a copy of that report has been disclosed by Dr Fox. There had also been another inquiry, by Ursula Brennan, Permanent Secretary to the MoD

15. Dr Fox's solicitors have said that he does not know what documents the MoD or Cabinet Office may have, but he raises no objection to Mr Boulter requesting documents from them. In

a letter of 4 October 2013 the solicitors for Mr Boulter identified a number of such documents, to which Dr Fox's solicitors replied that the requests were disproportionate and peripheral.

16.  On 31 October 2013 Mr Boulter's solicitors pursued their requests for disclosure with the Treasury Solicitor and Mr Werrity.

**The Law**

17.  The rules on standard disclosure are in the CPR , as follows:

> "31.6  Standard disclosure requires a party to disclose only–
>
> (a)  the documents on which he relies; and
>
> (b)  the documents which –
>
> (i)  adversely affect his own case;
>
> (ii)  adversely affect another party's case; or
>
> (iii)  support another party's case;..
>
> (1)   When giving standard disclosure, a party is required to make a reasonable search for documents falling within rule 31.6(b) …
>
> (2)  The factors relevant in deciding the reasonableness of a search include the following –
>
> (a)  the number of documents involved;
>
> (b)  the nature and complexity of the proceedings;
>
> (c)  the ease and expense of retrieval of any particular document; and
>
> (d)  the significance of any document which is likely to be located during the search.

> (3) Where a party has not searched for a category or class of document on the grounds that to do so would be unreasonable, he must state this in his disclosure statement and identify the category or class of document."

18. The application against Dr Fox is made pursuant to CPR r.31.12 which provides:

> "(1) The court may make an order for specific disclosure or specific inspection.
>
> (2) An order for specific disclosure is an order that a party must do one or more of the following things –
>
> (a) disclose documents or classes of documents specified in the order;
>
> (b) carry out a search to the extent stated in the order;
>
> (c) disclose any documents located as a result of that search."

19. Practice Direction 31 includes

> "5.4 In deciding whether or not to make an order for specific disclosure the court will take into account all the circumstances of the case and, in particular, the overriding objective described in Part 1. But if the court concludes that the party from whom specific disclosure is sought has failed adequately to comply with the obligations imposed by an order for disclosure (whether by failing to make a sufficient search for documents or otherwise) the court will usually make such order as is necessary to ensure that those obligations are properly complied with."

20. It follows from CPR 31.6 that in determining whether a document or class of documents has a potentially relevant bearing on one or more of the live issues in the case, the court should focus on the statements of case. The CPR is significantly different from the previous rules. As the court agreed in *Nichia Corp v Argos Ltd [2007] EWCA Civ 741* at paras 44ff, 68 and:

> "44  Following the Woolf reforms, and notwithstanding its changes, practitioners … carried on much as they did before. The cost of patent and large commercial actions did not reduce: if anything it went up. This was despite two important changes: the very important introduction into our scheme of civil procedure of the notion of proportionality, and a change in the nature of what documents are to be disclosed on a normal order for disclosure (formerly called discovery).
>
> 45  I start with the latter – the introduction of "standard disclosure". Prior to the CPR the test under the rules was that any document "relating to any matter in question" was discoverable. The courts took a very wide view of what was covered by this. The test was laid down a long time ago when no-one had the quantities of paper they have now. In the very well-known *Peruvian Guano case, (1882) 11 QBD 55* …
>
> 46  It is manifest that this is a much wider test than that for "standard disclosure." I have a feeling that the legal profession has been slow to appreciate this. What is now required is that, following only a "reasonable search" ( CPR 31.7(1) ), the disclosing party should, before making disclosure, consider each document to see whether it adversely affects his own or another party's case or supports another party's case. It is wrong just to disclose a mass of background documents which do not really take the case one way or another. And there is a real vice in doing so: it compels the mass reading by the lawyers on the other side, and is followed usually by the importation of the documents into the whole case thereafter – hence trial bundles most of which are never looked at.
>
> 47  Now it might be suggested that it is cheaper to make this sort of mass disclosure than to consider the documents with some care to decide whether they should be disclosed. And at that stage it might be cheaper – just run it all through the photocopier or CD maker – especially since doing so is an allowable cost. But that is not the point. For it is the downstream costs caused by overdisclosure which so often are so substantial and so pointless. It can even be said, in cases of massive overdisclosure, that there is a real risk that the really important documents will get overlooked – where does a wise man hide a leaf?

