# EXHIBIT 16

**Court**
Chancery Division

**Judgment Date**
23 February 2000

**Report Citation**
[2001] B.C.C. 245

Chancery Division

Pumfrey J.

Judgment delivered 23 February 2000

*Disqualification of directors—Evidence—Disclosure of documents—Proceedings for disqualification of director of insolvent company—Doubt as to dates of company's insolvency and director's knowledge thereof—Director applied for order for production by bank of documents in relation to company—Order granted—Application by bank to set aside or vary order—Meaning of bankers's books—Whether class of documents ordered to be disclosed too wide as against non-party to disqualification— Bankers Books (Evidence) Act 1879, s. 9(2) ; Civil Procedure Rules 1998 (SI 1998/3132), r. 31.17, 34.2 .*

This was an application by the bank of an insolvent company in administrative receivership to set aside or vary an order made by the registrar under the Bankers Books (Evidence) Act 1879 that the bank disclose certain documents in relation to the company to its sole director for use by that director in proceedings against him under the Company Directors Disqualification Act 1986 .

The bank appointed administrative receivers to the company early in 1996. Following the receivers' report to the Secretary of State for Trade and Industry, disqualification proceedings against the director under the Company Directors Disqualification Act were commenced on 14 January 1998. The disqualification proceedings were based on several grounds including that the director caused and allowed the company to continue trading when creditors' claims were not being met as and when they were due. The director applied to the registrar under the Bankers Books (Evidence) Act for certain classes of documents to be disclosed by the bank to the director. The registrar made an order under the Act for the following classes of documents

to be produced by the bank: (1) notes of interviews between the bank branch manager and the director concerning the company's bank account between January 1995 and 18 January 1996 when the company ceased to trade; (2) all internal bank memoranda kept or made by the branch manager for that period; (3) all notes kept by the branch manager for that period of interviews or conversations concerning the company between the manager and a firm of accountants during the period from 1 September 1996 to the commencement of the disqualification proceedings on 14 January 1998; (4) the like entries made by the branch manager for the same period at the office of the Central Lending Services of the bank; and (5) the like entries and records kept at Central Lending Services by any of the bank's officials thereat during that period. The director had sought these documents to establish independent evidence of his knowledge of the company's financial state at the relevant time and the support it could or could not expect from the bank.

The bank objected to the order and applied to have it set aside or varied. The bank argued that it was an order that could not properly have been made under the Bankers Books (Evidence) Act 1879 . It argued further that although it was willing to produce properly identified documents, it was not prepared to undertake a general discovery exercise and that the classes of documents sought were objectionable either as a class to be produced pursuant to a witness summons to produce documents under the CPR 1998 (SI 1998/3132) ('CPR'), r. 34.2 or as classes which were too wide to be the subject matter of an order for disclosure against a non-party under CPR, r. 31.17 .

*Held* , granting the application in part:

1.  In the context of insolvency proceedings it was important that a director be given a proper opportunity to defend himself and so as a matter of principle it was desirable that relevant documents, wherever they might be, should be made available.

2.  However the bank was correct that no order could be made for disclosure under the *246 Bankers Books (Evidence) Act 1879 . By virtue of s. 6 of the 1879 Act no order under compulsion could be made in the case of a banker's book. The definition of banker's book in s. 9(2) included ledgers, day books, cash books, account books and other records used in the ordinary business of the bank. It was plain that none of the classes of documents in the order made by the registrar included entries in ledgers, day books, cash books or account books. The words 'other records used in the ordinary business of the bank' were to be construed eiusdem generis with the earlier words in s. 9(2) to cover records of the same kind as ledgers, day books etc. which were the business by which a bank recorded day-to-day transactions. The words were not apt to cover conversations between employees of the bank, however senior, and customers

and the records in the present case were essentially the records of meetings which could not be properly regarded as entries in the bank's books for the purpose of its ordinary business. The registrar's order was one that could not have properly been made in relation to the classes of documents under the 1879 Act.