21. The application against the non-parties is made pursuant to CPR r.31.17 which includes:

> "(3) The court may make an order under this rule only where–
>
> (a) the documents of which disclosure is sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings; and
>
> (b) disclosure is necessary in order to dispose fairly of the claim or to save costs."

22. The meaning and effect of this rule is as follows. "Likely" in sub-rule 31.17(3)(a) means "may well": *Three Rivers DC v Bank of England (No 1) [2003] 1 WLR 210* . Disclosure against third parties should be regarded as the exception rather than the rule and not simply ordered by way of routine: see e.g. *Frankson v Home Office [2003] 1 WLR 1952* . The court has no power to make an order under CPR 31.17 in respect of a class of documents (the application in the present includes classes of document) where it is established that there are documents within the class not "satisfying the 'relevance' test": *Three Rivers District Council* , at [36].

23. The overriding objective which is set out in the CPR r.1.1 as follows (with the recently added words underlined):

> "(1) These Rules are a new procedural code with the overriding objective of enabling the court to deal with cases justly <u>and at proportionate cost</u> .
>
> (2) Dealing with a case justly <u>and at proportionate cost</u> includes, so far as is practicable –
>
> (a) ensuring that the parties are on an equal footing;

>   (b)  saving expense;
>
>   (c)  dealing with the case in ways which are proportionate –
>
>   (i)  to the amount of money involved;
>
>   (ii)  to the importance of the case;
>
>   (iii)  to the complexity of the issues; and
>
>   (iv)  to the financial position of each party;
>
>   (d)  ensuring that it is dealt with expeditiously and fairly;
>
>   (e)  allotting to it an appropriate share of the court's resources, while taking into account the need to allot resources to other cases; and
>
>   (f)  <u>enforcing compliance with rules, practice directions and orders</u> ."

24.  So, for the purpose of seeking to give effect to the overriding objective, it is necessary to have regard to what is at stake in the action, and to the positions of the parties to the applications.

25.  Mr Nicklin relies on the principle that in a libel action fairly disposing of the proceedings includes the need to avoid vindication of a claimant on a false basis: *Basham v Gregory* (unreported CA, 21 February 1996) . Ms Evans on the principle that it is the duty of the court to ensure, so far as possible, that the case is confined to the real issues between the parties, and so as to minimise the burden on litigants: *McPhilemy v Times Newspapers Ltd [1999] 3 All ER 775* . See Gatley on Libel and Slander 11th ed para 29.10 footnote 45, and para 29.36 footnotes 149–151.

**What is at Stake in this Action**

26.  I have little information about the positions of the parties to the action itself. But the other relevant matters have been considered by Bean J, and in submissions. In a libel action two of

the most important factors in determining the seriousness of any libel are the gravity of the allegation and the extent of the circulation.

27. Before Bean J Mr Boulter submitted that the natural and ordinary meaning of the website publication failed to surmount the threshold of seriousness which an allegation must surmount if it is to be held to be defamatory ( *Thornton v Telegraph Media Group Ltd [2011] 1 WLR 1985)* . Bean J rejected that submission saying (at para 30):

> "Of course this is not the gravest of libels by comparison with some which have come to court, but in my judgment it is not at all trivial."

28. In relation to the innuendo meaning Bean J said (at para 31):

> "That is plainly defamatory, and far from trivial."

29. Mr Nicklin records in his argument that figures made available from Sky suggest that the relevant page of the website show that the circulation in the period up to the time the words complained of were removed (October 2012) was to some 3,451 visitors to the relevant page of the website. He also notes that it was not until 4 June 2012 (that is over seven months after the first publication) that Dr Fox complained.

30. So, while words complained of contain an allegation which is far from trivial, at least in relation to the innuendo, the relevant number of publishees is relatively small. Overall, this is not the most serious defamatory allegation.