3. The court could order disclosure by a non-party to proceedings under the CPR, r. 31.17(3) where the documents sought were likely to support the case of the applicant or adversely affect the case of one of the other parties and disclosure was necessary in order to dispose fairly of the claim or save costs. The jurisdiction to make such an order should be exercised with some caution and where, as here, it related to a request for a class of documents it was necessary for the court to be satisfied that the requirements of r. 31.17(3) were complied with. The only class of documents sought that fell within these requirements were records of specific interviews between the director and the bank branch manager and an order for disclosure should be made in relation to three interviews identified. The other classes of documents set out in the registrar's order were too wide for an order under r. 31.17 , primarily as it could not be said with certainty that they would support the case of the applicant director or adversely affect the case of one of the other parties, and the order should not have been made in relation to them.

4. Disclosure of the specified documents above could also be ordered under r. 34.2 but it was preferable to make the order under r. 31.17 as above.

**The following cases were referred to in the judgment:**

*Panayiotou v Sony Music Entertainment (UK) Ltd* [1994] Ch 142 .
*R v Dadson* (1983) 77 Cr App R 91 .
*Williams v Williams* [1988] QB 161 .

## Representation

Nigel Dougherty (instructed by Norton Rose ) for the applicant bank.
Ian McCulloch and Nigel Brockley (instructed by Coles Miller , Poole) for the respondent.

## JUDGMENT

Pumfrey J:

This is an application by HSBC Bank plc ('the bank') to set aside or vary an order made by Mr Registrar Rawson under the Bankers Books (Evidence) Act 1879 . The order was made in the context of proceedings under the Company Directors Disqualification Act 1986 which have been brought by the Secretary of State against Christopher Paul Reynard at whose application Mr Registrar Rawson made his order. Mr Reynard was the sole director of a company called Howglen Ltd, which traded in the provision of adventure holiday services for children and young people among others. The application under the Company Directors Disqualification Act 1986 is made pursuant to a notification to the Secretary of State by the administrative receivers appointed by the bank under a debenture. The appointment took place in early 1996.

In support of the Secretary of State's application, an affidavit has been sworn by one of the administrative receivers, Mr Peter Brian Buckle, setting out the heads by reference to which it *247 is contended that Mr Reynard is unfit to be involved in the management of a company. The heads are as follows:

(a) that he caused and allowed the company to continue trading when creditors' claims were not being met as and when due;
(b) that he failed to ensure that the company provided holidays which had been paid for in advance;
(c) that he caused and allowed company moneys to be misused;
(d) that he caused and allowed a company vehicle to be misappropriated;
(e) that he was in breach of his fiduciary duty to both the company and to its creditors;
(f) that he drew excessive remuneration and benefits from the company;
(g) that he failed properly to deal with income tax affairs;
(h) that he failed to ensure that the company complied with s. 221 and 222 of the Companies Act 1985 by failing to maintain adequate accounting records;
(i) that he caused and allowed the company to be in breach of trading standards legislation;
(j) that he caused and allowed the company to be in breach of health and safety requirements; and
(k) finally, that he failed fully to cooperate with the administrative receivers in the administrative receivership as required by s. 235 of the Insolvency Act 1986 .

The application to Mr Registrar Rawson was made under the Bankers Books (Evidence) Act for certain classes of documents, and the registrar made an order under the Act for the following classes of documents to be produced by the bank under the Act:

(1) all notes of interviews between the branch manager of the bank and Christopher Paul Reynard concerning the bank account of the company and/or its conduct between 1 January 1995 and 18 January 1996 – I add that 18 January 1996 was the date on which the company ceased to trade;

(2) all internal memoranda kept by or made by the said manager for the said period;
(3) all notes kept by the said manager for the said period of interviews or conversations between himself and Coopers & Lybrand relating to the affairs of the said company for the period 1 September 1996 and the date of commencement of disqualification proceedings – I should add that the date of commencement of disqualification proceedings was 14 January 1998, and Mr McCulloch, who appears on behalf of Mr Reynard, disclaimed any desire to see any documents after 18 January 1996;
(4) the like entries made by Mr Bob Dawe as in (1)–(3) above for the same period at the office of the Central Lending Services of the bank; and
(5) the like entries and records kept at the Central Lending Services by any of the officials of the bank thereat during the period mentioned.