31. The words complained of in this action are:

> 'We plan on calling Dr Liam Fox and his pal Adam Werritty to give evidence in some of these ongoing legal disputes so they can tell the truth and so we can debunk these baseless allegations against me.
>
> This will also shine a spotlight on some of the murkier side of politics and lobbying and we need to get into some of those aspects in a little more detail.
>
> For instance, Atlantic Bridge, Fox's so-called charity which looks like a political lobbying group, and some of its connections into the US.
>
> I don't know what we will find at the moment but there are a lot of unanswered questions and until some of those questions are answered we will have to keep looking.…
>
> It does warrant some pretty hard questions being asked, and at some point they have to come forward and answer some of those tough questions.…
>
> They have stated they will be willing to come forth and give evidence in the US.
>
> I hope when they get there they can put their hand on the Bible and tell the truth – and I suspect they will be forced to come if they do not do it willingly".

32. The defamatory meaning of these words, both in their natural and ordinary meaning, and in their innuendo meaning was determined by Bean J. The difference is that in the innuendo meaning there are the words in square brackets. It is:

> "that the Claimant was in a [unique] position to give evidence to debunk the baseless allegations [of blackmail] made publicly against Mr Boulter but had not done so; that although Dr Fox had previously said that he was willing to do so, Mr Boulter doubted it; and that if Dr Fox did not attend court voluntarily in the United States to exonerate Mr Boulter, then he would be forced to do so by legal process."

**The Relevant Issues in the Action**

33. The Particulars of Innuendo (from which it is alleged that the reader would understand the allegedly baseless allegation to have been one of blackmail) include a number of facts which are admitted in the Re-Amended Defence. In para 5.1 (incorporating para 3) of the Particulars of Claim it is pleaded that:

> "5.1 In June 2011 Mr Boulter was the subject of widely reported allegations ("the Allegations") which he has characterised as being to the effect that he was guilty, or there were strong grounds to suspect that he was guilty, of an unlawful campaign of blackmail against the US corporation 3M Co. in an effort to extort millions of dollars in settlement of a hopeless piece of litigation. The Allegations arose following Mr Boulter's sending of two emails to 3M's lawyers on 18th and 19th June 2011. The allegations were the basis of a civil claim for blackmail brought against Mr Boulter by 3M. The Defendant counter-sued 3M for libel in England. …".

34. What is admitted in the Re-Amended Defence is that "… in June 2011, 3M Co … secured publicity in the UK (principally in The Guardian newspaper) for allegations that Mr Boulter had attempted to blackmail 3M. … The allegations were the basis of a civil claim for blackmail brought against Mr Boulter by 3M. The Defendant counter-sued 3M for libel in England."

35. Other admitted facts are:

> 5.2 On 20 June 2011 the Guardian newspaper reported that Mr Boulter had been accused of blackmail by 3M. In particular, it was reported that Mr Boulter had sent two emails to 3M as part of settlement negotiations in respect of a legal dispute between Porton Capital, a company of which Mr Boulter was CEO, and 3M, and that 3M had alleged that those emails constituted blackmail. …

> 5.4  3M had sued Mr Boulter for blackmail immediately following receipt of the emails. The US attorneys for 3M sent a copy of the proceedings to the Guardian newspaper, and as a result the Guardian publicised the allegations in an article of 20 June 2011. The Defendant sued 3M for libel.
>
> 5.5  The dispute between Mr Boulter and 3M received further publicity …"

36.  Following the ruling on meaning Mr Boulter re-amended his Defence to include a plea of honest comment in addition to the existing plea of justification. Mr Boulter contends that in so far as the meaning includes the words "Mr Boulter doubted it" the defamatory allegation is an expression of opinion, and not fact. But the question whether the meanings are allegations of fact or of opinion has not yet been determined. So the alternative plea of justification is on the basis that if (which is denied) the meanings are statements of fact, then they are true. The pleaded particulars of fact upon which the comment is said to be based, and the particulars of justification are the same. These particulars are set out in 36 sub-paragraphs.

37.  It is not Mr Boulter's case that Dr Fox or Mr Werrity had gone so far as to tell him, in the words Mr Boulter wrote to 3M in the e-mail of 18 June (pleaded in para 6.24 of the Re-Amended Defence and para 2.9 Of the Amended Reply)

> "that David Cameron's Cabinet might very shortly be discussing the rather embarrassing situation of George Buckley's knighthood."