Mr Bob Dawe is the man who became the branch manager for the company at the beginning of 1995.

The bank, who appear before me today by Mr Dougherty, object that this is an order which cannot properly be made under the Bankers Books (Evidence) Act 1879 . Secondly, the bank says that although it is willing to produce properly identified documents, it is not prepared to undertake a general discovery exercise and the classes of documents which are set out in Mr Registrar Rawson's order would be objectionable either as a class of documents to be produced pursuant to a witness summons to produce documents under the CPR 1998 (SI 1998/3132) ('CPR'), r. 34.2 or alternatively would be classes which are too wide to be the subject matter of an order for disclosure against a person not a party under CPR, r. 31.17 . Part of the discussion before me today has been directed to investigating the degree of overlap between these two provisions of the CPR .

*248

Before turning to the statutory provisions and to the provisions of the rules, however, I think it is convenient to find out why it is Mr Reynard thinks he needs the documents and what documents he has identified as existing. In support of the application to Mr Registrar Rawson, Mr Reynard's solicitor, Mr Senior, swore an affidavit. Having referred to the affidavits in support of the Secretary of State's application, Mr Senior says that the complaints relevant to the present application under the Bankers Books (Evidence) Act relate to grounds (a), (c) and (f) of the grounds set out in Mr Buckle's affidavit to which I have already referred. Mr Senior continues: 'Mr Reynard denies these allegations in his affidavit sworn on 23rd of [sic] 1998' and that is certainly true, and Mr Senior says this:

> 'He also alleges, and these are my firm's instructions, that this application for his disqualification is malicious and that the bankers to the company, then known as Midland Bank plc, had no need to appoint receivers over its undertaking.'

Mr Senior continues:

> 'Thus these issues inter alia will arise in the application for disqualification. The evidence and documents sought from the bank on the present application are relevant to these issues, in particular to the appointment of the receivers and the knowledge of Mr Reynard as to the financial state of the company, and the support it could or could not expect from the bank in the circumstances in which it traded in the year 1995.'

Mr Senior then deposes that the evidence from the bank's records being the only, as he puts it, independent evidence of the history of the matter, makes it necessary that Mr Reynard be given facilities to inspect the documents and entries which are set out.

In relation to each of the grounds (a), (c) and (f), in the end it was accepted by Mr McCulloch, in my judgment absolutely rightly, that grounds (c) and (f) were not really capable of supporting an application for disclosure on any orthodox basis. I can therefore concentrate upon ground (a) as it is set out in Mr Buckle's affidavit, and this ground is simply a complaint of trading while insolvent. Mr Buckle refers to para. 21–40 of his affidavit as supporting this allegation. Paragraphs 21–36 do not seem to me to have anything to do with the activities of the bank at all, and para. 37–40 all refer to the activities of the bank.

So it is said in para. 37 that Mr Reynard met with a branch manager of the Midland Bank, Mr Dawe, on 18 October 1995 at which it would seem, as Mr Buckle alleges, that Mr Reynard was told that the company was insolvent. In para. 38 he refers to a letter of 25 November 1996 written by one Mr Sargent, the then accountant to the company, which confirms, as Mr Buckle alleges, that the subject of insolvency had been raised by Mr Dawe, the then bank manager, and

that Mr Reynard had been advised to review his current position in regard to his responsibilities as a director. Mr Buckle deposes that notwithstanding the meeting of 18 October 1995 and the other indicators of the company's financial difficulties, the company continued to trade, incur credit and receive deposits from creditors until January 1996. Indeed, he says, a schedule of deposit creditors at the date of his appointment shows deposits being accepted both on and after 18 October 1995 totalling something in excess of £150,000. Mr Buckle then refers to cashflow difficulties in the company and concludes this section of his affidavit by saying that:

> 'Further and in spite of these difficulties Mr Reynard caused and allowed the company to continue to take deposits from creditors, even after a meeting with the company's accountant and bank manager at which he was given advice on the financial state of the company, and given the Respondent's conduct in this manner he caused the company to trade at the risk of its creditors.'