38.  So far as is material to the present applications, Mr Boulter's case as pleaded in the Re-Amended Defence is that there had been meetings between himself and Mr Werrity and Dr Fox, including the following:

  i)  (para 6.17) "At all stages, Mr Werrity held himself out, and was held out by [Dr Fox] as being, his advisor (whether official or 'Special' or otherwise ('Special Advisor') who was acting and was authorised to act on his behalf…"
  ii)  (para 6.19) in Dubai on 3 April 2011, when Mr Werrity "mentioned that he was aware of the BacLite litigation and that 'his boss' (ie [Dr Fox] was supportive of Porton's efforts to hold 3M to account…"

iii) (para 6.21) in Dubai on 15 June 2011, when Mr Werrity "commented that it did not look good for Mr Buckley to be knighted in the same week that 'we are in court with 3M' … [and told Mr Boulter] that he felt that it represented poor judgment on the part of the UK government to knight Mr Buckley at this time …". Mr Boulter further pleads that he "believed … and on the basis of Mr Werrity's position and his relationship with [Dr Fox] was entitled to believe and (it is to be inferred) was correct to believe that he was speaking for and on behalf of [Dr Fox]".

iv) (para 6.22) in Dubai on 17 June, at a meeting with Dr Fox that had been arranged by Mr Werrity, Mr Boulter "noted the irony that in the very month that George Buckley … would be revealed publicly in the litigation as the person who had 'pulled the plug' on BacLite he had received a knighthood".

39. However, in further information given in response to a request under CPR Pt 18 Mr Boulter made clear his case, namely that

> "the issue of Mr Buckley's knighthood had been discussed between Mr Boulter and Mr Werrity on 15 June 2011. There was not further discussion on 17 June 2011".

40. In the Defence (at para 6.34) Mr Boulter also pleads the Cabinet Secretary's report and that Dr Fox had stated that he accepted the conclusions of the Cabinet Secretary.

41. In the Amended Reply Dr Fox states that Mr Boulter had no honest belief in the truth of the assertions that he made, or the facts that would be necessary to support them. In particular, Dr Fox pleads (in para 2.9.2) that it was false for Mr Boulter to imply, in his e-mail to 3M, that Dr Fox would see to it that the UK government would shortly discuss Mr Buckley's knighthood with a view to it being taken away. He also pleads to paras 6.18 to 6.22 of the Defence over eleven pages, setting out his case as to the meetings in Dubai.

42. As to the April meeting, Dr Fox admits (at para 2.4.2) that Mr Werrity handed Mr Boulter a business card with "a crowned portcullis logo and a description of Mr Werrity as 'Advisor' to" Dr Fox. But he denies that Mr Werrity worked for himself, or for HM Government. Dr Fox

denies that Mr Werrity mentioned to Mr Boulter that he or Dr Fox was aware of the BacLite proceedings.

43. As to the 15 June meeting, Dr Fox pleads (amongst other matters, at para 2.6) that it was Mr Boulter who raised the matter of Mr Buckley's knighthood, that Mr Werrity expressed no meaningful view, and that there was no rational basis for Mr Boulter's contention that Mr Werrity was speaking for and on behalf of Dr Fox.

44. As to the 17 June meeting, Dr Fox pleads (amongst other matters, at para 2.7.4) that neither he nor Mr Werrity has any recollection of the issue of Mr Buckley's knighthood being mentioned by Mr Boulter, and he denies that Mr Werrity was his special adviser or official adviser.

45. In the Amended Reply (paras 2.21 and 2.22) Dr Fox admits the Cabinet Secretary's report and his statement that he accepted the conclusions. He denies that Mr Werrity was a special adviser (para 2.2). He denies that Mr Boulter could have been misled by Mr Werrity or himself as to Mr Werrity's position (paras 2.4.2 and 2.19).

46. According to the terms of the statement, quoted by Mr Nicklin in his skeleton argument, Dr Fox said on 9 October 2011 (shortly before his resignation on 14 October):

> "… I do accept that given Mr Werrity's defence related business interests, my frequent contacts with him may have given the impression of wrongdoing, and may also have given third parties the misleading impression that Mr Werrity was an official adviser rather than simply a friend."