Mr Reynard's answer to this is that not only did he not believe that the company was insolvent but that he believed he was trading at the material times if not with the active encouragement of the bank at least with the knowledge of the bank and without any warning as to the consequences of trading whilst insolvent. That is not a matter upon which I can make any comment at all.

*249

It seems to me clear, however, that in the context of disqualification proceedings it is important that the respondent be given a proper opportunity to defend himself. It seems therefore to me as a matter of principle that it is desirable that relevant documents, wherever they may be, that are relevant to the case, be made available.

The real objection of the bank in the present case, as I have said, is that no such order as has been made could conceivably be made under the Bankers Books (Evidence) Act . With this contention I agree. My reasons are as follows. As is well known, by s. 3 of the Bankers Books (Evidence) Act 1879 the copy of any entry in a banker's book shall in all legal proceedings be received as prima facie evidence of the entry, and of the matters, transactions and accounts therein recorded. The proof of the entry is an entry which is given either orally or by an affidavit and the copy can be verified in a similar manner. In the case of a banker's book, no subpoena duces tecum or like order can be made by virtue of the provisions of s. 6 of the Act, and the definition of banker's book is provided by s. 9(2) as follows:

> 'Expressions in this Act relating to bankers books include ledgers, day books, cash books, account books and other records used in the ordinary business of the bank whether those records are in written form or are kept on microfilm, magnetic tape or any other form of mechanical or electronic data retrieval mechanism,'

the more modern words having been added by amendment, I believe, most recently in the Banking Act 1979 .

It is plain that none of the classes of documents in the order made by Mr Registrar Rawson include copies of entries in ledgers, day books, cash books, account books, and I am therefore concerned only with the meaning of the words 'other records used in the ordinary business of the bank' in its context in s. 9(2) . If the matter were free from authority, I should be inclined to the view that these words should be construed restrictively. It seems to me clear that the purpose of the statute is to provide a convenient mode of proof for documents inherently probative of particular facts, and for this purpose one can refer to s. 3, 4 and 5 . However, the matter is not free from authority.

In *R v Dadson (1983) 77 Cr App R 91* the question arose whether letters in a bank's correspondence file were bankers books within the definition of s. 9(2) . In the judgment of the Criminal Division of the Court of Appeal Heilbron J said this at p. 93 of the report:

> 'Whilst the Bankers Books (Evidence) Act enables evidence to be admissible in a court by the production of copies rather than originals, it does so provided only that the book, one of the types referred to in that section, is one of the ordinary books of the bank and the entry was made in the ordinary course of banking business. It is therefore manifest that these letters could not be brought within the clearly expressed language of that Act. They are not bankers books, and in the judgment of this court they should not have been admitted. Furthermore, the emphatic references to those letters in the summing-up were in fact an invitation to the jury, if they were so minded, to rely upon them as material evidence to prove that the Appellant knew that he was not entitled to have an overdraft and so to infer that he falsely and dishonestly represented that he was authorised and

> entitled to use the cheque card when issuing the various cheques, and in our judgment they were misdirections and the verdicts cannot stand.'