47. From the foregoing it appears to me that the main issue between the parties on the matters pleaded in those paragraphs is what (if anything) was said or implied by Mr Werrity or Dr Fox to Mr Boulter about the knighthood for Mr Buckley, and, if anything material was said or implied, whether Mr Boulter (as opposed to anyone else) believed, and was led by Dr Fox or

Mr Werrity to believe, that what was said or implied was said or implied on behalf of Dr Fox and HM Government.

**The Cases for the Respondents**

48. In a witness statement dated 2 December 2013 Dr Fox states that in relation to documents formerly in his control, he does not know of individual documents that he can identify, it now being over two years since he resigned from office. He states that he had himself to make a Freedom of Information Act request to the current Secretary of State to obtain documents because he is not able to search for documents held by the Cabinet Office and the MoD. He submits that he has fulfilled his obligations as to disclosure.

49. Ms Evans for the Cabinet Office and the MoD submits that in the light of the narrow issues on the pleadings, it cannot reasonably be said that disclosure by her clients is necessary, and it would in any event be hugely disproportionate. Although they would be compensated financially in costs if they did carry out the tasks required, money would not be an adequate compensation. There are many demands upon the time of their lawyers, and if they were required to give the disclosure sought within a reasonable time before the trial of this action is due to start, that would disrupt their work on other litigation.

50. Mr Werrity's case is that the conditions for ordering non-party disclosure against him have not been met, and that even if they have, the court should not order disclosure as a matter of discretion. An order against him would be also an interference of his privacy rights, which would be unnecessary and disproportionate. The request is for documents going back to January 2010, but the factual disputes, such as they are, relate to a short period in April to June 2011. He also states that he has no staff, and would have to devote considerable time to searching for the documents now sought. But he has other commitments in the period up to the start of the trial and obliging him to engage in the exercise sought would be oppressive.

51. In oral argument Mr Nicklin accepted that the disclosure should relate to a period starting in May 2010, and he focussed his submissions on the documents that had been obtained for the purpose of the reports of the Cabinet Secretary and the Permanent Secretary. But he did not put forward amended versions of the Annexes to the draft Order.

**Discussion**

52. In the world of electronic data it is notorious that large numbers of documents are often generated even in relation to very limited matters. As a result identification and retrieval of documents within the meaning of r.31.6 is difficult and the significance of all but a very few documents is commonly very low. Given that Dr Fox and Mr Werrity were friends, who met often, and discussed matters which had nothing to do with this litigation, in my judgment, and on the material before the court as it now is, Dr Fox has conducted a reasonable search. In any event it would not be consistent with the overriding objective to order him to attempt to identify more documents.

53. The issues on the pleadings (to which the disclosure is said to be relevant) are now narrow. The disclosure sought is largely directed to Mr Werrity's position and business relationship with Dr Fox, as it was understood by Mr Boulter. The order sought would, in my view, be likely to cause the time and resources of the parties, and of the court at trial, to be directed away from the real issues between the parties, and to maximise the burden on the litigants and the court. I do not think it likely that my refusing to order the disclosure will lead to any vindication that Dr Fox obtains being on a false basis.

54. Of course, there is always a risk of a court reaching a result that is wrong in the sense that it is not the result that would have been reached if indefinite further resources had been devoted to the case. But it is not the law that unlimited resources are to be devoted to a case. If it were, then the burden on litigants would be such that many cases could not be brought at all, and justice (including any vindication to which a claimant might be entitled) would be denied on that account. It seems to me that the approach adopted by Mr Boulter in the applications now before the court pays no proper regard to the reforms in the law brought about by the CPR , or the considerations described by Jacob LJ in Nichia Corp v. Argos Ltd (supra).

55. In my judgment the disclosure orders sought are not necessary for disposing fairly of the action, and they would not save costs. The documents sought include classes of documents which are likely to include many which are outside the class of documents required to be disclosed in this case. The descriptions of the classes are too wide, and too vague. The exercise that the non-parties would be required to perform in the short period before the trial is due to start would be disproportionate, and, in the case of Mr Werrity, it would be oppressive.

**Conclusion**

56. For these reasons I dismiss Mr Boulter's applications.

Crown copyright