In *Williams v Williams [1988] QB 161* the Master of the Rolls, Sir John Donaldson, was confronted with the problem of a request for paid cheques and credit slips relating to specified accounts with a named bank. In his judgment, with which Parker LJ and Sir George Waller agreed, having reviewed the history of the Bankers Books (Evidence) Act and its amendment, he said this (at p. 168D), after dealing with the bank in question's policy in relation to the retention of cheques and paying–in slips:

> 'In this situation Mr Ryder, appearing for the applicant, has to submit, and does submit, that the bundles of cheques and paying-in slips constitute bankers' books within the modern definition and that adding each cheque or paying-in slip to the bundle constitutes making an entry in those books. Whilst I would be prepared to accept that the *250 cheques constitute part of the bank's records used in the ordinary business of the bank …, I am quite unable to accept that adding an individual cheque or paying-in slip can be regarded as making an "entry" in those records. Putting the matter in another way, "other records" in the new definition has, I think, to be construed ejusdem generis with "ledgers, day books, cash books and account books" and unsorted bundles of cheques and paying-in slips are not "other records" within the meaning of the Act.'

I take this case as clear authority that the words 'other records' have to be construed to cover records of the same kind as ledgers, day books, cash books and account books, which are, as is well known, the means by which a bank records day to day financial transactions. The words are not, it seems to me, apt to cover records kept by the bank of conversations between employees of the bank, however senior, and customers. The records in the present case are essentially the records of meetings, and it seems to me that those sort of notes of meetings cannot be properly regarded as entries in books kept by the bank for the purpose of its ordinary business within the definition of s. 9(2) .

Accordingly, I have come to the conclusion that the order which was made by Mr Registrar Rawson was not an order which could have been made correctly in relation to these classes of documents under the Bankers Books (Evidence) Act 1879 as amended. However, I will not leave the matter here. Since the respondent is present, and since it is plain that the bank are willing to produce documents which are clearly identified, it seems to me that it is necessary to review the state of the evidence as it presently stands and to see what documents can be identified which, falling within the classes of Mr Registrar Rawson's order, it would be right to order the disclosure under CPR, r. 31.17 . I am going to leave the question of the effect of CPR, r. 34.2 to the end of this judgment.

CPR, r. 31.17 provides for disclosure by a person who is not a party to the proceedings. It says an application for an order for such disclosure must be supported by evidence and by r. 31.17(3) :

> 'The court may make an order under this Rule only where–
>
> (a)  the documents of which disclosure is sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings, and
>
> (b)  disclosure is necessary in order to dispose fairly of the claim or to save costs.'

and by r. 31.15(4) :

> 'An order under this rule must–
>
> (a) specify the documents or the classes of documents which the respondent must disclose; and
>
> (b) require the respondent, when making disclosure, to specify any of those documents–
>
> (i)  which are no longer in his control; or
>
> (ii)  in respect of which he claims a right or duty to withhold inspection.'

Rule 31.17(5) deals with whether the respondent is also to state what happened to any of the documents no longer under his control and make provision for inspection.

Before looking at this provision in any more detail, it should also be noted that under CPR, r. 48.1(2), which deals with costs in special cases, where an order is sought under s. 34 of the Supreme Court Act 1981 which an order for discovery against a non-party is, then the general rule is that the court will award the person against whom the order is sought his costs of the application and of complying with an order made on the application.

It seems to me that, notwithstanding the provision as to costs, the jurisdiction to make an order against a non-party must be exercised with some caution. There is no doubt that an order in respect of specific documents presents no difficulties. However, in respect of a request for a class of documents it seems to me that notwithstanding the provision which I have read relating to the costs of the application and of compliance with any order made pursuant to it, it is *251 nonetheless necessary to be satisfied that there are documents falling within the classes which are specified and those documents are – not may be – documents in relation to which disclosure will support the case of the applicant or adversely affect the case of one of the other parties to the proceedings.

It does not seem to me to be right in the case of a non-party to impose the additional duty of satisfying itself as to those matters when it has no access either to the pleadings in a case or to such evidence as there may be. In other words, where the court makes an order for disclosure of a class of documents against a non-party under CPR, r. 31.17 the court must be satisfied that all the documents falling within the class are documents which satisfy the requirements of r. 31.17(3). It is not appropriate to leave the non-party with the duty of making up its mind whether they do or not.

Equally, it seems to me that the court must be satisfied that the documents do in fact exist, since it is not right to send the non-party off on a search before it can satisfy itself that no such documents do in fact exist.

In the present case, three occasions have been identified, looking at the evidence as a whole, in which it is clear that Mr Reynard was in contact with his local manager, who was probably Mr Dawe but may not have been. These occasions are, first, some date in July 1995, secondly, the 18 October meeting which is referred to in Mr Buckle's affidavit, and thirdly, the Friday before 20 November 1995, a date which can be ascertained by reference from a letter from Mr Dawe to Mr Reynard, exhibited to Mr Reynard's second affidavit in the proceedings. It seems to me that it is plain that the bank will have a record of each of those individual meetings. It seems to me plain that the bank ought to produce it. I am satisfied that to that extent at least an order for disclosure against the bank ought to be made.

However, I am equally satisfied that each of the classes of documents set out in the order of Mr Registrar Rawson is far too wide for an order under CPR, r. 31.17 . So far as the first class is concerned, other than the meetings to which I have referred, there is no evidence of there ever having been any other interview. The second class is all internal memoranda kept or made by the manager for the said period. That seems to me to be too wide. On the face of it, it relates to irrelevant matters, and is secondly a class of which it cannot be said with any certainty whether the documents either adversely affect the case of one of the parties to the proceedings or are likely to support the case of the applicant. It is therefore a class which is too wide under CPR, r. 31.17 and is not an order which should be made.

The third class – all notes kept by the manager for the said period of interviews or conversations between him and Coopers & Lybrand relating to the affairs of the company – seem simply to fail again to satisfy the requirements of r. 31.17(3) . It cannot be said that either these documents support Mr Reynard's case or adversely affect the case of the Secretary of State. Such a class of documents is plainly a fishing class and is too wide.

The fourth class I do not need to deal with since the order was made upon the assumption that there was more than one bank manager than Mr Dawe. The fifth is a very wide class – like entries and records kept at the Central Lending Services of the bank during the period mentioned and for the same reason as I have given in relation to the other classes, it is too wide, does not satisfy the requirements of r. 31.17(3) and is not an order which should be made. I come to the conclusion therefore that, whatever the outcome of the application under the Bankers Books (Evidence) Act , only the documents I have identified should be disclosed.

I now turn briefly to the question of a witness summons requiring the witness to produce documents. Such a summons is issued under CPR, r. 34.2 . It appears at first sight to be a

summons which is to all intents and purposes the same as a *subpoena duces tecum* . It is made clear by the judgment of Sir Donald Nicholls V-C, as he then was, in *Panayiotou v Sony Music Entertainment (UK) Ltd [1994] Ch 142* , that no order will be made in relation to a subpoena which involves the witness in an unduly burdensome effort in obtaining documents. Generally speaking, the principles applicable to a *subpoena duces tecum* are the same, as I understand it, *252* as those applicable to letters of request to a foreign court, and would be limited to specific identified documents. Accordingly, the provision of CPR, r. 34.2 is probably narrower in its scope than the provisions relating to discovery against non-parties.

Indeed, it is not clear to me in the light of provisions relating to discovery by non-parties why a summons under r. 34.2 for the production of documents should be made, the more so since it is likely, as I understand it, that a witness attending under CPR, r. 34.2 is likely only to obtain conduct money and his expenses and will not obtain an order for costs corresponding to the order for costs which will be obtained under CPR, r. 48.1 to which I have referred.

In fact the specific documents which I have identified would be suitable for an order either under CPR, r. 31.17 or under CPR, r. 34.2 but in my judgment it is preferable the order be made under r. 31.17 , which is what I propose to do. Accordingly, this application succeeds to the extent which I have mentioned, and there will be an order for disclosure of the specific documents which I have identified against the bank unless the bank will give an undertaking to produce them within a brief period.

*(Order accordingly)* *253*